# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT ~~OF CHANCERY OF~~
~~FOR~~ THE ~~STATE~~DISTRICT OF DELAWARE
~~IN AND FOR NEW CASTLE COUNTY~~

| | | |
|---|---|---|
| JEFFREY M. NORMAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 06-005-UNA |
| | : | |
| DAVID W. ELKIN, RICHARD M. SHORIN | : | |
| and THE ELKIN GROUP, INC. | : | Jury Trial Demanded |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| US MOBILCOMM, INC., | : | |
| | : | |
| Nominal Defendant. | : | |

### AMENDED COMPLAINT

Plaintiff, Jeffrey M. Norman, by and through his undersigned counsel, brings this amended complaint against defendants David W. Elkin, Richard M. Shorin, The Elkin Group, Inc. and US MobilComm, Inc., and alleges as follows:

### Introduction

1.    This action seeks redress for the wrongful and inequitable conduct of the sole director and majority stockholder of a closely-held corporation US Mobilcomm, Inc. ("USM" or the "Company"). Through abuse and neglect of his position with the Company, David W. Elkin ("Elkin") undertook a course of conduct that completely eviscerated the Company of its working capital and substantial assets. Elkin so grievously misused and disregarded the corporate structure of the Company as to render it an *alter ego* of his own self-interested pursuits. As a result of this conduct, Elkin benefited his own interests to the detriment and expense of the only other Company stockholder, Jeffrey M. Norman ("Norman"). This Amended Complaint seeks to remedy the following wrongs done to the Company and to Norman, directly: (i) breach of

contract; (ii) declaratory relief; (iii) usurpation of a corporate opportunity; (iv) breaches of Elkin's fiduciary duties of loyalty, care and good faith dealing to the Company and its minority stockholder; (v) breach of Elkin's fiduciary duty of disclosure; (vi) conversion and misappropriation of Company assets and goodwill; (vii) fraudulent representations; (viii) aiding and abetting breaches of fiduciary duties; and (ix) unjust enrichment.

Through his Amended Complaint, Norman seeks compensatory, rescissory or restitution damages, the imposition of a constructive trust over those assets or proceeds from assets rightfully belonging to the Company, an equitable accounting of all Company assets, a declaration as to ownership interest and distribution rights, the forfeiture of some or all of Elkin's interest in the Company, the appointment of a custodian to windup the Company, attorney fees and both pre- and post-judgment interest.

## Parties

2.    Jeffrey M. Norman ("Norman") is an individual and stockholder of USM. Norman is a citizen of the State of Connecticut, residing at 202 Weed Street, New Canaan, Connecticut.

3.    Elkin is an individual, stockholder, President and sole director of USM. Elkin is a citizen of the Commonwealth of Pennsylvania, residing at 805 Bryn Mawr Avenue, Newtown Square, Pennsylvania. Elkin is being sued in both his individual and fiduciary capacities.

4.    Richard M. Shorin ("Shorin") is an individual residing at 255 Ridings Way, Ambler, Pennsylvania. Upon information and belief, Shorin was an officer of the Company serving as its chief financial officer and assistant secretary.

5.    The Elkin Group, Inc. (the "Elkin Group") is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 805 Bryn Mawr Avenue, Newtown Square, Pennsylvania. The Elkin Group is wholly-owned and

2

controlled by Elkin and engages in a number of endeavors, including the acquisition and sale of Federal Communications Commission ("FCC") licenses.

6.      Nominal defendant USM is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 805 Bryn Mawr Avenue, Newtown Square, Pennsylvania. USM is or was the owner of, *inter alia*, (i) a number of FCC 220 MHz licenses and systems, and (ii) various equipment and signal stations used to effectuate and commercialize these FCC licenses.

## Factual Allegations

A.   Agreement to Acquire an Interest in USM

7.      In May 1994, Norman contributed a total of $250,000 for a 25% interest in the Company.

8.      Norman contributed this amount given Elkin's agreement that he would contribute an additional $750,000 in cash to the Company.

9.      In December 1994, Norman received a 25% interest (125 shares) in the Company for the cash payment of $.01 per share, the receipt of which was acknowledged by the Company. Norman continues to own these 125 shares. At that time, Elkin received an additional 275 shares to bring his total interest in the Company to 75%.

