IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JEFFREY M. NORMAN,         §
      Plaintiff,          §
                   §
   v.                    §
                   §
DAVID W. ELKIN, RICHARD M. SHORIN,  §   C.A. NO. 06-005-JJF
and THE ELKIN GROUP, INC.,       §
      Defendants,         §
                   §
   And                §
                   §
US MOBILCOMM, INC.,         §
     Nominal Defendant.     §

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

Steven L. Caponi                    Mark A. Evetts
(DE Bar No. 3484)              Law Offices of Mark A. Evetts
Blank Rome LLP                 8502 Jackson Creek Bend Lane
Chase Manhattan Centre         Humble, Texas 77396
1201 Market Street, Suite 800     Telephone: (281) 458-6914
Wilmington DE 19801          Facsimile: (281) 458-0326
Telephone: (302) 425-6400

*Attorneys for Defendants David W. Elkin, Richard M. Shorin, The Elkin Group, Inc., and Nominal Defendant US MobilComm, Inc.*

Dated: February 16, 2007

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES................................................................................................ii

STATEMENT OF NATURE OF PROCEEDINGS ......................................................1

SUMMARY OF THE ARGUMENT ...........................................................................2

STATEMENT OF FACTS.............................................................................................5

ARGUMENT...............................................................................................................16

I.    Summary Judgment Standards .............................................................................16

II.   The Facts of this Case Show That There is no Genuine Issue of
      Material Fact that all of Plaintiff's Claims Accrued More Than Four
      Years Prior to Institution of this Suit..................................................................17

      A.    Plaintiff's complaint demonstrates on its face that all of the claims are
            time-barred.............................................................................................17

      B.    Because Plaintiff's claims should be governed by Pennsylvania's
            two-year statute of limitations, instead of Delaware's longer three
            years, all of Plaintiff's claims are time-barred, even the claims relating
            to the December 3, 2003 letter................................................................19

      C.    No tolling doctrine saves the Plaintiff's claims .......................................21

            1.    Elkin's December 3, 2002 letter constitutes the latest possible cut-off
                  for statute of limitations purpose.....................................................22

            2.    In addition to Elkin's December 3, 2002 letter and his conversation with
                  Norman beforehand, Norman was on inquiry notice of his claims more
                  three years prior to filing suit as the result of documents provided to
                  him and documents publicly available through the FCC website ..........25

III.  Plaintiff's Breach of Contract Claim Fails for the Additional Reason that it
      Violates the Statute of Frauds.............................................................................28

CONCLUSION ...........................................................................................................29

## TABLE OF AUTHORITIES

Page(s)

*BellSouth Telecomm., Inc. v. W.R. Grace & Co.*, 77 F.3d 603 (2d Cir. 1996) ..............................16

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) .......................................................16

*Conway v. 20th Century Corp.*, 420 A.2d 405 (Pa. 1980) ...........................................4, 28

*David B. Lilly Co., Inc. v. Fisher*, 799 F. Supp. 1562 (D. Del. 1992),
    *aff'd*, 18 F.3d 1112 (3d Cir. 1994) ...............................................................21

*In re Dean Witter P'ship Litig.*, 1998 WL 442456 (Del. Ch.),
    *aff'd*, 725 A.2d 441 (Del. 1999) ........................................................4, 18, 21, 25

*IEJ Corp. v. Laserow*, 2006 WL 52822 (Pa. C.P. 2006) ............................................4, 21

*Genesis Underwriting Mgmt. Co. v. Ins. Mgmt. & Servs. Inc.*,
    1994 WL 811469 (Pa. C.P. 1994) ..................................................................2

*J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*,
    76 F.3d 1245 (1st Cir. 1996) ........................................................................16

*In re Marvel Entm't Group, Inc. v. Mafco Holdings, Inc.*, 273 B.R. 58
    (D. Del. 2002) .............................................................................................25

*In re ML/EQ Real Estate P'ship Litig.*, 1999 WL 1271885 (Del. Ch.) ...........................*passim*

*Ontario Hydro v. Zallea Sys., Inc.*, 569 F. Supp. 1261 (D. Del. 1983) .......................3, 21

*Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468 (Pa. 1983) .............3, 21

*Robertson v. Seidman & Seidman*, 609 F.2d 583 (2d Cir. 1979) .............................3, 23

*Youell v. Maddox*, 692 F. Supp. 343 (D. Del. 1988) .............................................2, 19

**Other Authorities**

10 Del. C. § 8106 ............................................................................................2

10 Del. C. § 8121 ........................................................................................3, 20

42 Pa.C.S. § 5524(7) .......................................................................................2

47 C.F.R. § 90.763 (1997) ...............................................................................12

47 C.F.R. § 90.733(a)(1)(A) (1997) ............................................................. 12

47 C.F.R. § 90.753(b)(1997) ..................................................................... 14

Fed. R. Civ. P. 56(c) ................................................................................. 16

## STATEMENT OF NATURE OF PROCEEDINGS

The Plaintiff is Jeffrey M. Norman; the Defendants are David W. Elkin ("Elkin"), Richard M. Shorin ("Shorin"), and The Elkin Group ("TEG"), and the Nominal Defendant is US MobilComm, Inc. ("USM").    Plaintiff filed this suit in Chancery Court, on December 3, 2005,[1] against Defendants for various causes of action. That suit was removed to this Court on the basis of diversity jurisdiction.

After removal, Plaintiff filed an Amended Complaint on January 6, 2006. Thereafter, Defendants answered on February 1, 2006, in which Defendants asserted a number of affirmative defenses and counterclaims.   Among other affirmative defenses, Defendants expressly plead that all of "Plaintiff's claims against Defendants are barred by statute of limitations." Defendants' Answer, Affirmative Defenses to Amended Complaint and Counterclaim ("Answer") at 22-23. In addition, Defendants plead that "Plaintiff's breach of contract claims are barred by the Statute of Frauds." *Id.*

Fact discovery closed on December 22, 2006.  Plaintiffs served an expert report on January 29, 2007, although that report was due by January 5, 2007.  Case dispositive motions are due by February 16, 2007.   In accordance with the deadline for case dispositive motions, Defendants have filed a Motion for Summary Judgment.  This is Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment. By their motion, Defendants have moved for summary judgment on all of Plaintiff's causes of action, including breach of contract, declaratory relief, usurpation of corporate opportunities, breach of fiduciary duty, conversion/misappropriation, fraud, aiding and abetting beach of fiduciary duty, and unjust enrichment.  Summary judgment should be

---

[1]   Because the suit was e-filed in the Court of Chancery after 5:00 pm on 12/2/05, it is deemed filed the next day, 12/3/05.  *See* Complaint (containing date and time it was Efiled).

granted in this case because all of these claims are barred by the statute of limitations. Plaintiff's breach of contract claim also fails because it is barred by the statute of frauds.

