# EXHIBIT 1



Not Reported in A.2d                                                      Page 1

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

**H**
In re Dean Witter Partnership LitigationDel.Ch.,1998.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
In re DEAN WITTER PARTNERSHIP LITIGATION
No. CIV. A. 14816.

July 17, 1998.

Pamela S. Tikellis, Esquire, and Robert J. Kriner, Jr., Esquire, of Chimicles, Jacobsen & Tikellis, Wilmington, Delaware; of Counsel: Nicholas E. Chimicles, Esquire, Denise Davis Schwartzman, Esquire, Francis J. Farina, Esquire, and M. Katherine Meermans, Esquire, of Chimicles, Jacobsen & Tikellis, Haverford, Pennsylvania, Attorneys for Plaintiffs.
Kenneth J. Nachbar, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; of Counsel: Martin London, Esquire, Richard A. Rosen , Esquire, Robert N. Kravitz, Esquire, and Tracy Anbinder Baron, Esquire, of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, Attorneys for Defendants.

MEMORANDUM OPINION
CHANDLER, Chancellor.
*1 Investors, owners of interests in numerous real estate limited partnerships, seek an accounting and damages from general partners and financial advisors for breaches of the fiduciary duties of care, loyalty and candor. Information available to the investors long before these lawsuits were instituted put the investors on notice of the wrongs about which they now complain. Therefore, all of the investors' claims are barred by operation of the applicable statute of limitations.

I. BACKGROUND

*1 This action is a consolidation of several actions brought by plaintiff investors against defendants Dean Witter, Discover & Co. ("Dean Witter Discover"), Dean Witter Reynolds, Inc. ("Dean Witter Reynolds"), Dean Witter Realty, Inc. ("Dean Witter Realty") (collectively "Dean Witter"), the managing and associate general partners of seven Dean Witter real estate limited partnerships, and Tempo-GP, Inc. ("Tempo-GP"), the general partner of Dean Witter/Coldwell Banker Tax Exempt Mortgage Fund, L.P. ("Tax Exempt Mortgage Fund ").FN1

> FN1. An Order of Consolidation dated August 16, 1996, consolidated three actions filed in the Court of Chancery-*Segel v. Dean Witter, Discover & Co.,* C.A. No. 14816 (filed Feb. 6, 1996); *Schectman v. Dean Witter, Discover & Co.,* C.A. No. 14829 (filed Feb. 9, 1996); *Dosky v. Dean Witter, Discover & Co.,* C.A. No. 14838 (filed Feb. 15, 1996)-and added to the consolidated action plaintiffs from two other suits, one pending in the Southern District of New York-*Grigsby v. Dean Witter Reynolds, Inc.,* S.D .N.Y., No. 96 Civ. 4064(LAP) (originally filed Dec. 27, 1995)-and one pending in the District of Maryland-*Young v. Dean Witter, Discover & Co.,* C.A. No. H-96-1139 (D.Md.) (originally filed Feb. 6, 1996). *See* Order of Consolidation (Aug. 16, 1996) (Docket No. 9).

*1 Plaintiffs are customers of Dean Witter Reynolds, who between 1984 and 1989, purchased from Dean Witter Reynolds units of the following limited partnerships: Dean Witter Realty Income Partnership I, L.P. ("Income I"); Dean Witter Realty Income Partnership II, L.P. ("Income II"); Dean Witter Realty Yield Income Partnership III, L.P. ("Income III"); Dean Witter Realty Income Partnership IV, L.P. ("Income IV"); Dean Witter

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 2

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

Realty Yield Plus, L.P. ("Yield Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield Plus II"); Dean Witter Realty Growth Properties, L.P. ("Growth Properties"); and Falcon Classic Cable Income Properties, L.P. ("Falcon Classic Cable").[FN2] With the exception of Falcon Classic Cable, each of these Partnerships is a wholly-owned direct or indirect subsidiary of Dean Witter and is organized in the State of Delaware.

> FN2. These limited partnerships will be referred to collectively as the "Partnerships." The Partnerships bearing the Dean Witter name, *i.e.,* all of the defendant partnerships except Falcon Classic Cable, will also be referred to as the "Proprietary Partnerships." All of the Proprietary Partnerships are real estate limited partnerships.

**\*1** Defendant Dean Witter Discover, a Delaware corporation, is a publicly-held financial services company providing credit and investment products. Defendant Dean Witter Reynolds, a Delaware corporation, is a broker-dealer and member of the New York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

**\*1** Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the associate general partners of the Proprietary Partnerships.[FN3] Officers and employees of Dean

Witter Realty served as officers and employees of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

> FN3. Managing and associate general partners will be referred to collectively as the "general partners."

**\*2** Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty Income Associates IV, L.P. are the managing and associate general partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are the managing and associate general partners, respectively, of Growth Properties.

**\*2** In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.-the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

**\*2** Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                        Page 3

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

Discover subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities.[FN4]

> FN4. In their Amended Complaint, none of the plaintiffs claims to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fund or its general partner, Tempo-GP. *See Alabama By-Products Corp. v. Cede & Co.,* Del.Supr., 657 A.2d 254, 264 (1995).

**\*2** Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter Reynolds or other selling agents affiliated with Dean Witter from 1984 through the present.[FN5] Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs as their fiduciaries. Plaintiffs complain that they relied-to their detriment-upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants.[FN6]

> FN5. First Consolidated and Amended Class Action Complaint ¶ 37 (Docket No. 10) [hereinafter *Complaint* ]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class of plaintiffs.

> FN6. Complaint ¶ 3.

**\*3** Plaintiffs assert that Dean Witter sold the Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts. [FN7] Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a relationship with the Partnerships and oversee their operation, [FN8] Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

> FN7. Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition* ].

> FN8. Complaint ¶ 25.

**\*3** Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and to aid in marketing new ones.[FN9]

> FN9. Pls.' Memo. in Opposition at 2.

**\*3** Defendants filed a motion to dismiss on December 10, 1996.[FN10] The motion cites several grounds for dismissal, including: (1) that the claims

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

are time-barred; (2) that plaintiffs' allegations fail to state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action. The parties briefed the motion, presented oral argument to the Court, and conducted a supplemental round of briefing specifically addressing the statute of limitations issue. As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims. [FN11] Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

FN10. Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss* ].

FN11. Because I have determined that defendants' claim of time-bar is dispositive, I need not address the other grounds offered by defendants in their motion to dismiss.

## II. LEGAL STANDARD

**\*3** There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations.[FN12] This is so even in equity. Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances.[FN13] Moreover, it is " well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss." [FN14]

FN12. *Boeing Co. v. Shrontz,* Del. Ch., C.A. No. 11273, Berger, V . C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran,* Del. Ch., 313 A.2d 139 (1973) (same).

FN13. *Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 271 (1993). *See also United*

*States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.,* Del.Supr., 677 A.2d 497 (1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

FN14. *Seaboard,* 625 A.2d at 277 (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

**\*4** In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded (*i.e.,* nonconclusory) allegations of the complaint for purposes of the motion.[FN15] I am also required to draw from the complaint all inferences or conclusions of fact that may reasonably be drawn from the specific facts alleged therein.[FN16] Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them.[FN17] In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint.[FN18]

FN15. *Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., C.A. No. 88, 1996, at 11-12, Veasey, C.J. (Sept. 17, 1997) (en banc); *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 & n. 6 (1988).

FN16. *Id.*

FN17. *In re Santa Fe Pac. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 65-66 (1995); *Grobow,* 539 A.2d at 187 & n. 6.

FN18. Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1105 (1985); *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, at 4-5, Chandler, V.C. (Jan. 14, 1994), *aff'd,* Del.Supr., 642 A.2d 837 (1994).
Plaintiffs cite *Snyder v. Butcher & Co.,* Del.Super., C.A. No. 91C-04-289,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                              Page 5

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

Goldstein, J. (Sept. 15, 1992), for the proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder*. *Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has "*successfully pled* fraudulent concealment." *Id* . at 9 (emphasis added). Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz,* op. at 4-5 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing). *See also Shockley v. Dyer,* Del.Supr., 456 A.2d 798, 799 (1983) (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

### III. ANALYSIS

#### A. Statute of Limitations

**\*4** It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.[FN19] With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their pre-consolidation complaints on February 6, 9 & 15, 1996, alleging breaches of fiduciary duty by

Dean Witter and the general partners of the Partnerships.[FN20] Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute. If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

FN19. 10 *Del. C.* § 8106; *Dofflemyer v. W.F. Hall Printing Co.,* D. Del., 558 F.Supp. 372, 379 (1983) (applying Delaware law).

FN20. Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases-*Segel*-was filed February 6, 1996. Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. *See* Order of Consolidation ¶¶ 1, 9.

#### B. Time of Accrual

**\*4** The general law in Delaware is that the statute of limitations begins to run, *i.e.,* the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action. [FN21] Plaintiffs here complain of two different types of injuries. First, they allege that Dean Witter violated its fiduciary duties in the marketing and sale of the Partnerships. Second, plaintiffs allege that defendants [FN22] committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

FN21. *David B. Lilly Co. v. Fisher,* D. Del., 18 F.3d 1112, 1117 (1994); *Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* Del.Supr., 330 A.2d 130, 132 (1974)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                             Page 6
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

.

> FN22. Plaintiffs do not allege post-offering mismanagement with respect to Falcon Classic Cable. Complaint ¶¶ 266-68.

**\*4** Plaintiffs allege that defendants breached their fiduciary duties in recommending and selling to plaintiffs Partnerships that would never (and could never) achieve their promised objectives. Accepting this allegation as true, plaintiffs' injuries occurred *when they purchased* their Partnership interests as a result of defendants' alleged misrepresentations.[FN23] Thus, plaintiffs' cause of action accrued when they invested in the allegedly fraudulent Partnerships. The Partnerships at issue were marketed and sold to the plaintiffs in the mid-to-late 1980s. The last of these sales was completed by the end of 1989.[FN24] Thus, with respect to the marketing and sale of the Partnerships, plaintiffs' cause of action accrued no later than year-end 1989. Absent tolling of the statute of limitations, these claims became stale at the end of 1992-years before plaintiffs filed their Amended Complaint.

> FN23. *Seidel v. Lee,* D. Del., C.A. No. 93-494-JJF, at 16, Farnen, C.J. (Dec. 30, 1996) (applying Delaware law) (fiduciary duty claim accrues when breach accomplished). *See also In re Merrill Lynch Ltd. Partnerships Litig.,* S.D.N.Y., No. 95 Civ. 10657(MBM), at 11-20 (Aug. 26, 1997) (applying federal RICO law, which has same standard for statute of limitations accrual).

> FN24. Complaint ¶¶ 9-23.

**\*5** With respect to the allegations of post-offering breaches arising out of the management and oversight of the Partnerships, plaintiffs allege that defendants operated the Partnerships to benefit themselves at the expense of the investors. Among other things, plaintiffs complain that Partnership real estate investments were chosen solely for the purpose of benefiting other Dean Witter affiliates and that the Partnerships paid excessive commissions and fees. For each Partnership, these

alleged violations of fiduciary duty began-and plaintiffs consequently began to suffer injury-shortly after each Partnership was formed. The Amended Complaint is replete with allegations of injudicious mortgage loans and unwarranted management commissions throughout the mid-to-late 1980s.[FN25] Thus, as with the marketing and sales claims, plaintiffs' cause of action regarding the alleged post-offering breaches accrued no later than year-end 1989.[FN26] Plaintiffs filed their complaint on February 6, 1996-well past the expiration of the three-year limitations period. *Absent tolling,* therefore, all of plaintiffs' claims fall outside the statutory period and would be time-barred.

> FN25. *See, e.g.,* Complaint ¶¶ 91-121 (Yield Plus), ¶¶ 129-35 (Yield Plus II), ¶¶ 136-46 (Yield Plus & Yield Plus II), ¶¶ 156-79 (Growth Properties), ¶¶ 193-98 (Income I), ¶¶ 209-16 (Income II), ¶¶ 233-39 (Income II, III & IV).

> FN26. *Dofflemyer,* 558 F.Supp. at 379 (fiduciary duty claim accrues at time of breach).

