# EXHIBIT
# 1

CONDENSED COPY

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3
 4   JEFFREY M. NORMAN           :   C.A. No. 06-005-JJF
         Plaintiff,             :
 5                               :
         - vs -                  :
 6                               :
 7   DAVID W. ELKIN, RICHARD M.  :
     SHORIN and THE ELKIN GROUP, :
     INC.,                        :
 8        Defendants,            :
                                 :
 9        and                    :
                                 :
10   US MOBILCOMM, INC.,         :
          Nominal Defendant.     :
11
12
13          ORAL DEPOSITION OF DAVID W. ELKIN, taken before
14   Nancy R. Toner, Registered Professional Reporter, Notary
15   Public, at the offices of BLANK ROME, LLP, 1201 North Market
16   Street, Suite 800, Wilmington, Delaware on Wednesday,
17   December 6, 2006, commencing at 9:50 a.m.
18
19
20
21
22            LOVE COURT REPORTING, INC.
                 1500 Market Street
23             12th Floor, East Tower
            Philadelphia, Pennsylvania  19102
24                (215) 568-5599
```

David W. Elkin

**Page 2**

1  APPEARANCES
2
3  COZEN O'CONNOR
   BY: SEAN J. BELLEW, ESQUIRE
4  Chase Manhattan Centre, Suite 1400
   1201 North Market Street
5  Wilmington, Delaware 19801
   (302) 295-2000
6  Attorney for Plaintiff
7
   LAW OFFICE OF MARK A. EVETTS
8  BY: MARK A. EVETTS, ESQUIRE
   8502 Jackson Creek Bend Lane
9  Houston, Texas 77396
   (281) 458-6914
10 Attorney for Defendants
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1              INDEX
2
3  WITNESS:
4  DAVID W. ELKIN
5    By Mr. Bellew            4
6    By Mr. Evetts          260
7    By Mr. Bellew          284
8
9
10 EXHIBITS:
11 ELKIN 1  Defendants' Response to Plaintiff's    61
          First Set of Interrogatories,
12        Defendants' Response to Plaintiff's
          First Request for Admission, and
13        Defendants' Response to First Request
          for Production.
14
   ELKIN 2  Paid In Capital Register        112
15
   ELKIN 3  US Mobilcomm, Inc. and US Mobilcomm   115
16        Management Corp. Shareholder Equity
          Contributions
17
   ELKIN 4  US Mobilcomm, Inc. Shareholder      154
18        Equity Contributions
19 ELKIN 5  Shareholder Loan Agreement      179
20 ELKIN 6  US Mobilcomm, Inc. Analysis of     191
          License Sales and Disbursements
21
   ELKIN 7  6/8/2006 Letter from Mark A. Evetts   257
22        to David A. Felice
23 ELKIN 8  Draft of letter to Jeff Norman from   260
          David W. Elkin
24

**Page 4**

1          DAVID W. ELKIN was called as a witness
2  after having been first duly sworn according to
3  law, was examined, and testified as follows:
4          ----------
5          -- EXAMINATION --
6  BY MR. BELLEW:
7      Q.  Good morning, Mr. Elkin. As you know, my
8  name is Sean Bellew from Cozen O'Connor and I'm here
9  on behalf of the plaintiff Jeff Norman.
10         Can you just identify yourself for the
11 record?
12     A.  David Wayne Elkin.
13     Q.  And could you give us your current
14 residence?
15     A.  805 Bryn Mawr Avenue, Newtown Square,
16 Pennsylvania, 19073.
17     Q.  And that's actually the address for US
18 Mobilcomm, Inc. which we will be discussing today,
19 correct?
20     A.  That's correct.
21     Q.  And it's also the address of the Elkin
22 Group, Inc., correct?
23     A.  Correct.
24     Q.  And prior to a merger event, it was the

**Page 5**

1  address for US Mobilcomm Management, Inc., correct?
2      A.  I believe the name was US Mobilcomm
3  Management Corp.
4      Q.  With that correction, it was the address?
5      A.  Correct.
6      Q.  Mr. Elkin, I know that you've given
7  depositions before, specifically one in this case.
8  So I'm going to — I also know that your — you have
9  a law degree so I'm going to dispense with
10 instructions.
11         But you generally understand what we are
12 doing here today, correct?
13     A.  Correct.
14     Q.  And sitting to your right is Mark Evetts.
15 Mr. Evetts is representing you here today
16 personally?
17     A.  Correct.
18     Q.  Does Mr. Evetts —
19     A.  As well as the company.
20     Q.  As well as the company and as well as
21 Mr. Shorin?
22     A.  That's correct.
23     Q.  And when you say the company today, we're
24 going to refer to US Mobilcomm, Inc., correct?

2 (Pages 2 to 5)

Love Court Reporting, Inc.

David W. Elkin

Page 34

1  and US Mobilcomm became your focus?
2      A.  I believe I may have been involved in US
3  Mobilcomm prior to the complete cessation of
4  activities at Bachow and Elkin.
5      Q.  So up until 1985 after you graduated from
6  law school, you served as -- you worked as an
7  associate in the tax law department of Greenberg
8  Traurig and served as general counsel for an
9  investment resources company, and you also were
10  involved in an endeavor involving an FCC related
11  business?
12          MR. EVETTS:  Objection to the form.
13          THE WITNESS:  You're trying to lump
14      everything together.  I've specifically gone
15      through each period of employment and tried to
16      be as specific as you've asked questions of me
17      in terms of what I did there.
18  BY MR. BELLEW:
19      Q.  Well, I'm trying to ramp up right before
20  US Mobilcomm began.  At that point you had
21  experience as a tax lawyer.  You had a degree from
22  University of Miami, correct?
23      A.  Correct.
24      Q.  And you also served as general counsel of

Page 35

1  a company?
2      A.  Of a different company, yes.
3      Q.  And after that, you actually were involved
4  in an endeavor for over five years related to cable
5  television systems?
6      A.  Correct.
7      Q.  You stated that the cessation of Bachow
8  and Elkin overlapped somewhat with your focus on US
9  Mobilcomm; is that accurate?
10      A.  I said it may have in terms of the
11  cessation of existence of the various entities.
12      Q.  When did you first envision a business
13  like the one that became US Mobilcomm?
14      A.  When I entered a lottery, I believe in
15  1992, for the awarding of licenses in the 220
16  industry.
17      Q.  Do you recall the date of that?
18      A.  To the best of my recollection, it was
19  1992.  I don't recall the month.
20      Q.  So in 1992 did you participate in this
21  lottery?
22      A.  Yes.
23      Q.  Were you --
24      A.  The Elkin Group participated.

Page 36

1      Q.  Was The Elkin Group awarded a license as a
2  result?
3      A.  It was.
4      Q.  And these -- the US Mobilcomm, The Elkin
5  Group, when we are talking about these licenses,
6  these are these 220 megahertz licenses?
7      A.  The Phase I licenses.
8      Q.  Talking about the industry, the industry
9  was focused on 220 megahertz, that bandwidth,
10  correct?
11      A.  Correct.
12      Q.  Can you describe for me -- so in 1992 The
13  Elkin Group was a successful lottery winner for
14  certain licenses?
15      A.  For a license.  It applied for some number
16  of licenses.  It was awarded or it was selected as a
17  potential licensee in Sacramento, California.
18      Q.  Can you describe for us that lottery
19  process?
20      A.  To the best of my recollection, the
21  application process was done through contracted
22  third parties.  To the best of my recollection, you
23  filed an application for each of the markets that
24  you were interested or that you wanted to enter the

Page 37

1  lottery for.
2      And if you were selected in that lottery
3  which, to the best of my knowledge, this
4  recollection was a pure random drawing, you had the
5  opportunity to be awarded that license.
6      Q.  So as of 1992, the Federal Government was
7  lotterying off these licenses, correct?
8      A.  As of 1992 they were.  It may have started
9  in 1991.  I don't recall the date.
10      Q.  And in order to participate, you just
11  needed to fill out an application and throw your --
12  sort of your ticket in the hat there to be picked
13  out?
14          MR. EVETTS:  Objection to the form.
15          THE WITNESS:  Again, you're trying to
16      summarize my prior testimony that I think was a
17      little more detailed.  I would prefer to stand
18      on that.
19  BY MR. BELLEW:
20      Q.  Do you know how many people were awarded
21  these licenses under the Phase I lottery?
22      A.  I do not.
23      Q.  How many Phase I licenses were lotteried
24  off?

10 (Pages 34 to 37)

Love Court Reporting, Inc.

David W. Elkin

**Page 38**

1    A.  I don't know.
2    Q.  When the Phase I lottery occurred, was a
3    Phase II lottery envisioned?
4    A.  I don't know.
5    Q.  When was the first time -- what was your
6    plan to capitalize on this license that you were
7    awarded in Sacramento?
8    A.  At what point in time?
9    Q.  At the point in time you decided to submit
10   an application for the lottery.  Did you have one?
11   Did you have a plan to make money off of it?
12   A.  Possibilities existed of possibly selling
13   the license.  If I were awarded or if The Elkin
14   Group were awarded a license, the possibility
15   existed to see if there was a business to operate
16   utilizing it.
17   Q.  Prior to its participation in the Phase I
18   lottery, what did The Elkin Group do, if anything?
19   A.  I don't believe it had any meaningful
20   activities at that time.
21   Q.  When was it created?
22   A.  I don't recall the date.  But early 1990s,
23   sometime prior to the filing to participate in the
24   auction or lottery.

**Page 39**

1    Q.  And is The Elkin Group a Pennsylvania
2    corporation?
3    A.  I believe so.  But as I sit here today I'm
4    not sure.
5    Q.  And you own all the stock in that company,
6    correct?
7    A.  I do.
8    Q.  When did you first get involved -- let me
9    back up.
10        Ultimately, these Phase I licenses were
11   awarded sometime in 1992.  Did you --
12        MR. EVETTS:  Objection to the form.
13   BY MR. BELLEW:
14   Q.  Do you disagree with that?
15   A.  That wasn't my testimony.  There was -- I
16   think they were called tentative selectees that were
17   announced to the best of my recollection in October
18   1992.
19        There was significant discovery around the
20   lottery and the industry.  I don't believe the
21   licenses were issued until sometime during 1993.  It
22   could have even been a later day.  I don't recall.
23        But I do recall that it was, you know,
24   sometime after the initial announcements of

**Page 40**

1    potential licensees was made.
2    Q.  Did you eventually conceive of a business
3    plan whether formally or informally to take
4    advantage of this Phase I 220 megahertz license
5    industry?
6    A.  I eventually developed a business plan
7    involved around providing business services in the
8    220 to 222 megahertz band.
9    Q.  And did that involve bundling these
10   licenses, so to speak?
11        MR. EVETTS:  Objection to form.
12        MR. BELLEW:  Let me back up.
13   BY MR. BELLEW:
14   Q.  The licenses -- how useful was an
15   individual license, say, in Sacramento?
16        MR. EVETTS:  Objection to form.
17        THE WITNESS:  Are you asking me with
18   the benefit of hindsight as we sit here today?
19   Or what are you asking at that point in time --
20   BY MR. BELLEW:
21   Q.  In 1993?
22   A.  Well, you asked me how useful?  Or how
23   useful did I think it was?
24

**Page 41**

1    Q.  I will re-ask the question.  In 1993, you
2    had -- The Elkin Group was awarded a license in
3    Sacramento.
4    A.  Correct.
5    Q.  What did that license involve?  What did
6    that give The Elkin Group the ability to do?
7    A.  Construct a wireless communications system
8    on the designated location that the licensee was --
9    that the license was designated for.  And provide
10   service to third parties.
11   Q.  And were there some limitations to the
12   ability to make money off a single license in a
13   single territory like that?
14        MR. EVETTS:  Objection to form.
15        THE WITNESS:  There were certain
16   capacity limitations, as I learned later on, in
17   terms of the practical users that could be on a
18   system.
19   BY MR. BELLEW:
20   Q.  Did it at some point based on the
21   limitations that you identified, did you conceive of
22   a business plan to bundle these licenses together to
23   make them more useful, make them --
24        MR. EVETTS:  Objection to form.

11 (Pages 38 to 41)

David W. Elkin

Page 42

1  BY MR. BELLEW:
2     Q. -- more available.
3        MR. EVETTS: Just try to wait for him
4  to finish.
5        Objection to form.
6        THE WITNESS: Again, you are trying
7  to bundle certain concepts together that I
8  don't think are appropriate. The business plan
9  evolved into one where I thought it made sense
10 to aggregate additional licenses to enhance the
11 business opportunity for US Mobilcomm.
12 BY MR. BELLEW:
13    Q. I used the word "bundle." Is that
14 synonymous with your use of the word "aggregate"?
15    A. Well, since you used it, I can't really
16 say whether it's synonymous or not. But I would not
17 use it that way.
18    Q. And how was this business plan conceived
19 in terms of the aggregation of the licenses? How
20 would that make them more valuable or more useful?
21    A. I understand that if in part -- if US
22 Mobilcomm had access to more spectrum, it could
23 develop a more robust business in terms of having
24 the ability to reach out in the marketplace and add

Page 43

1  customers in terms of having the potential to at
2  some point in time attract a larger third-party as a
3  potential acquirer of US Mobilcomm.
4     Q. How did you envision making money off
5  these licenses?
6     A. Well, primarily through offering --
7  providing wireless communications services to third
8  parties, be they voice services or be they
9  data-related services.
10    Q. So one way to make money off of them would
11 be to provide a service to a third-party through the
12 license that you owned that would allow them to do
13 two-way communications? For example, taxicabs?
14    A. The taxi industry was one potential
15 customer base for the company.
16    Q. Was law enforcement one of them, possible
17 customer?
18    A. Most users of two-way voice communications
19 were potential customers to some extent.
20    Q. So one way to make business was build out
21 your license so it could be -- the license could be
22 put to use and then sell that service to a
23 third-party, correct?
24       MR. EVETTS: Objection to the form.

Page 44

1     Enlisting subscribers is a more precise way
2  than selling. To differentiate between selling
3  the license outright.
4  BY MR. BELLEW:
5     Q. I said sell the service. But with Mr.
6  Evetts' keen clarification there, would you agree --
7  that was the way you were going to make money off
8  them?
9     A. We sought to provide voice and/or data
10 services to third parties who could use it.
11    Q. And I think you referenced this or alluded
12 to this. A grander scheme would be to aggregate the
13 licenses such that that service could be provided,
14 thus making the sale of these licenses to a
15 third-party attractive?
16       MR. EVETTS: Objection to the form.
17       THE WITNESS: I think you asked why
18 there were more licenses that were sought in a
19 given market. And certainly as we built a
20 bigger, more robust system with more
21 subscribers and more capacity, you had the
22 ability to attract down the road or the
23 opportunity, the potential down the road to
24 attract a third-party acquirer.

Page 45

1  BY MR. BELLEW:
2     Q. Wasn't that ultimately the real objective,
3  to get the company in a position where it was
4  attractive to a possible sale?
5     A. No. Certainly not the way you phrase it.
6  The objective of the business was to build a
7  successful profitable business that you didn't care
8  whether you ever sold or not.
9        But if you were successful in doing that,
10 then the opportunities to potentially realize a
11 value for the company on a sale or IPO or something
12 along those lines existed or I hoped would exist.
13    Q. I think we are all generally familiar with
14 US Mobilcomm's standard management agreement. Are
15 you?
16    A. I am.
17    Q. How did that management agreement tie into
18 this concept of aggregating licenses?
19    A. Can you be more specific?
20    Q. The management agreement, what was it?
21    A. We had multiple versions of a management
22 agreement that --
23    Q. Didn't they all do the same thing?
24       MR. EVETTS: Objection to the form.

12 (Pages 42 to 45)

David W. Elkin

Page 62

1   First Request for Admission, and Defendants'
2   Response to First Request for Production.
3       When I inquired about these earlier, you
4   had testified that you had reviewed these and that
5   you had verified the answers, correct?
6       A.  Correct.
7       Q.  So as far as you are concerned, the
8   information provided in response to these discovery
9   requests is accurate, correct?
10      A.  As accurate as they were capable of being
11  at that time.
12      Q.  Was there anything that will make them
13  incapable of being accurate at that time?
14      A.  Well, I would continuously reflect on any
15  question that you ask and you're talking about
16  events that occurred dating back to 13 years ago.
17      So there are clearly aspects of the
18  business and relationships that come to mind as time
19  goes on that may not have been in my mind at a given
20  point in time.
21      Q.  Do you understand that there's a
22  responsibility to supplement or correct these
23  discovery requests if something is learned to be
24  untrue?

Page 63

1       A.  I do.
2       Q.  Have you made any attempt to formally do
3   that in connection with these discovery requests
4   based on your reflection on things?
5       A.  No.
6       Q.  We were discussing before the break
7   Mr. Norman's capital contribution, the equity he
8   would receive, and any reciprocal obligation you
9   would have in connection with that.  Do you recall
10  those questions at least?
11      A.  Yes.
12      Q.  I want to direct your attention to what is
13  the third page in on your responses to
14  interrogatories.  And in response to Interrogatory
15  1, I will go to the answer in this first sentence in
16  the second paragraph, Elkin and Norman agreed over a
17  decade ago to co-own and co-operate USM.  They
18  agreed that Norman would contribute 25 percent of
19  the capital -- and in parentheticals, or $250,000,
20  end paren, in return for 25 percent of USM stock and
21  Elkin would contribute 85 percent of the capital,
22  paren, or $750,000, paren, for the remaining 75
23  percent of the stock.
24      Do you see that?

Page 64

1       A.  Yes.
2       Q.  Is that accurate?
3       A.  It is accurate.  But I would just further
4   elaborate that initially he was invited to acquire
5   25 percent ownership, as it says, to co-own and
6   co-operate at some point subsequent.  I think that
7   the number that we agreed that would kind of cap out
8   at would be a million dollars of capital for the
9   company.
10      Q.  At least in some point in time you agreed
11  to this construct with Mr. Norman?
12      A.  I think I just testified to what the
13  agreement was.
14      Q.  Just so I'm clear, the question, what's
15  delineated here in response to interrogatories as
16  you sit here today, you agree that at some point in
17  the past you had agreed with Mr. Norman regarding
18  this 25/75 percent construct?
19      A.  That is correct.
20      Q.  And the relative contributions in
21  connection with getting to that equity position as
22  described in this response?
23      A.  Can you rephrase your question?
24      Q.  Not only did you agree on the equity

Page 65

1   positions, but you agreed on the amount of capital
2   that would be contributed as delineated in this
3   response?
4       A.  Correct.
5       Q.  Was that agreement ever memorialized?
6           MR. EVETTS:  Objection to the form.
7           MR. BELLEW:  On what basis?
8           MR. EVETTS:  What basis?  Do you mean
9   was there a formal executed written agreement?
10  Agreements can be memorialized formally by
11  typing up a contract and signing it.
12      When you say memorialize an
13  agreement, that could be any number of pieces
14  of paper that evidence that agreement.  And
15  there were clearly pieces of paper that
16  evidenced both Mr. Elkin's view of this
17  relationship, Norman's view of this
18  relationship that were never signed by anybody.
19  It's vague.
20          MR. BELLEW:  I appreciate the
21  testimony.
22          MR. EVETTS:  You asked me the basis.
23  BY MR. BELLEW:
24      Q.  The response uses the word "agreed."  So

17 (Pages 62 to 65)

Love Court Reporting, Inc.

David W. Elkin

Page 70

1    They are sworn interrogatories and they speak
2    for themselves. What they say is what they
3    say.
