# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEFFREY M. NORMAN, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | C.A. No. 06-005-JJF |
| | § | |
| DAVID W. ELKIN, RICHARD M. | § | |
| SHORIN and THE ELKINS GROUP, INC. | § | Jury Trial Demanded |
| | § | |
| Defendants, | § | |
| and | § | |
| | § | |
| US MOBILCOMM, INC., | § | |
| | § | |
| Nominal Defendant. | § | |

## DEFENDANTS' RESPONSE TO
## PLAINTIFF'S FIRST SET OF INTERROGATORIES

To:    Plaintiff, Jeffrey M. Norman, through his attorney of record, Sean J. Bellow, Cozen
O'Connor, 1201 North Market Street, Suite 1400, Wilmington DE 19801.

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendants David W. Elkin

("Elkin"), Richard M. Shorin ("Shorin"), The Elkin Group, Inc. ("TEG"), and Nominal Defendant

US MobilComm, Inc. (collectively "Defendants") hereby object and respond to Plaintiff, Jeffrey

M. Norman's ("Plaintiff's") First Set of Interrogatories ("Interrogatories") as follows:

### GENERAL OBJECTIONS

1.     Defendants object generally to the Interrogatories, Definitions, and Instructions to the

extent that they seek to impose requirements or obligations in addition to or different from those

imposed by the Federal Rules of Civil Procedure.

2.     Defendants object generally to the Interrogatories to the extent that they are overbroad in

scope, unduly burdensome, oppressive, vexatious, and/or unreasonable.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 1**

3.    Defendants object to the Interrogatories to the extent that they seek information that is neither relevant to the subject matter of this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

4.    Defendants object generally to the Requests, Definitions, and Instructions to the extent that they are vague and/or ambiguous, including but not limited to the Definitions of "You," "Your," and "Defendants".

5.    Defendants object to the Interrogatories to the extent that they seek information not within its possession, custody, or control.

6.    Defendants object to the Interrogatories to the extent that they seek information that is protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, or any other applicable privilege or protection.

7.    Defendants object to the Interrogatories to the extent that they seek confidential and/or proprietary documents or information.

8.    Insofar as any of the Interrogatories seek information to which any of the foregoing objections apply, specification of – or failure to note any or all of – these General Objections shall not constitute a waiver of those or other General Objections that apply to any particular Interrogatory.

9.    These General Objections shall be deemed as continuing throughout and incorporated in Defendants' Specific Responses and Objections set out below.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 2**

## DEFENDANTS' SPECIFIC RESPONSES AND OBJECTONS
## TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

### INTERROGATORY NO. 1:

Identify all facts surrounding the drafting and execution of the Shareholder Loan Agreement by and between Elkin and USM dated as of September 1, 1995, including, without limitation, the date the Agreement was executed, the amount loaned under the Agreement (if any), the amount repaid pursuant to the Agreement (if any), the interest charged for the amount loaned (if any), the amount of interest paid (if any), and the notice provide to all other stockholders concerning any loans made pursuit to the Agreement.

### RESPONSE:

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, vexatious, and unreasonable. It is overbroad and unduly burdensome because it requires a chronicling and marshalling of "all facts" relating to any and all monies loaned, expenses advanced, and property contributed by Elkin to – or for the benefit of – USM over a twelve year period. Such an exercise is not only unduly burdensome, it is unreasonable and vexatious on its face. Subject to and without waiver of the foregoing objections and the general objections stated above, Defendants respond as follows.

Elkin and Norman agreed over a decade ago to co-own and co-operate USM. They agreed that Norman would contribute 25% of the capital (or $250,000) in return for 25% of USM's stock, and Elkin would contribute 75% of the capital (or $750,000) for the remaining 75% of the stock. Not only did Norman fail to live up to his obligation to co-operate the company, he also failed to invest $250,000. At the time Norman and Elkin agreed to co-own USM, Norman could only come up with $200,000 of his $250,000. Elkin understood Norman would pay the additional $50,000 as soon as he was able. Norman later argued, after he had failed to pay the additional $50,000, he should not be required to pay the extra $50,000 because he was owed about that

DEFENDANTS' RESPONSE TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES – Page 3

amount in expenses he had advanced on behalf of USM. When he failed to substantiate any of those expenses, over time, his capital was reduced accordingly.

In addition, after his initial and only investment in the company, Norman periodically requested and received monies from USM for his personal use, even though he had never contributed the additional $50,000 required to fully pay for his shares in the company (and never substantiated any of the expenses he allegedly advanced on behalf of USM). When it became obvious Norman had no intention of repaying those loans and/or advances, Elkin and Shorin treated those monies as a return of capital and Norman's capital account was reduced accordingly.

In contrast, Elkin contributed far more consideration for his ownership interest in USM than the $750,000 contemplated by him and Norman. Like many start-up companies with little or no cash flow, Elkin repeatedly paid USM's expenses or bills, declined or never sought reimbursement for expenses he incurred personally for USM's benefit, provided property or services to USM, or loaned money or property outright to USM to enable it to meet its ongoing obligations. Initially, Elkin did not even try to account for all that he had done personally for USM. He belatedly entered into a loan agreement with USM for the purpose of documenting, albeit only in small part, his personal efforts to finance the company over the years.

Not only did Elkin's contributions to USM exceed $750,000, he should not have been required to contribute the original $750,000, in light of Norman's failure to contribute $250,000. Norman's capital ultimately was reduced to approximately $140,000 to reflect his failure to substantiate expenses he allegedly incurred for the benefit of USM, his failure to pay the additional $50,000 he owed for his shares, and to reflect monies he has taken out of USM for his

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 4**

personal benefit and use. Therefore, Elkin's capital was reduced accordingly to reflect his lower pro rata contribution of capital in light of the parties' respective ownership interests and Norman's ultimate investment.

Upon information and belief, the loan document was executed in 2001 or 2002. It was prepared and executed by Elkin as the majority owner, sole director, and Chief Executive Officer of USM to reflect and capture in part his substantial financial and personal contributions to USM over the years. No notice was provided to Norman because shareholder notice and approval is not required for transactions of this nature. Even if notice had been provided or required, Elkin possessed the right – pursuant to his 75% ownership interest in USM – to approve such a transaction in any event.

Finally, with respect to its terms, what USM owes Elkin pursuant to the agreement, and what has been paid to Elkin, those answers may be derived or ascertained from the Shareholder Loan Agreement, the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, and from USM's bank account records. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents, all of which were previously provided to the Plaintiff.

**INTERROGATORY NO. 2:**

Identify all Federal Communications Commission ("FCC") 220 MHz licenses once or presently owned (outright or partial ownership) by USM.

**RESPONSE:**

Because the answer to this Interrogatory may be derived or ascertained from the Slow4 Lotus file already provided to the Plaintiff, and because the burden of deriving or ascertaining the answer is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from that file.

**INTERROGATORY NO. 3:**

Identify and describe the basis for the $20,500.00 "Loans to Shareholders" as appears on USM's 1997 tax return.

**RESPONSE:**

Subject to and without waiver of the general objections stated above, Defendants respond as follows. There was never a single $20,500 loan to USM shareholders. Instead, when USM was formed in or around 1994, a second company was also formed, named US MobilComm Management Corp. Shortly thereafter, the two companies were merged into one. USM"s controller, Rick Shorin, erroneously recorded what should have been denominated "due from affiliate" as a "Shareholder Loan". This mistake was corrected in 2001.

**INTERROGATORY NO. 4:**

Identify and quantify the distribution of income received from the sale of "FL 220 MHz License" as appears on Schedule D of USM's 2000 tax return.

