# EXHIBIT O

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into as of this *4th* day of February, 1999, by and between US MobilComm, Inc., with offices at 805 Bryn Mawr Avenue, Newton Square, PA 19073-4330 (hereinafter "Seller"), and Repeater Network Spectrum Aq., Inc. (or its assigns), a Florida corporation, with offices at P. O. Box 410, Bourbonnais, IL 60914 (hereinafter "Purchaser").

## RECITALS

**WHEREAS,** the Seller desires to sell to the Purchaser, or its assigns, and the Purchaser desires to purchase from the Seller, the Seller's 220 MHZ Phase I Federal Communications Commission ("FCC") licenses and systems for those licenses set forth on Exhibit A attached hereto and made a part hereof.

**NOW THEREFORE,** in consideration of the premises and the mutual representations, warranties and covenants contained herein, the receipt and adequacy of which are hereby acknowledged, the Seller and the Purchaser hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS
## AND ASSUMPTION OF LIABILITIES

1.1     Purchase and Sale of Assets. Subject to the terms and conditions of this Agreement, on the Closing Date (as such term is defined in Section 7.1 hereof), the Seller shall sell, transfer, convey, assign and deliver ("Transfer") to the Purchaser (or his designee), and the Purchaser shall purchase, acquire and accept from the Seller, all of the Seller's right, title and interest in, to and under the following assets, properties and rights set forth in Sections 1.1(a), (b), and (c) below (the "Transferred Assets"):

(a)     The Licenses to operate the Phase I 220 MHZ Systems set forth on Exhibit A attached hereto and the associated frequencies (the "Frequencies") identified with such Systems (hereinafter "Licenses" or "Systems").

(b)     All service records and FCC records and other information relating to the Systems, except to the extent that the Seller is required by law to retain the same, in which event the Seller shall deliver copies thereof to the Purchaser at the Closing (as such term is defined in Section 7.1 hereof).

(c)     The equipment ("Equipment") set forth on Exhibit B attached hereto, used by the Seller in the operation of the 220 MHZ System.

**PTF0053**

1.2  Assumption of Liabilities. Subject to the terms and conditions of this Agreement, the Purchaser shall not assume, and shall have no liability for, any debts, liabilities or obligations of the Seller relating to the Systems except as may be specifically assumed by the Purchaser pursuant to this Agreement. It is specifically understood that, as a condition of Closing pertaining to said Licenses being purchased hereunder, any and all rights of US MobilComm under any management, option or other agreement shall not be assumed and shall be considered of no force and effect with respect to the Purchaser and the Systems being purchased hereunder.

1.3  Purchase Price.: The purchase price (the "Purchase Price") for the Transferred Assets shall be as follows:

(a)  The total sum of Sixty-Five Thousand Dollars ($65,000.00) for the Phase I 220 MHZ Licenses, allocated as set forth on Exhibit A;

(b)  The sum equal to up to Seventy-Three Thousand Forty-Nine Dollars ($73,049.00), as set forth on Exhibit B, for equipment purchased by Purchaser from Seller at Closing.

1.4  Payment of Purchase Price. The abovesaid purchase price shall be paid as follows:

(a)  Within seven (7) business days of the execution of this Agreement, Purchaser shall deposit the sum of Thirty Thousand Dollars ($30,000.00)(the "Deposit") with David E. Weisman, Esq., as Escrow Agent ("Escrow Agent"), pursuant to an Escrow Agreement in the form set forth as Exhibit C of this Agreement (the "Escrow Agreement"). The Deposit shall be released to Seller and paid under the schedule set forth in Exhibit D prior to Closing, provided the conditions set forth therein are satisfied. It being understood that as a condition of such release of all or a portion of the Deposit, said funds shall be used to pay the obligations of Seller with respect to the assets being purchased hereunder, or with respect to assets being purchased by Purchaser under agreements entered into with 220 MHZ Phase I Licensees managed by US MobilComm, Inc., as set forth on Exhibit D. In the event Closing does not occur due to a default by Seller, Seller shall immediately repay all of the Deposit in full to Purchaser, plus interest thereon at the same money market rate or passbook savings rate being earned on the portion of the Deposit held in escrow hereunder. Purchaser shall also hold as collateral for repayment of the Deposit released prior to Closing and performance by the Purchaser, irrevocable assignment of The Elkin Group, Inc., of its EA Block C License for West Palm and Miami to the Purchaser. As additional collateral for the repayment of the Deposit and the performance by Seller hereunder, Purchaser shall hold all of Seller's right, title and interest in the equipment being purchased from US MobilComm, Inc. To the extent that the Deposit is released prior to Closing to pay any outstanding indebtedness on equipment owned by US MobilComm, Inc., such title shall be good and clear title.

(b)  At Closing, the balance of the Purchase Price for the Licenses shall be paid by the Purchaser to the Seller, in immediately available funds by wire transfer or by certified or cashier's funds.

2

PTF0054

1.5     <u>Instruments of Conveyance and Transfer, etc.</u> The Seller will deliver to the Purchaser such deeds, bills of sale, endorsements, assignments, and other good and sufficient instruments of conveyance and transfer, in form and substance reasonably satisfactory to the Purchaser, as shall be effective to vest in the Purchaser all of the Seller's respective right, title and interest in, to and under the Transferred Assets to which such Closing relates.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES <br> OF THE SELLER

It is understood that Seller's representations and warranties below are subject to obtaining all necessary consents from the FCC and any applicable licensee of the Systems being sold, as well as release of any liens or obligations owed to equipment vendors by Seller with respect to any such equipment being purchased hereunder; all of which consents and releases of liens shall be a condition of Closing. Accordingly, the Seller represents and warrants to the Purchaser the following:

2.1     <u>Authorization, etc.</u>. The Seller has full power and authority to execute, deliver and perform this Agreement and to Transfer the Transferred Assets and to carry out the transactions contemplated hereby. This Agreement is a valid and binding obligation of the Seller, enforceable in accordance with its terms.

2.2     <u>No Violation</u>. Except as set forth hereinabove, the Seller's execution, delivery and performance of this Agreement will not: (a) require the consent of any other party to, constitute a breach of, or result in the creation or imposition of any Lien (as defined in Section 2.4 hereof) upon any of the Seller's assets under any agreement or commitment to which the Seller is a party or by which the Seller or its assets are bound; or (b) violate any statute or law or any judgment, decree, order, regulation or rule of any court of governmental authority to which the Seller or the Transferred Assets are subject.

2.3     <u>Consents and Approvals of Governmental Authorities</u>.

Except for the consent of the FCC to the Transfer of the Licenses to the Purchaser, no consent, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required to be made or obtained by the Seller in connection with the execution, delivery and performance of its obligations under this Agreement.

2.4     <u>Title to Transferred Assets; Liens (if applicable)</u>. Except for payment of any equipment vendor with a lien on the equipment being sold hereunder or under a Purchase and Sale Agreement entered into by Purchaser with a Phase I 220 MHZ Licensee managed by US MobilComm, Inc., which lien will be paid by Closing or from the Escrow, the Seller has good and valid title to all of the properties and assets constituting all or part of the Transferred Assets free and

PTF0055

clear of all Liens. Seller will be solely responsible to pay any and all consideration due any licensee hereunder.

As used in this Agreement, "Lien" means any mortgage, pledge, security interest, conditional sale or other title retention agreement, encumbrance, lien, claim, right, covenant, restriction, warrant, option, rights of first refusal, management, operating, lease, loading or other agreement, tax, or charge of any kind or type whatsoever.

2.5    Litigation. No legal actions are pending, or to the best knowledge of the Seller, threatened against the Seller which question or challenge the validity of this Agreement or any action taken or proposed to be taken by the Seller pursuant hereto or in connection with the transactions contemplated hereby. The Seller is not subject to any judgment, order or decree affecting the Transferred Assets or the operation of the Systems.

2.6    Compliance with Law. With respect to the Phase I license for Miami being sold hereunder, the Seller has not received any notification from the FCC, or any petition or filing from any third party, either served on the Seller and/or filed with the FCC, asserting that the Seller is not in compliance in all material respects with the Communications Act of 1934, as amended, and all applicable FCC rules and regulations and policies.

The representations and warranties made in this Section 2.6 with respect to each of the Phase I 220 MHZ licenses being purchased hereunder located in Florida shall survive up to and through the Closing Date, and shall be considered of no further force or effect after the date of Closing on such licenses by the Purchaser.

2.7    Brokers. The Seller has not employed any finder or broker in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated by this Agreement. No person is entitled to any broker's or finder's fee based on contacts or communications with the Seller, or the Seller's directors, officers, employees or agents in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated by this Agreement.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller as follows:

3.1    Authorizations, etc.. The Purchaser has the full power and authority to execute, deliver and perform this Agreement. The Purchaser's execution, delivery and performance of this Agreement have been authorized by all necessary action on the part of the Purchaser. This Agreement is a valid binding obligation of the Purchaser enforceable in accordance with its terms.

**PTF0056**

3.2    <u>No Violation</u>. The Purchaser's execution, delivery and performance of this Agreement will not: (a) violate, or be in conflict with, or permit the termination of, or constitute a default under, or cause the acceleration of the maturity of, any debt or obligation of the Purchaser; (b) require the consent of any other party to, constitute a breach of, or result in the creation or imposition of any Lien upon any of the Purchaser's properties or assets under any agreement or commitment to which the Purchaser is a party or by which it is bound; or (c) violate any statute or law or any judgment, decree, order, regulation or rule of any court or governmental authority to which the Purchaser is subject.

3.3    <u>Consents and Approvals of Governmental Authorities</u>.    Except for the consent of the FCC to the Transfer of the Licenses from the Seller to the Purchaser, no consent, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required to be made or obtained by the Purchaser in connection with the execution, delivery and performance of its obligations under this Agreement.

3.4    <u>Litigation</u>. There are no legal actions pending or, to the best knowledge of the Purchaser, threatened against the Purchaser, or any of its properties or rights, before any court, arbitrator or administrative or governmental body, questioning or challenging the validity of this Agreement, any action taken or to be taken by the Purchaser pursuant hereto or in connection with the transactions contemplated hereby.

3.5    <u>Compliance with Law</u>. The Purchaser (i) is eligible to be a licensee of the FCC and will remain so immediately following the purchase of the Systems hereunder; and (ii) is not in default under any order, writ, injunction or decree of any court or governmental authority applicable to the Purchaser or having jurisdiction over the Purchaser.

3.6    <u>Brokers</u>.    The Purchaser has not employed any finder or broker in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated by this Agreement. No person (whose compensation is the responsibility of the Purchaser) is entitled to any broker's or finder's fee based on contacts or communications with the Purchaser or its officers, directors, employees or agents in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated hereby.

## ARTICLE IV

## <u>OBLIGATIONS OF THE PARTIES</u>

4.1    <u>Application for FCC Approval</u>.

(a)    Within ten (10) business days of the date of the execution of this Agreement (or as soon thereafter as a renewal of the Phase I License, if not previously obtained, has been granted to the Seller pursuant to a Final Order),  the Purchaser and the Seller shall join in applications to obtain the FCC's written consent to the Transfer of the Licenses to the Purchaser or

PTF0057

its assigns. Seller will also execute license cancellation documentation for Phase I licenses, which Purchaser may file upon issuance to it of EA licenses for the respective blocks governing Seller's licenses hereunder. The Purchaser and Seller shall provide promptly to the FCC any additional information requested by the FCC in connection with the Applications and the Purchaser and Seller shall use their commercially reasonable efforts to cause the Applications to be approved.

