IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JEFFREY M. NORMAN,                        :
                                          :
            Plaintiff,                     :
                                          :
      v.                                   :        C.A. No. 06-005-JJF
                                          :
DAVID W. ELKIN, RICHARD M. SHORIN         :
and THE ELKIN GROUP, INC.                 :        Jury Trial Demanded
                                          :
            Defendants,                    :
                                          :
      and                                  :
                                          :
US MOBILCOMM, INC.,                       :
                                          :
            Nominal Defendant.            :

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Dated: March 23, 2007                      Sean J. Bellew (#4072)
                                           David A. Felice (#4090)
                                           Cozen O'Connor
                                           1201 North Market Street, Suite 1400
                                           Wilmington, DE  19801
                                           Telephone:  (302) 295-2000
                                           Facsimile:  (302) 295-2013

## TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... iii

NATURE AND STAGE OF PROCEEDINGS ........................................................................ 1

STATEMENT OF FACTS ........................................................................................................ 3

    A.  The Parties ........................................................................................................... 3

    B.  Agreement to Acquire an Interest in USM .................................................... 3

    C.  Norman Aggregates Phase I Licenses............................................................. 4

    D.  Failed Sales and Strategic Alliances ............................................................... 5

    E.  Elkin's Self-Dealing During the FCC Phase II License Auction ....................... 6

        1.  USM, Not TEG, Was the Qualified Bidder for Phase II Auction No. 18.................... 7

        2.  Elkin Unilaterally Attempts to Change USM's Registration to TEG........................... 8

        3.  The FCC Publicly Announces the Winning Bidders for Auction No. 18 – No TEG ... 9

    F.  Elkin's Piecemeal Sale of USM Assets ........................................................ 10

    G.  TEG's Transfer of USM's Phase II Licenses ............................................... 11

    H.  Elkin's Attempt at a Cover-Up ....................................................................... 12

    I.  Norman's Inquiries Leading up to and Following Elkin's Fraudulent December 2002 Letter ............................................................................................................. 14

        1.  Information Known or Available to Norman before December 3, 2002.................... 14

        2.  Documents Discovered on December 3, 2002, and Afterwards Through Norman's Diligent Inquiry................................................................................. 16

ARGUMENT ......................................................................................................................... 19

I.  DELAWARE'S BORROWING STATUTE IS NOT APPLICABLE ................................... 19

II.  DEFENDANTS CANNOT ASSERT A STATUTE OF LIMITATIONS DEFENSE........... 21

A. Fiduciaries Engaged in and Benefiting from Self-Dealing Cannot Assert the Statute of Limitations Defense ..................................................................................................... 21

B. Even Absent Concealment, the Statute of Limitation Defense is not Available to a Fiduciary who Benefited from the Self-Dealing................................................................ 22

C. Norman's § 220 Action Tolled the Statute of Limitations ................................................ 23

III. IF APPLICABLE, THE STATUTE OF LIMITATIONS DOES NOT PRECLUDE THE CONTINUED PROSECUTION OF ANY CLAIM ..................................................................... 24

A. Certain Claims Did Not Arise Until After December 3, 2002.......................................... 24

B. The Statute of Limitations is Tolled for all Other Claims ................................................ 25

1. Federal Precedent Holds that the Statute of Limitations is Tolled Until Actual Knowledge of the Alleged Wrongdoing ..................................................................... 26

2. The Limitations Period is Equitably Tolled Given Defendants' Status as Fiduciaries for both USM and Norman ........................................................................................ 27

3. Elkin Actively Concealed his Conduct Until the Court of Chancery Required Full and Complete Disclosure ................................................................................................... 28

IV. THE STATUTE OF FRAUDS DEFENSE IS NOT APPLICABLE ..................................... 31

CONCLUSION..................................................................................................................... 32

WILMINGTON\50641\1  156666.000

# TABLE OF AUTHORITIES

**Cases**

*Becker v. Hamada, Inc.*,
455 A.2d 353 (Del. 1982) ............................................................................. 25

*Briggs v. Sackett*,
418 A.2d 586 (Pa. Super. 1980) .................................................................... 31

*Brown v. Dolese*,
154 A.2d 233 (Del. Ch. 1959) ....................................................................... 22

*Cahal v. Burbage*,
119 A. 574 (Del. Ch. 1922) ........................................................................... 23

*Coleman v. Taub*,
638 F.2d 628 (3d Cir. 1981) .......................................................................... 20

*Conley v. First Jersey Securities, Inc.*,
543 F. Supp. 368 (D. Del. 1982) ................................................................... 28

*Halpern v. D.H. Barran*,
313 A.2d 139 (Del. Ch. 1973) ................................................................. 21, 23

*Hill v. Der*,
521 F. Supp. 1370 (D. Del. 1981) ................................................................. 26

*Hill v. Equitable Bank, Nat. Ass'n*,
599 F. Supp. 1062 (D. Del. 1984) ................................................................. 27

*Holmberg v. Armbrecht*,
327 U.S. 392 (1946) ...................................................................................... 26

*Horowitz v. Fed. Kemper Life Assurance Co.*,
57 F.3d 300 (3d Cir. 1995) ............................................................................ 19

*IMX, Inc. v. LendingTree, LLC*,
405 F. Supp. 2d 479 (D. Del. 2005) .............................................................. 19

*In re Dean Witter P'ship Litig.*,
1998 WL 442456 (Del. Ch. Jul. 17, 1998) .................................................... 30

*In re Maxxam, Inc./Federated Development S'holders Litig.*,
1995 WL 376942 (Del. Ch. Jun. 21, 1995) ............................................. 21, 25

*In re ML/EQ Real Estate P'ship Litig.*,
    1999 WL 1271885 (Del. Ch. 1999) ................................................................ 30

*Kahn v. Seaboard Corp.*,
    625 A.2d 269 (Del. Ch. 1993)................................................................ 22, 23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................ 19

*Orloff v. Shulman*,
    2005 WL 3272355 (Del. Ch. Nov. 23, 2005) ................................................ 21

*Pennsylvania Coal Ass'n v. Babbitt*,
    63 F.3d 231 (3d Cir. 1995)........................................................................ 19

*Quillen v. Sayers*,
    482 A.2d 744 (Del. 1984) .......................................................................... 31

*Ramunno v. Capano*,
    2006 WL 510064 (Del. Ch. Nov. 23, 2006) ................................................ 21

*Richards v. McClafferty*,
    538 A.2d 11 (Pa. Super. 1988)................................................................... 31

*Smith v. McGee*,
    2006 WL 3000363 (Del. Ch. Oct. 16, 2006) ............................................... 27

*Technicorp Intern. II, Inc. v. Johnston*,
    2000 WL 713750 (Del. Ch. May 31, 2000)................................................. 23

*VantagePoint Venture Partners 1996 v. Examen, Inc.*,
    871 A.2d 1108 (Del. 2005) ........................................................................ 20

*Wolf v. Crosby*,
    377 A.2d 22 (Del. Chancery 1977) ............................................................ 32

WT Docket No. 96-188, Memorandum Opinion and Order on Reconsideration,
    14 FCC Rcd. 11145 (1999)........................................................................ 15

*Yaw v. Talley*,
    1994 WL 89019 (Del. Ch. Mar. 2, 1994)..................................................... 21

**Statutes**

10 *Del. C.* § 8121 ........................................................................................... 19

iv

13 Pa. C.S.A § 8113 .................................................................................................. 31

13 Pa. C.S.A. § 8319 ................................................................................................. 31

6 *Del. C.* § 8-113 ..................................................................................................... 31

8 *Del. C.* § 220 ........................................................................................................ 12

