# EXHIBIT 1

Not Reported in F.Supp.

Page 1

Not Reported in F.Supp., 1986 WL 27582 (E.D.N.Y.), 1987-1 Trade Cases P 67,417
**(Cite as: Not Reported in F.Supp.)**

**H**

State of New York v. Amfar Asphalt Corp.
E.D.N.Y.,1986.

United States District Court, E.D. New York.
STATE OF NEW YORK
v.
AMFAR ASPHALT CORP., Hendrickson Brothers,
Inc., Lizza Industries, Inc., Pratt & Pratt, Inc.,
Francis Ambrosio, Anthony Farino, Jack Farino,
Herbert Hochreiter, and James J. Pratt.
**No. CV 83-2598.**

Nov. 20, 1986.

Memorandum of Decision and Order
MISHLER, Senior District Judge.
**\*1** Plaintiff State of New York moves for partial
summary judgment on the issue of liability on its
claim against defendants Lizza Industries, Inc. (-"
Lizza"), Herbert Hochreiter ("Hochreiter"), Pratt &
Pratt, Inc. ("Pratt, Inc.") and James J. Pratt ("Pratt")
for violation of the Sherman Antitrust Act, 15
U.S.C. § 1. Plaintiff also seeks full summary
judgment against defendants Lizza, Hochreiter,
Pratt, Inc. and Pratt on its claim for civil penalties
under the Donnelly Act, N.Y.Gen.Bus.Law § 342(a).

*[Statute Election ]*

Defendants Lizza and Hochreiter cross-move for an
order (1) directing the plaintiff State of New York
to make an election prior to trial, to proceed on its
claim for damages either under Section 4 of the
Clayton Act, 15 U.S.C. § 15, or under Section
342-a of the Donnelly Act, N.Y.Gen.Bus.Law §§
340 *et. seq.,* and (2) for summary judgment
pursuant to Fed.R.Civ.P. 56 dismissing plaintiff's
claim for the assessment of penalties under Section
342-a of the Donnelly Act.

*[Bid Rigging ]*

Plaintiff's complaint in this action alleges a
conspiracy among the defendants and other to
obtain highway construction contracts from the New
York State Department of Transportation ("
NYSDOT") and the Suffolk County Department of
Public Works ("SCDPW") at prices which were
fixed and maintained at an artificial and
noncompetitive level in violation of the Sherman
Act, 15 U.S.C. § 1,[FN1] and the Donnelly Act,
N.Y.Gen.Bus.Law §§ 340 *et seq.* [FN2]

*[Mail Fraud and RICO ]*

Defendants Lizza and Hochreiter were convicted
after a jury trial on charges of mail fraud (18 U.S.C.
§§ 1341 and 1342) and RICO violations (18 U.S.C.
§ 1962(a)) for bid rigging on NYSDOT and
SCDPW contracts. *United States v. Herbert
Hochreiter and Lizza Industries, Inc.,* 83 CR
00159(S-2), *aff'd,* 775 F.2d 492 (2d Cir.1985), cert.
denied, --- U.S. ----, 106 S.Ct. 1459 (1986). Lizza
was fined $52,000 and ordered to forfeit
$1,000,000. Hochreiter was sentenced to two years
in prison, fined $62,000, and ordered to forfeit
$40,000 and his 30% stock interest in Lizza.

Defendant Pratt, Inc., by its president, defendant
Pratt, pled guilty to ten counts in a superseding
information charging mail fraud in obtaining a
NYSDOT contract. Pratt, Inc. was fined $10,000.

*Discussion*

*Plaintiff's Motion for Summary Judgment*

Plaintiff claims that Lizza's and Hochreiter's
criminal convictions for mail fraud and RICO
violations and Pratt, Inc.'s plea of guilty to mail
fraud charges constitute a finding or an admission

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1986 WL 27582 (E.D.N.Y.), 1987-1 Trade Cases P 67,417
**(Cite as: Not Reported in F.Supp.)**

of guilt by Lizza, Hochreiter, Pratt, Inc., and Pratt [FN3] to acts of bid rigging. Plaintiff argues that since bid rigging is a per se violation of the antitrust laws [FN4] the doctrine of collateral estoppel bars relitigation of this issue in this action.

In opposing plaintiff's summary judgment motion, defendants Lizza and Hochreiter argue that their criminal convictions only estop them from relitigating those issues that were "actually and necessarily decided by the prior verdicts," and that issues necessary to a finding of liability on their part in this action were not decided in their criminal trial. Thus, they contend they are not precluded from litigating the issue of liability for antitrust violations in this action. In addition, Lizza and Hochreiter argue that plaintiff's claim is barred by the statutes of limitation under both the Clayton and Donnelly Acts.[FN5]

*2 Defendant Pratt argues that Pratt, Inc.'s plea of guilty to mail fraud charges does not estop him from litigating the issue of his liability in this action. Defendant Pratt, Inc. argues that its plea of guilty to mail fraud is not the equivalent of a plea of guilty to or an admission of acts constituting antitrust activity. Defendants Pratt and Pratt, Inc. also claim that plaintiff's action is barred by the statutes of limitations under the Clayton and Donnelly Acts.

In exercising our discretion we deny plaintiff's motion for summary judgment because the issues raised in the motion are closely meshed with issues to be tried and summary disposition of these issues would not materially expedite the proceedings. Although the language of Fed.R.Civ.P. 56(c) appears to mandate the dismissal of an action whenever the requirements of the rule are met,[FN6] it has long been recognized that "a motion for summary judgment is always addressed to the discretion of the court." *Perma Research & Development Co. v. Singer Co.,* 308 F.Supp. 743, 750 (S.D.N.Y.1970).

[E]ven if a district judge feels that summary judgment in a given case is technically proper, sound judicial policy and the proper exercise of judicial discretion may prompt him to *deny* the motion and permit the case to be developed fully at trial. The ultimate legal rights of the movant can always be protected in the course of or even after trial.

*Roberts v. Browning,* 610 F.2d 528, 536 (8th Cir.1979) (emphasis in original).

Courts have frequently denied summary judgment motions where the movant has satisfied the technical requirements of Fed.R.Civ.P. 56 on the grounds that granting the motion would not expedite the litigation since "[the] part of [the] action ... ripe for summary judgment ... is intertwined with another claim that must be tried." *Taylor v. Rederi A/S Volo,* 374 F.2d 545, 549 (3rd Cir.1967). See *Powell v. Radkins,* 506 F.2d 763, 765 (5th Cir.), cert. denied, 423 U.S. 873, 96 S.Ct. 140 (1975); *Toyoshima Corp. v. General Footwear, Inc.,* 88 F.R.D. 559, 560 (S.D.N.Y.1980) ; *In Re Franklin National Bank Securities Litigation,* 478 F.Supp. 210, 223 (E.D.N.Y.1979). In such a situation "[t]o grant summary judgment would not save time or shorten the trial, since it must be conducted in any event." *Dunham-Bush, Inc. v. Mills,* 72 F.R.D. 42, 46 (S.D.N.Y.1976).

Granting plaintiff's motion for partial summary judgment on the issue of liability on its claim for violation of the Sherman Act and full summary judgment on its claim for violation of the Donnelly Act against defendants Lizza, Hochreiter, Pratt, and Pratt, Inc. would not obviate the need for a trial. Plaintiff's complaint in this action alleges a common scheme among *all* the named defendants in connection with bid rigging on NYSDOT contracts, and a scheme among defendants Amfar Asphalt Corp., Francis Ambrosio, Anthony Farino, Jack Farino, Lizza, and Hochreiter in connection with SCDPW contracts. Even if the court granted plaintiff's motions for summary judgment against Lizza, Hochreiter, Pratt, and Pratt, Inc., much of the same evidence would be introduced at the civil trial involving the remaining defendants. Thus, the trial will not be appreciably lengthened by denying plaintiff's motions for summary judgment, nor considerably shortened by granting plaintiff's motion. See *Taylor v. Rederi A/S Volo, supra,* 374 F.2d at 550. Where one claim "is inextricably woven to other claims which are destined for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1986 WL 27582 (E.D.N.Y.), 1987-1 Trade Cases P 67,417
**(Cite as: Not Reported in F.Supp.)**

determination by the trier of fact, the action is better left fully intact." *Berman v. Royal Knitting Mills, Inc.,* 86 F.R.D. 124, 126 (S.D.N.Y.1980).

**\*3** Plaintiff's motion for partial summary judgment on the issue of liability on its claim for violation of the Sherman Act and full summary judgment on its claim for violation of the Donnelly Act against defendants Lizza, Hochreiter, Pratt, and Pratt, Inc. is in all respects denied.

### Defendants' Motion for an Order Directing an Election of Remedies

Lizza and Hochreiter argue that Section 342-a of the Donnelly Act (which incorporates the fines which may be assessed in a criminal prosecution under § 341) precludes the state from recovering both treble damages under the Clayton Act and civil penalties under the Donnelly Act.

Section 342-a, captioned "Recovery of civil penalty by attorney-general" provides in pertinent part:

In lieu of any penalty otherwise prescribed for a violation of a provision of this article ... the attorney-general may bring an action in the name and in behalf of the people of the state against any person ... or against a corporation ... to recover a penalty in the sum specified in section three hundred forty-one of this article for the doing in this state of any act herein declared to be illegal, or any act in, toward or for the making or consummation of any contract, agreement, arrangement or combination herein prohibited....

The statute limits the exposure of a violator to either criminal fines or civil monetary penalties for violation of the Donnelly Act. *People v. Elmhurst Milk & Cream Co.* [1982-83 TRADE CASES ¶ 65,215], 116 Misc.2d 140, 455 N.Y.S.2d 473, 480-81 (Sup.Ct.1982); *People v. Gold Medal Farms, Inc.* [1982-2 TRADE CASES ¶ 64,944], 113 Misc.2d 574, 449 N.Y.S.2d 618, 620 (Sup.Ct.1982). It does not, however, restrict New York's attorney general from seeking treble damages under the federal antitrust laws while at the same time pursuing a civil penalty under New

York State's antitrust statute. In the event the State prevails on its federal antitrust claim, the amount of the award and the sentences previously imposed for mail fraud and RICO violations will be taken into consideration in fixing the amount of the civil penalty awarded under the Donnelly Act.

### Defendants' Motion to Dismiss Plaintiff's Claim for Civil Penalties Under the Donnelly Act

Defendants also seek summary judgment dismissing plaintiff's claim for civil penalties under the Donnelly Act. Defendants argue that Section 342-a of the Donnelly Act precludes an action for civil penalties against a defendant who has been criminally prosecuted for violation of the antitrust laws.[FN7]

The cases cited by defendants in support of their argument merely hold that the New York State Attorney General cannot simultaneously maintain both a civil action and criminal prosecution against a defendant under the Donnelly Act. See *People v. Elmhurst Milk & Cream Co., supra,* 455 N.Y.S.2d at 480-81; *People v. Gold Medal Farms, Inc., supra,* 449 N.Y.S.2d at 619-21. The cases do not go so far as to preclude the award of civil penalties under the Donnelly Act against individuals and corporations that have been criminally prosecuted under the federal antitrust laws.

**\*4** Defendants also argue that an award of civil penalties under the Donnelly Act would violate due process of notions of fundamental fairness and would constitute a "windfall recovery" for the state given the penalties that have already been imposed on defendants as a result of their criminal convictions. We find these arguments unpersuasive.

Defendants Lizza's and Hochreiter's motion for an order directing an election of remedies and for summary judgment dismissing plaintiff's claim for civil penalties under the Donnelly Act is in all respects denied.

### Statute of Limitations Claim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                     Page 4

Not Reported in F.Supp., 1986 WL 27582 (E.D.N.Y.), 1987-1 Trade Cases P 67,417
**(Cite as: Not Reported in F.Supp.)**

Although defendants interpose the statute of limitations as an affirmative defense in their answer and repeat the claim in opposing plaintiff's summary judgment motion, it is not clear from the moving papers whether defendants seek dismissal of the action based on statute of limitations. Defendants argue that plaintiff's antitrust claim is barred under the four year statute of limitations of the Clayton Act, 15 U.S.C. § 15b, and the three year limitations period under the Donnelly Act, N.Y.Gen.Bus.Law § 342-a. Plaintiff claims that the limitations period was tolled until the federal indictment became public because of the fraudulent concealment by defendants of their bid rigging scheme.[FN8] Defendants argue that plaintiff was aware or should have been aware through due diligence prior to the federal indictment of the defendants' activities. Thus, they argue the statute of limitations should not be tolled and should operate as a bar to the instant action.

It is well settled that the statute of limitations in an antitrust action begins to run when the defendant commits an act that injures the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.* [1971 TRADE CASES ¶ 73,484], 401 U.S. 321, 338, 91 S.Ct. 795, 806 (1971). In the context of a continuing antitrust conspiracy, this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act.

*Id.*

The rule on tolling the statute of limitations is less clear. There appears to be some dispute among authorities regarding the elements the plaintiff must establish in order to successfully assert the doctrine of equitable tolling or fraudulent concealment to toll the statute of limitations under the Clayton Act, 15 U.S.C. § 15b.

In *City of Detroit v. Grinnell Corp.* [1974-1 TRADE CASES ¶ 74,986], 495 F.2d 448 (2d Cir.1974), the Second Circuit, in the context of a civil antitrust action, set forth the standard applicable to a claim of fraudulent concealment as

follows:

Once it appears that the statute of limitations has run, the *plaintiff* must sustain the burden of showing not merely that he failed to discover his cause of action prior to the running of the statute of limitations, but also that he exercised due diligence and that some affirmative act of fraudulent concealment frustrated discovery notwithstanding such diligence.

**\*5** *Id.* at 461 (emphasis in original). Accord *Cerbone v. International Ladies' Garment Workers' Union,* 768 F.2d 45, 48 (2d Cir.1985); *Barrett v. United States,* 689 F.2d 324, 327 (2d Cir.1982); but see *Robertson v. Seidman & Seidman,* 609 F.2d 583, 593 (2d Cir.1979).[FN9]

Recent decisions in other jurisdictions in cases involving alleged bid rigging schemes in violation of the Sherman Act are in accord with this formulation of the fraudulent concealment rule. See *State of Colorado v. Western Paving Construction Co.* [1986-1 TRADE CASES ¶ 67,174], 630 F.Supp. 206, 208-10 (D.Colo.1986); *Commonwealth of Pennsylvania v. Lake Asphalt & Petroleum Co.* [1985-2 TRADE CASES ¶ 66,803], 610 F.Supp. 885, 887-90 (M.D.Pa.1985). These courts have held that signing a false noncollusion affidavit or submitting a complementary bid was, at most, a failure to disclose or a denial of wrongdoing, and did not amount to an affirmative act of concealment sufficient to toll the running of the limitations period. *State of Colorado v. Western Paving Construction Co., supra,* 630 F.Supp. at 209-10; *Commonwealth of Pennsylvania v. Lake Asphalt & Petroleum Corp., supra,* 610 F.Supp. at 888-89.

Plaintiff argues that it need not demonstrate affirmative acts of concealment by defendants in this action because a conspiracy to violate the antitrust laws is inherently self-concealing.[FN10] Some courts have adopted this view. See, e.g., *Greenhaw v. Lubbock County Beverage Association* [1984-1 TRADE CASES ¶ 65,777], 721 F.2d 1019, 1030 (5th Cir.1983), overruled on other grounds, *International Woodworkers v. Champion International Corp.,* 790 F.2d 1174, 1181 n. 8 (5th

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1986 WL 27582 (E.D.N.Y.), 1987-1 Trade Cases P 67,417
**(Cite as: Not Reported in F.Supp.)**

Cir.1986); *Baker v. F & F Investment* [1970 TRADE CASES ¶ 73,040], 420 F.2d 1191, 1199 (7th Cir.), cert. denied, 400 U.S. 821, 91 S.Ct. 41 (1970); *United National Records, Inc. v. MCA, Inc.* [1985-1 TRADE CASES ¶ 66,502], 609 F.Supp. 33, 37 (N.D.Ill.1984). The Second Circuit has not, however, reached this conclusion. We have found no decisions in the Second Circuit directly holding that an antitrust conspiracy is inherently self-concealing.[FN11]

Thus, in order for plaintiff here to successfully assert the doctrine of fraudulent concealment and toll the limitations period under the Clayton and Donnelly Acts the plaintiff New York State must demonstrate that it did not discover its cause of action prior to the running of the limitations period, that it exercised due diligence, and that affirmative acts of fraudulent concealment by the defendant independent of the underlying conspiracy prevented it from discovering its cause of action notwithstanding its diligence. We find these issues are questions of fact and cannot be resolved by summary disposition. Dismissal of the action based on statute of limitations grounds is therefore denied.

Plaintiff's motion for summary judgment and defendants' motion for election of remedies and summary judgment are in all respects denied, and it So Ordered.

> FN1. The pertinent portion of 15 U.S.C. § 1 provides:
> "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony...."
> New York seeks treble damages and attorney's fees under Section 4 of the Clayton Act, 15 U.S.C. § 15(a).

> FN2. Section 340 of the New York General Business Law states in pertinent part:
> "1.    Every    contract,    agreement, arrangement or combination whereby

> "Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained ... is hereby declared to be against public policy, illegal and void."
> The statutory penalty for a violation of § 340 by an individual is a fine of not more than $100,000 and/or imprisonment for not longer than four years. A corporation convicted of violating § 340 may be fined not more than $1,000,000. N.Y.Gen.Bus.Law § 341 (McKinney Supp.1986).

> FN3. Plaintiff argues that defendant Pratt, as president of Pratt, Inc., was "in privity with" Pratt, Inc., and thus is estopped from relitigating the issue of his liability for antitrust violations in this action.

> FN4. *Northern Pacific Railway v. United States* [1958 TRADE CASES ¶ 68,961], 356 U.S. 1, 5, 78 S.Ct. 514, 518 (1958).

> FN5. The Clayton Act provides a four year statute of limitations within which to file a claim for treble damages, 15 U.S.C. § 15b.
> The Donnelly Act provides a three year limitations period within which to file a claim for civil penalties. N.Y.Gen.Bus.Law § 342-a (McKinney 1968).