10.     From 1993 through and including 1996, Norman worked on behalf of the Company to negotiate and enter into management agreements with other FCC 220 MHz license holders. Pursuant to the terms of the Company's model management agreement, USM generally acquired an ownership interest in the negotiated licenses and was paid a monthly management fee of not less than $1,500.00 for services provided to the licensee.

11.     Upon information and belief, as of late 1996, the Company possessed (by way of either complete or partial ownership) approximately 50 licenses in states including New York,

3

Pennsylvania, Maryland, Florida, Massachusetts, Illinois, California, Texas, Connecticut, Wisconsin and the District of Columbia.

B.    Proposed $6 Million Transaction with Centennial Communications

12.    As of March 1997, USM had assets that encompassed at least 217 channels of 220 MHz spectrum throughout the United States. USM owned at least 45 licenses outright and the remaining 172 licenses were under management agreements.

13.    In or around May 1997, the Company was presented with a proposed transaction with Centennial Communications Corporation ("Centennial"). The proposed transaction contemplated a sale of all assets of USM for the sum of $6 million in total consideration, including $5 million in cash and a $1 million promissory note.

14.    The proposed Centennial transaction did not encompass any later-acquired Phase II FCC licenses. Upon information and belief, had the Centennial transaction included the later-acquired Phase II licenses, the transaction price would have been significantly higher.

15.    Elkin, as President of the Company, signed a letter of intent pursuant to the terms of the proposed transaction. Shorin assisted Elkin in his efforts, if any, to ascertain the propriety of the proposed transaction. The transaction with Centennial was never ~~consummated.~~consummated.

16.    Despite the fact that the Centennial transaction did not close, USM proceeded on its course to fully develop its market presence and make use of its incumbency position as a Phase I license holder in the areas covered by the 217 channels.

C.    Proposed 1998 Merger with Incom Communications Corporation

17.    Sometime around the first quarter of 1998, Elkin engaged in merger discussions with Incom Communications Corporation ("ICC").

4

18.     As part of the merger discussions, the companies engaged the services of an independent valuation expert to assess the value of each party to the proposed merger.

19.     As of January 1998, USM's licenses were valued at approximately $5.5 million. USM's subscribers and equipment were valued at an additional $1.1 million. As calculated by the independent valuation expert, USM's total asset and income value in January 1998 was in excess of $6.6 million.

20.     In a February 2, 1998 letter from Elkin to ICC, Elkin noted that as of January 1998, the Company had approximately $1.15 million in accrued management fees receivable. Elkin indicated that this value should be added to the total $6.6 million value calculated in January 1998. Accordingly, by Elkin's own calculations and estimate, USM had a value in excess of $7.6 million in 1998.

21.     Given this valuation, Elkin proposed a merger with ICC in which USM would receive a 25% interest in the surviving entity.

22.     The merger was never consummated and the Company's stockholders never fully recognized its $7.6 million value. Just as with the proposed Centennial transaction, the Company's valuation did not take into account any added value the Phase II licenses would bring to the Company.

D.     Elkin's Self-Dealing During the FCC Phase II License Auction

23.     As part of the FCC's continuing effort to expand and enhance the 220 MHz spectrum, it scheduled what was referred to as Phase II auctions. Whereas the Phase I licenses were distributed through a lottery system, the Phase II licenses were to be auctioned off by the FCC. The Phase II licenses covered a greater area than the Phase I licenses and offered other advantages over the Phase I licenses. Given this wide area coverage, certain Phase II licenses would encroach upon pre-existing Phase I licenses. In an effort to protect the interests of Phase I

license holders, the FCC developed rules through which incumbent Phase I license holders were afforded protection during the Phase II auctions. *See* 47 C.F.R. § 90.763 (1997).

24.     In order to bid on Phase II licenses, companies were required to become qualified bidders with the FCC. Companies were required to substantiate the wherewithal to construct base stations for transmission and thereafter develop the 220 MHz licenses for which they were bidding. Moreover, the bidders had to post an upfront payment sufficient to cover the licenses the company anticipated bidding on during the auction. *See* 47 C.F.R. § 90.733 (1997).

25.     USM was identified in FCC Public Notice DA 98-1787, dated September 4, 1998, as one of the only 54 qualified bidders for Phase II Auction No. 18. USM was eligible to bid on all licenses offered during Auction No. 18 and posted an upfront payment of $200,000. Shorin knew of the upfront payment made on behalf of the Company for the Phase II auction.