## SUMMARY OF THE ARGUMENT

Plaintiff's complaint makes clear on its face – and the documents corroborate – that all of the claims in this case stem from allegedly wrongful conduct that spanned the period from 1994 to mid 2001, at the latest. Because this complaint was not filed until December 3, 2005, none of the claims were brought before the expiration of the statute of limitations. There are two potentially relevant applicable limitations period. Under Delaware law, claims for fraud, breach of fiduciary duty, corporate waste, and breach of contract are all governed by a three year limitations period. 10 Del. C. § 8106; *see also In re ML/EQ Real Estate P'ship Litig.*, 1999 WL 1271885, *2 (Del. Ch.) (stating that breach of fiduciary duty and breach of contract claims are governed by three-year limitations period). Under Pennsylvania law, fraud and breach of fiduciary duty claims must be brought within two years; a breach of contract claim must be brought with four. *See* 42 Pa.C.S. § 5524(7); *Genesis Underwriting Mgmt. Co. v. Ins. Mgmt. & Servs. Inc.*, 1994 WL 811469 (Pa. C.P. 1994) (holding that claims for negligence, fraud, fraudulent conversion, breach of fiduciary duty, and piercing the corporate veil are all governed by the two-year statute of limitations for fraud).

A federal court sitting in diversity must apply the statutes of limitations of the forum state, including any applicable borrowing statute. *See, e.g., Youell v. Maddox*, 692 F. Supp. 343, 354-55 (D. Del. 1988) (applying Delaware's borrowing statute). Delaware's borrowing statute provides in relevant part as follows:

> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the

> expiration of whichever is shorter, the time limited by the law of this
> State, or the time limited by the law of the state or country where the cause
> of action arose, for bringing an action upon such cause of action.

10 Del. C. § 8121. Here, Plaintiff is clearly an out-of-state resident. Defendants are all

Pennsylvania residents, their allegedly wrongful conduct emanated from there, USM is

headquartered there, and all sales of assets and distributions to Elkin occurred from there.

Delaware's only connection to this lawsuit is USM's fortuitous choice to incorporate

under its laws. Thus, under a traditional conflict of law analysis and Delaware's

borrowing statute, all of the claims in this case should be governed by Pennsylvania's

two-year limitations period except the breach of contract claim, which should be

governed by Delaware's shorter three-year statute.

All of Plaintiff's claims, on their face, predate December 3, 2003, which is two

years prior to the filing of this lawsuit, and his breach of contract claim clearly predates

December 3, 2002. Under both Pennsylvania and Delaware law, "the statute of

limitations begins to run as soon as the right to institute and maintain a suit arises; lack of

knowledge, mistake or misunderstanding do not toll the running of the statute of

limitations." *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471

(Pa. 1983); *accord Ontario Hydro v. Zallea Sys., Inc.*, 569 F. Supp. 1261, 1268 (D. Del.

1983). While the law of the forum, including any applicable borrowing statute,

"determines the length of the limitations period, federal law determines when that period

begins to run." *Robertson v. Seidman & Seidman*, 609 F.2d 583, 587 (2d Cir. 1979).

Under federal law, the limitations period began to run when the allegedly tortuous

conduct occurred, unless there is a basis under the law and facts for tolling.

The Plaintiff has only arguably plead one basis for tolling: fraudulent concealment, which "requires an affirmative act of concealment by a defendant – an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry." *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5 (Del. Ch. 1998), *aff'd*, 725 A.2d 441 (Del. 1999). For this doctrine to apply, Plaintiff must prove "such fraud or concealment by evidence which is clear, precise and convincing." *IEJ Corp. v. Laserow*, 2006 WL 52822, at *4 (Pa. C.P. 2006). Based on the case law and the evidence, this burden will prove insurmountable here.

Even if tolling were appropriate, the limitations period is only tolled until such time as the Plaintiff either knew – or should have known – that he has suffered some sort of wrong. *In re ML/EQ Real Estate P'ship Litig.*, 1999 WL 1271885, at *3. Nearly all of Plaintiff's claims were readily ascertainable from public filings at the FCC and from documents that were provided to him. Thus, he was on inquiry notice long before filing this suit.

Finally, the only claim governed by the longer limitations period of three years – the breach of contract claim – fails for an additional reason: the statute of frauds. As a contract for the sale of securities, "there . . . [must be] some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities as a defined or stated price." *Conway v. 20th Century Corp.*, 420 A.2d 405, 409 n.5 (Pa. 1980). Otherwise, enforcement of the contract is barred by the statute of frauds.

## STATEMENMT OF FACTS

This case is a dispute between the only two shareholders of a closely-held corporation, USM. Defendants' Response to Plaintiff's First Set of Interrogatories at 3 (Response No. 1). Elkin and Norman originally operated the company together. *Id.*; Amended Complaint at 3, ¶ 10. They initially had high hopes for the company. It was created and positioned to take advantage of a new wireless arena, one which they hoped would rival the successes of the early cellular phone companies and other wireless communications ventures. USM was going to capitalize on the FCC's decision to award Phase I 220 MHz wireless licenses in a lottery-like giveaway. *See* Amended Complaint at 5, ¶ 23; Elkin Depo. at 36, line 12 – pg. 37, line 9. The company's business plan, initially conceived by Elkin after The Elkin Group, Inc. ("TEG") was selected to receive a Sacramento, CA license in an early 220 MHz lottery, Elkin Depo. at 36, lines 1-17, entailed first acquiring as many 220 MHz licenses in select major markets across the U.S. and/or entering into as many management contracts with other license holders in such markets, as the company could muster and afford. Amended Complaint at 3-4, ¶¶ 10, 11; Elkin Depo at 40, lines 2-8. The next step in the plan was to construct wireless communications systems utilizing the licenses and begin marketing the USM service to customers desirous of two-way wireless communications in those markets. Elkin Depo. at 40, line 2 – pg. 44, line 10. Norman and Elkin's co-operation of USM would only last until some time in 1996, although Elkin's stewardship of the company continues to this day. Amended Complaint at 3, ¶ 10.