### C. Tolling

**\*5** Plaintiffs allege that their claims are timely because the statute of limitations was tolled until January 26, 1996, when an article in the *Wall Street Journal* [FN27]-reporting that the Securities and Exchange Commission ("SEC") was negotiating with Dean Witter Reynolds and two other brokerage firms concerning their limited partnership sales practices during the 1980s and that a settlement fund might be established-first put them on notice of their potential claims.[FN28] Plaintiffs assert three separate theories to support a tolling of the statute of limitations in this case: (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. Each of these doctrines permits tolling of the limitations period where the facts underlying a claim were so hidden that a reasonable plaintiff could not timely discover them.[FN29]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 7

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

FN27. This article will be referred to as the "*Wall Street Journal* article" or the "article."

FN28. Pls.' Memo. in Opposition at 9.

FN29. *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as ' inherently unknowable' injuries or fraudulent concealment.").

**\*5** Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility.[FN30] For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury. [FN31] Often, plaintiffs can establish " blameless ignorance" by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception.[FN32] This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong has been committed. [FN33]

FN30. *Ruger v. Funk,* Del.Super., C.A. No. 93C-04-210, at 5-6, Lee, J. (Jan. 22, 1996).

FN31. *Seidel,* op. at 17.

FN32. *See, e.g., Isaacson,* 330 A.2d at 133-34 (applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").

FN33. *Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646, 650 (1985).

**\*5** The statute of limitations will also be tolled if a defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth.[FN34] Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry.[FN35] "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]." [FN36] Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence. [FN37]

FN34. *Litman,* op. at 8.

FN35. *Halpern,* 313 A.2d at 143.

FN36. *Id.*

FN37. *Id.*

**\*6** Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary.[FN38] Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]." [FN39] This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong.[FN40]

FN38. *Yaw v. Talley,* Del. Ch., C.A. No. 12882, at 10, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

limitations.).

FN39. *Seaboard,* 625 A.2d at 275-76 (Given the fiduciary duties that the law imposes on corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes.).

FN40. *In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., 659 A.2d 760, 769 (Feb. 13, 1995).

**\*6** As the party asserting that tolling applies, plaintiffs bear the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled.[FN41] Significantly, if the limitations period is tolled under any of these theories, it is tolled *only until* the plaintiff discovers (or exercising reasonable diligence should have discovered) his injury. [FN42] Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice.[FN43] Accordingly, for plaintiffs to establish that this action was filed in a timely manner, under any one of these theories, they must convince the Court that they were *not* on inquiry notice of their claims before February 6, 1993 (or before October 7, 1993, with respect to the Falcon Classic Cable claim).[FN44]

FN41. *United States Cellular,* 677 A.2d at 504; *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 35, Allen, C. (Nov. 21, 1995).

FN42. *In re ML-Lee Acquisition Fund II, L.P. Litig.,* D. Del., 848 F.Supp. 527, 554 (1994) (inherently unknowable injuries); *United States Cellular,* 677 A.2d at 503 (equitable tolling); *Litman,* op. at 8 (fraudulent concealment).

FN43. *See Seidel,* op. at 16-17 (inherently unknowable injuries: statute tolled until such time as persons of ordinary intelligence and prudence would have facts

sufficient to place them on inquiry notice of an injury); *Seaboard,* 625 A.2d at 275 (equitable tolling: statute of limitations does not run against plaintiff until he knows or has reason to know facts alleged to give rise to wrong); *Halpern,* 313 A.2d at 143 (fraudulent concealment: running of statute suspended only until plaintiff's rights are discovered or would have been discovered by exercise of reasonable diligence). *See also Nardo v. Guido DeAscanis & Sons, Inc.,* Del.Super., 254 A.2d 254, 256 (1969) (standard for length of tolling is the same for fraudulent concealment, equitable tolling and inherently unknowable torts).

FN44. Where the tolling of the statute of limitations turns on controverted issues of fact, a pre-discovery dismissal of the claim would be inappropriate. *See, e.g., In re Asbestos Litig.,* Del.Super., 673 A.2d 159, 163 (1996) (only when the record is uncontroverted that plaintiff "discovered" his injury more than [three] years prior to filing his suit is summary judgment appropriate). However, when it is clear from the face of the complaint (and the documents incorporated by reference in it) that plaintiffs' tolling theories fail even to raise a legitimate doubt about the time the claims accrued, dismissal is appropriate if the claims were filed after the applicable limitations period expired. Plaintiffs cite *In re Maxxam* for the proposition that "a defendant should not be permitted to use the statute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion." *In re Maxxam, Inc./Federated Dev. Shareholders Litig.,* Del. Ch., C.A. Nos. 12111 & 12353, at 13, Jacobs, V.C. (June 21, 1995). The danger is in dismissing an action prematurely when plaintiffs do not yet have access to the information they need to state their claims fully. Here, it is clear to the Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

that all of the necessary information was not only publicly available, but already in plaintiffs' hands at least as far back as 1990-an entirely different situation than the one presented in the *In re Maxxam* Court.

### D. Were Plaintiffs on Inquiry Notice?

**\*6** Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published.[FN45] That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply did not disclose any information about Dean Witter's sales practices, nor did it identify any limited partnerships by name.

FN45. *See, e.g., Grigsby v. Dean Witter Reynolds Inc.,* Cal.Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.,* E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.,* N.Y. Sup.Ct., Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting

claims with respect to Income II).

**\*6** Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously with the wrongful conduct now being alleged or publicly available Securities Exchange Commission ("SEC") filings made by the Partnerships.[FN46] As a matter of law, defendants assert, disclosures in any of those documents-the sole source of plaintiffs' allegations-were sufficient to place plaintiffs on inquiry notice of their claims long before February 6, 1993.

FN46. According to defendants, investors in each Partnership received from Dean Witter a prospectus (and all applicable supplements), annual and quarterly reports, and periodic "property profiles" describing properties in which the Partnership had invested. Each Partnership also filed with the SEC (and made available to investors on request) reports on Form 10-K, reports on Form 10-Q, and reports on Form 8-K. Defs.' Motion to Dismiss at 7-8.
The Court may properly consider the contents of the *Wall Street Journal* article, Partnership prospectuses, property profiles, customer account statements, quarterly and annual reports and SEC filings in considering this motion to dismiss, because by expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference into the Amended Complaint. *Glaser v. Norris,* Del. Ch., C.A. No. 9583, at 9 n. 1, Chandler, V.C. (Jan. 6, 1992).

**\*7** Although the information they now use to support their allegations was publicly available at the time of the alleged wrongs, plaintiffs claim that they were prevented from discovering defendants' wrongful conduct prior to January 26, 1996, as a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

result of defendants' misrepresentations regarding the health of their Partnership investments. Until reading the *Wall Street Journal* article, plaintiffs assert that they relied-and were entitled to rely-on defendants' assurances that the Partnerships' properties were performing better than comparable properties, that the Partnerships' losses were only temporary, and that these losses were not caused by any wrongful conduct on the part of defendants. In fact, the Partnerships' losses were accompanied by an overall real estate market decline. It was the publication of the article, plaintiffs contend, that first alerted them to their potential claims, *i.e.,* to the idea that their investment losses were the result of defendants' wrongful conduct rather than a general downturn in the real estate market. And it was not until, *after reading the article,* plaintiffs hired a consulting expert, who sifted through "more than 300 publicly-filed documents," that plaintiffs were able to reconstruct the Partnerships and actually discover defendants' wrongful conduct. [FN47] Accordingly, plaintiffs argue they were not on inquiry notice until January 26, 1996 and, therefore, that is the date the statute of limitations began to run.

FN47. Pls.' Memo. in Opposition at 3.

*\*7* As noted above, the limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to the discovery of the injury. [FN48] Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme.[FN49] Thus, the critical inquiry for purposes of this motion to dismiss is: were plaintiffs *entitled to rely* on defendants' representations for as long as they did, *i.e.,* up until publication of the January 26, 1996, *Wall Street Journal* article, or were they on inquiry notice before that date? [FN50]

FN48. *In re ML-Lee Acquisition Fund II,*

*L.P. Litig.,* 848 F.Supp. at 554 (defendants' misrepresentations were unknowable until publication of the Annual Report disclosing particular investment and its lack of success).

FN49. *McCoy v. Goldberg,* S.D.N.Y., 748 F.Supp. 146, 158 (1990) (statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme) (internal citations omitted). Although plaintiffs suggest that their claims were "unknowable" because it required an expert to uncover defendants' alleged wrongdoing, that argument is without merit. It may in fact have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required. Rather, "[o]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Harner v. Prudential Secs. Inc.,* E.D. Mich., 785 F.Supp. 626, 633 (1992) (citations omitted), *aff'd,* 6th Cir., 35 F.3d 565 (1994).

FN50. Defendants assert that when plaintiffs read the article, they responded by doing what they could have done several years earlier-they read the public documents and hired an expert to review them. Defs.' Motion to Dismiss at 15-16.

*\*7* The Partnerships sustained steady losses from the outset. Plaintiffs allege that defendants purposely put them off the trail of inquiry by notifying them of these losses, while at the same time reassuring plaintiffs that the Partnerships were returning profits.[FN51] For example, plaintiffs " received regular distributions, falsely reassuring [them] regarding the financial condition of their investments." [FN52] In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses.[FN53]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

FN51. *See, e.g., Income III,* 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general.... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[ ] problems.... The cash distribution paid during the 1990 fiscal year was ... an annualized return of 6.25%.").

FN52. Pls.' Memo. in Opposition at 51.

FN53. *Id.* at 48.

**\*8** Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of investors' capital rather than a "return on investment." [FN54] Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution ... was an annualized return on investment of 7.5%." [FN55] But in the same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest, hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more than fifteen pages in length. While the distributions were maintained at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

FN54. *See, e.g.,* Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.

FN55. *Yield Plus II,* 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 2-D (Docket No. 23).

**\*8** Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "[t]he emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting." [FN56] Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that beneficiaries are entitled to trust their fiduciaries.[FN57] As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations.[FN58] But, the trusting plaintiff still must be *reasonably attentive* to his interests. "*[B]eneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings.*" [FN59] Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available.[FN60]

FN56. *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 37, Allen, C. (Nov. 21, 1995).

FN57. *See, e.g., Borden v. Sinskey,* 3d Cir., 530 F.2d 478, 489, n. 10 (1976) (" Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

FN58. *Seaboard,* 625 A.2d at 275.

FN59. *Seidel,* op. at 18 (emphasis added).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                      Page 12

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

FN60. *Id.* (rejecting plaintiff's inherently unknowable tolling argument because "the public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, 18 Del. J. Corp. L. 1204, 1213 (1993) ("[I]nterest holders need not delve aggressively into the internal affairs of a ... limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

**\*8** It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs bothered, for example, to read the first page of the 1989 Annual Report for Income II-a document that was delivered to investors by mid-1990 at the latest-they would have been alarmed. [FN61] Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure. [FN62] In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989.[FN63] Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%." This blatant contradiction should have been a "red flag" to any investor-and should have prompted an inquiry by plaintiffs into the health of their investments. [FN64]

FN61. Income II, 1989 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).

FN62. For the fiscal year 1989, the Income

II Partnership shows a net income figure of $7,043,996 and cash distributions of $13,768,450. *Id.* at 7.

FN63. *Id.*

FN64. *In re Prudential Sec. Inc. L.P. Litig.,* S.D.N.Y., 930 F.Supp. 68, 76 (1996) (" Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him.").

**\*9** The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment interests. [FN65] Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement. [FN66] Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships. Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims.[FN67]

FN65. *See, e.g.,* Income I, 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                 Page 13

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

(attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

FN66. *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); *Halpern,* 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").

FN67. *See Ruger v. Funk,* op. at 6 (" Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party-plaintiff no longer blameless.").

The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions *they* were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not the result of investment gains-and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions-described in these annual reports as "annualized returns"-and the declining partners' capital and net income lower than the distributions should have

caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of profits. That is inquiry notice. *Queen Anne Pier Condominium Council v. Raley,* Del.Super., C.A. No. 85C-JA10, at 8, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, *if pursued,* would lead to the discovery).