4    BY MR. BELLEW:
5        Q. Do you have an answer, Mr. Elkin?
6        A. Mr. Bellew, when you are asking me certain
7    questions, there are certain words that you're using
8    that I don't necessarily believe are consistent with
9    the paragraphs or documents that you're citing, the
10   construct and so on.
11       As I testified, I agreed to give Jeff the
12   right to acquire 25 percent of the company. And in
13   this action by consent in writing the Board of
14   Directors, December 27th, 1994, those shares are
15   issued to him.
16       Q. So the company issued the 25 percent
17   equity stake to Mr. Norman on December 27th, 1994?
18       A. Correct.
19       Q. And that would be consistent with the
20   agreement that in exchange for that issuance of
21   stock he would contribute $250,000, correct?
22       MR. EVETTS: Objection. I think what
23   you're trying to embed in here that that
24   somehow evidences his contribution. I'm going

Page 71

1    to object. This is not a straightforward
2    question.
3    BY MR. BELLEW:
4        Q. You can answer the question.
5        A. As I stated, Jeff was given the right to
6    acquire 25 percent equity in the company. And as
7    part of that obligation, he would contribute 25
8    percent of the capital required for that company.
9        We agreed -- I agreed at some point that
10   that would be capped at $250,000 or that we would
11   designate a number of $250,000 for Jeff and $750,000
12   for me.
13       What you're trying to say, I think, when I
14   first approached Jeff, here it is, 250, and you can
15   buy 25 percent of the company. And that was not the
16   way that the relationship evolved from a
17   chronological standpoint.
18       Q. How do you explain the discovery response?
19       MR. EVETTS: If you look at the next
20   sentence --
21       MR. BELLEW: Mr. Evetts, my question
22   is to the witness. I think we've been very --
23       MR. EVETTS: This is ridiculous.
24       MR. BELLEW: There's nothing

Page 72

1    ridiculous.
2        MR. EVETTS: It's a sworn
3    interrogatory response. Why are you asking him
4    to repeat what he has already sworn to in the
5    case?
6        MR. BELLEW: I'm asking him to
7    reconcile. My lead question was were there any
8    documents to memorialize this agreement. Do
9    you recall that question, Mr. Evetts?
10       MR. EVETTS: To this day I don't
11   think that's an appropriate question.
12       MR. BELLEW: And you objected.
13       MR. EVETTS: Because it's too broad.
14   You said --
15       MR. BELLEW: There could be a million
16   things. I've put in front of him action by
17   written consent which shows an action by this
18   company to issue shares.
19       MR. EVETTS: It's one form of a
20   memorialization of one part of the agreement.
21       MR. BELLEW: I'm asking him has he
22   seen this document, is it consistent with --
23       MR. EVETTS: He has to have seen it.
24   He signed it as the only director. That's my

Page 73

1    point.
2        This is his binding admission without
3    testimony. This is sworn admission without
4    testimony. When are we going to get into
5    something new that you don't already have a
6    binding admission on?
7        MR. BELLEW: Can we get back to the
8    pending question.
9        (Whereupon, the court reporter read
10   the previous question as requested.)
11       MR. EVETTS: Objection to the form.
12       THE WITNESS: Mr. Bellew, I think
13   I've answered you several different ways.
14       MR. BELLEW: Let me strike the
15   question to move on.
16   BY MR. BELLEW:
17       Q. Did the company receive any consideration
18   for the action it took in PX-15?
19       MR. EVETTS: Objection to the form.
20       THE WITNESS: I'm not sure if at this
21   point in time there was any consideration
22   transferred.
23   BY MR. BELLEW:
24       Q. Did the company simply issue the shares

19 (Pages 70 to 73)

David W. Elkin

Page 74

1　without any return capital being paid?
2　　A. No. Jeff had invested certain capital
3　into the company, I believe, in June of 1994. The
4　only capital he ever invested into the company.
5　　Q. So as of June 1994, your recollection that
6　there was a capital contribution which resulted in
7　the issuance of the shares as evidenced by PX-15?
8　　A. Again, you're saying resulted in. But
9　Mr. Norman did contribute $200,000, which was a
10　portion of what he agreed to put in, and the company
11　did issue him shares in the company.
12　　Q. So just generically, the issuance of the
13　shares was in return for a capital contribution; is
14　that accurate?
15　　　　MR. EVETTS: Objection to the form.
16　No, I don't think it's accurate with his
17　testimony.
18　　　　THE WITNESS: The issuance of the
19　shares was in consideration for the agreement
20　that we have reached regarding Jeff's
21　involvement in US Mobilcomm.
22　BY MR. BELLEW:
23　　Q. And that involvement involved a cash
24　contribution, correct?

Page 75

1　　A. Of which a portion was made in June.
2　　Q. But the answer to my question is yes?
3　Whether a portion was made or not?
4　　A. I'm trying to be as clear as I can,
5　Mr. Bellew.
6　　Q. And nobody will prohibit you from being
7　clear. My question is simply a binary one. It's a
8　yes and no answer.
9　　Part of his agreement, as you
10　characterized it, was to provide a certain level of
11　capital to the company in exchange for the issuance
12　of these shares, correct?
13　　　　MR. EVETTS: Objection to the form.
14　　　　THE WITNESS: There were more than --
15　there was more than capital involved in the
16　issuance of shares to Mr. Norman. You keep
17　trying to reduce it down to something that I
18　think is misleading.
19　BY MR. BELLEW:
20　　Q. I said in part.
21　　A. No, that's not what you said.
22　　Q. Okay. What were all the things that
23　Mr. Norman had to do in addition to the injection of
24　capital for the issuance of the shares?

Page 76

1　　A. He agreed to run the company with me and
2　all things that would be incidental to that.
3　　Q. So it was running the company with you
4　plus an injection of capital equals the issuance of
5　shares? Is that fair?
6　　A. Running the company with me plus an
7　agreement to make a certain investment into US
8　Mobilcomm equaled the consideration for the
9　issuance -- well, I don't know if that's
10　consideration for the issuance of the shares. That
11　talks about one cent par value. But that was the
12　agreement I had with Mr. Norman.
13　　Q. And he had provided at least a certain
14　level of capital before these shares were issued,
15　correct?
16　　A. Correct.
17　　Q. Can you flip to the third page in. We had
18　discussed earlier US Mobilcomm Management Corp. I
19　asked you whether Mr. Norman had an ownership
20　interest in that company and you didn't recall. Do
21　you remember that testimony?
22　　A. I do.
23　　Q. Now seeing this document, do you recognize
24　that he did have an ownership interest in that

Page 77

1　company?
2　　A. I do.
3　　Q. And it was proportionate to the 25 percent
4　ownership interest that he had in US Mobilcomm,
5　Inc., correct?
6　　A. To the best of my knowledge.
7　　Q. Do you have any reason to doubt this Page
8　3 as evidencing his 25 percent ownership?
9　　A. I looked at the share certificate which is
10　actually Page 4.
11　　Q. What is Page 3? Do you see that?
12　　A. Pennsylvania S Corp. election and
13　shareholder consent. And it states that Jeff Norman
14　owns 25 percent of the company.
15　　Q. So Mr. Norman owned 25 percent of US
16　Mobilcomm Management, Inc., correct?
17　　A. US Mobilcomm Management Corp.
18　　Q. I apologize. He owned 25 percent of that
19　company?
20　　A. He did.
21　　Q. And you were unclear earlier whether that
22　was a Pennsylvania company. Does this refresh your
23　recollection?
24　　A. It does.

20 (Pages 74 to 77)

Love Court Reporting, Inc.

David W. Elkin

Page 122

1    Q. And it says cash paid in as of this point,
2 total of $530,150 for you?
3    A. Plus $70,000 for expenses, $600,952 total.
4    Q. What is the basis of the reductions in
5 Mr. Norman's column starting on October 30th, 1994
6 going up to March 31st, 1996?
7    A. This reflects monies that were provided to
8 Jeff Norman at his request.
9    Q. And —
10    A. Or on his behalf.
11    Q. And you treated that as a reduction of his
12 equity contribution?
13    A. Correct.
14    Q. And Mr. Shorin created this document?
15    A. Yes.
16    Q. Did he do —
17    A. And provided it to Mr. Norman on a regular
18 basis.
19    Q. The creation of this document, was it done
20 pursuant to your instructions?
21    A. As I stated earlier, at some point I'm
22 sure that I instructed Rick to track all the money
23 that Jeff or I provided to or on behalf of US
24 Mobilcomm.

Page 123

1    But it wasn't every time he updated it, it
2 wasn't necessarily pursuant to my request. Probably
3 wasn't.
4    Q. What are these numbers at the bottom here
5 on the left bottom that say Jeff Norman capital
6 reductions?
7    A. Well, just as you were discussing a second
8 ago, this reflects reductions in Jeff's schedule of
9 equity contributions per this document.
10    Q. Well, how do those entries at the bottom
11 left relate to the entries up in the shareholder
12 contribution column?
13    A. I think, again, I have not seen this
14 document in a very long time, if ever, this specific
15 document. But it looks like they tie into various
16 entries that are made.
17    The first kind of subtotal of $13,600
18 seems to match up to the October 1994 number of
19 $13,600. It just provides line by line detail.
20    And then the $10,500 in December of 1994
21 matches up with the $10,500 included or at least
22 part of that month for Jeff and then there's another
23 thousand dollars.
24    Q. So that is just further explanation? They

Page 124

1 are not in addition to these reductions.
2    A. I believe that's correct. In looking at
3 this document, I can't testify to exactly what it
4 is. But that certainly appears to be what it is.
5    Q. As reflected on this chart and assuming
6 that this was the state of affairs as of the March
7 27, 1996 date, at that point, Mr. Norman's capital
8 contribution had been reduced from 196 to 141,900,
9 correct?
10    A. Correct.
11    Q. And you went from — putting aside the
12 expenses of $70,000 — you had an initial entry of
13 $100 and your contributions had come up to an amount
14 of $530,150, correct? Is that accurate?
15    A. Cash paid in net of that number plus
16 certain expenses of $70,802.
17    Q. Okay. So as of this point, what was the
18 status of your agreement to contribute respectively
19 $250,000 for Mr. Norman and you to contribute
20 $750,000?
21    MR. EVETTS: That's a great question,
22    by the way.
23    MR. BELLEW: It took me three hours
24    to get one. I am just warming up.

Page 125

1    MR. EVETTS: I got you. That was a
2    great question.
3    THE WITNESS: Well, you asked me what
4    the status of the agreement. I would say
5    fundamentally there had not been a change to
6    that agreement as of this date.
7    However, I think that it seemed
8    pretty clear to me that Jeff was not going to
9    contribute additional money into US Mobilcomm.
10 BY MR. BELLEW:
11    Q. So you don't know? You don't know what
12 the status?
13    MR. EVETTS: Objection to that. I
14    think he did answer it.
15    THE WITNESS: If you can read back my
16    prior answer, I think I answered it in some
17    detail.
18    MR. BELLEW: We will move on.
19 BY MR. BELLEW:
20    Q. These reductions that we note under Jeff's
21 column, were they payments made on behalf of US
22 Mobilcomm?
23    MR. EVETTS: Objection to the form.
24    THE WITNESS: No.

32 (Pages 122 to 125)

David W. Elkin

Page 126

1  BY MR. BELLEW:
2      Q.  What were the nature of those outlays?
3      A.  Well, primarily, they were wire transfers
4  to Jeff made at his request for what I understood at
5  the time to be living expenses.  Or bills that Jeff
6  Norman had unrelated to US Mobilcomm.
7      Q.  Do you have any back up for that?
8      A.  For what?
9      Q.  The nature of where the outlays were
10 directed?  Did these go directly to an account,
11 personal account for Mr. Norman?
12         MR. EVETTS:  Objection to the form.
13         THE WITNESS:  I know that there were
14     wire transfers made to accounts that Jeff
15     Norman requested.  Whether they were just
16     personal accounts or others, I'm not sure.
17     But they certainly included -- I
18     mean, to my knowledge, they included personal
19     accounts and may have been exclusively personal
20     accounts to the extent that you're talking
21     about the wire transfers of 7,500 and 10,000
22     and so on.
23 BY MR. BELLEW:
24     Q.  I understand that that's what your

Page 127

1  understanding of these payments was.  Do you have
2  any -- does the company have any documents to
3  support that?  Have you seen any documents along
4  those lines?
5      A.  I believe I've seen wire transfers that
6  have been made to Mr. Norman.
7      Q.  So you have evidence of the money actually
8  going to his account?  Is that your testimony?
9      A.  And requests made by Mr. Norman for the
10 money.
11     Q.  Is there anything in that request that
12 demonstrates what the money is going to be used for?
13     A.  To my knowledge, as I said, these are all
14 to pay Jeff's living expenses or outstanding bills
15 that Jeff had unrelated to US Mobilcomm.
16     Q.  Is there a document that you can point me
17 to that was in the company's possession that would
18 support that understanding?
19     A.  Yes, absolutely.
20     Q.  What was the nature of that document?
21     A.  Oh, there's a document I am aware of in
22 1997 that talks about the sum total of the various
23 distributions that were made to Jeff.  And, of
24 course, this document which was contemporaneously

Page 128

1  prepared and provided to both Jeff and I.  It would
2  not have reduced his capital or equity had it not
3  been for personal matters.
4      Q.  My question is, is there anything in those
5  documents that establish that it was for a personal
6  expense that you know of?
7      A.  Yes.
8      Q.  Was there a request by Mr. Norman by
9  e-mail or letter that I need $7,500 to pay my
10 mortgage?  Anything along those lines?
11     A.  A contemporaneous documentation is what
12 you're asking me?
13     Q.  Or after the accident.  Any document
14 that --
15     A.  I've testified that, yes, that exists.
16 You're asking me now -- you're trying to summarize.
17     Q.  Let me back up.  I think you've testified
18 that there's evidence that the money was actually
19 transferred to Mr. Norman.
20     A.  Correct.
21     Q.  Okay.  I am moving past that.  Is there
22 anything else surrounding these transfers -- whether
23 it was wire instructions or requests or a letter --
24 that would indicate that it was for a personal

Page 129

1  expense?
2         MR. EVETTS:  Objection to the form.
3         THE WITNESS:  Yes.
4  BY MR. BELLEW:
5      Q.  What are the nature -- can you describe
6  for me those documents?
7      A.  Sure.  This document itself characterizes
8  what those distributions were for.  There's a May
9  1997 document that characterizes what those
10 distributions were for.
11     There were, I believe, filings with the
12 Internal Revenue Service that characterize what
13 those distributions were for, representations to
14 third parties as to capital in the company that
15 characterizes what those distributions were for.
16     Q.  And was that -- were those documents in --
17 are those documents currently in the company's
18 possession?
19     A.  I believe multiple documents supporting
20 that fact have been produced in connection with this
21 matter.
22     Q.  So you believe that that back up has been
23 produced?
24     A.  Yes.

33 (Pages 126 to 129)

Love Court Reporting, Inc.

David W. Elkin

**Page 218**

1 sheriff in town.
2          MR. BELLEW: It's a shame there's no
3 way to record laughter.
4          MR. EVETTS: Why would we record
5 laughter? All I heard was dead silence.
6 BY MR. BELLEW:
7     Q. The Centennial deal, Mr. Elkin, in the
8 letter of intent, it indicates a purchase price --
9     A. Mr. Bellew, can I just go back and
10 generally clarify for your benefit an additional
11 prior area of testimony? You've asked on multiple
12 occasions what evidence I have that things were
13 repaid as shareholder loans or advanced as loans and
14 so on.
15          I never altered the ownership in the
16 company notwithstanding having put up 90 percent of
17 the equity. So two choices are either I own 90
18 percent of the company or I own 75 percent of the
19 company and everything in excess of three times
20 Jeff's contribution is a loan to the company.
21          For the benefit of Mr. Norman, I agreed to
22 do that.
23     Q. The Centennial deal, at least as it was
24 proposed, the purchase price was 5 million in cash

**Page 219**

1 at closing and a million in promissory note for a
2 total of $6 million?
3     A. The transaction that I negotiated provided
4 for $6 million to be paid to US Mobilcomm.
5     Q. Did you see that as a fair value for the
6 company in March of '97?
7          MR. EVETTS: Objection to the form of
8 the question. Objection to the extent it's
9 seeking to obtain some sort of expert testimony
10 regarding valuation.
11          THE WITNESS: It had no relation
12 whatsoever to valuation of the company. It was
13 a negotiated price between US Mobilcomm and
14 Centennial.
15 BY MR. BELLEW:
16     Q. Was it arm's lengths negotiation that
17 resulted in that price?
18          MR. EVETTS: Objection to the
19 characterization. I think the term -- you're
20 combining a term that we've all heard from law
21 school with something that didn't happen here,
22 arm's length negotiation that results in the
23 sale.
24

**Page 220**

1          THE WITNESS: This was terms of a
2 potential transaction between US Mobilcomm and
3 Centennial. Has nothing whatsoever related to
4 the valuation of US Mobilcomm.
5 BY MR. BELLEW:
6     Q. Which you were prepared to accept that
7 deal?
8     A. I was.
9     Q. As a shareholder, were you prepared to
10 accept that deal?
11     A. Yes.
12     Q. As the director of the company, were you
13 prepared to accept that deal?
14     A. Yes.
15     Q. What happened to the Centennial deal?
16     A. It did not consummate.
17     Q. Do you recall why?
18     A. It is my understanding that Centennial was
19 unable to raise the capital to implement their
20 business plan, of which some small part was our
21 transaction.
22     Q. And then there was a contemplated deal
23 with Incom for a proposed merger, correct?
24     A. No, sir.

**Page 221**

1     Q. What was the contemplated deal, Incom
2 deal?
3     A. It was not a contemplated Incom deal.
4 There were ongoing discussions that I held with
5 various parties involved in Incom regarding the
6 possibility of combining our operations and
7 combining our assets.
8     Q. And were there any discussions as to
9 possible terms for that merger in terms of the
10 amount of money?
11     A. I don't understand what you're asking in
12 terms of the amount of money. I believe in all of
13 those cases I don't believe it involved money.
14     Q. Was the valuation created in connection
15 with a possible deal with Incom?
16     A. There was a -- what I always thought of as
17 a relative valuation of the two companies. One to
18 the other. Had nothing really to do with dollar
19 amounts as it did in terms of ownership of a pie, if
20 you will. Allocation of ownership.
21          And we went through various iterations of
22 how to achieve that allocation of ownership.
23     Q. Was it your hope that the allocation of
24 this pie you're discussing would account for a

56 (Pages 218 to 221)

David W. Elkin

**Page 222**

1  valuation of US Mobilcomm in excess of $7 million?
2     A.  Mr. Bellew, it had nothing to do with
3  valuation of US Mobilcomm. I sought in every
4  instance to negotiate the best terms for US
5  Mobilcomm that I could.
6     Q.  Did you in your mind have a -- an idea
7  what the value of US Mobilcomm was in connection
8  with a proposed merger?
9     A.  As I've testified, we are talking about a
10 relative -- what we are talking about is only
11 splitting a pie. You own X percent. We own Y
12 percent.
13       And the various back and forths were an
14 attempt by me on behalf of US Mobilcomm to negotiate
15 what I thought was the best and fair transaction for
16 US Mobilcomm in terms of ownership percentage.
17    Q.  And that ownership percentage would have a
18 relation to the perceived value of US Mobilcomm,
19 correct?