**RESPONSE:**

Because the answer to this Interrogatory may be derived or ascertained from the sales agreement related to the Florida license and the bank account records of USM, all of which have already provided to the Plaintiff, and because the burden of deriving or ascertaining the answer is

substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 5:**

(LEFT BLANK)

**RESPONSE:**

N/A

**INTERROGATORY NO. 6:**

Identify and describe the basis for the $82,000.00 distribution made to Elkin in 2000 as identified in the Schedule K-1 issued to Elkin in 2000.

**RESPONSE:**

The basis for every payment made to Elkin by USM over the years constitutes either the repayment of loans or a return of capital. The bases for this payment, as well as any and all other payments to Elkin, are described in detail in Defendants' response to Interrogatory No. 1, which response Defendants incorporate as if fully set forth herein. Finally, with respect to the timing and amount for this and all other payments to Elkin, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, and from USM's bank account records, all of which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 7**

**INTERROGATORY NO. 7:**

Identify and quantify the distribution of income received from the sale of "Phase I 220 MHz Licenses" as appears on Schedule D of USM's 2001 tax return.

**RESPONSE:**

Because the answer to this Interrogatory may be derived or ascertained from the sales agreements reflecting sales of Phase I licenses and from the bank account records of USM, all of which have already provided to the Plaintiff, and because the burden of deriving or ascertaining the answer is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 8:**

Identify and quantify the distribution of income received from the two sales of "220 MHz License – Additional Proceeds" as appears on Schedule D of USM's 2002 tax return.

**RESPONSE:**

Because the answer to this Interrogatory may be derived or ascertained from the sales agreements reflecting sales of Phase I licenses and from the bank account records of USM, all of which have already provided to the Plaintiff, and because the burden of deriving or ascertaining the answer is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 9:**

Identify and describe the reason(s) for the discharge of $20,500.00 "Loans to Shareholders" as appears on USM's 2001 tax return.

**RESPONSE:**

Defendants object to this Interrogatory as unduly burdensome because it is duplicative of other Interrogatories to which full and complete answers have already been provided. Subject to and without waiver of these and the general objections stated above, Defendants incorporate their response to Interrogatory No. 3 as if fully set forth herein.

**INTERROGATORY NO. 10:**

Identify and describe the draw-down of paid-in capital for USM during tax year 2001 as evidenced on line 23 of the "Balance Sheets per Books" of USM's 2001 tax return.

**RESPONSE:**

Defendants object to this Interrogatory as unduly burdensome because it is duplicative of other Interrogatories to which full and complete answers have already been provided. Subject to and without waiver of these and the general objections stated above, Defendants respond as follows. Capital in USM has been reduced in only one of four ways. Norman's capital has been reduced to reflect his failure to substantiate expenses he allegedly incurred for the benefit of USM and his failure to pay the additional $50,000 he owed for his shares. Norman's capital has also been reduced to reflect monies he has taken out of USM for his personal benefit and use, once it became clear he did not intend to repay those monies. Elkin's capital was reduced accordingly to reflect his lower pro rata contribution of capital in light of the parties' respective ownership interests and Norman's ultimate investment.

Finally, with respect to the specifics of a draw-down of paid-in capital for USM during tax year 2001, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 9**

investments and capital advanced to or on behalf of USM, which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

## INTERROGATORY NO. 11:

Identify by date and amount all cash contributions Elkin alleges he made to USM at anytime.

## RESPONSE:

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is vague and ambiguous because the term "contribution" has not been specifically defined. As used in this question, the term "cash contributions" can mean literally any payment Elkin has ever made to – or for the benefit of – USM, whether Elkin has ever sought repayment for such contributions and whether such contributions relate in any way to the claims or defenses of any party to this lawsuit. For that reason, this Interrogatory is also overbroad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. For further answer, Defendants incorporate their response to Interrogatory No. 1 as if fully set forth herein. Finally, with respect to the timing and specific amounts Elkin has invested in USM that have been documented, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 10**

advanced to or on behalf of USM SM, and from USM's bank account records, all of which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 12:**

Identify and describe all facts that support Defendants' allegations as contained in paragraph 128 of your counterclaim.

**RESPONSE:**

Defendants object to this Interrogatory as unduly burdensome because it is duplicative of other Interrogatories to which full and complete answers have already been provided. Subject to and without waiver of these and the general objections stated above, Defendants incorporate their response to Interrogatories Nos. 1 and 11 as if fully set forth herein.

**INTERROGATORY NO. 13:**

Identify by date and amount all non-cash contribution (sic) Elkin alleges he made to USM at anytime.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is vague and ambiguous because the term "non-cash contribution" has not been specifically defined. The term "non-cash contribution" can refer to any and all tangible and/or intangible property, duties, services, and/or benefits of any kind provided by Elkin to a company he single-handedly ran for more than twelve years. Of course, the term "contribution" also can

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 11**

mean the part played by Elkin to form and grow USM, which renders the question not only vague, but overbroad as well. Finally, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that track document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM M, and from USM's bank account records, all of which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 14:**

Identify and describe the bases for the filing of the USM's FCC Form 175 in September 1998 amending the name of the applicant from USM to TEG.

**RESPONSE:**

Subject to and without waiver of the general objections stated above, Defendants respond as follows. At the time of the FCC Phase II Auctions, and for some time before that, USM lacked the profits or capital necessary to continue to invest in FCC licenses. Elkin had hoped that USM would be able to raise money to participate in the auction, but that did not happen. Thus, USM lacked the financial ability not only to pay the required upfront fee, but to participate meaningfully at the auction at all. However, Elkin realized that the Phase II licenses, if acquired by anyone other than USM or a friendly affiliate, would severely undermine the value of USM's Phase I licenses as well as the prospect of being able to realize any value *via* a later sale of those Phase I licenses. To preserve the opportunity to realize value for USM's Phase I licenses (and prevent the decimation of any value those licenses might have possessed at that time), Elkin agreed to advance the funds to enable TEG to participate in the Phase II auction.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 12**

## INTERROGATORY NO. 15:

Identify and describe all consideration paid from TEG to USM for the application amendment filed with the FCC in September 1998.

## RESPONSE:

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, vexatious, and unreasonable. It is vexatious and unreasonable because it assumes that USM was owed something from TEG for the amendment. It is also vexatious and unreasonable because it incorrectly assumes USM conferred some sort of benefit to TEG in connection with the September 1998 FCC auction, when in fact the very opposite is true. Elkin, through TEG, graciously agreed to expend his own money and energy to acquire licenses that USM was unwilling and unable to acquire. Where TEG was successful, the licenses it was awarded and paid for in the FCC Phase II Auction provided significant value for Phase I licenses owned or managed by USM (or prevented the decimation of any such value), thereby making it possible to realize the greatest value for some of USM's licenses. This Interrogatory is also vague and ambiguous because the term "consideration" has not been specifically defined. Because "consideration" can describe both paying money as well as conferring other, non-cash, benefits, the Interrogatory and its response can be misleading. Subject to and without waiver of these and the general objections stated above, Defendants further respond by stating that while TEG did not pay any money to USM in connection with the application amendment filed with FCC in September 1998, by successfully bidding at the FCC Phase II Auction, TEG ultimately conferred a substantial benefit to USM. For further answer, Defendants incorporate their response to Interrogatory No. 14 as if fully set forth herein.