(b)     Alternatively to the above, the Purchaser, upon issuance pursuant to a Final Order, to it or its designee of a Phase II EA license covering the Phase I 220 MHZ systems being purchased hereunder from Seller, may request that the Seller, in lieu of the assignment of the local Phase I license, cancel such Phase I licenses as designated by Purchaser, and cause the deletion of such license(s) from the FCC database. For purposes of this Agreement, reference to "Transfer" of the License shall mean either the assignment of such Phase I licenses or the cancellation of such Phase I licenses pursuant to a Final Order of the FCC. Transfer of the License shall also mean assignment after issuance to Seller pursuant to Final Order of Seller's Phase II EA License.

(c)     The Purchaser shall pay the expenses in connection with the preparation and filing of the assignment of any of the FCC Phase I licenses assigned to it.

4.2     Conduct Prior to Closing Date. Except as otherwise contemplated by this Agreement or permitted by the prior written consent of the Purchaser, from the date hereof until the Closing, the Seller shall conduct the business and operations of the Systems only in the ordinary course.

4.3     Prohibited Transactions Prior to Closing Date. Except as otherwise contemplated by this Agreement or permitted by the prior written consent of the Purchaser, the Seller shall not sell or lease or enter into any agreement with any other Person for the sale or lease of the Transferred Assets.

4.4     Further Assurance:     Each party hereto shall execute and deliver, at or prior to the Closing, all such instruments and take all such other actions as the other party may reasonably request in order to carry out the intent of this Agreement. Each party hereto shall use its commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated. Each party hereto shall give prompt notice to the other, after its receipt thereof, of (i) any notice or other communication received from any third party and/or from any governmental agency relating to any default or event which, with notice or lapse of time or both, would become a default under any indenture, instrument or agreement material to either party to which either party is a party or by which it or its property is bound, and (ii) any notice or other communication from any third party alleging that the consent of such third party is or may be required in connection with the transactions contemplated by this Agreement.

## ARTICLE V

## CONDITIONS TO PURCHASER'S OBLIGATIONS

PTF0058

Each and every obligation of the Purchaser under this Agreement to be performed at or before the Closing shall be subject to the satisfaction, at or before such Closing (unless specifically waived in writing by the Purchaser), of each of the following conditions:

5.1     Representations and Warranties. The representations and warranties of the Seller contained herein and in all certificates and other documents and agreements delivered by the Seller to the Purchaser pursuant hereto or in connection with the transactions contemplated hereby shall be true and accurate in all material respects as of the date hereof and as of the Closing Date.

5.2     Performance. The Seller shall have performed and complied with all material agreements, obligations and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

5.3     Consents. All filings with and consents from all Federal, state and local governmental agencies required to consummate the transactions contemplated hereby shall have been obtained, including without limitation, the consent of the FCC pursuant to issuance of a Final Order to the Transfer (or cancellation and deletion) of the Licenses without any material changes to the terms thereof except as contemplated by this Agreement.

5.4     Termination of Management Agreements. At Closing, the parties agree that those System Management Agreements, as well as any other agreements entered into by and between the Seller and any of the licensees, shall be terminated as they relates to the License and System, and such agreements are not being assumed by the Purchaser.

5.5     Status of Licenses. All Phase I 220 MHZ licenses being sold hereunder shall have been renewed by the FCC pursuant to a Final Order. The Phase II EA license won by The Elkin Group, Inc., at the FCC auction shall have been issued to the Seller pursuant to a Final Order of the FCC. The Phase II EA Licenses for the West Palm Beach-Miami area for the A Block shall have been issued, pursuant to a Final Order, to Mobile Communications Service, and in the B and D Block in the West Palm Beach-Miami area, the Phase II EA Licenses shall have been issued by the FCC, pursuant to Final Order, to the Purchaser or its designee. It being understood that it shall not be a condition of Closing if the Phase II EA licenses are not issued by the FCC to the Purchaser and/or Mobile Communications because they failed to make their timely auction payments to the FCC for such licenses.

5.6     Site Leases. The Purchaser shall, if it so desires, be able to enter into a site lease for the location of the Phase I License at rental terms substantially similar to those set forth on Exhibit E.

5.7     Other Licenses. It shall be a condition of Closing that the six (6) Phase I Licenses located in the Miami, Florida, area and the Phase II EA License covering the West Palm Beach-Miami, Florida area, also being purchased by the Purchaser from US MobilComm, Inc., The Elkin Group, Inc., and licenses managed by US MobilComm, Inc., have been transferred to the Purchaser,

**PTF0059**

or its designee, pursuant to the terms of Purchase and Sale Agreements entered into by the Purchaser or its designee and such respective parties.

Notwithstanding the abovesaid, in the event that either or both of the two local Miami Licensees managed by US MobilComm, Inc., operating on WPCR 254 ($M_2F$) and WPCQ 454 (EC Comm) do not agree to the sale and transfer of their licenses to Purchaser (or its designee) within 21 days of the date of the execution of this Agreement, then the Purchaser and Seller shall, in good faith, attempt to negotiate a mutually acceptable alternative solution with respect to either or both such local Phase I licensees. It being understood that any alternative must be agreed to by Purchaser and Seller in writing. In the event the parties do not reach a mutually satisfactory alternative arrangement within fourteen (14) days after the twenty-one (21) day period in which to obtain the consent of such licensees to the sale of their licenses, then the Purchaser shall have the right to either proceed to Closing on the remaining licenses agreed to be sold to it, or to cancel this Agreement and declare it null and void, after which the Deposit shall be promptly returned to the Purchaser and all parties shall be released from any further obligation hereunder. Any alternate solution agreed to must be in writing and signed by both parties hereto.

## ARTICLE VI

## CONDITIONS TO THE SELLER'S OBLIGATIONS

Each and every obligation of the Seller under this Agreement to be performed on or before the Closing Date shall be subject to the satisfaction on or before the Closing Date (unless specifically waived in writing by Seller) of each of the following conditions:

6.1    Representations and Warranties. The representations and warranties of the Purchaser contained herein and in all certificates, agreements and other documents delivered by the Purchaser to the Seller pursuant hereto or in connection with the transactions contemplated hereby shall be true and accurate in all material respects as of the date hereof and as of the Closing Date.

6.2    Performance. The Purchaser shall have performed and complied with all material agreements, obligations and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

6.3    Consents. All filings with and consents from all Federal, state and local governmental agencies required to consummate the transactions contemplated hereby shall have been obtained, including without limitation, the consent of the FCC to the transfer of the License, as well as release of any liens owed to equipment vendors on any equipment being purchased hereunder.

6.4    Purchase Price. The Purchaser shall have deposited the Deposit with the Escrow Agent pursuant to Section 1.3 hereof and the Escrow Agreement, and at Closing the Purchaser shall

PTF0060

have paid the remaining balance of the Purchase Price due Seller in good funds as required by Section 1.3 hereof.

## ARTICLE VII

## CLOSING; CLOSING DATE; TERMINATION

7.1    Closing.  The Closing on the purchase and sale of the Transferred Assets (the "Closing") will be held on a date (the "Closing Date") which is within ten (10) business days after the FCC's consent to the Transfer to the Purchaser or its designee (or cancellation and deletion in the case of those Phase I licenses so designated by the Purchaser as set forth above) of the Licenses shall have become a final and non-appealable ("Final Order") either by mail or at the office of counsel to the Purchaser (located in the Washington, D.C., area), or at such other time and place as the Purchaser and the Seller may agree upon.  It being understood that by Closing, all of the Conditions to the Purchaser's Obligations under Article V and conditions to the Seller's obligations under Article VI shall have been fully satisfied or otherwise waived in writing by the respective party entitled to such performance as a condition of Closing.  For purposes of this Agreement, a Final Order shall mean that after the date of issuance of the grant of assignment (or, if applicable, cancellation) of the Licenses by the FCC all time periods for third party petitions and/or challenges will have lapsed and all periods for FCC reconsideration on its own motion will have passed without the filing of any petition, objection and/or appeal or proceeding by any party or by the agency to the grant of the assignment of the FCC Licenses to the Purchaser.

7.2    Termination.  This Agreement may be terminated by the parties hereto as set forth in this Section 7.2:

(a)    at any time by mutual agreement of the Purchaser and the Seller;

(b)    if the Closing does not occur on or before eighteen (18) months of the date of this Agreement (the "Termination Date"), either the Purchaser or the Seller may terminate this Agreement by delivering a written notice to the other, provided the failure of such Closing to occur is not due to such party's willful failure to satisfy a condition precedent or failure to perform its obligations hereunder;

(c)    at any time prior to the Closing by either party upon the other party's inability to satisfy a material condition contained herein or failure to perform, in all material respects, its obligations hereunder;

(d)    if the Purchaser fails to deposit the Deposit with the Escrow Agent under the Escrow Agreement after the execution of this Agreement, the Seller may terminate this Agreement at any time thereafter by delivering a written notice to such effect to the Purchaser.

**PTF0061**

Upon termination of this Agreement pursuant to this Section 7.2, this Agreement shall be of no further force and effect and the parties hereto shall be relieved of all of their obligations hereunder and each party shall be liable for its own expenses in connection herewith. Notwithstanding the foregoing, (i) if this Agreement is terminated by the Purchaser upon the Seller's wilful failure to satisfy a condition precedent hereto or willful failure to perform its obligations hereunder, such termination shall not affect any other rights or remedies that the Purchaser may have at law or in equity with respect to such breaches; it being understood that in the event of a willful breach, Purchaser's remedy shall be to seek specific performance of the Seller hereunder, and provided Seller does not oppose and agrees to such specific performance, Purchaser shall have no right to seek monetary damages from Seller at law by reason of Seller's breach; (ii) if this Agreement is terminated by the Seller upon the Purchaser's willful failure to satisfy a condition precedent hereto or willful failure to perform its obligations hereunder, the Seller shall be entitled as its sole and exclusive remedy to retain the Deposit and the Seller's retention of such Deposit shall be construed as liquidated damages and a waiver of any rights or remedies that the Seller may have at law or in equity with respect to such breach and (iii) if this Agreement is terminated because a Final Order for assignment of the License cannot be obtained from the FCC by the Termination Date (other than due to a breach by the Purchaser of his representation and warranty set forth in Section 3.5 hereof or due to the willful failure of the Purchaser to use his reasonable commercial efforts to obtain such Final Order prior to the Termination Date), the Deposit shall be promptly refunded in full to the Purchaser.

## ARTICLE VIII

## INDEMNIFICATION

8.1    Indemnification by the Seller. The Seller shall indemnify and hold harmless the Purchaser, its successors and permitted assigns, from and against any and all claims, liabilities and expenses, including without limitation reasonable legal and accounting expenses (collectively "Losses"), which may arise out of (i) any breach or violation of this Agreement by the Seller; and (ii) any breach of any of the representations, warranties or covenants which survive the Closing made in this Agreement by the Seller. The warranties, representations and covenants of the Seller contained in this Agreement or any certificate, documents, instrument or agreement delivered pursuant to this Agreement, any investigation by the Purchaser of the Seller or the Transferred Assets which survive the Closing shall survive the execution and delivery of this Agreement and the Closing and the consummation of the transactions contemplated by this Agreement for a period of one (1) year from the Closing.