**Regulations**

47 C.F.R. § 90.733 (1997) ........................................................................................... 7

47 C.F.R. § 90.763 (1997) ....................................................................................... 7, 8

Facilitate the Development and Use of the Universal Licensing System in the Wireless
    Telecommunications Services, 63 Fed. Reg. 68904-01 (Dec. 14, 1998).................................. 14

v

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff Jeffrey M. Norman ("Norman" or "Plaintiff") initiated this action against Defendants David W. Elkin ("Elkin"), Richard M. Shorin ("Shorin"), The Elkin Group, Inc. ("TEG") (collectively "Defendants") and Nominal Defendant US Mobilcomm, Inc. ("USM" or the "Company") in the Delaware Court of Chancery on December 2, 2005.[1]  On January 3, 2006, Defendants filed their Notice of Removal in this Court alleging diversity of citizenship jurisdiction.  (D.I. 1).  On January 6, 2006, Norman filed his Amended Complaint, seeking a jury trial and punitive damages.  (D.I. 2).  Norman's initial and amended complaint contain nine (9) separate causes of action asserted against Defendants in both their individual and/or corporate capacities (where applicable), including: (i) breach of contract; (ii) declaratory relief; (iii) usurpation of corporate opportunities; (iv) breaches of Elkin's fiduciary duties of loyalty, care and good faith dealing to the Company and its minority stockholder; (v) breach of Elkin's fiduciary duty of disclosure; (vi) conversion and misappropriation of Company assets and goodwill; (vii) fraudulent representations; (viii) aiding and abetting breaches of fiduciary duties; and (ix) unjust enrichment.  (D.I. 2) (hereinafter "Cmpt.").  On February 1, 2006, Defendants filed their Answer, Affirmative Defenses and Counterclaim.  (D.I. 5) (hereinafter "Ans.").  Defendants' counterclaim seeks declaratory relief substantially similar to the relief Norman seeks by way of his declaratory judgment claim.

On March 1, 2006, the Court entered a Rule 16 Scheduling Order, setting several pre-trial dates, including a fact discovery deadline of September 22, 2006.  (D.I. 10).  A pre-trial

---

[1] Defendants' statement that this action was filed on December 3, 2005 is incorrect.  The Complaint was, in fact, filed on December 2, 2005 and was filed in spite of Defendants' invitation to continue a month-long settlement dialogue.  (D.I. 1 at Ex. B) (containing a December 2, 2005 settlement letter from Steven Caponi, Esq. to Sean Bellew, Esq. expressing Defendants' "desire to engage in meaningful settlement discussions" rather than face the filing of the Complaint).  Based on this conduct alone, Defendants should be estopped from asserting a laches-based, statute of limitations defense to the equitable claims.  *See infra*, II.

conference was initially set for March 8, 2007. (D.I. 12). On October 6, 2006 (approximately two weeks after the close of fact discovery), Defendants presented a motion for an extension of time to complete fact discovery. (D.I. 19). On November 3, 2006, the Court granted Defendants' motion for an extension of the discovery deadline. (D.I. 24). Thereafter, an Amended Rule 16 Scheduling Order was entered setting the fact discovery deadline of February 9, 2007 and a dispositive motion deadline of February 16, 2007. (D.I. 26). The pre-trial conference initially scheduled for March 8, 2007 was cancelled and re-scheduled for May 10, 2007. (D.I. 27).

On February 16, 2007, Defendants filed their motion for summary judgment and opening brief. (D.I. 42, 43). This is Norman answering brief in opposition to Defendants' motion for summary judgment.

## STATEMENT OF FACTS

### A.    The Parties

Norman is an individual and 25% stockholder of USM.  (Cmpt. ¶¶ 2, 9).  Elkin is an individual, 75% stockholder, President and sole director of USM.  (Cmpt. ¶¶ 3, 9).  Elkin resides at 805 Bryn Mawr Avenue, Newtown Square, Pennsylvania.  (Cmpt. ¶¶ 3, 6).  Shorin is an individual and was an officer of the Company serving as its controller and Assistant Secretary.  (Cmpt. ¶ 4; Ans. ¶ 4).  TEG is a corporation organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 805 Bryn Mawr Avenue, Newtown Square, Pennsylvania.  (Cmpt. ¶ 5; Ans. ¶ 5).  TEG is wholly-owned and controlled by Elkin and engages in a number of endeavors, including the acquisition and sale of Federal Communications Commission ("FCC") licenses.  (Cmpt. ¶ 5; Op. Brf. at 26).

Nominal Defendant USM is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 805 Bryn Mawr Avenue, Newtown Square, Pennsylvania (the same as Elkin's residence and the principal offices of the Elkin Group).  USM is or was the owner of, *inter alia*, (i) a number of FCC 220 MHz licenses and systems, and (ii) various equipment and signal towers used to effectuate and commercialize these FCC licenses.  (Cmpt. ¶ 6; Ans. ¶ 6).

### B.    Agreement to Acquire an Interest in USM

Norman and Elkin agreed that the Company would be funded with $1 million in capital, with $250,000 contributed by Norman for his 25% ownership interest in the Company and $750,000 by Elkin for his 75% ownership interest in the Company.  (Exhibit A (Defendants' Interrogatory Responses) at No. 1); (Exhibit B (Defendants' Responses to Requests for Admission) at No. 11) (admitting that "Elkin agreed to pay consideration of $750,000 for his 75% ownership interest in USM, subject to Norman's agreement to pay $250,000 for his 25% interest").  In May 1994, Norman contributed his portion of the capital.  (Cmpt. ¶ 7).  In

December 1994, Norman received 125 shares of stock in USM (a 25% interest) for the cash payment of $.01 per share, the receipt of which was acknowledged by the Company. (Cmpt. ¶ 9); (Exhibit C (USM's Action by Written Consent and Stock Certificates)). Norman continues to own these 125 shares. At the same time, Elkin received an additional 275 shares to bring his total interest in the Company to 75%. (*Id.*).

As of December 1994, Elkin failed to contribute the $750,000 he agreed to contribute in exchange for his 75% interest. (Exhibit D (Capital Chart created by Shorin)). While Norman was aware of Elkin's failure to contribute the required capital, Elkin continued to provide assurances that his capital account would reach $750,000. (Exhibit E (Norman dep. at p. 10)). Assuming Elkin's contributions were in fact made and his calculations are accurate, he did not meet his required $750,000 contribution amount until August 1996. (*See* Exhibit E; Exhibit F (Elkin's Stockholder Loan Agreement)). However, sometime in 2001 or 2002, Elkin, unbeknownst to Norman, decided to retroactively recharacterize his capital contributions and make them loans. (*Id.*); (Exhibit A at Interrogatory Response No. 1) (indicating that the Elkin Shareholder Loan Agreement dated as of September 1, 1995 was "upon information and belief" actually executed sometime in 2001 or 2002). Elkin's execution of his Shareholder Loan Agreement sometime in 2001 or 2002 constitutes a breach of the parties' agreement to capitalize USM.

### C.    Norman Aggregates Phase I Licenses

The business plan for USM was to aggregate the FCC Phase I licenses to achieve a strong presence in major markets such as Boston, New York, Philadelphia, Washington D.C. and Miami and then find a suitable purchaser for the Company or enter into a strategic partnership with another company. (Exhibit G (Declaration of Jeffrey M. Norman "Norman Dec. ¶ __") at ¶ 6)). From 1993 through and including 1996, Norman worked on behalf of the Company to

negotiate and enter into management agreements with other FCC Phase I 220 MHz license holders. (Cmpt. ¶ 10); (Norman Dec. ¶¶ 4-5). During this time, Elkin was responsible for raising additional capital for the Company and for searching out potential acquirers or strategic partners. (Norman Dec. ¶ 6).

Pursuant to the terms of the Company's model management agreement, USM generally acquired an ownership interest in the negotiated licenses and was paid a monthly management fee of not less than $1,500.00 for services provided to the licensee. (Cmpt. ¶ 10; Ans. ¶ 10). As of late 1996, the Company possessed (by way of either complete or partial ownership) approximately 45 licenses in states including New York, Pennsylvania, Maryland, Florida, Massachusetts, Illinois, California, Texas, Connecticut, Wisconsin and the District of Columbia. (Cmpt. ¶ 11; Ans. ¶ 11).