> FN6. Fed.R.Civ.P. 56(c) provides in pertinent part that "judgment ... *shall* be rendered forthwith if ... there is no genuine issue as to any material fact. ..." (emphasis added). In light of this decision we need not reach the question of whether plaintiff has in fact satisfied the technical requirements of Rule 56.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF    Document 53-2    Filed 04/10/2007    Page 7 of 47    Page 117 of 133

Not Reported in F.Supp.                                                                            Page 6

Not Reported in F.Supp., 1986 WL 27582 (E.D.N.Y.), 1987-1 Trade Cases P 67,417
(Cite as: Not Reported in F.Supp.)

FN7. For the purpose of this summary judgment motion, defendants adopt plaintiff's contention that their convictions for mail fraud and RICO violations should be considered tantamount to convictions for antitrust violations because the activities underlying the mail fraud and RICO convictions were in fact antitrust violations.

FN8. "[R]ead into every federal statute of limitations ... is the equitable doctrine that in case of defendant's fraud or deliberate concealment of material facts relating to his wrongdoing, time does not begin to run until plaintiff discovers, or by reasonable diligence could have discovered, the basis of the lawsuit." *Barrett v. United States,* 689 F.2d 324, 327 (2d Cir.1982) (quoting *Fitzgerald v. Seamans,* 553 F.2d 220, 228 (D.C.Cir.1977). Likewise, under New York law, a court may use its equity jurisdiction to extend the statute of limitations where the defendant fraudulently conceals the cause of action from the plaintiff. *General Stencils, Inc. v. Chiappa,* 18 N.Y.2d 125, 272 N.Y.S.2d 337, 219 N.E.2d 169 (1966).

FN9. In *Robertson v. Seidman & Seidman,* a decision subsequent to *City of Detroit v. Grinnell Corp., supra,* the Second Circuit appeared to adopt the position held by some courts that where there has been active concealment by the defendant, the plaintiff's due diligence is irrelevant in applying the doctrine of equitable tolling; i.e., in cases of active concealment the running of the limitations period is tolled until plaintiff discovers his cause of action. See *Hobson v. Wilson,* 737 F.2d 1, 34 n. 103 (D.C.Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1843 (1985); *Campbell v. Upjohn Co.,* 676 F.2d 1122, 1127 (6th Cir.1982); *Clute v. Davenport Co.,* 584 F.Supp. 1562, 1578 (D.Conn.1984) (all citing *Robertson* for this proposition). Subsequent Second Circuit decisions applying the doctrine of equitable tolling

have not followed *Robertson.* See *Cerbone v. International Ladies' Garment Workers' Union,* 768 F.2d 45, 48 (2d Cir.1985); *Barrett v. United States,* 689 F.2d 324, 327 (2d Cir.1982).

FN10. Plaintiff argues alternatively that even if the court finds that an antitrust conspiracy is not self-concealing and that submission of false noncollusion affidavits and complementary bids do not constitute affirmative acts of concealment that defendants did take affirmative steps independent of the underlying conspiracy to conceal the bid rigging scheme.

FN11. In *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 460-61, the Second Circuit, in the context of a civil antitrust action, took the position that affirmative acts of concealment by the defendant were necessary to toll the running of the limitations period, and thus, implied that antitrust conspiracies were not self-concealing. See *State of Colorado v. Western Paving Construction Co.* [1986-1 TRADE CASES ¶ 67,174], 630 F.Supp. 206, 208 (D.Colo.1986) (citing *City of Detroit* to support the conclusion that plaintiff must establish affirmative acts of concealment by a defendant in an antitrust action to toll the statute of limitations).
However, this issue was not squarely presented to the court in *City of Detroit* because plaintiffs there did not argue they were within the tolling rule. See *Long v. Abbott Mortgage Corp.,* 459 F.Supp. 108, 118 (D.Conn.1978).
The most recent district court decisions in the Second Circuit are consistent with the formulation of the fraudulent concealment rule set forth in *City of Detroit v. Grinnell Corp., supra.* See *Korwek v. Hunt* [1986-2 TRADE CASES ¶ 67,340], No. 84 Civ 7934 (S.D.N.Y.Oct. 24, 1986) (available Nov. 13, 1986, on LEXIS, Genfed library, Dist file); *Donahue v. Pendleton Woolen Mills, Inc.* [1986-1 TRADE CASES ¶ 67,009], 633 F.Supp.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 7

Not Reported in F.Supp., 1986 WL 27582 (E.D.N.Y.), 1987-1 Trade Cases P 67,417
**(Cite as: Not Reported in F.Supp.)**

> 1423, 1443 (S.D.N.Y.1986). These cases
> do not explicitly address the issue of
> whether an antitrust conspiracy is
> self-concealing.

E.D.N.Y.,1986.
State of N.Y. v. Amfar Asphalt Corp.
Not Reported in F.Supp., 1986 WL 27582
(E.D.N.Y.), 1987-1 Trade Cases P 67,417

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Case 1:06-cv-00005-JJF   Document 53-2   Filed 04/10/2007   Page 10 of 47

nonePage 48 of 133

noneWestlaw.

Slip Copy

Slip Copy, 2006 WL 2935752 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Page 1

## C

Beana v. Woori Bank
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Scott L. BEANA, Litigation Trust of the Learnout
& Hauspie Speech Products N.V. Litigation Trust,
Plaintiff,
v.
WOORI BANK (f/k/a Hanvit Bank), Shinhan Bank,
Chohung Bank, and Hana Bank, Defendants.
**No. 05 Civ. 7018(PKC).**

Oct. 11, 2006.

### MEMORANDUM AND ORDER

CASTEL, J.
*1 Plaintiff Scott L. Baena, litigation trustee
appointed by the United States Bankruptcy Court
for the District of Delaware, brings this action on
behalf of the Lernout & Hauspie Speech Products
N.V. Litigation trust ("L & H Belgium") asserting
claims relating to financial collapse of Lernout &
Hauspie Korea ("L & H Korea"). Defendants in this
action are four South Korean banks, Hanvit Bank,
Shinhan Bank, Chuhung Bank and Hana Bank, who
are alleged to have aided and abetted John Seo in
the breach of his fiduciary duties to L & H Belgium
and aided and abetted Seo in a scheme to defraud L
& H Belgium. [FN1]

> FN1. Throughout, the Republic of Korea
> will be referred to as South Korea and the
> Kingdom of Belgium as Belgium. Hanvit
> Bank is now known as Woori Bank. The
> Second   Amended   Complaint   refers
> throughout to Hanvit Bank and that is the
> name used herein.

The initial complaint was filed on August 5, 2005
and was amended as of right. On December 23,
2005, with leave of court and in response to

defendants' assertions that plaintiff's pleading had
not alleged fraud with the requisite particularity,
plaintiff filed a Second Amended Complaint ("SAC"
). (12/21/06 Tr. at 23)

Defendants have moved to dismiss the SAC on
grounds that: (1) plaintiff lacks standing because his
claims are barred under the doctrine of *in par delicto*
and, hence, this court lacks subject matter
jurisdiction; (2) the courts of South Korea present
an adequate alternative forum and dismissal is
appropriate under the doctrine of *forum non
conveniens;* (3) plaintiff's claims are time-barred by
the statute of limitations; (4) plaintiff has failed to
allege his fraud-based claims with the particularity
required by Rule 9(b), Fed.R.Civ.P. For the reasons
set forth herein, I conclude that plaintiff has
standing to assert all claims. I further conclude that
the doctrine of *forum non conveniens* does not
apply because there is no adequate alternative
forum in which plaintiff's claims may be brought.
Plaintiff's claims are not time-barred under New
York law or under the laws of Belgium, which New
York would borrow under CPLR § 202. I conclude
that plaintiff's claims are not alleged with the
particularity required by Rule 9(b) and, in that
limited respect, defendants' motion to dismiss is
granted with leave to replead.

### Background

L & H Belgium, a public company, created and
licensed software primarily in the field of speech
recognition. The events giving rise to this litigation
began with the 1999 decision by L & H Belgium to
expand into the Pacific Rim by acquiring Bumil
Information and Communications Co. Ltd. ("Bumil"
) from its sole shareholder, John Seo. (SAC ¶ 16)
L & H Belgium agreed to acquire Seo's shares in
Bumil for a purchase price consisting of a closing
payment of $25 million and an additional potential "
earn-out" payment of $25 million, depending upon
whether certain financial targets were achieved by

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

https://web2.westlaw.com/print/printstream.aspx?rs=WLW7.02&destination=atp&vr=2.0&s...   4/10/2007

Slip Copy, 2006 WL 2935752 (S.D.N.Y.)
**(Cite as: Slip Copy)**

December 31, 2001. (SAC ¶¶ 16-21) The transaction closed on or about September 9, 1999. The acquired entity became a wholly-owned subsidiary of L & H Belgium and was renamed L & H Korea; Seo remained as president of the Korean operation. (SAC ¶ 20)

**\*2** The SAC alleges that after the closing, L & H Korea began entering into licensing and product sale agreements with customers who had little or no credit history. (SAC ¶ 29) Plaintiff alleges that L & H Korea, in turn, entered into agreements with the defendant banks which gave the appearance of a transfer of customer receivables to the defendant banks in exchange for discounted cash payments to L & H Korea. (SAC ¶ 31) Because the defendant banks ostensibly assumed the credit risks of non-payment by the customers, the payments to L & H Korea appeared to have been made on a "without recourse" basis, thereby entitling them to be recognized as revenue by L & H Korea. (SAC ¶ 30) The SAC alleges that, in truth and in fact, there was a second set of "secret" agreements with the defendant banks which required that the "payments" to L & H Korea be placed in "restricted time deposit accounts" as "collateral" for the "advances". FN2 (SAC ¶ 34) In some of the "secret" side deals, the payments were referred to as "factoring loans". (SAC ¶ 35) The Second Amended Complaint further alleges that the seemingly " without recourse" factoring agreements accounted for \$47 million of the \$61.5 million in revenue for the third and fourth quarters of 1999 and \$64.4 million of the \$ 113 million in revenue for the first and second quarters of 2000. (SAC ¶ 36)

> FN2. In the case of Chohung Bank, the second "secret" agreement was in the form of a pledge agreement. (SAC ¶ 34)

Based on L & H Korea's financial reports, L & H Belgium paid Seo the additional \$25 million under the earn-out provision. (SAC ¶ 22) Additionally, the board of directors of L & H Belgium, in reliance upon the apparent financial condition of L & H Korea, approved a further capital contribution of \$25 million to L & H Korea. A capital contribution of \$6 million was made on or about March 15, 2000

and another \$19 million on or about April 8, 2000. (SAC ¶ 27)

The financial improprieties began to come to light in the late summer of 2000. (SAC ¶ 42) The SAC contends that, when questioned, the defendant banks intentionally concealed the nature of the second set of agreements. (SAC ¶ 47) Thereafter, in November of 2000, the defendant banks seized \$95 million from the deposit accounts that L & H Korea maintained. (SAC ¶ 48)

On November 29, 2000, L & H Belgium filed for bankruptcy under chapter 11 in the United States Bankruptcy Court for the District of Delaware. (SAC ¶ 3) On April 2, 2004, a plan liquidating L & H Belgium became finalized and plaintiff in this action, Mr. Baena, was appointed litigation trustee by the Bankruptcy Court (the "Trustee"). (SAC ¶ 4) It is in that capacity that he brings this action on behalf of L & H Belgium.

### I. *The Doctrine of In Pari Delicto*

Under Article III, Section 2, of the United States Constitution, courts are empowered to adjudicate only actual cases ot controversies. To demonstrate sufficient constitutional standing under Article III, a plaintiff must demonstrate that they have suffered an injury in fact, that the injury is fairly traceable to the actions of the defendant and that it is likely that the injury will be redressed by a decision favorable to the plaintiff. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180-81 (2000).

**\*3** Defendants contend that claims or admissions made by the plaintiff in another litigation, which also arose from the collapse of L & H Belgium, demonstrate that L & H Belgium's injuries are not fairly traceable to the defendant banks. *Baena v. KPMG, LLP,* 389 F.Supp.2d 112, 118-21 (D. Mass 2005), *aff'd,* 453 F.3d 1 (1st Cir.2006). Defendants rely upon the doctrine of *in pari delicto* and assert that the active wrongdoing of L & H Belgium, in whose shoes the Trustee stands, bars all claims.

The doctrine of *in pari delcito* bars a plaintiff from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

bringing a claim where the plaintiff is complicit in the act for which he seeks redress. The doctrine is applied as both an equitable defense and a component of standing doctrine. *Compare In re Bennett Funding Group, Inc,* 336 F.3d 94, 99-102 (2d Cir.2003) *with BrandAid Marketing Corp. v. Biss,* 2006 WL 2520292, *2 (2d Cir. Aug. 31, 2006) . Here, defendant asserts the doctrine of *in pari delicto* on a Rule 12(b)(1) motion, asserting that plaintiff's complicity in the fraud at L & H Belgium deprives the Trustee of standing. A bankruptcy trustee generally has standing to bring any claim that the corporation could have brought were it not bankrupt. 11 U.S.C. §§ 41 & 542. A trustee takes the place of the bankrupt corporation in any litigation, remaining subject to any defense, affirmative or jurisdictional, that the corporation would be subject to, including *in pari delicto. See Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 354 (3rd Cir.2001). If it can be shown that, prior to commencement of the bankruptcy litigation, the debtor's management caused the misdeed for which the Trustee now seeks to recover-and that misconduct can be imputed to the debtor under substantive applicable law-the Trustee may be barred from bringing the claim. *Id.* at 358-60. Whether conduct may be imputed to a debtor is a matter of state law and, therefore, application of *in pari delicto* is dependent on the substantive law of the forum applied by the court. *See Official Comm. of the Unsecured Creditors of Color Tile, Inc.,* 322 F.3d 147, 157 (2d 2003) (look to Fifth Circuit and Texas law). On the motion before me, neither party has addressed whether Belgium or Korea have imported *in pari delicto* into their jurisprudence and absent the application of that doctrine, the Trustee is not deprived of standing.

Under the doctrine *in par delicto* as applied at common law, plaintiff must be "an active, voluntary participant in the unlawful activity that is the subject of the suit." *Pinter v. Dahl,* 486 U.S. 622, 636 (1988). Moreover, "[a]nother requirement for invocation of the doctrine of *in pari delicto* is that the plaintiff's wrongdoing be at least substantially equal to that of the defendant." *BrandAid,* 2006 WL 2520292, *2 (citing *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 310-11

(1985)). No discovery has been conducted in this action and the court cannot rationally allocate percentages of wrong at this early juncture.

*4 It nevertheless remains a fundamental requirement of Article III standing that an injury to plaintiff be fairly traceable to defendant. Defendants correctly asserts that where a plaintiff's injury is self-inflicted, it cannot be said to be fairly traceable to defendant's conduct. Here, however, L & H Belgium's injury cannot be said to be self-inflicted. Defendants cite to allegations made by the plaintiff in *Baena v. KPMG, LLP,* which are said to demonstrate that L & H Belgium was aware of, and even complicit in, the fraud which eventually lead to its collapse. Defendants then assert that L & H Belgium's injuries in this present action are not fairly traceable to defendants' actions as they are self-inflicted injuries.

An examination of the complaint in *Baena v. KPMG, LLP,* does not support the conclusion that L & H Belgium was a participant in the fraud asserted here. In that suit, the plaintiff claimed that certain breaching managers of L & H Belgium, along with its accountants KPMG, committed fraud which ultimately injured the corporate entity of L & H Belgium. The breaching managers were, by that complaint's own admissions, the primary wrongdoers in the fraud and defendants asserted that plaintiff's claims should therefore be barred by the doctrine of *in pari delicto.* In finding that the plaintiff's claimed were barred, the district court pointed to the critical fact that the fraud in that circumstance was committed to benefit L & H Belgium. 389 F.Supp.2d at 119. Plaintiff there asserted that L & H Belgium was endeavoring, with the alleged assistance of KPMG, to inflate its revenues and increase the value of the corporation. Here, the Trustee asserts that defendants aided and abetted Seo in committing a fraud upon L & H Belgium. Rather than inflating the revenues of L & H Belgium and making the company look better, this alleged fraud is said to have harmed the corporation through unearned payouts and capital contributions. The district court in *Baena v. KPMG, LLP,* noted that plaintiff in that litigation "do[es] not argue that the Breaching Managers acted to loot the corporation, but rather to 'falsely and artificially

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

inflate[ ] L & H's revenues and earnings" '. *Id.*
Here, if L & H Belgium's CFO was aware of the
fraud in L & H Korea, as defendants' contend
plaintiff admitted in *Baena v. KPMG, LLP,* he was
effectively acting to loot the corporation rather than
to benefit it. The $25 million post-closing payout to
Seo did not serve to bolster the financial statements
of L & H Belgium or otherwise benefit the
corporation. Here, the allegedly faithless officers or
directors of L & H Belgium were not seeking to
benefit L & H Belgium; rather they were acting
adversely to L & H Belgium. Therefore, unlike the
plaintiff in the litigation against KPMG, L & H
Belgium cannot be said to have caused its own
injury and dismissal for lack of Article III standing
or under Rule 12(b)(1) is not warranted.

## II. *Forum Non Conveniens*

**\*5** Under the doctrine of *forum non conveniens,* a
court may decline to exercise jurisdiction when
litigation of the case in a foreign forum would "best
serve the convenience of the parties and the ends of
justice." *Koster v. (American) Lumbermens Mut.
Cas. Co.,* 330 U.S. 518, 527 (1947). On a motion to
dismiss for *forum non conveniens,* a court considers
not only the allegations of the pleadings but all
evidence submitted on the motion. *See Cargill
Intern. S.A. v. M/T PAVEL DYBENKO,* 991 F .2d
1012, 1019 (2d Cir.1993). Additionally, "[t]he
defendant bears the burden to establish clearly each
factor ... and to demonstrate that the balance tilts
strongly in favor of the purported alternative forum."
*PT United Can Co., Ltd. v. Crown Cork & Seal
Co., Inc.,* 138 F.3d 65, 74 (2d Cir.1998).