26.     USM was recognized as an incumbent licensee for Auction No. 18.

27.     As an incumbent, USM was afforded a level of protection under the FCC rules during the Phase II auction process. *See* 47 C.F.R. § 90.763 (1997). Amongst other requirements, bidders who won a Phase II license that covered an incumbent Phase I licensee's areas were required to: (i) locate their paging stations at least 120 km from the Phase I licensee's paging station (generally in a highly populated area as the Phase I licenses first served more urban areas) and (ii) limit the field strength of its base stations so as to not interfere with the Phase I licensees.

28.     The FCC 220 MHz auction rules were designed to protect incumbent Phase I license holders and businesses. The FCC-mandated location and signal strength requirements for any Phase II license were limited by the area that encroached upon a Phase I incumbent. In practice, this worked to chill the open bidding for Phase II licenses during the auction process where there was a strong incumbent position. In addition, the incumbent requirements also

6

diminished the overall value of the Phase II license when it was not owned in common with the Phase I license. As a result, when Phase I and Phase II licenses were bundled together, the value of these licenses to any potential purchaser was exponentially higher than if the licenses were owned, acquired or transferred separately.

29.    The Elkin Group was not an incumbent licensee for the Phase II Auction No. 18 and was unable to meet the FCC requirements for licensing.

30.    Bidding in FCC Phase II Auction No. 18 commenced on September 18, 1998.

31.    USM was ready, willing and authorized by the FCC to participate in Auction No. 18. Elkin never presented any counter position or alternative arrangement to the Company or its stockholders for consideration.

32.    The winning bidders for Phase II Auction No. 18 were announced on October 23, 1998 through FCC Public Notice DA 98-2143. The FCC recognized USM as the winning bidder for five (5) licenses following Phase II Auction No. 18. The five (5) licenses were located in the following geographic areas: two (2) licenses for Boston, Massachusetts; one (1) license for Washington, D.C.; one (1) license for Miami, Florida; and one (1) license for Sacramento, California.

33.    The Elkin Group is not identified as the winning bidder for any license awarded through the FCC's Phase II Auction No. 18.

34.    On or about November 6, 1998, USM submitted its final application Form 601 for the Phase II Auction No. 18. The November 6 filing date was the final day permitted under the FCC's rules for filing a bidder's Form 601 following the completion of the auction.

35.    In USM's November 6, 1998 Form 601, Elkin represented to the FCC that an amended Form 175 registration statement was submitted to the FCC on September 28, 1998,

7

which changed the name of the applicant for the Phase II Auction No. 18 from USM to the Elkin Group. Shorin was aware of and helped facilitate this purported change in registration.

36.    This purported change in registration occurred after Auction No. 18 had commenced, without notice or approval of the Company's stockholders and without any compensation whatsoever paid to the Company for the change.

37.    Upon information and belief, USM's $200,000 upfront payment to the FCC was: (i) used by the Company to pay for the Phase II licenses won at auction and later transferred to the Elkin Group, or (ii) applied on behalf of the Elkin Group to acquire the Phase II licenses won by USM but later issued to the Elkin Group.

38.    Upon information and belief, USM was never compensated nor reimbursed for the use or application of its upfront payment by the Elkin Group.

39.    Elkin, as assisted by Shorin, qualified the Elkin Group for the FCC's Phase II Auction No. 24. Elkin did not take steps to qualify USM as a bidder. Elkin, through the Elkin Group, bid on and was the successful bidder for at least one Phase II license in Auction No. 24.

E.    Elkin's Piecemeal Sale of USM Assets

40.    On March 4, 1999, the Company executed a Purchase and Sale Agreement with Repeater Network Spectrum Aq., Inc. ("Repeater") for the Company's sale of an unknown number of licenses to Repeater for the sum of $138,049.00. Despite the fact that the Phase II license for Miami (won by USM at the auction) was identified in the Repeater transaction, the sale figure only represented payment for Phase I licenses.

41.    At some point between 1999 and 2001, Elkin resolved, either overtly or *de facto*, to sell all or substantially all of the Company's assets.