As part of their agreement, Elkin agreed to allow Norman to acquire a 25% ownership interest in USM in return for agreeing to provide 25% of the combined capital

provided to USM by Elkin and Norman. *Id.* ¶ 9. The amount of combined capital was not determined at the time of their agreement. Elkin Depo. at 63, line 12 – pg. 64, line 9; pg. 71, lines 4 – 17; Norman Depo. at 16, line 12 – pg. 19, line 8, pg 19, line 20 – pg. 21, line 3. As the result of discussions that USM was having with a potential equity investor, the parties ultimately agreed to provide $1 million of capital to USM ($250,000 by Norman and $750,000 by Elkin). Defendants' Response to Plaintiff's First Request for Admissions at 6 (Response No. 11). As well, both Norman and Elkin agreed to contribute their time, effort, and expertise to grow the company. Defendants' Response to Plaintiff's First Set of Interrogatories at 3-5 (Response No. 1); Elkin Depo. at 75, line 22 – pg. 76, line 12; Norman Depo. at 16, line 19 – pg. 19, line 10.

In what should have surely been a prescient sign, Norman failed to make his agreed upon investment of $250,000. Defendants' Response to Plaintiff's First Set of Interrogatories at 3-5 (Response No. 1). Norman contributed only $200,000 of his $250,000. *Id.* Elkin understood and agreed Norman could pay the additional $50,000 as soon as he was able. *Id.* Norman later argued that he should not be required to pay the extra $50,000 because he was allegedly owed that amount in expenses he had advanced on behalf of USM. *Id.* Not only did Norman fail to substantiate any of those expenses, he withdrew a substantial portion of the $200,000 that he did invest. Elkin Depo. at 122, lines 4 – 10; pg. 126, line 2 – pg. 128, line 20. Norman's capital was ultimately reduced accordingly. *Id.* at 122, lines 11 – 13.

By 1996, when the need for Norman's services was the greatest, Norman quit. Amended Complaint at 3, ¶ 10. By that time, USM had entered into agreements with holders of approximately 40-50 licenses in states that included New York, Pennsylvania,

Maryland, Florida, Massachusetts, Illinois, California, Texas, Connecticut, Wisconsin, and the District of Columbia. *Id.* ¶ 11. Its wireless services, however, were vastly under-subscribed. The next phase of the company's business plan was designed to remedy that problem by bringing paying subscribers onto USM's wireless systems.

After Norman's departure sometime in 1996 (through the present), the responsibility for USM has fallen virtually exclusively on Elkin. Defendants' Response to Plaintiff's First Set of Interrogatories at 18 (Response No. 22). Since Norman's departure, and in some cases well before, Elkin has served as USM's Chief Executive Officer, sales force, public relations department, marketing department, office manager, filing clerk, legal staff, and chief bottle washer. *Id.* His longstanding service to USM has not earned him any greater ownership interest in USM relative to Norman, even though his contribution of human capital to USM has far exceeded Norman's and that contribution remains uncompensated to this day. *Id.*

In addition to his 13 years of service to USM, Elkin has also been the company's only financial patron. Like many start-up companies with little or no cash flow and no profits, Elkin has repeatedly paid USM's expenses, never sought reimbursement for expenses he has incurred personally for USM's benefit, and loaned money or property outright to USM to enable it to meet its ongoing obligations. Defendants' Response to Plaintiff's First Set of Interrogatories at 17 (Response No. 21). Initially, Elkin did not even try to account for all that he had done personally for USM. *Id.* at 3-5 (Response no. 1). He belatedly entered into a loan agreement with USM for the purpose of documenting, albeit only in small part, his personal financing of the company over the years. *Id.*

From the very onset of the venture, Elkin was involved in continuous efforts to develop the 220 MHz industry, raise equity or debt financing for USM, and maximize the prospects and value of USM through potential mergers, acquisitions, and sales. *See, e.g.,* Elkin Depo. at 220, line 15 – pg. 230, line 1. Elkin served as Vice Chairman of the 220 MHz counsel, an industry organization whose primary goal was improving the FCC regulatory framework that governed the industry. In addition, Elkin tried to raise financing through LePerq deNeuflize, a French investment banking firm that was paid about $12,500 for its efforts, although the company never succeeded in raising any capital. *Id.* Elkin also directly pursued public and private equity financing from a large number of firms, including Montgomery Securities, Merrill Lynch, Burr Egan, Fleet Venture Partners, and many others. *Id.* Elkin also pursued debt financing from several firms including Kansallis, Osake, Panke Bank of Finland, and PNC Bank of Pennsylvania.

When efforts to secure outside financing proved unsuccessful, Elkin negotiated equipment financing with equipment manufacturers, thereby allowing the company to stretch its limited resources. In addition to Elkin's efforts to secure financing for USM's business, he was also involved in numerous attempts to merge USM with other firms, in the hope that consolidation within the industry would increase the industry's appeal in the capital marketplace. *Id.* These merger discussions took place over a 4-5 year period and included numerous meetings and discussions with various combinations of Incom Communications Corp., Wireless Plus, Narrowband Network Systems, and SMR Advisory Group. *Id.* Some of these merger discussions also involved meetings with Wall Street firms, including Jeffries and Company and Bear Stearns, with the hope of

securing these firms' commitment to capitalize the combined entity. Elkin also pursued joint venture discussions with U.K. based Securicor as well as Uniden.

Finally, while he had no background in manufacturing, Elkin pursued the possible acquisition of SEA, the leading 220 MHz equipment provider, in the hope that by controlling a key manufacturer of 220 MHz equipment, in addition to a number of licenses, USM could accomplish financing that would allow the company to subsidize distribution of its equipment at an attractive and competitive price point.

As the prospects for financing USM and building the firm into a competitive wireless provider proved ever dim, Elkin then tried to sell USM outright. He employed business broker Daniels and Associates, who shopped USM to several companies. The only prospect that emerged as a result of that effort, Centennial, was unable to raise the necessary funds to complete the transaction.[2] *Id.* Elkin personally had discussions with Nextel, Bell Atlantic, and others about acquiring USM, also all without success.