## IV. CONCLUSION

**\*9** On the basis of this record, I conclude that the information in the annual reports alone should have provided plaintiffs with adequate notice of any alleged misconduct by defendants.[FN68] Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim).[FN69] The limitations period for this cause of action is three years. Plaintiffs' February 1996 filing (the earliest of plaintiffs' filings) comes *more* than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations. [FN70]

FN68. Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 14

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

par, value of the Partnerships. *See In re Prudential Sec. Inc. L.P. Litig.,* 930 F.Supp. at 76-77; (2) that some investors in the Partnerships did manage to file lawsuits against the very same limited partnerships *before* January 26, 1996, suggests the alleged wrongful conduct was detectable by the average investor; and (3) that the *Wall Street Journal* article neither disclosed any concrete information about sales practices or the investments in question, nor mentioned by name the limited partnership defendants in this case, thus raising a serous doubt as to how the article alone could have prompted such an inquiry.

FN69. *Cf. Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, Allen, C. (Nov. 21, 1995) (motion to dismiss denied because issue of plaintiffs' inquiry notice was in dispute).

FN70. Plaintiffs' request, in the alternative, to amend their Amended Complaint is hereby denied. No amendment would cure the fatal flaw in plaintiffs' current Amended Complaint-that it was filed too late. *Glaser v. Norris,* Del. Ch., C.A. No. 9538, at 30-31, Chandler, V.C. (Jan. 6, 1992) ("A court should deny leave to amend a complaint when the amendment would be futile due to the insufficiency of the proposed amendment.")

*9 IT IS SO ORDERED.

Del.Ch.,1998.
In re Dean Witter Partnership Litigation
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**EXHIBIT 2**

Westlaw.

22 Pa. D. & C.4th 119                                                                    Page 1

1994 WL 811469 (Pa.Com.Pl.), 22 Pa. D. & C.4th 119

C

Court of Common Pleas of Pennsylvania, Pike
County.
Genesis Underwriting Management Co.
v.
Insurance Management & Services Inc.
**No. 1342-1992-Civil.**

December 22, 1994

PROCEDURAL BACKGROUND

West Headnotes

**Parties** ⌸25
287k25 Most Cited Cases
Plaintiff could not amend its complaint after the
statute of limitations to allege negligence, fraud,
fraudulent conversion, breach of fiduciary duty and
"corporate veil" claims against previously unnamed
defendants; but plaintiff could amend to add those
defendants for timely breach of contract and
racketeering claims. Motion to amend complaint
nunc pro tunc and for leave to join defendants
granted in part.

THOMSON, P.J.

**119** John J. Klemyer, for plaintiff.

John T. Stich, for defendant.

*1 On October 20, 1992, plaintiff, "GUMCO,"
filed a complaint against defendant, Insurance
Management & Services Inc. "IMS." On July 14,
1994, GUMCO filed an amended complaint against
IMS, Donald W. Kayton **120** and Richard H.
Kayton. On August 25, 1994, defendants filed
preliminary objections to the amended complaint
because plaintiff had not sought leave to amend the
complaint in accordance with Pa.R.C.P. 1033. On
October 17, 1994 plaintiff answered defendants'
preliminary objections and also filed a motion for
leave to file amended complaint nunc pro tunc and
for leave to join defendants. On November 21,

1994, argument was held on motion for leave to file
amended complaint.

DISCUSSION
The question to ask whenever there is an amended
caption to a complaint is "whether the right party
was sued but under a wrong designation, or whether
a wrong person was sued and the amendment was
designed to substitute another and distinct party."
Paulish v. Bakaitis, 442 Pa. 434, 440, 275 A.2d
318, 321 (1971), citing Gozdonovic v. Pleasant
Hills Realty Co., 357 Pa. 23, 53 A.2d 73 (1947).
(emphasis added) An amendment after the statute of
limitations has expired is permissible to correct the
name of a party, such as amending the name of a
company from a corporation to a partnership. Id.
However, "[a]n amendment of the complaint, after
the statute of limitations has run to bring in a new
and distinct party to the action cannot be
permitted." Gilbert v. School District of
Philadelphia, 98 Pa. Commw. 282, 287, 511 A.2d
258, 260 (1986), citing Cianchetti v. Kaylen, 241
Pa. Super. 437, 441, 361 A.2d 842, 843 (1976).
(emphasis added) In particular, it is impermissible
to allow a post-statute of limitations amendment of
a caption originally naming only a company to also
include an individual member of the company who
would not **121** be held personally liable for a
judgment against the company. Waugh v. Steelton
Taxicab Co., 371 Pa. 436, 440, 89 A.2d 527, 529
(1952).

In the instant case, plaintiffs are not correcting the
name of a party, but rather, they are attempting to
add Donald W. Kayton and Richard H. Kayton as
parties to the lawsuit. Since an amendment of a
pleading adding a new party may not take place
after the expiration of the statute of limitations, we
must determine the limitations periods applicable to
this case.

Two counts of the amended complaint assert that
the individually-named defendants acted negligently
when dealing with the funds of GUMCO.
Negligence is governed by a two-year statute of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

22 Pa. D. & C.4th 119                                                    Page 2

1994 WL 811469 (Pa.Com.Pl.), 22 Pa. D. & C.4th 119

limitations. 42 Pa.C.S. §5524(7). Therefore, the negligence claims against the Kaytons should be dismissed as untimely.

In addition to negligence, the plaintiffs have asserted several counts of fraud, fraudulent conversion, breach of fiduciary duty and corporate veil against the Kaytons. A two-year statute of limitations applies to fraud claims. 42 Pa.C.S. § 5524(7). See Maillie v. Greater Delaware Valley Health Care, 156 Pa. Commw. 582, 590, 628 A.2d 528, 532 (1993). Breach of fiduciary duty is governed by the two-year statute of limitations for fraud. Id. Since the counts of corporate veil specifically allege fraud and breach of fiduciary duty, they also fall under the statute of limitations for fraud.

*2 Plaintiff relies on Bohus v. Beloff, to assert that the statute of limitations for fraud runs from the date that the claimant knew or should have known of the fraudulent acts and not from the date the alleged acts were committed. Bohus v. Beloff, 950 F.2d 919 (3rd Cir. 1991). Plaintiff fails to mention that this is the standard to be applied when fraudulent concealment has been asserted by the **122 plaintiff. If a claimant proves fraudulent concealment by clear and convincing evidence, the statute of limitations is tolled until the claimant knew or should have known of the claim. Bohus at 925-26. See also, Federal Deposit Insurance Corporation v. Ciaffoni, 176 Pa. Super. 91, 107 A.2d 211 (1954). Plaintiff in the instant case has not established any acts of fraudulent concealment by the defendants. As a result, the statute of limitations has not been tolled and the claims of fraud, fraudulent conversion, breach of fiduciary duty and corporate veil brought against the Kaytons should be dismissed as untimely.

Plaintiff has asserted counts of breach of contract and racketeering against the Kaytons, who have admitted that these claims are timely filed. As a result, plaintiff should be granted leave to amend the complaint to include the contract and racketeering claims against the Kaytons.

ORDER
And now, December 22, 1994, plaintiff's motion for leave to file amended complaint nunc pro tunc

and for leave to join defendants is hereby granted in part and denied in part:

Counts X and XVI (negligence) shall be dismissed as untimely.

Counts VI, VII, IX, XI, XII, XIII, XV and XVII (fraud, breach of fiduciary duty, fraudulent conversion and corporate veil) shall be dismissed as untimely.

Plaintiff is granted leave to amend the complaint to include Counts VIII, XIV, XVIII and XIX (breach of contract and racketeering).

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

Westlaw.

Not Reported in A.2d                                                      Page 1

Not Reported in A.2d, 2006 WL 52822 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

**H**
IEJ Corp. v. LaserowPa.Com.Pl.,2006.Only the
Westlaw citation is currently available.
Court of Common Pleas of Pennsylvania,
Philadelphia County.
IEJ CORPORATION, and Ilyas M. Shah, a/k/a
Alberto Del Bello, Plaintiffs,
v.
Irving J. LASEROW, CPA and Bassman, Laserow,
Sternberg & Buckman, P.C., a/k/a Bassman,
Laserow & Co., P.C. Defendants.
**No. 1128 MARCH TERM 2004.**

Jan. 10, 2006.

*OPINION*
SHEPPARD, J.
*1 This Opinion is submitted relative to the appeal
by plaintiffs of this court's Order, dated October 25,
2005, which granted defendants' Motion for
Summary Judgment and denied plaintiffs' Motion
for Summary Judgment on defendants' counterclaim.

*1 For purposes of this appeal, this court submits
and relies upon its Opinion of October 25, 2005,
which was filed contemporaneously with the
appealed from Order. This prior Opinion is attached
as Appendix "A" and made a part of this
submission.

*1 For the reasons set forth in the prior Opinion,
this court respectfully submits that its October 25th
Order should be affirmed.

*1 In this action plaintiffs, IEJ Corporation and
Ilyas M. Shah a/k/a Alberto Del Bello are suing
defendants, Irving J. Laserow, CPA and Bassman,
Laserow, Sternbert & Buckman, P.C. a/k/a
Bassman, Laserow & Co., alleging accountant
malpractice. Presently before the court are the
parties' respective Motions for Summary Judgment.
For the reasons discussed, defendants' Motion for
Summary Judgment is granted and plaintiffs'

Motion for Summary Judgment is denied.

BACKGROUND

*1 Ilyas M. Shah a/k/a Alberto Del Bello ("Shah")
is the sole owner and chief operating officer of IEJ
Corporation. IEJ Corporation owns and operates II
Portico Restaurant, in Philadelphia. Defendants are
accountants who represented plaintiffs in a City of
Philadelphia tax audit which began in 1998 and
concluded in August 1999. On August 23, 1999, the
City of Philadelphia forwarded an Audit Notice to
IEJ Corporation which was received on August 26,
1999. The audit resulted in an increase in IEJ
Corporation's tax liability for the years 1995 to
1997, assessing additional taxes in the amount of
$72,393.32, plus interest of $ 11,166.41 and
penalties of $22,529.19, for a total obligation of
$106,088.92.

*1 On or about September 3, 1999, Shah instructed
IEJ Corporation's bookkeeper, Ingrid Villegas, to
fax the Audit Notice to Fred Loew of Bassman
Laserow. (Exhibit "I"; Exhibit "J"; March 10, 2005
pp. 34-35).[FN1]

> FN1. Defendants claim that they
> responded to this letter by phone and fax
> dated September 8, 1999. (Exhibit "K").
> The letter informed Shah that the notice
> was the result of the City's audit, that the
> last day to appeal was October 19, 1999
> and that Shah should seek legal advice or
> inform his new accountant. *Id.* Plaintiffs
> dispute receiving this letter.

*1 Sometime in October 1999, the accountant-client
relationship between plaintiffs and defendants
ended. The parties dispute the exact date the
relationship terminated. According to plaintiffs'
Motion and attached time records, there are no
activity listings after November 1999.[FN2] Further,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                  Page 2

Not Reported in A.2d, 2006 WL 52822 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

the account ledger also attached to plaintiffs' Motion shows no change in the account receivables after the period ending September 30, 1999. Plaintiffs hired Frank J. Vellucci, CPA as its new accountant. Vellucci began performing services for plaintiffs in October 1999. (Exhibit "J" Dfts. Mt. for SJ; dep. of Frank J. Vellucci, p. 34).

> FN2. Although the transaction listing notes a meeting between Shah and plaintiffs on November 17, 1999, plaintiffs were not charged for this meeting. The entry provides "Meeting with Al Shah at our office. Al signed termination letter. Review City Tax Audit and all other outstanding tax and accounting issues." (Exhibit "D" to Plts. Mt. for SJ).

**\*1** From August 23, 1999 to February 2002, the City of Philadelphia forwarded numerous tax delinquent notices to plaintiffs which included the assessed taxes plus additional delinquent taxes, interest and penalties that had accrued. Shah described the delinquent notices as a "rain shower of notices." (Exhibit "B" Dfts. Mt. for SJ.; dep. of Shah, p. 306).

**\*2** On February 25, 2002, the City of Philadelphia instituted suit against plaintiffs for the delinquent taxes, assessed as a result of the audit. The City obtained summary judgment in the amount of $169,000.00 against IEJ Corporation on July 10, 2002. No judgment has been entered against Shah.