20       MR. EVETTS: Objection to form.
21       THE WITNESS: No. Absolutely not.
22 BY MR. BELLEW:
23    Q.  Then how would you arrive at the
24 allocation?

**Page 223**

1     A.  Mr. Bellew, I've testified to this
2  already. It was my attempt to negotiate the
3  greatest ownership that I could for US Mobilcomm, be
4  that given its position in various markets, its
5  management agreements, encumbrances of other parties
6  to the transaction.
7        I did the best I could for the company.
8  Had nothing to do with the dollar value of the
9  company. In those discussions there was no money
10 changing hands.
11    Q.  Let me put in front of you, Mr. Elkin,
12 what's been previously marked Shorin 25.
13    A.  Are we done with this?
14    Q.  Yes, we are done with that.
15    A.  Yes.
16    Q.  Have you seen this document before?
17    A.  I have.
18    Q.  Can you explain to us what it is?
19    A.  As I have just testified to, this is a
20 document -- well, excuse me -- may I look at the
21 document?
22    Q.  Sure. Take as much time as you need to be
23 familiar with it.
24    A.  I believe you have multiple documents.

**Page 224**

1       MR. EVETTS: Yep.
2       THE WITNESS: Can you clarify to me,
3  are you speaking -- you've got multiple
4  documents.
5       MR. BELLEW: I know exactly what that
6  is relating from. These documents, these are
7  how they were produced to us in the way that
8  they are Bates stamped.
9       MR. EVETTS: I mean, that's the order
10 they are produced. Are you saying they were
11 produced stapled together like this?
12       MR. BELLEW: I believe so. I
13 wouldn't know.
14       MR. EVETTS: Well, the witness has
15 just testified --
16       MR. BELLEW: It's already been marked
17 previously --
18       MR. EVETTS: They are obvious on
19 their face three, four, or five discrete
20 different documents. So now I'm going to have
21 a running objection. Please refer to the
22 documents by the Bates number or some other
23 way.
24       MR. BELLEW: Okay.

**Page 225**

1  BY MR. BELLEW:
2     Q.  Do you recognize the first page of this
3  multi-page exhibit?
4     A.  I do.
5     Q.  And it's titled parameters of agreement
6  between USM and ICC?
7     A.  Slash, NVFCS.
8     Q.  Okay. And what is this document?
9     A.  This is a -- I haven't looked at it in
10 many years. Did you ask me what is this?
11    Q.  Please.
12    A.  This is a copy of a memorandum sent from
13 me to Gene Clothier, Richard Brown, and David
14 Kaufman, February 2nd, 1998, in connection with the
15 discussions that we were having regarding a
16 potential merger between US Mobilcomm and ICC and
17 NVFCS.
18    Q.  And your proposal was that the merger
19 would result in a new company of which US Mobilcomm
20 would own one quarter?
21    A.  Correct.
22    Q.  Do you have -- do you have any idea -- did
23 you have any idea at that point what the value of
24 one quarter of the merged company would be?

Love Court Reporting, Inc.

David W. Elkin

| | Page 226 | | Page 228 |
|---|---|---|---|
| 1 | A. No. | 1 | discussions? |
| 2 | Q. Was US Mobilcomm entitled to accrue | 2 | A. Absolutely. |
| 3 | management fees of approximately $1.15 million as of | 3 | Q. Did you communicate to him the nature of |
| 4 | February 2nd, 1998? | 4 | the transaction? |
| 5 | A. It had a contingent right to management | 5 | A. He had a copy of the documentation as I |
| 6 | fees if available from excess cash flow or sale of | 6 | believe so did his attorney, Mr. Sama. |
| 7 | the company. Had very little value. And what I was | 7 | Q. Did you communicate to him that the deal |
| 8 | attempting to do here, as I stated earlier, was | 8 | was not consummated and why? |
| 9 | negotiate the highest percentages I could for US | 9 | A. Yes. |
| 10 | Mobilcomm. | 10 | Q. What about Incom? |
| 11 | Q. What became of the merger discussions? | 11 | A. I believe Mr. Norman was generally |
| 12 | A. There was -- we never agreed to merge. | 12 | informed of all the various -- or most of the |
| 13 | Q. Do you recall the impetus for that, the | 13 | various discussions. There were things I engaged |
| 14 | not being consummated? | 14 | in, as I stated earlier, from the onset of the |
| 15 | A. I recall some of it. There were | 15 | company on a very regular basis with multiple |
| 16 | disagreements between ICC and NVFCS in terms of who | 16 | parties. |
| 17 | owned what regarding their combined interests. That | 17 | Q. I'm going to butcher this name. Did you |
| 18 | was one significant item. | 18 | as Mobilcomm engage in a company by the name of |
| 19 | We could never agree on a sharing, an | 19 | Lepercq? |
| 20 | appropriate sharing. And while I cannot date this | 20 | A. Yes. |
| 21 | document relative to certain other information, ICC | 21 | Q. L-E-P-E-R-C-Q. |
| 22 | was encumbered by millions of dollars of -- I | 22 | A. Yes. Lepercq. |
| 23 | believe it was preferred stock that I came to find | 23 | Q. And what was that company? |
| 24 | out was proposed that we be encumbered by that as | 24 | A. This was a investment banking firm that |

| | Page 227 | | Page 229 |
|---|---|---|---|
| 1 | well or that somehow was came to light later on. | 1 | Jeff Norman knew of and had a relationship with one |
| 2 | So for that and other reasons, it never | 2 | of their employees that we engage -- sorry -- you |
| 3 | happened. But discussions between US Mobilcomm and | 3 | asked me what kind of company it was? |
| 4 | ICC, you know, continued, I believe, into time | 4 | Q. Yes. |
| 5 | periods well past this date. | 5 | A. I believe an investment banking firm. |
| 6 | Q. Do you recall there being a -- | 6 | Q. And what was that engagement? What did it |
| 7 | A. I always felt that there was potential | 7 | involve? |
| 8 | value in creating a larger presence. | 8 | A. Their attempt to raise money for US |
| 9 | Q. Do you recall discussions with Wireless | 9 | Mobilcomm. |
| 10 | Plus regarding a merger proposal? | 10 | Q. Do you know if they created audited |
| 11 | A. I do. | 11 | financials in connection with those attempts? |
| 12 | Q. What were the substance of those | 12 | A. I do not believe they did. |
| 13 | discussions as far as you can recall? | 13 | MR. EVETTS: Just for the record, |
| 14 | A. I don't specifically recall. But along | 14 | there's -- that whole box is devoted to |
| 15 | the same lines of in one form or another combining | 15 | companies like Lepercq. There's binders in |
| 16 | our assets with the hope that one plus one would | 16 | there three inches thick prepared by the |
| 17 | equal three. | 17 | company. |
| 18 | Q. What became of that merger discussion? | 18 | THE WITNESS: These are from Jeff. |
| 19 | A. They -- Wireless Plus ended up selling | 19 | These are not mine. |
| 20 | their assets to a third-party. | 20 | BY MR. BELLEW: |
| 21 | Q. In connection with the Centennial deal, | 21 | Q. Did Lepercq ever establish a valuation for |
| 22 | did you all consult with Mr. Norman? | 22 | the company in connection with possible financing? |
| 23 | A. Yes. | 23 | A. No. They were never able to raise any |
| 24 | Q. Did you inform him of those ongoing | 24 | financing for the company under any terms to my |

58 (Pages 226 to 229)

David W. Elkin

Page 230

1  knowledge.
2      Q.  Mr. Elkin, I'm going to ask you to take a
3  look at the tax return for US Mobilcomm filed for
4  tax year 2001.
5      A.  Okay.
6      Q.  Can you just generally familiarize
7  yourself with that?
8      A.  If you can direct me to one specific area.
9      Q.  Let me ask you this:  Do you see a K-1
10  attached to this?
11          MR. EVETTS:  To Norman or to him?  Or
12  both?
13          MR. BELLEW:  Or either.  Either.
14          MR. EVETTS:  Either?
15          MR. BELLEW:  Yes.
16          MR. EVETTS:  Okay.
17          THE WITNESS:  I don't see one.
18  BY MR. BELLEW:
19      Q.  Do you know if the company created K-1s
20  for the shareholders in connection with the tax
21  return for 2001?
22      A.  Yes, it did.
23      Q.  Do you know if that -- they were produced?
24      A.  To the best of my knowledge.  To the best

Page 231

1  of my knowledge.
2      Q.  I don't have a copy of the K-1.  Can I ask
3  counsel to instruct Mr. Shorin to bring --
4          MR. EVETTS:  I will try to bring you
5      one tomorrow.  If we have one, I will bring you
6      one.  Sure.  And your clients didn't have one
7      that was sent to him personally?
8          MR. BELLEW:  You will get the chance
9      to ask him that question on Friday.
10  BY MR. BELLEW:
11      Q.  Along those same lines, Mr. Elkin, do you
12  recall receiving a K-1 from the company in 2001?
13      A.  I do.
14      Q.  You would need that to file your personal
15  tax return?
16      A.  That's correct.
17          MR. BELLEW:  Let's take five minutes
18      and we will finish up.
19          (Whereupon, a brief recess was
20      taken.)
21  BY MR. BELLEW:
22      Q.  Can I get you to look at -- I put it in
23  front of you -- PX-8.
24      A.  Yes.

Page 232

1      Q.  I just want to look at one specific entry
2  that's on the fourth page in.
3      A.  Yes.
4      Q.  Specifically, can we look at the line
5  item -- this is -- I believe this is Schedule L.  Is
6  it?  I'm not sure.  On the Line Entry 23 on Page 4.
7      A.  Yes.
8      Q.  And there's -- that line entry is for
9  additional paid in capital.  Do you see that?
10      A.  That is correct.
11      Q.  And in 2001, that additional paid in
12  capital number went from $973,038 to $515,438.  Do
13  you see that?
14      A.  I do.
15      Q.  Do you recall the facts and circumstances
16  surrounding that?
17      A.  That would have been as a result of the
18  sale transactions that we have discussed today.
19      Q.  How would those sales transactions have
20  impacted the additional paid in capital?
21      A.  Disbursements to shareholders.
22      Q.  Is that plural or singular, shareholder?
23      A.  You asked me how it would have.  The
24  answer is disbursements to shareholders.  But the

Page 233

1  disbursements were only to one shareholder.
2      Q.  And those disbursements, will they be
3  recognized on the K-1 when we see it?
4      A.  Well, the K-1 would allocate capital gains
5  and losses.
6      Q.  Well, I mean, I don't know.
7      A.  Incidents of income.  They wouldn't
8  necessarily tie into dollars, I mean, per se.
9  There's issues of basis and things like that.
10          MR. EVETTS:  I don't think a return
11      of capital is reflected on a K-1.
12          MR. BELLEW:  Are you testifying,
13      counsel?
14          MR. EVETTS:  You're a partner in a
15      firm, aren't you?  Have you ever had reductions
16      in capital?
17          MR. BELLEW:  Am I under examination
18      today?
19          MR. EVETTS:  Do you want a clear
20      record?
21          MR. BELLEW:  I'm asking for this
22      witness' information, his knowledge, what he
23      knows.
24

59 (Pages 230 to 233)

Love Court Reporting, Inc.

David W. Elkin

Page 234

1 BY MR. BELLEW:
2    Q. Mr. Elkin, let me put in front of you
3 what's been previously marked as Shorin 14.
4    A. Yes.
5    Q. Do you recognize that document?
6    A. I do.
7    Q. And this is a -- you will agree this is a
8 document listing qualified bidders for a Phase II
9 auction?
10    A. For a specific Phase II auction, yes.
11    Q. And that's Auction 18, correct?
12    A. Yes.
13    Q. Before we get into the details of that
14 document, there was a difference between Phase I
15 being a lottery and Phase II are actually sold by
16 auction, correct?
17    A. Sold by auction?
18    Q. Yeah. They were actually sold as opposed
19 to --
20    A. They were auctioned off by FCC.
21    Q. So the price by which they were sold was
22 reached by an auction process?
23    A. You're using the term sold. They were
24 issued by the government via an auction.

Page 235

1    Q. So --
2    A. Which I distinguish from having property
3 that you're selling to somebody else.
4    Q. Okay. And there were requirements to
5 qualify as bidders in these auctions, right?
6    A. Basically filing an application and
7 posting an up-front payment.
8    Q. And were you required to establish your
9 ability to build out the equipment to sustain the
10 license?
11    A. I don't recall.
12    Q. In terms of your business plan with US
13 Mobilcomm, when you were effectuating your
14 aggregation of licenses, you recognized that at some
15 point in the future there would be a Phase II
16 auction, correct?
17         MR. EVETTS: Objection to the form.
18         THE WITNESS: Without accepting your
19 characterization of the business plan of US
20 Mobilcomm, there was a point in time where the
21 proposal, if you will, of a Phase II auction
22 became public knowledge.
23 BY MR. BELLEW:
24    Q. Okay. And can you describe for us the

Page 236

1 interplay between the Phase I licenses and those
2 that are being auctioned off in Phase II?
3         MR. EVETTS: Objection to form.
4         THE WITNESS: You used the term
5 "interplay." I can describe the differences.
6 BY MR. BELLEW:
7    Q. Please do.
8    A. Or some of the differences. Let me put it
9 this way. A whole bunch of rules that apply to each
10 that I won't -- could not and won't attempt to
11 articulate at this point in time.
12       But among those differences are the Phase
13 I license was a site specific license. Granted, you
14 only have the right to operate a wireless
15 communications system on a designated latitude and
16 longitude and covered five -- as a general rule
17 covered five channel pairs.
18       A Phase II license granted you ten channel
19 pairs and the right to operate as many systems as
20 you wanted over a pretty wide geographic area.
21         MR. BELLEW: Can we go off the
22 record?
23         MR. EVETTS: Sure.
24         (Whereupon, a discussion was held off

Page 237

1 the record.)
2         MR. BELLEW: Back on the record.
3 BY MR. BELLEW:
4    Q. Explain briefly, Mr. Elkin, the
5 encumbrance issue vis-a-vis Phase I licenses and the
6 Phase II licenses.
7    A. The Phase II licenses covered ten
8 channels. Ten channel pairs. Phase I covered five
9 channel pairs.
10       If the Phase II license subsumed spectrum
11 that had also been issued in Phase I, then the Phase
12 II licensee was not entitled to operate that system
13 within a certain area that was covered by the
14 operations of the Phase I license.
15    Q. Was US Mobilcomm a qualified bidder in the
16 Phase II auction? That's what this document
17 indicates?
18         MR. EVETTS: Objection to the form.
19         THE WITNESS: As of this date, it
20 was. It was not as of some subsequent date.
21 BY MR. BELLEW:
22    Q. Did US Mobilcomm post an up-front payment
23 of $200,000?
24    A. No. David Elkin did.

60 (Pages 234 to 237)

Love Court Reporting, Inc.

David W. Elkin

Page 238

1    Q.  Is David Elkin's name on Shorin 14?
2    A.  No.  That's not what you asked me.
3    Q.  That's what I just asked you now.
4    A.  My name is not on this document.
5    Q.  As far as the FCC was concerned, US
6  Mobilcomm had fronted that money?
7        MR. EVETTS:  Objection to the form.
8  I don't know what the FCC thought.
9        THE WITNESS:  And I don't know if the
10  FCC is concerned with who posted the money at
11  all.
12  BY MR. BELLEW:
13    Q.  Did US Mobilcomm engage in the bidding
14  process for Auction No. 18?
15    A.  US Mobilcomm engaged in the bidding
16  process at the beginning of Auction 18 and then The
17  Elkin Group engaged as a bidder.
18    Q.  How did that come to be?
19    A.  How did that come to be?  The application
20  to participate in the auction was amended and The
21  Elkin Group was the applicant.
22    Q.  There was another FCC document that listed
23  the successful bidders at these auctions, correct?
24    A.  That is correct.

Page 239

1    Q.  And we've looked at this document and I
2  understand -- and I want to get you out of here on
3  time.
4    A.  Take your time.
5    Q.  That document listed US Mobilcomm as the
6  successful bidder of five licenses in the Phase II
7  Auction No. 18, correct?
8    A.  That document listed US Mobilcomm as the
9  high bidder did you say?
10    Q.  As the successful bidder.  I used the word
11  successful.
12    A.  I'm not sure it talked about successful
13  bidders or high bidders.  The licenses that were
14  issued were issued to The Elkin Group.
15    Q.  Let me back up.
16        MR. EVETTS:  Were you finished with
17  your answer on how that came about?
18        THE WITNESS:  If you will read it
19  back to me --
20        MR. EVETTS:  Never mind.
21  BY MR. BELLEW:
22    Q.  You will agree with me that US Mobilcomm
23  is listed in the --
24    A.  Did you ask me how it came about or --

Page 240

1    Q.  I'm on to another question.  If you want
2  to go back to answer that question prompted by Mr.
3  Evetts, go ahead.
4    A.  Well, I am just trying to give you -- the
5  application was amended to replace -- to have The
6  Elkin Group be the bidder because I was not willing
7  to finance -- I was not willing to invest an
8  additional $200,000 for US Mobilcomm to bid in the
9  auction.
10    Q.  So US Mobilcomm was listed as a qualified
11  bidder in Phase II No. 18 auction.  They thereafter
12  participated in the auction.  It thereafter
13  participated in the auction.
14    It was then awarded --
15    A.  During the auction on September 28th,
16  based on documents I have seen, The Elkin Group
17  became the applicant.
18    Q.  Based on a document that you filed with
19  the FCC?
20    A.  Yes.
21    Q.  And was that a Form 175 document?
22    A.  I believe an amended Form 175.
23    Q.  So the consequence of that filing after US
24  Mobilcomm was qualified as bidder and the bidding

Page 241

1  began was that you substituted The Elkin Group, a
2  company you wholly owned for US Mobilcomm which you
3  owned with Mr. Norman as the party participating in
4  the auction?
5        MR. EVETTS:  Object to the form of
6  the question.  It's compound.
7        THE WITNESS:  The consequence was
8  that an entity participated that I was willing
9  to finance in an attempt to acquire Phase II
10  licenses to protect the US Mobilcomm license
11  position versus a company that I was not
12  willing to finance to participate in that
13  auction.
14    And all of the money, 100 percent of
15  the money came from me as US Mobilcomm had no
16  resources to participate in the auction.
17        MR. EVETTS:  And, by the way, just an
18  aside to these documents that I Bates stamped
19  DWE, in addition to the back up, there's the
20  back up that he put up the money for that
21  auction off his personal auction.
22        MR. BELLEW:  I will put on the record
23  motion to strike that testimony by counsel.
24        MR. EVETTS:  It's not testimony.

61 (Pages 238 to 241)

David W. Elkin

Page 242

1    MR. BELLEW:  Seems like testimony to
2    me.
3    BY MR. BELLEW:
4        Q.  After the completion of the auction, what
5    party was listed on the FCC documents as the high
6    bidder or successful bidder?
7        A.  The Elkin Group was the entity that the
8    FCC issued the licensed to.  The Elkin Group was the
9    entity that filed a document, I believe, dated
10   November 6th -- if I recall seeing it recently -- of
11   1998 to have the licenses issued.
12       Q.  Do you know what entity was listed on
13   the -- in the FCC documents as the successful
14   bidder?
15       A.  Again, you keep using the term successful
16   bidder and I'm not sure that's an accurate
17   characterization.  The FCC tracked certain bidding
18   activity and then subsequently would issue licenses
19   upon payment for those licenses.
20       The licenses were paid for by The Elkin
21   Group.  They were never paid for by US Mobilcomm or
22   any other entity.