**INTERROGATORY NO. 16:**

Identify and substantiate the origination of the $200,000.00 "Upfront Payment" made by USM for FCC Phase II Auction No. 18.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, vexatious, and unreasonable. Defendants further object because it seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is vexatious and unreasonable because it incorrectly assumes USM made an upfront payment of $200,000 in connection with Phase II Auction No. 18, thereby making the Interrogatory and its response misleading. It is also objectionable because the source of TEG's $200,000 is completely irrelevant to any issue in this lawsuit. Indeed, the only conceivable relevant inquiry is whether TEG's $200,000 "Upfront Payment" came from USM's coffers. Subject to and without waiver of these and the general objections stated above, Defendants further respond as follows. All of the $200,000 came from several of Elkin's personal brokerage or bank accounts. Once the cash was ready for disbursement, Elkin directed payment of the funds to the FCC for the benefit of TEG.

**INTERROGATORY NO. 17:**

Identify and quantity the source (by buyer, sale date, sale amount and basis) of all revenue generated by USM through the sale of FCC 220 MHz licenses.

**RESPONSE:**

Because the answer to this Interrogatory may be derived or ascertained from the sales agreements reflecting sales of Phase I licenses and the bank account records of USM, all of which have already provided to the Plaintiff, and because the burden of deriving or ascertaining the

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 14**

answer is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 18:**

Identify and quantify (by kind, date and amount) the sources for all Contributions made by Elkins that amount to $877,150.00 as evidenced in the document Bates marked MC001165.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, overbroad, unduly burdensome, and seeks information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. This Interrogatory is vague and ambiguous because the term "Contributions" has not been specifically defined. The term "contribution" can refer to any and all tangible and/or intangible property, duties, services, and/or benefits of any kind provided by Elkin to a company he ran for more than twelve years. Of course, the term "contribution" also can mean the part played by Elkin to form and grow USM, which renders the question not only vague, but overbroad as well. Finally, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, and from USM's bank account records, all of which has been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents. For further answer, Defendants incorporate their responses to Interrogatories 11, 12, and 13 as if fully set forth herein.

Identify and quantify (including, without limitation, date and amount) the distributions made to Elkin that amount to $601,500.00 as evidenced in the document Bates marked MC001115 and/or MC001165.

**RESPONSE:**

The basis for every payment made to Elkin by USM over the years constitutes either the repayment of loans or a return of capital. The bases for this payment, as well as any and all other payments to Elkin, are described in detail in Defendants' response to Interrogatory No. 1, which response Defendants incorporate as if fully set forth herein. Finally, with respect to the timing and amount for this and all other payments to Elkin, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, and from USM's bank account records, all of which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 20:**

Identify and quantify (by kind, date and amount) all withdrawals allegedly made by Norman that amount to $60,600.00 as evidenced in the document Bates marked MC001165.

**RESPONSE:**

Norman's capital was reduced to reflect monies he has took out of USM for his personal benefit and use, once it became clear he did not intend to repay those monies. With respect to the timing and amount for any reductions in Norman's capital, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 16**

be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, and from USM's bank account records, all of which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 21:**

Identify and quantify (by kind, date and amount) all "Out of pocket expenses 1993-2001" allegedly paid by Elkin that amount to $150,476.00 as evidenced in the document Bates marked MC001165.

**RESPONSE:**

Like many start-up companies with little or no cash flow, Elkin repeatedly paid USM's expenses or bills and declined or never sought reimbursement for expenses he incurred personally for USM's benefit. With respect to the timing and specific amounts of expenses Elkin incurred or paid for the benefit of USM, the answer to this Interrogatory may be derived or ascertained from the spreadsheets that have been previously produced that document and track changes in Norman's and Elkin's investments and capital advanced to or on behalf of USM, which have been provided to the Plaintiff. Because the burden of deriving or ascertaining those answers is substantially the same for the Plaintiff as for the Defendants, Defendants respond by stating that this answer can be derived from those documents.

**INTERROGATORY NO. 22:**

Identify and quantify all acts, understandings or other services rendered that allegedly entitle Elkin to a set-off as alleged in defendants' Eleventh Affirmative Defense.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is vague, ambiguous, overbroad, and unduly burdensome. This Interrogatory is overbroad and unduly burdensome because, as written, the question literally calls for a detailed description of any and all tangible and/or intangible property, duties, services, and/or benefits of any kind provided or performed by Elkin to or for a company he ran for more than twelve years. Subject to and without waiver of these and the general objections stated above, Defendants respond as follows.

Under Delaware law, an officer is entitled to recover the reasonable value of his services on the basis of *quantum meruit* if he served as an officer of a company, did not grant himself excessive compensation, and provided services of value to the company. Elkin surely satisfies these requirements. Elkin has worked, without any pay, as the Chief Executive Officer of USM since 1993 or 1994. For more than twelve years, in addition to serving as CEO, Elkin has also served as USM's sales force, public relations department, marketing department, office manager, filing clerk, legal staff, and chief bottle washer. His longstanding service to USM has not earned him any greater ownership interest in USM relative to Norman. Moreover, he has not received any salary for his efforts. Neither Elkin, nor for that matter any reasonable person, would have bargained beforehand for that result. And, USM and Norman would be unjustly enriched if Elkin were required to forfeit all rights to compensation for services he legitimately performed for all these years.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 18**

**INTERROGATORY NO. 23:**

Identify by name and address each fact witness you intend to call at the time of trial and for each witness state the substance of his or her expected testimony.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and purports to impose requirements or obligations in addition to or different from those imposed by the Federal Rules of Civil Procedure. Defendants also object to this Interrogatory on the ground that it is premature pursuant to FRCP 26(a)(3)(A). Subject to and without waiver of the foregoing objections and the general objections stated above, Defendants presently expect that they will call David Elkin and Richard Shorin to testify at trial. Defendants will supplement this response as and when appropriate.

**INTERROGATORY NO. 24:**

Identify each document or exhibit you intend to use or introduce into evidence at trial.

**RESPONSE:**

In addition to the general objections stated above, Defendants object to this Interrogatory on the grounds that it is overbroad, unduly burdensome, and purports to impose requirements or obligations in addition to or different from those imposed by the Federal Rules of Civil Procedure. Defendants also object to this Interrogatory on the ground that it is premature pursuant to FRCP 26(a)(3)(C). Defendants will supplement this response as and when appropriate.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST SET OF INTERROGATORIES – Page 19**

## INTERROGATORY NO. 25:

Identify each person whom you expect to call as an expert at trial, and as to each person set forth in detail the person's qualifications as an expert, the substance of the facts and opinions to which the person is expected to testify and all other requirements as set forth in Federal Rule of Civil Procedure 26.

## RESPONSE:

In addition to the general objections stated above, Defendants object to this Interrogatory

on the grounds that it is overbroad, unduly burdensome, and purports to impose requirements or

obligations in addition to or different from those imposed by the Federal Rules of Civil

Procedure. Defendants also object to this Interrogatory on the ground that it is premature

pursuant to FRCP 26(a)(2). Defendants will supplement this response as and when appropriate.


Dated: September 22, 2006

Respectfully submitted,

Steven L. Caponi
Delaware Bar No. 3484
Blank Rome LLP
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

Mark A. Evetts
Berg & Androphy
3704 Travis Street
Houston, Texas 77002-9550
Telephone: (713) 529-5622
Facsimile: (713) 529-3785

*Attorneys for Defendants David W. Elkin, Richard M. Shorin, The Elkin Group, Inc., and Nominal Defendant US MobilComm, Inc.*

**DEFENDANTS' RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES – Page 20**

## VERIFICATION

STATE OF TEXAS    §
HARRIS COUNTY    §

On this day, appeared before me, the undersigned notary public, Mark A. Evetts, attorney of record for Defendants in this action. After I administered an oath to him, upon his oath, he said that he has been authorized to verify the responses set forth in Defendants' Response to Plaintiff's First Set of Interrogatories, that David W. Elkin has read the responses set forth therein in his individual capacity and as an officer of US MobilComm and The Elkin Group, and Richard M. Shorin has read the responses in his individual capacity, and Messrs. Elkin and Shorin have represented to him that the responses are within their personal knowledge and are true and correct.