8.2    Indemnification by the Purchaser. The Purchaser shall indemnify and hold harmless the Seller and its successors and permitted assigns from and against any and all Losses which may arise out of (i) any breach or violation of this Agreement by the Purchaser; and (ii) any breach of any of the representations, warranties or covenants which survive the Closing made in this Agreement by the Purchaser. The warranties and representations of the Purchaser contained in this Agreement which survive the Closing, or any certificate, documents, instrument or agreement delivered pursuant to this Agreement, shall survive the execution and delivery of this Agreement, the Closing and the

PTF0062

consummation of the transactions called for by this Agreement for a period of one (1) year from the Closing.

## ARTICLE IV
## MISCELLANEOUS PROVISIONS

9.1 <u>Taxes</u>. To the extent applicable, the Seller shall be responsible for the payment of Seller's portion, if any, of all transfer or income taxes due or payable in connection with the Transfer of the Transferred Assets to the Purchaser and the other transactions contemplated hereby.

9.2 <u>Amendment and Modification</u>. This Agreement may not be amended or modified or waived except by a written agreement signed by the party against whom enforcement of such amendment, modification or waiver is sought. Any waiver of any term or condition of this Agreement, or other breach of any covenant, representation or warranty contained herein, in any one instance, shall not operate as or be deemed to be construed as a further or continuing waiver of any other breach of such term, condition, covenant, representation or warranty or any other term, condition, covenant, representation or warranty, nor shall any failure at any time or times to enforce or require performance of any provision hereof operate as a waiver of or affect in any manner such parties' right at a later time to enforce or require performance of such provision or any other provision hereof.

9.3 <u>Fees and Expenses</u>. Each of the parties hereto will pay its own attorney's costs and expenses in connection with the negotiation, execution and performance of this Agreement.

9.4 <u>Severability</u>. If any provision of this Agreement shall be held or deemed to be, or shall in fact be, invalid, inoperative or unenforceable as applied to any particular case in the State of Florida or in all cases, because of the conflict of any provision with the constitution or any statute or rule of public policy of the State of Florida or for any other reason, such circumstance shall not have the effect of rendering the provision or provisions in question, invalid, inoperative or unenforceable in any other case or circumstance or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to the extent that such other provisions are not themselves actually in conflict with such constitution, statute or rule of public policy, but this Agreement shall be reformed and construed in any such case as if such invalid, inoperative or unenforceable provision had never been contained herein and such provision reformed so that it would be valid, operative and enforceable to the maximum extent permitted in such case.

9.5 <u>Notices</u>. All notices, requests or other communications required or permitted hereunder shall be given in writing and shall be deemed to have been duly given if delivered by hand on the date of receipt (or refusal), and if given by mail or Federal Express or similar nationally recognized expedited commercial courier, when deposited in the United States mail or delivered to Federal Express or similar nationally recognized expedited commercial courier, addressed to the recipient of the notice, postage prepaid and registered or certified mail (if mailed), or with all freight charges paid (if by Federal Express or other courier), to the following addresses:

11

PTF0063

restrictions, promises, warranties, covenants or undertakings other than those expressly set forth or referred to herein or therein. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year first above written.

SELLER:      US MOBILCOMM, INC.

By: _____
Name: *David W. Elkin*
Title: *President*

PURCHASER:      REPEATER NETWORK SPECTRUM AQ., INC.

By: _____
Name:
Title:

PTF0064

# EXHIBIT P

# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into as of this _30_ day of January, 2001 (the "Effective Date"), by and between US MobilComm, Inc., a Delaware corporation, with offices at 805 Bryn Mawr Avenue, Newtown Square, PA 19073-4330 ("Seller"), and Roamer One, Inc., a Delaware corporation, with offices at 1690 Topping Avenue, Kansas City, MO 64120-1224 ("Purchaser").

## RECITALS

**WHEREAS**, the Seller desires to sell to the Purchaser, or its assigns, and the Purchaser desires to purchase from the Seller, the assets of Seller's 220 MHz Phase I Federal Communications Commission ("FCC") systems set forth on Exhibit A attached hereto and made a part hereof.

**NOW THEREFORE**, in consideration of the premises and the mutual representations, warranties and covenants contained herein, the receipt and adequacy of which are hereby acknowledged, the Seller and the Purchaser hereby agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS
## AND ASSUMPTION OF LIABILITIES

1.1     <u>Purchase and Sale of Assets</u>. Subject to the terms and conditions of this Agreement, on the Closing Date (as such term is defined in Section 7.1 hereof), the Seller shall sell, transfer, convey, assign and deliver ("Transfer") to the Purchaser (or his designee) free and clear of any and all liens or encumbrances of any nature whatsoever, and the Purchaser shall purchase, acquire and accept from the Seller, all of the Seller's rights, title and interest in, to and under the following assets, properties and rights (the "Transferred Assets"):

(a)     the licenses to operate the Phase I 220 MHz systems set forth on Exhibit A attached hereto and the associated frequencies identified with such systems (hereinafter "Licenses" or "Systems");

(b)     all FCC records and other information relating to the Systems, except to the extent that the Seller is required by law to retain the same, in which event the Seller shall deliver copies thereof to the Purchaser at the Closing (as such term is defined in Section 7.1 hereof); and

(c)     the equipment ("Equipment") set forth on Exhibit B attached hereto, used by the Seller in the operation of the Systems, and all warranties and service contracts in effect for such equipment to the extent permitted under the applicable agreements;

**PTF0081**

(d)    any and all customer agreements to which the Seller is a party in relation to the operation of the Systems.

1.2    <u>Assumption of Liabilities</u>.  Subject to the terms and conditions of this Agreement, the Purchaser shall not assume, and shall have no liability for, any debts, liabilities or obligations of the Seller relating to the Systems, including, but not limited to, any liability or debt arising out of any site lease, rental agreement, license, easement or right for use in operation of the Systems prior to the Closing. All real estate, property or other taxes due with respect to the Systems shall be pro-rated at Closing between Purchaser and Seller, with Seller responsible for payment of that portion of the year up to and including the Closing Date and Purchaser responsible for that portion of the year after the Closing Date. The parties may use the tax assessment for the previous year as an approximation of the tax liability if the Seller has not received the tax assessment for the current year by Closing.

1.3    <u>Purchase Price</u>.

(a)    <u>Purchase Price for Transferred Assets</u>.  The total purchase price of Three Hundred Forty-Nine Thousand Dollars ($349,000.00) for the Transferred Assets (the "Purchase Price") shall be allocated as set forth on Exhibit A.

(b)    <u>Chicago System</u>.  The purchase price for the System located in Chicago, Illinois, identified by call sign WPDZ855 and including the Equipment and customer agreements related to the System (collectively, the "Chicago System"), shall be reduced from Forty-Nine Thousand Dollars ($49,000.00), as set forth in Exhibit A, to Twenty-Four Thousand Dollars ($24,000.00) unless the FCC consents to the Transfer from Seller to Purchaser of at least two of three Licenses located in Boston, Massachusetts, identified by call signs WPCV997, WPCP580 and WPCC462, within twelve months from the Effective Date and such Transfers are consummated within fifteen months from the Effective Date. In lieu of FCC consent to the Transfer from Seller to Purchaser of the License identified by call sign WPCC462, the Seller may deliver to the Purchaser (i) the partitioned area and disaggregated spectrum from the overlay Phase II license to which WPCC462 is incumbent that is the equivalent to the License identified by call sign WPCC462, and (ii) the cancellation of the License identified by call sign WPCC462.

1.4    <u>Payment of Purchase Price</u>.  The above said purchase price shall be paid as follows:

(a)    <u>"Deposit"</u>.  Purchaser shall deposit with a mutually acceptable escrow agent (i) Thirty-Four Thousand Nine Hundred Dollars ($34,900.00) within seven (7) business days of the execution of this Agreement, and (ii) One Hundred Thirty-Six Thousand One Hundred Ten Dollars ($136,110.00) upon the completion of satisfactory due diligence and filing of the license assignment applications (both payments are collectively termed "Deposit"), pursuant to an Escrow Agreement in the form set forth as Exhibit C of this Agreement (the "Escrow Agreement").

(b)    <u>Distribution of Deposit</u>. The Deposit shall be distributed to the Seller in the following manner:

**PTF0082**

(i)      at Closing, One Hundred Eleven Thousand Ten Dollars ($111,010.00) shall be released from the Escrow to the Seller pursuant to the terms of the Escrow Agreement; and

(ii)      at ninety (90) days following the Closing, the balance of the Deposit, Sixty Thousand Dollars ($60,000.00) (the "Withholding Escrow") shall be released, in whole or in part, to either the Purchaser or the Seller, as determined by the terms related to the Withholding Escrow in the Escrow Agreement. Also, as set forth in the Escrow Agreement, interest accrued on the Withholding Escrow shall be paid to the Seller at the time of disbursement.

(c)      At Closing, the balance of the Purchase Price for the Licenses, One Hundred Seventy-Seven Thousand Nine Hundred Ninety Dollars ($177,990.00), shall be paid by the Purchaser to the Seller, in immediately available funds by wire transfer or by certified or cashier's funds, as instructed by Seller.

1.5      <u>Instruments of Conveyance and Transfer</u>. The Seller will deliver to the Purchaser such deeds, bills of sale, endorsements, assignments, and other good and sufficient instruments of conveyance and transfer, in form and substance reasonably satisfactory to the Purchaser, as shall be effective to vest in the Purchaser all of the Seller's respective right, title and interest in, to and under the Transferred Assets to which such Closing relates.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES
## OF THE SELLER

Seller represents and warrants to the Purchaser the following:

2.1      <u>Organization, Good Standing and Authority</u>. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller has full power and authority to execute, deliver and perform this Agreement and to Transfer the Transferred Assets and to carry out the transactions contemplated hereby. This Agreement is a valid and binding obligation of the Seller, enforceable in accordance with its terms. Seller is qualified to do business, is in good standing and has all required and appropriate licenses in each jurisdiction in which its failure to obtain or maintain such qualification, good standing or licensing would have a material and adverse effect on the condition (financial or otherwise), assets, properties, business or prospects of the Seller.

2.2      <u>Corporate Powers; Consents; Absence of Conflicts With Other Agreements</u>. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein by the Seller:

(a)      are within the Seller's corporate powers and are not in contravention of the terms of its Articles of Incorporation and Bylaws, or any amendments thereto, and have been approved by all requisite corporate action;

**PTF0083**

(b)    except as otherwise expressly herein provided, do not require any approval or consent of, or filing with, any governmental agency or authority bearing on the validity of this Agreement;

(c)    do not conflict with, result in any breach or contravention of, or permit the acceleration of the maturity of any liabilities of the Seller, in any material respect, and do not create or permit the creation of any Encumbrance on or affecting any of the Transferred Assets;

(d)    do not violate, in any material respect, any statute, law, rule or regulation of any governmental authority to which the Seller or the Transferred Assets may be subject;

(e)    do not violate any judgment to which the Seller may be subject; and

(f)    do not conflict with or result in a breach or violation of any material agreements to which the Seller is a party or to which it is bound.

2.3    <u>Binding Effect</u>. This Agreement and all agreements hereunder to which the Seller is a party are valid and legally binding obligations of the Seller, enforceable against the Seller in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

2.4    <u>Title to Transferred Assets; Liens</u>. Except as indicated in Section 2.5(b), the Seller has good and valid title to all of the properties and assets constituting all or part of the Transferred Assets free and clear of all Liens. As used in this Agreement, "Lien" means any mortgage, pledge, security interest, conditional sale or other title retention agreement, encumbrance, lien, claim, right, covenant, restriction, warrant, option, rights of first refusal, tax, or charge of any kind or type whatsoever.