**D.**    **Failed Sales and Strategic Alliances**

In furtherance of their business plan, Elkin attempted to negotiate both a sale and merger of USM. Both efforts failed. The most compelling aspects of these transactions are not that they failed; but rather, the valuations attributed to USM's assets and the fact that under both proposed transactions, both Elkin and Norman would have given up control of their Company. As of March 1997, USM had assets that encompassed at least 217 channels of 220 MHz spectrum throughout the United States. USM owned at least 45 channels outright, and the remaining 172 channels were under management agreements. (Cmpt. ¶ 12; Ans. ¶ 12). In or around May 1997, the Company was presented with a proposed transaction with Centennial Communications Corporation ("Centennial"). The proposed transaction contemplated a sale of all assets of USM for the sum of $6 million in total consideration, including $5 million in cash and a $1 million promissory note. (Exhibit H (Letter of Intent with Centennial)). The proposed Centennial

transaction did not encompass any later-acquired Phase II FCC licenses. The transaction with Centennial was never consummated.

Sometime around the first quarter of 1998, Elkin engaged in merger discussions with Incom Communications Corporation ("ICC"). (Cmpt. ¶ 17; Ans. ¶ 17). As part of the merger discussions, the companies engaged the services of an independent valuation expert to assess the value of each party to the proposed merger. As of January 1998, USM's licenses were valued at approximately $5.5 million. (Exhibit I (ICC valuation chart)). USM's subscribers and equipment were valued at an additional $1.1 million. (*Id.*). As calculated by the independent valuation expert, USM's total asset and income value in January 1998 was in excess of $6.6 million. (*Id.*). In a February 2, 1998 letter from Elkin to ICC, Elkin noted that as of January 1998, the Company had approximately $1.15 million in accrued management fees receivable. (Exhibit J (Elkin's letter to ICC)). Elkin indicated that this value should be added to the total $6.6 million value calculated in January 1998. (*Id.*). Accordingly, by Elkin's own calculations and estimate, USM had a value in excess of $7.6 million in 1998. Given this valuation, Elkin proposed a merger with ICC in which USM would receive a 25% interest in the surviving entity. (Exhibit I). The merger was never consummated and the Company's stockholders never fully recognized its $7.6 million value. Just as with the proposed Centennial transaction, the Company's valuation did not take into account any added value the Phase II licenses would bring to the Company.

E.     **Elkin's Self-Dealing During the FCC Phase II License Auction**

As part of the FCC's continuing effort to expand and enhance the 220 MHz spectrum, it scheduled what was referred to as Phase II auctions. Whereas the Phase I licenses were distributed through a lottery system, the FCC auctioned Phase II licenses. The Phase II licenses covered a greater area than the Phase I licenses and offered other advantages over the existing

Phase I licenses. Given this wide area coverage, certain Phase II licenses would encroach upon pre-existing Phase I licenses. In an effort to protect the interests of Phase I license holders, the FCC developed rules through which incumbent Phase I license holders were afforded protection during the Phase II auctions. *See* 47 C.F.R. § 90.763 (1997).

1.   <u>USM, Not TEG, Was the Qualified Bidder for Phase II Auction No. 18</u>

In order to bid on Phase II licenses, companies were required to become qualified bidders with the FCC. Companies were required to substantiate the wherewithal to construct base stations for transmission and thereafter develop the 220 MHz licenses for which they were bidding. Moreover, the bidders had to post an upfront payment sufficient to cover the licenses the company anticipated bidding on during the auction. *See* 47 C.F.R. § 90.733 (1997). Elkin, purporting to be acting on behalf of the incumbent license holder USM, submitted an application to become a qualified bidder for Auction No. 18. As part of the application process, Elkin wired funds to the FCC on August 31, 1998 to be held as the upfront payment for USM. (Exhibit K (Elkin's wire receipts to the FCC)). As a result of these actions, USM was identified in FCC Public Notice DA 98-1787, dated September 4, 1998, as one of the only 54 qualified bidders for Phase II Auction No. 18. (Exhibit L (Qualified Bidders Public Notice)). USM posted an upfront payment and was eligible to bid on all licenses offered during Auction No. 18. (*Id.*).

As part of the application process and in preparation for the auction bidding, Elkin and/or Shorin was/were given a FCC Registration Number ("FRN") and for which they could set a secret password. The FRN and secret password allowed Elkin and/or Shorin (acting on behalf of USM), to file applications electronically and to participate in the various bidding rounds during the auction. The FRN and secret password were never furnished to Norman. (Norman Dec. ¶ 10).

7

The FCC's Public Notice that identified the qualified bidders for Auction No. 18 also identified USM as an incumbent Phase I licensee. (Exhibit L at Att. B). As an incumbent, USM was afforded a level of protection under the FCC rules during the Phase II auction process. *See* 47 C.F.R. § 90.763 (1997). Amongst other requirements, bidders who won a Phase II license that covered an incumbent Phase I licensee's area were required to: (i) locate their paging stations at least 120 km from the Phase I licensee's paging station,[2] and (ii) limit the field strength of its base stations so as to not interfere with the Phase I licensees. The FCC 220 MHz auction rules were designed to protect incumbent Phase I license holders and businesses. The FCC-mandated location and signal strength requirements for any Phase II license were limited by the area that encroached upon a Phase I incumbent. In practice, this worked to chill the open bidding for Phase II licenses during the auction process where there was a strong incumbent position.

2.  Elkin Unilaterally Attempts to Change USM's Registration to TEG

TEG never submitted an application for Auction No. 18. Instead, Elkin surreptitiously bootstrapped USM's incumbency position for TEG's benefit by amending USM's registration to name TEG as the applicant. (*See* Exhibit M (FCC Form 601 submission)). Although the November 6, 1998 Form 601 (submitted after the conclusion of Auction No. 18) suggests that the registration change occurred on September 28, 1998, that amendment is curiously absent from Defendants' production in this matter. It is also peculiar that this purported amendment came after the FCC issued its Public Notice identifying USM as the qualified bidder and after bidding commenced for Auction No. 18. Had TEG submitted its own application or timely amended USM's application, TEG would not have enjoyed the incumbency position attributed to

---

[2] The Phase I licensee's paging station s were generally in highly populated areas, as the Phase I licenses served more urban areas.

USM during Auction No. 18.  At no time did Elkin or anyone else at USM notify Norman of this purported change in registration.  (Norman Dec. ¶ 13).

> 3.   The FCC Publicly Announces the Winning Bidders for Auction No. 18 – No TEG

Bidding in FCC Auction No. 18 began on September 18, 1998.  The winning bidders for the auction were announced on October 23, 1998 through FCC Public Notice DA 98-2143. (Exhibit N (Winning Bidders Public Notice)).  The FCC recognized USM as the winning bidder for five (5) licenses following Phase II Auction No. 18.  (*Id.* at pp. 394, 396, 401 and 432).  The five (5) licenses were located in the following geographic areas: two (2) licenses for Boston, Massachusetts; one (1) license for Washington, D.C.; one (1) license for Miami, Florida; and one (1) license for Sacramento, California.  TEG was not identified as the winning bidder for any license awarded through the FCC's Phase II Auction No. 18.

On or about November 6, 1998, USM submitted its final application Form 601 for the Phase II Auction No. 18.  (Exhibit M).  The November 6 filing date was the final day permitted under the FCC's rules for filing a bidder's Form 601 following the completion of the auction.  In USM's November 6, 1998 Form 601, Elkin represented to the FCC that an amended Form 175 registration statement was submitted to the FCC on September 28, 1998, which changed the name of the applicant for the Phase II Auction No. 18 from USM to TEG.  (*Id.*).  At no time did Elkin or anyone else at USM notify Norman of this final Form 601 application or the purported change in registration.  (Norman Dec. ¶ 13).  Norman did, however, review the FCC Public Notice that recognized USM as a successful bidder.  (Norman Dec. ¶ 11).  The Phase II licenses won during Auction No. 18 were not issued by the FCC until March 22, 1999.  (D.I. 44 (Caponi Affidavit at Ex. D) (Defendants' own submission of the authorizations for the Phase II licenses won at Auction No. 18 indicates an effective date of March 22, 1999)).

**F.    Elkin's Piecemeal Sale of USM Assets**

At some point between 1999 and 2001, Elkin resolved to sell substantially all of the Company's assets and recoup his investment.  On March 4, 1999, the Company executed a Purchase and Sale Agreement with Repeater Network Spectrum Aq., Inc. ("Repeater") for the Company's sale of an unknown number of licenses to Repeater for the sum of $138,049.00. (Exhibit O).  Despite the fact that the Phase II license for Miami (won by USM at the auction) was identified in the Repeater transaction, the sale figure only represented payment for Phase I licenses.  Norman did not receive any notification of this sale.  (Norman Dec. ¶ 14).  Moreover, Elkin did not hold an annual stockholder meeting or make any type of annual disclosure that may have been used as a vehicle to communicate this sale to Norman.  (*Id.* at ¶ 21).