Under Second Circuit precedent, district courts are
instructed to undertake a tripartite analysis to
determine whether a *forum non conveniens*
dismissal is appropriate. Applying the analysis set
forth in *Iroagorri v. United Technologies Inc.,* 274
F.3d 65 (2d Cir.2001) and reaffirmed in *Norex
Petroleum Ltd. v. Access Industries, Inc.,* 416 F.3d
146 (2d Cir.2005), the court first assesses the
degree of deference given to a plaintiff's choice of
forum. The court then must determine whether there
is an adequate alternative forum for the resolution
of plaintiff's claims. Lastly, the court must weigh

and balance the relevant private and public interest
factors to determine which forum is more
appropriate and convenient. See *Norex,* 416 F.3d at
153 (citation omitted). While all factors are
important in the analysis, the requirement of an
alternative forum is dispositive. *Id.* at 157 ("To
secure dismissal of an action on grounds of *forum
non conveniens,* a movant must demonstrate the
availability of an adequate alternative forum. If the
movant fails to carry this burden, the *forum non
conveniens* motion must be denied regardless of the
degree of deference accorded plaintiff's forum
choice.") (citing *PT United Can,* 138 F.3d at 73).
As the court noted, it is for this reason that "courts
sometimes begin their *forum non conveniens*
analysis with this factor." *Id.*

Defendants point to South Korea as an adequate
alternative forum in which this claim can be
litigated. For a foreign forum to be considered
adequate, the defendants must be amenable to
service of process in the foreign jurisdiction and the
forum must permit litigation of the subject matter of
the dispute. [FN3] *See Piper Aircraft Co. v. Reyno,*
454 U.S. 235, 254 n. 22 (1981). The Second Circuit
has held that a forum is unavailable for purposes of
*forum non conveniens* when it would be impossible
for a plaintiff to proceed with a suit there due to the
availability of a meritorious statute of limitations
defense. *See Bank of Credit and Commerce Int'l
(Overseas) Ltd. v. State Bank of Pakistan ("BCCI"
),* 273 F.3d 241, 246 (2nd Cir.2001) ("It follows
that an adequate forum does not exist if a statute of
limitations bars the bringing of the case in that
forum."); *see also Norex,* 416 F.3d at 159. Where
there is no alternative forum, "the *forum non
conveniens* analysis does not concern itself with the
reason why an alternative foreign forum is no
longer available; its singular concern is the fact of
*present availability".  Norex,* 416 F.3d at 159
(emphasis added). Here, both parties agree that if
this case were dismissed in favor of a South Korean
forum, the Korean courts would apply the Korean
statute of limitations and the case would be
dismissed as time-barred. (Def.'s mem. at 27,
Plaintiff Mem. in Opp. at 13) The movants have
failed to demonstrate the existence of an adequate
alternative forum in which this claim may be
litigated and, therefore, a dismissal on *forum non*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2935752 (S.D.N.Y.)
**(Cite as: Slip Copy)**

*conveniens* ground is improper.

> FN3. Plaintiff states that there never was,
> and is not currently, an intent to bring this
> case in Belgium. (Plaintiff's Mem. in Opp.
> at 32 n. 4) There has been no showing that
> defendants are or would be subject to suit
> in Belgium.

### III. *Statute of Limitations*

**\*6** As noted, plaintiff concedes that if the Korean
statute of limitations is applied, all of their claims
are barred as this action was filed more than three
years after L & H Belgium became aware of the
inaccurate earnings reports from L & H Korea.
(12/21/06 Tr. at 11, 21; Pl. Mem. at 13). The
applicable statute of limitations under South Korean
law to all of plaintiff's claims is three years, running
from the date that the injured party becomes aware
of both the wrongdoer's identity and of the damage
that has been suffered, or ten years after the
commission of the tort, whichever is shorter. (*See*
Yune Decl. ¶ 59) As of August 8, 2000, the *Wall
Street Journal* published a report questioning L &
H Korea's explosive financial growth and
suggesting financial improprieties. (SAC ¶ 43) L
& H Belgium filed for bankruptcy on November 29,
2000, and the lawsuit was filed on August 5, 2006,
more than four and half years later.

Defendants contends that, under New York's
borrowing statute, CPRL § 202, this court should
look to South Korea law as the place where the
claims accrued and find them time-barred.
Alternatively, it argues that if they accrued in
Belgium, then Belgium would, in turn, look to
South Korea law under its choice of law principles.
Finally, it argues that the Korean statute of
limitation ought to be applied under the "internal
affairs" doctrine.

A federal court sitting in diversity must apply the
laws of the forum in which it sits.[FN4] *Klaxon Co. v.
Stentor Co.,* 313 U.S. 487 (1941). Thus, a federal
court sitting in New York will apply the New York's
statute of limitations. *See Guaranty Trust Co. v.
York,* 326 U.S. 99, 109-11 (1945). New York's

borrowing statute applies if the cause of action
accrues outside of New York to a non-New York
resident. CPLR § 202. *See Stuart v. American
Cyanamid Co.,* 158 F.3d 622, 627 (2d Cir.1998).
Under the borrowing statute, the shorter of either
New York's statute of limitations or the statute of
limitations, along with any relevant tolling
provisions, of the jurisdiction in which the cause of
action accrued is applied to a claim brought by a
non-resident. *See Cantor Fitzgerald Inc. v. Lutnick,*
313 F.3d 704, 710 (2d Cir.2002); *see also Antone v.
Gen. Motors Corp.,* 64 N.Y.2d 20 (1984). Here,
defendants do not contend that the claims would be
untimely under New York law. [FN5] Further, they
do not dispute that plaintiff is a non-New York
resident or that the cause of action accrued outside
of New York. The borrowing statute requires this
court look to the statute of limitations in the place
where the cause of action accrued either Belgium or
South Korea.

> FN4. In addition to diversity of citizenship,
> subject matter jurisdiction is also invoked
> under 28 U.S.C. §§ 157 and 1334,
> presumably on the theory that the claims
> are related to a bankruptcy proceeding.

> FN5. Because timeliness under New York
> law has not been challenged, I do not
> address it. *Cf. Bartang Bank and Trust Co.
> v. Caiola,* 2006 WL 2708453 at \*5
> (S.D.N.Y. Sept. 18, 2006).

In considering where a cause of action accrues
under CPLR § 202, the New York Court of Appeals
has concluded that the traditional place of injury
test applies. *Global Financial Corp. v. Triarc Corp.,*
93 N.Y.2d 525, 529 (1999) ( "[W]e have
consistently employed the traditional definition of
accrual-a cause of action accrues at the time and in
the place of the injury-in tort cases involving
interpretation of CPLR 202."). If the injured party
is a corporation, then the place of residence for the
purposes of CPLR § 202 is traditionally the state of
incorporation or the corporation's principal place of
business. *Compare American Lumbermens Mut'l
Cas. Co. v. Cochrane,* 129 N.Y.S.2d 489, 491
(N.Y.Sup.Ct 1954.), *aff'd* 284 A.D. 884 (1st

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2935752 (S.D.N.Y.)
**(Cite as: Slip Copy)**

Dept.1954), *aff'd* 309 N.Y. 1017 (1956) *with Investigative Group, Inc. v. Brooke Group Ltd., Inc.,* 1997 WL 727484, *3 (S.D.N.Y. Nov 21, 1997). For purposes of this analysis, L & H Belgium is both incorporated in and has its principal place of business in Belgium. (SAC ¶ 12) When, as in this case, an "alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss." *Global Financial,* 93 N.Y.2d at 529; *see also Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A,* 2001 WL 492363, *4 (S.D.N.Y May 9, 2001) (holding that a tort resulting in purely economic injury accrued at respective places of residence); *Proforma Partners, L.P. v. Skadden Arps Slate Meagher & Flom,* 720 N.Y.S.2d 139 (1st Dept.2001)(same). This rule is applicable both to common law fraud cases and to those alleging a breach of fiduciary duty. *See, e.g., Gordon & Co. v. Ross,* 63 F.Supp.2d 405, 408-09 (S.D.N.Y.1999); *Hughes v. LaSalle Bank, N.A.,* 419 F.Supp.2d 605, 614 (S.D.N.Y.2006). There is, however, a limited exception to the general place of injury rule. Where a plaintiff "maintain[s][a] separate financial base" and where the impact of the financial loss it felt at that location, it may constitute an alternative place of injury. *Global Financial,* 93 N.Y.2d at 510 (examining and summarizing *Lang v. Paine, Webber, Jackson & Curtis, Inc.,* 582 F.Supp. 1421 (S.D.N.Y.1984)). The *Lang* exception, however, is applied only in the "extremely rare" case where the party has offered "unusual circumstances" evincing that the economic injury occurred at a place other than the plaintiff's residence. *See Gorlin v. Bond Richman & Co.,* 706 F.Supp. 236, 240 n. 8 (S.D.N.Y.1989); *accord Block v. First Blood Assoc.,* 988 F.2d 344, 349 (2d Cir.1993).

*7 Here, defendants contend that the *Lang* exception is applicable and that this court ought to look to South Korea's statute of limitations since that is where the plaintiff's claims accrued. The injury to L & H Belgium is purely economic and so to determine the location of where plaintiff's claims accrued, the court must answer the sensible question asked by Judge Stewart, "who became poorer and where did they become poorer?" *Appel v. Kidder Peabody & Co. Inc.,* 628 F.Supp. 153, 156 (S.D.N.Y.1986) (citation omitted). Defendant

contends that because L & H Korea was acquired by L & H Belgium and L & H Belgium eventually lost funds due to the collapse of L & H Korea, plaintiff's claims fall within the *Lang* exception and accrued in South Korea. Unlike the plaintiffs in *Lang,* there was no effort on behalf of L & H Belgium to establish L & H Korea as a separate financial base. At the time of the alleged fraud, L & H Korea was a wholly-owned subsidiary of L & H Belgium. Although L & H Belgium engaged in activities in South Korea and South Korea is the site of events underlying all of plaintiff's causes of action, the economic impact of the injury was ultimately felt by L & H Belgium in Belgium where the company resided. The capital contributions to L & H Korea and the payment to Seo pursuant to the earn-out clause came from the corporate treasury of L & H Belgium in Belgium. Additionally, these payments were approved by the board of directors of L & H Belgium and the direct impact of the alleged events was to cause financial harm to L & H Belgium. I conclude that Belgium was the location of economic injury and, therefore, the place of accrual for purposes of the borrowing statute.

I note that it is irrelevant for purposes of applying CPLR § 202 that the defendants may not be subject to jurisdiction in Belgium. The New York Court of Appeals has interpreted CPLR § 202 as to permit the borrowing of a foreign jurisdiction's statute of limitations, even where the defendant would not be subject to jurisdiction in the foreign court. *Insurance Co. of North America v. ABB Power Generation, Inc,* 91 N.Y.2d 180, 186 (1997) ("The purposes underlying the borrowing statute do not require that amenability to suit be demonstrated before an action can be said to accrue in a particular jurisdiction.").

The Belgian statute of limitations is five years and begins to run the day after the plaintiff discovers the damage and the identity of the person who caused the damage. (*See* De Wulf Decl. at 8(b)) Defendants do not contend that plaintiff's claims are untimely if the Belgian statute of limitations is applied. (Decl. Hans De Wulf ¶ 12) Defendants assert that a Belgian court would apply Belgian choice of laws analysis which would lead, in turn, to the application of the Korean statute of limitations.[FN6]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF    Document 53-2    Filed 04/10/2007    Page 16 of 47

Page 54 of 133

Slip Copy

Page 7

Slip Copy, 2006 WL 2935752 (S.D.N.Y.)
(Cite as: Slip Copy)

New York has rejected incorporation of a foreign jurisdiction's choice of law analysis under CPLR § 202, instead concluding that "CPLR 202 is to be applied as written, without recourse to a conflict of laws analysis." *Ledwith v. Sears, Roebuck and Co., Inc.,* 231 A.D.2d 17, 24 (1st Dept.1997). In *Rescildo v. R.H. Macy's,* 187 A.D.2d 112, 116 (1st Dept.1993), plaintiffs sought to have the court apply the borrowing statute so as to "borrow a foreign jurisdiction's choice of law rules", ultimately requiring a reversion back to New York law, a process known as *renvoi.* The court declined to apply the foreign state's choice of laws analysis, even though a court sitting in the foreign state would have done so had it been confronted with the plaintiff's claim. *Id.* at 117.

> FN6. In a battle of dueling experts, both parties assert opposite contentions as to whether the Belgian court would or would not look to Korean law. Because I conclude that CPLR § 202 forecloses the use of Belgian choice of law principles, it is not necessary to reach this issue.

**\*8** I conclude that plaintiff's claims accrued in Belgium. The claims are timely under the laws of New York and the laws of Belgium, the jurisdiction whose law New York would borrow. Whether a court sitting in Belgium would look to another jurisdiction's law to determine the statute of limitations is not controlling under CPLR § 202. No New York court has accepted the "internal affairs" doctrine as an exception to traditional statute of limitation principles. Defendants' motion to dismiss on the grounds of statute of limitations is denied.

### IV. *Lack of the Particularity Required By Rule 9(b)*

While the parties vigorously contest whether Belgian or Korean substantive law applies to plaintiff's claims, it is uncontested that under either jurisdiction's law the plaintiff would be required to demonstrate fraud, whether as an independent tort or a component of the proof of liability. While Belgian law does not recognize a cause of action for aiding and abetting or breach of fiduciary duty, it

does recognize an independent tort of fraud requiring the showing of fault, intent, causation and damages. (*See* Decl. De Wulf ¶¶ 8, 15-17) Under Korean law, a plaintiff must establish: (1) a tort by the principal tortfeasor; (2) actions that aided or abetted the principal tortfeasor's conduct; (3) intent on the part of the defendant to aid and abet the principal's conduct or that the defendants were negligent in aiding and abetting the principal tortfeasor's acts; (4) causation; and (5) damages. (Yune Decl. ¶¶ 49-54)

Under Rule 9(b), "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." The heightened pleading standard of Rule 9(b) has also been held to apply equally to claims of aiding and abetting fraud. *See Wight v. BankAmerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000). The court need not decide which jurisdiction's law would govern the substantive claims as both Belgian and Korean law would require some proof of fraud to permit recovery and Rule 9(b) would apply. Where an allegation is factually rooted in fraud, Rule 9(b) will apply. *See Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir.2004)(noting that the wording of Rule 9(b) " is cast in terms of the conduct alleged, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action"). While Rule 9(b) does provide that conditions of mind may be generally averred and therefore "the requisite intent of the alleged [perpetrator of the fraud] need not be alleged with great specificity", *Chill v. General Elec. Co.,* 101 F.3d 263, 267 (2d Cir.1996), it still must be adequately alleged.

Here, plaintiff has adequately alleged the fraud committed by Seo. But he has failed to plead, other than in a conclusory fashion, the manner in which the banks aided the fraud. Plaintiff has alleged that there were two sets of agreements between the defendant banks and Seo, one of which was not known to L & H Belgium. The plaintiff has not alleged that it is unlawful for the parties to have entered into these two sets of agreements. Plaintiff simply leaves it as a matter of inference from the presence of two sets that the banks were complicit in Mr. Seo's use of the one set of agreements in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 2935752 (S.D.N.Y.)
**(Cite as: Slip Copy)**

preparation of false financial statements which were given to L & H Belgium.

**\*9** In a conclusory manner, the Second Amended Complaint alleges that, after Seo's fraud came to light, each and every one of the defendant banks concealed the existence of the so-called secret side agreements. (SAC ¶ 49) It is unclear whether the banks "concealed" by refusing to communicate with counsel conducting the investigation or whether each and every bank affirmatively and falsely represented that the factoring arrangement was " without recourse." Because of the lack of particularity of this allegation, I am unable to tell whether it fairly can be read to relate to the actions of the defendant banks at an earlier point in time. The Second Amended Complaint lacks the particularity required by Rule 9(b).

In his amended pleading, the plaintiff is free to renounce a fraud based theory and proceed solely under KCA Article 760. Under KCA Article 760, the plaintiff would need to prove the fraud committed by Mr. Seo as the underlying tort but the claim against the defendant banks will not "sound in fraud" but in the banks' own negligence.

As presently drafted, plaintiff's claims sound, at least in part, in fraud but do not allege the actions of the defendant banks with the particularity required by Rule 9(b).

### CONCLUSION

Defendants' motion to dismiss under Rule 9(b), Fed.R.Civ.P., is GRANTED with leave to replead within twenty (20) days. Defendants' motion to dismiss the Second Amended Complaint on all other grounds is DENIED.

SO ORDERED.

S.D.N.Y.,2006.
Beana v. Woori Bank
Slip Copy, 2006 WL 2935752 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 3

**Westlaw.**

Not Reported in A.2d                                                                                    Page 1

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

**H**

In re Dean Witter Partnership Litigation
Del.Ch.,1998.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
In re DEAN WITTER PARTNERSHIP
LITIGATION
**No. CIV. A. 14816.**

July 17, 1998.

Pamela S. Tikellis, Esquire, and Robert J. Kriner,
Jr., Esquire, of Chimicles, Jacobsen & Tikellis,
Wilmington, Delaware; of Counsel: Nicholas E.
Chimicles, Esquire, Denise Davis Schwartzman,
Esquire, Francis J. Farina, Esquire, and M.
Katherine Meermans, Esquire, of Chimicles,
Jacobsen & Tikellis, Haverford, Pennsylvania,
Attorneys for Plaintiffs.
Kenneth J. Nachbar, Esquire, of Morris, Nichols,
Arsht & Tunnell, Wilmington, Delaware; of
Counsel: Martin London, Esquire, Richard A. Rosen
, Esquire, Robert N. Kravitz, Esquire, and Tracy
Anbinder Baron, Esquire, of Paul, Weiss, Rifkind,
Wharton & Garrison, New York, New York,
Attorneys for Defendants.

MEMORANDUM OPINION
CHANDLER, Chancellor.

*1 Investors, owners of interests in numerous real
estate limited partnerships, seek an accounting and
damages from general partners and financial
advisors for breaches of the fiduciary duties of care,
loyalty and candor. Information available to the
investors long before these lawsuits were instituted
put the investors on notice of the wrongs about
which they now complain. Therefore, all of the
investors' claims are barred by operation of the
applicable statute of limitations.