42.    On January 30, 2001, the Company executed a Purchase and Sale Agreement with Roamer One, Inc. ("Roamer") for the Company's sale of six (6) Phase I licenses to Roamer for

8

the sum of $349,000.00. Certain other Phase II licenses were identified as having been or due to be transferred from the Elkin Group to Roamer. USM received no compensation for the transfer of the Phase II licenses to Roamer.

43.    On March 13, 2001, the Company executed another Purchase and Sale Agreement with Roamer, this time for the Company's sale of one (1) license to Roamer for the sum of $60,000.00. Certain other Phase II licenses were identified as having been or due to be transferred from the Elkin Group to Roamer. USM received no compensation for the transfer of the Phase II licenses to Roamer.

44.    As initially contemplated, the transaction with Roamer was to include the transfer of nine (9) Phase I licenses. There is one (1) Boston license (WPCY922) and one (1) Avon, Connecticut license (WPCW970) that have been represented as being sold (to Shepard McCready Partnership and KC Partners I, respectively). Roamer initially proposed to pay the Company at least $110,000 in total for the two licenses. Company check records depict a $30,000 payment in May, 2001 for the Boston license, which was in turn distributed to Elkin.

45.    Sometime during fiscal year 2001, a loan to a stockholder in the amount of $20,500, which was outstanding since at least 1997, was removed as a receivable from the Company's 2001 tax return. Norman did not knowingly borrow $20,500 from the Company nor did he ever personally receive any goods or services that would amount to $20,500 when he was working on behalf of the Company.

46.    Upon information and belief, sometime after 2000, Elkin sold all or substantially all of the remaining Company assets for sums unknown. Elkin's undertakings were without the aid of a diligent or effective process to ensure the maximization of stockholder value.

47.    Upon information and belief, Elkin abandoned other Phase I and Phase II licenses rather than first attempting to fully capitalize on their value to the Company.

9

48.     The above recited facts demonstrate that Elkin, as the majority stockholder and sole director, dominated the decision-making process to favor his own interests (both in equity and purported debt).

F.     The Elkin Group's Transfer of USM's Phase I and II Licenses

49.     Pursuant to the March 4, 1999 sale agreement with Repeater, the Phase II Miami license won by USM during Auction No. 18 was sold by the Elkin Group to Repeater.

50.     The Elkin Group or Elkin personally received at least $65,000 from Repeater for the Phase II Miami license.     Neither the Company nor Norman received any form of compensation for this transfer of assets.

51.     The January and March 2001 sale agreements with Roamer transferred certain Phase II licenses from the Elkin Group to Roamer.  Upon information and belief, the Phase II Boston licenses won by USM during Auction No. 18 were sold by the Elkin Group to Roamer.

52.     The Elkin Group or Elkin personally received at least $130,000 from Roamer for the two (2) Phase II Boston licenses.  Neither the Company not Norman received any form of compensation for this transfer of assets.

53.     Upon information and belief, in June 1999 Elkin negotiated the sale of three (3) Phase I licenses in New York City (and their associated equipment) to Elite Limousine Plus, Inc. ("Elite") for the sum of $312,500.  Norman is not aware whether this transaction ever closed or what was made of the three (3) New York City licenses.  Publicly available FCC records indicate that these licenses were either cancelled or expired.

54.     Beginning as late as 2001, Elkin knowingly cancelled or abandoned certain of the Company's Phase I licenses in an effort to further capitalize on the Phase II licenses sold by the Elkin Group to both Repeater and Roamer.  In practice, once the Phase I licenses were cancelled or abandoned, the incumbency position was lost and the Phase II license holder was no longer

10

under any obligation to comply with the FCC rules protecting incumbent Phase I licensees. *See* 47 C.F.R. § 90.763(c) (1997).

G.    Elkin's Attempt at a Cover-Up

55.    By letter dated December 3, 2002, Elkin informed Norman's counsel that the Repeater and January 2001 Roamer sales (citing an incorrect total of $479,708.00 when in actuality the total sale price was $487,049) went to pay various fees and expenses, including $380,588 for the "Repayment of Shareholder Loans." (*See* Exhibit A).

56.    Elkin's representation as to the total amount he received for the repayment of stockholder loans was false. Through certain discovery obtained by Norman, it appears that Elkin obtained at least $601,500 in repayment of stockholder loans. Indeed, USM accounting records clearly disclose that Elkin received approximately $450,600 in distributions in 2001, when Norman received none.