The 220 MHz Industry faced numerous obstacles to success, including a regulatory framework that precluded the industry from providing competitive service coverage, a fragmented licensing scheme, and the lack of a large scale equipment manufacturer with products that could be sold at a competitive price point. These obstacles ultimately led to (a) the unwillingness of the capital markets to finance the industry, (b) losses of hundreds of millions of dollars by Securicor, (c) the bankruptcy of Incom, (d) the firesale of SEA and NNS and, (e) in short, the failure of the 220 MHz industry.

---

[2]  Although USM signed a letter of intent with Centennial for the sale of all or substantially all of its assets for approximately $6 million, they could never close at that price or any other. Elkin Depo. at 220, lines 6 – 21. While Norman makes much of this $6 million "letter of intent," such a non-binding expression of interest is simply the entrance fee to conduct the necessary due diligence, not a "valuation" of the company.

By 1998, the FCC announced that it was going to auction Phase II 220 MHz licenses. Elkin Depo. at 234, lines 7 – 24. At the time of the FCC Phase II Auctions, and for some time before that, USM had lacked the profits or capital required to continue to invest in FCC licenses. Defendants' Response to Plaintiff's First Set of Interrogatories at 12 (Response No. 14). Elkin, nonetheless, registered USM to bid at the Phase II auction – if for no other reason than to preserve the opportunity – based on the slim chance the company would be able to raise money at the final hour to finance its participation, but that did not happen. Elkin depo. at 239, line 22 – pg. 241, line 16; Norman Depo. at 106, line 25 – pg. 107, line 8. Thus, USM lacked the financial resources not only to pay the upfront fee required by the FCC, but to participate meaningfully at the auction at all. Norman Depo. at 116, lines 2 – 11; *see also* FCC Document (describing as one of the main criteria for qualifying as a bidder as the ability "to submit an upfront payment . . . towards the bids they plan to make in the auction"), attached to the Affidavit of Steve L. Caponi as Exhibit A.

However, Elkin realized that the Phase II licenses, if acquired by anyone other than USM or a "friendly" affiliate, would severely undermine whatever value USM's Phase I licenses still possessed. Defendants' Response to Plaintiff's First Set of Interrogatories at 12 (Response No. 14). Therefore, as he had done throughout USM's existence, Elkin did what he had to do to preserve the value of USM's assets. *Id.* Elkin realized that if USM were to have any hope of realizing value for its Phase I licenses, he would have to personally advance money to USM to participate in the Phase II Auctions or ensure that an entity friendly to USM acquired any Phase II licenses that encroached on USM's Phase I licenses. *Id.* Because other creditors could have pursued claims

against USM if $200,000 or more were suddenly injected in the company, Elkin chose the second option.

Elkin, through another of his companies, TEG, agreed to expend his own money to acquire Phase II licenses that USM was financially unable to acquire. *Id.* The $200,000 upfront fee paid to the FCC in connection with the right to bid at the auction came from Elkin personally, although he directed payment of the funds to the FCC for the benefit of TEG. Defendants' Response to Plaintiff's First Request for Admissions at 4 (Response to No. 5); Defendants' Response to Plaintiff's First Set of Interrogatories at 14 (Response No. 16).

There were a number of reasons that the licenses awarded to TEG in the FCC Phase II Auction were absolutely critical to preserving whatever value USM's Phase I licenses still retained. First, Phase I local licenses were site-specific and covered a far smaller geographic area than Phase II licenses, in most cases far less than would be required to provide competitive wireless coverage throughout a metropolitan area. Elkin Depo. at 236, line 7 – pg. 237, line 14. In almost all situations, a network utilizing multiple antennae locations over a broad geographic area is required. Second, each Phase I license only included five channels. *Id.*

In contrast, each Phase II license included ten channels – twice as many as Phase I licenses – and covered a far wider geographic area, making it much easier to provide comprehensive wide-area coverage for prospective subscribers. *Id.* Thus, Phase II licenses held by a non-friendly entity made it a virtual impossibility for a Phase I licensee operating in the same geographic area to attract a subscriber base – rendering any such Phase I licenses obsolete for all practical purposes.

To handle this imminent obsolescence, the FCC proposed to give incumbent Phase I licenses certain limited protections. *See* 47 C.F.R. § 90.763 (1997); Amended Complaint at 5, ¶ 5. Among other requirements, "bidders who won a Phase II license that covered an incumbent Phase I licensee's areas were required to (i) locate their paging stations at least 120 km from then Phase I licensee's paging station . . . and (ii) limit the field strength of its base station so as not to interfere with the Phase I licensees." Amended Complaint at 6, ¶ 27. This limitation tended to dampen bidding for Phase II licenses in areas where incumbents actively operated. *Id.* ¶ 28. That dampening effect ultimately favored USM, however, because it meant Elkin could allocate less money to a Phase II license that he sold bundled with one of USM's Phase I licenses, thereby generating greater income to USM.

To realize the benefit of this limited incumbency protection, however, Phase I license holders had to demonstrate to the FCC a certain level of operating success in their geographic area. *See* 47 C.F.R. § 90.733(a)(1)(A) (1997). If the Phase I license holders were not able to demonstrate that they had achieved certain build-out and subscriber thresholds in a given area, the Phase I licenses were automatically cancelled and, thus, no incumbency protection would be granted. *Id.*; see also Norman Depo. at 175, lines 16 – 25. In those instances where such protections were not available, the award of a competing Phase II licenses would completely eviscerate the value of the pre-existing incumbent Phase I license.

It was likely that a large number of USM's Phase I licenses would not have been able to satisfy the build-out and subscriber thresholds established by the FCC. Thus, many USM's Phase I licenses were not technically entitled to any protection as an

incumbent.  Realizing this, Elkin, through TEG, sought to acquire Phase II licenses in any and every market where USM operated Phase I licenses, to ensure a stranger would not be able to acquire overlapping Phase II licenses where USM did business, thereby destroying the value of USM's licenses in the process.