**\*2** On March 4, 2004, plaintiffs instituted this malpractice action against defendants, alleging that defendants failed to properly represent plaintiffs in the City audit, failed to handle the necessary appeal or take the steps necessary to permit plaintiffs' appeal, and misrepresented the status of the audit. In September 2004, plaintiffs filed a Second Amended Complaint asserting claims for negligent malpractice (Count I), contractual malpractice (Count II), negligent misrepresentation (Count III) and breach of fiduciary duty (Count IV). Defendants filed a counterclaim, seeking to recover $23,061.00 which represents the outstanding balance due on services rendered as of October 1,

1999.

**\*2** The parties have now filed Motions for Summary Judgment based on the statute of limitations.

### DISCUSSION

#### I. Standard of Review

**\*2** Pennsylvania Rule of Civil Procedure 1035.2 provides two bases for the entry of summary judgment prior to trial. Summary judgment may be properly granted while discovery is still pending where "there is no genuine issue of material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report." *Manzetti v. Mercy Hosp. of Pittsburgh,* 741 A.2d 827, 831 (Pa.Commw.1999) *(quoting* Pa.R.C.P 1035.2(1)). Additionally, "after the [close] of discovery relevant to the motion, [summary judgment is also appropriate if] an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action ... which in a jury trial would require the issues to be submitted to a jury." *Matthews v. Clarion Hospital,* 742 A.2d 1111, 1115, (Pa.Super.1999) *(quoting* Pa.R.C.P. 1035.2(2)).

**\*2** The moving party bears the burden of proving the nonexistence of any genuine issue of material fact. *Walinsky v. St. Nicholas Ukrainian Catholic Church,* 740 A.2d 318, 320 n. 3 (Pa.Commw.1999). In determining whether to grant summary judgment, a trial court must examine the record in a light most favorable to the non-movant and resolve all doubts against the moving party. *Doe v. Philadelphia Community Health Alternatives Aids Task Force,* 745 A.2d 25, 27 (Pa.Super.2000). The entry of summary judgment is warranted only in those cases where the right is clear and free from doubt. *Kee v. Pennsylvania Turnpike Comm'n,* 743 A.2d 546, 549 (Pa.Commw.1999).

#### II. *Defendants' Motion for Summary Judgment is*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 3

Not Reported in A.2d, 2006 WL 52822 (Pa.Com.Pl.)
(Cite as: Not Reported in A.2d)

*Granted Since The Statute of Limitations Bar
Plaintiffs' Tort and Contract Claims.*

**\*2** Defendants move to dismiss plaintiffs' claims on the ground of the applicable statutes of limitations. Plaintiffs' claims sound both in tort (negligence, negligent misrepresentation and breach of fiduciary duty) and in contract. The applicable statutes of limitations are two and four years, respectively. See 42 Pa.C.S. §§ 5524, 5525.

**\*3** Defendants argue that the statute of limitations began to run on August 26, 1999, the date plaintiffs received the Audit Notice from the City. Defendants contend that at that time plaintiffs knew or should have known that the defendants' erroneous advice had caused them injury.

**\*3** Plaintiffs, on the other hand, maintain that they did not know they were injured by defendants until February 2002 when the City of Philadelphia filed the action seeking payment for the delinquent amount assessed. Plaintiffs assert that the defendants led them to believe that the audit had not been completed.

**\*3** Generally, the statute of limitations begins to run "as soon as the right to institute and maintain a suit arises...." *Pocono Int'l Raceway, Inc., v. Pocono Produce, Inc.,* 503 Pa. 80, 468 A.2d 468, 471 (Pa.1983). In other words, the statute of limitations is "triggered upon the occurrence of the alleged breach of duty." *Bigansky v. Thomas Jefferson Univ. Hosp.,* 442 Pa.Super. 69, 658 A.2d 423, 426 (Pa.Super.1995). "Lack of knowledge, mistake, or misunderstanding does not toll the running of the statute of limitations...." *Pocono International Raceway v. Pocono Produce,* 503 Pa. 80, 84, 468 A.2d 468, 471 (1983).

**\*3** One exception to the general rule is the "discovery rule". The discovery rule is applicable when a plaintiff is completely unable, despite the exercise of due diligence, to discover an injury. *Colonna v. Rice,* 445 Pa.Super. 1, 664 A.2d 979 (1995). The "discovery rule" provides that where the existence of the injury is not known to the complaining party and such knowledge cannot reasonably be ascertained within the prescribed statutory period, the limitations period does not begin to run until the discovery of the injury is reasonably possible.

**\*3** Our Supreme Court has explained that "reasonable diligence" is not an absolute standard. *Fine v. Checchio,* 582 Pa. 253, 870 A.2d 850, 858 (Pa.2005). Rather, reasonable diligence is "what is expected from a party who has been given reason to inform himself of the facts upon which his right to recovery is premised." *Id.* Although reasonable diligence is an objective test, it must remain "sufficiently flexible to take into account the differences between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Id.* A party's actions must be evaluated to determine "whether he exhibited those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interest and the interest of others." *Id.*

**\*3** When presented with an assertion that the discovery rule applies, a court must address the ability of the damaged party, exercising reasonable diligence, to ascertain that he has been injured and by what cause. *Id.* Because this question involves a factual determination as to whether a party was able, in the exercise of reasonable diligence, to know of his injury and its cause, ordinarily it is a question for the jury. *Id.* However, where reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines as a matter of law that the discovery rule does not apply. *Id.*

**\*4** In addition to the discovery rule, the doctrine of fraudulent concealment also tolls the running of the statute of limitations. *Id.* The doctrine is based on estoppel and provides that a defendant may not invoke the statute of limitations if, through fraud or concealment, he caused the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts. The doctrine does not require "intent to deceive" but only "unintentional deception." *Fine, supra.* Thus, the doctrine captures unintentional conduct on a defendant's part. Mere mistake, misunderstanding or lack of knowledge is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 52822 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

insufficient however ... and the burden of proving such fraud or concealment, by evidence which is clear, precise and convincing, is upon the asserting party. *Molineux v. Reed,* 516 Pa. 398, 402-403, 532 A.2d 792, 794 (1987).

**\*4** "In order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiffs justifiably relied." *Kingston Coal Co. v. Felton Mining Co. Inc.,* 456 Pa.Super. 270, 690 A.2d 284, 291 (Pa.Super.1997). Thus, in determining whether the doctrine of fraudulent concealment tolls the statute of limitations, the court must focus on whether there has been some affirmative independent act of concealment on behalf of the defendants and, if so, whether plaintiffs justifiably relied on that affirmative independent act of concealment.

**\*4** The reasonable diligence standard for determining the application of the discovery rule is the same threshold test for determining whether the doctrine of fraudulent concealment tolls the statute of limitations. *Fine v. Checchio,* 582 Pa. 253, 870 A.2d 850 at 860.

**\*4** Here, plaintiffs rely upon both the discovery rule and estoppel (the doctrine of fraudulent concealment) to toll the statute of limitations for its claims against defendants. This court finds that plaintiffs failed to produce sufficient evidence to support the application of either exception.

A. The Discovery Rule

**\*4** While a strict application of the limitations period would commence at the time the plaintiffs received the Audit Notice, that is August 26, 1999, plaintiffs argue that they did not discover their injury until the City of Philadelphia served its suit on March 7, 2002. In support, plaintiffs claim that from August 26, 1999 to March 7, 2002 the defendants assured them that the audit had not been completed. The evidence of record, however, does not support this position.

**\*4** The record demonstrates that plaintiffs received

notice of the assessment on August 26, 1999. The notice states, "The enclosed tax bill represents the additional tax due as a result of changes made in the course of our audit of your Philadelphia Business and/or Wage Tax Returns ... If you do not agree with this assessment, you must file a petition before the Tax Review Board within SIXTY (60) days after the mailing of the enclosed bill." (Exhibit "C" ). Shah testified that he found that the contents of this notice to be clear. (Exhibit "1" to Dfts. Reply to Plts. Response to Dfts. Mt. for SJ p. 268).

**\*5** Thus, as of August 26, 1999 plaintiffs' possessed sufficient information to reasonably conclude that the audit was complete and that the appeal period expired within sixty (60) days after the bill was mailed. The Audit Notice should have prompted plaintiffs to conduct some independent inquiry or investigation to ascertain whether the audit was, indeed, complete. Shah did take positive action in that he sent the notice to defendants. (Exhibit "I"). Whether defendants responded to this fax is not dispositive, since the audit notice dated August 26, 1999 was not the only notice plaintiffs received. Plaintiffs received numerous subsequent delinquency notices. These notices should have reasonably alerted plaintiffs that defendants had not taken any action with respect to the original notice. At this point, plaintiffs should have contacted the City or their new accountant. An injured party must use reasonable diligence to be properly informed of the facts and circumstances upon which a potential right of recovery is based and to institute suit within the prescribed statutory period. Here, the plaintiffs failed to do so.

**\*5** This court submits that reasonable minds would find that plaintiffs should have known that defendants failed to take any action with respect to the notice within the appeal period and that harm would result. Accordingly, the court finds as a matter of law that the discovery rule does not apply to toll the statute of limitations.

B. Fraudulent Concealment

**\*5** Plaintiffs also maintain that defendants should be estopped from asserting the statute of limitations as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                               Page 5

Not Reported in A.2d, 2006 WL 52822 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

a defense since they intentionally and willfully gave assurances to plaintiffs that the City audit had not been completed. In order to rely upon fraudulent concealment plaintiffs must present evidence that is clear, precise and convincing. The only evidence relied upon by plaintiffs is an affidavit signed by defendant Irving H. Laserow, CPA.[FN3] The court finds that this affidavit fails to satisfy plaintiffs' burden.

> FN3. The pertinent portions of the affidavit state:
> 3. The audit was never completed because the question of the time that these workers supposedly engaged by IEJ had not been resolved, and to my knowledge no final assessment occurred.
> 4. On June 25, 1999 I wrote a letter and sent the attached letter to the auditor, Vivienne Pettus, on the assumption that no final assessment had been made.
> 5. Ms. Pettus did not respond to my letter.
> 6. I never received any notice of final assessment, nor do I have any knowledge that such a notice was sent to IEJ.
> Exhibit "A"

**\*5** This affidavit was submitted in the enforcement action in April 2003, in order to defeat a motion for summary judgment filed by the City. It clearly constitutes a litigation tool used to support plaintiffs' defense that they never received the notices.

**\*5** A review of the affidavit reveals that it fails to describe any affirmative acts taken by Laserow or his accounting firm to mislead or divert plaintiffs' attention from discovering whether the audit was complete. Notably absent are any averments by Laserow that he or any representative from defendants actually communicated with plaintiffs and informed them that the City's audit was not complete. The affidavit does not say Laserow informed plaintiffs that the audit was incomplete or that he made such representations continually. Rather, it is a hindsight perspective of Laserow's understanding of the audit's status in April 2003. Plaintiffs' reliance upon Laserows' mistake,

misunderstanding or lack of knowledge concerning the status of the audit as set forth in the affidavit is not sufficient evidence of fraudulent concealment *See, Molineux v. Reed*, 516 Pa. 398, 402-403, 532 A.2d 792, 794 (1987).

**\*6** Additionally plaintiffs' reliance upon the statements contained within the affidavit is not justified particularly in light of the fact that plaintiffs continued to receive a "rain shower" of delinquent tax notices, terminated their accountant-client relationship with defendants as of October 1999, and hired a new accountant.

**\*6** Since plaintiffs have failed to put forward any clear, precise or convincing evidence of affirmative, independent and continuous acts by defendants to divert or mislead them from discovering that the audit was complete, the court finds that the doctrine of fraudulent concealment does not apply.

**\*6** Accordingly defendants' Motion for Summary Judgment is granted and the Second Amended Complaint is dismissed against all defendants.

II. *Plaintiffs' Motion for Summary Judgment is Moot.*

**\*6** Defendants filed a counterclaim against plaintiffs' seeking to obtain payment for the balance of services provided to plaintiffs as of October, 1999. Plaintiffs now move this court to dismiss said claim on the basis of the statute of limitations. In response, defendants argue that the claim is for set off and recoupment in the event judgment is entered in plaintiffs' favor on their claims against defendants. In that defendants' Motion for Summary Judgment is granted and disposes of all claims against plaintiffs, defendants' counterclaim for setoff and recoupment is also dismissed. Accordingly, plaintiffs' Motion for Summary Judgment is denied as Moot.