23       Q.  And at some point, you -- you swapped out
24   US Mobilcomm and replaced them with The Elkin Group,

Page 243

1    correct?
2        MR. EVETTS:  Objection to form.
3        THE WITNESS:  As I stated, the
4    application was amended to provide -- by The
5    Elkin Group to provide that The Elkin Group
6    would participate in the auction.
7    BY MR. BELLEW:
8        Q.  So it's your --
9        A.  It was only The Elkin Group that would
10   have the resources to acquire the licenses.
11       Q.  So it's your --
12       A.  If they were successful at bidding.
13       Q.  So it's your testimony that the change
14   from US Mobilcomm to The Elkin Group occurred during
15   the auction, not after the auction?
16       A.  Yes.
17       Q.  So is it your testimony that The Elkin
18   Group was listed as the party who had successfully
19   bid for the five licenses?
20       MR. EVETTS:  Objection to the
21   continued use of the word "successful."
22   BY MR. BELLEW:
23       Q.  The party that was entitled to purchase
24   the license after the auction --

Page 244

1        A.  Was The Elkin Group.
2        Q.  How would you characterize that?  If not a
3    successful bidder, how would you characterize it?
4        A.  I think I just characterized it.  The
5    party that was qualified after the auction was The
6    Elkin Group, not US Mobilcomm.
7        Q.  There was five licenses, correct?
8        A.  Correct.
9        Q.  That you purport to The Elkin Group?
10       A.  I purport?
11       Q.  You are purporting The Elkin Group
12   purchased those licenses?
13       A.  There were five licenses in Auction 18,
14   and there was an additional license I believe in
15   Auction 24 I think it was.
16       Q.  Where were the 5 and 18 areas?
17       A.  Two in Boston.  One in Miami.  One in
18   Washington, D.C.  And one in Sacramento.
19       Q.  Did those licenses eventually get sold?
20       A.  Three of them did.
21       Q.  Which three?
22       A.  The two in Boston and the one in Miami.
23       Q.  And how much money resulted from that
24   sale, those sales?

Page 245

1        A.  Well, there was also a sale of one in
2    Auction 24.  Total gross --
3        Q.  I want to focus just on 18.
4        A.  I believe that the total received was
5    $195,000.
6        Q.  That's for the two Boston licenses?
7        A.  And Miami.
8        Q.  And the Miami?  And what about Sacramento?
9        A.  Zero.
10       Q.  Was that canceled?
11       A.  Canceled, forfeited, abandoned.  I'm not
12   sure the exact terminology.
13       Q.  Did that --
14       A.  But it was not sold.
15       Q.  Did that cancellation --
16       A.  Zero revenue.
17       Q.  Well, that cancellation, did that result
18   in any benefit to an existing license in the
19   Sacramento area?
20       A.  No.
21       Q.  What about the D.C. license?
22       A.  No.
23       Q.  Was that sold?
24       A.  You asked me did it result in a benefit?

62 (Pages 242 to 245)

David W. Elkin

Page 246

1  I don't understand. I don't believe that -- I think
2  the answer is no, but I'm not sure exactly what
3  you're asking me.
4      Q. In terms of alleviating any encumbrance
5  issues?
6          MR. EVETTS: Objection to form.
7          THE WITNESS: I'm not sure how that
8      would alleviate anything, but they were.
9  BY MR. BELLEW:
10     Q. So you let the Sacramento license expire?
11         MR. EVETTS: Objection to form.
12         THE WITNESS: I am not sure if
13     technically they just expire. But that may be
14     the case. And that would be the case.
15     Whatever occurred with respect to Sacramento
16     occurred with respect to Washington. There was
17     no sale. There was no transfer. There was no
18     construction.
19 BY MR. BELLEW:
20     Q. And that $195,000 realized on the sale of
21 Boston and Miami, did any of those proceeds go to US
22 Mobilcomm?
23     A. US Mobilcomm wasn't entitled to any of
24 those proceeds.

Page 247

1      Q. So your answer is no?
2      A. Of course not.
3      Q. What did --
4      A. When you say realized, that was the gross
5  sales price?
6      Q. What was the purchase price for the five
7  licenses?
8      A. I don't recall. But there was a certain
9  discount for being a small business. And upon the
10 sale, there was a certain percentage, if not all of
11 the discount -- I don't recall -- that had to be
12 paid back to the FCC if the license wasn't held for
13 X number of years.
14         So that was the gross stated sales price.
15 I put up, I believe, somewhere in the neighborhood
16 of $250,000 between the various auctions. Gross
17 sales price of 195 for those three licenses.
18         And as I said, there was amounts paid to
19 the FCC that effectively increased the purchase
20 price. There was a stated purchase price, then a
21 discount that you had to then give back the
22 discount.
23     Q. Do you have an estimate as to what
24 ultimately the ballpark figure was for the purchase

Page 248

1  price?
2      A. I just told you.
3          MR. EVETTS: Objection to the form.
4      Do you mean what he bought the license for?
5          THE WITNESS: Oh, I'm not comfortable
6      speculating. I believe it's all on public
7      record.
8  BY MR. BELLEW:
9      Q. Was it -- it wasn't more than $195,000?
10     A. That's correct.
11     Q. So there was some net gain, so to speak,
12 on the sale?
13     A. Yes.
14     Q. Did you ever have an occasion —
15     A. And significant additional risk associated
16 with it.
17     Q. Did you ever have any --
18     A. And significant benefits to US Mobilcomm.
19     Q. Could you explain that last statement?
20     A. Sure. It enabled US Mobilcomm to enter
21 into a transaction and sell certain Phase I
22 licenses.
23     Q. So you are talking about the Roamer and
24 Repeater deals?

Page 249

1      A. Yes. Certain licenses and pay off debt.
2      Q. Meaning the debt to you?
3      A. Avoid bankruptcy. No, no.
4      Q. Partly?
5      A. No. Licensees, equipment vendors, other
6  creditors of the company, and shareholder loans.
7      Q. You personally received some of the
8  proceeds out of these transactions?
9      A. The vast majority of what was invested was
10 my money.
11     Q. My question is pretty simple. You saw
12 personally as a shareholder based on the shareholder
13 loans proceeds from the sales of licenses to Roamer
14 and Repeater, correct?
15     A. Absolutely.
16     Q. Well, you know, to be fair, Mr. Elkin, you
17 were discussing some altruistic purpose of staying
18 out of bankruptcy and paying off creditors on behalf
19 of the company. But at the same time, it was in
20 your own personal best interest to sell these
21 licenses, correct?
22     A. No. Mr. Bellew, you portray that as you
23 refer to altruistic attempt as something sinister.
24     Q. No. I said you portrayed it as being an

63 (Pages 246 to 249)

David W. Elkin

Page 278

1  with Mr. Norman, what is the latest date that
2  Mr. Norman would realize you had not done that?
3        MR. BELLEW: Objection.
4        THE WITNESS: That would have been
5  the time period of May or June 1994.
6  BY MR. EVETTS:
7     Q. So Mr. Norman would have known that you
8  failed to make that lump sum payment some 12 years
9  ago?
10    A. Absolutely.
11    Q. No question about that?
12    A. No question about it.
13    Q. When you sold some Phase I --
14    A. And it's reflected on innumerable tracking
15  documents that were provided and produced in this
16  case dating back to '94, '96.
17    Q. Do you recall -- long before the letter
18  from Mr. Sama dated October 2nd, 2002, do you recall
19  long before that letter having discussions with
20  Mr. Norman about selling licenses in Boston and
21  Miami?
22    A. Definitely.
23    Q. These are telephone conversations?
24    A. Telephone conversations with Mr. Norman,

Page 279

1  was informed of the sale of systems to Repeater and
2  to Securicor which would be the Florida and New
3  England systems.
4     Q. Approximately what year or time or month
5  would those conversations have taken place?
6     A. This would have been in the '99/2000 time
7  period.
8     Q. And in that same conversation, did you
9  make it clear to Mr. Norman that pursuant to Elkin
10  Exhibit 8 you had --
11    A. Best recollection would be the 2000 time
12  period.
13    Q. Did you make it clear to Mr. Norman in the
14  2000 time period during this conversation after the
15  sale of these licenses that pursuant to the notions
16  and propositions set forth in Elkin 7 you had
17  received some of the proceeds from those sales?
18       MR. BELLEW: Objection.
19       THE WITNESS: I did.
20  BY MR. EVETTS:
21    Q. No question about that?
22    A. Absolutely I did.
23    Q. He knew by sometime in 2000 you had sold
24  USM licenses and used some of the proceeds to repay

Page 280

1  yourself for loans?
2     A. No question.
3     Q. With regard to The Elkin Group becoming --
4  having the Auction 18 Phase II licenses assigned to
5  it, that information, when would the licenses to The
6  Elkin Group from Auction 18 actually have been
7  assigned?
8        The auction took place September to
9  October 1998. The application to replace USM with
10  The Elkin Group was filed September 1998?
11    A. Yes.
12    Q. The Form 601 to have the licenses issued
13  to The Elkin Group was filed on November 6th, 1998,
14  so all -- right?
15    A. Yes.
16    Q. When would the licenses have been actually
17  issued?
18    A. I believe it's in the public record and I
19  believe copies of the licenses have been produced.
20  But the latter part of 1998.
21    Q. So that was widely disseminated and Mr.
22  Norman was aware?
23       MR. BELLEW: Objection.
24       THE WITNESS: There were public

Page 281

1  notices of the licenses being issued pursuant
2  to the auction. And they are on the public
3  record wherever licenses were issued.
4  BY MR. EVETTS:
5     Q. I mean, in fact --
6     A. Fully available to anyone accessing the
7  FCC database which, of course, Mr. Norman did on
8  occasions.
9     Q. It was widely known and public and
10  available that the licenses were --
11    A. Yes.
12       MR. BELLEW: Objection.
13  BY MR. EVETTS:
14    Q. By the end of 1998?
15    A. Yes.
16    Q. Some seven years before this lawsuit was
17  brought?
18    A. Yes.
19    Q. Now, isn't it also true that --
20    A. And public notice was universally
21  available that the licenses were transferred by The
22  Elkin Group.
23    Q. Isn't it also true that one of the people
24  you were working with to try to realize value for

Love Court Reporting, Inc.

David W. Elkin

Page 282

1  USM and its shareholders was Mr. Mark Hatton?
2      A.  Yes.
3      Q.  And Mr. Mark Hatton was Mr. Norman's
4  relationship, wasn't he?
5      A.  Yes.
6      Q.  In fact, Mr. Norman ended up working for
7  Mr. Hatton after he quit US Mobilcomm?
8      A.  That's correct.
9      Q.  When did you provide information to
10  Mr. Hatton to try to answer his request in US
11  Mobilcomm?
12      A.  There were multiple occasions.  But it
13  extended into the period of December 1998.
14      Q.  And who actually communicated US
15  Mobilcomm's financial information to Mr. Hatton?
16  You personally?
17      A.  No.  Jeff Norman did.
18      Q.  In the financial information communicated
19  to Mr. Hatton, it would have been as of December
20  1998?
21      A.  Correct.
22      Q.  And in that financial information that
23  Mr. Norman is communicating to Mr. Hatton, does it
24  list that USM had been the winning bidder for any

Page 283

1  Phase II auctions?
2      A.  Does not.
3      Q.  Does it list that USM had current assets
4  of a $200,000 deposit on file with the FCC?
5      A.  Does not.
6      Q.  Did Mr. Norman represent to Mr. Hatton
7  that USM was going to be the recipient of five Phase
8  II licenses?
9      A.  I'm sure he didn't.
10      Q.  Why are you sure of that, Mr. Elkin?
11      A.  Because Mr. Norman knew that The Elkin
12  Group acquired those licenses.
13      Q.  Because he's communicating with his own
14  friend and his own employer, you're sure he would be
15  truthful with his own employer?
16      A.  Yes.
17      Q.  And he simply knew that Phase II licenses
18  weren't in the cards for US Mobilcomm?
19      A.  He knew that US Mobilcomm was not the
20  owner of the Phase II licenses.
21      Q.  Are there any allegations in Mr. Norman's
22  complaint against you, The Elkin Group, Mr. Shorin,
23  or USM that were not clearly known to Mr. Norman by
24  2000 at the latest?

Page 284

1      A.  None.
2          MR. EVETTS:  I will reserve the
3  remainder of my questions for the time of
4  trial.
5  BY MR. BELLEW:
6      Q.  Mr. Elkin, I just have briefly a couple
7  questions.
8          This document that's been marked as
9  Exhibit 8, this actual document was never mailed to
10  Jeff Norman, correct?
11      A.  This is a draft of a document that I
12  believe was mailed to Jeff Norman, as I've
13  testified.
14      Q.  My question is that document in that
15  format, was that mailed to Jeff Norman?
16      A.  As I have testified, this is a draft of a
17  letter that I believe was sent to Jeff Norman.
18      Q.  That's not my question.  My question isn't
19  whether this is a draft of a document you think you
20  sent to Jeff Norman.  My question is is the document
21  you're holding, was that sent to Jeff Norman in that
22  format?
23      A.  This document in this form with the
24  handwriting on it was not sent to Jeff Norman.

Page 285

1      Q.  Do you have a copy of the letter that you
2  purportedly send to Jeff Norman?
3      A.  I do not.
4      Q.  Do you have any documentary evidence to
5  indicate that a letter of this nature went to
6  Mr. Norman at any time?
7          MR. EVETTS:  Objection to the form.
8          THE WITNESS:  Yes.
9  BY MR. BELLEW:
10      Q.  This Elkin 8, this has handwriting from
11  both you and Mr. Shorin?
12      A.  Primarily Mr. Shorin.  There's only two
13  words that I see that are mine.
14      Q.  Do you know what computer system generated
15  this document?
16      A.  I do not.
17      Q.  Do you have --
18      A.  I have looked for it and have not been
19  able to locate it.
20      Q.  And this --
21      A.  I'm thinking perhaps Mr. Sama's file would
22  have a copy of it.
23      Q.  This document references the Centennial
24  deal you noted?

72 (Pages 282 to 285)

Love Court Reporting, Inc.

David W. Elkin

Page 286

1  A. Yes.
2  Q. That's how you dated it?
3      MR. EVETTS: Objection to the form.
4  The record speaks for itself.
5      THE WITNESS: That's one of the ways.
6  BY MR. BELLEW:
7  Q. This document could have been created last
8  night for all we know really?
9  A. That's not true.
10     MR. EVETTS: Objection to the
11  argumentative nature.
12     THE WITNESS: You made a comment
13  earlier that you didn't think you were being
14  antagonistic. I didn't even locate this
15  document. This was prepared at the time that
16  I've testified that it was prepared. And there
17  are other notes contemporaneously recorded
18  reflecting the conversations between Mr. Norman
19  and I on the matters contained in the letter.
20  BY MR. BELLEW:
21  Q. You will admit in connection with one
22  document -- that being the shareholder agreement --
23  that was created at a point much later than its
24  effective date, correct?

Page 287

1      MR. EVETTS: Objection to whatever
2  parallel you're trying to draw.
3      THE WITNESS: As I stated earlier,
4  the shareholder loan agreement is subsumed
5  within this document that we are looking at.
6      If you're referring to the document
7  called shareholder loan agreement, I believe we
8  discussed that earlier.
9      MR. BELLEW: I have no further
10  questions.
11     (Whereupon, the examination was
12  concluded at 5:25 p.m.)
13
14
15
16
17      /
18
19
20
21
22
23
24

Page 288

1  CERTIFICATION
2
3      I, NANCY R. TONER, Registered Professional Court
4  Reporter and Notary Public, hereby certify that the
5  foregoing is a true and accurate transcript of the
6  deposition of said witness who was first duly sworn by me on
7  the date and place hereinbefore set forth.
8
9      I FURTHER CERTIFY that I am neither attorney nor
10  counsel for, nor related to or employed by, any of the
11  parties to the action in which this deposition was taken,
12  and further that I am not a relative or employee of any
13  attorney or counsel employed in this action, nor am I
14  financially interested in this case.
15
16
17
18
19
20
21  NANCY R. TONER, RPR
22  Notary Public - My Commission
    expires 5/25/08.
23  Del. Cert. 197-PS
24

Page 289

1  CERTIFICATE OF DEPONENT
2
3      I, DAVID W. ELKIN, certify that I have read the
4  foregoing transcript of my deposition given on DECEMBER 6,
5  2006, and find it to be a true, correct, and complete
6  transcript of the answers given by me to the questions
7  therein propounded, except for corrections or changes in
8  form or substance, if any, noted in the attached Errata
9  Sheet.
10
11
12      _____
13      Date: _____
14
15  Subscribed and sworn to before me this _____ day of
16  _____, 200__.
17  My Commission Expires : _____
18
19
20
21  _____
22  NOTARY PUBLIC
23
24

73 (Pages 286 to 289)

# EXHIBIT
# 2

Page 1

1

2 IN THE UNITED STATES DISTRICT COURT

3 FOR THE DISTRICT OF DELAWARE

4

   --------------------------------x

5 JEFFREY M. NORMAN,

6            Plaintiff,

7         vs.

8 DAVID W. ELKIN, RICHARD M.
  SHORIN and THE ELKIN GROUP,
9 INC.,

10            Defendants.

11         and

12 US MOBILCOMM, INC.,

13            Nominal Defendant.

14

   --------------------------------x

15

16

17        DEPOSITION OF JEFFREY M. NORMAN

18            New York, New York

19         Friday, December 8, 2006

20

21

22

23

24 Reported by:
   LESLIE FAGIN

25 JOB NO.9289

Page 2

```
 1
 2            December 8, 2006
 3               7:59 a.m.
 4
 5        Videotaped Deposition of JEFFREY M.
 6   NORMAN, held at the offices of Blank
 7   Rome, 405 Lexington Avenue, New York, New
 8   York, pursuant to Notice and Federal
 9   Rules of Civil Procedure, before Leslie
10   Fagin, a Notary Public of the State of
11   New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2   A P P E A R A N C E S:
 3
 4   COZEN O'CONNOR
 5   Attorneys for Plaintiff
 6       Suite 1400
 7       Chase Manhattan Centre
 8       1201 North Market Street
 9       Wilmington, Delaware 19801-1147
10   BY:  DAVID A. FELICE, ESQ.
11
12   MARK A. EVETTS, ESQ.
13   Attorneys for Defendants
14       8502 Jackson Creek Bend Lane
15       Houston, Texas 77396
16
17   ALSO PRESENT:
18       PETER LEDWITH, Videographer
19
20
21
22
23
24
25
```

Page 4

```
 1
 2        IT IS HEREBY STIPULATED AND AGREED,
 3   by and between the attorneys for the
 4   respective parties herein, that filing
 5   and sealing be and the same are hereby
 6   waived.
 7        IT IS FURTHER STIPULATED AND AGREED
 8   that all objections, except as to the
 9   form of the question, shall be reserved
10   to the time of the trial.
11        IT IS FURTHER STIPULATED AND AGREED
12   that the within deposition may be sworn
13   to and signed before any officer
14   authorized to administer an oath, with
15   the same force and effect as if signed
16   and sworn to before the Court.