Mark A. Evetts

SWORN TO and SUBSCRIBED before me by Mark A. Evetts on September 22, 2006.

Notary Public in and for
the State of Texas

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded on this 22nd

day of September, 2006 to the following counsel of record:

> Sean J. Bellow
> David A. Felice
> Cozen O'Connor
> 1201 North Market Street, Suite 1400
> Wilmington DE 19801
> Telephone: (302) 295-2000
> Facsimile: (302) 295-2013

_____
Mark A. Evetts

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEFFREY M. NORMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | C.A. No. 06-005-JJF |
| | § | |
| DAVID W. ELKIN, RICHARD M. | § | |
| SHORIN and THE ELKINS GROUP, INC. | § | Jury Trial Demanded |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| US MOBILCOMM, INC., | § | |
| | § | |
| Nominal Defendant. | § | |

## DEFENDANTS' RESPONSE TO
## PLAINTIFF'S FIRST REQUESTS FOR ADMISSION

To:    Plaintiff, Jeffrey M. Norman, through his attorney of record, Sean J. Bellow, Cozen
O'Connor, 1201 North Market Street, Suite 1400, Wilmington DE 19801.

Pursuant to Federal Rules of Civil Procedure 26 and 36, Defendants David W. Elkin

("Elkin"), Richard M. Shorin ("Shorin"), The Elkin Group, Inc. ("TEG"), and Nominal Defendant

US MobilComm, Inc. (collectively "Defendants"), hereby object and respond to Plaintiff, Jeffrey

M. Norman's ("Plaintiff's") First Request for Admissions as follows:

## GENERAL OBJECTIONS

1.    Defendants object generally to the Requests, Definitions, and Instructions to the extent

that they seek to impose requirements or obligations in addition to or different from those

imposed by the Federal Rules of Civil Procedure.

2.     Defendants object generally to the Requests to the extent that they are overbroad in scope, unduly burdensome, oppressive, and not reasonably calculated to lead to the discovery of relevant information.

3.     Defendants object generally to the Requests, Definitions, and Instructions to the extent that they are vague and/or ambiguous, including but not limited to the Definitions of "You," "Your," and "Defendants".

4.     If any of the foregoing objections apply, specification of – or failure to note any or all of – these General Objections shall not constitute a waiver of those or other General Objections that apply to any particular Request.

## SPECIFIC RESPONSES AND OBJECTIONS

### REQUEST NO. 1:

Admit that TEG was not a qualified bidder (as defined by the Federal Communications Commission ("FCC")) for FCC Phase II Auction No. 18.

### RESPONSE:

Defendants object to this Request on the grounds that it is vague and ambiguous because it is not clear what is meant by a "qualified bidder." Moreover, after a reasonable inquiry, the information available was insufficient to enable Defendants to admit or deny this Request. Subject to and without waiving these and the general objections, Defendants admit only that TEG did bid at one or more FCC Phase II Auctions.

### REQUEST NO. 2:

Admit that Norman never received loan (sic) from USM.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION – Page 2**

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because it is not clear what is meant by a "received loan." Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that Norman periodically requested and received monies from USM for his personal use even though he had failed to contribute sufficient capital to fully pay for his shares in the company and he never repaid any of those monies. Defendants deny the remainder of the Request.

**REQUEST NO. 3:**

Admit that Norman never received a cash loan from USM.

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because it is not clear what is meant by a "received a cash loan." Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that Norman periodically requested and received monies from USM for his personal use even though he had failed to contribute sufficient capital to fully pay for his shares in the company and he never repaid any of those monies. Defendants deny the remainder of the Request.

**REQUEST NO. 4:**

Admit that USM never filed a tax return with the IRS that claimed any amount as "Loans from Shareholders" on Form 1120S.

**RESPONSE:**

Admit.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION – Page 3**

**REQUEST NO. 5:**

Admit that TEG did not make an "Upfront Payment (sic) for FCC Phase II Auction No. 18.

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because it is not clear what is meant by making a payment (that is, it is not clear whether the question is whether TEG physically wrote the check or wired the money from its account). Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that Elkin directed and paid funds from his personal accounts sufficient to satisfy the "Upfront Payment," for the benefit of TEG. Defendants deny the remainder of the Request.

**REQUEST NO. 6:**

Admit that Phase II licenses from FCC Phase II Auction No. 18 were registered in the name of TEG.

**RESPONSE:**

Admit.

**REQUEST NO. 7:**

Admit that TEG never owned any Phase II 220 MHz licenses other than those obtained as a result of FCC Phase II Auction No. 18.

**RESPONSE:**

Admit in part and deny in part. Defendants admit only that TEG never owned any Phase II 220 MHz licenses other than those obtained as a result of one or more FCC Phase II Auctions.

**REQUEST NO. 8:**

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION – Page 4**

Admit that TEG sold Phase II licenses originally obtained through the bidding process of FCC Auction No. 18.

**RESPONSE:**

Admit in part and deny in part. Defendants admit only that TEG sold some, but not all, of its Phase II licenses originally obtained through successfully bidding at one or more FCC Phase II Auctions. Defendants deny the remainder of the Request.

**REQUEST NO. 9:**

Admit that USM received no compensation for any Phase II licenses auctioned during FCC Auction No. 18.

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because the term "received no compensation" is subject to multiple interpretations. The Request is also unreasonable because USM never put up any money or bid for licenses during any FCC Phase II Auctions, and thus there was no basis for it to expect any compensation. Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that proceeds from the sale of Phase II licenses (and not from the related sale of Phase I licenses that were "bundled" with those Phase II licenses) acquired during one or more FCC Phase II Auctions and subsequently sold by TEG were never paid to USM. Defendants deny, however, that USM received no compensation relating in any way to TEG's sale of Phase II licenses.

**REQUEST NO. 10:**

Admit that Norman did not withdrawal any capital from USM during tax year 2001.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION – Page 5**

**REQUEST NO. 8:**

Admit that TEG sold Phase II licenses originally obtained through the bidding process of FCC Auction No. 18.

**RESPONSE:**

Admit in part and deny in part. Defendants admit only that TEG sold some, but not all, of its Phase II licenses originally obtained through successfully bidding at one or more FCC Phase II Auctions. Defendants deny the remainder of the Request.

**REQUEST NO. 9:**

Admit that USM received no compensation for any Phase II licenses auctioned during FCC Auction No. 18.

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because the term "received no compensation" is subject to multiple interpretations. The Request is also unreasonable because USM never put up any money or bid for licenses during any FCC Phase II Auctions, and thus there was no basis for it to expect any compensation. Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that proceeds from the sale of Phase II licenses (and not from the related sale of Phase I licenses that were "bundled" with those Phase II licenses) acquired during one or more FCC Phase II Auctions and subsequently sold by TEG were never paid to USM. Defendants deny, however, that USM received no compensation relating in any way to TEG's sale of Phase II licenses.

**REQUEST NO. 10:**

Admit that Norman did not withdrawal any capital from USM during tax year 2001.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION – Page 5**

**RESPONSE:**

Admit.

**REQUEST NO. 11:**

Admit that Elkin agreed to contribute at least $750,000.00 in cash capital to USM.

**RESPONSE:**

Admit in part and deny in part. Defendants admit only that Elkin agreed to pay consideration of $750,000 for his 75% ownership interest in USM, subject to Norman's agreement to pay $250,000 for his 25% interest. Defendants deny that Elkin agreed to pay "at least $750,000" no matter the circumstances and Defendants deny Elkin agreed to pay only cash for his ownership interest.