2.5    <u>Equipment</u>.

(a)    <u>Equipment Condition</u>. The equipment listed in Exhibit B to this Agreement on each of the sites of the Systems is in good working order except for normal wear and tear.

(b)    <u>Equipment Title</u>. Except for equipment liens with SEA Inc. of Delaware in Pennsylvania and Massachusetts ("SEA Liens"), Seller holds clear title to such equipment and will deliver the equipment free of any Liens or Encumbrances. As used in this Agreement, "Encumbrances" means liabilities, levies, claims, charges, assessments, mortgages, security interests, liens, pledges, conditional sales agreements, title retention contracts, leases, subleases, rights of first refusal, options to purchase, restrictions and other encumbrances and agreements to give any of the foregoing. Seller shall obtain release of the SEA Liens by Closing. In the event that SEA Liens are not released by Closing, the Seller and Purchaser shall enter into an agreement for use of such equipment by Purchaser. In addition, Ten Thousand Dollars ($10,000.00) held in Escrow shall remain in Escrow ("Lien Escrow") until the SEA Liens are

PTF0084

released. If the SEA Liens are not released within one year of Closing, the Lien Escrow will be refunded to the Purchaser.

2.6     <u>Contracts and Liabilities</u>. Seller maintains that, to the best of its knowledge, it is in material compliance with all contracts entered into by Seller with respect to the Systems and agrees that the Purchaser shall not assume any liabilities related to such contracts.

2.7     <u>Legal Proceedings</u>. No legal actions are pending, or to the best knowledge of the Seller, threatened against the Seller which question or challenge the validity of this Agreement or any action taken or proposed to be taken by the Seller pursuant hereto or in connection with the transactions contemplated hereby. The Seller is not subject to any judgment, order or decree affecting the Transferred Assets.

2.8     <u>Compliance with Law</u>. The Seller maintains that, to the best of its knowledge, (i) it is in compliance, in all material respects, with the Communications Act of 1934, as amended, and the rules, regulations and policies of the FCC promulgated thereunder (collectively the "FCC Act"), applicable to the Seller and the Systems; (ii) it is in compliance, in all material respects, with all other federal, state and local laws, rules, regulations, ordinances and policies applicable to the Seller; and (iii) it is not in default under any order, writ, injunction or decree of any court or governmental authority applicable to the Seller or having jurisdiction over the Seller.

2.9     <u>FCC Matters</u>. The Licenses are validly issued by the FCC and are in good standing. Seller holds good and valid title to the Licenses free and clear of any Encumbrances. There are no pending or, to the best of Seller's knowledge, threatened FCC enforcement proceedings or investigations with respect to Seller or the Licenses. The Licenses have been constructed and placed into operation in accordance with FCC rules and regulations.

2.10    <u>Brokers</u>. The Seller has not employed any finder or broker in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated by this Agreement. No person (whose compensation is the responsibility of the Seller) is entitled to any broker's or finder's fee based on contacts or communications with the Seller, or the Seller's directors, officers, employees or agents in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated by this Agreement.

2.11    <u>Taxes</u>. To the extent the failure to do so could after Closing adversely affect the Licenses, all tax returns required to be filed by Seller with respect to the Licenses have been filed in timely fashion with the appropriate Governmental entity, and all taxes have been paid when due. As set forth in Section 1.2, Seller shall pay all real estate, property or other taxes due with respect to the Systems for the year up to and including the Closing Date.

2.12    <u>No Undisclosed Liabilities</u>. Seller has no liabilities or obligations of any nature for which Purchaser will become liable by reason of this Agreement or the transactions contemplated hereunder, except for those specific liabilities expressly assumed by Purchaser under the terms of this Agreement.

**PTF0085**

2.13    <u>No Material Adverse Change</u>.  Other than matters affecting the 220 MHz industry generally, since the Effective Date there has not been any material adverse change in the Licenses, or condition of its business, and, to Seller's knowledge, no event has occurred or circumstance exists that may result in such a material adverse change.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller as follows:

3.1    <u>Organization, Good Standing and Authority</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  The Purchaser has requisite power and authority to execute, deliver and perform this Agreement and to carry out the transactions contemplated hereby.

3.2    <u>Corporate Powers; Consents; Absence of Conflicts With Other Agreements</u>.  The execution, delivery and performance of this Agreement by the Purchaser and all other agreements referenced herein and the consummation of the transactions contemplated herein by the Purchaser:

(a)    are within the Purchaser's corporate powers and are not in contravention of the terms of its Articles of Incorporation and Bylaws, or any amendments thereto, and have been approved by all requisite corporate action;

(b)    except as otherwise expressly herein provided, do not require any approval or consent of, or filing with, any governmental agency or authority bearing on the validity of this Agreement;

(c)    do not conflict with or result in any breach or contravention of, or the creation of any Encumbrance under, any indenture, agreement, lease, instrument or understanding to which the Purchaser is a party or by which the Purchaser is bound;

(d)    do not violate any statute, law, rule or regulation of any governmental authority to which the Purchaser may be subject;

(e)    do not violate any judgment to which the Purchaser may be subject; and

(f)    do not conflict with or result in a breach or violation of any material agreement or commitment to which the Purchaser is a party.

3.3    <u>Consents and Approvals of Governmental Authorities</u>.  Except for the consent of the FCC to the Transfer of the Licenses from the Seller to the Purchaser, no consent, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority

**PTF0086**

is required to be made or obtained by the Purchaser in connection with the execution, delivery and performance of its obligations under this Agreement.

3.4    Legal Proceedings. There are no legal actions pending or, to the best knowledge of the Purchaser, threatened against the Purchaser, or any of its properties or rights, before any court, arbitrator or administrative or governmental body, questioning or challenging the validity of this Agreement, any action taken or to be taken by the Purchaser pursuant hereto or in connection with the transactions contemplated hereby.

3.5    Compliance with Law. The Purchaser (i) is eligible to be a licensee of the FCC and will remain so immediately following the purchase of the Systems hereunder; and (ii) is not in default under any order, writ, injunction or decree of any court or governmental authority applicable to the Purchaser or having jurisdiction over the Purchaser.

3.6    Brokers. The Purchaser has not employed any finder or broker in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated by this Agreement. No person (whose compensation is the responsibility of the Purchaser) is entitled to any broker's or finder's fee based on contacts or communications with the Purchaser or its officers, directors, employees or agents in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated hereby.

## ARTICLE IV

## OBLIGATIONS OF THE PARTIES

4.1    Assignment or Cancellation of Licenses.

(a)    Within five (5) business days of the date of execution of this Agreement, Purchaser and the Seller shall file the necessary application(s) to obtain the FCC's written consent to the Transfer of the Licenses to the Purchaser or its assigns ("Application"). The Purchaser and Seller shall provide promptly to the FCC any additional information requested by the FCC in connection with the Application and the Purchaser and Seller shall use their commercially reasonable efforts to cause the Application to be approved.

(b)    In lieu of filing an application for assignment for one or more of the Licenses , the Purchaser may elect, at its own option, to request that the Seller cancel the License and cause the deletion of such license from the FCC database, provided that the Purchaser or its affiliates either hold or have acquired from The Elkin Group, Inc., pursuant to a Final Order by the FCC, the Phase II overlay license(s) covering the License(s). For purposes of this Agreement, reference to "Transfer" of the License shall mean either the assignment of such Phase I licenses or the cancellation of such Phase I licenses pursuant to this section.

(c)    The Purchaser shall pay the expenses in connection with the preparation and filing of the assignment of any of the FCC Phase I licenses assigned to it.

4.2    <u>Conduct Prior to Closing Date</u>.  Except as otherwise contemplated by this Agreement or permitted by the prior written consent of the Purchaser, from the date hereof until the Closing, the Seller shall conduct the business and operations of the Systems in the ordinary course and maintain the Licenses in good standing.

4.3    <u>Prohibited Transactions Prior to Closing Date</u>.  Except as otherwise contemplated by this Agreement or permitted by the prior written consent of the Purchaser, the Seller shall not sell or lease or enter into any agreement with any other Person for the sale or lease of the Transferred Assets.

4.4    <u>Further Assurance</u>.    Each party hereto shall execute and deliver, at or prior to the Closing, all such instruments and take all such other actions as the other party may reasonably request in order to carry out the intent of this Agreement.   Each party hereto shall use its commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated. Each party hereto shall give prompt notice to the other, after its receipt thereof, of (i) any notice or other communication received from any third party and/or from any governmental agency relating to any default or event which, with notice or lapse of time or both, would become a default under any indenture, instrument or agreement material to either party to which either party is a party or by which it or its property is bound, and (ii) any notice or other communication from any third party alleging that the consent of such third party is or may be required in connection with the transactions contemplated by this Agreement.

**ARTICLE V**

**CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS**

Each and every obligation of the Purchaser under this Agreement to be performed at or before the Closing shall be subject to the satisfaction, at or before such Closing (unless specifically waived in writing by the Purchaser), of each of the following conditions:

5.1    <u>Due Diligence</u>.  Purchaser shall have until five (5) business days following the Effective Date ("Diligence Period") to conduct a due diligence investigation of the Transferred Assets. If the Purchaser, in good faith, determines that the Transferred Assets are not as have been described by the Seller to the Purchaser, the Purchaser shall give the Seller notice at any time during the Diligence Period or within five (5) business days after the expiration of the Diligence Period that the Purchaser elects to terminate this Agreement, which notice shall specify the reason for such termination.

5.2    <u>Representations and Warranties</u>.  The representations and warranties of the Seller contained herein and in all certificates and other documents and agreements delivered by the Seller

8

**PTF0088**

to the Purchaser pursuant hereto or in connection with the transactions contemplated hereby shall be true and accurate in all material respects as of the date hereof and as of the Closing Date.

5.3    <u>Performance</u>.  The Seller shall have performed and complied with all material agreements, obligations and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

5.4    <u>Consents</u>. All filings with and consents from all Federal, state and local governmental agencies required to consummate the transactions contemplated hereby shall have been obtained, including without limitation, the consent of the FCC pursuant to issuance of a Final Order to the Transfer (or cancellation and deletion) of the Licenses without any material changes to the terms thereof except as contemplated by this Agreement.

5.5    <u>Incumbent Licenses</u>.  Prior to or upon Closing on three of the Licenses identified by call signs WPCM901, WPCP576 and WPBQ436 ("Incumbent Licenses"), the Purchaser must have acquired from The Elkin Group, Inc. the Phase II 220 MHz licenses for BEA003 (Boston-Worcester-Lawrence Lowell-Brockton, MA-NH-RI-VT), Channel Blocks B and C, under call signs WPOI695 and WPOI696.

5.6    <u>Closing Documents</u>.  Seller shall have executed and delivered to the Purchaser all agreements, instruments, certificates or other documents reasonably required to be executed by Seller pursuant to this Agreement at the Closing Date.

5.7    <u>Release of Equipment Liens</u>.  Seller shall have acquired the release of the SEA Liens prior to or at Closing, failure of such action resulting in the withholding of Lien Escrow as described in Section 2.5 of this Agreement.