On January 30, 2001, the Company executed a Purchase and Sale Agreement with Roamer One, Inc. ("Roamer") for the Company's sale of six (6) Phase I licenses to Roamer for the sum of $349,000.00.  (Exhibit P).  Certain other Phase II licenses were identified as having been or due to be transferred from TEG to Roamer.  USM received no compensation for the transfer of the Phase II licenses to Roamer.  Norman did not receive any notification of this sale. (Norman Dec. ¶ 14).  On March 13, 2001, the Company executed another Purchase and Sale Agreement with Roamer, this time for the Company's sale of one (1) license to Roamer for the sum of $60,000.00.  (Exhibit Q).  Certain other Phase II licenses were identified as having been or due to be transferred from TEG to Roamer.  USM received no compensation for the transfer of the Phase II licenses to Roamer.  Norman did not receive any notification of this sale. (Norman Dec. ¶ 14).  Defendants have not produced all the transaction documents for the sale of the Phase I licenses.  However, based on accounting and tax records, it is apparent that the Company sold at least $665,240 worth of Phase I licenses.  (Exhibit R (USM's own November 11, 2002 "Analysis of License sales and disbursements")).

Despite Defendants self-proclaimed altruistic motive behind the sale of the Phase I licenses, the simple fact remains that Elkin used all the net proceeds to pay only himself. Of the $665,240 proceeds realized from of USM's Phase I licenses, Elkin paid himself at least $601,500. (*Id.*; Exhibit B at Response No. 12 (admitting "USM distributed approximately $601,500.00 to Elkin")).[3] Norman received nothing. Of the $196,000 in revenue generated from TEG's sale of Phase II licenses, all the proceeds went to Elkin. *See infra*, G. Norman received nothing.

### G.    TEG's Transfer of USM's Phase II Licenses

Pursuant to the March 4, 1999 sale agreement with Repeater, the Phase II Miami license won by USM during Auction No. 18 was sold by TEG to Repeater. TEG, and in turn, Elkin, received the proceeds from the $65,000 Repeater paid for the Phase II Miami license. (Exhibit S (TEG's 2000 federal tax return with Elkin's Form K-1 disclosing proceeds)). Neither the Company nor Norman received any form of compensation for this transfer of assets. (Exhibit B at Response No. 9 (admitting the sale proceeds from the Phase II licenses "were never paid to USM")). The January and March 2001 sale agreements with Roamer transferred certain Phase II licenses from TEG to Roamer. TEG, and in turn, Elkin, received proceeds from the $131,000 Roamer paid for the two (2) Phase II Boston licenses. (Exhibit T (TEG's 2001 federal tax return with Elkin's Form K-1 disclosing proceeds). Neither the Company nor Norman received any form of compensation for this transfer of assets. (Exhibit B at Response No. 9).

---

[3] Elkin's Shareholder Loan Agreement and USM's Quickbooks files show that Elkin took distributions from April 2000 through at least May 2002. (*See*, *e.g.*, Exhibit F). The largest distributions were $220,000 in May 2001 and another $200,000 in August 2001. (*Id.*). Elkin never advised Norman of these distributions until 2003, when Elkin sent Norman's attorney a copy of the Shareholder Loan Agreement. (Exhibit F; Norman Dec. ¶¶ 14, 17).

11

### H.    Elkin's Attempt at a Cover-Up

On October 2, 2002, Norman, through his attorney, sent Elkin a letter requesting access to the Company's records because Elkin "confirmed to Mr. Norman that at least one sale of assets has taken place." (Exhibit U). This letter followed a very brief telephone conversation Norman had with Elkin concerning the status of the Company. During that call, Elkin told Norman that: (i) he had sold some USM licenses (but did not identify exactly which licenses or how many, nor did he disclose that the Phase II licenses were never actually issued to USM); (ii) he had taken a distribution of a few thousand dollars; and (iii) Norman's "turn" had not come up for a distribution. (Exhibit E (Norman dep. at 64-66)).

In response to the October 2, 2002 letter request, Elkin delivered three Purchase and Sale Agreements and disclosed (for the first time) the proceeds from these sales and the distributions he had taken – purportedly as repayment of shareholder loans. (Exhibit V). Unbeknownst to Norman at the time, the disclosures Elkin did make were false and Elkin purposefully omitted material facts. Elkin's December 2002 letter represented that the Repeater and January 2001 Roamer sales (citing an incorrect total of $479,708.00 when in actuality the total sale price was $487,049) went to pay various fees and expenses, including $380,588 for the "Repayment of Shareholder Loans." (*Id.*). Elkin's representation as to the total amount he received for the repayment of stockholder loans was false. Through document production Norman obtained in 2003 and through a books and records petition under 8 *Del. C.* § 220 in the Delaware Court of Chancery[4] (the "§ 220 Action"), it is now undisputed that Elkin, unilaterally and without any prior advice or consent, distributed at least $601,500 to himself as "repayment of shareholder loans." Company records disclose that an "Analysis of License sales and disbursements" was conducted as of November 11, 2002 (a mere 22 days prior to Elkin's fraudulent representations

---

[4] *Norman v. US Mobilcomm, Inc.*, C.A. No. 849-VCP (Del. Ch. filed Nov. 16, 2004).

to Norman).  The Company's "Analysis" demonstrated that Elkin was paid at least $601,500 from the total $665,240 in proceeds from the sales cited in his December 2002 letter.  (Exhibit R).  Through his letter, Elkin now readily admits that he paid himself at least $601,500.  (Exhibit B at Response No. 12).  Elkin did not disclose that his "shareholder loans" were once paid in capital.  Further, he did not disclose the existence of (if it even existed as of December 3, 2002) his Shareholder Loan Agreement.  As a result of the disbursements Elkin made to himself following the sale of substantially all the Company's assets, Elkin and his attorneys readily admit that USM is now insolvent.  (Exhibit CC (Elkin Deposition at pp. 258-59 (noting that the Company is insolvent)); (Exhibit DD (letter from Elkin's attorneys suggesting that USM "lacks the money or resources to satisfy the [$5,760.38] obligation to Mr. Norman")).

Elkin's purported basis for the $380,588 repayment of stockholder loans was his Shareholder Loan Agreement dated as of September 1, 1995.  The Shareholder Loan Agreement was an agreement by and between the Company (through Elkin, as the Company's President) and Elkin, personally.  Elkin drafted the Shareholder Loan Agreement and he executed it on behalf of both himself and the Company.  (Exhibit F; Exhibit W (Transcript of § 220 Action trial at p. 84)).  At the trial of the § 220 Action, Elkin did not specifically recall when he created his Shareholder Loan Agreement, but his "best guess [was] in a year or so subsequent to" the effective date of September 1, 1995.  (Exhibit W at p. 85).  In spite of his testimony at the trial of the § 220 Action, Elkin, through his interrogatory responses in this action, now claims that the Shareholder Loan Agreement was, "upon information and belief," executed sometime in 2001 or 2002.  (Exhibit A at Defendants' Response No. 1).  Regardless of whether Elkin executed his own Shareholder Loan Agreement in the 1990s or sometime in 2001 or 2002, the Company's federal tax returns from 1997 through 2004 do not indicate that the Company was indebted to any stockholder, let alone in an amount equal to the $380,588 Elkin initially represented he

repaid himself or the $601,500 he actually repaid himself.  (Exhibit X (Declaration of Martin H. Abo "Abo Dec. ¶ __") at ¶¶ 3, 6)).  Now, both Elkin and Shorin admit that USM never identified any amount as a shareholder loan in the Company's tax returns.  (Exhibit B at Response No. 4).

## I.    Norman's Inquiries Leading up to and Following Elkin's Fraudulent December 2002 Letter

Elkin provided Norman with very little, if any, information concerning the Company's finances or its proposed or consummated transactions following Norman's departure in 1996.  Defendants claim that Norman possessed sufficient information to place him on inquiry notice of his claims prior to December 3, 2002.  (Op. Brf. at 25).  The facts portray a different picture.