I. BACKGROUND

This action is a consolidation of several actions
brought by plaintiff investors against defendants
Dean Witter, Discover & Co. ("Dean Witter
Discover"), Dean Witter Reynolds, Inc. ("Dean
Witter Reynolds"), Dean Witter Realty, Inc. ("Dean
Witter Realty") (collectively "Dean Witter"), the
managing and associate general partners of seven
Dean Witter real estate limited partnerships, and
Tempo-GP, Inc. ("Tempo-GP"), the general partner
of Dean Witter/Coldwell Banker Tax Exempt
Mortgage Fund, L.P. ("Tax Exempt Mortgage Fund
").[FN1]

> FN1. An Order of Consolidation dated
> August 16, 1996, consolidated three
> actions filed in the Court of Chancery-
> *Segel v. Dean Witter, Discover & Co.,*
> C.A. No. 14816 (filed Feb. 6, 1996);
> *Schectman v. Dean Witter, Discover & Co.,*
> C.A. No. 14829 (filed Feb. 9, 1996);
> *Dosky v. Dean Witter, Discover & Co.,*
> C.A. No. 14838 (filed Feb. 15, 1996)-and
> added to the consolidated action plaintiffs
> from two other suits, one pending in the
> Southern District of New York-*Grigsby v.
> Dean Witter Reynolds, Inc.,* S.D .N.Y.,
> No. 96 Civ. 4064(LAP) (originally filed
> Dec. 27, 1995)-and one pending in the
> District of Maryland-*Young v. Dean
> Witter, Discover & Co.,* C.A. No.
> H-96-1139 (D.Md.) (originally filed Feb.
> 6, 1996). *See* Order of Consolidation
> (Aug. 16, 1996) (Docket No. 9).

Plaintiffs are customers of Dean Witter Reynolds,
who between 1984 and 1989, purchased from Dean
Witter Reynolds units of the following limited
partnerships: Dean Witter Realty Income
Partnership I, L.P. ("Income I"); Dean Witter Realty
Income Partnership II, L.P. ("Income II"); Dean
Witter Realty Yield Income Partnership III,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

L.P. ("Income III"); Dean Witter Realty Income Partnership IV, L.P. ("Income IV"); Dean Witter Realty Yield Plus, L.P. ("Yield Plus"); Dean Witter Realty Yield Plus II, L.P. ("Yield Plus II"); Dean Witter Realty Growth Properties, L.P. ("Growth Properties"); and Falcon Classic Cable Income Properties, L.P. ("Falcon Classic Cable").[FN2] With the exception of Falcon Classic Cable, each of these Partnerships is a wholly-owned direct or indirect subsidiary of Dean Witter and is organized in the State of Delaware.

> FN2. These limited partnerships will be referred to collectively as the "Partnerships. " The Partnerships bearing the Dean Witter name, *i.e.,* all of the defendant partnerships except Falcon Classic Cable, will also be referred to as the "Proprietary Partnerships." All of the Proprietary Partnerships are real estate limited partnerships.

Defendant Dean Witter Discover, a Delaware corporation, is a publicly-held financial services company providing credit and investment products. Defendant Dean Witter Reynolds, a Delaware corporation, is a broker-dealer and member of the New York Stock Exchange and other major securities, futures and options exchanges in the United States. Dean Witter Reynolds operates the securities business of Dean Witter Discover and acted as the offeror and/or underwriter for the sale of the Partnerships to plaintiffs. Dean Witter Reynolds also organized the Proprietary Partnerships that it sold to plaintiffs and acted as the exclusive selling agent for Falcon Classic Cable, which it did not sponsor.

Defendant Dean Witter Realty, a Delaware corporation, is a wholly-owned subsidiary of Dean Witter Discover. Dean Witter Realty is responsible for the creation, marketing and oversight of the Proprietary Partnerships. It is also the parent of the Delaware corporate subsidiaries formed to serve as the managing general partners of the Proprietary Partnerships. These corporate subsidiaries are, in turn, the general partners of the Delaware limited partnerships or corporations formed to serve as the

associate general partners of the Proprietary Partnerships.[FN3] Officers and employees of Dean Witter Realty served as officers and employees of these general partners. Dean Witter Realty was in charge of the day-to-day operations of each of the general partners of the Proprietary Partnerships.

> FN3. Managing and associate general partners will be referred to collectively as the "general partners."

**\*2** Defendants Dean Witter Realty Income Properties I Inc. and Dean Witter Realty Income Associates I, L.P. are the managing and associate general partners, respectively, of Income I. Defendants Dean Witter Realty Income Properties II Inc. and Dean Witter Realty Income Associates II, L.P. are the managing and associate general partners, respectively, of Income II. Defendants Dean Witter Realty Income Properties III Inc. and Dean Witter Realty Income Associates III, L.P. are the managing and associate general partners, respectively, of Income III. Defendants Dean Witter Realty Fourth Income Properties Inc. and Dean Witter Realty Income Associates IV, L.P. are the managing and associate general partners, respectively, of Income IV. Defendants Dean Witter Realty Yield Plus Inc. and Dean Witter Realty Yield Plus Associates, L.P. are the managing and associate general partners, respectively, of Yield Plus. Defendants Dean Witter Realty Yield Plus II Inc. and Dean Witter Realty Yield Plus Associates II, L.P. are the managing and associate general partners, respectively, of Yield Plus II. Defendants Dean Witter Realty Growth Properties Inc. and Dean Witter Realty Growth Associates, L.P. are the managing and associate general partners, respectively, of Growth Properties.

In addition, plaintiffs named as defendants Dean Witter Realty Income Associates I Inc. and Dean Witter Realty Income Associates II Inc.-the general partners of the associate general partners of Income I and Income II, respectively. Each of these defendant general partners is a Dean Witter affiliate, or wholly-owned direct or indirect subsidiary, organized in Delaware.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

Defendant Tempo-GP, a Delaware corporation, was originally owned jointly by a Dean Witter Discover subsidiary and Coldwell Banker Commercial Group, Inc. Today, Tempo-GP is a wholly-owned subsidiary of Dean Witter Discover. Tempo-GP is the general partner of the Tax Exempt Mortgage Fund and directed and controlled its activities.[FN4]

> FN4. In their Amended Complaint, none of the plaintiffs claims to have purchased units of the Tax Exempt Mortgage Fund. As such, plaintiffs do not have standing to assert any claims with respect to that fund or its general partner, Tempo-GP. *See Alabama By-Products Corp. v. Cede & Co.,* Del.Supr., 657 A.2d 254, 264 (1995).

Plaintiffs purport to bring this action on behalf of all persons and entities who purchased units of the Partnerships sold by or through Dean Witter Reynolds or other selling agents affiliated with Dean Witter from 1984 through the present.[FN5] Plaintiffs allege that defendants breached their fiduciary duties in connection with the Partnerships organized, sold and operated by defendants, in which plaintiffs invested. Among other things, plaintiffs allege that defendants breached the duties of loyalty, candor and care they owed to plaintiffs as their fiduciaries. Plaintiffs complain that they relied-to their detriment-upon the good faith of defendants in their roles as fiduciaries, as general partners, financial advisors and agents, and as officers and directors of the general partners. According to plaintiffs, defendants' breaches have caused plaintiffs to suffer the losses of substantial portions of their investments and have failed to realize the income, liquidity and security in their investments as promised them by defendants.[FN6]

> FN5. First Consolidated and Amended Class Action Complaint ¶ 37 (Docket No. 10) [hereinafter *Complaint* ]. All further references to "plaintiffs" shall include the named plaintiffs as well as the purported class of plaintiffs.

FN6. Complaint ¶ 3.

**\*3** Plaintiffs assert that Dean Witter sold the Partnerships through uniform sales materials that promoted sale of the Partnerships at the expense of candor. Specifically, plaintiffs claim that defendants misrepresented or failed to disclose to them at the time of purchase the nature of the risks involved in investing in the Partnerships, that defendants misrepresented or failed to disclose the financial condition of the Partnerships in order to conceal losses, mismanagement, fraud and self-dealing, and that defendants misled plaintiffs into believing that Dean Witter was recommending and selecting investments that presented low risk and were suitable for retirement accounts. [FN7] Plaintiffs further allege that although Dean Witter represented to plaintiffs that it would maintain a relationship with the Partnerships and oversee their operation, [FN8] Dean Witter failed to supervise the Partnerships in the plaintiff investors' best interests.

> FN7. Pls.' Memo. in Opp. to Defs.' Motion to Dismiss at 6 (Docket No. 32) [hereinafter *Pls.' Memo. in Opposition* ].

FN8. Complaint ¶ 25.

Plaintiffs insist that defendants were instead engaging in a systematic scheme designed to organize, sell and operate high risk, speculative limited partnerships in order to enrich themselves at the expense of plaintiff investors. According to plaintiffs, once defendants obtained investment capital from plaintiffs, defendants used the capital to purchase underperforming or failing investments owned by Dean Witter affiliates or to refinance underperforming loans owed to Dean Witter affiliates. Plaintiffs further allege that defendants channeled Partnership funds into faltering projects owned by earlier-formed Partnerships, to create the illusion of financial health for those Partnerships and to aid in marketing new ones.[FN9]

FN9. Pls.' Memo. in Opposition at 2.

Defendants filed a motion to dismiss on December 10, 1996.[FN10] The motion cites several grounds for dismissal, including: (1) that the claims are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

time-barred; (2) that plaintiffs' allegations fail to state a claim; and (3) that plaintiffs have improperly brought this action as a direct, rather than derivative, action. The parties briefed the motion, presented oral argument to the Court, and conducted a supplemental round of briefing specifically addressing the statute of limitations issue. As explained below, I agree with defendants that the applicable statute of limitations bars plaintiffs' claims. [FN11] Thus, plaintiffs' claims must be dismissed for failure to file within the statutory period.

> FN10. Defs.' Memo. in Support of Motion to Dismiss (Docket No. 21) [hereinafter *Defs.' Motion to Dismiss* ].

> FN11. Because I have determined that defendants' claim of time-bar is dispositive, I need not address the other grounds offered by defendants in their motion to dismiss.

## II. LEGAL STANDARD

There is clear legal precedent in Delaware for granting a motion to dismiss on the ground that a plaintiff's claims are barred by operation of the statute of limitations. [FN12] This is so even in equity. Although statutes of limitation do not generally apply directly in equity, equity follows the law and will apply a statute of limitations by analogy in appropriate circumstances. [FN13] Moreover, it is " well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss." [FN14]

> FN12. *Boeing Co. v. Shrontz,* Del. Ch., C.A. No. 11273, Berger, V . C. (Apr. 20, 1992) (dismissing breach of fiduciary duty claims on grounds of time-bar); *Halpern v. Barran,* Del. Ch., 313 A.2d 139 (1973) (same).

> FN13. *Kahn v. Seaboard Corp.,* Del. Ch., 625 A.2d 269, 271 (1993). *See also United*

> *States Cellular Inv. Co. v. Bell Atlantic Mobile Sys., Inc.,* Del.Supr., 677 A.2d 497 (1996) ("Absent some unusual circumstances, a court of equity will deny a plaintiff relief when suit is brought after the analogous statutory period.").

> FN14. *Seaboard,* 625 A.2d at 277 (dismissing, with permission to replead, complaint in equity on statute of limitations grounds).

**\*4** In evaluating a motion to dismiss, I am required to assume the truthfulness of all well-pleaded (*i.e.,* nonconclusory) allegations of the complaint for purposes of the motion. [FN15] I am also required to draw from the complaint all inferences or conclusions of fact that may reasonably be drawn from the specific facts alleged therein. [FN16] Conclusions asserted in the complaint, however, will only be accepted as true if there are specific allegations of fact to support them. [FN17] In the end, I may only dismiss the Amended Complaint if it is clear that plaintiffs will not be entitled to relief under any set of facts that could be proven based on the allegations of the complaint. [FN18]

> FN15. *Loudon v. Archer-Daniels-Midland Co.,* Del.Supr., C.A. No. 88, 1996, at 11-12, Veasey, C.J. (Sept. 17, 1997) (en banc); *Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 & n. 6 (1988).

> FN16. *Id.*

> FN17. *In re Santa Fe Pac. Shareholders Litig.,* Del.Supr., 669 A.2d 59, 65-66 (1995); *Grobow,* 539 A.2d at 187 & n. 6.

> FN18. Ct. Ch. R. 12(b)(6); *Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1105 (1985); *Litman v. Prudential-Bache Properties, Inc.,* Del. Ch., C.A. No. 12137, at 4-5, Chandler, V.C. (Jan. 14, 1994), *aff'd,* Del.Supr., 642 A.2d 837 (1994).
> Plaintiffs cite *Snyder v. Butcher & Co.,* Del.Super., C.A. No. 91C-04-289,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

Goldstein, J. (Sept. 15, 1992), for the proposition that it is improper for a court to grant a motion to dismiss on statute of limitations grounds whenever the complaint alleges fraudulent concealment as part of its claims. Plaintiffs, however, misread *Snyder.* *Snyder* stated that granting a motion to dismiss on statute of limitations grounds would be inappropriate where a plaintiff has "*successfully pled* fraudulent concealment." *Id* . at 9 (emphasis added). Where a plaintiff has successfully alleged a claim of fraudulent concealment "the affirmative statute of limitations defense turns on a question of fact," rendering a summary disposal inappropriate. *Id. Snyder* does nothing, however, to alter the general rule that when it is clear from the face of the complaint that the statute of limitations bars a plaintiff's claims, despite an allegation of fraudulent concealment, dismissal is still appropriate. *See Boeing Co. v. Shrontz,* op. at 4-5 (dismissing breach of fiduciary duty claims on statute of limitations grounds, despite allegation of fraudulent self-dealing). *See also Shockley v. Dyer,* Del.Supr., 456 A.2d 798, 799 (1983) (affirming grant of summary judgment, despite plaintiff's allegation of fraudulent concealment, where viewing the facts in a light most favorable to plaintiffs, "it becomes clear that by an exercise of due diligence plaintiff could have discovered her rights.").

### III. ANALYSIS

#### A. Statute of Limitations

It is well-settled under Delaware law that a three-year statute of limitations applies to claims for breach of fiduciary duty.[FN19] With the exception of the Falcon Classic Cable claim, which was a brand new claim as of the filing of the Amended Complaint on October 7, 1996, plaintiffs filed their pre-consolidation complaints on February 6, 9 & 15, 1996, alleging breaches of fiduciary duty by

Dean Witter and the general partners of the Partnerships. [FN20] Applying the three-year statute of limitations, any claim that accrued prior to February 6, 1993 (or prior to October 7, 1993, with respect to the Falcon Classic Cable claim) is barred by operation of the statute. If, however, plaintiffs' cause of action accrued on or after February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic claim), then the claims are timely and can proceed.

> FN19. 10 *Del. C.* § 8106; *Dofflemyer v. W.F. Hall Printing Co.,* D. Del., 558 F.Supp. 372, 379 (1983) (applying Delaware law).

> FN20. Under the Order of Consolidation, all documents previously filed and served in the cases consolidated by the Order were deemed filed, served and part of the record in the consolidated action. Only the three Court of Chancery cases were consolidated by that Order. The earliest of these cases-*Segel*-was filed February 6, 1996. Thus, February 6, 1996, is the earliest operative date for statute of limitations purposes. *See* Order of Consolidation ¶¶ 1, 9.

#### B. Time of Accrual

The general law in Delaware is that the statute of limitations begins to run, *i.e.,* the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action. [FN21] Plaintiffs here complain of two different types of injuries. First, they allege that Dean Witter violated its fiduciary duties in the marketing and sale of the Partnerships. Second, plaintiffs allege that defendants [FN22] committed post-offering breaches of their fiduciary duties in connection with the management and oversight of the Partnerships.

> FN21. *David B. Lilly Co. v. Fisher,* D. Del., 18 F.3d 1112, 1117 (1994); *Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* Del.Supr., 330 A.2d 130, 132 (1974)

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

.

> FN22. Plaintiffs do not allege post-offering
> mismanagement with respect to Falcon
> Classic Cable. Complaint ¶¶ 266-68.

Plaintiffs allege that defendants breached their
fiduciary duties in recommending and selling to
plaintiffs Partnerships that would never (and could
never) achieve their promised objectives. Accepting
this allegation as true, plaintiffs' injuries occurred
*when they purchased* their Partnership interests as a
result of defendants' alleged misrepresentations. [FN23]
Thus, plaintiffs' cause of action accrued when
they invested in the allegedly fraudulent
Partnerships. The Partnerships at issue were
marketed and sold to the plaintiffs in the mid-to-late
1980s. The last of these sales was completed by the
end of 1989.[FN24] Thus, with respect to the
marketing and sale of the Partnerships, plaintiffs'
cause of action accrued no later than year-end 1989.
Absent tolling of the statute of limitations, these
claims became stale at the end of 1992-years before
plaintiffs filed their Amended Complaint.

> FN23. *Seidel v. Lee,* D. Del., C.A. No.
> 93-494-JJF, at 16, Farnen, C.J. (Dec. 30,
> 1996) (applying Delaware law) (fiduciary
> duty claim accrues when breach
> accomplished). *See also In re Merrill
> Lynch Ltd. Partnerships Litig.,* S.D.N.Y.,
> No. 95 Civ. 10657(MBM), at 11-20 (Aug.
> 26, 1997) (applying federal RICO law,
> which has same standard for statute of
> limitations accrual).

> FN24. Complaint ¶¶ 9-23.

**\*5** With respect to the allegations of post-offering
breaches arising out of the management and
oversight of the Partnerships, plaintiffs allege that
defendants operated the Partnerships to benefit
themselves at the expense of the investors. Among
other things, plaintiffs complain that Partnership
real estate investments were chosen solely for the
purpose of benefiting other Dean Witter affiliates
and that the Partnerships paid excessive
commissions and fees. For each Partnership, these

alleged violations of fiduciary duty began-and
plaintiffs consequently began to suffer
injury-shortly after each Partnership was formed.
The Amended Complaint is replete with allegations
of injudicious mortgage loans and unwarranted
management commissions throughout the
mid-to-late 1980s.[FN25] Thus, as with the marketing
and sales claims, plaintiffs' cause of action
regarding the alleged post-offering breaches
accrued no later than year-end 1989.[FN26] Plaintiffs
filed their complaint on February 6, 1996-well past
the expiration of the three-year limitations period.
*Absent tolling,* therefore, all of plaintiffs' claims fall
outside the statutory period and would be
time-barred.