57.    Company records indicate that as of November 11, 2002 (a mere 22 days prior to his fraudulent representations to Norman), Elkin was paid the $601,500 amount from the total $665,240 in proceeds from the sales cited in his December 2002 letter.

58.    Through the December 2002 letter, Elkin knowingly: (i) misrepresented by at least $220,000 the amount he repaid himself for purported stockholder loans; (ii) misrepresented the sale price of the Boston licenses by approximately $185,000; (iii) withheld information he was under a duty to disclose concerning the Phase II licenses awarded in Auction No. 18; and (iv) withheld information he was under a duty to disclose concerning the March 2001 Roamer agreement as he could not substantiate the disbursement of funds from this agreement or the correct total transaction value of the Repeater and January 2001 Roamer sales.

59.    Elkin's fraudulent statements were willful, wanton and/or malicious.

60.    59. Elkin acknowledged, affirmed and further declared the substance of these fraudulent representations in sworn deposition and court testimony in an action brought under 8 *Del. C.* § 220, prosecuted by Norman in 2005. *See Norman v. US Mobilcomm, Inc.,* C.A. No. 849-N (Del. Ch.).

61.    60. In the December 2002 letter, Elkin instructed Norman's counsel that no further information would be made available regarding the two transaction because the Company had "entered into strict confidentiality agreements that bound USM [the Company] and anyone receiving information about the transaction from USM." (*Id.*). This representation was untrue and made with the intent that Norman would not pursue his inquiry regarding the disposition of the Phase II licenses.

62.    61. In and around December 2002, Norman made several telephonic requests of Elkin to provide him information concerning the Company's sales of assets. Each time, Elkin falsely detailed the number of transactions or refused to provide additional documentation on the transactions then known to Norman.

63.    62. Elkin concealed or otherwise misrepresented the complete and accurate portrayal of the Company's financial condition and his own self-dealing in an attempt to dissuade Norman from seeking to enforce his rights as a 25% stockholder of the Company.

64.    63. Shorin was aware of and aided Elkin's failure to accurately and completely disclose the terms of the Repeater and two Roamer agreements.

65.    64. Elkin's purported basis for the $380,588 repayment of stockholder loans was a Shareholder Loan Agreement dated as of September 1, 1995 (the "Loan Agreement").

66.    65. The Loan Agreement was an agreement by and between the Company and Elkin. Elkin signed on behalf of himself and the Company. Elkin does not recall exactly when

12

he created the Loan Agreement, but he does recall that it was created at least several months after the September 1995 effective date.

67.    66. The Company's tax returns from 1997 through the present do not indicate that the Company was indebted to any stockholder, let alone in an amount equal to or greater than $380,588.

68.    67. Elkin attempts to substantiate these stockholder loans through a recapitalization theory aimed at capturing expenses purportedly paid by Elkin on behalf of the Company and expenses the Company paid for its New York office.

69.    68. In practice, Elkin and Shorin would increase Elkin's paid in capital amount to capture overhead expenses paid by Elkin and $1,000 per month for use of Elkin's home as the Company office. Elkin and Shorin would decrease Norman's paid in capital amount to capture the Company's payment of overhead expenses for the New York office. In the final calculation used to substantiate the $601,500 paid to Elkin, no provision was made for the Company's previous estimate of $14,000 in expenses paid by Norman on behalf of the Company. These inconsistent maneuvers tended to overstate any changes in stockholder capital to the detriment of Norman.

70.    69. These steps were undertaken in violation of recognized Generally Accepted Accounting Procedures ("GAAP") practices and procedures.

71.    70. Upon information and belief, Shorin compiled, calculated and filed the Company's tax returns from 2002 to present. Accordingly, Shorin was aware of, aided in, and was complicit in Elkin's breaches of his fiduciary duty and fraudulent representations.

H.    Elkin's Unilateral Distributions and Capital Drawdowns

72.    71. The Company's financial records disclose revenue, in the aggregate, of approximately $890,000. The revenue was derived from management fees, the sale of Phase I

13

licenses, equipment and other miscellaneous assets. The $195,000 Elkin personally received from the sale of the Company's Phase II licenses (*See* F, *supra*) was not channeled through the Company's accounts and therefore is not included in the $890,000 gross revenue figure. In total, the Company realized at least $1.08 million in revenue through the sale of assets.