Thereafter, Elkin sold as many of his newly acquired Phase II licenses – bundled with USM's Phase I licenses that operated in the same geographic area – as he could; although in some cases he had to take a complete loss on his investment in some Phase II licenses.  Elkin Depo. at 244, line 19 – pg. 246, line 18; Amended Complaint at 8, ¶ 40 – pg. 9, ¶ 44.  Given the vastly greater coverage of Phase II licenses, the fact that they possessed twice the number of channels, and the fact that many of USM's Phase I licenses were not entitled to any protection as an incumbent, virtually one hundred percent of the "value" in any sale of overlapping Phase I and Phase II licenses should have been attributed to the Phase II licenses.  Elkin, however, ensured that the proceeds from any such sales was more than fairly allocated between the Phase II and Phase I licenses involved.  Amended Complaint at 8, ¶ 40 – pg. 9, ¶ 44.  USM, as a result, realized a windfall from these bundled sales.  In the end, by successfully bidding at FCC Phase II Auctions, Elkin, though TEG, conferred a substantial benefit to USM.

On or about March 1999, Elkin managed to sell some of USM's Phase I licenses in Miami to a company called Repeater Network Spectrum by bundling them with a Phase II license purchased by TEG.  Amended Complaint at 10, ¶¶ 49, 50.  In addition, Elkin was able to sell in January 2001 six of USM's Phase I licenses for $349,000 to a company called Roamer One, Inc., again by bundling USM's licenses with two Phase II licenses purchased by TEG.  *Id.* ¶¶ 51, 52.  Later, in March 2001, in connection with the

same transaction, Elkin sold another of USM's Phase I licenses to Roamer for another $60,000, again bundled with a Phase II license.

Elkin has neither acquired nor sold any other USM licenses, or any other assets for that matter, since March 2001. *See* Amended Complaint (omitting discussion of any additional asset sales, distribution, or causes of action later than mid 2001 even after completion of all fact discovery). Indeed, there has been virtually no activity in the company at all since 2001, with one exception. Some of USM's licenses have expired or have been forfeited to the FCC since 2001 since USM could not meet the same sort of build-out and subscriber thresholds that would have rendered any incumbency protection unavailable after the Phase II auctions. Amended Complaint at 9, ¶ 47; *see also* 47 C.F.R. § 90.753(b) (1997) ("The authorization of a licensee that does not construct its base station and place it in operation, or commence service by [12 months after the initial grant date], cancels automatically and must be returned to the Commission.").

As the result of these sales, Elkin has been repaid approximately $600,000 of the money he has advanced or paid on behalf of USM throughout the years, or as a partial reduction in his capital. Defendants' Original Answer at 12, ¶ 56. Capital in USM has been reduced in only one of three ways. Defendants' Response to Plaintiff's First Set of Interrogatories at 9 (Response No. 10). Norman's capital has been reduced to reflect his failure to substantiate expenses he allegedly incurred for the benefit of USM. *Id.* Norman's capital has also been reduced to reflect monies he has taken out of USM for his personal benefit and use, once it became clear he did not intend to repay those monies. *Id.* Elkin's capital has been reduced in only one way: it has been reduced to reflect his lower *pro rata* required contribution of capital in light of the parties' three-to-one

ownership ratio (75% to 25%) and Norman's ultimate capital investment of approximately $139,400 (in lieu of his promised $250,000). *Id.*

Thus, every payment made by USM to Elkin over the years has constituted either the repayment of loans he made to the company or a return of capital to normalize his capital investment with Norman's. Defendants' Response to Plaintiff's First Set of Interrogatories at 16 (Response No. 19). To this day, Elkin has never received a penny in compensation for his services to USM for the past thirteen years, a dividend, or any "distribution" of profits. Defendants' Response to Plaintiff's First Set of Interrogatories at 18 (Response No. 22). Moreover, to this day, Elkin has ensured that any return of capital to him has not caused his aggregate capital contribution to fall below three times that of Norman's capital contribution of $139,400, reflecting the parties' three-to-one ownership ratios in USM. Defendants' Response to Plaintiff's First Set of Interrogatories at 3-5 (Response No. 1).

Now, after disappearing for nearly ten years, Norman claims he is entitled to a twenty-five percent distribution or dividend of any and all dollars generated from USM asset sales at any time, notwithstanding Elkin's disproportionate investment of capital, Elkin's numerous loans to the company over the years, and Elkin's extremely disproportionate contribution of human capital (a/k/a his unpaid efforts on behalf of USM). Moreover, Norman even claims he is entitled to twenty-five percent of the proceeds of TEG's sales of Phase II licenses, even though USM was never able financially to participate in the Phase II auctions and never invested any money in any Phase II licenses and Norman never personally put one cent towards any Phase II license purchases.

As his complaint makes clear on its face, and as the foregoing facts further substantiate, all of Norman's claims relate to conduct that spanned the period from 1994 to 2001, at the latest. Defendants have done nothing since 2001, either by way of acquisition, sale, merger, distributions to Elkin, or anything else, that could give rise to a claim. Because this complaint was not filed until December 3, 2005, therefore, all of Norman's claims are barred by the statute of limitations.

Since Norman lacks a single viable claim, Defendants should not be forced to incur any additional expense or effort defending their conduct, conduct that is not only now stale, but conduct that would not have been actionable even if this lawsuit had been timely.

## ARGUMENT

### I.    Summary Judgment Standards

Summary judgment is proper in any case where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A defendant who seeks summary judgment on a plaintiff's cause of action must demonstrate the absence of a genuine issue of material fact by either (1) submitting summary judgment evidence that negates the existence of a material element of plaintiff's claim; or (2) showing there is no evidence to support an essential element of plaintiff's claim. *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996); *see Celotex Corp.*, 477 U.S. at 322-23. A statute of limitations defense is particularly well-suited to summary judgment. *See, e.g., BellSouth Telecomm., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 609 (2d Cir. 1996).

II.    **The Facts of this Case Show That There is no Genuine Issue of Material Fact that all of Plaintiff's Claims Accrued More Than Four Years Prior to Institution of this Suit.**

Because the statute of limitations is an affirmative defense, Defendants have the burden in the first instance to show there is no genuine issue of material fact that all of Plaintiff's claims are time-barred.