CONCLUSION

**\*6** Based on the foregoing, defendants' Motion for Summary Judgment is Granted and plaintiffs'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2006 WL 52822 (Pa.Com.Pl.)
**(Cite as: Not Reported in A.2d)**

Second Amended Complaint is dismissed against all defendants and plaintiffs' Motion for Summary Judgment is Denied.

**\*6** A contemporaneous Order consistent with this Opinion will be entered of record.

*ORDER*

**\*6** AND NOW, this 25th day of October 2005, upon consideration of defendants Irving Laserow, CPA and Bassman, Laserow, Sternberg & Buchman, P.C. a/k/a Bassman, Laserow & Co., P.C.'s Motion for Summary Judgment and plaintiffs' Motion for Summary Judgment to defendants' Counterclaim, the respective responses in opposition and memoranda, all matters of record and in accord with the contemporaneously filed Opinion, it is ORDERED that

**\*6** 1. Defendants' Motion for Summary Judgment is Granted and the Second Amended Complaint is Dismissed against all defendants.

**\*6** 2. Plaintiffs' Motion for Summary Judgment is Denied.

Pa.Com.Pl.,2006.
IEJ Corp. v. Laserow
Not Reported in A.2d, 2006 WL 52822 (Pa.Com.Pl.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

Not Reported in A.2d                                                                Page 1

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
(Cite as: Not Reported in A.2d)

▷
Briefs and Other Related Documents
In re ML/EQ Real Estate Partnership LitigationDel.Ch.,1999.Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Court of Chancery of Delaware.
In re ML/EQ REAL ESTATE PARTNERSHIP LITIGATION
No. CIV.A. 15741.

Dec. 21, 1999.

Pamela S. Tikellis, Esquire, James C. Strum, Esquire, Robert J. Kriner, Esquire, of Chimicles & Tikellis, Wilmington, Delaware; Of Counsel: Nicholas E. Chimicles, Esquire, Michael D. Gottsch, Esquire, of Chimicles & Tikellis, Haverford, Pennsylvania; Joel Bernstein, Esquire, Diane Zilka, Esquire, of Goodkind, Labaton, Rudoff & Sucharow, New York, New York, Attorneys for Plaintiffs.
Alan J. Stone, Esquire, Jessica Zeldin, Esquire, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Robert S. Smith, Esquire, Steven G. Rawlings, Esquire, Stacey A. Shortall, Esquire, of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York, Attorneys for Defendants EREIM Managers Corp., The Equitable Life Assurance Society of the United States, Equitable Real Estate Investment Management, Inc., EREIM L.P. Corp., and EREIM LP Associates.
Andre G. Bouchard, Esquire, Joel E. Friedlander, Esquire, of Bouchard Margules Friedlander & Maloneyhuss, Wilmington, Delaware, Attorneys for Defendant ML/EQ RealEstate Portfolio.

MEMORANDUM OPINION
STRINE, Vice Chancellor.
**\*1** Plaintiffs Marion F. Scher and Donald T. Follette are unitholders in defendant ML/EQ Real Estate Portfolio, L.P., which is a Delaware publicly registered limited partnership. They bring this action on their own behalf and on behalf of a yet to be certified class consisting of other ML/EQ unitholders ("Unitholders").

**\*1** In simple terms, the complaint alleges that the defendants, who are all affiliates of defendant Equitable Life Assurance Society of the United States and who control ML/EQ, have managed that partnership for the benefit of Equitable and not the Unitholders. Among other things, the plaintiffs allege that the defendants have failed to pay out to the Unitholders the proper amount of distributable cash, have mischaracterized those distributions they did make so as to benefit Equitable at the expense of the Unitholders, and have off-loaded onto ML/EQ poorly performing real estate assets-"dogs" -owned by Equitable.

**\*1** Before me now is the defendants' motion to dismiss elements of the plaintiffs' claims as barred by the statute of limitations. Many of the claims in the complaint challenge actions of the directors taken well before June 16, 1994, three years before the original complaint was filed. The premise of the defendants' motion is that all these actions were sufficiently disclosed to the Unitholders in public filings, thereby precluding the applicability of any so-called tolling doctrines. In this opinion, I find that ML/EQ made sufficient disclosure so as to place the Unitholders on inquiry notice of their claims relating to acts of the defendants before June 16, 1994 and that those claims are time-barred. But, for reasons I explain below, I believe that the implications of that finding for the plaintiffs' overall case are somewhat less significant than the defendants assert.

*I. Procedural And Legal Framework*

*A. Can I Address The Defendants' Limitations Defense On This Motion?*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 2

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**\*1** The defendants raise their statute of limitations defense on a facial challenge to the complaint. In a *footnote*, the plaintiffs assert that it is procedurally improper for me to resolve the statute of limitations issue now because the question of "whether the statute of limitations has been tolled is fact-intensive and is not resolved by reference to the pleading." [FN1] Although it is "well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss," [FN2] this rule is at times of somewhat limited utility, if one is candid about the inquiry often mandated by a motion to dismiss on statute of limitations grounds.

> FN1. Pls. Br. at 8 n. 3.
>
> FN2. *Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 277 (1993).

**\*1** It is, of course, the plaintiffs' burden to plead facts to "demonstrate that the statute of limitations was, in fact, tolled." [FN3] In this case, like many others, however, the defendants rely heavily on documents purportedly demonstrating that the plaintiffs had timely access to the facts underlying their claims such that they should be deemed to have been given "inquiry notice" and be barred from pursuing their claims on that basis. The court's ability to consider these documents is therefore critical to resolving this motion. But, as in other cases,[FN4] it is clear that many of the most important public filings relied upon the defendants on this motion (e.g., the 1992 and 1993 ML/EQ 10-Ks) were consulted, if not specifically relied upon, by the plaintiffs in drafting the complaint.[FN5] "[B]y expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference ...." [FN6]

> FN3. *In re Dean Witter Partnership Litig.,* Del. Ch., Consol. C.A. No. 14816, mem. op at 16, Chandler, C. (July 17, 1998), *aff'd,* Del.Supr., 725 A.2d 441 (1999).
>
> FN4. *E.g., In re Dean Witter,* mem. op. at

18 n. 46.

> FN5. *See, e.g.* Compl. ¶ 24 (citing offering prospectus for ML/EQ), ¶ 48 (citing to 1993 10-K), ¶ 53 (citing to 1995 10-K), ¶ 87 (citing to 1988 10-K and a 1988 8-K), ¶ 88 (citing to 1992 10-K), ¶ 89 (referring to disclosures in 10-Ks subsequent to 1992).
>
> FN6. *In re Dean Witter,* mem. op. at 18 n. 46.

**\*2** But, frankly, I am not sure that all the documents proffered by the defendants in support of the motion are so integral to the plaintiffs' complaint as to render them properly cognizable on a motion to dismiss. [FN7] If not, can the defendants rely upon them? This raises a broader issue: are defendants who are the subject of claims that on the face of the complaint appear to be time-barred therefore stuck with the unappetizing choice between litigating the motion without access to their most formidable weapon- evidence of inquiry notice-or acceding to discovery as the price of obtaining a dismissal of time-barred claims? I think not.

> FN7. Our Supreme Court has cautioned trial courts to be sparing in our resort to documents outside the pleadings. *In re Santa Fe Pacific Corp. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 68-70 (1995); *Vanderbilt Income and Growth Associates, L.L.C. v. Arvida/JMB Managers, Inc.,* Del.Supr., 691 A.2d 609, 613-14 (1996).

**\*2** Rather, resort to Chancery Court Rule 56 seems fair and appropriate in such circumstances. Treating a limitations motion in this manner does not prejudice the plaintiffs in any manner because the plaintiffs can easily rebut the defendants' proof without recourse to discovery. Put simply, if the defendants come forth with evidence demonstrating that the plaintiffs had access to information that should have put the plaintiffs on inquiry notice of claims, the plaintiffs can easily produce affidavits denying that they had access to such information or, as they have here, file briefs asserting that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 3

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

information pointed to by the defendants was insufficient to provide inquiry notice. The plaintiffs do not need discovery to develop additional evidence- evidence they obviously did not have at the time they filed their complaint-to prove that they did not possess, at times much earlier than filing, information sufficient to put them on inquiry notice.

**\*2** Where inquiry notice is the critical issue, the plaintiffs' access to and the sufficiency of the information pointed to by the defendants will usually be the only relevant issues. If there is no need for a further factual inquiry to resolve these issues, summary judgment can appropriately be granted to the party whose position is correct as a matter of law.

**\*2** It is on that alternative [FN8] and straightforward basis that I will proceed to resolve this motion. If, after reviewing the defendants' evidence, there is no dispute that the information was provided or available to the plaintiffs and was sufficient to put the plaintiffs on inquiry notice of their claims, judgment will be granted for the defendants.

> FN8. That is, it is an alternative ground to my reliance on the fact that the plaintiffs incorporated many of the key documents into their complaint. I would also note that the plaintiffs have taken substantial discovery in this case, although that discovery has been less than complete as to events before June 16, 1994.

### B. Basic Statute Of Limitations Principles

**\*2** The amended complaint sets forth claims for breach of fiduciary duty and breach of contract. These claims are both subject, as a general matter, to a limitations period of three years.[FN9] The statute of limitations begins to run on such claims " at the time of the alleged wrongful act[s], even if the plaintiff[s][are] ignorant of the cause of action." [FN10]

> FN9. *In re Dean Witter,* mem. op. at 10; *Fike v. Ruger,* C.A. No. 16791, mem. op.

at 11, Lamb, V.C. (Nov. 19, 1999); 10 *Del. C.* § 8106.

> FN10. *In re Dean Witter,* mem. op. at 11; *Fike,* mem. op. at 12.

**\*2** In this case, the original complaint was filed on June 16, 1997 and thus if the plaintiffs' claims accrued before June 16, 1994, they are time-barred unless some tolling doctrine applies. Unsurprisingly, the plaintiffs contend that at least three such doctrines apply, the inherently unknowable injuries, fraudulent concealment, and equitable tolling doctrines. The plaintiffs bear the burden of pleading facts supporting the applicability of any of these tolling doctrines to their claims.[FN11] The most the plaintiffs can rely on here is the doctrine of equitable tolling.[FN12] Under that theory, "the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary." [FN13]

> FN11. *Id.* at 16.

> FN12. The plaintiffs cannot rely on the inherently unknowable injury and fraudulent concealment doctrines. It was not "a practical impossibility for the plaintiffs" to discover any of the wrongdoing alleged in the complaint; all of the allegedly wrongful acts were readily discoverable from the books and records of ML/EQ. *In re Dean Witter,* mem. op. at 14. Thus the first doctrine, which should in my view rarely, if ever, apply in the entity law context, is inapplicable. The second doctrine does not apply because the plaintiffs have not pled any "affirmative act of concealment" by the defendants that was "intended to put a plaintiff off the trail of inquiry." *Id.* at 14-15 (citation omitted). The closest the complaint comes to doing so is alleging that the defendants attempted to "conceal" a fact by disclosing it in an 8-K rather than a 10-K. *See* Compl. ¶ 87. That is, the complaint does not come close

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                  Page 4

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

at all to adequately pleading fraudulent concealment.

FN13. *In re Dean Witter,* mem. op at 15.

*3 But the equitable tolling doctrine does not afford a plaintiff the luxury of indolence at a defendant's expense. "Significantly, if the limitations period is tolled under [this] theor[y], it is tolled *only until* the plaintiff discovers (or by exercising reasonable diligence should have discovered) his injury. Thus, the limitations period begins to run when the plaintiff is *objectively* aware of the facts giving rise to the wrong, *i.e.,* on inquiry notice." [FN14]

FN14. *Id.* at 16 (citations omitted) (emphasis in original); *see also Fike,* mem. op. at 12.