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1
 2        THE VIDEOGRAPHER:  Here begins
 3   videotape No. 1 in the deposition of
 4   Jeffrey Norman in the matter of Norman
 5   versus Elkin in the U.S. District Court,
 6   District of Delaware.
 7        Today's date is December 8, 2006.
 8   The time is 7:59 a.m.
 9        This deposition is being taken at
10   Blank Rome, 405 Lexington Avenue, New
11   York, New York, made at the request of
12   Mark Evetts of the law offices of Mark
13   Evetts.
14        The videographer is Peter Ledwith
15   on behalf of Esquire Deposition Services
16   located 216 East 45th Street, New York,
17   New York.
18        Would counsel and all present
19   please identify themselves.
20        MR. EVETTS:  Mark Evetts.  I
21   represent Mr. David Elkin, Richard
22   Shorin, The Elkin Group, the defendants.
23        MR. FELICE:  David Felice of Cozen
24   O'Connor representing the plaintiff,
25   Jeffrey Norman.
```

2 (Pages 2 to 5)

Page 6

1        J. Norman
2 J E F F R E Y  M.  N O R M A N, called as a
3   witness, having been duly sworn by a
4   Notary Public, was   examined and
5   testified as follows:
6 EXAMINATION BY
7 MR. EVETTS:
8    Q.   Would you please state your full
9 name for the record?
10    A.   Jeffrey Moore Norman.
11    Q.   Mr. Norman, when do you contend Mr.
12 Elkin breached his agreement with you to
13 invest $750,000 in USM?
14    A.   When I discovered that he had not
15 funded the company according to our original
16 agreement.
17        MR. EVETTS:   Objection.  Not
18 responsive.
19    Q.   The question wasn't when did you
20 discover, the question was when did he breach
21 it.  That is, when, in your opinion, based on
22 the agreement you contend existed in this
23 case, when was he obligated to invest
24 $750,000 and when did he fail to fulfill that
25 obligation?

Page 7

1        J. Norman
2        MR. FELICE:   Objection.  Compound.
3    Q.   Let's start with the first one.
4        When was he obligated, under the
5 oral agreement you're suing under in this
6 lawsuit, to invest $750,000?
7    A.   At the time that I contributed my
8 portion.
9    Q.   And I've got a document here that
10 will reflect this, but would you agree with
11 me that that was then around June 2, 1994?
12    A.   I contributed my $250,000 at that
13 particular time, yes.
14    Q.   And so it is your contention that
15 Mr. Elkin's obligation to contribute $750,000
16 was due and ripe at that moment?
17    A.   It was my understanding at that --
18 based on our conversation that when I put in
19 my contribution, he was going to put in his
20 contribution, if not that day, then within a
21 reasonable amount of time.
22    Q.   A reasonable amount of time being
23 within a month, two, three months?
24    A.   That was my understanding, yes.
25    Q.   And so Mr. Elkin, by your

Page 8

1        J. Norman
2 testimony, breached his agreement to invest
3 his equity into USM by the fall of 1994, is
4 that fair?
5        MR. FELICE:   Objection as to form.
6    A.   Well, I would call it that he
7 breached his commitment to contribute his
8 money that I understood would be happening at
9 the time that I contributed the money.
10    Q.   And that breach occurred by the
11 fall of 1994?
12    A.   By the fall of --
13    Q.   I'm doing that.  I know you put in
14 your money June 2, 1994.  I think your
15 testimony was you expected him to put up his
16 money contemporaneous or within a reasonable
17 period of time after that, so I'm tacking on
18 three or four months.
19    A.   That's true.
20    Q.   So by the fall of 1994, Mr. Elkin
21 breached his commitment to put in his
22 investment in USM, is that right?
23        MR. FELICE:   Objection as to form.
24    A.   In my mind, I don't know the legal
25 terminology, but in my mind, as a

Page 9

1        J. Norman
2 businessman, yes.
3    Q.   Okay.  And you knew by the fall of
4 1994 that Mr. Elkin hadn't put up his
5 750,000, didn't you?
6    A.   I don't remember the exact date,
7 but I discovered a few months after that,
8 when he didn't volunteer it to me, but I
9 asked him if he contributed his money and he
10 told me no, but he was going to be doing it
11 shortly.
12    Q.   And when was the next time you
13 became aware that he didn't live up to that
14 representation or that promise?
15    A.   Well, after that point in time,
16 I -- it was a long time ago, but, so I can't
17 give you an exact date, but I remember during
18 that time period that I might have seen a
19 selective document that had a capital
20 contribution chart that, you know, that
21 didn't show him putting in the money.  I
22 don't know -- I never actually got any kind
23 of documentation ever to this day, no cash
24 check statements or anything that -- of what
25 money was put in by Mr. Elkin.

3 (Pages 6 to 9)

Page 14

1         J. Norman
2 with, so on an overriding basis, I didn't
3 feel as though he had, in my mind, breached
4 our entire agreement.  It was maybe the
5 capital contribution part.
6      Q.  I want to get back to that
7 response, in particular, your
8 characterization of an entire agreement.
9         I want to understand what that
10 means, but before I get there, was there ever
11 a moment in time when your relationship had
12 developed to the point that you subjectively
13 believed he had not lived up, Mr. Elkin had
14 not lived up to his promise?
15         MR. FELICE:  Objection.  Asked and
16 answered.
17      A.  In our business relationship you're
18 talking about?
19      Q.  Let's make this simple.  I'm going
20 to be talking today about each of your causes
21 of action.
22         As far as I can recall, your first
23 cause of action is breach of contract, so
24 right now, all we're talking about is
25 whatever, let's get this straight, there is

Page 15

1         J. Norman
2 no writing for your oral contract, nobody
3 signed a contract?
4      A.  That's correct.
5      Q.  So it's breach of an oral contract,
6 right?
7      A.  Right.
8      Q.  And so an oral contract is proved
9 up by whatever you two gentlemen say that
10 agreement is, right?
11      A.  Correct.
12      Q.  Right now, you're the guy saying
13 what it is?
14      A.  Uh-huh.
15      Q.  So I'm asking you, based on the
16 oral agreement you contend was breached, was
17 there a moment in time when you realized Mr.
18 Elkin had failed to live up to his end of the
19 bargain under that oral agreement?
20         MR. FELICE:  Objection to form.
21      A.  Are you talking about the capital
22 contribution part of the agreement?
23      Q.  I'm talking about the oral
24 agreement you allege Mr. Elkin is in breach
25 of.

Page 16

1         J. Norman
2      A.  At that particular point in time,
3 at that moment in time, I felt, in my mind,
4 that from a business point of view, he didn't
5 live up to our agreement, our oral agreement
6 of putting in money.
7         As far as our overall business
8 contract or arrangement, whatever you want to
9 call it, I felt that predominantly, that the
10 business arrangement was positive enough to
11 continue.
12      Q.  So I think I understand from your
13 answer you're standing on your testimony that
14 you understood by the fall of '94 or very,
15 very early part of '95, he had at least
16 breached the part of your oral agreement to
17 invest his money?
18      A.  That's correct.
19      Q.  Now, let's talk about the agreement
20 in its entirety.
21         What are the components of this
22 oral agreement, what were the mutual
23 promises?
24      A.  Mr. Elkin, I had an ongoing
25 business in New York with a gentleman Mr. Tom

Page 17

1         J. Norman
2 Fiorita, offices on 1330 Avenue of the
3 Americas.  The company was doing maybe 650 to
4 a million dollars a year in revenue.
5         Mr. Elkin approached me and wanted
6 to get together.  He had just sold his cable
7 operation and had a concept about securing
8 some licenses in the last lottery spectrum.
9 He said, let's get together and I believe he
10 came to the Plaza Hotel in New York, let's
11 get together and he said, here is my idea,
12 that there is last lottery part of the
13 auction, 220 spectrum, let's put together a
14 company and aggregate licenses together.  The
15 split will be -- this is basically the first
16 time we met, 25 percent, 75 percent.
17         At that particular time, I don't
18 recall a capital figure and this is probably
19 early 1993, maybe even late 1992, we had this
20 conversation in New York.  No capital was
21 really discussed except for the fact you are
22 going to contribute 25 percent and I will be
23 responsible for 75 percent and the discussion
24 was primarily my job was going to be go out
25 and put together marketing plans, to secure

5 (Pages 14 to 17)

**ESQUIRE DEPOSITION SERVICES**
**302-426-9857**

Page 18

1       J. Norman
2 the licenses, figure out how to maybe
3 strategize in terms of aggregate for a
4 marketing pattern to create value.
5       Mr. Elkin's responsibilities, as he
6 relayed to me, as an attorney, he was going
7 to be able to handle the legal stuff.
8       Also with his financing background,
9 that he was going to raise capital for the
10 project and as his, you know, as an ex-chief
11 operating officer, he was also going to
12 handle that responsibility for the company
13 and that was our basic understanding.
14       The second piece of that is time --
15 so it was decided at that point in time,
16 basically within a month or two, do you want
17 to work on that project? I said, yes, he
18 understood I had another business, so I was
19 allocating time to this project and as time
20 went on throughout 1993, things evolved in
21 formulating the industry, I can't recall
22 whether the options took place then, but, you
23 know, the plan to aggregate the license with
24 cities to go after and then by the end of the
25 year, we started rough discussions about --

Page 19

1       J. Norman
2 primarily he did, what type of capital was
3 going to be needed and as I recall, the first
4 figure was less than a million dollars when I
5 signed on board, so it was also understood
6 that at that particular time, money that we
7 had put out for the business was going to be
8 counted towards our capital contribution and
9 that, I think, is a basis for our -- what was
10 the basis for our agreement.
11    Q.  I'm going to try to kind of parse
12 through that.  These are sort of the terms or
13 elements that I heard.
14       Initially, no agreement about how
15 much money -- the initial agreement was about
16 just respective ownership percentages, 75/25?
17    A.  I don't know I would call it an
18 agreement at that point in time.  I would
19 call it Mr. Elkin's proposal.
20    Q.  I heard from your answer that you
21 reached an agreement on the 25/75 before you
22 ever even knew how much money would be
23 associated with that?
24    A.  Yeah, he might have thrown a figure
25 out, we will put in half a million dollars.

Page 20

1       J. Norman
2    Q.  So you had this agreement that you
3 would co-own USM in the ratio of 75/25,
4 right?
5    A.  Right.
6    Q.  You had an agreement that the two
7 of you, I'm not going to try to summarize all
8 the different skill sets Mr. Elkin has versus
9 your skill sets, but, essentially, you guys
10 have an agreement that you would co-operate
11 USM?
12       MR. FELICE:  Objection as to form.
13    Q.  Based on each of your respective
14 skill sets?
15    A.  I did operations, but I wasn't --
16 my job was to secure the licenses.
17    Q.  I'm not trying to use a term of art
18 here.  I'm just talking about you were going
19 to both run the business?
20    A.  In a loose sense, you could say
21 that.
22    Q.  And, eventually, there was an
23 addendum to that agreement or a
24 supplementation to that agreement where the
25 amount of necessary capital was settled upon

Page 21

1       J. Norman
2 at a million, was that about right?
3    A.  That's right.
4    Q.  Was there any discussions in this
5 agreement about sort of how long you would
6 both be obligated to run the business, i.e.,
7 a year, two, 10?
8    A.  No.
9    Q.  Was there any understanding as to
10 what would happen if one of you quit running
11 the business, but the other guy continued
12 running the business?
13    A.  No.
14    Q.  Was there any discussions about how
15 long either or both of you could work without
16 receiving any compensation from the company?
17    A.  Was there any discussions about
18 that?  Potentially, possibly, it seems like
19 something that might have -- we might have
20 talked about, but I don't recall any details
21 of that.
22    Q.  Just so the jury is clear, as far
23 as the agreement we've just described, there
24 was no discussion about who was going to get
25 paid what, nobody was getting paid?

6 (Pages 18 to 21)

**ESQUIRE DEPOSITION SERVICES**
**302-426-9857**

Page 62

```
1          J. Norman
2    A.  It doesn't cure the fact that he
3  breached it when he was supposed to put it
4  in.
5    Q.  But that's a breach that took place
6  now 11 years ago, right?
7        MR. FELICE:  Objection as to form.
8    A.  At that particular time, yeah.
9    Q.  You do know, whether you know it or
10 not, you're charged with knowing it, do you
11 know the statute of limitations has run years
12 and years and years ago on that --
13       MR. FELICE:  Objection as to form.
14 If you have a question, he can answer.
15 If it doesn't call for legal conclusion,
16 you can ask it.
17       MR. EVETTS:  He has constructive
18 knowledge of the law, every word
19 written.
20   Q.  Do you know the statute of
21 limitations has run on breach of contract?
22       MR. FELICE:  Objection as to form.
23 Calls for legal conclusion.
24   Q.  He is not instructing you not to
25 answer, so you have to answer.
```

Page 63

```
1          J. Norman
2    A.  Do I know that?  You just told me
3  that.  I know you're a good attorney.
4    Q.  You've been involved in some
5  lawsuits, you know what a statute of
6  limitations is?
7        MR. FELICE:  Let's move on.  If you
8  want to tell him what it is, that's
9  fine, but you're asking for a legal
10 conclusion.
11   Q.  Look, a client who brings a lawsuit
12 not only is on constructive knowledge of the
13 statute of limitations, they have a duty to
14 know when the statute of limitations runs.
15       MR. FELICE:  Objection as to form.
16   Q.  Otherwise it's a malicious
17 prosecution, if you bring a lawsuit with no
18 basis under the law, you can be sued for
19 that.
20       MR. FELICE:  Objection as to form.
21 Don't answer.  He is calling for
22 disclosure of attorney/client privilege.
23   Q.  From your understanding of statute
24 of limitations and causes of action, you
25 don't have any idea that your 11 year old
```

Page 64

```
1          J. Norman
2  breach of contract --
3        MR. FELICE:  Objection as to form.
4  Calls for attorney/client privilege.
5  Don't answer that.
6    Q.  Are you going to follow your
7  counsel's instruction?
8        MR. FELICE:  I just instructed him
9  not to answer.  Move on.
10       MR. EVETTS:  Don't tell me what to
11 do, Mr. Felice.  I've been taking
12 depositions when you were a senior in
13 high school.
14   Q.  Are you going to follow your
15 counsel's instructions?
16   A.  Yes, sir.
17       MR. FELICE:  Don't badger my
18 client.
19   Q.  Isn't it true, Mr. Norman, you also
20 knew, you say it happened by happenstance,
21 but you learned that USM had sold licenses
22 from Mr. Elkin, isn't that right?
23   A.  Yes.
24   Q.  You learned it because you called
25 him on the phone and you asked him, right?
```

Page 65

```
1          J. Norman
2    A.  No, I didn't ask -- well, I guess
3  over time I did.  I called him because I
4  hadn't heard anything and it was probably
5  over a year.  Any information, despite some
6  requests, and I was driving in Pennsylvania
7  for business one day and I said I'm going to
8  call him up and see what's going on, haven't
9  heard anything, haven't gotten any
10 information, I get him on the telephone,
11 after the pleasantries, I said, what is going
12 on with the company?  He said, nothing, and
13 it was like an interrogation.  I said, do we
14 still have all our licenses?  He said, well,
15 no, and then I said, did we sell any
16 licenses, and he said, yes, and I said,
17 where?  Oh, I think we sold a couple in Miami
18 and in Boston.  I said, well, how much did we
19 get?  I don't recall exactly, a few hundred
20 thousand dollars.  Then I said, did you take
21 a distribution, and he said, yes, I did.  I
22 said, how come you didn't tell me about it?
23 He said, it wasn't your turn, and I said, why
24 don't you send me the information you got?
25 He said, okay.  Hung up the phone, didn't
```

17 (Pages 62 to 65)

Page 66

1       J. Norman
2 hear anything from him.
3    Q.  And didn't that occur in like early
4 2000?
5    A.  It occurred right before Mr. Sama
6 sent him a letter.
7    Q.  Right before?
8    A.  Shortly before. I can't recall the
9 exact timing of it. I called Mr. Sama up to
10 tell him about it.
11    Q.  You know that Mr. Sama's letter
12 went to Mr. Elkin in October 2002?
13    A.  I would like to see it to refresh
14 my memory. I haven't looked at that stuff in
15 a year.
16    Q.  You don't know that?
17    A.  I want to say yes, but I don't want
18 to say something that -- can I ask Mr. Felice
19 if that's true?
20       THE WITNESS: Is that true?
21       MR. FELICE: What was the question?
22    Q.  You know Mr. Sama's letter went to
23 Mr. Elkin in October 2002?
24    A.  I want to say yes.
25       MR. FELICE: I believe it's that

Page 67

1       J. Norman
2 time.
3    A.  I will say that.
4    Q.  Now that you know that, it's your
5 testimony this conversation with Mr. Elkin
6 took place shortly before that, is that
7 right?
8    A.  Yeah, I don't know how far in
9 advance, but it was before that, yes.
10    Q.  Shortly before that?
11    A.  I don't know. To be honest with
12 you, I'm just guessing.
13       Actually, it might have been. I
14 don't think I would -- I would give Mr.
15 Elkin, knowing me, I probably gave him more
16 than enough time to produce it and it
17 actually might have been a while before that
18 now that I think back on it, where I got up
19 my -- I got pissed off enough where I said,
20 he is still not sending me anything and I
21 just had it with all the requests and no
22 response and that's when I went to Mr. Sama.
23    Q.  And in that same conversation, you
24 learned about the Repeater transaction,
25 right?

Page 68

1       J. Norman
2    A.  I don't even think he told me who
3 he sold them to.
4    Q.  But you know today?
5    A.  Yes.
6    Q.  And in the same conversation he
7 told you about the Romer transaction?
8       MR. FELICE: Objection.
9    A.  He told me we got rid of some
10 licenses in Miami and Boston and it was a
11 couple hundred thousand dollars, I believe
12 were his words.
13    Q.  And so we're clear about when that
14 conversation took place, do you recall a
15 trial in a related case in the 220 action?
16    A.  The one you talked about earlier
17 today, the Warren trial.
18    Q.  I'm talking about the trial before
19 I was involved in this case, the 220 action
20 in the Vice Chancellor --
21    A.  Sure.
22    Q.  You remember that trial?
23    A.  Sure I do.
24    Q.  You remember you testified at the
25 trial?

Page 69

1       J. Norman
2    A.  I remember I testified at the
3 trial.
4    Q.  I will try to refresh your
5 recollection of how long before the Sama
6 letter went out that you talked to Mr. Elkin.
7       Here is the question. This is page
8 167, line 11:
9       What were your reasons for having
10 this letter delivered to the company?
11       Your answer: I have been
12 unsuccessful in getting any kind of
13 information that was satisfactory to me,
14 dated October, probably for the previous 24
15 months and actually prior to that, I had
16 discovered there was a sale of assets that,
17 you know, I kind of discovered by
18 happenstance and apprised Mr. Elkin on that.
19       Do you recall that you learned
20 about the sale of the assets more than 24
21 months before the Sama letter went out?
22    A.  I don't know. That doesn't
23 sound -- that paragraph there, to be honest
24 with you, as I sit here today, I can't tell
25 you the exact time that I called him.

18 (Pages 66 to 69)

Page 70

1          J. Norman
2     Q.   Where could we look --
3     A.   Twenty-four months.
4     Q.   Do you have notes at home of the
5 conversation where Mr. Elkin told you he sold
6 the licenses --
7     A.   Actually, I probably could track it
8 back because I was doing some work for a
9 technology company that was out of the other
10 part of Pennsylvania, so I would have to go
11 to my diaries and maybe I can track it back
12 looking at e-mails about meetings out in that
13 part of the state because I didn't go out
14 there a lot.
15     Q.   Based on when you knew you worked
16 for the technology company, can you give us a
17 better estimate of when you had that
18 conversation with Mr. Elkin?