**REQUEST NO. 12:**

Admit that Elkin withdrew at least $601,500.00 in cash from USM.

**RESPONSE:**

Defendants object to this Request on the grounds that it is vague and ambiguous because it is not clear what is meant by a "withdrew . . . cash." Subject to and without waiving these and the general objections, this Request is admitted in part and denied in part. Defendants admit only that USM distributed approximately $601,500.00 to Elkin over time, either as repayment of loans to USM or a reduction in capital.

**REQUEST NO. 13:**

Admit that Norman received no cash distributions from USM from 2001 to present.

**RESPONSE:**

Admit.

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**FIRST REQUESTS FOR ADMISSION – Page 6**

**REQUEST NO. 14:**

Admit that as of January 31, 1998, USM had a contractual right to accrued management fees in the amount of approximately $1,153,350.

**RESPONSE:**

Defendants admit that as of January 31, 1998, USM had a contractual right to accrued management fees in the amount of approximately $1,153,350, subject to revenues or profits being available to pay such management fees, which never materialized in the vast majority of cases.

Dated: September 22, 2006

Signed: _____
          *Attorney for Defendants*

Respectfully submitted,

_____
Steven L. Caponi
Delaware Bar No. 3484
Blank Rome LLP
Chase Manhattan Centre
1201 Market Street, Suite 800
Wilmington DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

Mark A. Evetts
Berg & Androphy
3704 Travis Street
Houston, Texas 77002-9550
Telephone: (713) 529-5622
Facsimile: (713) 529-3785

*Attorneys for Defendants David W. Elkin,*
*Richard M. Shorin, The Elkin Group, Inc.,*
*and Nominal Defendant US MobilComm,*
*Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was forwarded on this 22nd day of September 2006 to the following counsel of record:

> Sean J. Bellow
> David A. Felice
> Cozen O'Connor
> 1201 North Market Street, Suite 1400
> Wilmington DE 19801
> Telephone: (302) 295-2000
> Facsimile: (302) 295-2013

_____
Mark A. Evetts

# EXHIBIT C

## US MOBILCOMM, INC.

## ACTION BY CONSENT IN WRITING
## OF THE
## BOARD OF DIRECTORS

Dated: December 27, 1994

The undersigned, being the sole member of the Board of Directors of US MOBILCOMM, INC., a Delaware corporation, by Consent in Writing pursuant to the authority contained in the Delaware General Corporation Law, without the formality of convening a meeting, does hereby consent to the following actions of this Corporation:

RESOLVED, That this Corporation accept the offers of the following people (individually, "Subscriber") to acquire from the Corporation that number of shares of common stock, $.01 par value per share, as set forth beside their names below, in consideration of the transfer to the Corporation of cash in the amount of $.01 per share, receipt of which is hereby acknowledged:

| Name of Subscriber | Number of Shares |
|---|---|
| David W. Elkin | 275 |
| Jeffrey Norman | 125 |

FURTHER RESOLVED, That the President and Secretary of this Corporation be, and each of them hereby is, authorized, empowered and directed to issue and deliver certificates for fully paid and nonassessable shares of stock, $.01 par value per share, of this Corporation to each Subscriber for that amount of shares set forth above; and

FURTHER RESOLVED, That it is intended that the stock of this Corporation qualify under Section 1244 of the Internal Revenue Code of 1986, as amended; and

FURTHER RESOLVED, That this Corporation qualify to transact business as a foreign corporation in the Commonwealth of Pennsylvania pursuant to the authority contained in the Pennsylvania Business Corporation Law of 1988, as amended; and

**PTF0010**

FURTHER RESOLVED, That the President, Executive Vice President, Treasurer, Secretary and Assistant Secretary of this Corporation be, and each of them hereby is, authorized, empowered and directed to do any and all things, to execute any and all documents including, but not limited to, the Pennsylvania Application for Certificate of Authority to be filed with the Pennsylvania Department of State, Corporation Bureau, and to expend such monies as may be necessary to effect the intent of the foregoing Resolutions.

David W. Elkin

PTF0011

# PENNSYLVANIA S CORPORATION ELECTION AND SHAREHOLDERS' CONSENT

This election and consent statement must be completed by the Pennsylvania Small Business Corporation electing to be a "Pennsylvania S Corporation" and by its shareholders. Return the completed election and consent form to above address.

PA DEPARTMENT OF REVENUE
BUREAU OF CORPORATION TAXES
SPECIALTY TAXES DIVISION
DEPT. 280704
HARRISBURG, PA 17128-0704
ATTN: "S" CORPORATION

**Name of Corporation**
US MobilComm Management Corp.

**Corporation Tax File (Box) Number**

**Street Address**
805 Bryn Mawr Avenue

**Federal Employer Identification Number**
23-2767067

**City** Newtown Square,   **State** PA   **Zip Code** 19073

**Pennsylvania S Corporation Election is to be effective for:**
Tax Year beginning: month day year   Tax Year ending: month day year

Signature and Title of Corporate Officer    President

The Corporate statement of election of Pennsylvania S Corporation status must be signed by an authorized officer of the corporation. "The above named corporation hereby elects to be treated as a Pennsylvania S Corporation under Section 307 of the Tax Reform Code of 1971."

Date of Incorporation or Date of First Activity or Date of Issuance of Certificate of Authority

| A. Name of each shareholder, or person having an interest in the Corporation's stock [A husband and wife (and their estate) are counted as one shareholder in determining the number of shareholders without regard to the manner in which the stock is owned.] | B. Address of each Shareholder (Number and Street, City or Town, State and Zip Code) | C. Social Security Number of Each Shareholder (employer identification number for estate or trust). | D. Signature of each shareholder consenting to the election and date. "We, the undersigned shareholders, consent to the election of the corporation to be treated as a PA S Corporation under Section 307 of the Tax Reform Code of 1971." SIGNATURE          DATE | E. Percentage of stock owned by each shareholder (must equal 100%). |
|---|---|---|---|---|
| | STREET          CITY          STATE          ZIP CODE | | | |
| David W. Elkin | 805 Bryn Mawr Avenue  Newtown Square, PA  19073 | 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 | | 75% |
| Jeffrey Norman | 1824 Stoors Road  Stoors, CT  06268 | 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 | | 25% |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | | | TOTAL = 100% |

**NOTE:** If more than ten (10) shareholders, provide the required information on a separate sheet and attach to this form. A Pennsylvania "S" Corporation may not have more than thirty-five (35) shareholders.

Under penalties of perjury, I declare that I have examined this Pennsylvania S Corporation Election and Shareholders' Consent statement, and to the best of my knowledge and belief it is true, correct and complete.