## <u>ARTICLE VI</u>

## <u>CONDITIONS PRECEDENT TO THE SELLER'S OBLIGATIONS</u>

Each and every obligation of the Seller under this Agreement to be performed on or before the Closing Date shall be subject to the satisfaction on or before the Closing Date (unless specifically waived in writing by Seller) of each of the following conditions:

6.1    <u>Representations and Warranties</u>.  The representations and warranties of the Purchaser contained herein and in all certificates, agreements and other documents delivered by the Purchaser to the Seller pursuant hereto or in connection with the transactions contemplated hereby shall be true and accurate in all material respects as of the date hereof and as of the Closing Date.

6.2    <u>Performance</u>.  The Purchaser shall have performed and complied with all material agreements, obligations and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

9

PTF0089

6.3     <u>Consents</u>.    All filings with and consents from all Federal, state and local governmental agencies required to consummate the transactions contemplated hereby shall have been obtained, including without limitation, the consent of the FCC pursuant to issuance of a Final Order, as defined in Section 7.1, to the Transfer (or cancellation and deletion) of Licenses without any material changes to the terms thereof except as contemplated by this Agreement.

6.4     <u>Purchase Price</u>.    The Purchaser shall have deposited the Deposit with the Escrow Agent pursuant to Section 1.4 hereof and the Escrow Agreement, and at Closing the Purchaser shall have paid the remaining balance of the Purchase Price due Seller in immediately available funds as required by Section 1.4 hereof.

6.5     <u>Closing Documents</u>.    Purchaser shall have executed and delivered to the Seller all agreements, instruments, certificates or other documents reasonably required to be executed by Purchaser pursuant to this Agreement at the Closing Date.

## ARTICLE VII

### CLOSING; CLOSING DATE; TERMINATION

7.1     <u>Closing</u>.

(a)     <u>"Closing"; "Closing Date"</u>.    Subject to Section 7.1(c) herein, the Closing on the purchase and sale of the Transferred Assets (the "Closing") will be held on a date (the "Closing Date") which is within ten (10) business days after the FCC's consent to the Transfer to the Purchaser or its designee of all of the Licenses shall have become a Final Order, as defined below, at the office of the Seller, or at such other time and place as the Purchaser and the Seller may agree upon. It being understood that by Closing, all of the Conditions Precedent to the Purchaser's Obligations under Article V and Conditions Precedent to the Seller's Obligations under Article VI shall have been fully satisfied or otherwise waived in writing by the respective party entitled to such performance as a condition of Closing.

(b)     <u>"Final Order"</u>.    For purposes of this Agreement, a "Final Order" shall mean that date after the issuance of the grant of assignment of the Licenses by the FCC, all time periods for third party petitions and/or challenges will have lapsed, and all periods for FCC reconsideration on its own motion will have passed without the filing of any petition, objection and/or appeal or proceeding by any party or by the agency to the grant of the assignment of the Licenses to the Purchaser.

(c)     <u>Multiple Closings</u>.    With the exception of the Chicago License, as described in Section 1.3(b), and the Incumbent Licenses, in the event that the FCC consents to the Transfer of the Licenses to the Purchaser on different dates, the parties will consummate the transfer of those Systems to which the FCC has consented no later than forty (40) days following the initial consent.

10

**PTF0090**

In the event of Multiple Closings, all amounts released from the Escrow and paid to the Seller at Closing shall be prorated according to the purchase price allocation listed in Exhibit A.

7.2     Actions of the Seller at Closing.  At the Closing and unless otherwise waived in writing by the Purchaser, Seller shall deliver to the Purchaser:

(a)     certificates of the duly authorized representative of the Seller certifying that (1) Seller has authorized and approved the consummation of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein; (2) each representation and warranty of the Seller set forth herein and not qualified as to materiality is true and correct in all material respects as of the Closing Date; and (3) each representation and warranty of the Seller qualified as to materiality is true and correct as of the Closing Date and that each covenant and agreement of the Seller to be complied with or performed on or prior to the Closing Date pursuant to this Agreement has been complied with or performed in all material respects;

(b)     a General Bill of Sale and Assignment, fully executed by Seller conveying to the Purchaser good and valid title to the Transferred Assets free and clear of all encumbrances;

(c)     evidence of the release of the SEA Liens; and

(d)     any other documents necessary to consummate the transactions contemplated herein.

7.3     Actions of the Purchaser at Closing.  At the Closing and unless otherwise waived in writing by the Seller, the Purchaser shall deliver to the Seller or the Escrow Agent:

(a)     the balance of the Purchase Price, as set forth in Section 1.4;

(b)     certificates of the duly authorized officer of the Purchaser certifying that: (1) the Purchaser has authorized and approved the Purchaser's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein; (2) each representation and warranty of the Purchaser set forth herein and not qualified as to materiality is true and correct in all material respects as of the Closing Date, (3) and each representation and warranty of the Purchaser qualified as to materiality is true and correct as of the Closing Date and that each covenant and agreement of the Purchaser to be complied with or performed on or prior to the Closing Date pursuant to this Agreement has been complied with or performed in all material respects;

(c)     such documents necessary for release of the Deposit to the Seller pursuant to the Escrow Agreement; and

(d)     any other documents necessary to consummate the transactions contemplated herein.

11

**PTF0091**

7.4    Termination. This Agreement may be terminated by the parties hereto as set forth in this Section 7.4:

(a)    at any time by mutual agreement of the Purchaser and the Seller;

(b)    if the Closing does not occur on or before twelve (12) months following the Effective Date, either the Purchaser or the Seller may terminate this Agreement by delivering a written notice to the other, provided the failure of such Closing to occur is not due to such party's willful failure to satisfy a condition precedent or failure to perform its obligations hereunder;

(c)    at any time prior to the Closing by either party upon the other party's inability to satisfy a material condition contained herein or failure to perform, in all material respects, its obligations hereunder;

(d)    if the Purchaser fails to deposit the Deposit with the Escrow Agent under the terms of Section 1.4, the Seller may terminate this Agreement at any time thereafter by delivering a written notice to such effect to the Purchaser; or

(e)    upon either party's dissolution, liquidation, bankruptcy or insolvency, including (i) the filing of a voluntary petition seeking liquidation, reorganization, arrangement of readjustment, in any form of its debts under Title II of the Unites States Code or any other federal or state insolvency law, or its filing or an answer consenting to or acquiescing in any such petition, (ii) the making of any assignment for the benefit of its creditors or (iii) the expiration of 60 days after the filing of any involuntary petition under Title II of the United States Code, an application for the appointment of a receiver for its assets, or an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal or state insolvency law, provided that the same shall not have been vacated, set aside or stayed within such 60 day period.

Upon termination of this Agreement pursuant to this Section 7.4, this Agreement shall be of no further force and effect and the parties hereto shall be relieved of all of their obligations hereunder, each party shall be liable for its own expenses in connection herewith, and the Deposit shall be returned to the Purchaser, except as set forth herein. Notwithstanding the foregoing, if this Agreement is terminated by the Purchaser upon the Seller's failure to satisfy a condition precedent hereto or failure to perform its obligations hereunder, the Purchaser shall be entitled to seek specific performance of this Agreement or to recover its damages of an amount up to a prorated amount of the Deposit as reflected in the allocation set forth in Exhibit A to this Agreement for the Systems to which the breach applies; such payment shall be construed as liquidated damages and a waiver of any rights or remedies that the Purchaser may have at law or in equity with respect to such breach. If this Agreement is terminated by the Seller upon the Purchaser's failure to satisfy a condition precedent hereto or failure to perform its obligations hereunder, the Seller shall be entitled to a payment, as its sole and exclusive remedy, of an amount up to a prorated amount of the Deposit as reflected in the allocation set forth in Exhibit A to this Agreement for the Systems to which the breach applies; such payment shall be construed as liquidated damages and a waiver of any rights or remedies that the Seller may have at law or in equity with respect to such breach.

12

PTF0092

Notwithstanding the foregoing, the parties each disclaim any rights to recover consequential damages, including any costs accrued by Purchaser in acquiring comparable license(s) or system(s) as a result of the termination of this Agreement or any general diminution in the value of Purchaser other than its specific damages arising from Seller's breach.

## ARTICLE VIII

### INDEMNIFICATION

8.1    <u>Indemnification by the Seller</u>.  The Seller shall indemnify and hold harmless the Purchaser, its successors and permitted assigns, from and against any and all claims, liabilities and expenses, including without limitation reasonable legal and accounting expenses (collectively "Losses"), which may arise out of (i) any breach or violation of this Agreement by the Seller; and (ii) any breach of any of the representations, warranties or covenants which survive the Closing made in this Agreement by the Seller.  The warranties, representations and covenants of the Seller contained in this Agreement or any certificate, documents, instrument or agreement delivered pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and the consummation of the transactions contemplated by this Agreement for a period of one (1) year from the Closing. ____

8.2    <u>Indemnification by the Purchaser</u>. The Purchaser shall indemnify and hold harmless the Seller and its successors and permitted assigns from and against any and all Losses which may arise out of (i) any breach or violation of this Agreement by the Purchaser; and (ii) any breach of any of the representations, warranties or covenants which survive the Closing made in this Agreement by the Purchaser.  The warranties and representations of the Purchaser contained in this Agreement which survive the Closing, or any certificate, documents, instrument or agreement delivered pursuant to this Agreement, shall survive the execution and delivery of this Agreement, the Closing and the consummation of the transactions called for by this Agreement for a period of one (1) year from the Closing.

## ARTICLE IV
## MISCELLANEOUS PROVISIONS

9.1    <u>Taxes</u>.  To the extent applicable, the Seller shall be responsible for the payment of Sellers portion, if any, of all transfer or income taxes due or payable in connection with the Transfer of the Transferred Assets to the Purchaser and the other transactions contemplated hereby.

9.2    <u>Amendment and Modification</u>.  This Agreement may not be amended or modified or waived except by a written agreement signed by the party against whom enforcement of such amendment, modification or waiver is sought.  Any waiver of any term or condition of this Agreement, or other breach of any covenant, representation or warranty contained herein, in any one instance, shall not operate as or be deemed to be construed as a further or continuing waiver of any

13

**PTF0093**

other breach of such term, condition, covenant, representation or warranty or any other term, condition, covenant, representation or warranty, nor shall any failure at any time or times to enforce or require performance of any provision hereof operate as a waiver of or affect in any manner such parties' right at a later time to enforce or require performance of such provision or any other provision hereof.

9.3    Fees and Expenses.    Each of the parties hereto will pay its own attorney's costs and expenses in connection with the negotiation, execution and performance of this Agreement.

9.4    Severability.    If any provision of this Agreement shall be held or deemed to be, or shall in fact be, invalid, inoperative or unenforceable because of the conflict of any provision with any constitution, statute or rule of public policy or for any other reason, such circumstance shall not have the effect of rendering the provision or provisions in question, invalid, inoperative or unenforceable in any other case or circumstance or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to the extent that such other provisions are not themselves actually in conflict with such constitution, statute or rule of public policy, but this Agreement shall be reformed and construed in any such case as if such invalid, inoperative or unenforceable provision had never been contained herein and such provision reformed so that it would be valid, operative and enforceable to the maximum extent permitted in such case.

9.5    Notices.    Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given during regular business hours when: (a) personally delivered; (b) received by facsimile or other electronic means; or (c) delivered by overnight courier, in any event addressed as follows:

Seller:          David W. Elkin, President
                 US MobilComm, Inc.
                 805 Bryn Mawr Avenue
                 Newton Square, PA  19073-4330
                 Facsimile No.: (610) 525-6761

Purchaser:       Securicor Wireless, Inc.
                 1690 North Topping Avenue
                 Kansas City, MO  64120-1224
                 Attention:  Marvin E. Marstall
                 Facsimile No.: (816) 920-1144

with copy to:    Robert B. Kelly, Esq.
                 Squire, Sanders & Dempsey L.L.P.
                 1201 Pennsylvania Avenue, N.W.
                 Washington, DC 20004
                 Facsimile No.: (202) 626-6780

14

PTF0094

or such other address as any party may have designated for itself by written notice to the other in the manner herein prescribed, except that notices of change of address shall be effective only upon receipt.