### 1.    Information Known or Available to Norman before December 3, 2002

Norman possessed, discovered or had access to only five pieces of information prior to Elkin's letter of December 3, 2002.  The first two pieces of information were FCC public notifications.  Norman had access to and did, in fact, review the FCC Public Notices that announced the qualified bidders and successful bidders for Auction No. 18.  (Exhibits L, N and Norman Dec. ¶ 11); *see also* (D.I. 44 (Caponi Aff. at Ex. F)) (noting in an email from Norman to Elkin that Norman was following Auction No. 18).[5]  Defendants suggest that Norman should have refused to believe the FCC's public notifications, and instead questioned the credibility and forthrightness of his long-time business partner by conducting independent investigation into the Company's actual FCC applications.  (Op. Brf. at 25).  However, prior to the conclusion of Auction No. 18, the FCC website did not allow for application searches.  *See*, *e.g.*, Facilitate the Development and Use of the Universal Licensing System in the Wireless Telecommunications Services, 63 Fed. Reg. 68904-01 (Dec. 14, 1998) (containing the FCC's Final Rule establishing the Universal Licensing System ("ULS")); WT Docket No. 96-188, Memorandum Opinion and

---

[5]  It is worthy to note that despite Elkin's self-proclaimed altruistic intentions, when Norman wrote to Elkin (at his USM email address) immediately following the conclusion of Auction No. 18, Elkin did not take that opportunity to tell Norman that he had switched the registrations.

Order on Reconsideration, 14 FCC Rcd. 11145 (1999) (order of the FCC upholding substantially all aspects of the FCC's original Report and Order establishing the ULS); FCC Public Notice DA 99-1228 dated June 23, 1999 (identifying that the full ULS system is to go into effect on July 1, 1999). Moreover, no one at USM provided Norman with the Company's FRN number or secret password to permit him to access the FCC's filing system and the application that might have been searchable therein. (Norman Dec. ¶ 10).

As part of a potential acquisition, Norman was provided a draft copy of the Company's November 19, 1998 balance sheet. (*Id.* at Ex. G). Defendants argue that the absence of any Phase II licenses on the balance sheet requires that Norman be charged with knowledge of Elkin's covert scheme to switch registrations midstream for Auction No. 18. This fanciful argument might have some appeal if it were supported by any facts, but it is not. First, this is a draft balance sheet that was produced shortly after Auction No. 18 concluded. More importantly, Defendants' own submission belie their argument. The Phase II authorizations for Auction No. 18 plainly indicate that the licenses were granted (effective) on March 22, 1999. (*Id.* at Ex. D).

Norman received annual Internal Revenue Service ("IRS") Form K-1's, but these did not disclose nor imply that distributions were made or licenses sold. While certain K-1's disclose capital gains, other disclosed operating losses and capital losses. In either event, the apportionment of capital losses or capital gains does not indicate nor does it imply, as a matter of fact, that distributions were made during that given year. (Abo Dec. ¶ 4). Likewise, the fact that capital losses or capital gains are disclosed on certain K-1's does not indicate nor does it imply that licenses were sold. (Abo Dec. ¶ 5). This is true because USM owned or claimed an interest in a number of different capital assets in addition to its FCC licenses. (*Id.*).

The last piece of information that is relevant to this motion came in the form of a telephone conversation between Norman and Elkin.  During this call, Elkin only told Norman that he had sold some licenses, that he had taken a distribution from the proceeds and that it was not Norman's "turn" for a distribution.  (Exhibit E (Norman dep. at 64-66)).  Norman requested additional information, but Elkin did not say anything more during the telephone call, nor did he provide Norman with any documentation.  This telephone conversation did not and could not alert Norman to the rampant self-dealing of the President, majority stockholder, sole director and one-time friend – David Elkin.

     2.    Documents Discovered on December 3, 2002, and Afterwards Through Norman's Diligent Inquiry

Norman obtained all the information and documents that substantiate his claims against the Defendants on December 3, 2002 or thereafter.  Elkin's December 3, 2002 letter (mailed on that date) included several Purchase and Sale Agreements that included references to certain Phase II licenses that were transferred from TEG and the purchasers under separate agreements. (*See*, *e.g.*, Exhibit O at p. 7) (noting that the "Phase II EA license won by The Elkin Group, Inc., at the FCC auction shall have been issued to the Seller [defined earlier in the agreement as USM] pursuant to a Final Order of the FCC").

The linchpin assumption of Defendants' "inquiry notice" statute of limitation defense, that the fact that "[Norman] has failed to turn up any information in the related Section 220 action or this lawsuit that has given rise to any new claims," is simply wrong.  (Op. Brf. at 23). In addition to the Purchase and Sale Agreements first disclosed with Elkin's December 3, 2002 letter, Norman undertook the following steps and discovered the following documents after the December 3, 2002 letter:

- May 20, 2003 letter from Norman's attorney to Elkin indicating that Norman had "a number of additional questions and would like to review US Mobilcomm, Inc.'s books and records."  (Exhibit Y).

- August 6, 2003 letter from Norman's attorney to Elkin indicating that there was a June 17, 2003 telephone call wherein Elkin agreed to send additional documents, but no such documents were received.  (Exhibit Z).

- Elkin's self-serving Shareholder Loan Agreement – first delivered to Norman's attorney in October 2003 (Exhibit F) (containing an envelope with a postmark date of October 8, 2003).

- Norman first learns of Elkin's covert scheme to switch registrations mid-auction to have the Phase II licenses issued to TEG when he receives a fax copy of TEG's Form 601 from the FCC in August 2004.  (Norman Dec. ¶ 13); *see also* (Exhibit M) (noting fax banner).

- On October 25, 2004, Norman's attorneys send the Company a written demand for access to the Company's books and records.

- Receiving no response to the written demand, Norman initiates the § 220 Action on November 16, 2004 to enforce his right as a stockholder to review documents Elkin failed to provide.  *Norman v. US Mobilcomm, Inc.*, C.A. No. 849-VCP (Del. Ch. filed Nov. 16, 2004).

- On May 3, 2005, USM "voluntarily" produces its IRS tax returns in response to the § 220 Action.  (Exhibit AA) (letter from Elkin's attorney delineating the Bates range of production encompassing the USM tax returns).  These tax returns disclosed: (i) USM never reported any "loans from shareholders" to the IRS; (ii) sale prices and proceeds were higher than Elkin disclosed in his December 3, 2002 letter; and (iii) drawdown in capital of more than $450,000 in 2001 (later alleged to be Elkin's "repayment of shareholder loans").

- During an August 2005 deposition of  Elkin in the § 220 Action, Elkin disclosed (off the record) that USM did not receive any compensation whatsoever for the registration switch during Auction No. 18.  (Norman Dec. ¶ 15).

- Following two separate motions to dismiss the § 220 Action, Norman was forced to participate in a one day trial on August 23, 2005 to compel Elkin's compliance with his fiduciary duty of disclosure.

- At the trial of the § 220 Action, Elkin discloses, for the first time, his re-capitalization theory that purportedly, "as a matter of fairness," supports the loan and equity bases for his Shareholder Loan Agreement.  (Exhibit W at p. 86).

- Following Norman's success at the trial of the § 220 Action, on September 7, 2005, Elkin produces a number of Company documents including: (i) the November 11, 2002 "Analysis of  License sales and disbursements" spreadsheets detailing the gross and net proceeds and the total amount Elkin "repaid" himself; (ii) unexecuted sale agreements from TEG's sale of the Phase II licenses; and (iii) documents depicting Elkin's calculations that purportedly support his re-

17

capitalization theory.  (Exhibit BB) (letter from Elkin's attorney delineating the Bates range of production encompassing these documents).

These documents were all not properly disclosed by Elkin at the time they were created or when he undertook to make a partial disclosure to Norman during their telephone conversation.  It was not until Elkin was threatened with actual litigation and ultimate success through that litigation that he produced the documents that put Norman on notice of his claims.

18

## ARGUMENT

A court will only grant a motion for summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Here, Defendants bear the burden of proving that no genuine issues of material fact exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If Defendants demonstrated an absence of material fact, only then must Plaintiff "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *IMX, Inc. v. LendingTree, LLC*, 405 F. Supp. 2d 479, 484 (D. Del. 2005).