> FN25. *See, e.g.,* Complaint ¶¶ 91-121
> (Yield Plus), ¶¶ 129-35 (Yield Plus II),
> ¶¶ 136-46 (Yield Plus & Yield Plus II),
> ¶¶ 156-79 (Growth Properties), ¶¶
> 193-98 (Income I), ¶¶ 209-16 (Income
> II), ¶¶ 233-39 (Income II, III & IV).

> FN26. *Dofflemyer,* 558 F.Supp. at 379
> (fiduciary duty claim accrues at time of
> breach).

### C. Tolling

Plaintiffs allege that their claims are timely because
the statute of limitations was tolled until January 26,
1996, when an article in the *Wall Street Journal* [FN27]
-reporting that the Securities and Exchange
Commission ("SEC") was negotiating with Dean
Witter Reynolds and two other brokerage firms
concerning their limited partnership sales practices
during the 1980s and that a settlement fund might
be established-first put them on notice of their
potential claims.[FN28] Plaintiffs assert three
separate theories to support a tolling of the statute
of limitations in this case: (1) inherently
unknowable injuries; (2) fraudulent concealment;
and (3) equitable tolling. Each of these doctrines
permits tolling of the limitations period where the
facts underlying a claim were so hidden that a
reasonable plaintiff could not timely discover them.
[FN29]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

FN27. This article will be referred to as the "*Wall Street Journal*" article" or the "article.
"

FN28. Pls.' Memo. in Opposition at 9.

FN29. *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("Ignorance of the facts supporting a cause of action will not toll the statute, absent some special consideration such as ' inherently unknowable' injuries or fraudulent concealment.").

Under the doctrine of inherently unknowable injuries, the running of the statute of limitations is tolled while the discovery of the existence of a cause of action is a practical impossibility.[FN30] For the limitations period to be tolled under this doctrine, there must have been no observable or objective factors to put a party on notice of an injury, and plaintiffs must show that they were blamelessly ignorant of the act or omission and the injury. [FN31] Often, plaintiffs can establish " blameless ignorance" by showing justifiable reliance on a professional or expert whom they have no ostensible reason to suspect of deception.[FN32] This doctrine tolls the limitations period until a plaintiff had "reason to know" that a wrong has been committed. [FN33]

FN30. *Ruger v. Funk,* Del.Super., C.A. No. 93C-04-210, at 5-6, Lee, J. (Jan. 22, 1996).

FN31. *Seidel,* op. at 17.

FN32. *See, e.g., Isaacson,* 330 A.2d at 133-34 (applying "discovery rule" in light of relationship of "confidence and reliance by plaintiff on the expertise of defendant").

FN33. *Pack & Process, Inc. v. Celotex Corp.,* Del.Super., 503 A.2d 646, 650 (1985).

The statute of limitations will also be tolled if a

defendant engaged in fraudulent concealment of the facts necessary to put a plaintiff on notice of the truth.[FN34] Unlike the doctrine of inherently unknowable injuries, fraudulent concealment requires an affirmative act of concealment by a defendant-an "actual artifice" that prevents a plaintiff from gaining knowledge of the facts or some misrepresentation that is intended to put a plaintiff off the trail of inquiry.[FN35] "Mere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to operation of the statute [of limitations]." [FN36] Where there has been fraudulent concealment from a plaintiff, the statute is suspended until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence. FN37

FN34. *Litman,* op. at 8.

FN35. *Halpern,* 313 A.2d at 143.

FN36. *Id.*

FN37. *Id.*

**\*6** Under the theory of equitable tolling, the statute of limitations is tolled for claims of wrongful self-dealing, even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary.[FN38] Underlying this doctrine is the idea that "even an attentive and diligent [investor] relying, in complete propriety, upon the good faith of [fiduciaries] may be completely ignorant of transactions that ... constitute self-interested acts injurious to the [Partnership]." [FN39] This doctrine tolls the limitations period until an investor knew or had reason to know of the facts constituting the wrong.[FN40]

FN38. *Yaw v. Talley,* Del. Ch., C.A. No. 12882, at 10, Jacobs, V.C. (March 7, 1994) (Fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection of the statute of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

limitations.).

FN39. *Seaboard,* 625 A.2d at 275-76
(Given the fiduciary duties that the law
imposes on corporate directors,
stockholders are entitled to rely on the
good faith of the directors when they act
with respect to the corporation's property
or processes.).

FN40. *In re Maxxam, Inc./Federated Dev.
Shareholders Litig.,* Del. Ch., 659 A.2d
760, 769 (Feb. 13, 1995).

As the party asserting that tolling applies, plaintiffs
bear the burden of pleading specific facts to
demonstrate that the statute of limitations was, in
fact, tolled.[FN41] Significantly, if the limitations
period is tolled under any of these theories, it is
tolled *only until* the plaintiff discovers (or
exercising reasonable diligence should have
discovered) his injury. [FN42] Thus, the limitations
period begins to run when the plaintiff is *objectively*
aware of the facts giving rise to the wrong, *i.e.,* on
inquiry notice.[FN43] Accordingly, for plaintiffs to
establish that this action was filed in a timely
manner, under any one of these theories, they must
convince the Court that they were *not* on inquiry
notice of their claims before February 6, 1993 (or
before October 7, 1993, with respect to the Falcon
Classic Cable claim).[FN44]

> FN41. *United States Cellular,* 677 A.2d at
> 504; *Carlton Investments v. TLC Beatrice
> Int'l Holdings, Inc.,* Del. Ch., C.A. No.
> 13950, at 35, Allen, C. (Nov. 21, 1995).

FN42. *In re ML-Lee Acquisition Fund II,
L.P. Litig.,* D. Del., 848 F.Supp. 527, 554
(1994) (inherently unknowable injuries);
*United States Cellular,* 677 A.2d at 503
(equitable tolling); *Litman,* op. at 8
(fraudulent concealment).

FN43. *See Seidel,* op. at 16-17 (inherently
unknowable injuries: statute tolled until
such time as persons of ordinary
intelligence and prudence would have facts

sufficient to place them on inquiry notice
of an injury); *Seaboard,* 625 A.2d at 275
(equitable tolling: statute of limitations
does not run against plaintiff until he
knows or has reason to know facts alleged
to give rise to wrong); *Halpern,* 313 A.2d
at 143 (fraudulent concealment: running of
statute suspended only until plaintiff's
rights are discovered or would have been
discovered by exercise of reasonable
diligence). *See also Nardo v. Guido
DeAscanis & Sons, Inc.,* Del.Super., 254
A.2d 254, 256 (1969) (standard for length
of tolling is the same for fraudulent
concealment, equitable tolling and
inherently unknowable torts).

FN44. Where the tolling of the statute of
limitations turns on controverted issues of
fact, a pre-discovery dismissal of the claim
would be inappropriate. *See, e.g., In re
Asbestos Litig.,* Del.Supr., 673 A.2d 159,
163 (1996) (only when the record is
uncontroverted that plaintiff "discovered"
his injury more than [three] years prior to
filing his suit is summary judgment
appropriate). However, when it is clear
from the face of the complaint (and the
documents incorporated by reference in it)
that plaintiffs' tolling theories fail even to
raise a legitimate doubt about the time the
claims accrued, dismissal is appropriate if
the claims were filed after the applicable
limitations period expired. Plaintiffs cite *In
re Maxxam* for the proposition that "a
defendant should not be permitted to use
the statute of limitations as a shield where
the defendant possesses information
critical to the existence of an actionable
claim of wrongdoing and prevents the
plaintiff from discovering that information
in a timely fashion." *In re Maxxam,
Inc./Federated Dev. Shareholders Litig.,*
Del. Ch., C.A. Nos. 12111 & 12353, at 13,
Jacobs, V.C. (June 21, 1995). The danger
is in dismissing an action prematurely
when plaintiffs do not yet have access to
the information they need to state their
claims fully. Here, it is clear to the Court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

that all of the necessary information was not only publicly available, but already in plaintiffs' hands at least as far back as 1990-an entirely different situation than the one presented to the *In re Maxxam* Court.

### *D. Were Plaintiffs on Inquiry Notice?*

Defendants contend it is clear that, based on the allegations of the Amended Complaint, plaintiffs cannot under any circumstances show that the statute of limitations was tolled for the length of time necessary to render their action timely. First, defendants note that the very facts pleaded in the Amended Complaint demonstrate that plaintiffs were on inquiry notice of defendants' alleged wrongful conduct long before February 6, 1993 (or October 7, 1993, with respect to the Falcon Classic Cable claim). Second, defendants point out that other Partnership investors filed lawsuits against Dean Witter Reynolds alleging breach of fiduciary duty in connection with the same Proprietary Partnerships *before* the *Wall Street Journal* article was published.[FN45] That fact, defendants argue, shows conclusively that the existence of the claims was not beyond the grasp of the reasonably diligent investor. Finally, defendants make the practical argument that the *Wall Street Journal* article, touted by plaintiffs as their clarion call, could not possibly have provided the "essential missing information" that plaintiffs assert. The article simply did not disclose any information about Dean Witter's sales practices, nor did it identify any limited partnerships by name.

> FN45. *See, e.g., Grigsby v. Dean Witter Reynolds Inc.,* Cal.Super. Ct., C.A. No. 695777 (filed Dec. 27, 1995) (asserting claims with respect to the Proprietary Partnerships); *McCoy v. Dean Witter Reynolds, Inc.,* E.D. Tenn., C.A. No. 94-5779 (regarding demand for arbitration filed Dec. 28, 1989, asserting claims with respect to Income I & II); *Eno v. Dean Witter Reynolds, Inc.,* N.Y. Sup.Ct., Index No. 127300/95 (regarding demand for arbitration filed May 25, 1994, asserting

claims with respect to Income II).

Defendants emphasize that the allegations of wrongful conduct asserted in the Amended Complaint are based on events that all occurred in the mid-to-late 1980s. Moreover, every fact cited by plaintiffs in the Amended Complaint comes from disclosures in documents that were either provided to plaintiffs contemporaneously with the wrongful conduct now being alleged or publicly available Securities Exchange Commission ("SEC") filings made by the Partnerships.[FN46] As a matter of law, defendants assert, disclosures in any of those documents-the sole source of plaintiffs' allegations-were sufficient to place plaintiffs on inquiry notice of their claims long before February 6, 1993.

> FN46. According to defendants, investors in each Partnership received from Dean Witter a prospectus (and all applicable supplements), annual and quarterly reports, and periodic "property profiles" describing properties in which the Partnership had invested. Each Partnership also filed with the SEC (and made available to investors on request) reports on Form 10-K, reports on Form 10-Q, and reports on Form 8-K. Defs.' Motion to Dismiss at 7-8.
> The Court may properly consider the contents of the *Wall Street Journal* article, Partnership prospectuses, property profiles, customer account statements, quarterly and annual reports and SEC filings in considering this motion to dismiss, because by expressly referring to and so heavily relying on these documents in the Amended Complaint, plaintiffs have incorporated them by reference into the Amended Complaint. *Glaser v. Norris,* Del. Ch., C.A. No. 9583, at 9 n. 1, Chandler, V.C. (Jan. 6, 1992).

*7 Although the information they now use to support their allegations was publicly available at the time of the alleged wrongs, plaintiffs claim that they were prevented from discovering defendants' wrongful conduct prior to January 26, 1996, as a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

result of defendants' misrepresentations regarding the health of their Partnership investments. Until reading the *Wall Street Journal* article, plaintiffs assert that they relied-and were entitled to rely-on defendants' assurances that the Partnerships' properties were performing better than comparable properties, that the Partnerships' losses were only temporary, and that these losses were not caused by any wrongful conduct on the part of defendants. In fact, the Partnerships' losses were accompanied by an overall real estate market decline. It was the publication of the article, plaintiffs contend, that first alerted them to their potential claims, *i.e.,* to the idea that their investment losses were the result of defendants' wrongful conduct rather than a general downturn in the real estate market. And it was not until, *after reading the article,* plaintiffs hired a consulting expert, who sifted through "more than 300 publicly-filed documents," that plaintiffs were able to reconstruct the Partnerships and actually discover defendants' wrongful conduct. FN47 Accordingly, plaintiffs argue they were not on inquiry notice until January 26, 1996 and, therefore, that is the date the statute of limitations began to run.

FN47. Pls.' Memo. in Opposition at 3.

As noted above, the limitations period is tolled until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, *if pursued,* would lead to the discovery of the injury. FN48 Inquiry notice does *not* require *actual* discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme.FN49 Thus, the critical inquiry for purposes of this motion to dismiss is: were plaintiffs *entitled to rely* on defendants' representations for as long as they did, *i.e.,* up until publication of the January 26, 1996, *Wall Street Journal* article, or were they on inquiry notice before that date? FN50

FN48. *In re ML-Lee Acquisition Fund II,*

*L.P. Litig.,* 848 F.Supp. at 554 (defendants' misrepresentations were unknowable until publication of the Annual Report disclosing particular investment and its lack of success).

FN49. *McCoy v. Goldberg,* S.D.N.Y., 748 F.Supp. 146, 158 (1990) (statutory period does not await plaintiffs' leisurely discovery of the full details of the alleged scheme) (internal citations omitted). Although plaintiffs suggest that their claims were "unknowable" because it required an expert to uncover defendants' alleged wrongdoing, that argument is without merit. It may in fact have taken an expert to unravel the entire scheme alleged by plaintiffs. But having all of the facts necessary to articulate the wrong is *not* required. Rather, "[o]nce a plaintiff is in possession of facts sufficient to make him suspicious, or that ought to make him suspicious, he is deemed to be on inquiry notice." *Harner v. Prudential Secs. Inc.,* E.D. Mich., 785 F.Supp. 626, 633 (1992) (citations omitted), *aff'd,* 6th Cir., 35 F.3d 565 (1994).

FN50. Defendants assert that when plaintiffs read the article, they responded by doing what they could have done several years earlier-they read the public documents and hired an expert to review them. Defs.' Motion to Dismiss at 15-16.

The Partnerships sustained steady losses from the outset. Plaintiffs allege that defendants purposely put them off the trail of inquiry by notifying them of these losses, while at the same time reassuring plaintiffs that the Partnerships were returning profits. FN51 For example, plaintiffs "received regular distributions, falsely reassuring [them] regarding the financial condition of their investments." FN52 In reliance on the fiduciary duties owed by defendants, plaintiffs assert that they "had no reason to go behind Defendants' campaign of misinformation" to discover the true source of the Partnership losses. FN53

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF    Document 53-2    Filed 04/10/2007    Page 29 of 47    Page 74 of 133

Not Reported in A.2d    Page 11

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

FN51. *See, e.g.,* Income III, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 6-C (Docket No. 25) ("1990 was a difficult and disappointing year for real estate investments in general.... Fortunately, due to the high quality of its properties and size of its portfolio, the Partnership has been able to avoid the worst of the[ ] problems.... The cash distribution paid during the 1990 fiscal year was ... an annualized return of 6.25%.").

FN52. Pls.' Memo. in Opposition at 51.

FN53. *Id.* at 48.

**\*8** Plaintiffs specifically complain that the annual reports concealed the fact that these consistent cash distributions were actually a return of investors' capital rather than a "return on investment." [FN54] Pointing to the 1990 Annual Report for the Yield Plus II Partnership as an example, plaintiffs assert that they could not have known that Partnership capital was being impaired, in light of the statement that the "distribution ... was an annualized return on investment of 7.5%." [FN55] But in the same annual report, three pages away on page four, is a chart showing clearly that the partners' capital had declined from the previous year. Moreover, from a chart on page six, it is apparent from even the most cursory glance that the amount of the cash distributions for the year 1990 far exceeded the Partnership's net income for the same year. These charts are not, as plaintiffs suggest, hard to understand, nor are they buried at the back of a thick report. The typical annual report for the Partnerships is no more than fifteen pages in length. While the distributions were maintained at a fairly high level, looking beyond the language on the first page of these annual reports, the fact that the distributions are consistently greater than the Partnership income *should have alerted* plaintiffs to the fact that something was amiss.

FN54. *See, e.g.,* Pls.' Memo. in Opposition at 7, 23-24, 26-28, 51.

FN55. Yield Plus II, 1990 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (Dec. 10, 1996), Ex. 2-D (Docket No. 23).

Plaintiffs seek refuge in the proposition that where the statute of limitations inquiry involves claims of self-dealing by a fiduciary, "[t]he emphasis is upon the protection of the beneficiary of the fiduciary duty, so long as she is reasonably attentive to her interests, albeit trusting." [FN56] Accordingly, plaintiffs assert, the fiduciary relationship between plaintiffs and defendants in this case entitled plaintiffs to rely upon the presumed good faith and loyalty of defendants. Plaintiffs correctly point out that beneficiaries are entitled to trust their fiduciaries .[FN57] As a result, reasonable reliance on the competence and good faith of those who have assumed a legal responsibility toward a plaintiff can be sufficient to toll the running of the statute of limitations.[FN58] But, the trusting plaintiff still must be *reasonably attentive* to his interests. " *[B]eneficiaries should not put on blinders to such obvious signals as publicly filed documents, annual and quarterly reports, proxy statements, and SEC filings.*" [FN59] Thus, even where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available.[FN60]

FN56. *Carlton Investments v. TLC Beatrice Int'l Holdings, Inc.,* Del. Ch., C.A. No. 13950, at 37, Allen, C. (Nov. 21, 1995).

FN57. *See, e.g., Borden v. Sinskey,* 3d Cir., 530 F.2d 478, 489, n. 10 (1976) (" Shareholders have no duty to search a corporation's records for evidence of misconduct on the part of corporate officers and directors. Rather, they are entitled to assume that those standing in a fiduciary relationship to them will be faithful to their charge.").

FN58. *Seaboard,* 625 A.2d at 275.