73. 72. Elkin caused a number of property distributions to be made by the Company to himself. These include: (i) an $82,000 distribution as noted in the Company's 2000 tax return (noted as $90,000 in the Company's check register); (ii) a $30,000 distribution in May, 2001 (noted as check #2988, dated May 2, 2001 in the Company's check register); (iii) a wire transfer for $190,000 on May 22, 2001; (iv) a $30,6000 distribution in July, 2001 (noted as check #3012, dated July 5, 2001 in the Company's check register); and (v) a wire transfer for $200,000 on August 22, 2001. (*See* Exhibit B (containing the background tax return and check register pages)). These amounts do not, on their face, implicate or encompass the purported repayment of stockholder loans discussed above. Norman did not receive any such distributions, proportional or otherwise.

74. 73. The Company's 2001 tax return depicts an undocumented drawdown of approximately $460,000 of the Company's paid-in capital. (*See* Exhibit B). This amount dovetails with the distributions made to Elkin in 2001 – noted immediately above – as identified in the Company's check register. Norman received no distribution or reimbursement of his initial capital contribution, proportionate or otherwise. Shorin was aware of and aided in the unilateral drawdown of the Company's paid-in capital.

75. 74. The Company's check register for 2001 also depicts the reclassification of a stockholder loan in the amount of $20,500 from stockholder loan receivable into distributions. Again, Norman at no time received a stockholder loan nor did he receive any cash distributions in 2001.

76.    75. Upon information and belief, USM has transferred, sold or otherwise disposed of many, if not the majority, of its rights and assets over the past several years. During this time, USM has failed to provide Norman with a complete accounting of the proceeds of all such sales, transfers or other dispositions, and has not made any stockholder or other distributions to Norman as a result of such transfers, sales or other dispositions of its rights or assets. However, Norman was required to report certain purported earnings of the Company to the IRS arising from his ownership interest in the Company.

I.    *Alter Ego* Allegations

77.    76. From 1997 to present, USM was controlled and administered in such a manner as to effectively render it the *alter ego* of Elkin and the Elkin Group.

78.    77. From 1997 to present, USM's sole purpose was to provide a means for Elkin and the Elkin Group to acquire Phase II licenses and otherwise trade-off of the Company's goodwill, its incumbency position with the FCC and its physical assets.

79.    78. Elkin utilized USM to further his personal interests and those of the Elkin Group during the Phase II auction and the subsequent piecemeal sale of assets to Repeater and Roamer.

80.    79. From its inception, USM's books and records were maintained (if at all) at the residence of Elkin. Elkin's residence served as the principal place of business for both USM and the Elkin Group.

81.    80. Elkin has otherwise failed to maintain the corporate formalities required of a business entity organized under the laws of the State of Delaware in that he has failed or refused to: (i) maintain Company books and records; (ii) regularly convene stockholder meetings; (iii) hold annual elections for the Company's director(s); and (iv) regularly and candidly communicate with stockholders.

15

J.    Demand Futility Allegations

82.    81. Where applicable, the required proffer of a demand of the Company is excused as the Company only has one director and his interests are so intertwined with the allegations contained in this Amended Complaint as to render any such demand futile. Moreover, the challenged transactions that form the basis of this Amended Complaint are not the product of a valid exercise of business judgment, but are instead, self-interested transactions between the Company and its sole director and majority stockholder.

## Causes of Action

### Count I
### Breach of Contract
### (Against Elkin)

Plaintiff repeats and realleges each allegation contained above as though fully set forth herein.

83.    82. Norman performed all of his obligations under the oral agreement between himself and Elkin, and is the owner of 25% of the common stock of USM.

84.    83. Elkin breached his agreement with Norman by, *inter alia*:

(i)    failing and refusing to provide Norman with complete access to USM's corporate, business, financial and accounting books and records;

(ii)    failing and refusing to fully account to Norman and/or distribute to Norman his 25% share of the proceeds of the transfer(s), sale(s) or other disposition(s) of any rights or assets of USM;

(iii)    failing and refusing to contribute $750,000 in capital as required by the agreement between Elkin and Norman when Norman first acquired his 25% interest in the Company; and

16

(iv)    obtaining FCC licenses under the name of USM and thereafter transferring those licenses to the Elkin Group, a corporation 100% owned by Elkin.