A.    **Plaintiff's complaint demonstrates on its face that all of the claims are time- barred.**

Plaintiff's claims can be summarized as follows:

   b.  Elkin breached his 1994 oral agreement with Norman to contribute $750,000 for his seventy-five percent (75%) ownership interest in USM, Amended Complaint at 16;[3]

   c.  Elkin usurped a corporate opportunity of USM by causing TEG to bid at the Phase II Actions, buy licenses it was awarded, and by taking ownership in those licenses in TEG's name, Amended Complaint at 18;

   d.  Elkin breached his fiduciary duties to Norman by causing TEG to bid on and buy Phase II licenses, bundling TEG's Phase II licenses with USM's Phase I licenses in sales of USM's assets, failing to provide the Plaintiff with "complete access" to the company's books and records, failing to fully account for the various sales of assets, failing to distribute twenty-five percent of those sales proceeds to the Plaintiff, and distributing some of those sales

---

[3]    Although Plaintiff has alleged other assorted "breaches,' such as failing to provide the Plaintiff with access to the company's books and records, failing to fully account for the various sales of assets, and failing to distribute twenty-five percent of those sales proceeds to the Plaintiff, Amended Complaint at 16, these claims are more appropriately treated as breaches of Defendants' fiduciary duty.

proceeds to himself either as repayment of loans or a reduction in capital, Amended Complaint 18;

e.  Elkin committed fraud – and fraudulently concealed his wrongful conduct – by virtue of a December 3, 2002 letter he sent to Plaintiff's counsel setting out details of USM asset sales and distributions to him as repayment of shareholder loans, *id.* at 20-21;

f.  Shorin aided and abetted Elkin's breaches of duty, *id.* at 21; and

g.  Elkin and TEG have been unjustly enriched by the foregoing, *id.* at 21-22.

As these allegations demonstrate on their face, all of these claims relate to allegedly wrongful conduct that spanned the period from 1994 to mid 2001, at the latest, except for claims relating to the December 3, 2002, which will be addressed below. Because this complaint was not filed until December 3, 2005, none of Plaintiff's claims were brought before the expiration of the statute of limitations. Thus, Defendants have made the requisite showing and need do no more to be entitled to summary judgment unless and until the Plaintiff can show that one or more of these claims should be tolled. *See, e.g., In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *3 ("[I]t is 'well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss,'" making a motion for summary judgment an equally if not more appropriate vehicle).

B.   **Because Plaintiff's claims should be governed by Pennsylvania's two-year statute of limitations, instead of Delaware's longer three years, all of Plaintiff's claims are time-barred, even the claims relating to the December 3, 2003 letter.**

The only claim that arguably comes within exactly three years prior to this lawsuit is Plaintiff's claim of fraud relating to Elkin's December 3, 2002 letter. Even that claim fails as a matter of law, however, for two reasons. First, there is competent, uncontroverted summary judgment evidence that revelations of any legal significance in Elkin's December 3, 2002 letter – or that he allegedly failed to reveal through that letter, including that Elkin had sold some of USM's assets, or had received distributions from USM while Norman had not, or that TEG had taken USM's place at the Phase II auctions – was known to Norman in advance of the letter, in some cases well in advance. Second, if a shorter two-year statute of limitations applies to Plaintiff's fraud claim, even if the letter had revealed for the first time some new basis for a fraud claim, such a claim would nonetheless be barred by Plaintiff's failure to assert it within two years after the letter. As the following will show, Plaintiff's fraud claim is indeed subject to a shorter two-year limitations period.

A federal court sitting in diversity must apply the statutes of limitations of the forum. *See, e.g., Youell v. Maddox*, 692 F. Supp. 343, 354-55 (D. Del. 1988). "However, Delaware has a adopted a 'borrowing statute' in an effort to prevent nonresident plaintiffs from 'forum-shopping' for a statute of limitations that is longer than the one imposed by the state in which the action arose." *Id.* at 355-56. Delaware's borrowing statute provides in relevant part as follows:

> Where a cause of action arises outside of this State, an action cannot be brought in a court of this State to enforce such cause of action after the expiration of whichever is shorter, the time limited by the law of this

122138.00601/40167300v.1

19

State, or the time limited by the law of the state or country where the cause of action arose, for bringing an action upon such cause of action.

10 Del. C. § 8121.

All of Plaintiff's claims – who is himself an out-of-state resident – arose in Pennsylvania, as the following summary makes clear:

(1) USM was and is headquartered in Pennsylvania, Amended Complaint at 3, ¶ 6;

(2) The Elkin Group was incorporated and is headquartered there, *id.* at 2, ¶ 5;

(3) Both Elkin and Shorin are Pennsylvania residents, *id.* at 2, ¶¶ 3-4;

(4) The oral agreement at issue in this case was negotiated, formed, and carried out in Pennsylvania, *id.* at 2, ¶ 3;

(5) By virtue of his Pennsylvania residence, Elkin negotiated any and all asset sales from Pennsylvania, *id.*;

(6) Any and all asset sales were consummated in Pennsylvania, *id.*,

(7) Any distributions made to Elkin were made in Pennsylvania, *id.*,

(8) Any failure to provide meaningful information to the Plaintiff emanated from there, *id.*;

(9) In short, all of Defendants' alleged acts of wrongdoing originated from or occurred in Pennsylvania; and

(10) USM continues to be operated from Pennsylvania, *id.* at 3, ¶ 6.

Delaware's only connection to this lawsuit is USM's decision to incorporate under its laws. Connecticut is the only other potentially relevant state, but only because the Plaintiff currently resides there, not because Connecticut enjoys any other connection whatsoever to this lawsuit or the torts complained of therein. *Id.* at 2, ¶ 2. Thus, under a

traditional conflict of law analysis and pursuant to Delaware's borrowing statute, all of Norman's claims should be governed by Pennsylvania's two-year limitations period except his breach of contract claim, which should be governed by Delaware's shorter three-year limitations period.

Under both Pennsylvania and Delaware law, "the statute of limitations begins to run as soon as the right to institute and maintain a suit arises; lack of knowledge, mistake or misunderstanding do not toll the running of the statute of limitations." *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983); *accord Ontario Hydro v. Zallea Sys., Inc.*, 569 F. Supp. 1261, 1268 (D. Del. 1983). Moreover, "mere ignorance" will not excuse Plaintiff's tardiness in bringing suit. *David B. Lilly Co., Inc. v. Fisher*, 799 F. Supp. 1562, 1569 (D. Del. 1992), *aff'd*, 18 F.3d 1112 (3d Cir. 1994).

C.    **No tolling doctrine saves the Plaintiff's claims.**

Plaintiff's claims are clearly all "time-barred unless some tolling doctrine applies." *In re ML/EQ Real Estate P'ship Litig.*, 1999 WL 1271885, at *2. While the law recognizes a couple of different tolling doctrines, Plaintiff has only arguably pleaded one: fraudulent concealment. *See, e.g., In re ML/EQ Real Estate P'ship Litig.*, 1999 WL 1271885, at *1 ("It is, of course, the plaintiff's burden to plead facts to 'demonstrate that the statute of limitations was, in fact, tolled.'").