*3 To establish that they filed this action in a timely manner, the plaintiffs must convince me that they were not on inquiry notice of their claims before June 16, 1994. If they received such notice, the equitable tolling doctrine cannot salvage their claims.[FN15]

FN15. *Id.; Fike,* mem. op. at 12.

II. *Background On ML/EQ And The Other Defendants* [FN16]

FN16. All facts are drawn from the amended complaint, which is cited to as simply the complaint, unless they come from a specifically cited source.

*3 The defendants other than ML/EQ have the bewilderingly similar and unpronounceable names characteristic of limited partnerships. Defendant EREIM Managers Corp. is the managing general partner of ML/EQ (the "General Partner") and the managing venturer of the Joint Venture. As one would also fear, EREIM Managers is a wholly-owned subsidiary of defendant Equitable Real Estate Investment Management, Inc. (" EREIM, Inc."), which in turn is a wholly-owned,

indirect subsidiary of defendant Equitable Life Assurance Society of the United States. Helpfully to clear thinking, Equitable also owns defendant EREIM LP Corp., which happens to be the co-General Partner, along with Equitable itself, of defendant EREIM LP Associates.

*3 Before the reader gets too much insight into what it must feel like to be ex-heavyweight champion George Foreman,[FN17] I hope to cut through this. All that the reader need know is:

FN17. Each of whose several sons is also named George Foreman, with a different numerical suffix. The possibility of differentiating his sons by use of entity suffixes (George Foreman, L.P.; George Foreman, L.L.C.; George Foreman, L.L.P.; George Foreman, P.A., etc.) may have been raised by Mr. Foreman's managers, who no doubt feared that it would limit his flexibility to undertake his various business ventures, such as the marketing of (it is claimed) fat-reducing hamburger grills.

*3 • ML/EQ was formed in 1987. A public offering was made of units in 1987 and 1988, and over $108 million in capital was raised.
*3 • A key selling point of the public offering was that Equitable guaranteed to Unitholders that they would receive, by the time ML/EQ terminates as a limited partnership, in the aggregate, no less than a 9.75% annual rate of return on their adjusted capital contributions plus the return of their initial invested capital (the "Guarantee").[FN18]

FN18. In the interests of simplicity, I am ignoring some niceties, including the fact that the Guarantee was originally held by the Joint Venture and was assigned to the Partnership in exchange for the Partnership's assumption of the Joint Venture's obligations, including the liability to pay a semiannual guarantee fee.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

**\*3** • Partnership distributions from available cash flow were to be made 95% to ML/EQ's Unitholders and 5% to EREIM Managers as General Partner, except that any distributions to EREIM Managers were to be deferred if the Unitholders did not receive at least a 6% annualized return during any six-month fiscal period. [FN19]

> FN19. I am slighting the fact that MLH Real Estate Associates, which is a subsidiary of Merrill Lynch & Company and not a defendant in this suit, is the Associate General Partner of ML/EQ and received part of the payments.

**\*3** • ML/EQ was formed to join with Equitable (through its affiliate, EREIM LP Associates) in a joint venture called EML Associates ("the Joint Venture").
**\*3** • Eighty percent of the Joint Venture is owned by ML/EQ. The other twenty percent is owned by Equitable, which received that interest in exchange for certain zero coupon mortgage notes (discussed in greater detail below) that it contributed to the Joint Venture.
**\*3** • Both ML/EQ and the Joint Venture are managed by an indirect, wholly-owned Equitable subsidiary, EREIM Managers.
**\*4** • Therefore, if ML/EQ or the Joint Venture engaged in transactions with Equitable or another wholly-owned Equitable affiliate, there was an obvious risk of self-dealing because Equitable in reality controls both sides of any such transactions.

### III. Legal Analysis

**\*4** In general, the complaint alleges that EREIM Managers preferred the interests of its owner, Equitable, over the interests of the Unitholders of ML/EQ, to which EREIM Managers owed the traditional fiduciary duties of loyalty [FN20] and care. For purposes of this motion, the claims in the complaint can be classified in three separate categories. The first is comprised of claims alleging that EREIM Managers caused ML/EQ to enter into unfavorable real estate transactions that involved the acquisition by ML/EQ from Equitable of interests in real estate properties that were "dogs" to the detriment of the Unitholders and the improper benefit of Equitable (the "real property claims"). The second category involves the claim that EREIM Managers caused ML/EQ to hoard cash that should have been distributed to the Unitholders but was instead held by ML/EQ to benefit Equitable at the expense of the Unitholders (the "hoarding claims"). The third and final category-asserted formally for the first time in the amended complaint filed August 31, 1999-alleges that EREIM Managers mischaracterized those distributions it caused ML/EQ to make to the Unitholders, again so as to unfairly advantage Equitable (the " mischaracterization claims").

> FN20. Within which would seem to be logically subsumed a duty to act with good rather than bad faith towards the Unitholders. Bad faith conduct toward the Unitholders would seem to be other than loyal conduct. *See Webster's Ninth New Collegiate Dictionary* 446 (1987) (indicating that: the primary definition of "faith" is "allegiance to duty or a person: LOYALTY"; the primary definition of "faithless" is "not true to allegiance or duty: TREACHEROUS, DISLOYAL"; "loyal" is a synonym for "faithful"; and "disloyal" is a synonym for "faithless").

**\*4** Before addressing whether these claims are time-barred, it is worth mentioning two overriding points that color my entire analysis. It was no mystery to Unitholders that ML/EQ engaged in several transactions with Equitable affiliates. To the extent that the results of those transactions were timely reported, plaintiffs "reasonably attentive to their investment interests" therefore had information "to prompt inquiry" into whether these results were the product of fiduciary breaches in the transactions themselves.[FN21] Nor did the plaintiffs just discover that ML/EQ's handling of cash could affect the defendants' obligations and the Unitholders' payouts under the Guarantee. This was obvious from the inception of the business.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                      Page 6

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN21. *In re Dean Witter,* mem. op at 25.

### A. The Real Property Claims

**\*4** There are three real property claims.

**\*4** First, plaintiffs attack a transaction critical to the formation of the Joint Venture itself, which occurred in 1988. The Joint Venture was contemplated from the inception of ML/EQ and was outlined in the prospectus distributed in connection with the original offering of ML/EQ Units.[FN22]

FN22. Zeldin Aff. Ex. 3 (Prospectus, dated April 23, 1987).

**\*4** As discussed, the Joint Venture is owned 80% by ML/EQ and 20% by Equitable. ML/EQ contributed to the Joint Venture the cash it received in the public offering, some $108 million. In turn, Equitable contributed its interests in certain zero coupon mortgage notes (the "Zero Coupon Notes"), which were secured by mortgage liens on two shopping centers, the Northland Center in Michigan and the Brookdale Center in Minnesota. The complaint alleges that it was a breach of fiduciary duty for Equitable to contribute-and for EREIM Managers to accept-the Zero Coupon Notes because they were illiquid and inadequate consideration for a 20% interest in the Joint Venture. In addition, because the Zero Coupon Notes were secured by mortgages on poorly performing properties, ML/EQ was later forced to acquire those properties in the mid-1990s through foreclosure, "which also created an over concentration of Joint Venture assets in shopping centers, in violation of the Partnership's investment objective of diversification." [FN23]

FN23. Compl. ¶ 91.

**\*5** But the prospectus disclosed that the Joint Venture was likely to acquire the Zero Coupon Notes:
**\*5** *Acquisition of Zero Notes from an Affiliate of the Managing General Partner.* The Venture may acquire an interest in some or all of the Zero Notes described under "Real Property Investments-The

Zero Notes" from an affiliate of the Managing General Partner. *The terms of acquisition of the Zero Notes by the Venture from an affiliate of the Managing General Partner have not been determined by arm's length negotiation.*

**\*5** The Venture will hold a diversified portfolio of real estate investments of which approximately 20% to 25% will consist of Zero Notes. Two of the Zero Notes which are expected to be acquired by the Venture are presently owned by Equitable.... See " Conflicts of Interest-Acquisition of Zero Notes from an Affiliate of the Managing General Partner." [FN24]

FN24. Zeldin Aff. Ex. 3 at 13, 50 (second emphasis added).

**\*5** The other real property claims involve the Joint Venture's acquisition of the Richland Mall in 1988 and a mortgage on the Bank of Delaware Building in 1989. Both acquisitions were publicly disclosed in the year they took place. [FN25] Richland was acquired from Integrated Resources, Inc., a corporation that was owned 11.1% by Equitable at that time, a fact publicly reported in an ML/EQ 8-K. The mortgage was obtained from Merrill, Lynch, Pierce, Fenner & Smith, the parent corporation of the Merrill Lynch affiliate that serves as the Associate General Partner of ML/EQ.

FN25. As to the Richland Mall, *see* Zeldin Aff. Exs. 8 at 2 (August 1988 Form 8-K) & 10 at 1-3 (Third Quarter Report dated November 29, 1988). As to the Bank of Delaware Building mortgage, *see* Zeldin Aff. Exs. 9 at 11 (December 1988 Form 8-K) & 11 at 1, 17-20 (1988 Annual Report, dated April 28, 1989).

**\*5** During the early 1990s, each of these investments experienced difficulties. For example, ML/EQ disclosed in its 1992 Annual Report that " [o]ver the past two years, the general economic recession has severely hampered the [Richland

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 7

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Mall's] leasing efforts.... During this period Richland Mall suffered from lease expirations as well as cancellations by of tenant expirations. " [FN26] As to the Bank of Delaware Building mortgage, ML/EQ's 1993 Annual Report, dated April 30, 1994, indicated that the building's occupancy had dropped to less than 68%, that the owner was not certain it would fund improvements necessary to maintain the building's occupancy, and that the owner had recently defaulted on the mortgage.[FN27] That disclosure also indicated that ML/EQ had increased its working capital and reduced distributions to the Unitholders in part to " relet vacant space at ... the property secured by the Bank of Delaware Building mortgage loan." [FN28] Indeed, the complaint itself cites to disclosures of poor performance of these properties in 1990 and years after.[FN29]

> FN26. Zeldin Aff. Ex. 12 at 12 (1992 Annual Report, dated March 26, 1993).

> FN27. Zeldin Aff. Ex. 7 at 6 (1993 Annual Report, dated April 30, 1994).

> FN28. *Id.* at 8.

> FN29. Compl. ¶¶ 87-89.

**\*5** The plaintiffs contend that none of these disclosures put them on inquiry notice that the acquisitions of the Zero Coupon Notes, the Richland Mall, and the Bank of Delaware Building mortgage were suspect. According to them, it was not until the Zero Coupon Notes and the Bank of Delaware Building loans defaulted and ML/EQ acquired the underlying assets secured by those instruments that the plaintiffs "would have had reason to suspect that the defendants had breached their fiduciary duties in making the real property investments." [FN30] This did not happen, plaintiffs say, until ML/EQ made the following disclosure in 1996:

> FN30. Pls. Br. at 14.

**\*6** The Partnership was formed to invest in a diversified portfolio of properties and mortgage loans. The Partnership considers its business to represent one industry segment, investment in real property. The partnership has, however, developed a concentration of retail real estate investments with the inclusion of the Venture's interests in Northland Center and Brookdale Center.[FN31]

> FN31. *Id.* (*quoting* Compl. ¶ 92; Zeldin Aff. Ex. 3 at 40).

**\*6** The problem with this theory is manifest. The plaintiffs have known since 1988 that ML/EQ's interest in the Zero Coupon Notes was secured by the underlying Northland and Brookdale properties. In the event that those properties did not perform well and their owners were unable to make the required payments under the instruments, ML/EQ's recourse was to take direct ownership. Those properties would then become part and parcel of ML/EQ's direct portfolio and thereby affect its balance. Moreover, before June 16, 1994, ML/EQ had made public the difficulties being experienced at each of the properties, difficulties that obviously suggested a risk of default.[FN32]

> FN32. *E.g.,* Zeldin Aff. Ex. 7 at 1-2 (1993 Annual Report dated April 30, 1994) (discussing the delinquency on the Bank of Delaware Building mortgage loan, the difficulties posed by the Northland property that secured one of the Zero Coupon Notes and by the fact that the Joint Venture was likely to assume ownership of that property, and the renegotiation of the mortgage on the Brookdale property securing the other Zero Coupon Note).