19     A.   I would have to check my diaries to
20 pin it down, but I know the sequence was I
21 talked to him on the telephone, I didn't get
22 the document, I went to Mr. Sama.
23     Q.   Here is what you say at the 220
24 trial. The question was --
25          MR. FELICE: What page are you on?

Page 71

1          J. Norman
2          MR. EVETTS: I'm on page 192.
3     Q.   Just to put it in context, this is
4 when the cross-examination first began after
5 Mr. Felice passed the witness.
6          Good afternoon, Mr. Norman. My
7 name is Elizabeth Wilburn.
8          You responded, hi.
9          She asked you the very same
10 question I asked you, Mr. Norman, the demand
11 letter in this case is dated -- this is your
12 later demand letter, October 2004?
13     A.   This says 2004, I think we sent
14 two, I think we sent two demand letters.
15     Q.   You sent a demand letter --
16     A.   There was some legal thing, I had
17 to send one and then he also sent one, so I
18 think there were two. As I recall there were
19 two letters because we didn't get -- in the
20 first demand letter, we didn't get -- in our
21 minds, enough information and that's what
22 kind of triggered the whole thing and as I
23 recall, there were -- Mr. Sama sent him a
24 couple of letters and then there was a formal
25 demand letter that went out.

Page 72

1          J. Norman
2     Q.   If you talked to Mr. Elkin any time
3 before the then Sama letter went out, which I
4 think is uncontroverted you did?
5     A.   That's true.
6     Q.   And he revealed he had sold
7 licenses and he revealed to you what you now
8 know are the Repeater and Romer transactions,
9 right?
10     A.   I don't recall the names of the
11 companies he sold them to, but I remember he
12 said he got rid of some licenses, sold some
13 license.
14     Q.   He told you in that same
15 conversation that he had made a distribution
16 to himself, right, and you certainly knew --
17     A.   I don't know if he used the word
18 distribution, but I asked him if money was
19 distributed and I didn't get any and there
20 are own two shareholders.
21     Q.   You knew you didn't get any?
22     A.   Exactly.
23     Q.   Mr. Sama's letter went out more
24 than three years before you filed this
25 lawsuit. It is uncontroverted you knew,

Page 73

1          J. Norman
2 prior to that, sometime prior to that, that
3 Mr. Elkin sold licenses and made a
4 distribution, if I represent to you the
5 longest statute of limitations available to
6 you, and I don't think that it will even
7 apply is three years, how aren't all those
8 claims barred by the statute of limitations?
9          MR. FELICE: Objection. Calls for
10 legal conclusion.
11     A.   That's a legal conclusion that I
12 guess will be answered. All I know is from
13 my point of view is he told me I couldn't get
14 the information from him and that was, I
15 think, evident in a lot of these things we've
16 been talking about for Mr. Elkin.
17          Stretch, stretch, stretch. Give as
18 little as possible, hedge the bet and not
19 provide. Instead, most business situations
20 I'm in, you ask the question, yeah, sure, I
21 sold Miami 10 licenses, it was -- I know he
22 remembered exactly what he did. He has got a
23 mind for that. I sold it for 350, whatever
24 the sale price was, I sold the other one 10
25 licenses for X and it was closed on this day,

19 (Pages 70 to 73)

**ESQUIRE DEPOSITION SERVICES**
**302-426-9857**

Page 78

1      J. Norman
2 assets it owned were licenses, right?
3      MR. FELICE: Objection as to form.
4    A.   Right.
5    Q.   So if there is a capital gain, by
6 definition, it has to be sale of a license?
7      MR. FELICE: Objection as to form.
8    A.   Yeah.
9    Q.   Let's take a look. I'm going to
10 hand you what was previously marked PX-7.
11 This is a copy of the US Mobilcomm, Inc.'s
12 2000 tax return.
13      If you'll look at the K-1 for you,
14 which is Bates stamped MC 543, the second to
15 last page.
16      Do you see that?
17    A.   MC 543, I'm looking at it.
18    Q.   That's your K-1?
19    A.   Yeah.
20    Q.   You received it?
21    A.   Yeah.
22    Q.   You probably received that around
23 March 2001?
24    A.   That's when it's supposed to be
25 sent out, yeah.

Page 79

1      J. Norman
2    Q.   Did you normally get them when they
3 were supposed to be sent out?
4    A.   Sometimes I didn't, actually.
5    Q.   This is a bad year because this is
6 one of the few years that you had to actually
7 pay income taxes on ordinary income.
8      Do you see?
9    A.   Yes.
10    Q.   But this is a doubly bad year
11 because you also have a net long term capital
12 gain, don't you?
13    A.   Where does it say that?
14    Q.   Next to the biggest number on the
15 page.
16    A.   Are we looking -- 16,000 total for
17 the year?
18    Q.   Yeah.
19    A.   Okay, yeah.
20    Q.   So the minute you received this,
21 given that it imposed whatever your personal
22 tax rate is on that ordinary income, plus
23 whatever the capital gains tax rate is, this
24 is a bad year for you, you have to pay --
25 I've seen plenty of years where you had a

Page 80

1      J. Norman
2 major benefit from owning your stock in US
3 Mobilcomm, you had an ordinary loss, right?
4    A.   Yeah, a lot of years.
5    Q.   But this a bad year because you
6 have to pay, double, you have to pay taxes on
7 two different line items, so you knew the
8 minute you received this, that US Mobilcomm
9 had sold licenses, didn't you?
10      MR. FELICE: Objection as to form.
11    A.   No, I guess so if I look at it now,
12 but I think you're overdramatizing the effect
13 on my reaction to it when I got it. I think
14 I just put it in the stack with my accounting
15 stuff for the tax guy. I didn't jump on the
16 phone right away and say, oh, my God, we sold
17 all the licenses of the company, let me find
18 out what's going on.
19    Q.   You may call it overdramatization,
20 but I've got news for you, statute of
21 limitations, accruals, causes of action,
22 sometimes it doesn't even matter if you know,
23 but if there a chance for you to know, i.e.,
24 tax returns showing taxable income from the
25 sale of licenses, whether you actually dawned

Page 81

1      J. Norman
2 on you or not, you knew?
3      MR. FELICE: Objection to form. If
4 you have a question, you can ask him a
5 question. Stop badgering my witness.
6    Q.   Did you have a response to that?
7      MR. FELICE: Is there a question?
8    A.   I didn't know when I read this tax
9 return. Maybe I was supposed to, but I did
10 not know.
11      THE WITNESS: Can we take a break
12 at some point in time.
13      MR. EVETTS: Right now.
14      THE VIDEOGRAPHER: The time is 9:23
15 a.m. We're off the record.
16      (Recess.)
17      THE VIDEOGRAPHER: 9:33. On the
18 record.
19    Q.   Back to your claims, Mr. Norman, of
20 the breach of contract. I want to go back to
21 the first one, failing and refusing to
22 provide Norman with complete access to USM's
23 corporate business financial accounting books
24 and records.
25      By what date did Mr. Elkin breach

21 (Pages 78 to 81)

Page 94

J. Norman

1
2 facts.
3      MR. EVETTS:  That is appropriate to
4 assume certain facts.  Do you not know
5 that?
6      MR. FELICE:  You are saying, assume
7 that US Mobilecomm didn't have that.  If
8 you want to take the oath and testify,
9 go ahead.  If you want to put a document
10 in front of him, go ahead.
11     Q.  If USM -- how was USM ready to
12 participate in auction 18 if it lacked the
13 finances to make the required upfront payment
14 to the FCC?  Just tell the jury that, simple
15 question.
16     A.  There were a lot of variables
17 involved with the auction and give me the
18 date for that again.
19     Q.  The auction?
20     A.  Yes.
21     Q.  September 18, 1998.
22     A.  I wasn't involved with the company
23 at that point in time and I hadn't gotten any
24 documents after I left, so it was my
25 assumption, because I had no communication

Page 95

J. Norman

2 when I left, the company was ready for the
3 auction.
4      Q.  What do you mean you hadn't gotten
5 any documents after you left?  You know now,
6 from reviewing documents, that there were
7 contracts, financial statements, lists of
8 licenses, lists of equipment being
9 transferred from USM to Centenial with blind
10 copies going to Vincent Sama.  We had Vincent
11 Sama editing purchase agreements.  You know
12 there were tons of documents regarding USM
13 financial condition that you were privy to.
14     A.  The documents, we only got the
15 purchase and sale agreement from Mr. Elkin,
16 we didn't get any -- the financial documents
17 you're describing.
18     Q.  When you were acting as liaison
19 between USM and Mark Hatten in the fall of
20 1998, you weren't getting financial documents
21 then?
22     A.  I think I might have gotten one
23 that I just sent to Mr. Hatten.  You would
24 have to show it to me.
25     Q.  You're saying you got a financial

Page 96

J. Norman

2 document from USM?
3      A.  I'm saying I don't know if I did.
4      Q.  You didn't look at it, you just
5 sent it onto Mark Hatten?
6      A.  I probably would have looked at it.
7      Q.  You're sitting there telling me
8 your big complaint is you can't get enough
9 financial information.  Now, you get a
10 full-blown balance sheet and P&L and you're
11 not going to study it a little bit?
12     A.  I don't know if it was or not.  I
13 would have to look at it.  I remember seeing
14 something the other day from the exhibits,
15 something for Mark Hatten, a fax.  There was
16 some financial information.  It's still
17 regarding my answer to the auction.  I don't
18 agree with your supposition.
19     Q.  My supposition is very simple.  If
20 USM didn't have any money, was it ready to
21 participate in the auction?
22      MR. FELICE:  Objection as to form.
23     A.  I didn't believe that to be the
24 case.
25     Q.  I didn't ask you whether you

Page 97

J. Norman

2 believed that to be the case.
3      I asked you, if USM did not have
4 any money, could it have participated in the
5 auction?
6      MR. FELICE:  Objection.  Form.
7 Foundation.
8      A.  Probably.
9      Q.  What?
10     A.  Probably, it could have.
11     Q.  Let's talk about that.  Let me ask
12 you something else, too.
13      Are you taking a position in this
14 lawsuit that -- let me start back, scratch on
15 that.
16      You followed USM and some of its
17 progress through the FCC, right?
18     A.  Through the FCC auction, the
19 auction 18, I did.
20     Q.  You had some testimony, and I've
21 got some documents here that say I've been
22 following the document through the FCC
23 website.
24     A.  I followed auction 18 through the
25 FCC, yes, I did.

25 (Pages 94 to 97)

**ESQUIRE DEPOSITION SERVICES**
**302-426-9857**

Page 98

1        J. Norman
2    Q.  So you knew that USM was a
3 qualified bidder?
4    A.  Yes.
5    Q.  To know that, you saw -- the same
6 document that lists USM as a qualified bidder
7 lists the 200,000 upfront deposit?
8    A.  Yes.
9    Q.  You also, by following that
10 auction, you also knew they were the high
11 bidder on five different licenses, right?
12    A.  Yes.
13    Q.  And let me show you what I'm
14 marking Norman Exhibit 4.
15        (Document marked Norman Exhibit 4
16    for identification.)
17    Q.  Isn't this a facsimile transmittal
18 sheet from you to Mark Hatten and David
19 Kleeman dated December 15, 1998?
20    A.  Well, I can't say definitely
21 because there is no fax number on here, plus
22 it says total of pages 3, including the
23 cover, and there are four, so I can't say
24 definitely yes, but what's the question?
25    Q.  This is your document, right, you

Page 99

1        J. Norman
2 produced this document, right?
3    A.  I did.
4        MR. FELICE:  I can represent PFT is
5    the plaintiff's production.
6    Q.  This is your own document from your
7 own files representing your copy of something
8 you sent to Mark Hatten, right?
9    A.  That's what I said.  I can't tell
10 you for sure that I did send it to him.  If
11 we produced it, I had it in my files.  If you
12 look on the top, I say, click here, type, I
13 didn't finish it and there is no fax
14 confirmation and no fax number on it and the
15 page is wrong, so I can't say 100 percent
16 yes, but let's assume --
17    Q.  Mr. Norman, you worked, after you
18 left USM in late '96 or early 97, the person
19 you went to work for is Mark Hatten?
20    A.  I did some consulting.  I didn't go
21 to work for him.  Brief consulting for him.
22    Q.  At this point in time, you've lost,
23 you know this, you lost the Centenial deal,
24 right?
25    A.  Yes.

Page 100

1        J. Norman
2    Q.  At this point in time, you were the
3 one that told Mr. Elkin that Mark Hatten and
4 his company had an interest in buying,
5 acquiring, investing in US Mobilcomm, right?
6    A.  Yes.
7    Q.  You acted as liaison between US
8 Mobilcomm and Mark Hatten and his company?
9    A.  For the introduction, I did.
10    Q.  They must have asked you for some
11 financial information, didn't they?
12    A.  I just put him in touch with Mr.
13 Elkin.
14        MR. EVETTS:  Objection.  Not
15    responsive.
16    Q.  Did Mr. Hatten ask you for
17 financial information on the company?
18    A.  I don't recall.
19    Q.  Did you provide this financial
20 information to Mr. Hatten on the company?
21    A.  I don't recall.
22    Q.  Look at the next page, it's the
23 balance sheet for US Mobilcomm dated November
24 16, 1998, is that right?
25    A.  The one that says draft on it?

Page 101

1        J. Norman
2    Q.  Yes.
3    A.  Yes.
4    Q.  This came from your files?
5    A.  I assume so.
6    Q.  So this had to be provided to you
7 at sometime around the date on that document,
8 right?
9    A.  Yes.
10    Q.  Will you tell the jury how much
11 cash US Mobilcomm has in both the checking
12 and money market account at this point?
13    A.  According to this document, it has
14 got 10,300.
15    Q.  Where in this document, by the way,
16 does it make note that USM either owns some
17 phase 2 licenses or has a $200,000 deposit at
18 the FCC?
19    A.  Nowhere on this page.
20    Q.  If you had been following USM on
21 the FCC website and you know or you think it
22 has $200,000 at the FCC or by this time, has
23 five licenses, why wouldn't that raise a red
24 flag with you, where is that 200,000, where
25 are those licenses?

26 (Pages 98 to 101)

Page 106

1  J. Norman
2  speculation.
3  A.  I can't speculate on that.
4  Q.  Look --
5  A.  I certainly would have liked that
6 telephone call. I would like that
7 opportunity.
8  Q.  I happen to have a very detailed
9 report on you, Mr. Norman, which includes
10 your small claims judgments from clothing
11 stores and God knows what else, gas
12 companies, tax liens on your home.
13  You're telling me you don't know
14 for sure whether in the latter part of 1998,
15 you had an extra $50,000 laying around?
16  A.  I don't think that's the point.
17 The point is whether I wanted to take the
18 opportunity.
19  When I first went into the venture,
20 I didn't have the whole $250,000 at that time
21 either, but I took advantage of it and got
22 that for the business opportunity.
23  MR. EVETTS:  Objection.
24  Nonresponsive.
25  Q.  Do you know that Mr. Elkin, in the

Page 107

1  J. Norman
2 months, really in the years leading up to
3 this auction, had been trying to raise the
4 money for US Mobilcomm to participate
5 meaningfully in the phase 2 auctions, did you
6 know that?
7  A.  I know we were both trying to raise
8 the money.
9  Q.  At some point, Mr. Elkin had to
10 decide, as the deadline is approaching, to
11 put your money up or shut up. At some point,
12 he has to say, nobody is going to come
13 through, at some point if nobody comes up to
14 the table, you have to take the matter in
15 your own hands, right?
16  MR. FELICE:  Objection as to form.
17  A.  I can't answer for Mr. Elkin.
18  Q.  My point to you, it's a simple
19 question, not whether you would have wanted
20 the call, whether you would have wanted the
21 opportunity, had a call come to you in August
22 1998, if we're going to do this, I need your
23 50,000 and I need it now, were you in the
24 financial position to send that $50,000 to
25 the company?

Page 108

1  J. Norman
2  MR. FELICE:  Objection as to form.
3  A.  Probably yes.
4  Q.  Probably yes?
5  A.  Yes.
6  Q.  August 1998?
7  A.  Yeah, I could have raised the cash.
8  Q.  I didn't ask you that.
9  I want to know, did you have the
10 cash?
11  MR. FELICE:  Objection as to form.
12  A.  I don't know. I would have to look
13 back. This is a long time ago.
14  Q.  The two of you had been trying to,
15 quote, raise the cash, as you just said, for
16 years, so if you could have raised the cash,
17 why didn't you?
18  MR. FELICE:  Objection. Asked and
19  answered.
20  A.  Why didn't we raise the cash?
21  Q.  Why didn't you raise it? You said
22 you could have raised it.
23  A.  We did have a couple of potential
24 companies that wanted to raise cash for us.
25  Q.  I can show you 50 attempts to raise

Page 109

1  J. Norman
2 cash that Mr. Elkin engaged in, but my
3 question is, you just said to me, I think I
4 could have given the 50,000 because I believe
5 I could have raised it. If you could have
6 raised the money, why didn't you?
7  MR. FELICE:  Objection. Asked and
8  answered.
9  A.  We weren't raising $50,000 for the
10 company, we were raising a couple of million
11 dollars for the company and we had problems
12 doing that and it turned out some of those
13 problems with some of the people in New York
14 that I talked to after the fact -- I got some
15 feedback from numerous people that they
16 didn't want to put money in because Mr. Elkin
17 had a reputation of being a difficult person
18 to deal with.
19  MR. EVETTS:  Objection.
20  Nonresponsive.
21  Q.  You know, raising money for a
22 privately held company always requires a
23 certain connection with the founders, doesn't
24 it?
25  A.  Yes.

28 (Pages 106 to 109)

Page 114

1        J. Norman
2 that?
3     A.   That's his business, that's his own
4 personal business and he has a right to do
5 that and I -- you know, his personal money, I
6 have nothing to say about it.
7     Q.   That's an interesting point.  Let
8 me ask you this...
9         MR. EVETTS:  Let's take a break.
10        THE VIDEOGRAPHER:  10:07.  Off the
11 record.  End of tape 1.
12        (Recess.)
13        THE VIDEOGRAPHER:  10:14.  On the
14 record.  Beginning of tape 2.
15    Q.   You talk a lot in your complaint
16 about what it means to be, quote, a qualified
17 bidder for auction 18.
18        Do you recall that?
19    A.   Yes.
20    Q.   And the fact that USM was a
21 qualified bidder, right?
22    A.   Yes.
23    Q.   Do you understand whether the
24 primary qualification, in accordance with the
25 FCC guidelines for filling out an

Page 115

1        J. Norman
2 application, is putting up a deposit
3 sufficient to cover the licenses you
4 anticipate bidding on?
5     A.   Yes.
6     Q.   So the primary, quote, factor for
7 US Mobilcomm was the ability to put up the
8 upfront deposit, right?
9     A.   Right.
10    Q.   And so if, as you already said, if
11 it turns out in this case, under the facts,
12 that USM didn't put up the 200,000, it didn't
13 have the 200,000, Mr. Elkin put up the
14 200,000, regardless of what FCC things, USM
15 wasn't qualified to bid at the auction,
16 right?
17        MR. FELICE:  Objection.
18    A.   Say that again.
19    Q.   It's really simple.  You said that
20 if USM didn't have the money, Mr. Elkin
21 didn't have any obligation to put it up,
22 right, if he did put it up, just to hold
23 their spot, he could change his mind and take
24 it back, as you put it, it's his money, he
25 could do what he wants to with it, right?