**NAME OF CORPORATE OFFICER**
David W. Elkin

**SIGNATURE OF CORPORATE OFFICER**

**TITLE OF CORPORATE OFFICER**
President

**SOCIAL SECURITY NUMBER**
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

**TELEPHONE NUMBER**
( 215 ) 525-2372

**DATE**
12/27/7?

(OVER)

PTF0012



**US MobilComm Management Corp.**

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

Authorized Capital Stock 1,000 Shares   Par Value $.01 Per Share

This Certifies that   Jeffrey Norman   is the owner

of   One Hundred Twenty-Five   (125)   Shares of the Capital Stock of

THE REVERSE FOR CERTAIN DEFINITIONS

US MobilComm Management Corp.

fully paid and non assessable transferable only on the books of the Corporation
in person or by Attorney upon surrender of this Certificate properly endorsed.
In Witness Whereof, the said Corporation has caused this Certificate to be signed
by its duly authorized officers and its Corporate Seal to be hereunto affixed

this   27th   day   of   December   A.D. 19 94

Jeffrey Norman
SECRETARY

David W. Elkin
PRESIDENT



PTF0014

# EXHIBIT D

16-Jan-98  
JEFFDAVE

**US MOBILCOMM INC**  
**SHAREHOLDER EQUITY CONTRIBUTIONS**  
**MONEY MARKET INTEREST EARNED/ALLOCATED**

| | SHAREHOLDER CONTRIBUTIONS AND (REDUCTIONS) | | TOTAL INTEREST EARNED-CS | —INTEREST ALLOCATION— | |
| --- | --- | --- | --- | --- | --- |
| | JEFF | DAVID | | JEFF | DAVID |
| 31-May-94 | 4,000.00 | 100.00 | | | |
| 02-Jun-94 | 196,000.00 | | | | |
| 30-Jun-94 | | | 140.40 | 140.40 | |
| 26-Jul-94 | | 52,500.00 | | | |
| 29-Jul-94 | | | 381.57 | 373.23 | 8.34 |
| 31-Aug-94 | | | 410.00 | 323.38 | 86.62 |
| 30-Sep-94 | | | 378.79 | 298.76 | 80.03 |
| 30-Oct-94 | (13,600.00) | 20,000.00 | | 0.00 | 0.00 |
| 31-Oct-94 | | | 374.33 | 269.40 | 104.93 |
| 05-Nov-94 | | 62,450.00 | | 0.00 | 0.00 |
| 05-Nov-94 | | 55,000.00 | | 0.00 | 0.00 |
| 30-Nov-94 | | | 408.02 | 202.03 | 205.99 |
| 12-Dec-94 | (10,500.00) | | | | |
| 29-Dec-94 | 0.00 | 115,100.00 | 24.50 | 8.96 | 15.54 |
| 31-Dec-94 | (1,000.00) | | 357.24 | 130.16 | 227.08 |
| 31-Jan-95 | 0.00 | | 665.33 | 242.40 | 422.93 |
| 28-Feb-95 | (500.00) | | 800.15 | 290.99 | 509.16 |
| 31-Mar-95 | (5,500.00) | | 728.31 | 259.49 | 468.82 |
| 30-Apr-95 | (250.00) | | 440.18 | 156.68 | 283.50 |
| 31-May-95 | (250.00) | | 348.89 | 124.07 | 224.82 |
| 30-Jun-95 | (250.00) | | 278.48 | 98.94 | 179.54 |
| 31-Jul-95 | (250.00) | | 235.97 | 83.75 | 152.22 |
| 31-Aug-95 | (250.00) | | 173.41 | 61.49 | 111.92 |
| 30-Sep-95 | (250.00) | 100,000.00 | 124.11 | 36.29 | 87.82 |
| 31-Oct-95 | (250.00) | 20,000.00 | 76.84 | 21.68 | 55.16 |
| 30-Nov-95 | (5,250.00) | 20,000.00 | 68.85 | 18.36 | 50.49 |
| 31-Dec-95 | (250.00) | | 124.08 | 33.05 | 91.03 |
| 31-Jan-96 | (5,250.00) | 20,000.00 | 74.61 | 18.77 | 55.84 |
| 29-Feb-96 | (5,250.00) | 30,000.00 | 80.03 | 18.72 | 61.31 |
| 31-Mar-96 | (5,250.00) | 35,000.00 | 61.18 | 13.20 | 47.98 |
| 30-Apr-96 | (250.00) | 25,000.00 | 58.47 | 12.15 | 46.32 |
| 31-May-96 | (2,750.00) | 25,000.00 | 57.29 | 11.32 | 45.97 |
| 30-Jun-96 | (3,250.00) | | 63.62 | 12.34 | 51.28 |
| 31-Jul-96 | (250.00) | 35,000.00 | 73.48 | 13.58 | 59.90 |
| 31-Aug-96 | 0.00 | 35,000.00 | 76.77 | 13.55 | 63.22 |
| 30-Sep-96 | 0.00 | | 56.52 | 9.98 | 46.54 |
| 31-Oct-96 | 0.00 | 35,000.00 | 73.25 | 12.38 | 60.87 |
| 30-Nov-96 | 0.00 | 35,000.00 | 73.02 | 11.84 | 61.18 |
| 31-Dec-96 | 0.00 | 25,000.00 | 67.03 | 10.56 | 56.47 |
| 31-Jan-97 | 0.00 | 0.00 | 61.27 | 9.66 | 51.61 |
| 28-Feb-97 | 0.00 | 10,000.00 | 42.36 | 6.60 | 35.76 |
| 31-Mar-97 | 0.00 | 10,000.00 | 51.83 | 7.99 | 43.84 |
| 30-Apr-97 | 0.00 | 0.00 | 61.59 | 9.49 | 52.10 |
| 31-May-97 | 0.00 | 0.00 | 38.32 | 5.91 | 32.41 |
| 30-Jun-97 | 0.00 | 0.00 | 26.64 | 4.11 | 22.53 |
| 31-Jul-97 | 0.00 | 20,000.00 | 38.65 | 5.83 | 32.82 |
| 31-Aug-97 | 0.00 | 0.00 | 41.45 | 6.25 | 35.20 |
| 30-Sep-97 | 0.00 | 10,000.00 | 25.41 | 3.79 | 21.62 |
| 31-Oct-97 | 0.00 | 0.00 | 28.48 | 4.25 | 24.23 |
| 30-Nov-97 | 0.00 | 15,000.00 | 27.79 | 4.08 | 23.71 |
| 31-Dec-97 | 0.00 | 0.00 | 29.02 | 4.26 | 24.76 |
| 31-Jan-98 | 0.00 | 5,000.00 | 0.00 | 0.00 | 0.00 |
| CASH PAID IN (NET) | 139,400.00 | 815,150.00 | 7,827.53 | 3,404.14 | 4,423.39 |
| CREDIT- EXPENSES PD | 14,000.00 | | | JEFF estimate- need detail | |
| CREDIT- EXPENSES PD | | 122,370.60 | | DAVID Actual (Direct expenses only) | |
| SUBTOTAL-DAVID/JEFF | 153,400.00 | 937,520.60 | 1,090,920.60 | PAID IN CAPITAL | |

MC 001744

# EXHIBIT E

1

2    IN THE UNITED STATES DISTRICT COURT

3    FOR THE DISTRICT OF DELAWARE

4

    -------------------------------x

5    JEFFREY M. NORMAN,

6                    Plaintiff,

7            vs.

8    DAVID W. ELKIN, RICHARD M.

    SHORIN and THE ELKIN GROUP,

9    INC.,

10                    Defendants.

11            and

12    US MOBILCOMM, INC.,

13                    Nominal Defendant.

14

    -------------------------------x

15

16

17            DEPOSITION OF JEFFREY M. NORMAN

18                New York, New York

19            Friday, December 8, 2006

20

21

22

23

24    Reported by:

    LESLIE FAGIN

25    JOB NO. 189905

1              J. Norman

2         MR. EVETTS:  Objection to the

3         nonresponsive part of the answer.  Move

4         to strike.

5         Q.   But if I understand your answer

6    correctly, he had breached, by the fall of

7    1994, you knew within a couple of months of

8    that because you learned somehow that he

9    hadn't put in the money, right?

10        A.   Right.

11        Q.   Then he said, but it will be here

12   shortly, fair?

13        A.   I don't know if that was his exact

14   words, but he assured me that the money was

15   going to be put in.

16        Q.   And then, based on however

17   infrequently you received the equity

18   contribution tracking sheet, we'll call it

19   the Jeff Dave tracking sheet.

20        A.   Yes.

21        Q.   You know what I'm talking about

22   when I say that?