9.6    <u>Assignment</u>.  This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.  In the event this Agreement (or any part thereof) and the rights, interest or obligations hereunder shall be assigned by either the Seller or the Purchaser, they shall require that written notification thereof be given to the other party and that such assignment shall be in writing, that the assignor not be released from its obligations hereunder, and that the assignee is considered to be bound by all of the terms and conditions of this Agreement.

9.7    <u>Governing Law</u>.  This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law.  Each of the parties hereby submits to the exclusive jurisdiction of the federal and state courts in the State of Delaware, with respect to claims brought to enforce this Agreement.

9.8    <u>Counterparts</u>.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.9    <u>Headings</u>.  The headings contained in this Agreement are inserted for convenience only and shall not constitute a part hereof.

9.10    <u>Entire Agreement</u>.  This Agreement, including the Exhibits hereto and other documents referred to herein which form a part hereof, embody the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein.  There are no restrictions, promises, warranties, covenants or undertakings other than those expressly set forth or referred to herein or therein.  This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

PTF0095

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

> **SELLER:**    US MOBILCOMM, INC.
>
> By: _____
> David W. Elkin
> President

> **PURCHASER:**    ROAMER ONE, INC.
>
> By: _____
> Marvin E. Marstall
> Vice President Treasurer

16

**PTF0096**

## EXHIBIT A

### FCC LICENSES
(Copies attached.)

#### Allocation of Purchase Price

| Call Sign | Market | License Price | Equipment/etc. Price |
|-----------|--------|---------------|----------------------|
| WPCV997 | Boston, MA | $ 59,000.00 | $ 1,000.00 |
| WPBQ436 | Boston, MA | $ 59,000.00 | $ 1,000.00 |
| WPCM901 | Boston, MA | $ 59,000.00 | $ 1,000.00 |
| WPCP576 | Boston, MA | $ 59,000.00 | $ 1,000.00 |
| WPCP580 | Boston, MA | $ 59,000.00 | $ 1,000.00 |
| WPDZ855(*) | Chicago, IL | $ 48,000.00 | $ 1,000.00 |
| | | $343,000.00 | $ 6,000.00 |

**TOTAL**     **$ 349,000.00**

(*) Pursuant to Section 1.3(b) of the Agreement, the total purchase price of system (including license, equipment, etc.) in Chicago, IL may be reduced to $24,000.00.

17

**PTF0097**

**EXHIBIT B**

List of Equipment

TO BE COMPLETED

18

**PTF0098**

**EXHIBIT C**

Escrow Agreement
(Copy attached.)

19

**PTF0099**

# EXHIBIT Q

### PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT (this "Agreement") is made and entered into as of this _23_ day of March, 2001 (the "Effective Date"), by and between US MobilComm, Inc., a Delaware corporation, with offices at 805 Bryn Mawr Avenue, Newtown Square, PA 19073-4330 ("Seller"), and Roamer One, Inc., a Delaware corporation, with offices at 1690 Topping Avenue, Kansas City, MO 64120-1224 ("Purchaser").

### RECITALS

**WHEREAS**, the Seller desires to sell to the Purchaser, or its assigns, and the Purchaser desires to purchase from the Seller, the assets of Seller's 220 MHz Phase I Federal Communications Commission ("FCC") system in Boston, Massachusetts identified by call sign WPCC462.

**NOW THEREFORE**, in consideration of the premises and the mutual representations, warranties and covenants contained herein, the receipt and adequacy of which are hereby acknowledged, the Seller and the Purchaser hereby agree as follows:

### ARTICLE I

### PURCHASE AND SALE OF ASSETS
### AND ASSUMPTION OF LIABILITIES

1.1     Purchase and Sale of Assets.  Subject to the terms and conditions of this Agreement, on the Closing Date (as such term is defined in Section 7.1 hereof), the Seller shall sell, transfer, convey, assign and deliver ("Transfer") to the Purchaser (or his designee) free and clear of any and all liens or encumbrances of any nature whatsoever, and the Purchaser shall purchase, acquire and accept from the Seller, all of the Seller's rights, title and interest in, to and under the following assets, properties and rights (the "Transferred Assets"):

(a)     the license to operate the Phase I 220 MHz system in Boston, Massachusetts identified by call sign WPCC462, a copy of which is attached as Exhibit A to this Agreement, and the associated frequencies identified with such system (hereinafter "License" or "System");

(b)     all FCC records and other information relating to the System, except to the extent that the Seller is required by law to retain the same, in which event the Seller shall deliver copies thereof to the Purchaser at the Closing (as such term is defined in Section 7.1 hereof);

(c)     any and all equipment used by the Seller in the operation of the System, as set forth in Exhibit B attached hereto, and all warranties and service contracts in effect for such equipment to the extent permitted under the applicable agreements (collectively, "Equipment");

**PTF0100**

(d)    any and all customer agreements to which the Seller is a party in relation to the operation of the System ("Customer Agreements").

1.2    Assumption of Liabilities. Subject to the terms and conditions of this Agreement, the Purchaser shall not assume, and shall have no liability for, any debts, liabilities or obligations of the Seller relating to the System, including, but not limited to, any liability or debt arising out of any site lease, rental agreement, license, easement or right for use in operation of the System prior to the Closing. All real estate, property or other taxes due with respect to the System shall be pro-rated at Closing between Purchaser and Seller, with Seller responsible for payment of that portion of the year up to and including the Closing Date and Purchaser responsible for that portion of the year after the Closing Date. The parties may use the tax assessment for the previous year as an approximation of the tax liability if the Seller has not received the tax assessment for the current year by Closing.

1.3    Purchase Price for Transferred Assets. The total purchase price of Sixty Thousand Dollars ($60,000.00) for the Transferred Assets (the "Purchase Price") shall be allocated as follows: $59,000.00 for the License and $1,000.00 for the Equipment and Customer Agreements.

1.4    Payment of Purchase Price. The Purchase Price shall be paid as follows:

(a)    "Deposit". Within five (5) business days following the filing of the license assignment application, as set forth in Section 4.1 herein, Purchaser shall deposit Twenty-Nine Thousand Four Hundred Dollars ($29,400.00) ("Deposit") with a mutually acceptable escrow agent, pursuant to an Escrow Agreement in the form set forth as Exhibit C of this Agreement (the "Escrow Agreement"). The Deposit shall be held in escrow for a minimum of one year following the Effective Date and shall be distributed according to Section 1.6 herein.

(b)    Balance of Purchase Price. At Closing, the balance of the Purchase Price for the License, Thirty Thousand Six Hundred Dollars ($30,600.00), shall be paid by the Purchaser to the Seller, in immediately available funds by wire transfer or by certified or cashier's funds, as instructed by Seller.

1.5    Instruments of Conveyance and Transfer. The Seller will deliver to the Purchaser such deeds, bills of sale, endorsements, assignments, and other good and sufficient instruments of conveyance and transfer, in form and substance reasonably satisfactory to the Purchaser, as shall be effective to vest in the Purchaser all of the Seller's respective right, title and interest in, to and under the Transferred Assets to which such Closing relates.

1.6    Action Taken or Threatened Against System.

(a)    If, at any time until one year following the Effective Date, there is an investigation, litigation, claim, lien, judgment, assessment or other encumbrance (collectively referred to as "Action") pending or threatened against the System or License, by either the FCC or a third-party, the Seller shall have ninety (90) days following notice of the Action to acquire a final and non-appealable settlement that validates the Seller's rights, title and interest in the Transferred Assets. If the Purchaser, in its sole discretion, determines in good faith that the Seller has not settled

**PTF0101**

the Action within ninety (90) days such that it validates the Seller's rights, title and interest in the Transferred Assets, the Purchaser may notify Seller in writing that it has elected to terminate the Agreement. Upon receipt of such notice, Seller shall have additional ninety (90) days to acquire a partitioned and/or disaggregated license from the Phase II 220 MHz license that subsumes the frequencies and service contour covered by the License ("Phase II License") or otherwise acquire use of such frequencies for the benefit of the Purchaser under the same terms and conditions granted to Purchaser for the License. In the event that Seller has not, within the 90-day period following receipt of Purchaser's notice of termination of this Agreement, either acquired a partition of the Phase II License or otherwise acquired for the benefit of the Purchaser use of the such frequencies under the same terms and conditions granted to Purchaser for the License, any and all monies paid to the Seller or that remain in escrow shall be returned to the Purchaser. In the event of termination, the Parties shall have no further obligations under this Agreement and the Purchaser shall have the right to seek damages in accordance with Section 7.4.

(b)     If, after one year following the Effective Date of this Agreement, there has been no Action taken against the System or the License, either by the FCC or a third-party, the Seller shall certify that fact to the Seller, and, thereafter, the Deposit shall be released from Escrow to the Seller, pursuant to the terms of the Escrow Agreement.

(c)     If either party receives notice of an Action, that party serve a copy of notice on the other party within five (5) business days of receiving notice.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES
## OF THE SELLER

Seller represents and warrants to the Purchaser the following:

2.1     <u>Organization, Good Standing and Authority</u>. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller has full power and authority to execute, deliver and perform this Agreement and to Transfer the Transferred Assets and to carry out the transactions contemplated hereby. This Agreement is a valid and binding obligation of the Seller, enforceable in accordance with its terms. Seller is qualified to do business, is in good standing and has all required and appropriate licenses in each jurisdiction in which its failure to obtain or maintain such qualification, good standing or licensing would have a material and adverse effect on the condition (financial or otherwise), assets, properties, business or prospects of the Seller.

2.2     <u>Corporate Powers; Consents; Absence of Conflicts With Other Agreements</u>. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein by the Seller:

**PTF0102**

(a)    are within the Seller's corporate powers and are not in contravention of the terms of its Articles of Incorporation and Bylaws, or any amendments thereto, and have been approved by all requisite corporate action;

(b)    except as otherwise expressly herein provided, do not require any approval or consent of, or filing with, any governmental agency or authority bearing on the validity of this Agreement;

(c)    do not conflict with, result in any breach or contravention of, or permit the acceleration of the maturity of any liabilities of the Seller, in any material respect, and do not create or permit the creation of any Encumbrance on or affecting any of the Transferred Assets;

(d)    do not violate, in any material respect, any statute, law, rule or regulation of any governmental authority to which the Seller or the Transferred Assets may be subject;

(e)    do not violate any judgment to which the Seller may be subject; and

(f)    do not conflict with or result in a breach or violation of any material agreements to which the Seller is a party or to which it is bound.

2.3    <u>Binding Effect</u>. This Agreement and all agreements hereunder to which the Seller is a party are valid and legally binding obligations of the Seller, enforceable against the Seller in accordance with the respective terms hereof or thereof, except as enforceability may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

2.4    <u>Title to Transferred Assets; Liens</u>. The Seller has good and valid title to all of the properties and assets constituting all or part of the Transferred Assets free and clear of all Liens. As used in this Agreement, "Lien" means any mortgage, pledge, security interest, conditional sale or other title retention agreement, encumbrance, lien, claim, right, covenant, restriction, warrant, option, rights of first refusal, tax, or charge of any kind or type whatsoever.