## I.    DELAWARE'S BORROWING STATUTE IS NOT APPLICABLE

Despite Defendants' arguments to the contrary, Delaware's borrowing statute has absolutely no application to most, if not all, of Norman's claims in light of Delaware's well-settled choice of law rules and Delaware's internal affairs doctrine. In an effort to have this Court apply Pennsylvania's two-year statute of limitations to all of Norman's claims, Defendants argue that Delaware's borrowing statute, 10 *Del. C.* § 8121, applies. For obvious reasons, Defendants look to Delaware's borrowing statute, a provision of general application. However,

Defendants completely look past Delaware internal affairs doctrine, which relates specifically to corporate disputes like the one at bar and is directly on point.

In support of their contentions, Defendants would have the Court believe that this litigation has little relationship to the State of Delaware save "USM's decision to incorporate under its laws." (Op. Brf. at 19). Yet it is precisely this – USM's status as a Delaware corporation – that warrants the application of Delaware's, not Pennsylvania's, statute of limitations to Norman's claims. Delaware's choice of law rules require the application of "the law of the state of incorporation to issues involving corporate internal affairs." *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1115 (Del. 2005). The doctrine "is a major tenet of Delaware corporation law having important federal constitutional underpinnings." *Id.* (citing *McDermott, Inc. v. Lewis*, 531 A.2d 206, 209 (Del. 1987). "The internal affairs doctrine applies to those matters that pertain to the relationship among or between the corporation and its officer, directors, and shareholders" and is invoked in connection with "the entire gamut of corporate internal affairs." *Id.* at 1113 (citing *McDermott*, 531 A.2d at 214).

Of Norman's nine (9) claims asserted against Defendants, only one (1) – the breach of contract claim between Elkin and Norman – arguably falls outside of the scope of involving USM's internal affairs. Even that claim, however, can be said to relate to "issues involving corporate affairs" of the Company, given the connection of the contract claims to the agreement to capitalize the Company. The balance of the claims (e.g., declaratory relief; usurpation of corporate opportunities; breaches of Elkin's fiduciary duties; conversion; misappropriation of Company assets and goodwill; aiding and abetting breaches of fiduciary duties) clearly fall under the internal affairs doctrine. *See, e.g., Coleman v. Taub*, 638 F.2d 628, 629 n.1 (3d Cir. 1981) (breach of fiduciary duty claims involve the internal affairs of the corporation). Accordingly,

Defendants' argument as to the effect of Delaware's borrowing statute completely misses the mark.

## II.    DEFENDANTS CANNOT ASSERT A STATUTE OF LIMITATIONS DEFENSE

As a general proposition, courts sitting in equity do not normally apply statute of limitations directly, but only under appropriate circumstances applying the limitations period by analogy. *In re Maxxam, Inc./Federated Development S'holders Litig.*, 1995 WL 376942, at *6 (Del. Ch. Jun. 21, 1995); *Orloff v. Shulman*, 2005 WL 3272355, at *9-10 (Del. Ch. Nov. 23, 2005). Disputes arising in the context of closely-held business entities present the type of circumstances where a court sitting in equity will not apply an analogous statute of limitations. *See Ramunno v. Capano*, 2006 WL 510064, at *1 n.6 (Del. Ch. Nov. 23, 2006).

Defendants cannot assert the statute of limitations defense for two principal reasons. First, a corporate fiduciary, such as Elkin, cannot assert the statute of limitations defense where the fiduciary personally benefits from the alleged wrongdoing. Second, Defendants have asserted no facts to suggest that Norman's action was time-barred as of the date he commenced the § 220 Action.

### A.    Fiduciaries Engaged in and Benefiting from Self-Dealing Cannot Assert the Statute of Limitations Defense

In cases where the corporate fiduciary engages in fraudulent concealment of the cause of action, "the benefit of the statute of limitation will be denied to those corporate officers and directors who profited personally from their misconduct." *Halpern v. D.H. Barran*, 313 A.2d 139, 142 (Del. Ch. 1973); *Yaw v. Talley*, 1994 WL 89019, at *5 (Del. Ch. Mar. 2, 1994) (recognizing that "fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute [of limitations]").

There is no doubt that Elkin and Shorin are fiduciaries for USM and Norman as a minority stockholder. Elkin was and is USM's sole director, President and majority stockholder. (Cmpt. and Ans. ¶¶ 3, 9). Shorin is or was USM's controller and Assistant Secretary. (Cmpt. and Ans. ¶ 4). Elkin, as TEG's 100% stockholder, acted on its behalf during Auction No. 18 and thereafter when he converted the Phase II licenses and later sold them for $196,000. Elkin plainly profited from the self-dealing transactions as he repaid his shareholder loans pursuant to a Shareholder Loan Agreement he drafted (at least six years after the fact), executed and used to pay himself at least $601,500 before paying other creditors or maintaining his capital account. Moreover, he received the proceeds from the $196,000 realized for the Phase II licenses sold by TEG. (Exhibits S, T). Shorin's benefit from the self-dealing was his continued employment with both USM and TEG. Finally, there are sufficient allegations (many of which are no longer disputed) that Elkin purposefully mislead and falsified communications and disclosures he made to Norman about the license sales, the "loan" repayments and the capital he committed to contribute to the Company. Based on these facts, Defendants cannot rely on the statute of limitations as a defense to this action.

### B.    Even Absent Concealment, the Statute of Limitation Defense is not Available to a Fiduciary who Benefited from the Self-Dealing

The rule set forth in *Halpern* has been extended to preclude fiduciaries from asserting the statute of limitations defense even in the absence of fraudulent concealment. In the context of an existing fiduciary relationship and a claim of actionable self-dealing, a defendant cannot assert the statute of limitations defense until the plaintiff knew or had reason to know of the facts constituting the alleged wrong. *Kahn v. Seaboard Corp.*, 625 A.2d 269, 276-77 (Del. Ch. 1993); *see also Brown v. Dolese*, 154 A.2d 233, 239 (Del. Ch. 1959) (denying application of the statute of limitations defense where the director/president of the corporation fraudulently diverted corporate assets to his own use). Courts apply this rule to a fiduciary, reasoning that "[s]ince

trust and good faith are the essence of this relationship, it would be corrosive and contradictory for the law to punish reasonable reliance on that good faith by applying the statute of limitation woodenly or automatically to alleged self-interested violations of trust." *Kahn*, 625 A.2d at 275. For the same reason that preclude Defendants from asserting the statute of limitations defense under *Halpern* and it progeny, the outcome remains unchanged under the reasoning announced in *Kahn*.

### C.  Norman's § 220 Action Tolled the Statute of Limitations

Even if the analogous statute of limitations were applicable, it was tolled during the pendency of the § 220 Action. It is settled Delaware law that the institution of other litigation to ascertain the facts involved in the later suit will toll the statute while that litigation proceeds.  As the Court of Chancery stated in *Cahall v. Burbage*: "Delay pending other proceedings has frequently been held excusable . . . where the termination of such proceedings was necessary for the ascertainment of facts involved in the later suit."  *Cahall*, 119 A. 574, 576-77 (Del. Ch. 1922).  Where a plaintiff "diligently and doggedly pursued all facts of which he was aware" and where the reason why suit was not filed in a more timely manner rests with a defendant that "at every bend and turn . . . resisted and obstructed [plaintiff's] efforts to obtain the necessary information[,]" the defendant-fiduciary will not be permitted to assert the statute of limitations defense.  *See Technicorp Intern. II, Inc. v. Johnston*, 2000 WL 713750, at *7 (Del. Ch. May 31, 2000).  Here, Norman was diligent in his pursuit of facts that now substantiate his claims.  He worked diligently to uncover the fraud that first became apparent to him through Elkin's December 3, 2002 letter.  Norman's diligence included a number of correspondence and oral requests for information between his attorneys and Elkin, and ultimately the initiation and full prosecution through trial of the § 220 Action.  Defendants have failed to allege any credible basis to assert that Norman had actual knowledge or reason to know of Defendants' unlawful conduct

prior to November 2001 or even December 3, 2002. Accordingly, the statute of limitations defense is not applicable.