FN59. *Seidel,* op. at 18 (emphasis added).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
(Cite as: Not Reported in A.2d)

FN60. *Id.* (rejecting plaintiff's inherently unknowable tolling argument because "the public documents, which form the basis of many of Plaintiff's claims, could have provided Plaintiff with adequate notice of an alleged misconduct by Defendants."). In the instant case, the public documents provide the basis for *all* of plaintiffs' claims. *See also In re USACafes, L.P. Litig.,* Del. Ch., C.A. No. 11146, 18 Del. J. Corp. L. 1204, 1213 (1993) ("[I]nterest holders need not delve aggressively into the internal affairs of a ... limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights.").

It is not too much to ask investors to read beyond the first page of an annual report, to read past the rosy forecasts and actually look at the cold, hard figures provided to them. Had plaintiffs bothered, for example, to read past the first page of the 1989 Annual Report for Income II-a document that was delivered to investors by mid-1990 at the latest-they would have been alarmed. FN61 Although large distributions were being made, with a quick glance it is clear that the amount of these distributions far exceeded the "net income" figure.FN62 In fact, the figures show the amount of the "partners' capital" steadily declining from 1986 to 1989.FN63 Yet, the first page of this annual report states so optimistically: "The cash distribution paid for the 1989 fiscal year [constituted] an annualized return of 7%." This blatant contradiction should have been a "red flag" to any investor-and should have prompted an inquiry by plaintiffs into the health of their investments. FN64

> FN61. Income II, 1989 Annual Report at 1, attached to Affidavit of Ronald J. DiPietro (July 11, 1997), Ex. C (Docket No. 52).

> FN62. For the fiscal year 1989, the Income

II Partnership shows a net income figure of $7,043,996 and cash distributions of $13,768,450. *Id.* at 7.

FN63. *Id.*

FN64. *In re Prudential Sec. Inc. L.P. Litig.,* S.D.N.Y., 930 F.Supp. 68, 76 (1996) (" Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him.").

\*9 The presence of this inherently contradictory information in each Partnership's annual report starting in the late 1980s for the earlier Partnerships and its appearance in all of the Partnerships by 1990 compels the conclusion that plaintiffs were not reasonably attentive to their investment interests. FN65 Plaintiffs were not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement. FN66 Whether accompanied by optimistic projections or not, these discrepancies alone were sufficient notice of wrongdoing to prompt inquiry into the Partnerships. Upon receipt for each Partnership of the first annual report revealing cash distributions in excess of net income, plaintiffs were on inquiry notice of their claims.FN67

> FN65. *See, e.g.,* Income I, 1989 Annual Report, Ex. A; Income II, 1989 Annual Report, Ex. C; Income III, 1989 Annual Report, Ex. L; Income IV, 1989 Annual Report, Ex. M; Growth Properties, 1989 Annual Report, Ex. D (attachments to the Affidavit of Ronald J. DiPietro (July 11, 1997) (Docket No. 52)); Yield Plus, 1989 Annual Report, Ex. 1-D; Yield Plus II, 1990 Annual Report, Ex. 2-D (attachments to Affidavit of Ronald J. DiPietro (Dec. 10, 1996) (Docket No. 23)); Falcon Classic Cable, 1990 Annual Report, Ex. B

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF   Document 53-2   Filed 04/10/2007   Page 31 of 47

Page 76 of 133

Not Reported in A.2d                                                          Page 13

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

(attachment to Affidavit of Mary Lou Frick (Dec. 10, 1996) (Docket No. 26)).

FN66. *See, e.g., Playtex, Inc. v. Columbia Casualty,* Del.Super., C.A. No. 88C-MR-233, at 7, Del Pesco, J. (Sept. 20, 1993) ("inherently unknowable" theory of tolling did not apply where a "wealth of information regarding [the cause of action] was generally available" when the fraud occurred); *Halpern,* 313 A.2d at 143 (statute is tolled only for the "period of fraudulent concealment").

FN67. *See Ruger v. Funk,* op. at 6 (" Actual discovery surely commences the running of the statute; so will any change in circumstances that renders the injury no longer inherently unknowable, or the ignorance of the party-plaintiff no longer blameless.").

The Amended Complaint also alleges that such "deceptive" cash distributions were used to promote the sale of later Partnerships, and the purchasers of the later Partnerships would have no reason to review the financial information/materials for the earlier Partnerships. Assuming this is true, it still should have been obvious to the investors soon after receiving their annual reports that the cash distributions *they* were receiving were inflated and not reflective of actual earnings. Perhaps for one year, this would not raise too much concern, but certainly after the second or third straight year of cash distributions that far exceeded Partnership income, accompanied by a commensurate decline in partners' capital, plaintiffs should have been aware that the cash distributions they were receiving were not the result of investment gains-and that they were most likely duped into purchasing the Partnerships in the first place. The inherent contradiction between the distributions-described in these annual reports as "annualized returns"-and the declining partners' capital and net income lower than the distributions should have

caused plaintiffs to question whether the touted cash distributions of the earlier partnerships were truly indicative of profits. That is inquiry notice. *Queen Anne Pier Condominium Council v. Raley,* Del.Super., C.A. No. 85C-JA10, at 8, Lee, J. (Jan. 26, 1988) (inquiry notice means the existence of facts sufficient to put person of ordinary intelligence and prudence on inquiry which, *if pursued,* would lead to the discovery).

## IV. CONCLUSION

On the basis of this record, I conclude that the information in the annual reports alone should have provided plaintiffs with adequate notice of any alleged misconduct by defendants.[FN68] Based on the facts alleged in the Amended Complaint, drawing all inferences in favor of plaintiffs, I conclude that plaintiffs were clearly on inquiry notice of their claims long before February 6, 1993 (or before October 7, 1993, with regard to the Falcon Classic Cable claim).[FN69] The limitations period for this cause of action is three years. Plaintiffs' February 1996 filing (the earliest of plaintiffs' filings) comes *more* than three years after they were placed on inquiry notice. For these reasons, I grant defendants' motion to dismiss on the ground that the plaintiffs' claims are time-barred by operation of the statute of limitations. [FN70]

> FN68. Although I conclude that the glaring inconsistencies contained in the annual reports were sufficient, in and of themselves, to place plaintiffs on inquiry notice of their potential causes of action, those discrepancies were not the only indications plaintiffs had of their potential claims. I need not address them in substance (as I find the material in the annual reports dispositive on the issue), but I am inclined to agree with defendants' other assertions of plaintiffs' inquiry notice: (1) that plaintiffs were on notice no later than 1992, when defendants changed the format of their monthly account statements to reflect the true, rather than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1998 WL 442456 (Del.Ch.), 24 Del. J. Corp. L. 203
**(Cite as: Not Reported in A.2d)**

> par, value of the Partnerships. *See In re
> Prudential Sec. Inc. L.P. Litig.,* 930
> F.Supp. at 76-77; (2) that some investors
> in the Partnerships did manage to file
> lawsuits against the very same limited
> partnerships *before* January 26, 1996,
> suggests the alleged wrongful conduct was
> detectable by the average investor; and (3)
> that the *Wall Street Journal* article neither
> disclosed any concrete information about
> sales practices or the investments in
> question, nor mentioned by name the
> limited partnership defendants in this case,
> thus raising a serous doubt as to how the
> article alone could have prompted such an
> inquiry.

> FN69. *Cf. Carlton Investments v. TLC
> Beatrice Int'l Holdings, Inc.,* Del. Ch.,
> C.A. No. 13950, Allen, C. (Nov. 21, 1995)
> (motion to dismiss denied because issue of
> plaintiffs' inquiry notice was in dispute).

> FN70. Plaintiffs' request, in the alternative,
> to amend their Amended Complaint is
> hereby denied. No amendment would cure
> the fatal flaw in plaintiffs' current
> Amended Complaint-that it was filed too
> late. *Glaser v. Norris,* Del. Ch., C.A. No.
> 9538, at 30-31, Chandler, V.C. (Jan. 6,
> 1992) ("A court should deny leave to
> amend a complaint when the amendment
> would be futile due to the insufficiency of
> the proposed amendment.")

IT IS SO ORDERED.

Del.Ch.,1998.
In re Dean Witter Partnership Litigation
Not Reported in A.2d, 1998 WL 442456 (Del.Ch.),
24 Del. J. Corp. L. 203

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

## Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1994 WL 782230 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Page 1

**C**
Ecke v. U.S.
D.Del. 1994
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Wolfgang ECKE, Plaintiff,
v.
UNITED STATES of America, et al., Defendants.
**Civ. A. No. 88-688-LON.**

March 1, 1994.

Wolfgang Ecke, pro se, plaintiff, Berlin Germany.
Nina A. Pala, U.S. Atty's Office, Wilmington, DE,
for defendants.

*ORDER*

LONGO BARDI, District Judge.
**\*1** 1. Presently before the Court is the
Magistrate-Judge's January 12, 1994 Report and
Recommendation, Docket Item (D.I.) 66,
recommending dismissal of this action, or in the
alternative summary judgment for Defendants.
Originally, Plaintiff was to file his objections to the
Report and Recommendation, if any, by January 31,
1994. On February 1, 1994, Plaintiff sent a fax to
the Court requesting that the deadline for filing
objections to the Report and Recommendation be
extended until February 28, 1994. D.I. 68. This
Court granted Plaintiff's request for an extension
and ordered that Plaintiff submit his objections, if
any, by February 28, 1994. D.I. 69. Plaintiff has
failed to file any objections by February 28, 1994
and, as of the signing of this order, the Court has
not received an additional request for an extension
of time or any other communication from Plaintiff.

2. The Magistrate-Judge recommends dismissal of
Plaintiff's action pursuant to Defendants' motion to
dismiss, D.I. 58. As the Magistrate-Judge
recognized in her Report and Recommendation,
Plaintiff has repeatedly failed to comply with the
orders of this court. This Court has been extremely

indulgent of Plaintiff in granting him extensions of
time, giving him numerous opportunities to amend
his complaint and excusing his failure to comply
with the rules. This indulgence, however, must
come to an end. For all of the reasons stated by the
Magistrate-Judge in the Report and
Recommendation, this Court grants Defendants'
motion to dismiss.

NOW, THEREFORE, after a careful and de novo
review of the record in this action,

IT IS ORDERED that:

1. The Magistrate-Judge's Report and
Recommendation, D.I. 66, is adopted by the Court.

2. Defendants' motion to dismiss, D.I. 58, is
GRANTED and Plaintiff's claims against all
Defendants are dismissed without prejudice.

3. Defendants' motion to stay discovery, D.I. 60, is
moot.

*REPORT AND RECOMMENDATION*

[January 12, 1994]

TROSTLE, United States Magistrate-Judge.

FACTS AND PROCEEDINGS

Plaintiff's *pro se* Complaint was received by this
Court on November 3, 1988 (D.I. 2). Prior to that
time, plaintiff had filed an administrative claim with
the U.S. Department Justice under the Federal Tort
Claims Act, 28 U.S.C. § 2672 et seq. (FICA).
Pursuant to this administrative claim, plaintiff
asserted that the FBI lost, damaged and did not
properly inventory personal property that was
seized in connection with his arrest (D.I. 59, Ex.A).
After the claim was reviewed, it was denied by the
Department of Justice on August 23, 1988 on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 782230 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

basis of insufficient evidence of negligence on the part of any federal employee. Pursuant to that letter, plaintiff was advised that if dissatisfied with the determination, he could file suit in the appropriate United States District Court under 28 U.S.C. § 2401(b) within six (6) months after the date of mailing of the notification of denial (D.I. 59, Ex.B).

In his initial Complaint, plaintiff sued the United States of America, the U.S. Department of Justice and the Federal Bureau of Investigation alleging that these agencies were negligent in seizing his personal property (D.I. 2). The Complaint did refer to defendant Atkins in its body, though he was not a named party to the original Complaint.

**\*2** Thereafter, the Magistrate construed his Complaint as an attempt to assert a civil rights claim under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388 (1971), and determined that the Complaint should be dismissed without prejudice pursuant to 28 U.S.C. § 1915(d) (D.I. 4).

Plaintiff had insisted that he was bringing his action under the Federal Tort Claims Act until the Court determined that the FTCA precluded his claim. In his objections to the Magistrate-Judge's Report and Recommendation, plaintiff asserted that since he was a *pro se* litigant and a German citizen unfamiliar with the laws of this country, he did in fact intend to bring a civil rights action for constitution violation under *Bivens* (D.I. 6, 26, 28, 30).

In its Order dated June 25, 1992 (D.I. 39), the Court concurred with the Magistrate-Judge's determination that 28 U.S.C. §2680(c) and *Kosak v. United States,* 465 U.S. 848 (1984) precluded a FTCA claim, and dismissed plaintiff's Federal Tort Claim Act action against all defendants. However, the Court found that the *Bivens* action was not precluded as a matter of law and on the facts before it, but did note that plaintiff had named only the United States, the U.S. Department of Justice and the Federal Bureau of Investigation as parties in the caption of his Complaint. As a result, since no *Bivens* remedy was available against defendants pursuant to *Laswell v. Brown,* 683 F.2d 261, 268

(8th Cir. 1982), *cert. denied* sub nom., *Laswell v. Weinberger,* 459 U.S. 1210 (1983); *Jaffee v. U.S.,* 592 F.2d 712, 717-18 (3d Cir. 1978), *cert. denied,* 441 U.S. 961 (1979), the Court determined that the United States, the U.S. Department of Justice and the FBI were not appropriate parties and dismissed the action against these three defendants. Because plaintiff did name an FBI agent who received service on behalf of defendant Federal Bureau of Investigation and indicated within the Complaint that other unidentified agents were also involved in the alleged constitutional deprivations, the Court afforded plaintiff the opportunity to amend his Complaint pursuant to Fed.R.Civ.P.15, by requiring plaintiff to file an Amended Complaint pursuant to his *Bivens* claims against the individual FBI agents within twenty days of the date of the Order. If plaintiff failed to do so, then the claims against the FBI agents would be dismissed without prejudice (D.I. 39). Since plaintiff failed to amend his Complaint within the time specified pursuant to the June 1992 Order, on July 24, 1992, an Order dismissing plaintiff's *Bivens* claims against the individual agents without prejudice was entered (D.I. 42).

On August 4, 1992, plaintiff moved for reconsideration of the Court's July 24, 1992 Order and the case was reopened ( D.I. 43). On August 12, 1992, the Court granted plaintiff's motion for reconsideration and ordered him to file an Amended Complaint within thirty days of the receipt of the Order (D.I. 45). That meant that the Amended Complaint should have been filed by mid-September 1992. Subsequently, on September 25, 1992, the deadline within which plaintiff was to amend his Complaint was extended to October 19, 1992 (D.I. 47). Again, plaintiff failed to meet the required date, but did file on October 26, 1992 a document titled "Amendment to the Complaint in Civil Action No. 88-688-LON and a Motion to Appoint Counsel for the Service of Volunteer Counsel" (D.I. 48).

**\*3** Thereafter, the government in a letter motion to the Court requested that plaintiff's *Bivens* claims be dismissed (D.I. 50). Pursuant to an Order dated December 11, 1992 (D.I. 51), that motion was denied and plaintiff was provided with a copy of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 782230 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Local Rule 15.1 and another opportunity to amend his Complaint within thirty days of his acknowledged receipt of the Order. The Order emphasized that since plaintiff's amendment failed to conform to the format mandated by Local Rule 15.1, the Court was unable to determine exactly how plaintiff was amending his Complaint, noting that the proposed amendment included the defendants who had previously been dismissed, defendant Atkins, other unnamed special agents of the FBI, as well as, William Carpenter, U.S. Attorney for the District of Delaware and Kent A. Jordan, Assistant U.S. attorney.

Finally, on January 12, 1993, plaintiff filed another document titled "Amended Complaint Pursuant to *Bivens* Claim Against the Individual FBI Agents and the U.S. Attorney" (D.I. 56). Pursuant to this pleading, the action has been instituted against the following defendants: Special Agent Donald Atkins, Jr., Special Agent Kenneth Stuller, Jr., U.S. Attorney William C. Carpenter and Special Agents of the FBI for the District of Delaware Unnamed.

On the same date, plaintiff filed a notice of change of address with the Court specifically advising the address at which all future communications and papers should be sent regarding this matter (D.I. 55).

Thereafter, on March 29, 1993, defendants filed a motion to dismiss and opening brief in support thereof with a number of exhibits attached (D.I. 58, 59). The basis of defendants' motion is that the statute of limitations operates against plaintiff's claims under the First, Fourth, Fifth and Eighth Amendments arising out of the seizure of his property, that plaintiff failed to perfect service on the individual FBI agents, therefore this Court lacks personal jurisdiction over the defendants, that the amendment fails to state a cognizable claim since it is devoid of any facts to impose liability against the individual defendants, that qualified immunity operates to protect the individual defendants and since the amendment failed to comply with Local Rule 15.1, it should be dismissed.

In addition to filing their motion to dismiss, defendants also filed a motion to stay discovery on the basis of the immunity defense and pursuant to

*Hunter v. Bryant,* 112 S.Ct. 534, 536 (1991) and *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (D.I. 60).

Since plaintiff failed to respond and was in violation of D.Del.L.R.7.1.1, an Order was entered on August 4, 1993 setting up a memorandum or brief schedule regarding defendants' outstanding motions (D.I. 62). Pursuant to that Order, a copy of it was to be sent to plaintiff via airmail at his current address in Berlin Germany as directed in his previous letter (D.I. 55) to the Court. Plaintiff was further required to acknowledge the receipt of this Order by signing, dating and returning to the Court the enclosed copy. According to the Court records, the two copies of that Order were sent via airmail to plaintiff. However, on August 20, 1993, copies of the Order of August 4, 1993 were returned as non-deliverable, despite being sent to the last address previously identified by plaintiff (D.I. 64).

\*4 Since the obligation rests with plaintiff to keep this Court properly advised of his location, and since it has been nine months since plaintiff filed his proposed Amended Complaint and over six months since defendants filed their motions, this matter is ripe for decision.