85.    84. By reason of defendants' breaches and failures to perform under the agreement, Norman has been damaged in an amount to be determined at trial.

## Count II
## Declaratory Relief
## (Against all Defendants)

Plaintiff repeats and realleges each allegation contained above as though fully set forth herein.

86.    85. This Court has jurisdiction to render declaratory relief pursuant to 28 U.S.C. § 2201 and 10 Del. C. § 6501, et seq.

87.    86. Based on the facts set forth above, Norman is entitled to relief as follows:

(i)    A declaration that the Company is entitled to all payments and consideration which have been derived or are to be derived from the sale, transfer, cancellation, abandonment or other exploitation of rights and assets properly belonging to the Company;

(ii)    A declaration that Norman is entitled to at least 25% of the proceeds, net of reasonable expenses, heretofore paid by third parties to any or all of the defendants in connection with the sale, transfer, cancellation, abandonment or other exploitation of rights and assets properly belonging to the Company;

(iii)    A declaration that Norman is entitled to at least 25% of all future proceeds, net of reasonable expenses, to be paid by third parties to any or all of the defendants in connection with the sale, transfer, cancellation, abandonment or other exploitation of rights and assets properly belonging to the Company; and

17

(iv)    A declaration that some, if not all, of Elkin's interest in the Company is forfeited as a result of the fraudulent conduct noted above and his failure to make the capital contribution he contractually agreed to provide the Company.

## Count III
### Usurpation of Corporate Opportunities
### (Against Elkin)

Plaintiff repeats and realleges each allegation contained above as though fully set forth herein.

88.    87. The opportunities to obtain FCC licenses including, but not limited to, Phase II licenses offered through FCC Auction Nos. 18 and 24, were and are corporate opportunities belonging to USM.

89.    88. Elkin's conduct in bidding on the FCC licenses during Auction No. 18 and winning such bids in the name of USM and thereafter causing those licenses to be issued in the name of the Elkin Group rather than USM is a violation of Elkin's fiduciary duties and constitute(s) an unlawful usurpation of corporate opportunities.

90.    89. Elkin's conduct in bidding on the FCC licenses during Auction No. 24 to the exclusion of USM constituted an unlawful, usurpation of corporate opportunities.

91.    90. By virtue of Elkin's usurpation of corporation opportunities belonging to USM, Norman has been damaged in an amount to be determined at trial and is entitled to an equitable accounting of those assets Elkin took in violation of his fiduciary duties.

92.    91. By virtue of Elkin's usurpation of corporation opportunities belonging to USM, Norman is entitled to the imposition of a constructive trust over the assets or the proceeds from those assets.

## Count IV
### Breach of the Fiduciary Duties of Loyalty, Care and Good Faith Dealing

18

**(Against Elkin)**

Plaintiff repeats and realleges each allegation contained above as though fully set forth herein.

93. ~~92.~~ By virtue of his status as a majority stockholder, President and director of USM, Elkin owned various fiduciary duties to Norman.

94. ~~93.~~ By virtue of the conduct described herein, Elkin has failed to discharge his fiduciary duties of loyalty, care and good faith dealing to Norman, and has, in fact, breached his fiduciary duties.

95. ~~94.~~ By virtue of Elkin's breaches of his fiduciary duties to Norman, he has been damaged in an amount to be determined at trial.

**Count V**
**Breach of the Fiduciary Duty of Disclosure**
**(Against Elkin)**

Plaintiff repeats and realleges each allegation contained above as though fully set forth herein.

96. ~~95.~~ By virtue of his status as the President and director of USM, Elkin owed Norman the fiduciary duty to disclose all pertinent facts regarding the Company's operations and the sales of assets.

97. ~~96.~~ By virtue of the conduct described herein, Elkin has failed to discharge his fiduciary duty of disclosure, and has, in fact, breached his fiduciary duty by never convening a stockholder meeting, providing annual reports to the Company's stockholders or providing notice as to the sale of all or substantially all of the Company's assets.

98. ~~97.~~ By virtue of Elkin's breaches of his fiduciary duties to Norman, he has been damaged in an amount to be determined at trial.

**Count VI**
**Conversion and Misappropriation**
**(Against Elkin and the Elkin Group)**

19

WILM1\3091433168\1 156666.000

Plaintiff repeats and realleges each allegation contained above as though fully set forth herein.