"[F]raudulent concealment requires an affirmative act of concealment by a defendant — an 'actual artifice' that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry." *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *5. "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the

[statute of limitations]." *Id.* Finally, for this doctrine to apply, the Plaintiff must prove "such fraud or concealment by evidence which is clear, precise and convincing." *IEJ Corp. v. Laserow*, 2006 WL 52822, at *4 (Pa. C.P. 2006). Judged by these standards, this burden is demonstrably insurmountable.

> **1.    Elkin's December 3, 2002 letter constitutes the latest possible cut-off for statute of limitations purposes.**

Plaintiff's arguable claims of fraudulent concealment are set out on pages 11 and 12 of the Amended Complaint. Ironically, Elkin's December 3, 2002 letter to Plaintiff's attorney constitutes the very latest possible actionable conduct on Defendants' part, because virtually nothing has occurred with USM since then, and yet the very same letter effectively cuts off any further tolling as a matter of law. Fraudulent concealment, as with all other tolling doctrines, only tolls the limitations period until such time as the Plaintiff ***should have*** discovered his injury by the exercise of reasonable diligence. *In re ML/EQ Real Estate P'ship Litig.*, 1999 WL 1271885, at *3.

Elkin's December 3, 2002 letter, which is attached to and thus incorporated by reference in plaintiff's Amended Complaint as Exhibit A, informs Norman that USM has sold a number of its assets and that it has used most of the proceeds of those sales for 'Repayment of Shareholder Loans." Amended Complaint, at Exhibit A (December 3, 2002 Letter). Norman strives to misconstrue the letter as a further act of concealment by virtue of Elkin's passing remark that the asset sales were subject to confidentiality agreements.[4] However, Norman did not need any additional information to put him on

---

[4]   Contrary to Plaintiff's claim in his complaint, Elkin did not say in the letter "that no further information would be made available regarding the two transaction (sic) because the Company had 'entered into strict confidentiality agreements,'" which Norman claims put him off further inquiry. Amended Complaint at 12. Instead, Elkin merely passed along "that in cases of both of the above transactions USM entered into strict confidentiality agreements that bound USM and anyone receiving information about the transactions from

inquiry notice that Defendants had engaged in conduct that, if not tortuous, certainly suspicious. The law requires no more.

Where a plaintiff is able, through the exercise of reasonable diligence, to ascertain he has suffered a wrong from reviewing documents, including public documents, he has been put an inquiry notice, whether he in fact knew about the wrongful conduct or not. *See, e.g., In re ML/EQ Real Estate P'ship Litig.*, 1999 WL 1271885, at *3. Moreover, it is not required that the information that constitutes inquiry notice necessarily reveals the *details* of the Plaintiff's claims. In other words, "having all of the facts necessary to articulate the wrong is *not* required." *Id.* at *6 (emphasis in original). "Rather, once a plaintiff is in possession of facts sufficient to make him suspicious, or that *ought to make him suspicious*, he is deemed to be on inquiry notice." *Id.* (emphasis added).

That all Norman needed to know to put him on inquiry notice of his claims was in fact known to him by December 3, 2002, at the latest, is bolstered by the fact that he has failed to turn up any information in the related Section 220 action or this lawsuit that his given rise to any new claims. He may have been able to refine somewhat the asset sales numbers and the size of the distributions to Elkin as the result of discovery in the Section 220 action or in this case, or he may have been able to figure out precisely which Phase I and Phase II licenses have been sold, but he has not made any additional claims or asserted any new causes of action as a result of information gleaned through fact discovery. In any event, those are revelations of degrees, not of kind. The classic statement of the rule of accrual in this circuit is as follows:

---

USM," information the sales agreements themselves required Elkin to pass on to anyone receiving such information from USM.

122138.00601/40167300v.1

23

> [T]he time from which the statute of limitations begins to run is not the
> time at which a plaintiff ***becomes aware of all of the various aspects of
> the alleged fraud***, but rather the statute runs from the time at which
> plaintiff should have discovered ***the general fraudulent scheme***. "[T]he
> statutory period . . . [does] not await [plaintiff's] ***leisurely discovery of the
> full details*** of the alleged scheme."

*Robertson*, 609 F.2d at 587 (citing *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402,

410 (2nd Cir. 1975)) (emphasis added).

Not only does Elkin's December 3, 2002 letter constitute the latest possible cut-

off for tolling purposes, Norman has admitted that Elkin told him prior to that letter that

USM had sold some of its licenses and that Elkin had been distributed some of the

proceeds from those sales, even though Norman had not. *See* Elkin Depo. at 278, line 17

– pg. 280, line 2 (testifying that he had told Norman "in the 2000 time frame" that USM

had sold some of its licenses and that Elkin "had received some of the proceeds" from

those sales); Norman Depo. at 64, line 19 – pg. 66, line 10, pg. 66, line22 – pg. 67, line 9,

pg. 72, lines 2 - 23  (same); *see also* September 2002 draft letter from Norman's attorney

to Elkin, produced from Norman's files, demonstrating that Norman's conversation with

Elkin had to pre-date September 2002, attached to Steven L. Caponi Affidavit as Exhibit

B).  Thus, it is uncontroverted that Norman was made aware of both USM asset sales and

distributions to Elkin prior to December 3, 2002, which is more than three years prior to

the filing of this lawsuit.  So, even if Delaware's longer three-year statute of limitations

applied, all of Norman's claims are time-barred.