**\*6** The mere fact that the owners eventually fell into default did not provide the plaintiffs with information qualitatively more suggestive of a fiduciary breach than that which had been publicly available for many years. A reasonably diligent investor interested in tracking the performance of his investment was on inquiry notice before June 16, 1994.[FN33]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 8

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN33. *In re Dean Witter,* mem. op at 21-25 (where partnerships had suffered steady losses from the outset and the partnerships' public filings contained hard information suggesting potential problems, plaintiffs were on inquiry notice of claims); *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, mem. op at 12, Chandler, V.C. (Jan. 14, 1994) (disclosure of negative results "was enough to put a reasonable investor on a notice that some aspects of the Partnership were not performing as expected. Such information should prompt a reasonable investor concerned about her investment to inquire.... ").

*6 In so holding, I am conscious of the plaintiffs' assertion that if I deem these disclosures sufficient to constitute inquiry notice, "a plaintiff would need to file a law suit every time a fiduciary disclosed a transaction involving possible conflicts of interest in order to avoid a time bar should it later be discovered that the transactions involved breaches of duty." [FN34] While I would hesitate to make the trigger finger of the corporate plaintiffs' bar any itchier,[FN35] no such threat is posed by my ruling. Once information is in the marketplace adequate to constitute inquiry notice, a plaintiff has three years to develop further information and decide to sue. He can use avenues such as a books and records request, if he wishes to proceed in a deliberate and responsible manner. What he may not do is sit on his hands and let more than three years pass and then attempt to hold the defendants accountable for actions they took many moons ago.

FN34. Pls. Br. at 16.

FN35. It is, of course, common for this court to receive numerous complaints attacking transactions within a day, if not hours, of their initial public announcement, based on little more than bald assertions that the transactions are unfair, usually because of some alleged conflict of interest. The deep and abiding trust that is reposed in directors by plaintiffs' lawyers

rarely manifests itself outside of the statute of limitations context.

*6 Although business fiduciaries are rightly subject to more onerous obligations than others in our society, they are not without rights. Business fiduciaries are often sued faster than any defendants in society; they should not also be left open to suit long after the actions for which they are sought to be held liable have been publicly disclosed.

*6 Plaintiffs' argument is also flawed for another reason. Implicit in their reasoning is the contention that fiduciaries must engage in self-flagellating disclosures in order to preserve a statute of limitations defense. According to the plaintiffs, it is not enough that the fiduciaries disclose the material terms of a transaction and the facts necessary for investors to suspect that the transaction could implicate the entire fairness standard. Unless the fiduciaries go further and state that they acted improperly, the plaintiffs suggest, they have not provided the marketplace with information sufficient to put investors (and the sophisticated " private attorneys general" who advise them) on notice of a possible claim.

*7 Putting aside the otherworldly nature of this assertion,[FN36] Delaware law has long held that fiduciaries need not beat themselves up in disclosures or plead guilty to fiduciary breaches. [FN37] The policy basis for adding the words "unless they wish to thereby preserve their right to rely on a statute of limitations defense" to the preceding sentence is not apparent to me. For the fiduciary who is actually innocent of a breach, such an addition would mean incurring the aggravation and cost of defending baseless suits attacking acts that have long faded from the sight of the fiduciary's rear view mirror.

FN36. That is, the proposition that the very diligent corporate plaintiffs' bar lacks adequate ammunition for claims without fiduciary confessions is at odds with the reality that that bar effectively challenges the actions of corporate America on a daily basis without such self-incriminating

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

statements.

FN37.    *E.g.,    Loudon    v.
*Archer-Daniels-Midland Co.,* Del Supr.,
700 A.2d 135, 145 (1997); *Stroud v.
Grace,* Del.Supr., 606 A.2d 75, 84 n. 1
(1992) *(citing Michelson v. Duncan,* Del.
Ch., 386 A.2d 1144, 1155 (1978), *aff'd in
part,* Del.Supr., 407 A.2d 211, 222 (1979)).

### B. *The Hoarding Claims*

**\*7** The plaintiffs allege that the defendants failed to
distribute out to the Unitholders "distributable cash"
and instead held that cash in the Joint Venture and
ML/EQ, generating interest to help the defendants
meet their obligations under the Guarantee and
denying interest rightly belonging to the
Unitholders themselves.

**\*7** According to the complaint, the Partnership
Agreement states that "distributable cash" must be
distributed from the Joint Venture to ML/EQ and
then to the Unitholders on a semi-annual basis. The
term "distributable cash" means all cash receipts
other than "sale or financing proceeds" and capital
contributions, less operating expenses and amounts
set aside for working capital reserves, plus amounts
no longer required to be held as reserves. "Sale or
financing proceeds" are defined as all cash receipts
arising from the sale or financing of Joint Venture
property, less transaction costs.

**\*7** In the words of the complaint:
**\*7** Defendants manipulated the cash receipts of the
Partnership in such a way as to minimize their
obligation under the Guarantee. Specifically,
Defendants hoarded "distributable cash" at the
venture level, earning interest thereon as a hedge
toward their eventual obligation under the
Guarantee. The hoarding of cash unjustly enriched
the Defendants to the detriment of the Limited
Partners. Instead of making payments of
distributable cash to the Limited Partners on a
semi-annual basis as required under the Partnership
Agreement, Defendants held the cash in the Joint
Venture earning interest. Every dollar of interest
earned reduced Defendants' exposure under the
Guarantee because it increased the cash which

could be paid to the Limited Partners from the
Partnership and therefore reduced the amount
payable by the Defendants under the Guarantee.
However, the Limited Partners were entitled to
receive the cash as it was earned by the Partnership.
The Limited Partners were harmed because they
were denied the use of the cash.[FN38]

FN38. Compl. ¶ 41.

**\*7** The underlying facts regarding the defendants'
so-called "hoarding" were, however,
contemporaneously disclosed. During the period
1991 to 1997, the complaint alleges that the
reserves of the Joint Venture went from $3.7
million to $25.3 million. But the major hoarding
concern raised by the complaint is the "huge jump"
in Joint Venture cash reserves-from $3.8 million to
$19 million-that occurred in 1993.[FN39]

FN39. Compl. ¶ 45.

**\*8** This "huge jump" was publicly disclosed on
March 25, 1994 in ML/EQ's 10-K, as was the fact
that ML/EQ would be cutting back on distributions
and increasing reserves:
**\*8** The Partnership withheld the distribution for the
semi-annual period that would have been made in
August 1993. The determination to withhold such
distributions at that time was based upon the then
anticipated needs of the Venture to fund capital
improvements to the Northland Center in order to
preserve the Venture's equity in the Northland Zero
Note in addition to other working capital needs of
the Venture. The levels of future cash distributions
principally will be dependent on the distributions to
the Partnership by the Venture, which in turn will
be dependent on returns from the Venture's
investments and future reserve requirements.

**\*8** It is anticipated that the Partnership will not
make distributions of Distributable Cash from
operations in 1994 which will equal or exceed the
amount distributed in 1993, and such distributions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                            Page 10

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

will probably be less ... The Partnership has increased its working capital reserves, and reduced distributions of Distributable Cash in connection with its efforts to relet vacant space at certain of its Properties, most significantly at Sentry Park West and the property secured by the Bank of Delaware Mortgage Loan, and future distributions are expected to be reduced by amounts to be contributed by the Partnership in connection with the consummation of the proposed Northland transaction and the renovation of the Northland Center. The Partnership would be required to contribute $3.8 million upon the consummation of the proposed Northland transaction and thereafter contribute approximately $6.7 million towards the renovation of the Northland Center. There can be no assurance that distributions of Distributable Cash from operations will be made at any particular level or at all.[FN40]

FN40. Zeldin Aff. Ex. 6 at 21 (1993 Form 10-K, dated March 25, 1994).

**\*8** ML/EQ's 1993 Annual Report, dated April 30, 1994, which was mailed to each Unitholder, likewise stated:
**\*8** It is anticipated that the Partnership will not make distributions of Distributable Cash from operations in 1994 which will equal or exceed the amount distributed in 1993, and such distributions will probably be less.... The Partnership has increased its working capital reserves, and reduced distributions of Distributable Cash in connection with its efforts to relet vacant space at certain of its Properties, .... [FN41]

FN41. Zeldin Aff. Ex. 7 at 8 (1993 Annual Report, dated April 30, 1994).

**\*8** Plaintiffs contend that these disclosures did not put them on inquiry notice "that the Defendants were unjustifiably hoarding distributatable cash." [FN42] Rather, they contend that inquiry notice was provided at the earliest on March 24, 1995, when ML/EQ supposedly disclosed that less than half the

reserves had as of that time been expended for the property improvements for which they had been set aside. It was this fact, plaintiffs say, that first provided any reasonable investor with a reason to suspect wrongdoing. In this regard, the only specific evidence the plaintiffs cite to support the contention that less than half the reserves had been expended for their intended purpose are disclosures supposedly showing that less than half of what was set aside for the Northland transaction was actually used.[FN43]

FN42. Pls. Br. at 12.

FN43. *See* Zeldin Aff. Ex. 17 at 38 (1994 Form 10-K, dated March 24, 1995). The initial disclosure indicating ML/EQ's shift away from distributions toward heavier reserves enumerates several uses for reserved cash. The plaintiffs, who have the burden to show why their more than three year-old claims are not time-barred, fail to address any of these other uses.

**\*9** But the later disclosures to which plaintiffs cite do not seem to show any such thing. The 1993 10-K indicated that ML/EQ was supposed to incur $3.8 million in costs to close the Northland transaction. [FN44] The subsequent disclosures cited by plaintiffs do not indicate that it cost the Partnership any less to do so. As to the Northland renovation costs, the 1993 10-K estimated that ML/EQ would have to contribute approximately $6.7 million. [FN45] The 1994 10-K indicates that the Joint Venture's share of such renovations was "expected to be approximately $8.6 million," and 80% of $8.6 million (the Partnership's share) is $6.88 million. [FN46] The 1995 10-K indicates that the Joint Venture's share turned out to be $7.9 million, and 80% of that is $6.32 million.[FN47] Thus the Partnership saved a little less than $400,000 over the renovation costs estimated in the 1993 10-K.

FN44. Zeldin Aff. Ex. 6 at 21 (1993 Form 10-K, dated March 25, 1994).

FN45. *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

FN46. Zeldin Aff. Ex. 17 at 38 (1993 Form 10-K, dated March 25, 1994).

FN47. Tikellis Aff. Ex. 1 at 49 (1995 Form 10-K, dated April 1, 1996).

**\*9** This seems like a fact less likely to raise a hound's head than the "huge jump" in reserves that the plaintiffs bemoan in the complaint, a jump that was disclosed in March of 1994. Although the March 1994 10-K and April 1994 Annual Report did not confess that the defendants were "hoarding" cash, they straightforwardly indicated the General Partner's intentions and signaled a major shift in strategic direction whereby a substantial sum of cash was set aside for particular, identified purposes. In my view, a reasonable investor attentive to his own interests was at that time given information adequate to trigger a duty to inquire. I note that the complaint itself states that "[a]ctual operations *since 1992* have demonstrated that there was no reasonable operating need for the extraordinary and excessive cash accumulations." FN48

FN48. Compl. ¶ 46 (emphasis added).

**\*9** Therefore, I conclude that the plaintiffs are barred from attacking any decision not to distribute cash before July 16, 1994. Unlike the defendants, however, I view the effect of this ruling to be quite confined. The ruling does not limit the plaintiffs from contending that after June 16, 1994 EREIM Managers, as General Partner, wrongfully failed to pay out distributable cash in excess of what was necessary to be maintained as reserves. What the ruling does foreclose is any claim by the plaintiffs for damages related to the failure of EREIM Managers to distribute such cash before June 16, 1994. FN49 In contrast to the defendants, I believe that the plaintiffs adequately allege that after June 16, 1994 the defendants hoarded cash that they knew exceeded what was necessary to be maintained as reserves.

FN49. Of course, any attack on the other defendants' conduct in that respect is also

barred.