Page 116

1        J. Norman
2        So my point is, if, in fact, USM
3 qualified only by the grace of David Elkin
4 because he put up his personal money, when he
5 took away his personal money, USM would no
6 longer qualify to bid at that auction, would
7 they?
8        MR. FELICE:  Objection.
9        Foundation.
10    A.   If there was no money there as a
11 deposit, they wouldn't, no.
12    Q.   Let me get back to the point where
13 you said it was his money, he could do what
14 he wants to with it.
15        Have you ever started a business
16 from scratch yourself?
17    A.   Uh-huh.
18    Q.   Where you were the sole
19 shareholder?
20    A.   Yes.
21    Q.   And have you experienced, like many
22 startup businesses, during that first year,
23 it's hard to pay all the bills or as you
24 start adding employees, it's hard to make
25 payroll and all that good stuff?

Page 117

1        J. Norman
2     A.   Yes.
3     Q.   From time to time, have you just
4 had to forego your own salary or compensation
5 or, for that matter, put in money to make
6 other people's payrolls?
7     A.   Yes.
8     Q.   And in that situation, what is it
9 your expectation, let's just say, January 1st
10 rolls around, not enough money in the bank to
11 make payroll, I've heard about that a bunch
12 of times in my past experience, not enough
13 money to make payroll, you have to go write a
14 check and put it in your company's bank
15 account, $10,000 to make that payroll.
16        You've done that in the past?
17    A.   Yes.
18    Q.   What is your expectation when the
19 company becomes better off, becomes more
20 flush, a big sale or big receivable comes in,
21 would you expect to be able to get back that
22 $10,000 you put in to cover the payroll?
23    A.   Hopefully, yes.
24    Q.   And would you expect that, even if
25 you didn't enter into any kind of formal loan

30 (Pages 114 to 117)

Page 174

1         J. Norman
2 opposed to, you're just saying you never
3 talked about it?
4    A.   A concept and generalities, I'm not
5 opposed to, no.
6    Q.   So as we sit here today, now that
7 it's been 10 years since you've left, do you
8 think David should be entitled to some sort
9 of an adjustment for putting in an extra 10
10 years into the company than you did?
11       MR. FELICE:  Objection.
12 Foundation.
13    A.   No, I don't.
14    Q.   You don't?
15    A.   No, I don't.
16    Q.   I thought you just said yes.
17    A.   You asked me a hypothetical
18 question in life, okay.  You're asking me
19 specific.
20    Q.   Telling me why, in this situation,
21 putting in an additional 10 years isn't worth
22 the same?
23    A.   Because, first of all, he never
24 communicated so -- we were holding licenses.
25 Okay.  There is not a lot of work involved

Page 175

1         J. Norman
2 with that.
3    Q.   Mr. Norman, and --
4    A.   And Rick Shorin was getting paid
5 out of the company costs to do a lot of the
6 day to day stuff besides being a CFO.
7    Q.   You do know before you went out
8 because this was your forte, you were the
9 person responsible for aggregating the
10 licenses?
11    A.   Uh-huh.
12    Q.   So you do know that as you
13 aggregated these licenses, you made
14 commitments to pay site rental fees, right?
15    A.   Right.
16    Q.   And you also know, under the SEC
17 rules, there were deadlines to get the
18 licenses constructed so they wouldn't be
19 forfeited, you knew that, right?
20    A.   Yes.
21    Q.   You also knew there were FCC rules
22 that required having subscribers on the
23 system by certain periods or you would
24 forfeit or lose the licenses?
25    A.   Yes.

Page 176

1         J. Norman
2    Q.   Do you have any idea what the
3 aggregate site rental fees were when you
4 maxed out the number of licenses the company
5 either owned or managed?
6    A.   I've got an idea.
7    Q.   What is it?
8    A.   Anywhere from a couple hundred to
9 $1,000 a month, maybe.
10    Q.   So how much was it a month to just
11 keep up with your contractual obligations?
12    A.   It's hard to -- I can't set here
13 this second because some of the licensees
14 were paying that amount themselves.
15    Q.   Let's throw out a number.  If it
16 was 30,000 a month to cover site rental fees
17 for 50 licenses, plus your construction
18 requirements, plus your subscriber
19 requirements, do you have any idea what the
20 high watermark was for USM subscriber
21 revenues or revenues of any kind from
22 operations?
23    A.   Anywhere from 60 to a hundred
24 thousand annually.
25    Q.   Annually, so 5,000 to 8,000 a

Page 177

1         J. Norman
2 month?
3    A.   Yes.
4    Q.   If your site rental fees are 30,000
5 a month, plus you've got to install a half
6 million dollars worth of equipment, plus you
7 have to continually work to bring subscribers
8 and keep subscribers on the system so you
9 don't forfeit everything you sunk all that
10 money into, that's an ongoing separate
11 operating business with ongoing financial
12 obligations, isn't it?
13    A.   Yes, but I think you're mixing the
14 time up on the build out and constructing on
15 that.
16       I believe when I left the company,
17 most of that stuff was already done because
18 we were involved with that, too, Tom and I.
19    Q.   But when the company --
20    A.   So --
21    Q.   When the company never manages to
22 generate sufficient cash flow to pay even a
23 fraction of its ongoing bills, who do you
24 think has to deal with the creditors, the
25 people that aren't being paid, the equipment

45 (Pages 174 to 177)

**ESQUIRE DEPOSITION SERVICES**
**302-426-9857**

Page 198

```
 1          J. Norman
 2    to give you the courtesy.
 3        MR. FELICE:  If you're not
 4    finished, it may not make sense for me
 5    to question him and if you are given the
 6    right to recall this witness, we will
 7    address it then.  If not, we'll address
 8    it through other evidence.  Thank you.
 9        THE VIDEOGRAPHER:  This is the end
10    of deposition of Jeff Norman and the
11    time is 12:04 p.m.  This is the end of
12    tape No. 2.
13        (Time noted:  12:04 p.m.)
14
15    _____
16        JEFFREY M. NORMAN
17
18 Subscribed and sworn to before me
19 this ___ day of _____, 2006.
20
21 _____
22
23
24
25
```

Page 200

```
 1
 2 ----------------I N D E X----------------
 3 WITNESS        EXAMINATION BY    PAGE
 4 JEFFREY M. NORMAN  MR. EVETTS        6
 5
 6 ------------------EXHIBITS------------------
 7     NORMAN        FOR ID.
 8     1        45
 9     2        43
10     3        54
11     4        98
12     5        130
13     6        134
14     7        134
15     8        134
16     9        143
17     10        156
18
19
20
21
22
23
24
25
```

Page 199

```
 1
 2        C E R T I F I C A T E
 3 STATE OF NEW YORK    )
 4                     : ss.
 5 COUNTY OF NEW YORK   )
 6
 7      I, LESLIE FAGIN, a Notary Public
 8 within and for the State of New York, do
 9 hereby certify:
10      That JEFFREY M. NORMAN, the witness
11 whose deposition is hereinbefore set
12 forth, was duly sworn by me and that such
13 deposition is a true record of the
14 testimony given by the witness.
15      I further certify that I am not
16 related to any of the parties to this
17 action by blood or marriage, and that I
18 am in no way interested in the outcome of
19 this matter.
20      IN WITNESS WHEREOF, I have hereunto
21 set my hand this 14th day of December,
22 2006.
23
24    _____
25        LESLIE FAGIN, RPR
```

51 (Pages 198 to 200)

# EXHIBIT
# 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEFFREY M. NORMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. 06-005-JJF |
| | § | |
| DAVID W. ELKIN, RICHARD M. | § | |
| SHORIN and THE ELKINS GROUP, INC. | § | Jury Trial Demanded |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| US MOBILCOMM, INC., | § | |
| | § | |
| Nominal Defendant. | § | |

## DEFENDANTS' RESPONSE TO
## PLAINTIFF'S FIRST REQUESTS FOR ADMISSION

To:     Plaintiff, Jeffrey M. Norman, through his attorney of record, Sean J. Bellow, Cozen
O'Connor, 1201 North Market Street, Suite 1400, Wilmington DE 19801.

Pursuant to Federal Rules of Civil Procedure 26 and 36, Defendants David W. Elkin

("Elkin"), Richard M. Shorin ("Shorin"), The Elkin Group, Inc. ("TEG"), and Nominal Defendant

US MobilComm, Inc. (collectively "Defendants"), hereby object and respond to Plaintiff, Jeffrey

M. Norman's ("Plaintiff's") First Request for Admissions as follows:

### GENERAL OBJECTIONS

1.     Defendants object generally to the Requests, Definitions, and Instructions to the extent

that they seek to impose requirements or obligations in addition to or different from those

imposed by the Federal Rules of Civil Procedure.

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST REQUESTS FOR ADMISSION – Page 1

2.     Defendants object generally to the Requests to the extent that they are overbroad in scope, unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of relevant information.

3.     Defendants object generally to the Requests, Definitions, and Instructions to the extent that they are vague and/or ambiguous, including but not limited to the Definitions of "You," "Your," and "Defendants".

4.     If any of the foregoing objections apply, specification of – or failure to note any or all of – these General Objections shall not constitute a waiver of those or other General Objections that apply to any particular Request.

## SPECIFIC RESPONSES AND OBJECTIONS

### REQUEST NO. 1:

Admit that TEG was not a qualified bidder (as defined by the Federal Communications Commission ("FCC")) for FCC Phase II Auction No. 18.

### RESPONSE:

Defendants object to this Request on the grounds that it is vague and ambiguous because it is not clear what is meant by a "qualified bidder." Moreover, after a reasonable inquiry, the information available was insufficient to enable Defendants to admit or deny this Request. Subject to and without waiving these and the general objections, Defendants admit only that TEG did bid at one or more FCC Phase II Auctions.

### REQUEST NO. 2:

Admit that Norman never received loan (sic) from USM.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION – Page 2**

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because it is not clear what is meant by a "received loan." Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that Norman periodically requested and received monies from USM for his personal use even though he had failed to contribute sufficient capital to fully pay for his shares in the company and he never repaid any of those monies. Defendants deny the remainder of the Request.

**REQUEST NO. 3:**

Admit that Norman never received a cash loan from USM.

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because it is not clear what is meant by a "received a cash loan." Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that Norman periodically requested and received monies from USM for his personal use even though he had failed to contribute sufficient capital to fully pay for his shares in the company and he never repaid any of those monies. Defendants deny the remainder of the Request.

**REQUEST NO. 4:**

Admit that USM never filed a tax return with the IRS that claimed any amount as "Loans from Shareholders" on Form 1120S.

**RESPONSE:**

Admit.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION – Page 3**

**REQUEST NO. 5:**

Admit that TEG did not make an "Upfront Payment (sic) for FCC Phase II Auction No. 18.

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because it is not clear what is meant by making a payment (that is, it is not clear whether the question is whether TEG physically wrote the check or wired the money from its account). Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that Elkin directed and paid funds from his personal accounts sufficient to satisfy the "Upfront Payment," for the benefit of TEG. Defendants deny the remainder of the Request.

**REQUEST NO. 6:**

Admit that Phase II licenses from FCC Phase II Auction No. 18 were registered in the name of TEG.

**RESPONSE:**

Admit.

**REQUEST NO. 7:**

Admit that TEG never owned any Phase II 220 MHz licenses other than those obtained as a result of FCC Phase II Auction No. 18.

**RESPONSE:**

Admit in part and deny in part. Defendants admit only that TEG never owned any Phase II 220 MHz licenses other than those obtained as a result of one or more FCC Phase II Auctions.

**REQUEST NO. 8:**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION – Page 4**

Admit that TEG sold Phase II licenses originally obtained through the bidding process of FCC Auction No. 18.

**RESPONSE:**

Admit in part and deny in part. Defendants admit only that TEG sold some, but not all, of its Phase II licenses originally obtained through successfully bidding at one or more FCC Phase II Auctions. Defendants deny the remainder of the Request.

**REQUEST NO. 9:**

Admit that USM received no compensation for any Phase II licenses auctioned during FCC Auction No. 18.

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because the term "received no compensation" is subject to multiple interpretations. The Request is also unreasonable because USM never put up any money or bid for licenses during any FCC Phase II Auctions, and thus there was no basis for it to expect any compensation. Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that proceeds from the sale of Phase II licenses (and not from the related sale of Phase I licenses that were "bundled" with those Phase II licenses) acquired during one or more FCC Phase II Auctions and subsequently sold by TEG were never paid to USM. Defendants deny, however, that USM received no compensation relating in any way to TEG's sale of Phase II licenses.

**REQUEST NO. 10:**

Admit that Norman did not withdrawal any capital from USM during tax year 2001.

**REQUEST NO. 8:**

Admit that TEG sold Phase II licenses originally obtained through the bidding process of FCC Auction No. 18.

**RESPONSE:**

Admit in part and deny in part. Defendants admit only that TEG sold some, but not all, of its Phase II licenses originally obtained through successfully bidding at one or more FCC Phase II Auctions. Defendants deny the remainder of the Request.

**REQUEST NO. 9:**

Admit that USM received no compensation for any Phase II licenses auctioned during FCC Auction No. 18.

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because the term "received no compensation" is subject to multiple interpretations. The Request is also unreasonable because USM never put up any money or bid for licenses during any FCC Phase II Auctions, and thus there was no basis for it to expect any compensation. Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that proceeds from the sale of Phase II licenses (and not from the related sale of Phase I licenses that were "bundled" with those Phase II licenses) acquired during one or more FCC Phase II Auctions and subsequently sold by TEG were never paid to USM. Defendants deny, however, that USM received no compensation relating in any way to TEG's sale of Phase II licenses.

**REQUEST NO. 10:**

Admit that Norman did not withdrawal any capital from USM during tax year 2001.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST REQUESTS FOR ADMISSION – Page 5**

**RESPONSE:**

Admit.

**REQUEST NO. 11:**

Admit that Elkin agreed to contribute at least $750,000.00 in cash capital to USM.

**RESPONSE:**

Admit in part and deny in part. Defendants admit only that Elkin agreed to pay consideration of $750,000 for his 75% ownership interest in USM, subject to Norman's agreement to pay $250,000 for his 25% interest. Defendants deny that Elkin agreed to pay "at least $750,000" no matter the circumstances and Defendants deny Elkin agreed to pay only cash for his ownership interest.

**REQUEST NO. 12:**

Admit that Elkin withdrew at least $601,500.00 in cash from USM.

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because it is not clear what is meant by a "withdrew . . . cash." Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that USM distributed approximately $601,500.00 to Elkin over time, either as repayment of loans to USM or a reduction in capital.

**REQUEST NO. 13:**

Admit that Norman received no cash distributions from USM from 2001 to present.

**RESPONSE:**

Admit.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION – Page 6**

**REQUEST NO. 14:**

Admit that as of January 31, 1998, USM had a contractual right to accrued management fees in the amount of approximately $1,153,350.

**RESPONSE:**

Defendants admit that as of January 31, 1998, USM had a contractual right to accrued management fees in the amount of approximately $1,153,350, subject to revenues or profits being available to pay such management fees, which never materialized in the vast majority of cases.

Dated: September 22, 2006

Signed: _____

     *Attorney for Defendants*

Respectfully submitted,

_____

Steven L. Caponi
Delaware Bar No. 3484
Blank Rome LLP
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

Mark A. Evetts
Berg & Androphy
3704 Travis Street
Houston, Texas 77002-9550
Telephone: (713) 529-5622
Facsimile: (713) 529-3785

*Attorneys for Defendants David W. Elkin,
Richard M. Shorin, The Elkin Group, Inc.,
and Nominal Defendant US MobilComm,
Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded on this 22nd

day of September 2006 to the following counsel of record:

        Sean J. Bellow
        David A. Felice
        Cozen O'Connor
        1201 North Market Street, Suite 1400
        Wilmington DE 19801
        Telephone: (302) 295-2000
        Facsimile: (302) 295-2013

Mark A. Evetts

# EXHIBIT
# 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEFFREY M. NORMAN, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | C.A. No. 06-005-JJF |
| | § | |
| DAVID W. ELKIN, RICHARD M. | § | |
| SHORIN and THE ELKINS GROUP, INC. | § | Jury Trial Demanded |
| | § | |
| Defendants, | § | |
| and | § | |
| | § | |
| US MOBILCOMM, INC., | § | |
| | § | |
| Nominal Defendant. | § | |

## DEFENDANTS' RESPONSE TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

To:    Plaintiff, Jeffrey M. Norman, through his attorney of record, Sean J. Bellow, Cozen O'Connor, 1201 North Market Street, Suite 1400, Wilmington DE 19801.

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendants David W. Elkin ("Elkin"), Richard M. Shorin ("Shorin"), The Elkin Group, Inc. ("TEG"), and Nominal Defendant US MobilComm, Inc. (collectively "Defendants") hereby object and respond to Plaintiff, Jeffrey M. Norman's ("Plaintiff's") First Set of Interrogatories ("Interrogatories") as follows:

## GENERAL OBJECTIONS

1.    Defendants object generally to the Interrogatories, Definitions, and Instructions to the extent that they seek to impose requirements or obligations in addition to or different from those imposed by the Federal Rules of Civil Procedure.

2.    Defendants object generally to the Interrogatories to the extent that they are overbroad in scope, unduly burdensome, oppressive, vexatious, and/or unreasonable.

3.    Defendants object to the Interrogatories to the extent that they seek information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

4.    Defendants object generally to the Requests, Definitions, and Instructions to the extent that they are vague and/or ambiguous, including but not limited to the Definitions of "You," "Your," and "Defendants".

5.    Defendants object to the Interrogatories to the extent that they seek information not within its possession, custody, or control.

6.    Defendants object to the Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or protection.

7.    Defendants object to the Interrogatories to the extent that they seek confidential and/or proprietary documents or information.

8.    Insofar as any of the Interrogatories seek information to which any of the foregoing objections apply, specification of – or failure to note any or all of – these General Objections shall not constitute a waiver of those or other General Objections that apply to any particular Interrogatory.

9.    These General Objections shall be deemed as continuing throughout and incorporated in Defendants' Specific Responses and Objections set out below.

<u>DEFENDANTS' RESPONSE TO PLAINTIFF'S</u>
<u>FIRST SET OF INTERROGATORIES</u> – Page 2

## DEFENDANTS' SPECIFIC RESPONSES AND OBJECTONS
## TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1:

Identify all facts surrounding the drafting and execution of the Shareholder Loan Agreement by and between Elkin and USM dated as of September 1, 1995, including, without limitation, the date the Agreement was executed, the amount loaned under the Agreement (if any), the amount repaid pursuant to the Agreement (if any), the interest charged for the amount loaned (if any), the amount of interest paid (if any), and the notice provide to all other stockholders concerning any loans made pursuit to the Agreement.

### RESPONSE:

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, vexatious, and unreasonable. It is overbroad and unduly burdensome because it requires a chronicling and marshalling of "all facts" relating to any and all monies loaned, expenses advanced, and property contributed by Elkin to – or for the benefit of – USM over a twelve year period. Such an exercise is not only unduly burdensome, it is unreasonable and vexatious on its face. Subject to and without waiver of the foregoing objections and the general objections stated above, Defendants respond as follows.