23        A.   Yes.

24        Q.   Based on your receipt of that,

25   shortly after Mr. Elkin promised you he would

3/7/2007  Norman - 12/8/06

```
1                    J. Norman
2    breach of contract --
3              Mr. FELICE:  Objection as to form.
4         Calls for attorney/client privilege.
5         Don't answer that.
6         Q.  Are you going to follow your
7    counsel's instruction?
8              MR. FELICE:  I just instructed him
9         not to answer.  Move on.
10             MR. EVETTS:  Don't tell me what to
11        do, Mr. Felice.  I've been taking
12        depositions when you were a senior in
13        high school.
14        Q.  Are you going to follow your
15   counsel's instructions?
16        A.  Yes, sir.
17             MR. FELICE:  Don't badger my
18        client.
19        Q.  Isn't it true, Mr. Norman, you also
20   knew, you say it happened by happenstance,
21   but you learned that USM had sold licenses
22   from Mr. Elkin, isn't that right?
23        A.  Yes.
24        Q.  You learned it because you called
25   him on the phone and you asked him, right?
```

3/7/2007  Norman - 12/8/06

```
 1            J. Norman
 2       A.   No, I didn't ask -- well, I guess
 3    over time I did.  I called him because I
 4    hadn't heard anything and it was probably
 5    over a year.  Any information, despite some
 6    requests, and I was driving in Pennsylvania
 7    for business one day and I said I'm going to
 8    call him up and see what's going on, haven't
 9    heard anything, haven't gotten any
10    information, I get him on the telephone,
11    after the pleasantries, I said, what is going
12    on with the company?  He said, nothing, and
13    it was like an interrogation.  I said, do we
14    still have all our licenses?  He said, well,
15    no, and then I said, did we sell any
16    licenses, and he said, yes, and I said,
17    where?  Oh, I think we sold a couple in Miami
18    and in Boston.  I said, well, how much did we
19    get?  I don't recall exactly, a few hundred
20    thousand dollars.  Then I said, did you take
21    a distribution, and he said, yes, I did.  I
22    said, how come you didn't tell me about it?
23    He said, it wasn't your turn, and I said, why
24    don't you send me the information you got?
25    He said, okay.  Hung up the phone, didn't
```

```
 1                  J. Norman

 2    hear anything from him.

 3         Q.   And didn't that occur in like early

 4    2000?

 5         A.   It occurred right before Mr. Sama

 6    sent him a letter.

 7         Q.   Right before?

 8         A.   Shortly before.  I can't recall the

 9    exact timing of it.  I called Mr. Sama up to

10    tell him about it.

11         Q.   You know that Mr. Sama's letter

12    went to Mr. Elkin in October 2002?

13         A.   I would like to see it to refresh

14    my memory.  I haven't looked at that stuff in

15    a year.

16         Q.   You don't know that?

17         A.   I want to say yes, but I don't want

18    to say something that -- can I ask Mr. Felice

19    if that's true?

20              THE WITNESS:  Is that true?

21              MR. FELICE:  What was the question?

22         Q.   You know Mr. Sama's letter went to

23    Mr. Elkin in October 2002?

24         A.   I want to say yes.

25              MR. FELICE:  I believe it's that
```

# EXHIBIT F

# SHAREHOLDER LOAN AGREEMENT

This agreement entered by and between David W. Elkin ("Shareholder") and US MobilComm, Inc. ("USM") as of September 1, 1995.

Whereas, USM may from time to time be in need of capital; and

Whereas, Shareholder may from time to time agree to lend capital to USM upon the following terms and conditions.

Now, Therefore, in consideration for the mutual covenants and promises contained herein, the parties agree as follows.

Shareholder shall be under no obligation to provide loans to USM.

Any and all funds provided by Shareholder to or on behalf of USM in excess of $420,000 shall be provided as a loan by Shareholder to USM.

Any and all such loans shall be made on an open account basis without interest being charged to USM.

The Shareholder Loans shall be repaid by USM to Shareholder prior to any distributions being made on account of equity contributions made to the company.

US MOBILCOMM, INC.

David W. Elkin, President


SHAREHOLDER

DAVID W. ELKIN

PLTF1270

**US MobilComm**
**Shareholder Loan Schedule**

| | Loan Amount | Cumulative |
|---|---|---|
| 31-Aug-95 | 0 | |
| 30-Sep-95 | 100,000 | 100,000 |
| 31-Oct-95 | 20,000 | 120,000 |
| 30-Nov-95 | 20,000 | 140,000 |
| 31-Dec-95 | 19,189 | 159,189 |
| 31-Jan-96 | 20,000 | 179,189 |
| 29-Feb-96 | 30,000 | 209,189 |
| 31-Mar-96 | 35,000 | 244,189 |
| 30-Apr-96 | 25,000 | 269,189 |
| 31-May-96 | 25,000 | 294,189 |
| 30-Jun-96 | 0 | 294,189 |
| 31-Jul-96 | 35,000 | 329,189 |
| 31-Aug-96 | 35,000 | 364,189 |
| 30-Sep-96 | 0 | 364,189 |
| 31-Oct-96 | 35,000 | 399,189 |
| 30-Nov-96 | 35,000 | 434,189 |
| 31-Dec-96 | 40,718 | 474,907 |
| 31-Jan-97 | 0 | 474,907 |
| 28-Feb-97 | 10,000 | 484,907 |
| 31-Mar-97 | 10,000 | 494,907 |
| 30-Apr-97 | 0 | 494,907 |
| 31-May-97 | 0 | 494,907 |
| 30-Jun-97 | 0 | 494,907 |
| 31-Jul-97 | 20,000 | 514,907 |
| 31-Aug-97 | 0 | 514,907 |
| 30-Sep-97 | 10,000 | 524,907 |
| 31-Oct-97 | 0 | 524,907 |
| 30-Nov-97 | 15,000 | 539,907 |
| 31-Dec-97 | 13,788 | 553,695 |
| 31-Jan-98 | 5,000 | 558,695 |
| 28-Feb-98 | 10,000 | 568,695 |
| 31-Mar-98 | 20,000 | 588,695 |
| 30-Apr-98 | 0 | 588,695 |
| 31-May-98 | 8,000 | 596,695 |
| 30-Jun-98 | 10,000 | 606,695 |
| 31-Jul-98 | 0 | 606,695 |
| 31-Aug-98 | 6,000 | 612,695 |
| 30-Sep-98 | 0 | 612,695 |
| 31-Oct-98 | 0 | 612,695 |
| 30-Nov-98 | 0 | 612,695 |
| 31-Dec-98 | 12,000 | 624,695 |
| 31-Jan-99 | 0 | 624,695 |
| 28-Feb-99 | 0 | 624,695 |
| 31-Mar-99 | 0 | 624,695 |
| 30-Apr-99 | 0 | 624,695 |