2.5    <u>Equipment</u>.

(a)    <u>Equipment Condition</u>. The equipment of the System listed in Exhibit B to this Agreement is in good working order except for normal wear and tear.

(b)    <u>Equipment Title</u>. Seller holds clear title to such equipment and will deliver the equipment free of any Liens or Encumbrances. As used in this Agreement, "Encumbrances" means liabilities, levies, claims, charges, assessments, mortgages, security interests, liens, pledges, conditional sales agreements, title retention contracts, leases, subleases, rights of first refusal, options to purchase, restrictions and other encumbrances and agreements to give any of the foregoing.

2.6    <u>Contracts and Liabilities</u>. Seller maintains that, to the best of its knowledge, it is

in material compliance with all contracts entered into by Seller with respect to the System and agrees that the Purchaser shall not assume any liabilities related to such contracts.

2.7    <u>Legal Proceedings</u>.  No legal actions are pending, or to the best knowledge of the Seller, threatened against the Seller which question or challenge the validity of this Agreement or any action taken or proposed to be taken by the Seller pursuant hereto or in connection with the transactions contemplated hereby.  The Seller is not subject to any judgment, order or decree affecting the Transferred Assets.

2.8    <u>Compliance with Law</u>.  The Seller maintains that, to the best of its knowledge, (i) it is in compliance, in all material respects, with the Communications Act of 1934, as amended, and the rules, regulations and policies of the FCC promulgated thereunder (collectively the "FCC Act"), applicable to the Seller and the System; (ii) it is in compliance, in all material respects, with all other federal, state and local laws, rules, regulations, ordinances and policies applicable to the Seller; and (iii) it is not in default under any order, writ, injunction or decree of any court or governmental authority applicable to the Seller or having jurisdiction over the Seller.

2.9    <u>FCC Matters</u>.  The License is validly issued by the FCC and is in good standing. Seller holds good and valid title to the License free and clear of any Encumbrances.  There are no pending or, to the best of Seller's knowledge, threatened FCC enforcement proceedings or investigations with respect to Seller or the License.  The License has been constructed and placed into operation in accordance with FCC rules and regulations, and such operation has not been discontinued for one year or more.

2.10    <u>Brokers</u>.  The Seller has not employed any finder or broker in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated by this Agreement.  No person (whose compensation is the responsibility of the Seller) is entitled to any broker's or finder's fee based on contacts or communications with the Seller, or the Seller's directors, officers, employees or agents in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated by this Agreement.

2.11    <u>Taxes</u>.  To the extent the failure to do so could after Closing adversely affect the License, all tax returns required to be filed by Seller with respect to the License have been filed in timely fashion with the appropriate Governmental entity, and all taxes have been paid when due. As set forth in Section 1.2, Seller shall pay all real estate, property or other taxes due with respect to the System for the year up to and including the Closing Date.

2.12    <u>No Undisclosed Liabilities</u>.  Seller has no liabilities or obligations of any nature for which Purchaser will become liable by reason of this Agreement or the transactions contemplated hereunder, except for those specific liabilities expressly assumed by Purchaser under the terms of this Agreement.

2.13    <u>No Material Adverse Change</u>.  Other than matters affecting the 220 MHz industry generally, since the Effective Date there has not been any material adverse change in the License,

**PTF0104**

or condition of its business, and, to Seller's knowledge, no event has occurred or circumstance exists that may result in such a material adverse change.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Seller as follows:

3.1    <u>Organization, Good Standing and Authority</u>.  Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  The Purchaser has requisite power and authority to execute, deliver and perform this Agreement and to carry out the transactions contemplated hereby.

3.2    <u>Corporate Powers; Consents; Absence of Conflicts With Other Agreements</u>.  The execution, delivery and performance of this Agreement by the Purchaser and all other agreements referenced herein and the consummation of the transactions contemplated herein by the Purchaser:

(a)    are within the Purchaser's corporate powers and are not in contravention of the terms of its Articles of Incorporation and Bylaws, or any amendments thereto, and have been approved by all requisite corporate action;

(b)    except as otherwise expressly herein provided, do not require any approval or consent of, or filing with, any governmental agency or authority bearing on the validity of this Agreement;

(c)    do not conflict with or result in any breach or contravention of, or the creation of any Encumbrance under, any indenture, agreement, lease, instrument or understanding to which the Purchaser is a party or by which the Purchaser is bound;

(d)    do not violate any statute, law, rule or regulation of any governmental authority to which the Purchaser may be subject;

(e)    do not violate any judgment to which the Purchaser may be subject; and

(f)    do not conflict with or result in a breach or violation of any material agreement or commitment to which the Purchaser is a party.

3.3    <u>Consents and Approvals of Governmental Authorities</u>. Except for the consent of the FCC to the Transfer of the License from the Seller to the Purchaser, no consent, approval or authorization of, or declaration, filing or registration with, any governmental or regulatory authority is required to be made or obtained by the Purchaser in connection with the execution, delivery and performance of its obligations under this Agreement.

3.4    <u>Legal Proceedings</u>. There are no legal actions pending or, to the best knowledge of the Purchaser, threatened against the Purchaser, or any of its properties or rights, before any court, arbitrator or administrative or governmental body, questioning or challenging the validity of this Agreement, any action taken or to be taken by the Purchaser pursuant hereto or in connection with the transactions contemplated hereby.

3.5    <u>Compliance with Law</u>. The Purchaser (i) is eligible to be a licensee of the FCC and will remain so immediately following the purchase of the System hereunder; and (ii) is not in default under any order, writ, injunction or decree of any court or governmental authority applicable to the Purchaser or having jurisdiction over the Purchaser.

3.6    <u>Brokers</u>. The Purchaser has not employed any finder or broker in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated by this Agreement. No person (whose compensation is the responsibility of the Purchaser) is entitled to any broker's or finder's fee based on contacts or communications with the Purchaser or its officers, directors, employees or agents in connection with the purchase and sale of the Transferred Assets or the other transactions contemplated hereby.

## ARTICLE IV

## OBLIGATIONS OF THE PARTIES

4.1    <u>Assignment of License</u>.

(a)    Within five (5) business days of the Effective Date, Purchaser and the Seller shall file the necessary application(s) to obtain the FCC's written consent to the Transfer of the License to the Purchaser or its assigns ("Application"). The Purchaser and Seller shall provide promptly to the FCC any additional information requested by the FCC in connection with the Application and the Purchaser and Seller shall use their commercially reasonable efforts to cause the Application to be approved.

(b)    The Purchaser shall pay the expenses in connection with the preparation and filing of the assignment of the License.

4.2    <u>Conduct Prior to Closing Date</u>. Except as otherwise contemplated by this Agreement or permitted by the prior written consent of the Purchaser, from the date hereof until the Closing, the Seller shall conduct the business and operations of the System in the ordinary course and maintain the License in good standing.

4.3    <u>Prohibited Transactions Prior to Closing Date</u>. Except as otherwise contemplated by this Agreement or permitted by the prior written consent of the Purchaser, the Seller shall not sell or lease or enter into any agreement with any other Person for the sale or lease of the Transferred Assets.

PTF0106

4.4    Further Assurance.    Each party hereto shall execute and deliver, at or prior to the Closing, all such instruments and take all such other actions as the other party may reasonably request in order to carry out the intent of this Agreement. Each party hereto shall use its commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated. Each party hereto shall give prompt notice to the other, after its receipt thereof, of (i) any notice or other communication received from any third party and/or from any governmental agency relating to any default or event which, with notice or lapse of time or both, would become a default under any indenture, instrument or agreement material to either party to which either party is a party or by which it or its property is bound, and (ii) any notice or other communication from any third party alleging that the consent of such third party is or may be required in connection with the transactions contemplated by this Agreement.

## ARTICLE V

## CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS

Each and every obligation of the Purchaser under this Agreement to be performed at or before the Closing shall be subject to the satisfaction, at or before such Closing (unless specifically waived in writing by the Purchaser), of each of the following conditions:

5.1    Representations and Warranties.    The representations and warranties of the Seller contained herein and in all certificates and other documents and agreements delivered by the Seller to the Purchaser pursuant hereto or in connection with the transactions contemplated hereby shall be true and accurate in all material respects as of the date hereof and as of the Closing Date.

5.2    Performance.    The Seller shall have performed and complied with all material agreements, obligations and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

5.3    Consents.    All filings with and consents from all Federal, state and local governmental agencies required to consummate the transactions contemplated hereby shall have been obtained, including without limitation, the consent of the FCC pursuant to issuance of a Final Order to the Transfer of the License without any material changes to the terms thereof except as contemplated by this Agreement.

5.4    Closing Documents.    Seller shall have executed and delivered to the Purchaser all agreements, instruments, certificates or other documents reasonably required to be executed by Seller pursuant to this Agreement at the Closing Date.

8

**PTF0107**

# ARTICLE VI

## CONDITIONS PRECEDENT TO THE SELLER'S OBLIGATIONS

Each and every obligation of the Seller under this Agreement to be performed on or before the Closing Date shall be subject to the satisfaction on or before the Closing Date (unless specifically waived in writing by Seller) of each of the following conditions:

6.1     Representations and Warranties. The representations and warranties of the Purchaser contained herein and in all certificates, agreements and other documents delivered by the Purchaser to the Seller pursuant hereto or in connection with the transactions contemplated hereby shall be true and accurate in all material respects as of the date hereof and as of the Closing Date.

6.2     Performance. The Purchaser shall have performed and complied with all material agreements, obligations and conditions required by this Agreement to be performed or complied with by it on or prior to the Closing Date.

6.3     Consents. All filings with and consents from all Federal, state and local governmental agencies required to consummate the transactions contemplated hereby shall have been obtained, including without limitation, the consent of the FCC pursuant to issuance of a Final Order, as defined in Section 7.1, to the Transfer of License without any material changes to the terms thereof except as contemplated by this Agreement.

6.4     Purchase Price. The Purchaser shall have deposited the Deposit with the Escrow Agent pursuant to Section 1.4 hereof and the Escrow Agreement, and at Closing the Purchaser shall have paid the remaining balance of the Purchase Price due Seller in immediately available funds as required by Section 1.4 hereof.

6.5     Closing Documents. Purchaser shall have executed and delivered to the Seller all agreements, instruments, certificates or other documents reasonably required to be executed by Purchaser pursuant to this Agreement at the Closing Date.

# ARTICLE VII

## CLOSING; CLOSING DATE; TERMINATION

7.1     Closing.

(a)     "Closing"; "Closing Date". Subject to Section 7.1(c) herein, the Closing on the purchase and sale of the Transferred Assets (the "Closing") will be held on a date (the "Closing Date") which is within ten (10) business days after the FCC's consent to the Transfer to the Purchaser of the License shall have become a Final Order, as defined below, at the office of the Seller, or at such other time and place as the Purchaser and the Seller may agree upon. It being understood that

PTF0108

by Closing, all of the Conditions Precedent to the Purchaser's Obligations under Article V and Conditions Precedent to the Seller's Obligations under Article VI shall have been fully satisfied or otherwise waived in writing by the respective party entitled to such performance as a condition of Closing.

(b)    "Final Order". For purposes of this Agreement, a "Final Order" shall mean that date after the issuance of the grant of assignment of the License by the FCC, all time periods for third party petitions and/or challenges will have lapsed, and all periods for FCC reconsideration on its own motion will have passed without the filing of any petition, objection and/or appeal or proceeding by any party or by the agency to the grant of the assignment of the License to the Purchaser.