**III.    IF APPLICABLE, THE STATUTE OF LIMITATIONS DOES NOT PRECLUDE THE CONTINUED PROSECUTION OF ANY CLAIM**

The statute of limitations, if applicable, does not bar any of Norman's claims for two reasons. First, certain claims arose on or after December 3, 2002 are were presented within the applicable limitations period. Second, the statute of limitations is tolled for any claims that may have arisen prior to December 3, 2002 given Defendants' capacity as fiduciaries for Norman and the Company and their concealment of the facts forming the bases for Norman's claims.

**A.    Certain Claims Did Not Arise Until After December 3, 2002**

A number of Norman's claims arose on December 3, 2002 or thereafter. These claims include: (i) fraud; (ii) breach of contract; and (iii) breach of fiduciary duty of disclosure. Defendants have not and cannot dispute that facts forming the bases for these claims did not occur until December 3, 2002 or thereafter. These facts include:

- It is now undisputed that Elkin's December 3, 2002 letter contained false, misleading and incomplete statements of fact. *Compare* (Exhibit V (December 3, 2002 letter)) *with* (Exhibit B at Response No. 12 (admitting "USM distributed approximately $601,500.00 to Elkin")) *and* (Exhibit R (USM's own Analysis of License sales and disbursements (completed less than a month before the December 3, 2002 letter) indicating the total and net proceeds from sales)).

- Defendants now claim that Elkin's Shareholder Loan Agreement "upon information and belief" was created sometime in 2001 or 2002. (Exhibit A at Response No. 1). Regardless of when it was created, it is undisputed that Norman was not notified of the existence of loans until the December 3, 2002 letter and did not receive a copy of the Shareholder Loan Agreement until Elkin mailed it to Norman's attorney in October 2003. (Exhibit F) (containing an envelope with a postmark date of October 8, 2003); (Norman Dec. ¶ 17). Elkin's execution of his Shareholder Loan Agreement (bringing his paid-in capital amount to $420,000) constitutes a breach of his agreement to contribute $750,000 in capital.[6]

---

[6] Additional bases for Norman's breach of contract claim include Elkin's failure to contribute his required capital in a timely fashion and his failure to distribute proceeds from sales in a

- Elkin's December 3, 2002 letter was a disclosure in his role as an officer and director of USM.[7] His disclosure was materially incomplete and false. Once Elkin "traveled down the road of partial disclosure of the history [of the transaction, he] had an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events. *Arnold v. Society for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994).

Under the rule of discovery, discovery "means discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery." *Becker v. Hamada, Inc.*, 455 A.2d 353, 356 (Del. 1982) (citation omitted) (emphasis removed). The facts giving rise to these claims either did not exist prior to December 3, 2002 or were not disclosed or made available to Norman until after this time. Based on these facts, Norman's claims for fraud, breach of contract and breach of the fiduciary duty of disclose are not susceptible to the statute of limitations defense.

**B.    <u>The Statute of Limitations is Tolled for all Other Claims</u>**

Elkin's conduct in purposefully shielding Norman from discovery of facts that give rise to this litigation present a most compelling argument for the application of tolling under the doctrines of equitable tolling and fraudulent concealment. The policy considerations advanced by both doctrines center around the belief "that a defendant should not be permitted to use the statute of limitations as a shield where the defendant possesses information critical to the existence of an actionable claim of wrongdoing and prevents the plaintiff from discovering that information in a timely fashion." *In re Maxxam*, 1995 WL 376942, at *6 (citing *Litman v. Prudential-Bache Properties, Inc.*, 1994 WL 30529, at *3 (Del. Ch. Jan. 14, 1994)).

---

proportionate amount. These claims are controlled by the analysis discussed in sections II, and III.B.

[7] Elkin is also responsible for breaching his fiduciary duty of disclosure by failing to provide Norman with notice and/or the right to vote on the sale of substantially all the Company's assets, failing to disclose or seek approval for the execution of the Shareholder Loan Agreement and failing to timely disclose the various sales of assets.

25

     1.     Federal Precedent Holds that the Statute of Limitations is Tolled Until Actual Knowledge of the Alleged Wrongdoing

Defendants are correct that the limitations period of Norman's claims are governed by state law, but federal law determines when a cause of action accrues and when the limitations period begins to run.  (Op. Brf. at 3) (citing *Robertson v. Seidman & Seidman*, 609 F.2d 583, 587 (2d Cir. 1979)).  What Defendants failed to cite from the *Robertson* decision was the Second Circuit's holding that, under "the federal equitable tolling doctrine, the active concealment of fraudulent conduct tolls the statute of limitations un favor of the defrauded party until such time as he <u>actually knew</u> of the fraudulent conduct of the opposing party." *Id.* at 593 (emphasis added).  The Supreme Court long ago adopted the rule that the statute of limitations is tolled by a defendants' fraudulent conduct until the fraud or self-dealing is actually discovered. *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946) (holding that "the bar of the statute [of limitations] does not begin to run until the fraud is discovered").  This Court has applied *Holmberg* and reached the same holding. *See*, *e.g.*, *Hill v. Der*, 521 F. Supp. 1370, 1387 (D. Del. 1981).[8]  Based on a more complete assessment of federal precedent on the issue of tolling, it is clear that the statute of limitations in this action is tolled until Norman actually discovered Elkin's fraud and self-dealing.

---

[8] *Hill* also recognizes that a defendant's actual knowledge or diligence in attempting to obtain knowledge of the alleged wrongdoing is a question of fact that is not appropriate for summary disposition. *Hill*, 521 F. Supp. at 1388; *see also Hill v. Equitable Bank, Nat. Ass'n*, 599 F. Supp. 1062, 1076 n.16 (D. Del. 1984) (noting that a defendant's concealment presents a factual issue as to Plaintiff's diligence); *Coleman v. PriceWaterhouseCoopers, LLC*, 854 A.2d 838, 843 (Del. 2004) (recognizing that in the absence of "red flag" document, the inferences potentially drawn from lesser information presents an issue to be adjudicated at trial).  As disclosed in the statement of facts, it is undisputed that Norman did not actually discover Elkin's false statement and fraudulent schemes until after December 3, 2002.

2.    The Limitations Period is Equitably Tolled Given Defendants' Status as Fiduciaries for both USM and Norman

Any limitations period applied to Norman's claims is tolled given Defendants' status as fiduciaries for both USM and Norman.  Conveniently, Defendants look past the facts that Elkin is the sole director, President and majority stockholder and Shorin is the controller and Assistant Secretary of USM in their opening brief and do not address the issue of equitable tolling.  As is plainly apparent, the individual defendants' fiduciary capacities operate to toll the statute of limitations until Norman had actual knowledge of the their wrongdoing.

Under the federal doctrine of equitable tolling, "the statute of limitations does not begin to run on a cause of action for fraud or self-dealing if the plaintiff 'remains in ignorance of [the fraud] without any fault or lack of diligence on his part.'"  *Hill v. Equitable Bank, Nat. Ass'n*, 599 F. Supp. 1062, 1075 (D. Del. 1984) (quoting *Holmberg*, 327 U.S. at 397); *Smith v. McGee*, 2006 WL 3000363, at *3 (Del. Ch. Oct. 16, 2006) (noting that equitable tolling "is appropriate where a plaintiff reasonably relies on the competence and good faith of a fiduciary") (internal citations omitted).  The specific policy advanced by this doctrine "is the idea that even an attentive and diligent investor relying, in complete propriety, upon the good faith of fiduciaries may be completely ignorant of transactions that constitute self-interested acts injurious to the [corporation.]"  *Smith*, 2006 WL 3000363, at *3 (internal citations and formatting omitted).

Here, Elkin owed USM a fiduciary duty as its sole director and President.  Elkin owed Norman a fiduciary duty because he was the sole director and President of USM and the majority stockholder.  Similarly, Shorin owed USM a fiduciary duty as he was the controller and Assistant Secretary.  Under the facts and timeline set forth in the Statement of Facts, Norman did not know or have reason to know of the fraud and self-dealing until, at the earliest, Elkin's December 3, 2002 letter.  For these reasons, any applicable statute of limitations is tolled until, at the earliest, Norman received Elkin's December 3, 2002 letter.