#### Facts

The basis of the claims raised in this matter result from the arrest of plaintiff and his business partner, Johann W. Zalud, on October 16, 1987 in Wilmington, Delaware in connection with bank fraud and conspiracy charges. On that same date, plaintiff consented to a search of his apartment located at the Plaza Apartments, his business office and automobiles (D.I. 59, Ex.C). At that time, plaintiff received a copy an itemized receipt for the property seized from him related to his arrest. A copy of the receipt for the property seized from his apartment was left at his residence (D.I. 59, Ex.D, receipts for items seized). As a result of the search, the personal property seized was used as evidence in the criminal matter against plaintiff. The property seized included U.S. currency, traveler's checks, money orders, camera, a Chevrolet van, binoculars, televisions, a video cassette recorder, airline tickets,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

business records, vehicle registrations, a driver's license and other documents pertaining to the identity of plaintiff, as well as, his business partner.

The unrefuted evidence shows that certain property was released or disposed of as follows.

Pursuant to the directions of Jack Willard, plaintiff's attorney, on November 7, 1987, Jeanne Hart took possession of miscellaneous personal items which included two leather jackets, a black leather carrying case, credit cards, business cards, auto club cards and binoculars and two cameras. Ms. Hart was designated by plaintiff pursuant to a power of attorney to retrieve his personal belongings. Since the time Ms. Hart received these items, until at least the execution of her affidavit in April 1992, she has retained the personal belongings which she took custody of at his request. Further, plaintiff was aware of the items which she has in her possession since, on more than one occasion, plaintiff had been provided with an inventory list (D.I. 59, Ex.E, aff. of Jeanne Hart).

Thereafter, on September 7, 1989, pursuant to Order of Restitution of this Court, the U.S. currency, money orders, traveler's checks and the Chevrolet van were released to the U.S. Marshals (D.I. 59, Ex.F) to make partial restitution to the Second National Federal Savings Bank and the Colonial National Bank, two of plaintiff's victims.

Pursuant to an Order dated March 5, 1991, plaintiff's motion requesting return of a number of items of personal property seized was denied (D.I. 59, Ex.G). However, the government was given a reasonable amount of time to determine which of the items requested by plaintiff had no evidentiary value to the United States or other governmental entities, to determine which such items lacking evidentiary value plaintiff would be permitted to have in his possession while incarcerated by the Bureau of Prisons and to furnish the Court with a list of items falling into either of those categories. Thereafter, the Court would then consider plaintiff's motion with regard to the items on his list. Apparently, plaintiff made a further request to Mr. Jordan through a letter of December 1, 1991 to have certain property returned to a Jean Morris located in

Wichita Falls, Texas. As a result, another Order was issued by the Honorable Joseph J. Longobardi on March 11, 1992 authorizing the return of certain personalty to Jean Morris, plaintiff's designated recipient. Those items were two television sets, a VCR, two wallets, nail clippers and a handkerchief. On June 15, 1992, these items were released to Delaware Moving and Storage for shipment to plaintiff's designated recipient, Jean Morris (D.I. 59, Ex.G).

**\*5** Of the property currently being held by the FBI, it primarily consists of personal identity documents regarding Mr. Ecke and his partner, Mr. Zalud. This personalty includes a driver's license of plaintiff, an auto registration for the Chevrolet van which was part of the restitution and had been owned by Dream Travel Club, airline tickets and business records of IET Corporation and Dream Travel Corporation.

Pursuant to plaintiff's latest filing, that is the document purporting to be an Amended Complaint, plaintiff is alleging that as a result of not receiving an inventory as he requested and the failure to release the airline tickets to him, he sustained damages in the amount of One Million Dollars ($1,000,000.00) along with court costs.

### DISCUSSION

#### Standard of Review

Although defendants couch their motion as a motion to dismiss, referred to and relied upon in their brief are a number of exhibits, including the affidavit of Jeanne Hart, which are matters outside the pleadings. Therefore, the standard of review would be pursuant to Rule 56 for summary judgment.

Federal Rules of Civil Procedure 56(c) provides that a party is entitled to summary judgment where " the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Although

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 782230 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

the party seeking summary judgment always bears the initial responsibility of informing the Court of the basis for its motion, and identifying those portions of the pleadings, papers and documents on file, including affidavits, which demonstrate the absence of a genuine issue of material fact, where the non-moving party opposing summary judgement has the burden of proof at trial on the issue for which summary judgment is sought, he must then make a showing sufficient to establish the existence of an element essential to his case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). If the non-moving party fails to make such a showing, then the moving party is entitled to judgment as a matter of law. *Id.* at 322-23.

"[I]n other words [are] any genuine factual issues that properly can be resolve only by a finder of fact because they may *reasonably be* resolved in favor of either party." (Emphasis added). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

Factual disputes that are irrelevant or unnecessary will not be counted. *Id.* at 248. The mere existence of a scintilla of evidence in support of the non-moving party will not prevent the grant of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on that issue. *Id.* 249. Mere speculation or conjecture by the non-moving party clearly cannot preclude the granting of summary judgment.

### Proposed Amended Complaint

Plaintiff has been given repeated opportunities to allege a cause of action. He has been repeatedly provided direction from this Court regarding its procedures, including being provided a copy of the Local Rule 15.1. He has been directed to keep this Court advised of his address changes and location. In every regard, plaintiff has continually failed to follow this Court's instructions. Even taking into account plaintiff's *pro se* and foreign citizen status, extensive patience has been exercised by the Court. Further, based upon the papers and letters submitted by plaintiff to date, it is clear that he has a substantial understanding of English and is very

capable in expressing himself in that language.

**\*6** Plaintiff's last Amended Complaint (D.I. 56) again fails to meet the requirements of Local Rule 15.1. It appears that plaintiff is claiming that the defendants, through negligence, caused damage to plaintiff by failing to return personality or by sending certain personalty to Jeanne Hart, an individual plaintiff now claims was not his authorized representative.

However, this amendment fails in all respects to comply with Local Rule 15.1. Generally, a single failure to comply with this Court's rules will not automatically result in a denial of a motion to amend, however, plaintiff's continued failure to comply with the Rules and Orders of this Court over an extensive period of time leads to dismissal of his proposed Amended Complaint and as a result, dismissal of this action.

### Failure to State a Cause of Action

Even if the Amended Complaint was allowed, it would not survive a motion to dismiss and does not survive defendants' motion for summary judgment. In his conclusory allegations, plaintiff asserts that his First, Fourth, Fifth and Eighth Amendments have been violated. But, there are no facts alleged to support this claim. As noted previously, at the most, plaintiff asserts that defendants were negligent in the handling of the seizure or property. No facts have been asserted to suggest improperly seized or retention of certain personalty regarding his underlying criminal charges and convictions to support either a Fourth Amendment claim or an action under the Fifth Amendment due process clause. The bald assertion of alleged violations under the First and Eighth Amendments are even more tenuous. No facts averred remotely suggest a violation of the free speech protection or indicate deliberate indifference or cruel and unusual punishment.

Although the "heightened specificity requirement" for civil rights complaints may have been modified by *Leatherman v. Tarrant County Narcotics Gov't.,* 113 S.Ct. 1160 (1993), a litigant under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Fed.R.Civ.P.8(a)(2) is still required to provide a short plain statement of the claim that will give fair notice of what plaintiff's claim is and the grounds upon which it rests. *Id.* at 1163. Further, a claim for relief for a constitutional violation must be asserted. *Butz v. Economou,* 438 U.S. 478 (1978).

Actions based in negligence do not rise to a constitutional violation. *Daniels v. Williams,* 474 U.S. 327 (1986).

Although a liberal policy has been adopted in favor of granting leave to amend to allow decisions on the merits whenever possible, such a policy is not without restraint. *Frantz v. United States of America,* C.A. No. 91-483-JLL (D. Del. February 10, 1992). Leave to amend is within the clear decision of the Court, which should be granted freely unless other factors, such as, undue delay, bad faith, dilatory motive, *repeat failure to cure deficiencies,* undue prejudice to the opposing party or futility of the amendment warrant denial. *Id.* at 182. An amendment to a complaint will be "futile" if it cannot withstand a motion to dismiss. *Jablonski v. Pan American World Airways, Inc.,* 863 F.2d 289, 292 (3d Cir. 1988). As discussed above, plaintiff's proposed Amended Complaint would not survive a Rule 12 motion. For this additional reason, it should be dismissed.

### Qualified Immunity

**\*7** Although it has been long recognized that an action for damages may be appropriate where a government official abuses his office, qualified immunity exists to protect government officials from the personal costs of litigation and the resultant inhibiting affect such litigation would and can have on the proper discharge of their responsibilities. *Anderson v. Creighton,* 483 U.S. 635, 638 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 814, 818 (1982); *Lee v. Mihalich,* 847 F.2d 66, 69 (3d Cir. 1988). Therefore, government officials are protected from civil liability insofar as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818. Qualified immunity is freedom

from suit, not just a liability defense. As a result, resolution of whether immunity applies is to be determined at the earliest possible stage in litigation. *Hunter v. Bryant,* 112 S.Ct. 534, 536 (1992); *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985). The burden, therefore, rests on plaintiff to adequately allege and show the facts and circumstances known to the defendants establishing that no officer in defendants' respective positions could have reasonably believed that the conduct taken was lawful. *Anderson,* 483 U.S. at 640-41.

In the absence of any factual demonstration of violations of plaintiff's constitutional rights or allegations indicating a knowing constitutional violation, qualified immunity applies. There are no objective parameters alleged to suggest that defendants know or should have known that the search, seizure, retention and authorized release of plaintiff's property in connection with his arrest was improper. Rather, as shown by the affidavit of Jeanne Hart and the other exhibits attached to defendants' brief, there is unrefuted evidence to the contrary. The exhibits show that the conduct of defendants was consistent with the Orders of this Court and the directions provided by plaintiff and his counsel (D.I. 59, Exhibits). Therefore, under the circumstances, this matter should be dismissed.

### Respondeat Superior

Plaintiff appears to attempt to add William Carpenter, then United States Attorney for this district as a defendant based upon the conduct of the other defendants for which he was somehow responsible. No specific direct or personal involvement in the conduct has been alleged against him. Since claims under § 1331 and *Bivens* are the federal counterpart of §1983 actions, the law on collateral issues and defenses apply by analogy. *Paton v. LaPrade,* 524 F.2d 862, 871 (3d Cir. 1975)

Repeatedly and unequivocally, the Third Circuit has rejected *respondeat superior* as the sole basis for liability under §1983. *Gay v. Petsock,* 917 F.2d 768, 771 (3d Cir. 1990); *Rizzo v. Goode,* 423 U.S. 362, 375 (1976). For liability under §1983 to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

imposed against a supervisory official, a plaintiff must 1) identify with particularity what the supervisory official failed to do that demonstrates his deliberate indifference and 2) demonstrate a close causal relationship between the identified deficiency and the ultimate injury. *Sample v. Diecks,* 885 F.2d 1099, 1188 (3d Cir. 1989). In the absence of any allegations showing acquiescence or personal involvement, any claim raised against defendant Carpenter should be dismissed on that basis alone.

### Statute of Limitations/Fed.R.Civ.P.15

**\*8** Defendants claim that plaintiff's Amended Complaint is time barred because the applicable statute of limitations for actions alleging constitutional violations brought against federal employees in their individual capacities is two years, relying on *Carr v. Town of Dewey Beach,* 730 F.Supp. 591 (D.Del. 1990). As a result, plaintiff's Amended Complaint does not relate back to the date of the filing of the original Complaint.

Since the remedy allowed pursuant to *Bivens* is a judicial one, rather than pursuant to a statute, no federal statute of limitations exists for actions alleging constitutional violations against federal officials. *Bivens* actions have been determined to be analogous to civil right actions brought against state officials under 42 U.S.C. §1983. *Wilson v. Garcia,* 471 U.S. 261 (1985); *Carlson v. Green,* 446 U.S. 14, 21 n.6 (1980). Since there is no specific federal statute of limitations for claims under the Civil Rights Act, the Supreme Court has held that 42 U.S.C. §1988 directs federal courts to adopt the state statute of limitations for the most comparable cause of action, not inconsistent with federal law or policy. *Wilson v. Garcia,* 471 U.S. at 266-67, 269. Such claims are most comparable to commonlaw tort actions, and are subject to the state statute of limitations for personal injury claims. *Id.* at 275, 280; *Owens v. Okure,* 488 U.S. 235 (1989). As a result, the relevant state statute of limitations for personal injury proceedings would determine the timeliness of an action brought under *Bivens. Goodman v. Lukens Steel Co.,* 482 U.S. 656, 662 (1987). Therefore, Delaware's personal injury

limitations period which is applicable to a §1983 claim would also be applicable to a *Bivens* action. *Chin v. Bowen,* 833 F.2d 21, 23-24 (2d Cir. 1987); *VanStrum v. Lawn,* 940 F.2d 406 (9th Cir. 1991); *Bieneman v. City of Chicago,* 864 F.2d 463, 469 (7th Cir. 1988), *cert. denied,* 490 U.S. 1080 (1989).

In Delaware, the relevant state statute of limitations on a personal injury claim is two years, pursuant to 10 *Del. C.* §8119. *Carr v. Dewey Beach,* 730 F.Supp. 591 (D.Del. 1990). The period begins to run when the injury is sustained, not when the full extent of the injury is known. *Chrisco v. Schafran,* 525 F.Supp. 613 (D.Del. 1981). The courts cannot extend the limitations period due to hardship or out of notions of fair pay. *Nose v. Rementer,* 610 F.Supp. 1991 (D.Del. 1985).

Although state law determines the applicable limitations period for claims under §1983, federal law decides the date of accrual. *Deary v. Three Unnamed Police Officers,* 746 F.2d 185, 197, n.16 (3d Cir. 1984). A claim under §1983 accrues when the plaintiff knows or has reason to know of the injury that forms the basis of his cause of action. *Id.; Sandutch v. Muroski,* 584 F.2d 252, 254 (3d Cir. 1992).

However, the application of the two year statute of limitations must be examined in light Fed.R.Civ.P.15, of the various Court Orders and plaintiff's Complaint and attempted amendments.

**\*9** In the first final Order entered (D.I. 39), the Court, in addition to dismissing plaintiff's Federal Tort Claim action, dismissed *without* prejudice plaintiff's *Bivens* claim against the United States, the U.S. Department of Justice and the F.B.I. on the basis of sovereign immunity, the absence of a *Bivens* action existing against the United States and the absence of a *Bivens* action existing on the theory of *respondeat superior.* However, plaintiff was allowed to amend his Complaint to pursue a *Bivens* claim against the individual F.B.I. agents, as named in his original Complaint, if the amendment was filed within twenty days of the Order. Otherwise, the failure to do so would result in the *Bivens* claims against the individual F.B.I. agents, including agent Atkins, being dismissed *without*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

prejudice. Therefore, the possible *Bivens* claims against agent Atkins was not dismissed to the extent that the body of plaintiff's original Complaint contained allegations against him. Those allegations can be found primarily at ¶¶3, 4, 7, 9-12 (D.I. 2). According to these allegations, plaintiff claims that somehow his constitutional rights were violated because the F.B.I. agents involved failed to make an accurate and correct inventory of the personality removed, damaged or lost some of plaintiff's personality seized, including $12,000.00 in cash and a Chevelet van which belonged to a Delaware corporation of which he was a principal and improperly returned the keys to his apartment at the Plaza to management without his knowledge or permission. Further, the unidentified agents allegedly informed the Plaza management to pack up the plaintiff's remaining property and remove it for management's own use.

On July 22, 1992, almost thirty days after the original Order, because plaintiff failed to file an Amended Complaint, the *Bivens* claims against the F.B.I. agents were dismissed without prejudice (D.I. 42).

Subsequently, plaintiff filed a motion for reconsideration (D.I. 43). Because plaintiff claimed that he had not received the June 25 Order (D.I. 39), his motion for reconsideration was granted and plaintiff was given another thirty days from August 11, 1992 in which to amend his Complaint (D.I. 45).

On September 3, 1992, the Order of August 11, 1992 was modified to reflect plaintiff's current address and require an acknowledged receipt from him of both the August 11 and September 3 Orders (D.I. 46, 47). Plaintiff acknowledged receipt of said Orders and their enclosures on September 18, 1992. However, he failed to file an Amended Complaint within thirty days, but did file a document captioned as an Amended Complaint and a motion for appointment of counsel (D.I. 48). Although the Amended Complaint was not timely filed, failed to conform to D.Del.L.R.15.1 and included parties previously dismissed, the Court allowed plaintiff another thirty days to file an Amended Complaint in the appropriate formate, that is, consistent with L.R.15.1. The Court also noted that the proposed

Amended Complaint included previously unnamed parties, that is, Williams Carpenter and Kent Jordan.

**\*10** Thereafter, on January 12, 1993, plaintiff filed the present Amended Complaint under consideration to assert a *Bivens* claim against certain individual F.B.I. agents (Atkins and Stuller), unnamed agents of the F.B.I. and William C. Carpenter, then the United States Attorney for this district. In the present proposed amendment, plaintiff asserts that the named and unnamed F.B.I. agents who engaged in the seizure of his property and defendant Carpenter by his orders for the seizure, are responsible for the loss and damage to plaintiff's personality. In the proposed amendment, plaintiff asserts that neither the named or unnamed defendants provided him with an appropriate inventory or responded to his request for such an inventory, retained airline tickets beyond the time limit for a reimbursement of their cost and negligently and improperly allowed Jeanne Hart to enter both his apartment and office and remove property without his permission. For this, plaintiff is requesting damages and for a proper inventory of all property in the possession of defendants and that released to Ms. Hart.

### *Relation Back*

Relation back of amendments is governed by Fed.R.Civ.P.15(c). Although Fed.R.Civ.P.15(a) provides a liberal policy for amending pleadings, providing that leave to amend pleadings "shall be freely given when justice so requires," Rule 15(c) applies a more "stringent standard for a plaintiff seeking to relate back the joinder of a party." *Jordan v. Tapper,* 143 F.R.D. 575, 580 (D.N.J. 1992). Until December 1, 1991, Rule 15(c) provided, in relevant part:

Whenever the claim or offense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the aforegoing provision is satisfied and, within the period provided by law for commencing the action against

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 782230 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

the party to be brought in by amendment that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining his defense on the merits, and (2) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

In *Schiavone v. Fortune,* 477 U.S. 21, 106 S.Ct. 2379 (1986), the Supreme Court concluded that an amendment adding a new party to the action shall relate back to the original complaint only if the following four factors are satisfied:1) The basic claim must have arisen out of the conduct set forth in the original pleading; 2) the party to be brought in must have received such notice that it will not be prejudice in maintaining its defense; 3) that party must or should have known that but for a mistake concerning identity, the action would have been brought against it; and 4) the second and third requirements must have been fulfilled within the prescribed limitations period.