99.   98. Elkin personally and the Elkin Group have profited from their misappropriation of USM's qualified bidder and incumbent status with the FCC.

100.   99. Elkin and the Elkin Group have exercised control and dominion over the Phase II licenses won by USM in the FCC's Phase II Auction No. 18 so as to deprive USM of all use and economic value.

101.   100. Elkin personally and the Elkin Group have profited from the misappropriation and conversion of the USM's Phase II licenses in an amount to be determined at trial.

## Count VII
## Fraud
## (Against Elkin)

Plaintiff repeats and realleges each allegation contained above as though fully set forth herein.

102.   101. Through the December 2002 letter to Norman's counsel and other communications at or about this time, Elkin made false representations of fact to Norman concerning the financial condition of the Company, Elkin's self-dealing and the distribution of proceeds from known sales.

103.   102. Elkin knew these representations to be false when they were made or were asserted with reckless indifference to the truth.

104.   Elkin's fraudulent representation willful, wanton and/or malicious.

105.   103. Elkin proffered these representation with the intent that Norman would not act to enforce his rights as a 25% stockholder of the Company, hold accountable the director and officers for their failure to discharge their fiduciary duties to the Company or otherwise seek and accounting of the Company's assets.

20

106. ~~104.~~ Norman refrained from acting at the time in justifiable reliance upon Elkin's representations.

107. ~~105.~~ Norman has suffered damages in an amount to be determined at trial.

## Count VIII
### Aiding and Abetting Elkin's Breach of Fiduciary Duties
### (Against Shorin)

Plaintiff repeats and realleges each allegation contained above as though fully set forth herein.

108. ~~106.~~ By virtue of his status as a majority stockholder, President and director of USM, Elkin owned various fiduciary duties to Norman.

109. ~~107.~~ By virtue of the conduct described herein, Elkin has failed to discharge his fiduciary duties of loyalty, care and good faith dealing to Norman, and has, in fact, breached his fiduciary duties.

110. ~~108.~~ Shorin knowingly participated in Elkin's breaches of his fiduciary duties given his active participation in the affairs of USM and the Elkin Group as the chief financial officer of both companies. Moreover, Shorin compiled, calculated and filed the Company's tax returns from 2002 to present.

## Count IX
### Unjust Enrichment
### (Against Elkin and the Elkin Group)

Plaintiff repeats and realleges each allegation contained above as though fully set forth herein.

111. ~~109.~~ Elkin and the Elkin Group have been unjustly enriched in that, *inter alia*, they have failed to account to Norman in connection with the acquisition and/or sale, transfer or other disposition of USM's rights and assets and has, instead, distributed the proceeds of any such

21

transfer(s), sale(s) or other disposition(s) of USM's rights or assets to himself, the Elkin Group or others.

112. 110. By virtue of defendants' unjust enrichment, Norman has been damaged in an amount to be determined at trial.

WHEREFORE, Norman demands, through a trial by jury, judgment against the defendants as follows:

A.    an award of nominal, compensatory, rescissory and/or restitution damages in an amount to be determined at trial,

B.    an award of punitive damages in an amount to punish and deter similar conduct in the future;

C.    the imposition of a constructive trust over those assets or proceeds from assets that rightfully belonged to the Company;

CD.    declaring that Elkin has unlawfully usurped corporate opportunities of USM;

DE.    declaring that Norman is entitled to at least 25% of all proceeds from the sale of Company assets, minus reasonable expenses;

EF.    declaring that some, if not all, of Elkin's interest in the Company is forfeited;

FG.    requiring Elkin to provide a full and complete accounting (equitable accounting) of all Company assets and other such property or rights adjudged to be Company assets;

GH.    the appointment of a custodian to wind-up the affairs of USM and distribute any and all assets *pro rata*;

HI.    an award of both pre- and post-judgment interest at the legal rate;

IJ.    an award of the costs and disbursements of this action, including reasonable counsel, accountants' and experts' fees, costs and expenses; and

22

~~J~~K.    all such other and further relief as the Court deems just and proper under the circumstances.

Dated:  ~~December 2, 2005~~January 5, 2006

_____

Sean J. Bellew (#4072)
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE 19801
Telephone: (302) 295-2000
Facsimile: (302) 295-2013
    *Attorneys for Plaintiff Jeffrey M. Norman*

23