**2.**  **In addition to Elkin's December 3, 2002 letter and his conversation with Norman beforehand, Norman was on inquiry notice of his claims more than three years prior to filing suit as the result of documents provided to him and documents publicly available through the FCC website.**

A number of documents either provided to Norman or within the public domain put Norman on inquiry notice of his claims well before Elkin's December 3, 2002. All of Norman's claims about the cancellation or forfeiture of Phase I licenses, his claims about TEG stepping into USM's shoes for purposes of the Phase II auctions – which allegations underlie all of Norman's usurpation of corporate opportunity claims – and his claims relating to sales of USM licenses were either known to him or should have been known to him as the result documents provided to him or in the public domain. Documents available through the FCC website, which Norman testified he frequently followed to ascertain what was going on with USM and the 220 MHz industry generally, Norman Depo. at 97, line 16 – pg. 98, line 12, constitute precisely the sort of public notice that the law holds puts a party on inquiry notice. *See, e.g., In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6 (describing SEC filings as "publicly available" documents sufficient to put a party on inquiry notice); *In re Marvel Entm't Group, Inc. v. Mafco Holdings, Inc.*, 273 B.R. 58, 66 (D. Del. 2002) (same); *see also* Amended Complaint at 6 -7 (describing FCC documents relied upon in drafting his complaint, including a public document that "that changed the name of the applicant for the Phase II Auction No. 18 from USM to the (sic) Elkin Group"). Elkin testified in his deposition that it was easily ascertainable from the FCC website that TEG substituted for USM in Phase II Auction 18. Elkin Depo. at 280, line 3 – pg. 281, line 11; *see also* 11/4/98 FCC Form 601 (showing that substitution), attached to the Affidavit of Steven L. Caponi as Exhibit C. Norman has

even pleaded that this substitution was made known through the FCC.    Amended

Complaint at 7, ¶¶ 34-35.  FFC documents also show that Phase II licenses were granted

to TEG.  *See, e.g.*, FCC 10/26/99 Radio Station Authorization (showing five Phase II

licenses issued in TEG's name), attached to the Affidavit of Steven L. Caponi as Exhibit

D.  It was also publicly disseminated by the FCC that TEG that transferred Phase II

licenses it won at auction to others, and not USM.  *Id.* at 281, lines 19 – 22; *see also* FCC

1/05/2000 Public Notice (showing assignments of licenses from TEG to Repeater

Network Spectrum Aq., Inc.), attached to the Affidavit of Steven L. Caponi as Exhibit E.

Norman cannot honestly content that he thought the Phase II licenses bid on by USM in

late 1998 were later acquired by USM.  Not only do publicly available documents belie

such claim, Norman's own communications with third-parties undermine such a claim.

Norman was communicating at that time with a man named Mark Hatten about

a possible acquisition by Hatten of USM.  Elkin Depo. at 281, line 23 – pg. 283, line 20;

Norman Depo. at 99, line 17 – pg. 100, line 9, pg. 101, line 15 – pg. 102, line 3; *see also*

November 10, 1998 e-mail from Norman to Elkin (produced from Norman's files, and

showing Norman's communications with Hatten), attached to the Affidavit of Steven L.

Caponi as Exhibit F; 12/15/98 fax from Norman to Hatten (produced from Norman's

files, enclosing a USM November 19, 1998 balance sheet that says nothing about either a

$200,000 deposit with the FCC or Phase II licenses won by USM in Auction 18),

attached to the Affidavit of Steven L. Caponi as Exhibit G.  In those communications,

Norman never discussed Phase II licenses as part of USM's assets, a fact he would have

been sure to communicate to a potential buyer of USM had Norman believed it to be true.

*Id.*

Finally, there were a number of documents provided to Norman by USM that put him on inquiry notice long before two, or even three, years of filing this lawsuit. As a Subchapter S corporation, for example, USM provided K-1s to its shareholders, including Norman, that reflected any ordinary or capital gains or losses for the company for federal income tax purposes. Norman's K-1s for both 2000 and 2001 clearly show long-term capital gains, which Norman testified USM could have generated only by selling licenses. *See* Norman's 2000 K-1, attached to his amended Complaint as part of Exhibit B, and which is also attached to the Affidavit of Steven L. Caponi as Exhibit H (showing Norman's share of long-term capital gains for 2000 as $16,711); Norman's 2001 K-1, attached to the Affidavit of Steven L. Caponi as Exhibit I (showing Norman's share of long-term capital gains for 2001 as $104,000); Norman Depo. at 77, line 14 – pg. 78, line 8. These K-1s, which Norman testified he received, should have alerted him to the fact that sales of licenses were taking place, especially where those sales caused him personally to realize more than $120,000 in capital gains. Norman Depo. at 78, lines 18 – 25.

It would be hard to find a better case for a summary judgment based on the statute of limitations. Not only is a statute of limitations defense particularly amenable to a motion for summary judgment, especially where, as here, fact discovery has been completed, even Plaintiff's tolling argument can be easily dispensed with as a matter of law. As other courts have appropriately noted, "[w]here inquiry notice is the critical issue, the plaintiff's access to and the sufficiency of the information pointed to by the defendants will usually be the only relevant issues." *In re ML/EQ Real Estate P'ship Litig.*, 1999 WL 1271885, at *2. "If there is no need for a further factual inquiry to

resolve these issues, summary judgment can appropriately be granted to the party whose position is correct as a matter of law." *Id.* Guided by these well-settled principles, summary judgment is demonstrably appropriate here.

III.    **Plaintiff's Breach of Contract Claim Fails for the Additional Reason that it Violates the Statute of Frauds.**

Finally, the only claim governed by the longer limitations period of three years – the breach of contract claim – fails for an additional reason: the statute of frauds. The oral contract at issue in this case is clearly a contract for the sale of securities. As such, "there . . . [must be] some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securi0ties as a defined or stated price." *Conway v. 20th Century Corp.*, 420 A.2d 405, 409 n.5 (Pa. 1980). Otherwise, the statute of frauds bars any claim based on the contract.

Even if the statute of frauds were inapplicable, Norman testified he was aware of Elkin's alleged breach of contract by 1995, at the latest, a full ten years before filing suit. Norman Depo. at 10, lines 5 – 10, pg. 16, lines 12 – 18. This claim, therefore, is the easiest of all to dispose of as time-barred.

## CONCLUSION

For these reasons, Defendants ask the Court to grant their motion for summary judgment in its entirety. Finally, Defendants ask for any and all other relief to which they may be entitled.

Dated:    February 16, 2007

Respectfully submitted,

/s/ Steven L. Caponi
Steven L. Caponi
Delaware Bar No. 3484
Blank Rome LLP
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

Mark A. Evetts
Law Offices of Mark A. Evetts
8502 Jackson Creek Bend Lane
Humble, Texas 77396
Telephone: (281) 458-6914
Facsimile: (281) 458-0326

***Attorneys for Defendants David W. Elkin, Richard M. Shorin, The Elkin Group, Inc., and Nominal Defendant US MobilComm, Inc.***