### C. *The Mischaracterization Claims*

**\*9** The mischaracterization claims are based on the assertion that the defendants distributed cash to Unitholders as sale or financing proceeds that should have been characterized as distributable cash. The financial significance of such a characterization is important to the Unitholders, because a distribution of sale or financing proceeds is treated as a return of capital to the Unitholders and reduces the "adjusted capital contributions" on which the 9.75% guaranteed return is due.

**\*10** Because the mischaracterization claims were pled FN50 for the first time in the amended complaint, defendants advance two arguments to support this aspect of their motion. First, the defendants contend that the mischaracterization claims are all stale regardless of whether the limitations date based on the original complaint-June 16, 1994-appropriately applies to those claims. Second, the defendants argue that the mischaracterization claims do not fairly relate back to the original complaint and must therefore be deemed time-barred if the plaintiffs had inquiry notice as of August 31, 1996, which was three years before the August 31, 1999 amended complaint was filed. I will address both arguments.

FN50. I intentionally use this simpler form, although I readed (sic?) that the supposedly "best past-tense and past-participial form" is "pleaded." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 667 (2d ed.1995). In my view, "pled " is less awkward than "pleaded" and more consistent with the similarly pronounced past tenses of read and lead.

### 1. *The Northland Shopping Center Claim*

**\*10** First, the plaintiffs allege that a $6.6 million payment made by the Joint Venture in connection with its acquisition of the Northland Shopping Center in 1994 should have been treated as an additional capital contribution by the Unitholders,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                      Page 12

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

increasing the capital on which the guaranteed return was payable. ML/EQ's share of this payment was approximately $4.73 million. This transaction was disclosed in a 10-Q on May 15, 1994.[FN51]

> FN51. Zeldin Aff. Ex. 16 at 9 (Form 10-Q for period ending March 31, 1994, dated May 15, 1994). The transaction was again disclosed in ML/EQ's 1994 10-K and Annual Reports, dated March 24 and April 28, 1995, respectively. Zeldin Aff. Ex. 17 at 10, Ex. 18 at 1, 5.

**\*10** Plaintiffs argue that this disclosure did not put them on inquiry notice of wrongdoing. Yet the May 15, 1994 10-Q clearly indicated that the Joint Venture paid $6.6 million to Northland's owner at that time. The disclosure did not indicate that the payment was to be treated as an additional capital contribution by Unitholders and added to their capital accounts. Any reasonable investor who believed, unlike the General Partner, that the payment constituted an addition to Unitholders' capital accounts under the ML/EQ Partnership Agreement had information sufficient to give him reason to suspect that the $4.73 million had not been accounted for in this manner. Thus this claim is time-barred regardless of whether the amended complaint's mischaracterization claims relate back to the filing of the original complaint.

### 2. The Merritt Loan Claim

**\*10** The second mischaracterization claim involves distributions resulting from payments made to the Joint Venture for the payoff of a mortgage loan secured by an office building in Norwalk, Connecticut (the "Merritt Loan"). Between 1994 and 1998, the proceeds of the payoff-a sum totalling over $8 million-were distributed to the Unitholders by ML/EQ. Plaintiffs claim that the distributions were improperly accounted for as distributions of sale or financing proceeds rather than of distributable cash. They also claim that they "did not know the characterization of all these distributions until after June 16, 1994" because it was not until ML/EQ's 1994 10-K, filed March 24,

1995, that the Unitholders knew that the distributions were to be characterized as sale or financing proceeds.[FN52]

> FN52. Pls. Br. at 18 (*citing* Zeldin Aff. Ex. 17 at 17.)

**\*10** But ML/EQ's 1993 10-K, dated March 25, 1994, clearly states:
**\*10** In receiving $8.4 million, [the Partnership's] 80% share of the $10.5 million [payoff] payment, the Partnership realized the carrying value of the mortgage loan on its books. *The Partnership's share of the amount represents Sale or Financing Proceeds (as defined in the Partnership Agreement).*[FN53]

> FN53. Zeldin Aff. Ex. 6 at 16 (emphasis added).

**\*11** Thus the Unitholders were given a clear indication of how the payoff proceeds were to be treated. As a result, regardless of whether the mischaracterization claims relate back, the plaintiffs' attack on the characterization of the Merritt Loan payoff proceeds is time-barred.

**\*11** In so holding, I reject the plaintiffs' contention that even though there was timely notice of the characterization of these claims, the statute of limitations should be tolled because the plaintiffs required the assistance of an "expert" to determine from the public disclosures that these proceeds had been mischaracterized under the Partnership Agreement. The plaintiffs have failed to identify any material omission from ML/EQ's disclosures regarding the terms of the Merritt Loan and the basis on which it was paid off. Once again, the plaintiffs seem to believe that the statute of limitations should be tolled so long as the defendants refuse to make self-flagellating admissions of their own wrongdoing. Indeed, it is possible to understand the plaintiffs as arguing that the statute of limitations was tolled indefinitely on the Merritt Loan claims, or at least until such time as a Unitholder engaged an expert to examine the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 13

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

issue. The unfairness of this proposition seems to me to be self-evident.

**\*11** I also reject the plaintiffs' assertion that they can challenge distributions made from the Merritt Loan proceeds after June 16, 1994. Unlike the issue of whether ML/EQ needs to retain certain reserves, which involves a continuing process of review by the General Partner, the General Partner's decision about the characterization of all the Merritt Loan proceeds was made and disclosed before June 16, 1994. However the plaintiffs try to look at it, they are challenging that initial decision, and an attack on that decision is untimely.

### 3. The Saab Loan Claim

**\*11** The final mischaracterization claim involves a $1.1 million lease termination payment ML/EQ received from Saab in 1992. The Unitholders received $878,707 from that payment in the form of sale or financing proceeds. In ML/EQ's 1991 Annual Report, dated April 29, 1992, Unitholders were told that Saab had paid off the remaining amount of a lease it had with the Joint Venture for 100% occupancy of a warehouse/distribution facility in Atlanta, Georgia.[FN54] Unitholders were specifically informed that "[t]he Partnership's share of this amount constitutes Sale or Financing Proceeds (as defined in the Partnership Agreement) and will be distributed ... together with the next scheduled semi-annual distribution in August." [FN55] The plaintiffs' only contention is that they needed expert assistance to determine that these proceeds were mischaracterized and that therefore only a self-flagellating disclosure would have been sufficient to set the statute in motion. For reasons previously discussed, I reject this argument and find that this claim is time-barred.

> FN54. Zeldin Aff. Ex. 15 at 4 (1991 Annual Report, dated April 29, 1992).

> FN55. *Id.; see also* Zeldin Aff. Ex. 12 at 13 (1992 10-K, dated March 26, 1993) (making the same disclosure).

### 4. *Do The Mischaracterization Claims Relate Back To The Original Complaint?*

**\*12** The defendants also contend that the mischaracterization claims do not relate back to the June 16, 1997 original complaint and thus are barred so long as the plaintiffs were on inquiry notice of those claims before August 31, 1996, three years before the amended complaint was filed.

**\*12** Under the only provision of Chancery Court Rule 15(c) pertinent to this case, "[a]n amendment of a pleading relates back to the date of the original pleading when ... (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading ...." [FN56] For a plaintiff to invoke this subsection of Rule 15(c) successfully, she must show that the " 'defendant should have had notice from the original pleadings that the plaintiff's new claim might be brought against him.' " [FN57]

> FN56. Ch. Ct. R. 15(c)(2).

> FN57. *The Scott Fetzer Co. v. Douglas Components Corp.,* Del. Ch., C.A. No. 11327, mem. op. at 17, Hartnett, V.C. (April 12, 1994) (*quoting Atlantis Plastics Corp. v. Sammons,* Del. Ch., 558 A.2d 1062, 1065 (1989)).

**\*12** The original complaint fairly raised the hoarding claims by alleging that ML/EQ had been accumulating distributable cash that should have been paid out to the Unitholders. That complaint also indicates that part of the motivation for that hoarding was to reduce the defendants' obligations under the Guarantee.

**\*12** But the complaint nowhere complains about any mischaracterization of funds as sale or financing proceeds rather than distributable cash. Indeed, the original complaint never mentions the Saab transaction in any respect. As to the Merritt Loan, the original complaint states:
**\*12** [D]uring the later part of 1993, the Joint Venture received "sale or financing proceeds" in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 14

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

the approximate amount of $10.5 million in connection with the payoff of the Merritt Loan. Instead of distributing this money to the Partnership, and in turn to the Limited Partners, Defendants kept the bulk of the money in the Joint Venture ....” [FN58]

FN58. Original Compl. ¶ 43; *see also id.* at ¶ 40 (“Moreover, according to the Partnership's 10-Ks, all of the amounts distributed by the Partnership to the Limited Partners from 1993 to the present were ‘sale or financing proceeds' associated with the payoff of the 201 Merritt Seven Joint Venture Loan (‘ Merritt Loan') in 1993.”).

**\*12** Yet the original complaint does not challenge the characterizations of those loan payments.

**\*12** Similarly, the original complaint mentions the Northland transaction, which required the Joint Venture to pay $6.6 million towards the purchase of that shopping center.[FN59] The plaintiffs now allege that ML/EQ's $4.73 million share of that payment should have been credited to the Unitholders' capital accounts. But the original complaint in no respect puts the defendants on notice that they should have expected to later face such a claim.

FN59. Original Compl. ¶ 62.

**\*12** The original complaint simply does not provide any indication that ML/EQ's characterization of funds might become the subject of a specific claim later in the lawsuit. If anything, the original complaint's reference to the Merritt Loan payments as sale or financing proceeds without disputation of that characterization suggests the opposite. The complaint's total silence about the Saab transaction and its failure to focus on the payment involved in the Northland transaction also imply that the plaintiff had no gripe about the characterization of the funds involved in those transactions.

**\*12** As a result, I conclude that the plaintiffs'

mischaracterization claims do not relate back to the filing of the original complaint. The plaintiffs admit that they were on inquiry notice of the Merritt Loan claims at least as early as March 24, 1995.[FN60] Therefore, those claims are time-barred even if I err in ruling that the plaintiffs received inquiry notice sufficient to bar the mischaracterization claims if they were deemed filed on June 16, 1997.

FN60. Pls. Br. at 18.

**\*13** As to the Saab and Northland mischaracterization claims-claims with respect to which the plaintiffs contend that they never received inquiry notice before discovery was taken in this lawsuit-the fact that those claims do not relate back also bolsters their untimeliness. Between June 16, 1994 and August 31, 1996, additional public disclosures were made regarding the Northland transaction, none of which indicated that the Unitholders' capital accounts had been credited as a result of ML/EQ's $4.73 million payment. During that same period, ML/EQ made no disclosures indicating that the Saab transaction proceeds were being recharacterized from sale or financing proceeds to distributable cash.

**\*13** Because the plaintiffs have the burden to demonstrate that the statute was tolled, this additional period during which the plaintiffs had access to material financial information about their claims reinforces my conclusion that they sat on their rights in a manner prohibited by the statute of limitations.

IV. *Conclusion*

**\*13** For the foregoing reasons, the defendants' motion is granted in substantial part and denied as to the plaintiffs' allegation that ML/EQ improperly hoarded cash after June 16, 1994 in excess of what was necessary for reserves. IT IS SO ORDERED.

Del.Ch.,1999.
In re ML/EQ Real Estate Partnership Litigation
Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                              Page 15

Not Reported in A.2d, 1999 WL 1271885 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Briefs and Other Related Documents (Back to top)

• 1999 WL 34000968 (Trial Motion, Memorandum
and Affidavit) Defendants' Joint Reply Brief in
Support of their Motion to Dismiss the
Consolidated and Amended Class Action Complaint
(Nov. 15, 1999) Original Image of this Document
(PDF)
• 1999 WL 34000966 (Trial Pleading) Answer to
Consolidated and Amended Class Action Complaint
(Oct. 8, 1999) Original Image of this Document
(PDF)
• 1999 WL 34000967 (Trial Pleading) Answer to
Consolidated and Amended Class Action Complaint
(Oct. 8, 1999) Original Image of this Document
(PDF)
• 1999 WL 34000965 (Trial Motion, Memorandum
and Affidavit) Defendants' Joint Brief in Support of
their Motion to Dismiss the Consolidated and
Amended Class Action Complaint (Oct. 1, 1999)
Original Image of this Document (PDF)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.