Elkin and Norman agreed over a decade ago to co-own and co-operate USM. They agreed that Norman would contribute 25% of the capital (or $250,000) in return for 25% of USM's stock, and Elkin would contribute 75% of the capital (or $750,000) for the remaining 75% of the stock. Not only did Norman fail to live up to his obligation to co-operate the company, he also failed to invest $250,000. At the time Norman and Elkin agreed to co-own USM, Norman could only come up with $200,000 of his $250,000. Elkin understood Norman would pay the additional $50,000 as soon as he was able. Norman later argued, after he had failed to pay the additional $50,000, he should not be required to pay the extra $50,000 because he was owed about that

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES – Page 3

amount in expenses he had advanced on behalf of USM. When he failed to substantiate any of those expenses, over time, his capital was reduced accordingly.

In addition, after his initial and only investment in the company, Norman periodically requested and received monies from USM for his personal use, even though he had never contributed the additional $50,000 required to fully pay for his shares in the company (and never substantiated any of the expenses he allegedly advanced on behalf of USM). When it became obvious Norman had no intention of repaying those loans and/or advances, Elkin and Shorin treated those monies as a return of capital and Norman's capital account was reduced accordingly.

In contrast, Elkin contributed far more consideration for his ownership interest in USM than the $750,000 contemplated by him and Norman. Like many start-up companies with little or no cash flow, Elkin repeatedly paid USM's expenses or bills, declined or never sought reimbursement for expenses he incurred personally for USM's benefit, provided property or services to USM, or loaned money or property outright to USM to enable it to meet its ongoing obligations. Initially, Elkin did not even try to account for all that he had done personally for USM. He belatedly entered into a loan agreement with USM for the purpose of documenting, albeit only in small part, his personal efforts to finance the company over the years.

Not only did Elkin's contributions to USM exceed $750,000, he should not have been required to contribute the original $750,000, in light of Norman's failure to contribute $250,000. Norman's capital ultimately was reduced to approximately $140,000 to reflect his failure to substantiate expenses he allegedly incurred for the benefit of USM, his failure to pay the additional $50,000 he owed for his shares, and to reflect monies he has taken out of USM for his

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES – Page 4

personal benefit and use.  Therefore, Elkin's capital was reduced accordingly to reflect his lower pro rata contribution of capital in light of the parties' respective ownership interests and Norman's ultimate investment.

Upon information and belief, the loan document was executed in 2001 or 2002.  It was prepared and executed by Elkin as the majority owner, sole director, and Chief Executive Officer of USM to reflect and capture in part his substantial financial and personal contributions to USM over the years.  No notice was provided to Norman because shareholder notice and approval is not required for transactions of this nature.  Even if notice had been provided or required, Elkin possessed the right -- pursuant to his 75% ownership interest in USM -- to approve such a transaction in any event.

Finally, with respect to its terms, what USM owes Elkin pursuant to the agreement, and what has been paid to Elkin, those answers may be derived or ascertained from the Shareholder Loan Agreement, the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, and from USM's bank account records.  Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents, all of which were previously provided to the Plaintiff.

**INTERROGATORY NO. 2:**

Identify all Federal Communications Commission ("FCC") 220 MHz licenses once or presently owned (outright or partial ownership) by USM.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 5**

**RESPONSE:**

Because the answer to this Interrogatory may be derived or ascertained from the Slow4 Lotus file already provided to the Plaintiff, and because the burden of deriving or ascertaining the answer is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from that file.

**INTERROGATORY NO. 3:**

Identify and describe the basis for the $20,500.00 "Loans to Shareholders" as appears on USM's 1997 tax return.

**RESPONSE:**

Subject to and without waiver of the general objections stated above, Defendants respond as follows. There was never a single $20,500 loan to USM shareholders. Instead, when USM was formed in or around 1994, a second company was also formed, named US MobilComm Management Corp. Shortly thereafter, the two companies were merged into one. USM"s controller, Rick Shorin, erroneously recorded what should have been denominated "due from affiliate" as a "Shareholder Loan". This mistake was corrected in 2001.

**INTERROGATORY NO. 4:**

Identify and quantify the distribution of income received from the sale of "FL 220 MHz License" as appears on Schedule D of USM's 2000 tax return.

**RESPONSE:**

Because the answer to this Interrogatory may be derived or ascertained from the sales agreement related to the Florida license and the bank account records of USM, all of which have already provided to the Plaintiff, and because the burden of deriving or ascertaining the answer is

substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

## INTERROGATORY NO. 5:

(LEFT BLANK)

## RESPONSE:

N/A

## INTERROGATORY NO. 6:

Identify and describe the basis for the $82,000.00 distribution made to Elkin in 2000 as identified in the Schedule K-1 issued to Elkin in 2000.

## RESPONSE:

The basis for every payment made to Elkin by USM over the years constitutes either the repayment of loans or a return of capital. The bases for this payment, as well as any and all other payments to Elkin, are described in detail in Defendants' response to Interrogatory No. 1, which response Defendants incorporate as if fully set forth herein. Finally, with respect to the timing and amount for this and all other payments to Elkin, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, and from USM's bank account records, all of which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 7**

## INTERROGATORY NO. 7:

Identify and quantify the distribution of income received from the sale of "Phase I 220 MHz Licenses" as appears on Schedule D of USM's 2001 tax return.

## RESPONSE:

Because the answer to this Interrogatory may be derived or ascertained from the sales agreements reflecting sales of Phase I licenses and from the bank account records of USM, all of which have already provided to the Plaintiff, and because the burden of deriving or ascertaining the answer is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

## INTERROGATORY NO. 8:

Identify and quantify the distribution of income received from the two sales of "220 MHz License – Additional Proceeds" as appears on Schedule D of USM's 2002 tax return.

## RESPONSE:

Because the answer to this Interrogatory may be derived or ascertained from the sales agreements reflecting sales of Phase I licenses and from the bank account records of USM, all of which have already provided to the Plaintiff, and because the burden of deriving or ascertaining the answer is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

## INTERROGATORY NO. 9:

Identify and describe the reason(s) for the discharge of $20,500.00 "Loans to Shareholders" as appears on USM's 2001 tax return.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 8**

**RESPONSE:**

Defendants object to this Interrogatory as unduly burdensome because it is duplicative of other Interrogatories to which full and complete answers have already been provided. Subject to and without waiver of these and the general objections stated above, Defendants incorporate their response to Interrogatory No. 3 as if fully set forth herein.

**INTERROGATORY NO. 10:**

Identify and describe the draw-down of paid-in capital for USM during tax year 2001 as evidenced on line 23 of the "Balance Sheets per Books" of USM's 2001 tax return.

**RESPONSE:**

Defendants object to this Interrogatory as unduly burdensome because it is duplicative of other Interrogatories to which full and complete answers have already been provided. Subject to and without waiver of these and the general objections stated above, Defendants respond as follows. Capital in USM has been reduced in only one of four ways. Norman's capital has been reduced to reflect his failure to substantiate expenses he allegedly incurred for the benefit of USM and his failure to pay the additional $50,000 he owed for his shares. Norman's capital has also been reduced to reflect monies he has taken out of USM for his personal benefit and use, once it became clear he did not intend to repay those monies. Elkin's capital was reduced accordingly to reflect his lower pro rata contribution of capital in light of the parties' respective ownership interests and Norman's ultimate investment.

Finally, with respect to the specifics of a draw-down of paid-in capital for USM during tax year 2001, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES** – Page 9

investments and capital advanced to or on behalf of USM, which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 11:**

Identify by date and amount all cash contributions Elkin alleges he made to USM at anytime.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is vague and ambiguous because the term "contribution" has not been specifically defined. As used in this question, the term "cash contributions" can mean literally any payment Elkin has ever made to – or for the benefit of – USM, whether Elkin has ever sought repayment for such contributions and whether such contributions relate in any way to the claims or defenses of any party to this lawsuit. For that reason, this Interrogatory is also overbroad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. For further answer, Defendants incorporate their response to Interrogatory No. 1 as if fully set forth herein. Finally, with respect to the timing and specific amounts Elkin has invested in USM that have been documented, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 10**

advanced to or on behalf of USM SM, and from USM's bank account records, all of which have

been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is

substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that

this answer can be derived from those documents.

## INTERROGATORY NO. 12:

Identify and describe all facts that support Defendants' allegations as contained in
paragraph 128 of your counterclaim.

## RESPONSE:

Defendants object to this Interrogatory as unduly burdensome because it is duplicative of

other Interrogatories to which full and complete answers have already been provided. Subject to

and without waiver of these and the general objections stated above, Defendants incorporate their

response to Interrogatories Nos. 1 and 11 as if fully set forth herein.

## INTERROGATORY NO. 13:

Identify by date and amount all non-cash contribution (sic) Elkin alleges he made to USM
at anytime.

## RESPONSE:

In addition to the general objections stated above, Defendants object to this Interrogatory

on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and seeks information

that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

This Interrogatory is vague and ambiguous because the term "non-cash contribution" has not been

specifically defined. The term "non-cash contribution" can refer to any and all tangible and/or

intangible property, duties, services, and/or benefits of any kind provided by Elkin to a company

he single-handedly ran for more than twelve years. Of course, the term "contribution" also can

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 11**

mean the part played by Elkin to form and grow USM, which renders the question not only vague, but overbroad as well. Finally, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that track document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM M, and from USM's bank account records, all of which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 14:**

Identify and describe the bases for the filing of the USM's FCC Form 175 in September 1998 amending the name of the applicant from USM to TEG.

**RESPONSE:**

Subject to and without waiver of the general objections stated above, Defendants respond as follows. At the time of the FCC Phase II Auctions, and for some time before that, USM lacked the profits or capital necessary to continue to invest in FCC licenses. Elkin had hoped that USM would be able to raise money to participate in the auction, but that did not happen. Thus, USM lacked the financial ability not only to pay the required upfront fee, but to participate meaningfully at the auction at all. However, Elkin realized that the Phase II licenses, if acquired by anyone other than USM or a friendly affiliate, would severely undermine the value of USM's Phase I licenses as well as the prospect of being able to realize any value *via* a later sale of those Phase I licenses. To preserve the opportunity to realize value for USM's Phase I licenses (and prevent the decimation of any value those licenses might have possessed at that time), Elkin agreed to advance the funds to enable TEG to participate in the Phase II auction.

**INTERROGATORY NO. 15:**

Identify and describe all consideration paid from TEG to USM for the application amendment filed with the FCC in September 1998.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, vexatious, and unreasonable. It is vexatious and unreasonable because it assumes that USM was owed something from TEG for the amendment. It is also vexatious and unreasonable because it incorrectly assumes USM conferred some sort of benefit to TEG in connection with the September 1998 FCC auction, when in fact the very opposite is true. Elkin, through TEG, graciously agreed to expend his own money and energy to acquire licenses that USM was unwilling and unable to acquire. Where TEG was successful, the licenses it was awarded and paid for in the FCC Phase II Auction provided significant value for Phase I licenses owned or managed by USM (or prevented the decimation of any such value), thereby making it possible to realize the greatest value for some of USM's licenses. This Interrogatory is also vague and ambiguous because the term "consideration" has not been specifically defined. Because "consideration" can describe both paying money as well as conferring other, non-cash, benefits, the Interrogatory and its response can be misleading. Subject to and without waiver of these and the general objections stated above, Defendants further respond by stating that while TEG did not pay any money to USM in connection with the application amendment filed with FCC in September 1998, by successfully bidding at the FCC Phase II Auction, TEG ultimately conferred a substantial benefit to USM. For further answer, Defendants incorporate their response to Interrogatory No. 14 as if fully set forth herein.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 13**

**INTERROGATORY NO. 16:**

Identify and substantiate the origination of the $200,000.00 "Upfront Payment" made by USM for FCC Phase II Auction No. 18.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, vexatious, and unreasonable. Defendants further object because it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is vexatious and unreasonable because it incorrectly assumes USM made an upfront payment of $200,000 in connection with Phase II Auction No. 18, thereby making the Interrogatory and its response misleading. It is also objectionable because the source of TEG's $200,000 is completely irrelevant to any issue in this lawsuit. Indeed, the only conceivable relevant inquiry is whether TEG's $200,000 "Upfront Payment" came from USM's coffers. Subject to and without waiver of these and the general objections stated above, Defendants further respond as follows. All of the $200,000 came from several of Elkin's personal brokerage or bank accounts. Once the cash was ready for disbursement, Elkin directed payment of the funds to the FCC for the benefit of TEG.

**INTERROGATORY NO. 17:**

Identify and quantity the source (by buyer, sale date, sale amount and basis) of all revenue generated by USM through the sale of FCC 220 MHz licenses.

**RESPONSE:**

Because the answer to this Interrogatory may be derived or ascertained from the sales agreements reflecting sales of Phase I licenses and the bank account records of USM, all of which have already provided to the Plaintiff, and because the burden of deriving or ascertaining the

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 14**

answer is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 18:**

Identify and quantify (by kind, date and amount) the sources for all Contributions made by Elkins that amount to $877,150.00 as evidenced in the document Bates marked MC001165.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is vague and ambiguous because the term "Contributions" has not been specifically defined. The term "contribution" can refer to any and all tangible and/or intangible property, duties, services, and/or benefits of any kind provided by Elkin to a company he ran for more than twelve years. Of course, the term "contribution" also can mean the part played by Elkin to form and grow USM, which renders the question not only vague, but overbroad as well. Finally, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, and from USM's bank account records, all of which has been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents. For further answer, Defendants incorporate their responses to Interrogatories 11, 12, and 13 as if fully set forth herein.

Identify and quantify (including, without limitation, date and amount) the distributions made to Elkin that amount to $601,500.00 as evidenced in the document Bates marked MC001115 and/or MC001165.

**RESPONSE:**

The basis for every payment made to Elkin by USM over the years constitutes either the repayment of loans or a return of capital. The bases for this payment, as well as any and all other payments to Elkin, are described in detail in Defendants' response to Interrogatory No. 1, which response Defendants incorporate as if fully set forth herein. Finally, with respect to the timing and amount for this and all other payments to Elkin, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, and from USM's bank account records, all of which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 20:**

Identify and quantify (by kind, date and amount) all withdrawals allegedly made by Norman that amount to $60,600.00 as evidenced in the document Bates marked MC001165.

**RESPONSE:**

Norman's capital was reduced to reflect monies he has took out of USM for his personal benefit and use, once it became clear he did not intend to repay those monies. With respect to the timing and amount for any reductions in Norman's capital, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that

be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, and from USM's bank account records, all of which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

## INTERROGATORY NO. 21:

Identify and quantify (by kind, date and amount) all "Out of pocket expenses 1993-2001" allegedly paid by Elkin that amount to $150,476.00 as evidenced in the document Bates marked MC001165.

## RESPONSE:

Like many start-up companies with little or no cash flow, Elkin repeatedly paid USM's expenses or bills and declined or never sought reimbursement for expenses he incurred personally for USM's benefit. With respect to the timing and specific amounts of expenses Elkin incurred or paid for the benefit of USM, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

## INTERROGATORY NO. 22:

Identify and quantify all acts, understandings or other services rendered that allegedly entitle Elkin to a set-off as alleged in defendants' Eleventh Affirmative Defense.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome. This Interrogatory is overbroad and unduly burdensome because, as written, the question literally calls for a detailed description of any and all tangible and/or intangible property, duties, services, and/or benefits of any kind provided or performed by Elkin to or for a company he ran for more than twelve years. Subject to and without waiver of these and the general objections stated above, Defendants respond as follows.

Under Delaware law, an officer is entitled to recover the reasonable value of his services on the basis of *quantum meruit* if he served as an officer of a company, did not grant himself excessive compensation, and provided services of value to the company. Elkin surely satisfies these requirements. Elkin has worked, without any pay, as the Chief Executive Officer of USM since 1993 or 1994. For more than twelve years, in addition to serving as CEO, Elkin has also served as USM's sales force, public relations department, marketing department, office manager, filing clerk, legal staff, and chief bottle washer. His longstanding service to USM has not earned him any greater ownership interest in USM relative to Norman. Moreover, he has not received any salary for his efforts. Neither Elkin, nor for that matter any reasonable person, would have bargained beforehand for that result. And, USM and Norman would be unjustly enriched if Elkin were required to forfeit all rights to compensation for services he legitimately performed for all these years.

**INTERROGATORY NO. 23:**

Identify by name and address each fact witness you intend to call at the time of trial and for each witness state the substance of his or her expected testimony.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and purports to impose requirements or obligations in addition to or different from those imposed by the Federal Rules of Civil Procedure. Defendants also object to this Interrogatory on the ground that it is premature pursuant to FRCP 26(a)(3)(A). Subject to and without waiver of the foregoing objections and the general objections stated above, Defendants presently expect that they will call David Elkin and Richard Shorin to testify at trial. Defendants will supplement this response as and when appropriate.

**INTERROGATORY NO. 24:**

Identify each document or exhibit you intend to use or introduce into evidence at trial.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and purports to impose requirements or obligations in addition to or different from those imposed by the Federal Rules of Civil Procedure. Defendants also object to this Interrogatory on the ground that it is premature pursuant to FRCP 26(a)(3)(C). Defendants will supplement this response as and when appropriate.

## INTERROGATORY NO. 25:

Identify each person whom you expect to call as an expert at trial, and as to each person set forth in detail the person's qualifications as an expert, the substance of the facts and opinions to which the person is expected to testify and all other requirements as set forth in Federal Rule of Civil Procedure 26.

## RESPONSE:

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and purports to impose requirements or obligations in addition to or different from those imposed by the Federal Rules of Civil Procedure. Defendants also object to this Interrogatory on the ground that it is premature pursuant to FRCP 26(a)(2). Defendants will supplement this response as and when appropriate.

Dated: September 22, 2006

Respectfully submitted,

Steven L. Caponi
Delaware Bar No. 3484
Blank Rome LLP
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

Mark A. Evetts
Berg & Androphy
3704 Travis Street
Houston, Texas 77002-9550
Telephone: (713) 529-5622
Facsimile: (713) 529-3785

*Attorneys for Defendants David W. Elkin, Richard M. Shorin, The Elkin Group, Inc., and Nominal Defendant US MobilComm, Inc.*

## VERIFICATION

STATE OF TEXAS    §
HARRIS COUNTY    §

      On this day, appeared before me, the undersigned notary public, Mark A. Evetts, attorney of record for Defendants in this action. After I administered an oath to him, upon his oath, he said that he has been authorized to verify the responses set forth in Defendants' Response to Plaintiff's First Set of Interrogatories, that David W. Elkin has read the responses set forth therein in his individual capacity and as an officer of US MobilComm and The Elkin Group, and Richard M. Shorin has read the responses in his individual capacity, and Messrs. Elkin and Shorin have represented to him that the responses are within their personal knowledge and are true and correct.

 

_____
Mark A. Evetts

      SWORN TO and SUBSCRIBED before me by Mark A. Evetts on September 22, 2006.

_____
Notary Public in and for
the State of Texas

[Notary Seal: TRACY LYNN DUNFORD, NOTARY PUBLIC, STATE OF TEXAS, EXPIRES 05-12-2007]

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 21**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded on this 22nd day of September, 2006 to the following counsel of record:

> Sean J. Bellow
> David A. Felice
> Cozen O'Connor
> 1201 North Market Street, Suite 1400
> Wilmington DE 19801
> Telephone: (302) 295-2000
> Facsimile: (302) 295-2013

_____
Mark A. Evetts