PLTF1271

**US MobilComm**
**Shareholder Loan Schedule**

| | Loan Amount | Cumulative |
|---|---|---|
| 31-May-99 | 0 | 624,695 |
| 30-Jun-99 | 0 | 624,695 |
| 31-Jul-99 | 0 | 624,695 |
| 31-Aug-99 | 0 | 624,695 |
| 30-Sep-99 | 0 | 624,695 |
| 31-Oct-99 | 0 | 624,695 |
| 30-Nov-99 | 0 | 624,695 |
| 31-Dec-99 | 12,000 | 636,695 |
| 31-Jan-2000 | 0 | 636,695 |
| 29-Feb-2000 | 8,000 | 644,695 |
| 31-Mar-2000 | 0 | 644,695 |
| 30-Apr-2000 | (90,000) | 554,695 |
| 31-May-2000 | 0 | 554,695 |
| 30-Jun-2000 | 0 | 554,695 |
| 31-Jul-2000 | 0 | 554,695 |
| 31-Aug-2000 | (35,000) | 519,695 |
| 30-Sep-2000 | 0 | 519,695 |
| 31-Oct-2000 | 0 | 519,695 |
| 30-Nov-2000 | 0 | 519,695 |
| 31-Dec-2000 | 12,000 | 531,695 |
| 31-Jan-2001 | 0 | 531,695 |
| 28-Feb-2001 | 0 | 531,695 |
| 31-Mar-2001 | 0 | 531,695 |
| 30-Apr-2001 | 0 | 531,695 |
| 31-May-2001 | (220,000) | 311,695 |
| 30-Jun-2001 | 0 | 311,695 |
| 31-Jul-2001 | (30,600) | 281,095 |
| 31-Aug-2001 | (200,000) | 81,095 |
| 30-Sep-2001 | 0 | 81,095 |
| 31-Oct-2001 | 13,500 | 94,595 |
| 30-Nov-2001 | 0 | 94,595 |
| 31-Dec-2001 | 12,000 | 106,595 |
| 31-Jan-2002 | 0 | 106,595 |
| 28-Feb-2002 | (10,000) | 96,595 |
| 31-Mar-2002 | 0 | 96,595 |
| 30-Apr-2002 | 0 | 96,595 |
| 31-May-2002 | (29,426) | 67,169 |
| 31-Dec-2002 | 12,000 | 79,169 |

PLTF1272



ELKIN
805 Bryn Mawr Ave
Newtown Sq., PA 19073

Vincent Sama
Winston + Strawn
200 Park Ave.
New York, NY 10166 - 4193

10166+0005

PLTF1273

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JEFFREY M. NORMAN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 06-005-JJF |
| | : | |
| DAVID W. ELKIN, RICHARD M. SHORIN | : | |
| and THE ELKIN GROUP, INC. | : | Jury Trial Demanded |
| | : | |
| Defendants, | : | |
| | : | |
| and | : | |
| | : | |
| US MOBILCOMM, INC., | : | |
| | : | |
| Nominal Defendant. | : | |

## DECLARATION OF JEFFREY M. NORMAN

I, Jeffrey M. Norman, hereby state in accordance with the provisions of Title 28, section 1746 of the United States Code as follows:

1.      I am over eighteen (18) years of age and competent to testify regarding the facts stated herein.

2.      I own 125 shares or 25% of US Mobilcomm, Inc. ("USM") and I am the plaintiff in the above-captioned action. David Elkin ("Elkin") owns the balance of the shares in USM and is its sole director.

3.      USM owns, manages and services 220 MHz licenses issued from the Federal Communications Commission (the "FCC").

4.      Phase I 220 MHz licenses were distributed by the FCC through a lottery system. Thereafter, I worked on behalf of USM to aggregate the Phase I licenses through management agreement in and around key geographic markets, including Boston, New York, Philadelphia, Washington D.C. and Miami as well as other areas.  Not only did the aggregation of Phase I

licenses in and around major geographic markets make USM an attractive acquisition candidate, it provided USM with an incumbency position as a Phase I license holder, which the FCC protected with various rules and regulations during the Phase II auctions.

5.     Once I completed the aggregation of Phase I licenses within the target markets, my work with USM was complete. I stopped actively working on behalf of USM in 1996.

6.     The business plan contemplated by both Elkin and myself was to aggregate Phase I licenses to achieve a strong presence in the five (5) major markets noted above and to find a suitable purchaser for the company or enter into a strategic partnership with another company. While I assisted with this endeavor (*i.e.* presented a proposed deal with a group led by Mark Hatten), Elkin was principally responsible for locating strategic alliances or potential acquirers for the company given his background as a licensed attorney (with an advanced tax degree) and practical work experience in the financing and acquisitions.

7.     In the fall of 1998, the FCC conducted an auction for certain Phase II 220 MHz licenses (the "Phase II auction"). A Phase II 220 MHz license covers a larger geographic area and provides a greater number of channels than a Phase I license.

8.     Elkin, assisted by Richard Shorin ("Shorin"), knew of and participated in the Phase II auction.

9.     Neither Elkin nor Shorin provided any notice or other opportunity to me concerning the Phase II auction.

10.    I was not provided with USM's FCC Registration Number ("FRN") and secret password. Prospective licensees obtain a FRN from the FCC and set a secret password so they can electronically submit auction application materials to the FCC and participate in the bidding process. Elkin and/or Shorin had USM's FRN and set the secret password.

2

11.    I had occasion to observe the FCC's public notices for Phase II auction number 18 and noted that USM was a qualified bidder and, in fact, was the successful bidder for at least five (5) Phase II licenses through the Phase II auction.

12.    As USM was identified as the successful bidder for several Phase II licenses in the markets where the company had a significant presence, I did not conduct any subsequent investigation as to the issuance of the licenses or any subsequent transfers as I presumed the FCC's public notice was correct and that Elkin would act in USM's best interests.

13.    I did not possess and could not access USM's Form 601 registration change form when it was initially filed. Neither Elkin nor anyone else at USM notified me of this attempted change in registration. I did not become aware of USM's Form 601 registration change until it was faxed to me in August 2004. The only reason I sought out this information was the result of a letter Elkin sent to my attorney in December 2002 noting that he had sold several licenses and had taken a distribution as a purported creditor. In a sale agreement furnished with that letter, it was noted in passing that a Phase II license owned by Elkin's company, The Elkin Group, Inc. ("TEG"), had or would be transferred separately.

14.    Elkin did not provide me with any copies of sale agreements at the time of sale or at any time prior to his December 2002 letter to my attorney. Likewise, before his December 2002 letter, Elkin never disclosed in writing that any sale of assets were contemplated (other than the Centennial) or, in fact, consummated.

15.    I did not know USM failed to receive any compensation for the Phase II licenses Elkin took from the company and placed with TEG until an off the record discussion occurred during Elkin's deposition in the Court of Chancery books and records action in 2005.

16.    Neither Elkin, Shorin nor anyone else working with or on behalf of USM ever informed me of the existence of a Shareholder Loan Agreement by and between Elkin and the

3

company. The first time I became aware of any stockholder loans was when Elkin suggested in his December 2002 letter to my attorney that he had paid himself back for stockholder loans.

17.     I did not know of the existence of Elkin's Shareholder Loan Agreement until Elkin mailed a copy of his Agreement and schedule of payments to my attorney in October 2003.

18.     After I stopped working on behalf of the company, Elkin and/or Shorin stopped sending me copies of the company's balance sheets and profit and loss statements.

19.     I was provided a copy of the company's profit and loss statement in November 1998 to facilitate its production to a group of potential purchases, led by Mark Hatten. The copy of the profit and loss statement I received was marked "draft." I did not receive any balance sheets or profit and loss statements at anytime after the November 1998 "draft" copy.

20.     After I stopped working with USM, I was not provided access to or copies of USM's federal or state tax returns.

21.     Since 1996, I was never provided with any notice of stockholders' meetings, committee meetings nor provided any written communication purporting to be an annual report. Based on this lack of notice, I believe USM has not had any annual stockholders' meetings, committee meetings or produced any annual reports since 1996.

22.     I never had a telephone conversation with Elkin in 2000, nor did I ever have a telephone conversation with Elkin (at any other time) during which he told me he took the proceeds from the sales of licenses and repaid himself for stockholder loans.  The only conversation I recall with Elkin concerning the sales of licenses occurred shortly before my attorney delivered an official request for documents to the company. During that telephone conversation, Elkin merely stated that he sold a few licenses and that it was not "my turn" for a distribution.

4

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 2\_ day of March, 2007.

Jeffrey M. Norman