7.2    Actions of the Seller at Closing. At the Closing and unless otherwise waived in writing by the Purchaser, Seller shall deliver to the Purchaser:

(a)    certificates of the duly authorized representative of the Seller certifying that (1) Seller has authorized and approved the consummation of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein; (2) each representation and warranty of the Seller set forth herein and not qualified as to materiality is true and correct in all material respects as of the Closing Date; and (3) each representation and warranty of the Seller qualified as to materiality is true and correct as of the Closing Date and that each covenant and agreement of the Seller to be complied with or performed on or prior to the Closing Date pursuant to this Agreement has been complied with or performed in all material respects;

(b)    a General Bill of Sale and Assignment, fully executed by Seller conveying to the Purchaser good and valid title to the Transferred Assets free and clear of all encumbrances; and

(c)    any other documents necessary to consummate the transactions contemplated herein.

7.3    Actions of the Purchaser at Closing. At the Closing and unless otherwise waived in writing by the Seller, the Purchaser shall deliver to the Seller or the Escrow Agent:

(a)    the balance of the Purchase Price, as set forth in Section 1.4;

(b)    certificates of the duly authorized officer of the Purchaser certifying that: (1) the Purchaser has authorized and approved the Purchaser's performance of the transactions contemplated hereby and the execution and delivery of this Agreement and the documents described herein; (2) each representation and warranty of the Purchaser set forth herein and not qualified as to materiality is true and correct in all material respects as of the Closing Date, (3) and each representation and warranty of the Purchaser qualified as to materiality is true and correct as of the Closing Date and that each covenant and agreement of the Purchaser to be complied with or performed on or prior to the Closing Date pursuant to this Agreement has been complied with or performed in all material respects; and

10

PTF0109

(c)     any other documents necessary to consummate the transactions contemplated herein.

7.4     Termination.  This Agreement may be terminated by the parties hereto as set forth in this Section 7.4:

(a)     at any time by mutual agreement of the Purchaser and the Seller;

(b)     if the Closing does not occur on or before twelve (12) months following the Effective Date, either the Purchaser or the Seller may terminate this Agreement by delivering a written notice to the other, provided the failure of such Closing to occur is not due to such party's willful failure to satisfy a condition precedent or failure to perform its obligations hereunder;

(c)     at any time prior to the Closing by either party upon the other party's inability to satisfy a material condition contained herein or failure to perform, in all material respects, its obligations hereunder;

(d)     if the Purchaser fails to deposit the Deposit with the Escrow Agent under the terms of Section 1.4, the Seller may terminate this Agreement at any time thereafter by delivering a written notice to such effect to the Purchaser; or

(e)     upon either party's dissolution, liquidation, bankruptcy or insolvency, including (i) the filing of a voluntary petition seeking liquidation, reorganization, arrangement of readjustment, in any form of its debts under Title II of the Unites States Code or any other federal or state insolvency law, or its filing or an answer consenting to or acquiescing in any such petition, (ii) the making of any assignment for the benefit of its creditors or (iii) the expiration of 60 days after the filing of any involuntary petition under Title II of the United States Code, an application for the appointment of a receiver for its assets, or an involuntary petition seeking liquidation, reorganization, arrangement or readjustment of its debts under any other federal or state insolvency law, provided that the same shall not have been vacated, set aside or stayed within such 60 day period.

Upon termination of this Agreement pursuant to this Section 7.4, this Agreement shall be of no further force and effect and the parties hereto shall be relieved of all of their obligations hereunder, each party shall be liable for its own expenses in connection herewith, and the Deposit shall be returned to the Purchaser, except as set forth herein.  Notwithstanding the foregoing, if this Agreement is terminated by the Purchaser upon the Seller's failure to satisfy a condition precedent hereto or failure to perform its obligations hereunder, the Purchaser shall be entitled to seek specific performance of this Agreement or to recover its damages of an amount up to the Deposit; such payment shall be construed as liquidated damages and a waiver of any rights or remedies that the Purchaser may have at law or in equity with respect to such breach.  If this Agreement is terminated by the Seller upon the Purchaser's failure to satisfy a condition precedent hereto or failure to perform its obligations hereunder, the Seller shall be entitled to a payment, as its sole and exclusive remedy, of an amount up to the Deposit; such payment shall be construed as liquidated damages and a waiver

PTF0110

of any rights or remedies that the Seller may have at law or in equity with respect to such breach. Notwithstanding the foregoing, the parties each disclaim any rights to recover consequential damages, including any costs accrued by Purchaser in acquiring comparable license(s) or system(s) as a result of the termination of this Agreement or any general diminution in the value of Purchaser other than its specific damages arising from Seller's breach.

## ARTICLE VIII

## INDEMNIFICATION

8.1    Indemnification by the Seller.  The Seller shall indemnify and hold harmless the Purchaser, its successors and permitted assigns, from and against any and all claims, liabilities and expenses, including without limitation reasonable legal and accounting expenses (collectively "Losses"), which may arise out of (i) any breach or violation of this Agreement by the Seller; and (ii) any breach of any of the representations, warranties or covenants which survive the Closing made in this Agreement by the Seller.  The warranties, representations and covenants of the Seller contained in this Agreement or any certificate, documents, instrument or agreement delivered pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing and the consummation of the transactions contemplated by this Agreement for a period of one (1) year from the Closing.

8.2    Indemnification by the Purchaser.  The Purchaser shall indemnify and hold harmless the Seller and its successors and permitted assigns from and against any and all Losses which may arise out of (i) any breach or violation of this Agreement by the Purchaser; and (ii) any breach of any of the representations, warranties or covenants which survive the Closing made in this Agreement by the Purchaser.  The warranties and representations of the Purchaser contained in this Agreement which survive the Closing, or any certificate, documents, instrument or agreement delivered pursuant to this Agreement, shall survive the execution and delivery of this Agreement, the Closing and the consummation of the transactions called for by this Agreement for a period of one (1) year from the Closing.

## ARTICLE IV

## MISCELLANEOUS PROVISIONS

9.1    Taxes.  To the extent applicable, the Seller shall be responsible for the payment of Sellers portion, if any, of all transfer or income taxes due or payable in connection with the Transfer of the Transferred Assets to the Purchaser and the other transactions contemplated hereby.

9.2    Amendment and Modification.  This Agreement may not be amended or modified or waived except by a written agreement signed by the party against whom enforcement of such amendment, modification or waiver is sought.  Any waiver of any term or condition of this

PTF0111

Agreement, or other breach of any covenant, representation or warranty contained herein, in any one instance, shall not operate as or be deemed to be construed as a further or continuing waiver of any other breach of such term, condition, covenant, representation or warranty or any other term, condition, covenant, representation or warranty, nor shall any failure at any time or times to enforce or require performance of any provision hereof operate as a waiver of or affect in any manner such parties' right at a later time to enforce or require performance of such provision or any other provision hereof.

9.3   Fees and Expenses.   Each of the parties hereto will pay its own attorney's costs and expenses in connection with the negotiation, execution and performance of this Agreement.

9.4   Severability.   If any provision of this Agreement shall be held or deemed to be, or shall in fact be, invalid, inoperative or unenforceable because of the conflict of any provision with any constitution, statute or rule of public policy or for any other reason, such circumstance shall not have the effect of rendering the provision or provisions in question, invalid, inoperative or unenforceable in any other case or circumstance or of rendering any other provision or provisions herein contained invalid, inoperative or unenforceable to the extent that such other provisions are not themselves actually in conflict with such constitution, statute or rule of public policy, but this Agreement shall be reformed and construed in any such case as if such invalid, inoperative or unenforceable provision had never been contained herein and such provision reformed so that it would be valid, operative and enforceable to the maximum extent permitted in such case.

9.5   Notices.   Any notice, demand or communication required, permitted or desired to be given hereunder shall be deemed effectively given during regular business hours when: (a) personally delivered; (b) received by facsimile or other electronic means; or (c) delivered by overnight courier, in any event addressed as follows:

Seller:          David W. Elkin, President
                 US MobilComm, Inc.
                 805 Bryn Mawr Avenue
                 Newton Square, PA  19073-4330
                 Facsimile No.: (610) 525-6761

Purchaser:       Roamer One, Inc.
                 1690 North Topping Avenue
                 Kansas City, MO  64120-1224
                 Attention:  Marvin E. Marstall
                 Facsimile No.: (816) 920-1144

with copy to:    Robert B. Kelly, Esq.
                 Squire, Sanders & Dempsey L.L.P.
                 1201 Pennsylvania Avenue, N.W.
                 Washington, DC 20004
                 Facsimile No.: (202) 626-6780

13

**PTF0112**

or such other address as any party may have designated for itself by written notice to the other in the manner herein prescribed, except that notices of change of address shall be effective only upon receipt.

9.6     Assignment. This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. In the event this Agreement (or any part thereof) and the rights, interest or obligations hereunder shall be assigned by either the Seller or the Purchaser, they shall require that written notification thereof be given to the other party and that such assignment shall be in writing, that the assignor not be released from its obligations hereunder, and that the assignee is considered to be bound by all of the terms and conditions of this Agreement.

9.7     Governing Law. This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law. Each of the parties hereby submits to the exclusive jurisdiction of the federal and state courts in the State of Delaware, with respect to claims brought to enforce this Agreement.

9.8     Counterparts. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.9     Headings. The headings contained in this Agreement are inserted for convenience only and shall not constitute a part hereof.

9.10    Entire Agreement. This Agreement, including the Exhibits hereto and other documents referred to herein which form a part hereof, embody the entire agreement and understanding of the parties hereto in respect of the subject matter contained herein. There are no restrictions, promises, warranties, covenants or undertakings other than those expressly set forth or referred to herein or therein. This Agreement supersedes all prior agreements and understandings between the parties with respect to such subject matter.

14

PTF0113

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year first above written.

SELLER:          US MOBILCOMM, INC.

By: _____
David W. Elkin
President

PURCHASER:       ROAMER ONE, INC.

By: _____
Marvin E. Marstall
Vice President Treasurer

15

**PTF0114**

**EXHIBIT A**

FCC LICENSE

(Copy attached.)

16

**PTF0115**

## EXHIBIT B

<u>List of Equipment</u>

TO BE COMPLETED

17

**PTF0116**

**EXHIBIT C**

<u>Escrow Agreement</u>
(Copy attached.)

18

**PTF0117**

# EXHIBIT R

11-Nov-2002

## US MobilComm, Inc
### Analysis of License sales and disbursements

Proceeds

| | | |
|---|---:|---:|
| March 2000 Florida licenses- gross proceeds | 130,708 | |
| August 2001 Boston licenses- gross proceeds | 495,132 | |
| May 2002 Boston licenses- additional proceeds | 39,400 | |
| | | 665,240 |

Use of Funds

| | | |
|---|---:|---:|
| Equipment Loan Repayment/Settlement | 31,996 | |
| Legal services- current and prior years | 31,124 | |
| Repayment of Shareholder Loans | 601,500 | |
| | | 664,620 |



MC001115

**Analysis of capital contribtuions and loans since inception**

|  | Jeff | David |
|---|---|---|
| Total cash Contributions | 200,000 | 877,150 |
| Less cash withdrawals | (60,600) | (601,500) |
| Out of pocket expenses 1993-2001 |  | 150,476 |
| Total | 139,400 | 426,126 |



MC001165