WILMINGTON\50641\1 156666.000

3.  Elkin Actively Concealed his Conduct Until the Court of Chancery Required Full and Complete Disclosure

Elkin's fraudulent concealment of wrongs he committed against the Company and Norman toll the statute of limitations until such time as Norman knew or had reason to know of the unlawful conduct. Defendants suggest that Norman was on inquiry notice of Elkin's self-dealing and fraud prior to December 3, 2002. (Op. Brf. at 21-28). Defendants' position is misplaced as a matter of law and fact. First, Defendants' argument applies the state law standard of "inquiry notice" when federal precedent requires actual notice or reason to know in order for the statute of limitations to begin to run. Second, all the factual evidence Defendants are able to muster in support of their misplaced inquiry notice argument is easily distinguished from the types and categories of disclosures held to place a plaintiff on inquiry notice that there was wrongdoing.

Under the "federal doctrine of fraudulent concealment, the statute of limitations is tolled when the party injured by the fraud 'remains in ignorance of it without any fault or want of diligence on his part." *Conley v. First Jersey Securities, Inc.*, 543 F. Supp. 368, 373 (D. Del. 1982) (internal citations omitted). As revealed by the facts and timeline set forth in the Statement of Facts, Norman did not know or have reason to know of the fraud and self-dealing until, at the earliest, Elkin's December 3, 2002 letter.

Defendants allege that Norman possessed the Form 601 through which Elkin executed his covert scheme to switch registrations for Auction No. 18. Accordingly, Defendants' story goes, Norman must be charged with inquiry notice of the wrongdoing. This argument disregards the facts in the record and is incorrect for at least three reasons. First, Norman had access to and did, in fact, review the FCC Public Notices that announced the qualified bidders and successful bidders for Auction No. 18. (Exhibits L, N and Norman Dec. ¶ 11). Based on those public notifications, Norman had no reason to question the credibility and forthrightness of his long-

time business partner by conducting an independent investigation into the Company's actual FCC applications. The FCC-identified chain of title was unbroken as viewed from the outside world. Second, even if further inquiry was warranted, the FCC's website did not permit searches prior to the conclusion of Auction No. 18. *See supra*, (Statement of Facts at I.1). Moreover, no one at USM provided Norman with the Company's FRN or secret password to permit him to access the FCC's filing system and the applications that might have been searchable therein. (Norman Dec. ¶ 10). Finally, when Norman emailed Elkin about Auction No. 18, Elkin never attempted to respond to his email by indicating that the Phase II licenses were to be issued to TEG rather than USM. (D.I. 44 at Ex. F)) (noting in an email from Norman to Elkin that Norman was following Auction No. 18); (Norman Dec. ¶ 12).

Defendants' next argument is premised on proof by a negative. Defendants allege that Norman should have been on inquiry notice that the Phase II licenses were not issued to USM because they did not appear on a draft copy of the Company's November 19, 1998 balance sheet. (Op. Brf. at 26). Defendants' balance sheet does not give rise to inquiry notice for two reasons. First, the balance sheet was a draft, produced shortly after Auction No. 18 concluded. (D.I. 44 at Ex. G). A reason person could conclude that the Phase II licenses recently won at Auction No. 18 were not included in the "draft" balance sheet. This is particularly true when Norman told Elkin he was following the auction and Elkin never attempted to inform Norman that he switched registrations. Second, the Auction No. 18 authorizations Defendants submit with their opening brief indicate that the Phase II licenses were issued on March 22, 1999. (*Id.* at Ex. D). This is well after the November 1998 draft balance sheet was delivered to Norman.

Defendant then suggest that Norman was on inquiry notice of the license sales and distributions through his annual IRS Form K-1's. While Norman did receive K-1's and some disclosed capital gains, other disclosed operating losses. In either event, the apportionment of

capital losses or capital gains does not indicate, as a matter of fact, nor does it even imply that distributions were made during that given year. (Abo Dec. ¶ 4). Likewise, the fact that capital losses or capital gains are disclosed on certain K-1's does not indicate nor does it imply that licenses were sold. (Abo Dec. ¶ 5). This results from the fact that USM owned or claimed an interest in a number of different capital assets in addition to its FCC licenses. (*Id.*).

Defendants' final argument is based on a telephone call between Elkin and Norman which they claim placed Norman on inquiry notice of Elkin's wrongdoing. (Op. Brf. at 24). During this call, Elkin only told Norman that he had sold some licenses, that he had taken a distribution from the proceeds and that it was not Norman's "turn" for a distribution. (Exhibit E (Norman dep. at 64-66)). This disclosure is insufficient as a matter of fact and law to attribute inquiry notice to Norman concerning Elkin's wrongdoing in this matter. First, no loans were discussed and Elkin never disclosed how many or which licenses were sold or exactly how much he was paid. Second, this telephone call, as all the other "public notice" information Defendants attribute to Norman, does not compare to the types or characteristics of the Securities and Exchange Commission ("SEC") filings Defendants' cited precedent recognizes as being sufficient public notice.

In *In re ML/EQ Real Estate P'ship Litig.* (Op. Brf. passim), the publicly disclosed documents placed at issue were SEC Forms 10-K, 10-Q and 8-K. *In re ML/EQ*, 1999 WL 1271885, at *4-10. Likewise, in *In re Dean Witter*, (Op. Brf. 4, 18, 21, 25) the publicly disclosed documents were all SEC filings that contained "cold, hard figures" that "with a quick glance [made it] clear that the amount of these distributions far exceeded the 'net income' figure." *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8 (Del. Ch. Jul. 17, 1998). Defendants simply do not have the facts to support or even allege that there were comparable publicly available documents or information to place Norman on notice of Elkin's wrongdoing.

For these reasons, any applicable statute of limitations is tolled until, at the earliest, Norman received Elkin's December 3, 2002 letter.

## IV.    THE STATUTE OF FRAUDS DEFENSE IS NOT APPLICABLE

Norman's breach of contract claim against Elkin is in no way barred by the Statute of frauds because the Statute of frauds is completely inapplicable. Citing only a footnote in a twenty-six (26) year old decision of the Pennsylvania Supreme Court, Defendants argue that the oral contract here is barred by the Statute of frauds because it involves a contract for the sale of securities, which requires a writing. Had Defendants looked at the issue with any level of attention, they would have quickly realized that the provision cited in the Pennsylvania High Court's decision, 13 Pa. C.S.A. § 8319, was repealed over ten (10) years ago. Defendants also would have discovered that, in direct contravention to their argument, both Delaware and Pennsylvania law specifically provides that a "contract . . . for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought." 6 *Del. C.* § 8-113; 13 Pa. C.S.A § 8113. In sum, Defendants argument regarding a statute of fraud bar is erroneous.

Even if the authority cited by Defendants were somehow operative, Defendants' statute of frauds defense is clearly implausible given that, at minimum, there has been part performance by the Company's issuance of 125 shares of the stock to Norman, which no one disputes. *Briggs v. Sackett*, 418 A.2d 586 (Pa. Super. 1980) (discussing part performance as exception to statute of frauds); *Quillen v. Sayers*, 482 A.2d 744 (Del. 1984) (same). Finally, it is even more astonishing that Defendants proffer a statute of frauds defense considering that they have unequivocally admitted in their discovery responses, the existence of the contract. (Exhibit B at Response No. 11). *Richards v. McClafferty*, 538 A.2d 11 (Pa. Super. 1988) (discussing

admission as exception to statute of frauds); *Wolf v. Crosby*, 377 A.2d 22 (Del. Ch. 1977).

Accordingly, there is just no supportable basis for Defendant's statute of fraud arguments.


## <u>CONCLUSION</u>

For the reasons set forth above, Plaintiff respectfully requests that Defendants' motion for summary judgment be denied in all respects.


Dated: March 23, 2007                    */s/ Sean J. Bellew*

                                          Sean J. Bellew (#4072)
                                          David A. Felice (#4090)
                                          Cozen O'Connor
                                          Chase Manhattan Centre
                                          1201 N. Market Street, Suite 1400
                                          Wilmington, DE  19801
                                          Telephone:  (302) 295-2000
                                          Facsimile:  (302) 295-2013