**\*11** *Schiavone v. Fortune,* 477 U.S. at 29, 106 S.Ct. at 2384. Thus, the added party must have received actual notice of the action before the statute of limitations period expired. *Schiavone,* 477 U.S. at 30-31, 106 S.Ct. at 2385.

Fed.R.Civ.P.15(c) was amended on December 1, 1991, altering the *Schiavone* holding. Rule 15(c) now reads in relevant part:
An amendment of a pleading relates back to the date of the original pleading when:
(1) Relation back is permitted by the law that provides the statute of limitations applicable to the action, or
(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or
(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the aforegoing provision (2) is satisfied *and,* within the period provided by Rule 4(j) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudice in maintaining a defense on the merits,

and (B) knew or should have known that, but for a *mistake concerning the identity of a party,* the action would have been brought against the party. [FN1] (Emphasis added).

As a result of the amendment, relation-back is now governed by a modified standard. The significant difference between the superseded rule and revised Rule 15(c)(3) concerns the extension of time allowed for notification of an action. In amending the rule, "Congress altered the severe impact of the fourth requirement of *Schiavone,* ... by providing that the intended party must have received notice within the period for service of the summons and complaint, rather than within the limitations period." *Jordan,* 143 F.R.D. at 581. Put simply, "[a]n amended complaint which changes the name of the defendant will relate back to the filing of the original complaint if it arises out of the same conduct contained in the original complaint and the new party was aware of the action within 120 days of the filing of the original complaint." *Worthington v. Wilson,* #790 F.Supp. 829, 833 (C.D.Ill. 1992). Although revised Rule 15(c)(3) severely modifies the impact of the fourth requirement of *Schiavone,* it does not otherwise alter the first, second, or third *Schiavone* requirements. *Jordan,* 143 F.R.D. at 585 [FN2].

### *Retroactivity of Rule 15(c)*

In its order of April 30, 1991 adopting the 1991 amendments to the Federal Rules of Civil Procedure, the Supreme Court stated:
the foregoing additions to and changes in the Federal Rules of Civil Procedure ... shall take effect on December 1, 1991, and shall govern all proceedings in civil actions thereafter commenced, and insofar as just and practicable, all proceedings in civil actions then pending.

*Worthington,* 790 F.Supp. at 834. Although the original Complaint was filed prior to the 1991 revisions in the Federal Rules, the Amended Complaint was filed approximately three months after the revisions, on March 2, 1992 (D.I. 46). Thus, in line with the Supreme Court's instruction, justice requires that the Amended Complaint be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 782230 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

governed by the modified version of Rule 15(c).

*Application of State Law - Rule 15(c)(1)*

**\*12** Pursuant to revised Fed.R.Civ.P. 15(c)(1), this Court must first examine Delaware state law to determine whether it permits relation back. *Jordan,* 143 F.R.D. at 581. Delaware Superior Court Rule 15 provides the basis for relation back of amendments. Although Delaware law clearly permits the relation back of amendments when attempting to add new parties pursuant to Fed.R.Civ.P. 15, Delaware Rule 15(c) is at odds with Fed.R.Civ.P. 15(c)(3) regarding the length of time provided for notification of the action. Delaware Rule 15 is virtually identical to former Federal Rule of Procedure 15 (prior to the 1991 amendments), in that it follows the four-prong test set forth in *Schiavone. Marrow v. Gopez,* C.A. No. 92C-01-102, Del Pesco, J. (Del. Supr. March 31, 1993).

Since the Delaware rule regarding relation back follows all of the *Schiavone* standards which the present federal Rule 15(c) was adopted to modify, the state Rule 15(c) is "less forgiving" than the present federal rule. As a result, Rule 15(c)(1) does not provide a basis relation back of the proposed Amended Complaint since the statute of limitations as applied under Delaware law and relation back would be two years pursuant to 10 *Del. C.* §8119. Further, under §8119, there are no relation back provisions. Therefore, analysis of the application of Rule 15(c)(3) must occur.

*Rule 15(c)(3)*

As noted previously, the critical difference between superseded Rule 15(c) and the revised Rule is the extension of time allowed for notification of the action. The time period is no longer limited within the statutory limitations period, but includes the time period allowed for service of summons and the complaint. However, the conduct alleged in the amended pleading must relate to and arise out of the same events and conduct alleged in the original complaint. Further, plaintiff *must demonstrate* that

the new parties received actual notice of his claim and that each proposed added party knew or should have known that but for a mistake concerning identity, the action would have been instituted against them. Therefore, actual notice and knowledge of the mistaken identity must occur within the time period prescribed under new Rule 15(c)(3).

Defendants do not argue that plaintiff's proposed Amended Complaint does not arise out of the same " conduct, transaction or occurrence" as contained in the original Complaint. Both appear to relate to the seizure of personalty as a result of the search warrants executed on plaintiff's residence and business. [FN3] Both claim damages resulting from the alleged subsequent improper handling of that personalty. Therefore, the conditions of Rule 15(c)(2) have been met.

Although the proposed Amended Complaint meets the requirements of Rule 15(c)(2), in the circumstances where the amendment changes a party or the naming of a party, the conditions of Rule 15(c)(3)(A) and (B) must also be met. It is under these provisions that the applicable limitations period effects relation back.

**\*13** The events relating to plaintiff's original claim arose as a result of the search warrants executed on October 16, 1987. Between that date and August 20, 1988, when plaintiff filed a federal tort claim with the Department of Justice, he attempted to locate the property seized from his residence and business. Plaintiff obviously was aware of a violation of his constitutional rights sometime prior to August 20, 1988 when he filed his administrative action (D.I. 59, Ex.A). His administrative claim not only mentioned defendant Atkins, but also was based upon the damages or loss of personal property relating to his arrest, the same allegations as raised in his original and proposed Amended Complaints. Plaintiff was required to institute his *Bivens* claim within two years from the date of the alleged constitutional violations. Although the statute of limitations period begins to run *when the injury is sustained*[FN4] and not when the full extent of the injury is known, even giving plaintiff the benefit of the doubt that his awareness of the injury

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 782230 (D.Del.)
(Cite as: Not Reported in F.Supp.)

did not occur until shortly before the filing of the administrative action, plaintiff had two years, at the latest from August 20, 1988, in which to bring his *Bivens* action against these defendants, or by no later than August 20, 1989.

Including the benefit of the 120 day rule for service, the proposed defendants must have received actual notice of the action by no later than December 18, 1990.

The original Complaint was filed on December 8, 1988. Service of the original Complaint on the United States Attorney for the District of Delaware occurred on June 18, 1990 (D.I. 21). The present Amended Complaint was filed on January 21, 1993. No service has been requested or made on any of the proposed defendants.

In his original Complaint, plaintiff does not assert a claim against defendants Stuller or Carpenter. In fact, the original Complaint fails to allege any constitutional violation against either of these defendants.

Although notice under Rule 15(c)(3) may be formal or informal, more than mere awareness of a lawsuit is necessary to constitute actual notice under the Rule. *Jordan v. Tapper,* 143 F.R.D. 575, 586 (D. N.J. 1992), *citing Edwards v. Occidental Chemical Corp.,* 892 F.2d 1442, 1447 (9th Cir. 1990); *Keller v. Prince Georges County,* 923 F.2d 30, 33-34 (4th Cir. 1991).

There has been no showing whatsoever that defendant Stuller was even aware of plaintiff's original action. Although defendant Carpenter may have been aware of the prior non-specific complaint against the Department of Justice, such notice does not constitute actual notice of the claims presently raised against him. *Jordan,* 143 F.R.D. at 586.

Further, plaintiff cannot satisfy Rule 15(c)(3)(B) regarding these defendants. The present Rule does not differ from prior Rule 15(c) which allowed adding a defendant not accurately identified in the original Complaint. However,

Rule 15(c) was intended to protect a plaintiff when he mistakenly names a party and then discovers,

after the relevant statute of limitations has run, the identity of the proper party. Fed.R.Civ.P.15(c) was never intended to assist a plaintiff who ignored or failed to respond in a reasonable fashion to notice a potential party, *nor was it intended to permit a plaintiff to engage in piecemeal litigation.*

*\*14 Jordan,* 143 F.R.D. at 587, *citing, Kilkenny v. Arco Marine, Inc.,* 800 F.2d 853, 857-58 (9th Cir. 1986); *Unicure, Inc. v. Thurman,* 97 F.R.D. 1, 6 (W.D. N.Y. 1982); *Guitierrez v. Raymond Intern, Inc.,* 86 F.R.D. 684, 685 (S.D. Tex. 1980).

Therefore, it is irrelevant whether the proposed party knew or should have known that the action would have been brought against him if there is lack of mistake in the identification of the proper party in the Complaint. *Jordan,* 143 F.R.D. at 585.

Clearly, a lawsuit against the Department of Justice is insufficient to impute to Attorney General Carpenter knowledge of his future status as a defendant. Similarly, an action against the Federal Bureau of Investigation and unidentified F.B.I. agents is inadequate to impute knowledge to S.A. Stuller. Plaintiff offer no grounds for why S.A. Stuller and Attorney General Carpenter should have been "uniquely aware that they were the parties in interest." *Doe v. Sullivan County, Tenn.,* 956 F.2d 545, 552 (6th Cir. 1992). Rule 15(c) permits an amendment to relate back only where there has been an error made concerning the identity of a proper party and not where there is a lack of knowledge of the proper party. *Jordan,* 143 F.R.D. at 588. *Davis v. Frapolly,* 742 F.Supp. 971, 973 (N.D. Ill. 1990).

This Court granted plaintiff leave to amend his Complaint, but that does mean the defenses under Rule 15 to such an amendment do not apply. This Court had previously struck plaintiff's latest attempt to amend his Complaint for non-conformance to D.Del.L.R.15.1 (D.I. 51). "Although requirements of technical pleading and conformity with procedural rules should be viewed liberally when a litigant is acting *pro se,* the rules are not suspended simply because the litigant is unrepresented by counsel. The *pro se* complainant must exercise reasonableness and good faith in prosecution of his claims." *Carter v. Three Unknown Police Officers,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 782230 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

112 F.R.D. 48, 52 (D. Del. 1986).

This amendment proposed to add new parties, not to substitute new defendants for a mistakenly named defendant. No mistake was made concerning the identity of S.A. Stuller and Attorney General Carpenter. Nor does this involve a name correcting amendment as to defendants Stuller and Carpenter. Since plaintiff failed to meet the requirements of Rule 15(c) and did not properly file or perfect his *Bivens* action within the limitation period under this Rule, plaintiff's Amended Complaint should not be allowed and his action should be dismissed as to these defendants.

However, a different result occurs when applying Rule 15(c) to S.A. Atkins. Unlike the other defendants, S.A. Atkins was named in the body of the original Complaint. In fact, he was the only individual identified in the original pleading. Further, service of the original Complaint on behalf of the F.B.I. was accepted by this defendant. Therefore, there are facts to support that S.A. Atkins was aware of this action and the allegations relating to his conduct within the time period required under Rule 15(c)(3).

Service of Process/Personal Jurisdiction

**\*15** Before any federal court can exercise jurisdiction over a defendant, service of the summons as required under Fed.R.Civ.P.4 must be met. *Omni Capital International, Ltd. v. Rudolph Wolf and Co.,* 484 U.S. 97, 104 (1987). In the present case, there no evidence in the file that plaintiff has made any attempt to serve the individual defendants with a copy of his Amended Complaint as required under the Federal Rules of Civil Procedure.

Pursuant to Rule 4, service of process on individual defendants who are officers of the United States can be accomplished in a variety of ways:

1. By delivering a copy of the summons and complaint to the individual personally. Rule 4(d)(1)

2. By leaving copies of the summons and complaint

at the individual's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein. Rule 4(d)(1)

3. By delivering a copy of the summons and complaint to an agent authorized by appointment or by law to receive service of process. Rule 4(d)(1).

4. By serving the United States *and* by sending a copy of the summons and of the complaint by registered or certified mail to the officer. Rule 4(d)(1).

5. By mailing a copy of the summons and the Complaint by first class mail, postage prepaid to the person to be served along with two copies of the notice and acknowledgement and a return envelope, postage prepaid addressed to the sender. Rule 4(d)(2)(c).

In this circumstance, plaintiff only attempted service was by mail directed to William Carpenter at the United States Attorney's Office. No attempt whatsoever was made to serve the Amended Complaint on the F.B.I. agents named therein. Service of the Amended Complaint was required upon each of these defendants. Fed.R.Civ.P.5(a).

As to what is proper service under Rule 4, in part depends upon the capacity in which the federal officer is being sued and the basis of plaintiff's claims. For example, when a plaintiff is seeking money damages from a federal officer in a *Bivens* action, service must be made under Fed.R.Civ.P.4(d)(1). *Johnston v. Horne,* 875 F.2d 1415 (9th Cir. 1989). Other jurisdictions have held that Fed.R.Civ.P.4(d)(5) does not apply to *Bivens* suits. *Lewellen v. Morley,* 875 F.2d 118 (7th Cir. 1989). Further, it has been recognized that although the United States Attorney's Office was properly served pursuant to Fed.R.Civ.P.4(d)(4), such service did not obviate the requirement of personal service under Rule 4(d)(1) when the action is in substance against a federal official in his individual capacity. *Delgado v. Federal Bureau of Prisons,* 727 F.Supp. 24, 26 (D.D.C. 1989).

It is unclear from plaintiff's proposed Amended Complaint as to the capacity in which he has sued

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 782230 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

the individual F.B.I. agents. However, it is clear that plaintiff has failed to have them served either under Rule 4(d)(1), or under Rule 4(d)(5).

Plaintiff has made no attempt to have these defendants served and has provided no good cause for this failure. Plaintiff has not met the time limitations for service under Fed.R.Civ.P.4(j). Although plaintiff did not receive this Court's Order of August 4, 1993 directing him to respond to defendants' motion, that was not due to the conduct of either the Court or defendants. Rather, it was due to plaintiff's failure to provide an updated address for receipt of mail. Therefore, failure to have the individual F.B.I. defendants properly served under Rule 4 is caused for dismissal of plaintiff's action. *National Impeachment Coalition v. U.S. Capitol Police,* 1988 WL 33038 (D.D.C. 1988).

### Rule 41

**\*16** Under Fed.R.Civ.P.41(a)(2) and (b), this Court may order dismissal of an action for failure to prosecute and/or for failure on the part of plaintiff to comply with its Orders. Pursuant to D.Del.L.R.41.1 in each case pending where no action has been taken for a period of three (3) months, this Court may, after reasonable notice, enter an Order dismissing the case, unless good reason for the inaction is given.

It has been almost a year since the filing of plaintiff's proposed Amended Complaint. Further, it has been almost ten months since the filing of defendants' motion to dismiss and brief in support thereof. During this time, there has been no response whatsoever from plaintiff, despite this Court's attempt to contact him. For this reason, this action should be dismissed.

For the reasons contained herein, defendants motion to dismiss shall be GRANTED and plaintiff's action should be DISMISSED.

An Order consistent with this Report and Recommendation shall follow.

### ORDER

For the reasons set forth in the Magistrate's Report and Recommendation entered in this case on this date,

IT IS ORDERED that the Clerk shall mail a copy of the Magistrate's Report and Recommendation and this Order to Mr. Wolfgang Ecke at his last known address in Berlin, Germany as contained in D.I. 55. These papers shall be sent by air mail. Plaintiff shall acknowledge receipt of the Report and Recommendation and this Order by signing, dating and returning to the Court the enclosed copy of the Report and Recommendation and this Order.

In addition, the Clerk shall mail a copy of said Report and Recommendation and this Order to Nina A. Pala, Esquire.

Both mailings shall contain notice that any objections thereto must be filed within ten days after service of same.

> FN1. In commenting on the revision, the Advisory Committee noted that
> *Paragraph (c)(3).* This paragraph has been revised to change the results in *Schiavone v. Fortune* [106 S.Ct. 2379 (1976)], with respect to the problem of the misnamed defendant. An intended defendant who is notified of an action within the period allowed by Rule 4[j] for service of a summons and complaint may not under the revised Rule defeat the action on account of a defect in the pleading with respect to the defendant's name, provided that the requirements of clauses (A) and (B) have been met. If the notice requirement is met within the Rule 4[j] period, a complaint may be amended at anytime to correct a formal defect such as a misnomer or misidentification. On the basis of the text of the former Rule, the court reached a result in *Schiavone v. Fortune* that was inconsistent with the liberal pleading practices secured by Rule 8...
> In allowing a *name-correcting* amendment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 14

Not Reported in F.Supp., 1994 WL 782230 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

> within the time allowed by Rule 4[j] ...,
> this Rule allows not only the 120 days
> specified in that rule, but also any
> additional time resulting from any
> extension ordered by the court pursuant to
> that rule, as may be granted, for example,
> if the defendant is a fugitive from service
> of the summons. (Emphasis added).
> (Citations omitted).
>
> FN2. The first *Schiavone* factor was
> codified in Rule 15(c)(2), and the second
> and third *Schiavone* factors are virtually
> identical to Rule 15(c)(3)(A) and (B), thus,
> "the plaintiff must demonstrate that the
> new parties received actual notice of the
> plaintiff's claim and that each party knew
> or should have known that but for a
> mistake concerning identity, the suit would
> have been brought against them." *Jordan,*
> 143 F.R.D. at 585.
>
> FN3. Plaintiff does not appear to dispute
> or allege any facts suggesting that the
> execution of the search warrants were
> improper. Nor does he allege any facts that
> the taken of the property pursuant to the
> search warrants was improper.
>
> FN4. That date is October 16, 1987.
> Using that date, then the two year
> limitation period would run to October 16,
> 1989.

D.Del. 1994
Ecke v. U.S.
Not Reported in F.Supp., 1994 WL 782230 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.