# EXHIBIT 5

Westlaw.

Not Reported in A.2d                                                                                    Page 1

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

**H**
Orloff v. Shulman
Del.Ch.,2005.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
George D. ORLOFF, Madeline Orloff, and J.W.
Acquisitions, LLC, individually and derivatively on
behalf of Weinstein Enterprises, Inc., Plaintiffs,
v.
Lloyd J. SHULMAN, Sylvia W. Shulman, Ward M.
Lyke, Jr., and Gail S. Koster, Defendants,
andWEINSTEIN ENTERPRISES, INC., a
Delaware corporation, Nominal Defendant.
**No. Civ.A. 852-N.**

Submitted Sept. 13, 2005.
Decided Nov. 23, 2005.

Stephen E. Jenkins, Steven T. Margolin, Ashby &
Geddes, Wilmington, Delaware; Matthew J. Sava,
Shapiro Forman Allen Sava & McPherson LLP,
New York, New York, for the Plaintiffs.
Donald J. Wolfe, Jr., Matthew E. Fischer, Sarah E.
DiLuzio, Potter Anderson & Corroon, Wilmington,
Delaware; Joseph P. Augustine, Nicholl & Davis
LLP, New York, New York, for the Defendants.
William O. LaMotte, Samuel T. Hirzel, II, Morris,
Nichols, Arsht & Tunnell, Wilmington, Delaware,
for the Nominal Defendant.

*MEMORANDUM OPINION AND ORDER*
LAMB, Vice Chancellor.
**\*1** This is a case brought individually and
derivatively on behalf of Weinstein Enterprises,
Inc., claiming that the defendants violated their
fiduciary duties and committed waste by
mismanaging Weinstein, and that the defendants
disseminated misleading information to the
company's minority shareholders. The defendants
have moved to dismiss the case on the basis of res
judicata, laches, failure to state a claim on which

relief can be granted, and lack of standing. This is
the court's decision on that motion.

I.

Weinstein is a closely held company originally
founded by the patriarch of the once famed Mays
department stores, Joseph Weinstein, in order to
hold some of the stores' real estate.[FN1] In 1982,
Mays filed for bankruptcy, closed all its stores, and
reemerged as a real estate company in 1989.
Weinstein's assets now chiefly consist of a
combination of real property and securities that
include approximately 45.15% of the outstanding
common stock of Mays. [FN2]

FN1. Compl. ¶ 4.

FN2. Compl. ¶ 2.

A. *The Parties*

Lloyd Shulman, a grandson of Joseph Weinstein,
succeeded his father, Max, to become CEO and
Chairman of Weinstein in 1997. Together, Lloyd
Shulman and his family own 66% of Weinstein. In
addition to controlling Weinstein, the Shulmans are
closely involved in the company's management.
Sylvia Shulman, Lloyd's mother, is both a director
and a vice president of Weinstein. Joseph
Weinstein's daughter, Gail S. Koster, also sits on
the Weinstein board. Ward Lyke, a long-time
associate of the Shulmans, has been a Weinstein
director for many years and formerly was a member
of Weinstein's executive committee.

In addition to Weinstein's ownership of a near
majority of Mays's common stock, the Shulman
family and the J. Weinstein Foundation, Inc., a
charitable foundation of which Sylvia and Lloyd
Shulman are the officers and directors, together
hold an additional 11.72% of Mays.[FN3] The ties

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 2

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
(Cite as: Not Reported in A.2d)

between Weinstein and Mays are strengthened by the fact that some of the directors and officers of Weinstein have similar roles in Mays. Lloyd and Sylvia Shulman are Mays directors, while Lyke is currently Mays's Vice President of Management Information Systems. Lloyd and Sylvia Shulman, Lyke, and Koster are all named as defendants in this action.

FN3. Compl. ¶ 25.

The plaintiffs, Madeline Orloff and her son, George Orloff, are minority stockholders of Weinstein and are related to the Shulmans. Madeline Orloff has been a record shareholder since approximately 1972, and until 2004 sat on the board of Weinstein. In 2004, however, she was removed from the board, allegedly without her knowledge and without notice. [FN4] George Orloff inherited his shares from his grandmother in 2002. Until recently, the Orloffs held approximately 34% of Weinstein's stock. On June 28, 2004, however, the Orloffs sold their minority position in Weinstein, less 62 shares, to J.W. Acquisitions, LLC ("JWA") for over $26 million. JWA, which is a plaintiff in this case, is a New York limited liability company owned by members of the Cayre and Adjmi families, and is currently managed by Robert Cayre.[FN5] The Orloffs' remaining shares, which constitute over 1% of the 6,000 shares outstanding in Weinstein, are valued by them in excess of $1 million .[FN6]

FN4. Compl. ¶ 6.

FN5. The JWA plaintiffs concede that they have standing only to challenge continuing wrongs allegedly committed by the defendants, including the causes of action relating to Rockridge Farm and the Middle Bay Country Club lease. Compl. ¶ 17.

FN6. Compl. ¶ 17.

B. *Prior Litigation*

**\*2** The parties in this case have a long and acrimonious history of litigation. A recent episode,

filed in 1992 and referred to throughout this opinion as the "New York action," was resolved by the New York Appellate Division on September 10, 1998. In that case, Madeline Orloff and her sister, Linda Jessogne, brought suit against Weinstein, as well as both Shulman defendants in their individual capacities, making a range of allegations as to breaches of fiduciary duty and oppressive conduct towards the minority Weinstein shareholders under New York law.[FN7] The trial court in the New York action, following what the Appellate Division called "extensive discovery," [FN8] dismissed the Orloffs' claims as to fraud or illegality, but held that the " defendants' conduct in this regard [i.e., the exclusion of Madeline Orloff from meetings of the board of directors and other corporate affairs] is clearly oppressive." [FN9] This decision was reversed by the Appellate Division, which held that none of the plaintiffs' allegations rose "to a level entitling plaintiff[s] to any of the relief sought in the complaint or which was granted by the motion court. " [FN10]

FN7. The claims were as follows: (1) that the Shulmans caused Weinstein to wastefully buy Rockridge Farm, a property in Putnam County, New York; (2) that the Shulmans in their individual capacities charged Lloyd Shulman below market rent to live at Rockridge Farm; (3) that Weinstein, as a corporate entity, charged the individual defendants below market rents while they lived at Rockridge Farm; (4) that Weinstein paid Max and Lloyd Shulman inappropriate and excessive compensation; (5) that Weinstein improperly pledged its own securities as collateral for a $3 million loan to Mays; (6) that Weinstein redeemed shares held in trust by Celia Weinstein, but refused requests by the plaintiffs that the corporation redeem its own shares; (7) that the individual defendants caused the corporation to promote their interests by using funds to acquire additional shares of Mays; (8) that the defendants excluded the plaintiffs from occupying residences at Rockridge Farm; (9) that the defendants

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

excluded Madeline Orloff from board of
directors meetings and denied her access to
the corporate books and records.

FN8. *Orloff v. Weinstein Enters., Inc.,* 247
A.D.2d 63, 65 (N.Y.App.Div.1998).

FN9. *Orloff v. Weinstein Enters., Inc.,*
Index No. 44504/92, Pl.'s Ex. A.

FN10. *Orloff,* 247 A.D.2d at 67.

In January 2004, George Orloff filed an action in
this court pursuant to 8 *Del. C.* § 220(c) "to obtain
the information necessary to obtain a meaningful
bid for the Orloff shares from third parties." FN11
Ultimately, Orloff was granted access to a portion
of the documents he sought.FN12

FN11. Compl. ¶ 8.

FN12. *Orloff v. Weinstein Enters.,* 2004
Del. Ch. LEXIS 85 (Del. Ch. June 22,
2004), *rev'd sub. nom. Weinstein Enters. v.
Orloff,* 870 A.2d 499 (Del.2005).

In August 2004, Weinstein filed an action in New
York Supreme Court against the present plaintiffs,
among others, asserting a wide range of fiduciary
duty violations, torts, and breaches of contract
relating to the sale of the Orloffs' shares.FN13 In
November 2004, the current plaintiffs responded by
filing this case, alleging violations of fiduciary
duties and waste. They then moved to stay or
dismiss the 2004 New York action in favor of this
one, and, on July 29, 2005, the New York Supreme
Court agreed and dismissed the Shulmans' action on
the condition that the Orloffs would consent to
Delaware jurisdiction.FN14

FN13. Specifically, the defendants in this
action claimed in New York that the
Orloffs breached their duties to Weinstein,
violated a confidentiality agreement by
sharing Weinstein's information,
fraudulently induced Weinstein to enter
into the Confidentiality Agreement,

tortuously interfered with Weinstein's
business relationship, defamed and
slandered the Shulmans, and conspired
with JWA to harm Weinstein and the
Shulmans. Compl. ¶¶ 1, 2, 4.

FN14. *Weinstein Enters., Inc. v. Orloff,*
Index No. 602497/2004, Pl.'s Reply Br.
Ex. A.

The amended complaint in this case alleges six
causes of action, the facts underlying which are set
forth below: (i) breach of fiduciary duty and waste
in connection with certain transactions between
Weinstein and Mays; FN15 (ii) breach of fiduciary
duty and waste in approving a series of "third-party"
transactions; FN16 (iii) breach of fiduciary duty
and waste in relation to certain vacant lots and
loss-making properties; FN17 (iv) breach of
fiduciary duty and waste in relation to Rockridge
Farm; FN18 (v) breach of fiduciary duty in relation
to both a bylaw amendment and an amended
certificate of incorporation; FN19 and (vi) breach of
fiduciary duty in relation to faulty disclosure.FN20

FN15. Compl. ¶¶ 95-97.
FN16. Compl. ¶¶ 98-102.
FN17. Compl. ¶¶ 103-105.
FN18. Compl. ¶¶ 106-110.
FN19. Compl. ¶¶ 111-114.
FN20. Compl. ¶¶ 115-117.

Some of these allegations, if true, would tend to
reduce the income available to Weinstein, and thus
to its managers and controlling shareholders. The
complaint, therefore, also alleges that the apparent
inconsistency between the defendants' actions and
their normal incentives to maximize the income of
Weinstein can be explained in two ways-first, by the
fact that the defendants wished to purchase the
Orloffs' shares for less than their fair value, and thus
were willing to depress the value of their own
Weinstein shares until they achieved their goal;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

alternatively, the plaintiffs suggest that depriving Weinstein of income could have been useful to the defendants for estate planning purposes.[FN21]

FN21. Compl. ¶ 29.

### C. *The Mays Transactions*

**\*3** The complaint alleges that the defendants violated their fiduciary duty of loyalty and committed waste in the following three transactions with Mays.

#### 1. *Levittown*

Weinstein owns a two-story and basement store property in Levittown, New York. Before 1983, Weinstein leased the property to Mays.[FN22] The lease, which was scheduled to run until 2004, contains a "use" clause which requires Mays to maintain the premises as a retail department store. In 1983, in the course of bankruptcy, Mays negotiated a modification and assignment of the lease to Trade Town, Inc., at a substantially higher rent, for use as a flea market.[FN23] Weinstein objected, citing the "use" clause, and Mays and Weinstein agreed to share the excess rental equally. [FN24] Mays then petitioned the bankruptcy court for permission to assume the lease and assign it to Trade Town.[FN25] After notice, the bankruptcy court entered an order granting the relief requested, finding that it was in the best interest of Mays's creditors. [FN26] Ignoring the bankruptcy court's review and approval, the plaintiffs allege that this arrangement improperly diverted over $8 million of revenues from Weinstein to Mays over the next 20 years, in violation of the defendants' fiduciary duty to Weinstein.[FN27] This is so, they claim, because Weinstein could have simply refused to agree to the assignment unless it received substantially all of the excess rental income for the property, rather than only half.

FN22. The property was technically leased through a Weinstein subsidiary, Celwyn. The complaint treats Celwyn as equivalent

to Weinstein for the purposes of this case. Compl. ¶ 31.

FN23. Fischer Aff. Ex. D.

FN24. *Id.*

FN25. *Id.*

FN26. Fischer Aff. Ex. C.

FN27. Compl. ¶ 31.

#### 2. *Fulton Street*

Fulton Street is a major shopping artery in Brooklyn, New York. Weinstein owns a parcel at 504-506 Fulton Street, on which there is a multi-story building. This property and building is leased to Mays, which rents out space in the building to its own retail tenants. The original 1928 lease on the property, at a rental rate of $60,000 per year, expired in 1995. Weinstein extended the lease to 2011 at an initial rental rate of $99,000 per year, which was increased in 2001 to $108,000 per year. [FN28] The complaint alleges that, given the rental rates on Fulton Street in 1995, the property could have been rented to a third party for at least $500,000 per year, and could have been rented to Mays for even more because Mays would have violated its own subleases to tenants by allowing the property to revert to Weinstein. Furthermore, the plaintiffs allege that the defendants' valuation of the property at $1.2 million in 2001 was erroneous, and that the fair market value of the property in that year was far more than that amount. The plaintiffs allege that all of these facts establish that the defendants breached their fiduciary duties in connection with the Fulton Street property.

FN28. Compl. ¶ 37.

#### 3. *Jamaica Avenue*

Weinstein owns the ground at 168-21-52 Jamaica Avenue (approximately 73,575 square feet) in Queens, New York, which it leases to Mays. Mays owns a 250,000 square foot building on the parcel,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

which it carries on its books at $17 million and which it rents to many tenants, including Toys-R-Us. In 1958, the Weinstein predecessor leased the ground to Mays at $60,000 per year. That lease expired in 1985, subject to Mays's right to extend for two 21-year periods, based on rent calculated at 6% of the unimproved value of the ground. Mays opted to extend the lease in 1985, paying $61,800 based on an estimated value of the ground of $1.03 million. This constitutes a rental rate of $.84 per square foot of ground space. The complaint alleges that the value of the ground was actually "more than $5 million in 1985." [FN29] According to the complaint, therefore, a proper valuation of the property in 1985 would have yielded rent in excess of $300,000 per year, or roughly $4 per square foot of ground space. The plaintiffs argue, on this basis, that the defendants breached their fiduciary duties by undervaluing the land in 1985 and renting the land to Mays at an insufficient price.

FN29. Compl. ¶ 43.

### D. *Third-Party Transactions*

*4 The plaintiffs claim that the defendants violated their fiduciary duties and committed waste in the following four transactions with third parties.

#### 1. *Jimmy Jazz*

Weinstein owns a 12,000 square foot retail property at 518-520 Fulton Street, which it rents to Jimmy Jazz, a women's clothing store. In 2003, Jimmy Jazz became the sole tenant and entered into a 16-year triple net lease with Weinstein. The lease was initially set at $290,000 per year, or $24.17 per square foot. The plaintiffs allege that this is $22,500 less than the rents Weinstein had been receiving under the old leases prior to 2003.[FN30] The complaint also alleges that the market rent for the property should have been at least $1 million per year, or at least $100 per square foot, as measured by the fact that new leases on Fulton Street in 2003 were almost uniformly over $100 per square foot.

FN30. Compl. ¶¶ 50-51.

#### 2. *Modell's*

Weinstein owns retail property at 360 Fulton Street, which it rents on a triple net basis to Modell's Sporting Goods, a sporting goods retailer. Prior to 2003, this rent was $172,000 per year. In 2003, the lease with Modell's was renewed at a rate of $179,000 per year, with 2% annual increases, and extends until 2015 with an automatic right to renew for another five years. At the current rate, the rent approximates $15 per square foot. The plaintiffs allege, however, that if the property were rented to a third party on arm's length terms the market rent would have been at least $1 million per year.[FN31] The complaint further alleges that Weinstein should have been able to demand a premium from Modell's because the space at 360 Fulton Street is part of a larger building, the remainder of which is owned by Modell's. Without the Weinstein space, the plaintiffs argue, Modell's would have been deprived of a viable store. By renting the property at less than 20% of the alleged fair market value, therefore, the plaintiffs allege that the defendants violated their fiduciary duties.

FN31. Compl. ¶¶ 54-56.

#### 3. *Westchester Foreign Autos*

Weinstein leases a 15,000 square foot property at 75 Vredenburgh Avenue in Yonkers, New York, to Westchester Foreign Autos, which operates a Toyota dealership on the premises. In 1993, Weinstein entered into a 10-year lease with Westchester at $110,000 for the first year, with 3% increases annually. Under the original lease, Westchester had a two-year renewal option. In 1999, however, Weinstein agreed to give Westchester a seven-year lease extension right, which Westchester immediately exercised at the 1993 rates plus the annual 3% increases. At the time Weinstein agreed to extend the renewal term, the tenant's rent payment equaled approximately $8 .50 per square foot. The plaintiffs contend that the fair market rate would have been "at least twice that amount." [FN32] The plaintiffs therefore argue that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 5

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

which it carries on its books at $17 million and which it rents to many tenants, including Toys-R-Us. In 1958, the Weinstein predecessor leased the ground to Mays at $60,000 per year. That lease expired in 1985, subject to Mays's right to extend for two 21-year periods, based on rent calculated at 6% of the unimproved value of the ground. Mays opted to extend the lease in 1985, paying $61,800 based on an estimated value of the ground of $1.03 million. This constitutes a rental rate of $.84 per square foot of ground space. The complaint alleges that the value of the ground was actually "more than $5 million in 1985." [FN29] According to the complaint, therefore, a proper valuation of the property in 1985 would have yielded rent in excess of $300,000 per year, or roughly $4 per square foot of ground space. The plaintiffs argue, on this basis, that the defendants breached their fiduciary duties by undervaluing the land in 1985 and renting the land to Mays at an insufficient price.

FN29. Compl. ¶ 43.

D. *Third-Party Transactions*

**\*4** The plaintiffs claim that the defendants violated their fiduciary duties and committed waste in the following four transactions with third parties.

1. *Jimmy Jazz*

Weinstein owns a 12,000 square foot retail property at 518-520 Fulton Street, which it rents to Jimmy Jazz, a women's clothing store. In 2003, Jimmy Jazz became the sole tenant and entered into a 16-year triple net lease with Weinstein. The lease was initially set at $290,000 per year, or $24.17 per square foot. The plaintiffs allege that this is $22,500 less than the rents Weinstein had been receiving under the old leases prior to 2003. [FN30] The complaint also alleges that the market rent for the property should have been at least $1 million per year, or at least $100 per square foot, as measured by the fact that new leases on Fulton Street in 2003 were almost uniformly over $100 per square foot.

FN30. Compl. ¶¶ 50-51.

2. *Modell's*

Weinstein owns retail property at 360 Fulton Street, which it rents on a triple net basis to Modell's Sporting Goods, a sporting goods retailer. Prior to 2003, this rent was $172,000 per year. In 2003, the lease with Modell's was renewed at a rate of $179,000 per year, with 2% annual increases, and extends until 2015 with an automatic right to renew for another five years. At the current rate, the rent approximates $15 per square foot. The plaintiffs allege, however, that if the property were rented to a third party on arm's length terms the market rent would have been at least $1 million per year. [FN31] The complaint further alleges that Weinstein should have been able to demand a premium from Modell's because the space at 360 Fulton Street is part of a larger building, the remainder of which is owned by Modell's. Without the Weinstein space, the plaintiffs argue, Modell's would have been deprived of a viable store. By renting the property at less than 20% of the alleged fair market value, therefore, the plaintiffs allege that the defendants violated their fiduciary duties.

FN31. Compl. ¶¶ 54-56.

3. *Westchester Foreign Autos*

Weinstein leases a 15,000 square foot property at 75 Vredenburgh Avenue in Yonkers, New York, to Westchester Foreign Autos, which operates a Toyota dealership on the premises. In 1993, Weinstein entered into a 10-year lease with Westchester at $110,000 for the first year, with 3% increases annually. Under the original lease, Westchester had a two-year renewal option. In 1999, however, Weinstein agreed to give Westchester a seven-year lease extension right, which Westchester immediately exercised at the 1993 rates plus the annual 3% increases. At the time Weinstein agreed to extend the renewal term, the tenant's rent payment equaled approximately $8 .50 per square foot. The plaintiffs contend that the fair market rate would have been "at least twice that amount." [FN32] The plaintiffs therefore argue that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

the defendants' decision to extend the lease in 1999, and the low price subsequently demanded, constitutes a violation of the defendants' fiduciary duties.

FN32. Compl. ¶¶ 57-59.

#### 4. *Middle Bay Country Club*

**\*5** Weinstein owns the land under the Middle Bay Country Club in Oceanside, New York, which it has leased to the Middle Bay Golfers Association for the period 1968 through 2017. The complaint alleges that the 168-acre property is worth more than $11 million but is currently generating only $160,000 per year in rental income. If the lease were terminated, the plaintiffs argue, the property could be sold for a substantial profit, or rented at current market rates which are allegedly multiples of the amount now being paid in rent. The plaintiffs further claim that the Middle Bay Country Club is in breach of its lease agreement for failure to repair a bulkhead on the property, affording Weinstein the right to either terminate the lease or sue the tenant for breach. The defendants have allegedly failed to enforce their rights against the country club. The plaintiffs argue that this failure to maximize the value of the Middle Bay Country Club property constitutes a violation of the defendants' fiduciary duties.[FN33]

FN33. Compl. ¶¶ 62-64.

#### E. *Vacant Properties, Loss-Making Properties, And Rockridge Farm*

The complaint alleges that the defendants violated their fiduciary duties and committed waste in the following three transactions, which they designate as the vacant and loss-making properties.

#### 1. *Nine Vacant Properties*

The plaintiffs allege that nine of Weinstein's properties are currently vacant. Six of the nine vacant properties form "one contiguous parcel

across Jamaica Avenue from the property Weinstein leases to Mays." [FN34] The complaint specifies that the original cost of these properties was $941,799, and, in 1999, they were appraised to be worth between $1.75 million and $2.2 million. In 1998, the plaintiffs allege that Weinstein removed tenants and cleared buildings on the property in order to make the properties available for future development. But despite what the plaintiffs call potentially lucrative offers from developers and brokers, the plaintiffs argue that the defendants have done nothing with these six properties. The plaintiffs believe that they have identified three additional vacant lots located in Yonkers, New York. According to the plaintiffs, these properties had an original cost of about $420,000, have annual expenses of approximately $130,000, and were appraised in 2003 at close to $1 million. The plaintiffs allege that the defendants have violated their fiduciary duties by making "no attempt to develop or generate income" from these properties.
FN35

FN34. Compl. ¶ 66.

FN35. Compl. ¶ 66.

#### 2. *Four Loss-Making Properties*

The plaintiffs claim that the defendants own a number of potentially lucrative properties which are being operated at significant losses to Weinstein. The bulk of these properties are in Kansas City, Missouri, and were purchased initially for an investment of $11.6 million. For example, the complaint alleges that the 32-story Kansas City Power and Light building, owned by Weinstein, is only 30% occupied, and was operated at a net loss of $100,278 in 2003. The plaintiffs claim that the defendants' "failure to make economically productive use of these properties" constitutes a breach of their fiduciary duties.

#### 3. *Rockridge Farm*

**\*6** Rockridge Farm is a 114-acre estate in Putnam County, New York. The property contains a 1,800

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF    Document 53-3    Filed 04/10/2007    Page 9 of 87    Page 21 of 133

Not Reported in A.2d                                                                 Page 7

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
(Cite as: Not Reported in A.2d)

square foot wooden office building which serves as
the corporate headquarters of Weinstein, and
separate homes which serve as the residences of
Lloyd and Sylvia Shulman. According to
Weinstein's 2003 financial statement, the land has a
cost basis of $177,484, while the buildings and
equipment cost $2.6 million. In fiscal year 2003, the
plaintiffs claim, Weinstein spent 30.4% of its
average net income for the last three years, or
$423,810 in cash plus $74,949 in depreciation
charges, for upkeep of the properties. In contrast,
the plaintiffs allege, in 2003 the Shulmans paid
Weinstein only $18,000 in rent for the privilege of
residing at the estate and for using the property's
garages for the Shulmans' collection of classic cars.
The plaintiffs, therefore, allege that Weinstein's
maintenance of Rockridge Farm in lieu of renting
appropriate corporate headquarters elsewhere, and
the below market rent paid to Weinstein by the
Shulmans, constitute a breach of the defendants'
fiduciary duties.

### F. *The Advancement Bylaw And Section 102(b)(7) Provision*

The complaint alleges that on March 12, 2004, the
Weinstein board held a meeting in which the
directors approved new bylaws and approved an
amendment to the certificate of incorporation. The
new bylaws contain provisions giving the directors
the right to have attorneys' fees advanced during
litigation. The certificate amendment also contains a
Section 102(b)(7) provision limiting directors'
liability for breaches of fiduciary duty.[FN36]
Crucially, say the plaintiffs, these changes were
made in conjunction with the plaintiffs' books and
records claim under 8 *Del. C.* § 220.[FN37] Each of
the defendants voted in favor of the provisions,
while Madeline Orloff voted against them.
Therefore, the plaintiffs allege, it is apparent that
the defendants approved each of these provisions
under the threat of imminent litigation, and
breached their fiduciary duties by self-interestedly
protecting themselves against litigation that they
knew would soon name them as defendants.

FN36. Compl. ¶ 78.

FN37. Compl. ¶ 79.

### G. *Disclosure Claims*

The complaint alleges that in 2003 the defendants
provided false documentation to the Orloffs in the
form of a flawed list of properties owned by
Weinstein. [FN38] For example, the plaintiffs claim
that the 2003 document falsely lists the 168-21-52
property at Jamaica Avenue as being much smaller
than it actually is, thus making the property's low
rental price per square foot seem more in keeping
with the market rate. The plaintiffs additionally
allege that Lloyd Shulman provided a "
fraudulent[ly]" low appraisal of the Orloffs' shares
on November 24, 2003,[FN39] in an effort to
purchase the shares for an artificially depressed
price. Moreover, the plaintiffs claim that Lloyd
Shulman caused Weinstein to attempt to commit
securities fraud by depressing the apparent value of
Weinstein, and hiding information that could have
allowed the plaintiffs to stop the defendants'
misconduct earlier. Finally, the complaint alleges
that the defendants have violated their duty of
disclosure by refusing to provide the Orloffs with
the company's 2004 annual report unless they agree
to an unreasonable confidentiality agreement,[FN40]
while JWA was denied the information outright.
This, the plaintiffs claim, was a violation of the
defendants' fiduciary duties.

FN38. Compl. ¶ 82.

FN39. Compl. ¶ 83.

FN40. Compl. ¶ 87.

### H. *The Defendants' Response*

\*7 The defendants contest the plaintiffs' allegations
that they breached their fiduciary duties. First, they
maintain that none of the plaintiffs in this case has
standing to pursue many of the claims raised in the
complaint because JWA purchased their shares after
the claims accrued, and because the Orloffs
effectively sold their claims in transferring most of
their shares to JWA while intentionally keeping
only in their own hands the minimum required to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                   Page 8

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

justify a law suit. This conduct, the defendants
argue, constitutes champerty, and is forbidden
under Delaware law. The defendants next argue that
the plaintiffs' claims as to the Mays transactions and
as to Westchester Foreign Autos lease are barred by
laches. Second, even if these two causes of action
are not time barred, the defendants claim that those
causes of action, as well as the plaintiffs' allegations
as to any of the third-party transactions in
connection with vacant lots, as to Rockridge Farm,
and as to faulty disclosure, are barred by res
judicata because those issues were already
adjudicated in the New York action. Finally, the
defendants argue that any of the plaintiffs' claims
that survive laches and res judicata fail to rebut the
business judgment presumption, or to properly
allege a claim of waste against the defendants. [FN41]
Therefore, the defendants maintain, all counts
of the amended complaint should be dismissed
under Court of Chancery Rule 12(b)(6) for failure
to state a claim.[FN42]

> FN41. The defendants' forum non
> conveniens argument is somewhat
> dependent on the concurrent action
> initiated by the Shulmans in New York.
> Def's Opening Br. 61. Because that action
> has now been stayed in favor of this
> litigation, the defendants cannot meet the
> heavy burden required to invoke the court's
> discretionary power to decline jurisdiction
> over this case. *Candlewood Timber Group
> v. Forestal Santa Barbara SRL,* 2004 Del.
> LEXIS 458 (Del. Oct. 4, 2004).

> FN42. The defendants concentrate their
> argument on showing that the plaintiffs
> have not satisfied the pleading
> requirements of Rule 12(b)(6). The court
> notes, however, that the defendants have
> also moved to dismiss the plaintiffs'
> derivative claims under the higher pleading
> standards required to excuse demand under
> Court of Chancery Rule 23.1. Def.'s
> Opening Br. 19; Def.'s Reply Br. 40. The
> court has conducted its review of the
> plaintiffs' fiduciary duty claims under the
> higher standard required by Rule 23.1, and

concludes that the plaintiffs' claims survive
under that rule to the same extent as they
survive under Rule 12(b)(6).

II.

In order to dismiss a claim under Court of Chancery
Rule 12(b)(6), a court "must determine with
reasonable certainty that, under any set of facts that
could be proven to support the claims asserted, the
plaintiffs would not be entitled to relief." When
making its decision, a court must accept as true all
well pleaded factual allegations in the complaint
and all reasonable inferences to be drawn from
those facts.[FN43] But a court need not "blindly
accept as true all allegations, nor must it draw all
inferences from them in plaintiffs' favor unless they
are reasonable inferences." [FN44]

> FN43. *Grobow v. Perot,* 539 A.2d 180,
> 187 n. 6 (Del.1988).

> FN44. *Id.* at 187.

III.

*A. Res Judicata*

The doctrine of res judicata provides that a final
judgment on the merits rendered by a court of
competent jurisdiction may, in the absence of fraud
or collusion, be raised as an absolute bar to the
maintenance of a second suit in a different court
upon the same matter by the same party or his
privies. [FN45] Res judicata is a not a mere
technicality. Rather, the doctrine stands as a
foundation of the legal system, judicially created in
order to ensure a definitive end to litigation. Res
judicata permits a litigant to press his claims but
once, and requires him to be bound by the
determination of the forum he has chosen, so that he
"may have one day in court but not two." [FN46]
Although courts formerly limited res judicata to
actions that were actually already litigated and
determined, the modern view of the doctrine is
transactional in nature. Causes of action that arise
out of the same transaction are precluded if brought

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                    Page 9

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

in a subsequent action.[FN47]

> FN45. *Epstein v. Chatham Park, Inc.,* 153
> A.2d 180, 184 (Del.Super.1959).
>
> FN46. *Maldonado v. Flynn,* 417 A.2d 378,
> 381 (Del.1959) *(quoting Malone Freight
> Line, Inc. v. Johnson Motor Lines, Inc.*
> 148 A.2d 770, 775 (Del.1959)).
>
> FN47. The extent to which separate events
> constitute one transaction is a matter to be
> determined   flexibly    by    the    court.
> Restatement  (Second)  of  Judgments  §
> 24(b)  (1982);  the  requirements  for  res
> judicata  in  Delaware  are  described  in
> *Bradley   v.   Div.   of   Child   Support
> Enforcement,*   582   A.2d   478,   480
> (Del.1990).

**\*8** The defendants argue that most of the claims in
the complaint are barred by the adjudication of the
New York action. Specifically, the defendants claim
that all of the plaintiffs' claims except Count V (the
bylaw amendments and the amended certificate of
incorporation) are barred by res judicata.[FN48] The
court agrees with the defendants as to Count IV, but
concludes that Counts I, II, III, and VI are not
barred by the prior adjudication.

> FN48. Def.'s Opening Br. 44. The bylaw
> amendment and amended certificate of
> incorporation, which form the basis of the
> plaintiffs'   fifth   cause   of   action,
> indisputably post date the earlier litigation
> in New York. Compl. ¶ 22.

The plaintiffs' claims as to the Rockridge Farm
lease are barred by res judicata because they were
previously litigated by Madeline Orloff and
Jessogne in the New York action. Rockridge Farm
was expressly part of the previous litigation. The
complaint in the New York action alleged
substantially identical breaches of fiduciary duty by
the Shulmans as those raised in the current case,
including below market rents charged to the
defendants and waste. [FN49]

FN49. Def.'s Ex. 4 ¶¶ 21-26.

The current complaint makes some superficially
different allegations as to the Rockridge Farm
property. For example, the Orloffs now claim that
the maintenance of Rockridge Farm constitutes
waste because corporate headquarters could be
rented in Manhattan for less money than Weinstein
spends to maintain Rockridge Farm,[FN50] but such
claims are plainly of the same kind and about the
same transaction advanced in the New York action.

FN50. Compl. ¶ 75.

The plaintiffs argue that the present claim can be
distinguished from the New York action because
the latter was a direct suit against the corporation
and the current claims are derivative.[FN51] It is not
entirely clear that the plaintiffs are correct. The
New York Court of Appeals has explained that a
Section 1104 oppression action is the kind of relief
available   to   allegedly   oppressed   minority
shareholders when a derivative claim is unavailable
for   whatever   reason.[FN52]   But   some   of   the
plaintiffs' claims in the prior case seem to be
derivative in nature under Delaware law, alleging
financial mismanagement that would harm the
corporation as a whole, and for which the
corporation should be compensated.[FN53] The court
need not decide this issue, however, because even if
the court assumes that the plaintiffs' prior claims
were direct, and the current claims derivative, the
court concludes that the plaintiffs' pre-1998 claims
are barred by res judicata.

> FN51. Pl.'s Opening Br. 52.
>
> FN52. *In Re Kemp & Beatley, Inc.,* 64
> N.Y.2d 63, 70 (1984). The only Delaware
> case that has squarely addressed the issue
> of oppression is *Litle v. Waters,* 1992 Del.
> Ch. LEXIS 25 (Del. Ch. Feb. 10, 1992). In
> that case, the court rejected the defendants'
> arguments that oppression was available
> only under "special state statutes," and
> instead defined the action as "a violation
> of the reasonable expectations of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

minority." *Id.* at *22 (*quoting Gimpel v. Bolstein,* 477 N.Y.S.2d 1014, 1017 (N.Y.Sup.Ct.1984)). *Gimpel,* where the plaintiff had brought both derivative claims and a statutory oppression action, strongly suggests that oppression is an individual claim under New York law.

> FN53. *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.,* 845 A.2d 1031, 1035-36 (Del.2004).

As a rule of black-letter law, suits brought by the same party in another capacity are not subject to claim preclusion.[FN54] The general rule yields, however, to considerations of public policy. Courts need not spare plaintiffs from the bar of res judicata if the important purposes of judicial efficiency and finality that the doctrine serves would be foiled. [FN55] This case presents precisely such an instance. Weinstein is a closely held corporation which has long had only one minority shareholder group. As such, the nexus of interest between the derivative action and the individual action is likely to be especially close. In that context, to allow the Orloffs to proceed with a derivative suit would be to cut the heart out of the previous adjudication, conducted at great length and expense in New York.[FN56] Courts have no duty to allow such laborious re-litigations by identical parties, and this court declines to sanction one now. While some other plaintiff could hypothetically bring a derivative claim on behalf of Weinstein, the Orloffs have already had their opportunity to do so.[FN57]

> FN54. *Carlton Invs. TLC Beatrice,* 1997 Del. Ch. LEXIS 62, *7-8 (Del. Ch. Apr. 21, 1997).

> FN55. *Satterfield v. Pharmacia Corp.,* 2002 Del. Ch. LEXIS 70, *4 n. 5 (Del. Ch. June 17, 2002), *aff'd,* 812 A.2d 224 (Del.2002) (holding that res judicata applied where identical plaintiff attempted to relitigate a claim as an administrator that he had already lost in his individual capacity).

> FN56. *Boothe v. Baker Industries,* 262 F.Supp. 168 (D.Del.1966).

> FN57. *Liken v. Shaffer,* 64 F.Supp. 432, 442 (D.Iowa 1946) annunciates an important principle with resonance here. In that case, the court held that "the fact that one stockholder has discovered fraud and is guilty of laches does not prevent another stockholder who is not guilty of laches from instituting a stockholder's derivative action." It is the same as to res judicata in this case. The corporation is not barred from bringing its claim because of the Orloffs' prior action. But the Orloffs are indeed barred in equity from doing so.

**\*9** The plaintiffs note, correctly, that George Orloff was not a plaintiff in the New York action. In normal circumstances, a third party is not barred by res judicata as a result of claims made by a different plaintiff with whom he is not in privity. A parent-child relationship, without more, does not generally create privity between two plaintiffs.[FN58] Thus, in normal circumstances, George Orloff would be permitted to bring claims his mother is barred from advancing.

> FN58. Restatement (Second) of Judgments § 663 (1982).

In some cases, however, a substantial identity of parties' interests has been held to place two superficially separate parties in privity.[FN59] Here, it is fair to conclude that the entire Orloff family has long been intricately intertwined in this litigation. [FN60] The claims and disagreements identified by the various members of the family are so similar that the court cannot conclude that the claims raised by Madeline Orloff in the New York action and those alleged by George Orloff in this case are anything other than functionally one legal right. [FN61] The law simply does not allow already litigated claims to be passed from one generation of the Orloff family to another in the hope that some court, someday, will eventually grant relief. George Orloff's claims as to Rockridge Farm are therefore barred to the same extent as his mother's claims.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

FN59. *Id.*

FN60. The Delaware Supreme Court has defined privity as pertaining to "the relationship between a party to a suit and a person who was not a party but whose interest in the action was such that he [or she] will be bound by the final judgment as if he or she were a party. *Bradley,* 582 A.2d at 478. An important discussion of privity in res judicata can be found in a persuasive federal district court case, *Goel v. Heller,* 667 F.Supp. 144 (D.N.J.1987). In that case, the court held that a group of defendants were in privity with each other (and therefore entitled to res judicata) where the plaintiffs were clearly abusing the concept of privity to repeatedly bring substantially identical claims against closely associated defendants. As the court held in that case, the test of privity is whether there is a "close or significant relationship between successive defendants. " *Id.* at 150.

FN61. In *VanDeWalle v. Albion Nat. Bank,* 500 N.W.2d 566 (Neb.1993), the Nebraska Supreme Court faced a situation much like that before this court. In that case, two brothers who were part of a particularly litigious family attempted to bring a suit in state court after their parents had already been defeated in federal court on the same claims. The court in that case, though it acknowledged that the plaintiffs in the two cases were different, barred the brothers' claims by res judicata, noting that "the facts remain that the parents and sons had a close, mutual, relationship with respect to the property and that all [the] suits arise out of the same occurrence." *Id.* at 506. The court concluded with the observation that "under the circumstances, the entire VanDeWalle clan is in privity for the purposes of these suits." *Id.*

The remaining claims, Counts I, II, III, and VI, are not barred by res judicata. Some of the claims in these counts occurred after judgment in the New

York action. Those claims, of course, are not barred. None of the other claims at issue arise from the same transaction as that alleged in the New York action. Examining the complaint filed in New York, the gravamen of the plaintiffs' argument there plainly centered around Rockridge Farm and accusations of excessive compensation and minority shareholder oppression under the New York statute. The claims at issue in this case arise from entirely different circumstances.

The disputed Mays transactions, for example, concern discrete transactions between the two companies controlled by the Shulmans that cannot be captured by either the general allegations of breaches of fiduciary duty in the New York action or the more specific counts as to Rockridge Farm. The same is true of those other transactions, such as the Westchester Foreign Autos lease, which occurred before the New York action. The court, therefore, cannot dismiss any of the plaintiffs' other claims on the basis of res judicata.

### B. *Laches*

Of the claims remaining after the application of res judicata, the defendants argue that the plaintiffs' allegations as to the Mays transactions and as to the Westchester Foreign Autos lease are time barred. As the defendants correctly note, none of these claims accrued more recently than 1999, and claims for breach of fiduciary duty are governed by a three-year statute of limitations. Therefore, the defendants claim, the plaintiffs are barred by laches from bringing their claims for unreasonable delay. FN62

> FN62. *United States Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.,* 677 A.2d 497, 502 (Del.1996).

**\*10** The equitable defense of laches, rooted in the basic sense that those seeking equity must not slumber on their rights, interacts strongly with the statute of limitations. As the Delaware Supreme Court has held, great weight is placed on analogous statutes of limitations in determining whether a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                            Page 12

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

plaintiff's claim should be barred by laches, or allowed to continue.[FN63] Indeed, Delaware courts have consistently held that analogous statutory provisions create a "presumptive time period for application of laches to bar a claim," [FN64] thereby relieving courts of the need to conduct the traditional equitable test. When applied by a court of equity, however, the statute of limitations is not applied inflexibly or arbitrarily.[FN65] Thus, under the doctrine of equitable tolling, the statute does not run against the plaintiff until he or she had reason to know the facts alleged to give rise to the wrong. [FN66]

> FN63. Donald J. Wolfe, Jr. and Michael A. Pittenger, Corporate and commercial practice in the delaware court of chancery, § 11.5(c) (2005 ed.)
>
> FN64. *Id.*
>
> FN65. Especially important is the concept that "fiduciaries who benefit personally from their wrongdoing, especially as a result of fraudulent self-dealing, will not be afforded the protection" of the statute of limitations. *Yaw v. Talley,* 1994 Del. Ch. LEXIS 35, *17-18 (Del. Ch. Mar. 2, 1994).
>
> FN66. Wolfe & Pittenger, *supra* note 59.

As to all the claims aside from those concerning the Levittown lease, the court concludes that the defendants have failed to establish their claim of laches because the plaintiffs have pleaded sufficient facts to show that they could not have brought these claims without the information gathered during the Section 220 action in 2004. The information was not available in any public way. Indeed, the plaintiffs allege that the defendants were engaged in a campaign of intentional disinformation towards the minority shareholders. It is true that Madeline Orloff was on the board of Weinstein until 2004, and therefore would normally be considered to have had access to crucial information. But in response, the plaintiffs advance well pleaded allegations that Madeline Orloff was misled in her directorial capacity, and that she was intentionally excluded

from the affairs of Weinstein.[FN67] These allegations, if true, mean that Madeline Orloff would have been unable, exercising normal diligence, to extract sufficient information from Weinstein and the defendants to bring this complaint at an earlier date. A complaint that includes such allegations cannot be barred by laches on a motion to dismiss before discovery has established a factual record.

> FN67. Compl. ¶ 6.

The allegations relating to the Levittown lease present different issues. As discussed, *infra,* the court concludes that those allegations do not state a claim for relief and, thus, must be dismissed under Court of Chancery Rule 12(b)(6). Even if this were not the case, however, the claim relating to the Levittown lease would be barred by laches. The 1983 renegotiation and assignment of the Levittown lease was a matter of public record in the Mays bankruptcy-a proceeding that was highly material to the Orloff family because of Weinstein's substantial holdings of Mays common stock, as well as Weinstein's status as lessor of a number of the Mays department store properties. It is simply implausible that the plaintiffs or their predecessors-in-interest either did not know or did not have sufficient information to cause them to inquire into the Mays bankruptcy and, more particularly, the terms of the Levittown lease assignment. To allow the plaintiffs now to litigate claims relating to this 22-year old transaction would serve only to weaken the important doctrine of laches, and the ideal of diligent prosecution that it represents.

### C. Standing

*11 As the defendants note, the Orloffs' decision to pursue this case is somewhat puzzling. The bulk of their former economic interest is now in the hands of the co-plaintiff, JWA, and the amount at issue is relatively minor in relation to the cash the Orloffs have extracted from the sale of their stock. [FN68] The defendants argue that this constitutes the offense of champerty, which consists of "an agreement between the owner of a claim and a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF Document 53-3 Filed 04/10/2007 Page 15 of 87

Page 27 of 133

Not Reported in A.2d

Page 13

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
(Cite as: Not Reported in A.2d)

volunteer that the latter may take the claim and
collect it, dividing the proceeds if they prevail; the
champertor to carry on the suit at his own expense ."
FN69 There is no reason to believe, however, that
the plaintiffs have engaged in the type of conduct
that would deprive them of standing. The Orloffs
maintain a substantial financial stake in Weinstein.
There are no calls outstanding against their stock,
and anyone who wants to buy them out must pay the
price at which the Orloffs value their stake. So long
as they maintain that stake, and held stock at the
time of the alleged breaches of duty, they may bring
their claims before this court.FN70

> FN68. JWA has standing to bring only the
> causes of action for Rockridge Farm and
> the Middle Bay Country Club. Because the
> Orloffs are proper derivative plaintiffs, the
> defendants' argument that JWA's action
> represents a "strike suit" making
> allegations about transactions prior to
> stock ownership is unavailing. Def.'s
> Opening Br. 51.

> FN69. *Gibson v. Gillespie,* 152 A. 589,
> 593 (Del.Super.1928); *In re Emerging
> Comm., Inc. S'holders Litig.,* 2004 Del.
> Ch. LEXIS 70, *106 (Del. Ch. May 3,
> 2004).

> FN70. The formal nature of the stock
> ownership requirement is underlined by
> Chancellor Chandler's recent decision in *In
> re New Valley Corp. Deriv. Litig.,* 2004
> Del. Ch. LEXIS 107 (Del. Ch. June 28,
> 2004). In that case, the court held that a
> current and long-term shareholder in the
> defendant lacked standing to bring a
> derivative claim because of a single
> five-month gap in his share ownership,
> during which he held only non-voting
> warrants. In reaching that decision, the
> court expressly rejected the plaintiff's
> argument that his long-term interest in the
> defendant vitiated the policy concern of
> abusive law suits behind the "iron-clad"
> continuous ownership rule. *Id.* at *13. As
> the court stated the rule, "a plaintiff who

ceases to be a shareholder, whether by
reason of a merger or for any other reason,
loses standing to continue a derivative suit.
" *Id.* The reverse proposition, as in this
case, is also true. A shareholder who
formally maintains continuous ownership
generally has standing to bring a derivative
claim, no matter how few shares he or she
holds. *See also Dann v. Chrysler Corp.,*
174 A.2d 696, 699 (Del. Ch.1961).

### D. *Breaches Of Fiduciary Duty And Waste*

Taking into account only those claims which are not
barred by res judicata, the plaintiffs allege in Counts
I, II, III, V, and VI that the defendants breached
their fiduciary duties and committed waste.
Delaware's business judgment rule operates
primarily as a presumption that directors making
business decisions act in good faith, on an informed
basis, and in the honest belief that their actions are
in the corporation's best interest.FN71 The burden
is on the party challenging the decision FN72 to
allege particularized facts creating a reasonable
doubt that (1) the directors are disinterested and
independent and (2) the challenged transaction was
otherwise the product of a valid exercise of business
judgment.FN73 One way of showing the latter is to
allege that the defendants wasted corporate assets.
But the standard for establishing a claim of waste is
a high one. Indeed, it has been held that the test for
finding waste of corporate assets is whether the
consideration received by the corporation was so
inadequate that no person of ordinary sound
business judgment would deem it worth that which
the corporation paid.FN74 While this is not the
impossibly stringent test urged on the court by the
defendants,FN75 merely poor, misguided, or
loss-making transactions are insufficient for a
finding of waste.

> FN71. *Aronson v. Lewis,* 473 A.2d 805,
> 812 (Del.1984).

> FN72. *Id.* at 812 (*citing Puma v. Marriot,*
> 283 A.2d 693, 695 (Del. Ch.1971)).

> FN73. *Aronson,* 473 A.2d at 815.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

> FN74. Rodman Ward, Edward P. Welch, & Andrew Turezyn, Folk on the Delaware General Corporation Law, § 141.2.11 (2005 ed.); *Saxe v. Brady,* 184 A.2d 602 (Del. Ch.1962).

> FN75. The defendants insist that in order to state a claim for waste, a plaintiff must " demonstrate that the transaction served no corporate purpose or was so completely bereft of consideration as to constitute a gift." Def.'s Opening Br. 27. The source of this standard is the court's decision in *President & Fellows of Harvard Coll. v. Glancy,* 2003 Del. Ch. LEXIS, 25, \*72 (Del. Ch. Mar. 21, 2003), which drew on Chancellor Allen's decision in *Lewis v. Vogelstein,* 699 A.2d 327, 336 (Del. Ch.1997). Read in context, the cited language is merely an illustration of a typical claim of waste rather than the definition itself: "most often, the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received. Such a transfer is in effect a gift." *Id.* The actual legal standard for waste, as expressed in *Vogelstein,* is the traditional one: "an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade. " *Id.*

The complaint alleges that the defendants have violated their fiduciary duties and committed waste by approving what are alleged to be substantially below market transactions between Weinstein and Mays. The plaintiffs also point to a number of transactions between Weinstein and third parties as evidence of potential waste or breaches of fiduciary duty.

The court first considers the plaintiffs' claims as to the Levittown transaction. The plaintiffs' claim is that the defendants committed waste by " inexplicably" consenting to the assignment of the Mays Levittown store lease to Trade Town. Had they instead refused to consent, the plaintiffs allege,

Weinstein could have secured all the excess revenue from the Levittown lease to itself, rather than sharing half with Mays.

**\*12** The record of the bankruptcy court's approval of the Levittown lease assignment (of which the court takes judicial notice), however, fatally contradicts the complaint's blithe allegation of misconduct. Indeed, a review and consideration of Mays's bankruptcy court petition requesting approval of the Levittown assignment clearly demonstrates that there was a real issue as to whether or not Weinstein would be able to recover any of the excess value of that lease. The bankruptcy record shows that the Levittown lease was recognized as a valuable asset of the estate. Thus, in its petition seeking authorization from the court to assume the lease and agree to the assignment, the burden was clearly on Mays to show that it was fair to Mays's creditors to pay half of the excess rents to its landlord, Weinstein. It is this dynamic that explains the reference in Mays's petition to an objection raised by counsel for Celwyn's minority shareholders (Celwyn being a subsidiary of Weinstein) during the lease reassignment negotiation process.[FN76]

> FN76. Fischer Aff. Ex. D at ¶ 12.

What Mays hoped to show by including the objections raised by Celwyn in the record was not that the deal might be unfair to Celwyn, as the plaintiffs suggest, but that the deal reached was the best that Mays could achieve in the face of active opposition by someone other than the Shulmans. Because the Shulmans stood on both sides of the lease reassignment,[FN77] Mays's creditors might otherwise have been justly suspicious that the lease reassignment had been engineered to shift revenue from Mays to Weinstein, and thus to shield assets from the bankruptcy proceeding.

> FN77. The bankruptcy court papers show that Max Shulman approved the lease reassignment on behalf of Celwyn, and Lloyd Shulman signed on behalf of Mays. Fischer Aff. Ex. D ¶ 20.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

In this context, the plaintiffs' bald assertion that the defendants wasted Weinstein assets by not insisting on even better terms from Mays and its creditors is simply insufficient to rebut the business judgment rule presumption as to the Levittown lease. The situation was obviously more complex than the complaint allows, and the directors' decision to authorize a compromise that secured a substantial advantage to Weinstein is plainly one within their sound business judgment. Indeed, even if the plaintiffs are ultimately correct in their allegations that the Shulmans later systematically moved revenue from Weinstein to Mays, such an action would have made no sense at all during Mays's bankruptcy, when any money shifted to Mays would have been available to repay creditors. The plaintiffs' allegations of fiduciary duty breach as to the Levittown property, therefore, must be dismissed for failure to state a claim.

Although some of the plaintiffs' remaining allegations are more serious than others, the court concludes that the plaintiffs have pleaded sufficient facts to sustain these allegations against a motion to dismiss. As to the transactions between Weinstein and Mays, the consideration secured for Weinstein from these transactions was troublingly low, in some cases less than 20% of what the plaintiffs allege was the fair market rate. Second, the Shulmans obviously stand on both sides of the transaction, as controllers of both Weinstein and Mays. Given the possibility that the defendants might, for the self-serving reasons that the plaintiffs have alleged, prefer revenues and profits to be shifted from Weinstein to Mays, the court cannot dismiss these allegations at this stage in the proceeding.

**\*13** The plaintiffs' allegations as to transactions with third parties and as to the vacant and loss-making properties, if true, together suggest a striking picture of financial mismanagement. The plaintiffs have alleged, for example, that the defendants have rented many of their properties to third parties for less than 20% of their market value, as measured against the rents charged for properties on the same streets. Although there may be legitimate reasons that explain such a disparity between the alleged market price and the price

Weinstein collected, the size of the gap between the two numbers means that the court cannot say that a claim of waste or breach of fiduciary duty could not be proven at trial. It is equally unclear why the defendants would leave what appear to be viable plots on Jamaica Avenue entirely vacant for years at a time, rather than generating what revenue they could.

Some of the plaintiffs' other factual allegations, such as the defendants' alleged inaction in the face of the Middle Bay Country Club's breach of its lease with Weinstein, or the loss-making properties in Kansas City, appear more within the protection of the business judgment rule. If these allegations had appeared alone, the court might well have dismissed them for failure to state a claim. But in the context of the plaintiffs' other allegations, where the plaintiffs seek to show a pervasive scheme through which Weinstein's management pursued actions designed to depress Weinstein's earnings, the plaintiffs should have the opportunity to conduct discovery into these claims. Ultimately, the plaintiffs' burden of proof on these matters remains high, especially where they seek to show waste. The defendants could have reasonable explanations for all of the alleged incidents of mismanagement. But at this stage, enough questions remain about the defendants' property transactions that the court cannot dismiss the plaintiffs' claims before discovery.

The same is not true of the plaintiffs' claim that the defendants violated their fiduciary duties by approving a bylaw amendment which provided for the advancement of legal fees during litigation. The law of Delaware is clear on the permissibility of advancing legal fees. This is especially true when, as here, the plaintiffs challenge the adoption of a bylaw that requires the corporation to advance litigation costs sometime in the future rather than challenging the directors' decision to advance particular litigation expenses. [FN78] Bylaw amendments mandating litigation advances are a fundamental part of Delaware's policy to encourage qualified people to serve as corporate directors. Moreover, as the Delaware Supreme Court has held, bylaw amendments are presumed to be valid unless they are unreasonable. [FN79] The plaintiffs have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                           Page 16

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

pleaded no facts which suggest that the bylaw amendment at issue is unreasonable in this case. Therefore, it is not subject to further scrutiny by this court.

> FN78. Decisions to advance litigation costs in the absence of a bylaw mandate are governed by the business judgment of the board of directors. *Havens v. Attar,* 1997 Del. Ch. LEXIS 12 (Del. Ch. Jan. 30, 1997).

> FN79. *Frantz Mfg. Co. v. EAC Indus.,* 501 A.2d 401 (Del.1985).

Relatedly, the plaintiffs allege that the defendants have violated their fiduciary duties by approving an amendment to Weinstein's certificate of incorporation which includes a Section 102(b)(7) provision protecting the directors from personal liability for violations of due care. This action constitutes a violation of the defendants' fiduciary duties, according to the plaintiffs, because the directors knew they were in imminent danger of being sued and thus stood on both sides of the " transaction." The court has at least twice before rejected claims of this kind, noting that they are " but variations on the 'directors suing themselves' and 'participating in the wrongs' refrain." FN80 Nor do the plaintiffs' allegations in this complaint allege particularized facts creating a reasonable doubt that the directors were disinterested or independent when they made their decision to approve the certificate amendment. In the absence of such facts, the directors' decision to adopt a Section 102(b)(7) provision, which was later approved by the shareholders, does not provide any reason to depart from the court's settled precedent. FN81

> FN80. *Decker v. Clausen,* 1989 Del. Ch. LEXIS 143 (Del. Ch. Nov. 6, 1989), *8; *Caruana v. Saligman,* 1990 Del. Ch. LEXIS 210, *11 (Del. Ch. Dec. 21, 1990).

> FN81. *Caruana,* 1990 Del. Ch. LEXIS at *11.

*14 Finally, the plaintiffs allege that the defendants violated their fiduciary duties by making false disclosures to the Orloffs, which, had they been truthful and complete, would have allowed the plaintiffs to mitigate the losses they attribute to the defendants' alleged mismanagement of Weinstein. The Delaware Supreme Court has held that claims for a breach of fiduciary duty of disclosure can only arise when the defendant has made statements to the corporation's stockholders in connection with a request for stockholder action. FN82 Of course, the statements in this case were not made in connection with any kind of corporate action, such as in a proxy statement. The courts have been willing, however, to allow plaintiffs to plead fraudulent disclosures under the rubric of the duty of loyalty. FN83

> FN82. *Steinman v. Levine,* 2002 Del. Ch. LEXIS 132, *46-47 (Del. Ch. Nov. 27, 2002), *aff'd* 822 A.2d 397 (Del.2003).

> FN83. *Id.*

To successfully state a duty of loyalty claim against directors for providing information in the absence of a request for stockholder action, a stockholder must allege that he received "false communications" from directors who were "deliberately misinforming shareholders about the business of the corporation." FN84 In this case, the plaintiffs have pleaded sufficient facts claiming that the defendants misled the Orloff shareholders. The alleged fraudulent appraisal of the Orloffs' shares, for example, could have, but did not, persuade the Orloffs to sell their shares at an insufficient price. As for the 2003 document that allegedly misstates the size of certain properties, the faulted disclosures could have been, but were not, material in keeping the minority shareholders quiescent while funds were shifted from Weinstein to Mays. In sum, therefore, the plaintiffs' allegations, if true, could demonstrate a violation of the defendants' duty of loyalty to the plaintiffs.

> FN84. *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 389 (Del.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740
**(Cite as: Not Reported in A.2d)**

    Ch.1999).

            IV.

For the foregoing reasons, the defendants' motion to dismiss pursuant to Rule 12(b)6 is GRANTED as to Counts IV and V, GRANTED IN PART AND DENIED IN PART as to Count I, and DENIED as to Counts II, III, and VI. IT IS SO ORDERED.

Del.Ch.,2005.
Orloff v. Shulman
Not Reported in A.2d, 2005 WL 3272355 (Del.Ch.), 31 Del. J. Corp. L. 740

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6

Westlaw.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 517967 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Page 1

**H**

Rugerio v. Estate of Poppiti
Del.Ch.,2005.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware.
Nicholas A. RUGGERIO, Plaintiff,
v.
ESTATE OF Michael A. POPPITI, Sr., Edmund F.
Lynch, ADM CTA, Ciro C. Poppiti, Michael A.
Poppiti, Jr., Sandy Poppiti and Cricklewood
Associates, L.P., Defendants.
**No. Civ.A. 18961-NC.**

Submitted Oct. 25, 2004.
Decided Feb. 23, 2005.

Nicholas A. Ruggerio, Wilmington, Delaware,
Plaintiff pro se.
Jeffrey M. Weiner, Fox Rothschild LLP,
Wilmington, Delaware, for Defendants.

MEMORANDUM OPINION
PARSONS, Vice Chancellor.
*1 This action stems from equity interests in two
Delaware businesses held by Plaintiff, Nicholas
Ruggerio ("Ruggerio"). Ruggerio entered into the
two businesses in the mid-1990s with his longtime
friend Michael A Poppiti, Sr. ("Poppiti, Sr."). Both
businesses were involved in the purchase,
development and sale of real estate. Until his death
on August 15, 1999, Poppiti, Sr. largely controlled
the two businesses, along with members of his
family, including Defendants Ciro Poppiti, Sandy
Poppiti and Michael Poppiti, Jr. ("Poppiti, Jr.").
Ruggerio alleges that the Poppitis and the
administrator of Poppiti, Sr.'s estate, Edmund F.
Lynch ("Lynch"), never reported or accounted to
him with respect to his share of the assets of the two
businesses.

Poppiti, Sr. formed the first entity, Cricklewood

Associates, L.P. (the "Cricklewood Partnership"),
on July 24, 1995, in connection with efforts to
develop property called Cricklewood Greene.
Ruggerio owned a 33% interest in the Cricklewood
Partnership.

The second entity was formed in 1997. In the early
to mid-1990s, Ruggerio found himself in dire
financial condition. He was exposed, for example,
to foreclosure actions against his residence and
several investment properties. On March 25, 1997,
Poppiti, Sr. formed ENAR, Inc., a Delaware
corporation ("ENAR"), to help Ruggerio avoid
foreclosure on his home and other properties and
accomplish an orderly liquidation of certain of his
assets.

On June 18, 2001, Ruggerio filed this action against
the Cricklewood Partnership and certain persons
involved in administering the two entities
(collectively "Defendants"), alleging breach of
fiduciary duty, commingling of assets and failure to
account. Ruggerio seeks an accounting as to the two
businesses, any damages demonstrated through the
accounting and an award of attorneys' fees.

On July 23, 2001, the Estate of Poppiti, Sr. (the "
Poppiti Estate") and its administrator, Lynch, filed a
motion to dismiss for failure to state a claim. The
motion seeks to dismiss all claims against the Estate
and Lynch because the action was filed more than
six months after Poppiti, Sr.'s death and thus outside
the time period mandated by 10 *Del. C.* § 8113.[FN1]
On August 30, 2004, Defendants moved for
summary judgment on all claims based on
transactions pre-dating June 18, 1998, as being
time-barred based on an analogous three-year
statute of limitations, and on all claims generally for
failure to state a claim.

> FN1. Plaintiff responded to the motion to
> dismiss on September 5, 2001. The record,
> however, does not contain a reply or other

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

indication that the Estate or Lynch actively pursued the motion after Plaintiff's response.

These are the Court's rulings on both of the pending motions. The Poppiti Estate and Lynch's motion to dismiss is denied. Assuming the well-pled allegations of the Complaint are true, the Poppiti Estate may be found to hold property in constructive trust for the benefit of Ruggerio. Property held in constructive trust by a decedent does not become property of the decedent's estate; therefore, claims regarding such property are not subject to the limitations period of § 8113.

The Court grants summary judgment in favor of Defendants on all claims regarding pre-June 18, 1998 transactions. This includes: (1) ENAR's sale of 5076 W. Brigantine Court, (2) ENAR's sale of 14 Wineberry Drive, and (3) the Cricklewood Partnership's sale of a portion of the Pike Creek Office Park to Avanti. The Court denies summary judgment with respect to all other claims and transactions, because Defendants failed to meet their burden of proving that there are no material issues of fact and that they are entitled to judgment as a matter of law. Thus, Ruggerio's claims for an accounting, damages and attorney's fees may proceed with respect to any Cricklewood Partnership and ENAR activities after June 18, 1998, that are challenged in the relevant pleadings.

## I. BACKGROUND [FN2]

FN2. Unless otherwise noted, the facts set forth in this opinion are taken from the well-pleaded allegations of the Complaint or, to the extent they relate to Defendants' summary judgment motion, from Defendants' appendix.

### A. The Cricklewood Partnership

*2 The Cricklewood Partnership was formed in 1995 and funded by loans of $2,909,246 from the Ruth E. Poppiti Trust ("REP Trust") and $840,253 from Poppiti, Sr. Cricklewood Associates, Inc. ("

Cricklewood Corporation"), a Delaware corporation, is the Cricklewood Partnership's general partner and a 1% shareholder. Ruggerio, Poppiti, Sr. and Poppiti, Jr. were the limited partners, each with a 33% ownership interest.

In April 1996, the Cricklewood Partnership purchased property known as the Pike Creek Office Park. In March 1998, the Partnership sold a portion of the Pike Creek Office Park ("Parcel I") to Avanti, LLC ("Avanti").[FN3] Avanti was founded by Poppiti, Sr. and two non-parties.[FN4] Around the time of the sale to Avanti, the Cricklewood Partnership guaranteed a mortgage to PNC Bank for Avanti in the amount of $1,900,000 and, as collateral, encumbered the remaining property of the Partnership. Avanti constructed a building on Parcel I before reselling the property in 1999.

FN3. The Cricklewood Partnership sold the remainder of the Pike Creek Office Park in 2001.

FN4. Ruggerio apparently had no ownership interest in Avanti.

Ruggerio complains that the Cricklewood Partnership never received any consideration for its guarantee of the Avanti mortgage or any part of the proceeds of Avanti's sale of Parcel I. Ruggerio also alleges that, since its inception, the Partnership has never given him an accounting of its income and disbursements. The record contains no evidence, however, that Ruggerio ever asked for such an accounting before June 18, 1998, the critical date for statute of limitations purposes.

Ruggerio also alleges that the Cricklewood Partnership sold a number of lots in Cricklewood Greene at various times and entered into mortgage transactions in connection with the development of that property. In addition, in July 1996, the Cricklewood Partnership purchased some real estate known as the Marker Property in New Castle County, Delaware. The Partnership sold that property in April of 2001.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 517967 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

### B. ENAR, Inc.

In the early to mid 1990s, Ruggerio encountered financial difficulty. In March 1995, with 10 months of mortgage payments in arrears, the Wilmington Trust Company ("Wilmington Trust") began foreclosure proceedings against Ruggerio's residence, 14 Wineberry Drive. On December 30, 1996, Wilmington Trust gained title to the residence through a sheriff's sale. Soon thereafter, Poppiti, Sr. stepped in to aid his friend and business partner.

On March 25, 1997, Poppiti, Sr. formed ENAR for the benefit of Ruggerio, its only shareholder. Poppiti, Sr. was elected ENAR's president, secretary and treasurer; Ciro Poppiti was elected a vice president and assistant secretary; and Sandy Poppiti was elected a vice president and assistant secretary. The purpose of ENAR was to use Poppiti, Sr.'s credit to stabilize Ruggerio's situation and allow for the orderly liquidation of certain property he had owned.

On May 1, 1997, Wilmington Trust conveyed 14 Wineberry Drive to ENAR, and Ruggerio conveyed five other properties to ENAR.[FN5] ENAR concurrently paid off Ruggerio's substantial debt to Wilmington Trust through mortgage refinancing with a personal guarantee by Poppiti, Sr. In August and September 1997, ENAR sold 5706 W. Brigantine Court to Ruggerio's daughter and her husband and 14 Wineberry Drive to a third party. In October 1997, ENAR purchased 123 Bunting Drive, again subject to a bank mortgage and a personal guarantee from Poppiti, Sr. ENAR also engaged in a number of other real estate transactions after June 18, 1998.

> FN5. Ruggerio personally conveyed 2717, 2719 and 2721 W. Third Street and 221 N. DuPont Street to ENAR. The conveyance of 5076 Brigantine Court was by Nicholas A. Ruggerio, Inc.

**\*3** By July 29, 1999, ENAR had sold all six of the properties it originally owned. At that time, $188,899.92 remained outstanding on the loan made to ENAR by Wilmington Trust and

guaranteed by Poppiti, Sr. On August 16, 1999, the Cricklewood Partnership paid the note in full and correspondingly debited Ruggerio's Partnership interest. There is no evidence, however, that Ruggerio ever approved of, authorized or even knew about this charge against his Partnership interest until long after it occurred. Ruggerio cites this transaction as supporting his claim for breach of fiduciary duty. Ruggerio also alleges that ENAR has never given him an accounting of its various transactions.

### II. ANALYSIS

#### A. Motion to Dismiss

The Poppiti Estate and Lynch move to dismiss for failure to state a claim. A motion to dismiss under Rule 12(b)(6) will be granted where it appears with reasonable certainty that the plaintiff cannot prevail on any set of facts that can be inferred from the pleadings.[FN6] Plaintiff is entitled to all reasonable inferences that can be drawn from the Complaint.[FN7]

> FN6. *See Leonard Loventhal Account v. Hilton Hotels Corp.,* 2000 WL 1528909, at \*3 (Del. Ch. Oct. 10, 2000).

> FN7. *See Growbow v. Perot,* 539 A.2d 180, 187 n. 6 (Del.1988).

Section 8113 of Title 10 of the Delaware Code limits the time for commencing an action against a decedent's estate to either six months from the date of the decedent's death or three months from notice of rejection of a claim submitted to the administrator. The Poppiti Estate and Lynch have moved to dismiss Ruggerio's claims against them because Ruggerio's Complaint was filed more than 22 months after Poppiti, Sr.'s death. Ruggerio replies that the Poppiti Estate holds property of his in constructive trust and that such property does not become part of a decedent's estate. Therefore, according to Ruggerio, § 8113's six-month time limitation does not apply to his claims.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 517967 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

A constructive trust is "an equitable remedy of great flexibility and generality." [FN8] A constructive trust is proper when "a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty." [FN9] The Complaint alleges facts relating to Ruggerio's claims for breach of fiduciary duties, fraud and self-dealing that, if proven, could give rise to a constructive trust.

> FN8. *Cannon v. Sisneros,* 1987 WL 16286, at *2 (Del. Ch. Aug. 31, 1987).

> FN9. *Adams v. Jankouskas,* 452 A.2d 148, 152 (Del.1982).

Our courts have held that property within an express, constructive, or resulting trust is held for the beneficiary and does not become part of a decedent's estate.[FN10] Applying this rationale, courts have held statutes limiting the time period to bring an action against an estate inapplicable to property held in constructive or resulting trusts because claims against such property are not claims against the decedent's estate.[FN11]

> FN10. *Adams,* 452 A.2d at 154 (trust property cannot become part of the estate because "a trustee has only legal, and not beneficial or equitable title to the trust res" ); *see also Everett v. Lanouette,* 1994 WL 681106, at *9 (Del. Ch. Nov. 10, 1994).

> FN11. *See Everett,* 1994 WL 681106, at *9 ("[t]he party seeking the imposition of a trust over assets in the estate alleged to have been held in trust by the decedent is not a creditor of the estate and is not required to present a claim"); *Adams,* 452 A.2d at 154 (allowing claim notwithstanding expiration of 12 *Del. C.* § 2102's six-month period of limitations); *Wagner v. Ware,* 1988 WL 30184, at *2 (Del. Ch. Mar. 29, 1998) (holding action seeking constructive trust not barred by expiration of time to review proof of will under 12 *Del. C.* § 1309).

Ruggerio's claims against the Poppiti Estate and Lynch relate to property in which he claims equitable title. Drawing all inferences in Ruggerio's favor, that property may be found to be held in constructive trust by the Poppiti Estate, rather than part of the Estate itself. Therefore, because § 8113's time limit only applies to actions against property of the estate, the statute does not bar Ruggerio's claims against the Poppiti Estate and Lynch in this action. [FN12]

> FN12. Ruggerio's Complaint does not explicitly refer to either a constructive or resulting trust. The Complaint's repeated references to fiduciary duties owed to Ruggerio in connection with property and monies held by ENAR and the Cricklewood Partnership for his benefit, however, are sufficient to put Defendants on notice of his claims for equitable relief. Furthermore, Ruggerio's response to the motion to dismiss in 2001 explicitly mentioned the constructive trust theory. Thus, Defendants could not reasonably complain about lack of notice of that theory.

B. Defendants' Motion for Summary Judgment

*4 Defendants have moved for summary judgment on two grounds. First, Defendants argue that any claims that arose prior to June 18, 1998 are time-barred. Second, Defendants contend Ruggerio's request for an accounting or constructive trust has no merit.

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. [FN13] The burden is on the moving party to prove absence of a material issue of fact, and any doubt regarding the existence of such an issue will be resolved against the movant.[FN14] Once a motion for summary judgment is made and supported, however:

> FN13. Ch. Ct. Rule 56(c); *Burkhart v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 517967 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

*Davies,* 602 A.2d 56, 59 (Del.1991).

> FN14. *Scureman v. Judge,* 626 A.2d 5, 10-11 (Del. Ch.1992).

an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56], must set forth specific facts showing that there is a genuine issue for trial.[FN15]

> FN15. Ch. Ct. R. 56(e).

In assessing a motion for summary judgment, the court must draw all factual inferences against the moving party.[FN16]

> FN16. *Judah v. Del. Trust Co.,* 378 A.2d 624, 632 (Del.1977).

1. Are any of Ruggerio's claims time-barred?

Where the relief sought from an accounting is merely the recovery of money, the case is analogous to an action for monetary damages.[FN17] In such cases, the court applies the equivalent statute of limitations by analogy. [FN18] The statute of limitations for a breach of fiduciary duty is three years.[FN19] In addition, "[a] right to an accounting .. . does not revive a claim barred by law." [FN20]

> FN17. *Artesian Water Co. v. Lynch,* 283 A.2d 690, 692 (Del. Ch.1971).

> FN18. *Merck & Co. v. SmithKline Beecham Pharms. Co.,* 1999 WL 669354, at *42 (Del. Ch. Aug. 5, 1999).

> FN19. 10 *Del. C.* § 8106

> FN20. *Fike v. Ruger,* 754 A.2d 254, 264 (Del. Ch.1999) (quoting the *Revised Uniform Partnership Act* § 405(c) (1996) to interpret 6 *Del. C.* §§ 1521-22).

Ruggerio filed this action on June 18, 2001. At least three of the transactions at issue occurred more than three years earlier, before June 18, 1998:(1) ENAR's sale of 5076 W. Brigantine Court, (2) ENAR's sale of 14 Wineberry Drive, and (3) the Cricklewood Partnership's sale of a Parcel I of the Pike Creek Office Park to Avanti. Defendants argue that any claims based on transactions pre-dating June 18, 1998 are time-barred.

In response, Ruggerio urges the Court not to apply the statute of limitations inflexibly. Ruggerio relies on *Yaw v. Talley* for the proposition that " fiduciaries who benefit personally from their wrongdoing ... will not to be afforded the protection of the statute ." [FN21] The rule *Yaw* refers to comes from a line of cases holding that in extraordinary instances the statute of limitations will not protect a defendant who personally profited from a fraudulent, self-dealing transaction.[FN22] A defendant's actionable self-dealing, however, only works to toll the statute until the plaintiff becomes aware of the wrong.[FN23]

> FN21. 1994 WL 89019, at *5-6 (Del. Ch. Mar. 2, 1994) (dismissing plaintiff's claim that defendants wasted corporate assets in a self-dealing transaction because the three-year statute of limitations had run).

> FN22. *See Bovay v. H.M. Byllesby & Co.,* 38 A.2d 808 (Del.1944) (holding fiduciaries responsible for corporation's insolvency could not rely on statute of limitations as a defense); *Halpern v. Barran,* 313 A.2d 139, 142 (Del. Ch.1973) (interpreting *Bovay* ). Furthermore, "where the complaint asserts a claim that on its face would otherwise be time-barred, the plaintiff bears the burden of pleading facts that would operate to toll the statute." *Yaw,* 1994 WL 89019, at *6.

> FN23. *See Bokat v. Getty Oil Co.,* 262 A.2d 246, 251 (Del.1970) (affirming summary judgment in favor of defendants that allegedly engaged in self-dealing transactions because plaintiff was aware of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 6

Not Reported in A.2d, 2005 WL 517967 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

all claims at least three years before he commenced suit); *Kahn v. Seaboard Corp.,* 625 A.2d 269, 274-76 (Del. Ch.1993) (equity "treats the statute as running from the discovery of the fraud, not before").

Ruggerio alleges that Poppiti, Sr. benefited personally from breaches of fiduciary duty. Ruggerio claims, for example, that in connection with the Partnership's sale of Parcel I to Avanti in March 1998, it did not receive any consideration in exchange for guaranteeing Avanti's $1.9 million mortgage from PNC Bank. In that transaction, the Cricklewood Partnership's assets were encumbered for the benefit of Avanti, a company in which Poppiti, Sr., but not Ruggerio, owned an interest. Ruggerio thus argues that Poppiti, Sr. should not be able to rely on a statute of limitations defense to claims based on the 1998 transaction involving Parcel I.[FN24]

> FN24. The only argument Ruggerio explicitly makes as to why the statute of limitations should be tolled is that Poppiti, Sr. forced a distribution of Ruggerio's Cricklewood Partnership interest in order to pay an ENAR debt on or about August 19, 1998. Ruggerio's Answering Brief at 5-7. Ruggerio contends Poppiti, Sr. personally profited from satisfaction of the ENAR debt because he had personally guaranteed the note. This transaction, however, occurred after June 18, 1998 and thus is not time-barred.

**\*5** Ruggerio has not presented evidence sufficient to toll the time period. Ruggerio's response to Defendants' summary judgment motion did not include affidavits or other evidence proving specific facts that show there is a genuine issue for trial. Ruggerio's averment that Poppiti, Sr. profited personally from the payment of an ENAR debt after June 18, 1998 is not sufficient to create such an issue. For tolling to be applicable, Ruggerio would have to show, at a minimum, that the pre-June 18, 1998 transactions themselves were fraudulent, that Poppiti, Sr. or another defendant personally profited from them, and that Ruggerio did not know, and

could not have known with the exercise of reasonable diligence, of the fraud until after June 18, 1998. Ruggerio has not made such a showing.

Defendants have shown that at least some of the transactions referenced in Ruggerio's complaint occurred more than three years before he filed this action. Ruggerio has failed to present evidence that shows there is a genuine issue of material fact as to whether the limitations period should be tolled as to any of the pre-June 18, 1998 transactions. Therefore, Defendants' motion for summary judgment is granted as to all claims based on pre-June 18, 1998 transactions.

### 2. Claims on the merits

Both ENAR and the Cricklewood Partnership made a number of transactions after June 18, 1998.[FN25] Ruggerio alleges breach of fiduciary duty by the commingling of funds among ENAR, the Cricklewood Partnership and Cricklewood Corporation. He also complains that he was never given an accounting for either ENAR or the Cricklewood Partnership.

> FN25. Transactions after June 18, 1998 include: (1) ENAR's sales of 2717-21 W. Third Street and 212 N. DuPont Street, (2) the alleged forced distribution of a portion of Ruggerio's partnership interest in satisfaction of an ENAR debt, and (3) the Cricklewood Partnership's sale of Parcel I of the Pike Creek Office Park property.

In support of their motion for summary judgment on the merits of Ruggerio's claims, Defendants filed an extensive Appendix containing documentary evidence relating to the transactions referred to in the Complaint. According to Defendants, those documents show that there was nothing unusual about any of the challenged transactions and that there is no basis for Ruggerio's allegations of a breach of fiduciary duties. In addition, the record shows that before Ruggerio filed this suit Defendants supplied him with a number of documents relating to the two entities, including

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 517967 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

checking account records and financial
compilations. During the litigation, Defendants
produced many more documents, including tax
returns for ENAR and the Cricklewood Partnership
and bookkeeping ledgers. These are the types of
documents upon which Defendants rely.

On a motion for summary judgment it is the
movant's burden to show the absence of any
material issue of fact. In this case, Defendants
attempt to meet that burden by relying mainly upon
documents they produced in discovery. In the
context of a trial, those documents and any related
testimony of witnesses with relevant knowledge
may well be sufficient to support a judgment in
Defendants' favor. The documentary evidence
alone, however, does not provide a satisfactory
basis for concluding that there are no material
issues of fact in dispute.

*6 During the relevant time period, ENAR and the
Cricklewood Partnership entered into a number of
different transactions. Some of the transactions
involved multi-party financing arrangements.

The documents cited by Defendants are less than
ideal in terms of reliability, especially on a motion
for summary judgment. For example, the financial
documents of ENAR and the Partnership are only
compilations, as opposed to more reliable audited
financial statements.[FN26] Defendants also rely on
the tax returns of the two entities. Tax returns,
however, are of limited aid in understanding the
operation of the entities in question, because the tax
code's definition of "income" is not identical to the
definition under Generally Accepted Accounting
Principles. Therefore, Defendants' showing that the
Cricklewood Partnership consistently produced a *tax*
loss, does not necessarily prove that it experienced
a *financial* loss. Thus, even considering the totality
of Defendants' disclosures, the Court is not
convinced that their evidence elucidates the facts
with sufficient clarity and reliability to show that no
material issue of fact remains.

> FN26. Unlike audited financial statements,
> which contain data independently verified
> by the preparer, compilations generally are

merely a reformatting of information given
to the preparer by the client. *See*
Accountant's Compilation Report page 3,
Defendants' Appendix at 108.
Compilations are used in some cases
because they are considerably cheaper than
reviewed statements and audited
statements for which more stringent
preparation standards apply.

To prevail on summary judgment, Defendants also
must prove that they are entitled to judgment as a
matter of law. At this stage, Defendants have failed
to prove that Ruggerio cannot succeed on any of his
claims for breach of fiduciary duties. The ownership
and management structure of both ENAR and the
Cricklewood Partnership are complicated and have
yet to be clarified. Both entities were run
informally, without regular reporting to the owners,
including Ruggerio, and often without
documentation.[FN27] In addition, drawing all
inferences in Ruggerio's favor, as it must, the Court
cannot conclude as a matter of law that Ruggerio
cannot succeed on any of his claims. Defendants
have failed to demonstrate, for example, that none
of the post-June 18, 1998 transactions of ENAR or
the Cricklewood Partnership involved self-dealing
by Poppiti, Sr. or other Defendants. On the
contrary, the evidence of record on some of the
transactions arguably could support an inference of
self-dealing, in which case Defendants would have
to demonstrate the entire fairness of the challenged
transaction.

> FN27. *See, e.g.,* Ruggerio Appendix at 5
> (use of one "open account" to keep track
> of loans from the REP Trust to the
> Cricklewood Partnership in order to "cut
> down on expenses and costs"), 14
> (explaining the lack of any writing
> memorializing Poppiti, Sr.'s lending of
> $590,000 to the Cricklewood Partnership).

In summary, the financial documentation and other
evidence produced by Defendants in support of
their motion is not sufficient to demonstrate that
there is no genuine issue of material fact for trial.
Furthermore, the Court considers it desirable to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d

Not Reported in A.2d, 2005 WL 517967 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

inquire thoroughly into the facts of this case in order to clarify the application of the law to the circumstances.[FN28] Therefore, Defendants are not entitled to summary judgment on the merits of Ruggerio's claims.

> FN28. *See Ebersole v. Lowengrub,* 180 A.2d 467, 469 (Del.1962).

### III. CONCLUSION

For the foregoing reasons, the motion to dismiss filed by the Poppiti Estate and Lynch is denied. Defendants' motion for summary judgment is granted as to any and all claims based on transactions that occurred before June 18, 1998. The Court denies summary judgment as to all other claims. Thus, Ruggerio may continue to seek an accounting with respect to Cricklewood Partnership and ENAR transactions, income and disbursements that occurred on or after June 18, 1998.

*7 IT IS SO ORDERED.

Del.Ch.,2005.
Ruggerio v. Estate of Poppiti
Not Reported in A.2d, 2005 WL 517967 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 7

Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 1996 WL 361505 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

►
Taylor v. LSI Logic Corp.
Del.Ch.,1996.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
Ethel TAYLOR, Plaintiff,
v.
LSI LOGIC CORPORATION, Defendant.
**C.A. No. 13915.**

Submitted March 4, 1996.
Decided June 21, 1996.

Joseph A. Rosenthal and John G. Day of Rosenthal,
Monhait, Gross & Goddess, P.A., Wilmington; H.
Adam Prussin of Silverman, Harnes & Harnes, New
York City; Berman, Devalerio, Pease & Tabacco,
San Francisco, California, of counsel, for Plaintiff.
R. Franklin Balotti and Robert Stearn, Jr. of
Richards, Layton & Finger, Wilmington; Dennis J.
Block and Michael J. Maimone of Weil, Gotshal &
Manges, New York City, of counsel, for Defendant.

*MEMORANDUM OPINION*
STEELE, Vice Chancellor.

### CONTENTIONS OF PARTIES

*1 Plaintiff, Ethel Taylor ("Taylor"), is a public
shareholder of LSI Logic of Canada, Inc., ("LSI
Canada"). Plaintiff alleges Defendant, LSI Logic
Corporation ("LSI") a Delaware corporation,
breached its fiduciary duty as a majority
shareholder of LSI Canada to LSI Canada's
minority shareholders.

Plaintiff brought this action individually and on
behalf of LSI Canada's former minority
shareholders. Plaintiff filed an Amended
Complaint and moved to expedite proceedings.
This Court declined to expedite on June 9, 1995.

Defendant moves to dismiss the Amended
Complaint on three grounds. First, LSI contends
this Court should dismiss the Amended Complaint
based on the doctrine of *forum non conveniens.*
Second, LSI alleges plaintiff has failed to plead a
colorable claim under Canada law. Third, LSI
insists this Court should deny Plaintiff's request for
injunctive relief, because Plaintiff cannot establish
she will suffer irreparable harm.

### BACKGROUND

LSI is a Delaware corporation with its headquarters
in Milpitas, California. LSI primarily engages in
the design, development, manufacture, and
marketing of customized, integrated circuit
products. LSI owned approximately 55 percent of
LSI Canada's outstanding common stock at the time
Plaintiff brought this action.

LSI Canada is incorporated under the law of
Canada with its headquarters in Calgary, Alberta.
LSI Canada designs computer systems for its
Canada customers.

On November 29, 1994, LSI publicly announced it
intended to purchase the remaining 45 percent of
LSI Canada's common stock for $3.30 (Canadian)
per share. The announcement also included a plan
to terminate all of LSI Canada's design and
manufacturing operations and to convert LSI
Canada into a distributor of LSI's products in
Canada. None of the proposed negotiations or
transactions took place in Delaware or implicated
Delaware law.

After LSI's announcement, LSI Canada's outside
directors hired ScotiaMcLeod, an investment
banking firm, to perform a valuation of LSI
Canada's common stock. ScotiaMcLeod concluded
LSI Canada's shares were worth more than LSI's
$3.30 (Canadian) per share offer. On February 3,
1995, LSI announced it had suspended plans to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1996 WL 361505 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

purchase LSI Canada's common stock because of substantial differences of opinion regarding the value of the stock.

On May 2, 1995, LSI revised its tender offer and announced it was offering LSI Canada's minority shareholders $4.00 (Canadian) per share.

The Offer to Purchase, ("the Offer") disclosed the Offer was conditional on LSI Canada tendering at least 30.3 percent of LSI Canada's common stock and not withdrawing them.[FN1] The Offer remained opened until July 6, 1995.

> FN1. The 30.3 percent LSI Canada tendered is approximately 66.6 percent of the common shares which LSI does not own.

The Offer announced LSI would (1) eliminate all of LSI Canada's independent design and manufacturing functions; (2) convert LSI Canada into a distributor of LSI products; and (3) use this downgrading of LSI Canada's business as a justification for raising drastically the "transfer" prices it charges LSI Canada for computer systems and other products.

*2 The Offer also revealed ScotiaMcLeod's valuation of LSI Canada's stock. The valuation indicated the shares were worth between $4.90 and $5.90 (Canadian) per share.[FN2]

> FN2. LSI hired Prudential which reviewed ScotiaMcLeod's valuation methodologies. Prudential employed a comparable company capitalization approach. It advised LSI the reasonable value would be between $2.99 to $3.37 (Canadian) per share.

LSI Canada issued its response to the Offer in the " Directors' Circular" which states in pertinent part:
The Independent Committee concludes that the Proposed Offer does not reflect the fair market value of the Shares. Nonetheless ... the Independent Committee believes that is will be

increasingly difficult for LSI Canada to diversify its business activities or to resist the intention of LSI to operate LSI Canada under its global business model and to implement the proposed transfer pricing arrangements, which the Independent Committee believes will materially reduce the profitability of LSI Canada. On that basis, the Independent Committee recommends to the Board that it recommend that Shareholders review these factors and seriously consider accepting the Proposed Offer.

Subsequently, LSI Canada's shareholders, including Plaintiff, tendered their shares. The shareholders tendered approximately 10.1 million shares. LSI Canada purchased the remaining 1.6 million shares outstanding through a 1.6 million-to-one reverse stock split that cashed out the public's shares at $4.00 (Canadian) per share.

## CONCLUSIONS OF LAW

### Standard of Review for Motion to Dismiss

On a motion to dismiss, Delaware courts only consider those matter which the parties refer to in the pleadings. *James River-Pennington Inc. v. CRSS Capital, Inc.,* Del.Ch., C.A. No. 13870, Steele, V.C. (Mar. 6, 1995), Mem. op. at 9 (*citing Hart Holding v. Drexel Burnham Lambert,* Del.Ch., 593 A.2d 535, 538 (1991)). Delaware courts will consider all plead facts to be true and will draw all inferences in the light most favorable to the nonmoving party. *Id.* at 10 (*citing Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6 (1988)). However, a court will not accept conclusory allegations as true. *Id.* Delaware courts will not dismiss a complaint unless it appears to a reasonable degree of certainty the plaintiff would not be entitled to relief under any set of facts which the plaintiff could prove in support of the claim. *Id.* (*citing Rabkin v. Philip A. Hunt Chem. Corp.,* Del.Supr., 498 A.2d 1099, 1104 (1985); *In re USACafes, L.P. Litig.,* Del.Ch., 600 A.2d 43, 47 (1991)).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 3

Not Reported in A.2d, 1996 WL 361505 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

Motion to Dismiss the Amended Complaint based
on *Forum Non Conveniens*

Defendant claims this Court should dismiss the
Amended Complaint based on *forum non
conveniens.* In addressing a motion to dismiss an
amended complaint based on *forum non conveniens,*
Delaware courts consistently uphold a plaintiff's
choice of forum except in the rare case where the
defendant establishes overwhelming hardship and
inconvenience. *Chrysler First Business Credit
Corporation v. Locust Limited Partnership,*
Del.Supr., 669 A.2d 104, 105 (1995) (*citing
General Foods Corp v. Cyro Maid, Inc.,* Del.Supr.
198 A.2d 681 (1964)).

*3 In making the forum non conveniens analysis, a
court weighs six factors:
(1) the applicability of Delaware law;
(2) the relative ease of access to proof;
(3) the availability of compulsory process for
witnesses;
(4) the pendency or non-pendency of a similar
action or actions in another jurisdiction;
(5) the possibility of a view of the premises, if
appropriate; and
(6) all other practical considerations which would
make the trial easy, expeditious, and inexpensive.

*Harbor Finance Partners v. Sunshine Mining and
Refining Company,* Del.Ch., C.A. No. 14159,
Steele, V.C. (February 16, 1996), Mem. op. at 6-7.
A defendant has the burden to prove "the
combination and the weight of the factors to be
considered balance *overwhelmingly* in favor of the
defendant." (emphasis added) *Macklowe v. Planet
Hollywood, Inc.* Del.Ch., C.A. No. 13689, Steele,
V.C. (Oct. 4, 1994) Mem. op. at 8 (*citing Miller v.
Phillips Petroleum Co. Norway,* Del.Supr., 537
A.2d 190, 202 n. 24 (1987) (*quoting Kolber v.
Holyoke Shares, Inc.,* Del.Supr., 213 A.2d 444, 447
(1965)).

### 1. The Applicability of Delaware Law

Plaintiff concedes Canada law applies. According
to the *internal affairs doctrine,* this Court must
apply the law of the place of incorporation (Canada)

in determining the matters of substantive law
concerning the internal affairs of a corporation.
*McDermott Inc. v. Lewis,* Del.Supr., 531 A.2d 206
(1987). Here, the law of Canada, not Delaware
controls. Accordingly, this factor weighs in favor
of LSI's Motion to Dismiss the Amended Complaint.

### 2. The Relative Ease of Access to Proof

LSI must establish litigating in Delaware would
cause inconvenience in accessing sources of proof.
*Kolber v. Holyoke Shares, Inc.,* Del.Supr., 213 A.2d
444, 446 (1965). LSI argues all sources of proof
are located either in California or Canada making
Plaintiff's choice of a Delaware forum inconvenient.
One fact is clear-none of the sources of proof for
any contention are located in Delaware.

Plaintiff responds LSI has failed to demonstrate this
case involves a large number of documents and
records. Plaintiff contends the mere absence of
sources of proof in Delaware fails to establish
proceeding in Delaware as opposed to California or
Canada would be any more inconvenient.

LSI itself, a Delaware Corporation, cannot
reasonably argue surprise at the inconvenience of
litigating in its corporate home. However, the
factual focus of this case is on the value of the
shares of a Canada corporation and the actions of a
Delaware corporate majority shareholder effecting
that share value. I can see no clear advantage nor
clear disadvantage in access to evidence by
litigating in any one of the three jurisdictions as
opposed to another.

### 3. The Availability of Compulsory Witnesses

LSI argues it would be difficult for a Delaware
court to issue compulsory process to the directors
and officers of LSI Canada who are potential
non-party witnesses for this action. Defendant cites
*Sumner Sports Inc. v. Remington Arms Co.,*
Del.Ch., C.A. No. 12508, Chandler, V.C. (Mar. 4,
1993), Mem. op. at 10 to support its contention. In
*Sumner Sports Inc.,* this Court found it would be
difficult to issue compulsory process to foreign

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1996 WL 361505 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

nationals or officials of Canada corporations. This is so especially where the claims against the foreign defendants do not arise out of business transacted in Delaware. *Id.*

**\*4** Plaintiff argues LSI has no basis for alleging any difficulties in securing compulsory process. Plaintiff contends the only witnesses needed to testify in this case are LSI's own employees. I disagree. Plaintiff alleges LSI's offer was coercive. In order to support her allegation, Plaintiff would undoubtedly need LSI Canada's employees' and/or Directors' testimony to resolve this dispute.

The Plaintiff complains of actions of a Delaware corporation acting as a majority shareholder of a Canada corporation. Obviously Canada courts would find it easier to serve process to the necessary witnesses in Canada in order to determine whether Plaintiff's allegations have merit. This factor weighs in favor of Defendant's Motion to Dismiss.

### 4. The Possibility of Viewing the Premises

This factor is irrelevant.

### 5. The Pendency of Similar Actions

There is an action pending in California focusing on the same subject matter, but the Delaware action is the first filed action. LSI stayed the later filed action in California pending disposition of this case.

While I recognize no suit is pending in Canada at this time, Canada courts should interpret the public policy of Canada where the inter-corporate relationships are entirely a creature of the law of the foreign jurisdiction. *Taylor v. LSI Logic Corporation,* Del.Ch., C.A. No. 13915-NC, Steele, V.C. (June 19, 1995), Letter Op. at 4. Canada's courts have broad statutory authority to address the alleged oppression of minority shareholders. One critical element seems to be missing-Canada law does not recognize the broad range of discretion granted to Delaware courts to award attorneys' fees. While Delaware courts have the ability to interpret

the policy underlying the statute of another country, it is altogether a different matter to conclude Delaware *should* interpret that policy in the absence of any meaningful tie to this jurisdiction.

Plaintiff contends Delaware is the appropriate forum for resolving this matter. I disagree. This case involves the application of an aggressive Canada law to a transaction that occurred in Canada. I conclude this Court should take interest in issues focusing on the *internal* affairs of Delaware corporations. The same aggressive stance rings hollow when the sole role played by a Delaware interest is a Delaware corporation acting as a majority shareholder in a foreign corporation where the foreign jurisdiction's laws and courts contain rights, remedies and access to process equal to or broader than our own. Ironically, the sole Delaware player in the current tactical game opposes litigation on its own home field. Although it is not unusual for Delaware courts to deal with open questions of the law of sister states or of foreign countries, *Kolber v. Holyoke Shares, Inc.,* De.Supr., 213 A.2d 444, 446 (1965), I find a Canada court would be a more appropriate forum for adjudicating Canada's statutory policy. On the facts of this case, Canada can better interpret its own statutory law, legislative history, and policy rationales.

### 6. All Other Practical Considerations Which Would Make the Trial Easy, Expeditious and Inexpensive

**\*5** Finally, in order to facilitate, to expedite, and to economize costs in this case, Delaware should decline to entertain this litigation. Plaintiff is a Canada citizen who owned shares in a Canada corporation. Her allegations are based on the Canadian Business Corporation Act and the Ontario Securities Act. Delaware has no interest in resolving this dispute between a minority shareholder of a foreign corporation and a Delaware corporation which happens to be the majority shareholder in the foreign corporation. This is not a case where a plaintiff is suing derivatively on behalf of a Delaware corporation. Rather, Plaintiff's choice of forum is only predicated on the fact Delaware is the majority shareholder's state of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1996 WL 361505 (Del.Ch.)
**(Cite as: Not Reported in A.2d)**

incorporation.

Although LSI is a Delaware corporation, none of the transactions occurred in this state. The scope of LSI's fiduciary duties to LSI Canada and/or its minority shareholders are defined by Canada law and should be interpreted by a Canada court. All the disclosures concerning the Offer took place in Canada. It is not in the best interest of this Court to allow this case to proceed in Delaware when Canada courts have the resources and knowledge to resolve this matter efficiently and effectively. It simply makes sense to conclude Canada's courts have a greater interest in the outcome of this case and that they should resolve the application of Canada laws to a Canada corporation and its investors.

## CONCLUSION

Based on the foregoing analysis, I conclude this action should not proceed in Delaware. It may well be unusual to find a forum where no suit is pending to be a more appropriate forum for resolving an intra corporate dispute. However, the absence of an action in Canada does not control. *See Williams Gas Supply v. Apache Corp.,* Del.Super., C.A. No. 90C-AU-1, Babiarz, J. (Feb. 12, 1991), *aff'd,* Del.Supr., 594 A.2d 3 (1991). The overwhelming practical considerations suggest Delaware is not an appropriate forum where the sole connection any party has with Delaware is the Defendant's place of incorporation. The complaint is dismissed based upon the doctrine of *forum non conveniens.* In reaching this conclusion, I do not need to address the assertions that Plaintiff failed to plead a colorable claim under Canada law nor that the sweeping statutory remedies afforded her under Canada law prohibit any rational conclusion she faces irreparable injury. The complaint is dismissed.

IT IS SO ORDERED.

Del.Ch.,1996.
Taylor v. LSI Logic Corp.
Not Reported in A.2d, 1996 WL 361505 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

Westlaw.

--- A.2d ----

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

Page 1

**H**
In re Tyson Foods, Inc.
Del.Ch.,2007.
Only the Westlaw citation is currently available.
Court of Chancery of Delaware,New Castle County.
In re TYSON FOODS, INC. Consolidated
Shareholder Litigation.
**C.A. No. 1106-N.**

Submitted: Sept. 20, 2006.
Decided: Feb. 6, 2007.

Stuart M. Grant, Megan D. McIntyre, and Michael
J. Barry, of Grant & Eisenhofer P.A., Wilmington,
Delaware; of Counsel: Jeffrey G. Smith and Robert
Abrams, of Wolf Haldenstein Adler Freeman &
Herz LLP, New York, New York, Attorneys for
Plaintiffs.
A. Gilchrist Sparks, III, S. Mark Hurd, and Samuel
T. Hirzel, of Morris, Nichols, Arsht & Tunnell LLP,
Wilmington, Delaware; of Counsel: David F.
Graham, Anne E. Rea, and Julie K. Potter, of Sidley
Austin LLP, Chicago, Illinois, Attorneys for
Defendants.
Kurt M. Heyman and Patricia L. Enerio, of Proctor
Heyman LLP, Wilmington, Delaware, Attorneys for
Nominal Defendant.

*OPINION*
CHANDLER, Chancellor.
**\*1** Before me is a motion to dismiss a lengthy and
complex complaint that includes a decade's
worth of challenged transactions. Plaintiffs level
charges, more or less indiscriminately, at eighteen
individual defendants, one partnership, and the
company itself as a nominal defendant. Several
allegations are leveled at clearly inappropriate
directors or challenge actions well beyond the
statute of limitations. Over six hundred pages of
additional documents and briefs have been filed by
one party or another in order to provide context for
my decision. Although I do not grant defendants'
motion in its entirety, I may at this point winnow the

grist of future proceedings from chaff that may be
dismissed.

My decision is divided roughly into three parts.
First, I describe in some detail the parties, the facts
alleged in plaintiffs' complaint (and any appropriate
accompanying materials), and the parties' primary
contentions. Second, I describe the legal standards
that are applicable across most counts in the
complaint: the demand requirement and the statute
of limitations. Finally, I evaluate each count of the
consolidated complaint separately, highlighting the
relevant legal issues and determining the extent to
which a particular count may be limited or
dismissed altogether.

In evaluating a motion to dismiss, I must accept as
true all well-pleaded factual allegations.[FN1] Such
facts must be asserted in the complaint, not merely
in briefs or oral argument.[FN2] I must draw all
reasonable inferences in favor of the non-moving
party, and dismissal is inappropriate unless the "
plaintiff would not be entitled to recover under any
reasonably conceivable set of circumstances
susceptible of proof." [FN3]

> FN1. *In re Gen. Motors (Hughes) S'holder
> Litig.,* 897 A.2d 162, 168 (Del.2006)
> (quoting *Savor, Inc. v. FMR Corp.,* 812
> A.2d 894, 896-7 (Del.2002)).

> FN2. *Orman v. Cullman,* 794 A.2d 5, 28 n.
> 59 (Del. Ch.2002).

> FN3. *In re Gen. Motors,* 897 A.2d at 168
> (quoting *Savor, Inc. v.. FMR Corp.,* 812
> A.2d 894, 896-97 (Del.2002)).

**I. PARTIES AND PROCEDURAL HISTORY**

This case arises from an unusually complex
procedural history. Plaintiffs' consolidated
complaint is the fourth iteration arising from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

defendants' challenged actions. Before delving into disputes spanning over a decade and the events that bring the parties before this Court, I pause briefly to describe the relevant players.

### A. The Plaintiffs

An SEC investigation regarding the proper classification of executive perquisites aroused the suspicions of plaintiff Eric Meyer, a New Jersey resident and Tyson shareholder. He made a written demand for documents to the company pursuant to 8 *Del. C.* § 220 on August 26, 2004. After almost a year of wrangling over precisely which papers were and were not to be produced, Tyson handed over an agreed upon set of documents on July 21, 2005. Meyer then filed his initial lawsuit on September 12, 2005.

Meyer was not alone in his concerns. Plaintiff Amalgamated Bank, a New York-based banking institution, had begun its own investigation slightly earlier. [FN4] Its action, filed on February 16, 2005, included both class action and derivative complaints for breaches of fiduciary duty and proxy disclosure violations. Amalgamated's complaint was later amended on July 1, 2005.

> FN4. Amalgamated's shareholder standing derives from its trusteeship of the LongView MidCap 400 Index Fund.

*2 On September 21, 2005, this Court requested that counsel for the two plaintiffs confer and determine whether their actions could be consolidated. They agreed and filed the consolidated complaint on January 11, 2006.

### B. Tyson Foods, Inc.

Tyson Foods, Inc., a Delaware corporation with its principal office in Springdale, Arkansas, provides more protein products to the world than any other firm. Founded in the 1930s, the Tyson family has at all times kept the company under its power and direction. Tyson's share ownership structure ensures

this: as of October 2, 2004, Tyson had 250,560,172 shares of Class A common stock and 101,625,548 shares of Class B common stock outstanding. Each Class A shareholder may cast one vote per share on all matters subject to the shareholder franchise, while Class B shareholders may cast ten votes for each one of their Class B shares.

The Tyson Limited Partnership ("TLP"), a limited partnership organized in Delaware, owns 99.9% of the Class B stock, thus controlling over 80% of the company's voting power. In turn, Don Tyson controls 99% of TLP, either directly or indirectly through the Randal W. Tyson Testamentary Trust. Tyson Limited Partnership is also a defendant in this matter.

### C. Defendant Board Members

Defendant Don Tyson has served as a director since 1952, and as Senior Chairman of the Board from 1995 to 2001. He has retired from that position, but remains employed as a consultant to the Tyson firm. He maintains his position as the managing general partner of TLP.

Defendant John Tyson, son of Don Tyson, joined the board in 1984 and was elevated to Chairman in 1998. In April 2000, he became Tyson's Chief Executive Officer. Like his father, he is a general partner of TLP.

Defendant Barbara Tyson, the widow of Randal Tyson and the sister-in-law of Don Tyson, took her board position in 1998. Retiring from the company's Vice Presidency in 2002, Ms. Tyson entered into a consultancy arrangement with the company. She remains a shareholder in the company and a general partner of TLP.

Defendant Lloyd V. Hackley came to the board in 1992. Hackley beneficially owns at least 13,510 shares of Tyson Class A common stock and serves as Chairman of the Governance Committee.

Defendant Jim Kever, besides serving on Tyson's board, also owns twelve percent of the shares of DigiScript, Inc., a company in which John Tyson

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----

Page 3

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

made an indirect investment in 2003. He serves as the Chairman of the Audit Committee and sits on the Governance Committee. Kever owns at least 2,621 shares of Tyson Class A common stock.

Defendant David A. Jones joined the board in 2000, beneficially owns 2,492 shares of Tyson Class A stock, and served on the Compensation and Audit Committees. He resigned from the Tyson board in 2005, shortly after this action was filed.

Defendant Richard L. Bond, Tyson's President and Chief Operating Officer, also sits on the board of directors. He owns at least 1,523,288 shares of Tyson Class A common stock as well as significant quantities of restricted stock. He serves as an officer under a contract that extends through February 2008.

**\*3** Defendant Jo Ann R. Smith joined the Tyson board in 2001 and remains a director. She is president of Smith Associates, an agricultural marketing business. Chairperson of the Compensation Committee and a member of the Audit and Governance Committees, she is also the beneficial owner of 6,932 shares of Tyson Class A common stock.

Defendant Leland E. Tollett has been a board member since 1984. He served as the Chairman of the Board and Chief Executive Officer from 1995 to 1998. After retiring in 1998, he signed a ten-year consulting contract which provided for payments of \$310,000 per year for the first five years and \$125,000 per year for the remainder of the term, as well as providing for the vesting of Tollett's outstanding options and continuing health insurance. He is a general partner of TLP and the beneficial owner of 3,398,034 shares of Tyson Class A common stock.

Defendant Wayne B. Britt sat on the Tyson board from 1998 to 2000. He served as Chief Executive Officer from 1998 until 2000, as Executive Vice President and Chief Financial Officer from 1996 to 1998, as Senior Vice President, International Division from 1994 to 1996, as Vice President, Wholesale Club Sales and Marketing from 1992 to 1994, and in a variety of positions before 1992.

Defendant Joe F. Starr served on the Tyson board from 1969 until 1992. He also served as Vice President until 1996.

Defendant Neely E. Cassady participated in the board's Audit and Compensation Committees from 1994 to 2000 and was a member of the Special Committee from 1997 to 2000. He started on the board in 1974 and left in 2000.

Defendant Fred Vorsanger held a board position from 1977 until 2000. During his tenure he served on the Audit, Compensation, and Special Committees.

Tyson elected defendant Shelby D. Massey to the board in 1985, where he remained until 2002. He served as Senior Vice Chairman from 1985 until 1988. He was a member of the Compensation Committee (approximately 1994 to 2002), Special Committee (1997 to 2002) and Governance Committee (2002).

Defendant Donald E. Wray was a board member from 1994 to 2002. He also held the positions of President from April 1995 until 2000 and Chief Operating Officer from 1991 until 1999. Wray currently holds a Senior Executive Employment Agreement that extends until 2008.

Defendant Gerald M. Johnston served on the board from 1996 until 2002. From 1981 to 1996, he served as Executive Vice President of Finance, after which he stepped down and became a consultant for Tyson.

Defendant Barbara Allen served on the board between 2000 and 2002. She was selected at various times to participate on the Compensation and Audit Committees as well as the Compensation Subcommittee.

Defendant Albert C. Zapanta is President and CEO of the United States-Mexico Chamber of Commerce. He joined the board in May 2004 and sits on the Compensation and Governance committees.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

## II. FACTUAL BACKGROUND

### A. The Herbets Action and the Formation of the Special Committee

\*4 Many of the defendants do not find themselves before this Court for the first time answering challenges to their duty of loyalty. In February 1997, this Court entered an order pursuant to a settlement agreement in *Herbets v. Don Tyson* and, thus, resolved an earlier long-running dispute between the Tyson family and minority shareholders.[FN5] As is typical in such settlements, no defendant admitted to any wrongdoing whatsoever.[FN6] Nevertheless, as part of the settlement, Tyson Foods consented to create a " Special Committee" consisting of outside directors to annually review "the terms and fairness of all transactions between the company, on the one hand, and its directors, officers or their affiliates, on the other, which are required to be disclosed in the company's proxy statements pursuant to Securities and Exchange Commission regulations." [FN7] Further, the Special Committee was to "review the reasonableness of Don Tyson's requests for expense reimbursements annually." [FN8]

> FN5. C.A. No. 14231 (Del. Ch. Feb. 7, 1997).

> FN6. Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. O at 14-15 [hereinafter " *Herbets* Settlement"]. ("No provision contained in this Stipulation, nor any document prepared or proceeding taken in connection with this Stipulation, shall be deemed an admission by any of the Defendants as to any claims alleged or asserted ... and neither this Stipulation nor the negotiations or proceedings in connection with this Stipulation shall be offered or received in evidence at any action or proceeding....") Nor can the fact of the settlement be used to prove liability for any of the actions covered therein. Del. R. Evid. 408.

> FN7. *Herbets* Settlement at 9-10.

> FN8. *Id.* at 9.

The Special Committee consisted of defendants Massey, Jones, Kever, and Hackley (who served as Chairman), although it is unclear who served at which times. The *Herbets* settlement required this committee to make its determinations once a year, and plaintiffs concede that it "held ... one meeting annually from 1999 to 2002...." [FN9] According to plaintiffs, the Committee did not review all of the related-party transactions or Don Tyson's requests for expenses, despite the annual meetings. Plaintiffs allege that the committee's limited review ignored recommendations of outside consultants and approved transactions without regard to their fairness to Tyson.

> FN9. Consol. Compl. at ¶ 60. Plaintiffs complain that the Special Committee "held only one meeting annually." The *Herbets* settlement contains a relatively simple set of requirements with regard to independent committees, however: there must be a committee, and that committee must once a year review at least two issues (Don Tyson's expenses and related-party transactions). *Herbets* Settlement at 9. The only requirement that the Governance Committee meet more often is allegedly contained in its charter, which specifies that the Committee should "normally ... [meet] four times per year." Consol. Compl. at ¶ 62.

On August 2, 2002, the Special Committee was replaced by the Governance Committee. A charter provision required the Governance Committee to " review and approve" every "Covered Transaction," which is in turn defined as "any transaction ... between the Company and any officer, director, or affiliate of the company that would be required under the Securities and Exchange Commission rules and regulations to be disclosed in the company's annual proxy statement." [FN10] Such reviews were to be annual, and were to include analyses of whether the terms of related-party

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

transactions were fair to the company. Although the charter provides that the Governance Committee is to meet " 'normally ... four times per year,' " plaintiffs allege that it did not meet at all in 2002 and met only once in 2003 and once in 2004.[FN11] Plaintiffs identify defendants Hackley (Chairman), Massey, Kever, Jo Ann Smith and Albert Zapanta as former or current members of the Governance Committee.

> FN10. Consol. Compl. at ¶ 61.

> FN11. Once again, the timing of the Special Committee and Governance Committee meetings seem confused in the consolidated complaint. Plaintiffs make three assertions. First, "The Special Committee held only one meeting annually from 1999 to 2002, when it was replaced by the Governance Committee on August 2, 2002." *Id.* at ¶ 60. Second, "[The Governance Committee's charter provides that it is] to meet 'normally ... four times per year....' " *Id.* at ¶ 62. Finally, "[T]he Governance Committee did not meet at all in 2002, and met only once in 2003 and once in 2004." *Id.* Taken together, this suggests that some committee empowered to discuss related-party transactions met at least once per year between 1999 and 2004. This meets the requirements of the *Herbets* settlement, if not the Governance Committee Charter.

### B. Compensation and Regulation Before the SEC Investigation in 2004

Plaintiffs contend that the *Herbets* settlement did little to prevent the Tyson family's abuse of the corporation and that the same managerial self-dealing complained of in 1997 continues to this day. The complaint concentrates on three particular types of board malfeasance: (1) approval of consulting contracts that provided lucrative and undisclosed benefits to corporate insiders; (2) grants of "spring-loaded" stock options to insiders; and (3) acceptance of related-party transactions that favored insiders at the expense of shareholders.

### 1. The Don Tyson and Peterson Consulting Contracts

**\*5** In 1998, John Tyson succeeded his father, Don Tyson, as Chairman of the Tyson Board of Directors and CEO. The elder Tyson remained until 2001 as Senior Chairman of the Board. Upon his retirement in October 2001, the board approved a pair of consulting contracts, one for Don Tyson and one for Robert Peterson, former Chairman of the Board and CEO of Iowa Beef Packers ("IBP").[FN12] Both contracts provided that the former executives would "upon reasonable request, provide advisory services ... as follows: ... (b) [Employee] may be required to devote up to twenty (20) hours per month...." [FN13] In the event of the employee's death before the expiration of the agreement, all payments and benefits were to go to designated survivors. Don Tyson's consulting contract provided for an annual payment of $800,000 for ten years, and granted the right to personal perquisites and benefits, including " 'travel and entertainment costs ... consistent with past practices.' " [FN14] Peterson's contract similarly entitled him to a payment of $400,000 per year for ten years plus personal perquisites and benefits.

> FN12. IBP and Tyson Foods merged before Don Tyson retired.

> FN13. Defs.' Opening Br. in Supp. of Mot. to Dismiss Exs. D & E.

> FN14. *Id.*

Peterson died in May 2004, and his rights to salary and perquisites passed to his wife. Plaintiffs make much of the fact that Peterson rendered no services to the company after May 2004.

Plaintiffs also allege that defendants Tollett and Wray agreed to similar, if smaller, consulting contracts in 1999 and 1998 respectively. Both receive health insurance and the vesting of stock options throughout the terms of their agreements, in addition to annual payments ranging from $100,000 to $350,000 over ten years.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

#### 2. *Stock Option Grants*

In 2001, Tyson adopted a Stock Incentive Plan granting the board permission to award Class A shares, stock options, or other incentives to employees, officers, and directors of the company. Tyson gave the Compensation Committee and Compensation Subcommittee complete discretion as to when and to whom they would distribute these awards, but instructed that they were to consult with and receive recommendations from Tyson's Chairman and Chief Executive Officer. Plaintiffs allege that, at all relevant times, the Plan required that the price of the option be no lower than the fair market value of the company's stock on the day of the grant.[FN15]

> FN15. Consol. Compl. at ¶ 134. Tyson's 2004 Proxy Statement, however, suggests a more complex and nuanced Stock Incentive Plan. The Proxy states:
>
> The Plan provides for the grant of incentive stock options and nonqualified options....
>
> The exercise price of an option shall be set forth in the applicable Stock Incentive agreement. The exercise price of an *incentive stock option* may not be less than the fair market value of the Class A Common Stock on the date of the grant (nor less than 100% of the fair market value if the participant owns more than 10% of the stock of the Company or any subsidiary).... *Nonqualified stock options* may be made exercisable at a price equal to, less than or more than the fair market value of the Class A Common Stock on the date that the option is granted.
>
> Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. M at 10-11 (emphasis added). The authority of the Compensation Committee to set a strike price depends upon whether the grant of options in question concerns "incentive" or "nonqualified" stock options.

Plaintiffs allege that the Compensation Committee, at the behest of several Defendant board members, "

spring-loaded" these options. Days before Tyson would issue press releases that were very likely to drive stock prices higher, the Compensation Committee would award options to key employees. [FN16] Around 2.8 million shares of Tyson stock bounced from the corporate vaults to various defendants in this manner. Plaintiffs specifically identify four instances of allegedly well-timed option grants.

> FN16. A compensation committee that " spring loads" options grants them to executives before the release of material information reasonably expected to drive the shares of such options higher. (An opposite effect, "bullet dodging," is achieved by granting options to employees after the release of materially damaging information.)

The Compensation Committee (then Massey, Vorsanger, and Cassady) granted John Tyson, former-CEO Wayne Britt, and then-COO Greg Lee options on 150,000 shares, 125,000 shares and 80,000 Class A shares, respectively, at $15 per share on September 28, 1999. The next day, Tyson informed the market that Smithfield Foods, Inc. had agreed to acquire Tyson's Pork Group. The announcement propelled the price upwards to $16.53 per share in less than six days, and to $17.50 per share by December 1, 1999.[FN17]

> FN17. Plaintiffs and defendants both agree that Tyson subsequently cancelled the grants to John Tyson and Lee, rendering moot any claim with respect to those grants. It remains unclear whether the grant to Britt was also cancelled.

\*6 Once again, the Compensation Committee (then Massey, Hackley, and Allen) granted options on 200,000 Class A shares to John Tyson, 100,000 to Lee, and 50,000 to then-CFO Steven Hankins at $11.50 per share on March 29, 2001. A day later, Tyson publicly cancelled its $3.2 billion deal to acquire IBP, Inc. By the close of that day, the stock price had shot up to $13.47.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF   Document 53-3   Filed 04/10/2007   Page 43 of 87

Page 86 of 133

--- A.2d ----                                                                    Page 8

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
(Cite as: --- A.2d ----)

transactions from 1998 through 2004, Meyer could
only verify that the Committees had reviewed $69
million, or less than 42% of the total transactions by
value. Specifically, plaintiff Meyer did not observe
any evidence that the Committees had reviewed the
swine grow-out program, the poultry grow-out
program, cattle purchases from Massey, a lease of
cold storage facilities partially owned by Johnston,
or certain individual farm leases.

*7 Defendants contend that I may not infer from
these documents that the transactions were not in
fact reviewed, notwithstanding the high degree of
deference to which a plaintiff is entitled on a
12(b)(6) motion. Defendants point out that the
documents requested in Meyer's § 220 demand did
not cover all the transactions alleged in the
complaint, and that the proxy statements repeatedly
state that all transactions were reviewed.

It is true that a very strong negative inference is
required for me to suppose from the facts alleged
that the appropriate board committees did not
review these transactions, yet two aspects of the
complaint lead me to conclude that a negative
inference is warranted. First, plaintiffs made a § 220
request to defendants who knew the crux of
plaintiffs' complaint. Even if the request was in fact
narrow, defendants had the opportunity to widen the
scope of documents granted in order to exculpate
themselves.FN20 While they were, of course, not
required to do so, it is more reasonable to infer that
exculpatory documents would be provided than to
believe the opposite: that such documents existed
and yet were inexplicably withheld.

> FN20. Advisors to Delaware corporations
> should realize by now that the company's
> books and records can serve as a "tool at
> hand" to defend against unfounded charges
> of wrongdoing. A books and records
> demand under 8 *Del. C.* § 220 can afford
> the company an opportunity to rebut a
> shareholder's complaint and actually deter
> the filing of litigation. *See* S. Mark Hurd &
> Lisa Whittaker, *Books and Records
> Demands and Litigation: Recent Trends
> and Their Implications for Corporate*

*Governance,* 9 Del. L.Rev. 1, 32-36 (2006)

Second, the complaint contains detailed allegations
that would lead me to infer that some transactions
were not, in fact, reviewed. The SEC Order and the
logo vendor transactions described below, for
instance, suggest a board of directors that at the
very least failed to pay sufficient attention to
transactions with Don Tyson and his associates. It is
not unreasonable to infer that a board which lets
these transactions pass without scrutiny is not
watching other related-party transactions with an
eagle eye. Drawing every reasonable inference in
favor of the plaintiffs, there is at least a suggestion
that some transactions were not, in fact, reviewed.

In any event, plaintiffs allege that where an
independent committee did review a transaction,
such a review put little effort into considering
whether the transactions simulated arms-length
deals or whether bidding processes would have
saved money. Three specific examples of improper
reviews are alleged in the complaint: the Arnett
Sow Complex, the Tyson Children's Partnership
Lease, and the Logo Vendor affair.

a. Arnett Sow Complex

In the spring of 2000, an independent consultant
advised that the company was paying an inflated
rate of return to the Arnett Sow Complex (partially
owned by Don Tyson and Starr) despite the fact that
the complex was reportedly in worse shape than
other suitable sow farms. The Pork Group (a
subsidiary of Tyson) proposed that lease rates with
the complex be revised downwards by 85% to
reflect poor conditions within the industry.
Plaintiffs contend that the board ignored these
recommendations, although they admit that the
company did cut the lease rates half as much as
recommended by the Pork Group.

b. Tyson Children's Partnership Lease

Plaintiffs allege that the company leased a farm
belonging to the Tyson Children's Partnership at a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

https://web2.westlaw.com/print/printstream.aspx?rs=WLW7.02&destination=atp&vr=2.0&s...   4/10/2007

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
(Cite as: --- A.2d ----)

much higher rate than would be expected in an arm's length transaction. The ten-year lease required payments of $450,000 per year (plus all taxes, utility costs, and insurance and maintenance costs) for a farm whose appraised value stood at $2.8 million. Plaintiffs also allege that an independent auditor was of the opinion that the lease was not an arms-length market lease.

### c. The Logo Vendor Affair

**\*8** In addition to the Arnett Sow Complex and the Tyson Children's Family Lease, plaintiffs also point to a transaction with a "supplier of logo merchandise " owned by a close personal friend of Don Tyson. Almost $5 million of product was purchased from the vendor without engaging in a bidding process. At the same time, the Compensation Committee was forced to cancel a company credit card that Don Tyson had given to the vendor without company authorization.

### C. The 2004 SEC Investigation of Don Tyson's Perquisites

In March 2004, the Securities and Exchange Commission (the "SEC") conducted a formal, non-public investigation into the annual perquisites given to several board members and other executives that had been disclosed as "other annual compensation" in the footnotes of Tyson's proxy statements. This "other annual compensation" category appeared every year since at least 1992, when only Don Tyson received such remuneration. In 1998, when John Tyson became Chairman of the Board, he too began receiving "other annual compensation." Upon his ascension to the board in 2001, Richard Bond, Tyson's then-President and Chief Operating Officer, started to benefit from " other annual compensation" as well. The proxy statement dated December 31, 2003 described this category of compensation as consisting of travel and entertainment costs, insurance premiums, reimbursements for income tax liability related to the travel and entertainment costs, and other such items.

The SEC investigation revealed that Tyson's proxy statements were incomplete and misleading between 1997 to 2003, in that they included under "travel and entertainment costs" expenses that could not reasonably be considered either travel or entertainment. On August 16, 2004, the SEC notified Tyson that it intended to recommend a civil enforcement action against the company and a separate action against Don Tyson. Further, the SEC was considering a monetary penalty based on Tyson's noncompliance with SEC regulations for the years 1997 through 2003. The noncompliance penalty would cover over $1.7 million of perquisites given to Don Tyson, the inadequacy of internal controls over the personal use of Tyson assets, and incomplete disclosure of perquisites and personal benefits.

Tyson consented to the SEC's entry of an "Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing Cease-and-Desist Order Pursuant to Section 21C of the Securities Exchange Act of 1934" (the "Order").[FN21] In the Order, the SEC found that Tyson made misleading disclosure of perquisites and personal benefits provided to Don Tyson in proxy statements filed from 1997 to 2003. The Order described how Tyson had failed to disclose over $1 million in perquisites and improperly characterized many disclosed perquisites. Nearly $3 million worth of undisclosed or inadequately disclosed perquisites had been paid to Don Tyson, or to his family and friends, including use of the Tyson corporate credit cards for personal expenditures such as antiques, vacations, a horse, and substantial additional purchases of clothing, jewelry, artwork, and theater tickets. Family and friends were also allegedly given virtually unlimited use of corporate aircraft and company-owned homes in England and Cabo San Lucas, Mexico, including the use of company-paid chauffeurs, cars, cooks, housekeepers, landscapers, telephones, and a boat crew.

> FN21. Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. P.

**\*9** The Order found that Tyson made false or

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

inadequate disclosures regarding the perquisites and personal benefits paid to Don Tyson pursuant to his 2001 consulting agreement. The SEC further faulted Tyson for violating proxy solicitation and reporting provisions required by federal securities laws and failing to implement internal accounting controls over personal use of assets sufficient to detect, prevent, or account properly for Don Tyson's and his family's and friends' use of company assets. The Compensation Committee conducted its own investigation in light of the SEC findings and determined that Don Tyson should reimburse the company for improper compensation and perquisites.

Unsurprisingly, the 2004 proxy statement read quite differently from those of earlier years. First, it disclosed that Don Tyson had agreed to pay the company over $1.5 million as reimbursement for certain perquisites and personal benefits received during fiscal years 1997 through 2003, and that he had also agreed to pay an additional $200,000 for improper expenses. Second, Tyson disclosed that on July 30, 2004, it had approved an increase in Don Tyson's annual compensation pursuant to his consulting contract from $800,000 to $1.2 million annually, with the consideration to be paid, in the event of his death, to his three children until the termination of the contract in 2011.[FN22] The proxy statement further disclosed that the Governance Committee had approved the purchase by Tyson of over 1 million shares of Don Tyson's Class A common stock at a purchase price of $15.11 per share.[FN23]

> FN22. Incidentally, the proxy statement **incorrectly** describes the terms of the contract as "Mr. Tyson *will* continue to furnish up to 20 hours *per week* of advisory services," while the contract actually states that he *may* furnish up to 20 hours per *month. Id.* at 41 (emphasis added).

> FN23. Consol. Compl. at ¶ 131. Plaintiffs regard this as unseemly. There is no allegation, however, that the shares purchased were at more than market value.

## III. CONTENTIONS

From these facts, plaintiffs make nine separate claims, each of them against various defendants. In Counts I-IV, plaintiffs contend that the board violated its fiduciary duties by approving the Peterson and Don Tyson consulting contracts in 2001 and the amended Don Tyson consulting contract in 2004 (Count I); the awards of "Other Annual Compensation" between 2001 and 2003 (Count II); the "spring-loaded" options of 1999 to 2003 (Count III); and related-party transactions occurring since 1997 (Count IV). Count V, which is brought against every individual director, alleges a " pattern and practice of failing to investigate and disclose self-dealing payments," which plaintiffs contend not only wasted assets but also brought SEC investigations and fines against the company. [FN24] In the next two counts (VI and VII), plaintiffs contend that the defendant directors not only breached their contractual duties (Count VI) but also violated an order of this Court (Count VII) by failing to act in accordance with the *Herbets* settlement. Count VIII, a class action but not a derivative claim, maintains that the defendant directors materially misrepresented facts in the company's 2004 proxy statement such that the election of directors in that year should be held to be invalid. Finally, plaintiffs assert (Count IX) that the related-party transactions, spring-loaded options, consulting contracts and payments in the " other annual compensation" category amount to unjust enrichment of certain individual defendants, entitling the company to, among other things, a disgorgement of benefits from the unjustly enriched individual defendants.

FN24. Consol. Compl. at ¶ 188.

**\*10** Defendants raise their own chorus of objections in support of their motion to dismiss. First, many of the claims (they say) are barred by the statute of limitations. Second, many claims are raised against directors who had little or nothing to do with the challenged decisions. Third, in some cases plaintiffs have brought derivative actions where demand was not excused. Finally, where the proper directors have been named in the complaint and the action

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

itself is not time-barred, defendants assert that plaintiffs have not stated a claim for which relief can be granted.

## IV. DEMAND, INTERESTEDNESS AND INDEPENDENCE

Before addressing the morass of plaintiffs' various legal theories, it will be helpful to consider in detail two legal doctrines implicated in almost every count: the standards for demand excusal and the process by which the Delaware statute of limitations runs and is tolled.

The first hurdle facing any derivative complaint is Rule 23. 1, which requires that the complaint " allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors ... and the reasons for the plaintiff's failure to obtain the action or for not making the effort." [FN25] Rule 23.1 stands for the proposition in Delaware corporate law that the business and affairs of a corporation, absent exceptional circumstances, are to be managed by its board of directors. [FN26] To this end, Rule 23.1 requires that a plaintiff who asserts that demand would be futile must "comply with stringent requirements of factual particularity that differ substantially from the permissive notice pleadings" normally governed by Rule 8(a).[FN27] Vague or conclusory allegations do not suffice to upset the presumption of a director's capacity to consider demand.[FN28] As famously explained in *Aronson v. Lewis,* plaintiffs may establish that demand was futile by showing that there is a reason to doubt either (a) the distinterestedness and independence of a majority of the board upon whom demand would be made, or (b) the possibility that the transaction could have been an exercise of business judgment. [FN29]

FN25. Ch. Ct. R. 23.1.

FN26. *In re Walt Disney Co. Derivative Litig.,* 2005 WL 2056651, at *31 (Del. Ch. Aug. 9, 2005).

FN27. *Zimmerman ex rel. Priceline.com, Inc. v. Braddock,* 2002 WL 31926608, at *7 (Del. Ch. Dec. 20, 2002).

FN28. *Id.*

FN29. *Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984).

There are two ways that a plaintiff can show that a director is unable to act objectively with respect to a pre-suit demand. Most obviously, a plaintiff can assert facts that demonstrate that a given director is personally interested in the outcome of litigation, in that the director will personally benefit or suffer as a result of the lawsuit in a manner that differs from shareholders generally.[FN30] A plaintiff may also challenge a director's independence by alleging facts illustrating that a given director is dominated through a "close personal or familial relationship or through force of will," [FN31] or is so beholden to an interested director that his or her "discretion would be sterilized." [FN32] Plaintiffs must show that the beholden director receives a benefit "upon which the director is so dependent or is of such subjective material importance that its threatened loss might create a reason to question whether the director is able to consider the corporate merits of the challenged transaction objectively." [FN33]

FN30. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,* 845 A.2d 1040, 1049 (Del.2004).

FN31. *Orman v. Cullman,* 794 A.2d 5, 25 n. 50 (Del. Ch.2002).

FN32. *Beam,* 845 A.2d at 1050 (quoting *Grimes v. Donald,* 673 A.2d 1207, 1217 (Del.1996)).

FN33. *Texlon Corp. v. Meyerson,* 802 A.2d 257, 264 (Del.2002).

**\*11** Frequent confusion arises because the *Aronson* test for demand futility closely resembles the test for determining whether a duty of loyalty claim survives a motion to dismiss under Rule 12(b)(6). In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

Here defendants rely upon a formalistic and
spiritless reading of past precedent to divide
Delaware law from an obvious reality.[FN38] The
Tyson family defendants focus upon their
undoubted *independence,* when the issue is actually
whether they "will receive a personal financial
benefit from a transaction that is not equally shared
by the stockholders" [FN39]-in other words, are the
Tyson family directors interested in such
transactions? Plaintiffs' complaint in the present
case presents a conspiracy-style theory of
related-party transactions: the Tyson family's
perquisites are alleged to be granted by other
favored directors in exchange for their own
favorable related-party transactions. Defendants ask
us to believe that, despite the allegation that
unearned benefits to non-Tyson family directors are
the *quid pro quo* for approval of perquisites to the
Tyson family, the latter would quite readily pursue a
claim against the former.[FN40] Such an assertion
goes against human nature and flies in the face of
common sense. If the allegations in the complaint
are true, then the Tyson family is interested in every
related-party transaction, as these are the currency
through which they in turn ensure their advantages.

> FN38. Defendants rely upon *Brehm v.
> Eisner,* 746 A.2d 244, 257-58 (Del.2000) (
> "Because we hold that the Complaint fails
> to create a reasonable doubt that Eisner
> was disinterested in [the transaction], we
> need not reach or comment on" whether
> directors were beholden to Eisner) and
> *Rales v. Blasband,* 634 A.2d 927, 936
> (Del.1993) ("Blasband must show that the
> directors are "beholden" to the Rales
> brothers or so under their influence that
> their discretion would be sterilized.").

FN39. *Rales,* 634 A.2d at 936.

> FN40. Defendants dismiss allegations of a
> *quid pro quo* as "conclusory and
> unsupported." They do not challenge
> demand futility in connection with types of
> transactions in which Tyson family and
> non-family directors both had interests (
> *e.g.,* farm leases), and protest only

related-party transactions of a different
type (*e.g.,* poultry research). Defendants
walk far too fine a line here. Even under
Rule 23.1's heightened pleading standards,
where plaintiffs allege a plethora of
related-party transactions, it is reasonable
to assume that *quid pro quo* transactions
will not be limited merely to those of the
very same specific order.

A related and somewhat stronger argument
that defendants might raise is that the 2005
board could not be interested in
transactions involving directors who had
left the board at the time of the suit. Again,
however, plaintiffs are entitled to the
reasonable inference that so long as (a) the
majority of the complaint rests against
present directors, (b) the challenged
transactions represent an alleged *quid pro
quo* relationship and (c) current directors
expect to retire from the board in the
future, then the current directors will be
interested in protecting the gains of former
directors so that their own potential
benefits are safeguarded in the future.

**\*12** For purposes of demand, I will therefore
consider both family and non-family transactions to
be on the same footing. As to the former,
defendants have virtually conceded that demand is
futile. Don Tyson, Barbara Tyson and John Tyson
are all either interested in each transaction or can be
considered to lack independence by reason of
consanguinity or marriage. Tollett's general
partnership in the Tyson Family Partnership, as well
as his alleged benefit from related-party
transactions, suffices to create a reasonable doubt as
to his independence, as does Bond's service as
CEO, essentially at the pleasure of the Tyson family.
[FN41] Every derivative count implicates either a
member of the Tyson family or Tollett or Bond and,
hence, plaintiffs raise a reason to doubt the
disinterestedness and independence of the board,
justifying excusal of demand with regard to the
entire consolidated complaint.[FN42]

> FN41. According to Tyson's 2004 proxy
> statement, Bond received a base salary of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

$943,615 and a bonus of $1.2 million in 2003. He is also one of the executives receiving the "other annual compensation" attacked in Count II. While the general Delaware rule holds that neither a director nor an executive appointed by a controlling shareholder are *per se* incapable of considering demand upon the company, where an executive's considerable salary is set by an otherwise dominated board, this Court may reasonably infer that a director-executive is dominated. *See In re Walt Disney Derivative Litig.,* 731 A.2d 342, 357 (Del. Ch.1998), *rev'd in part on other grounds, Brehm v. Eisner,* 746 A.2d 244 (Del.2000) (concluding two directors may be interested because their salaries set by the board exceeded their personal shareholdings). In this case, the value of Bond's shareholdings may well exceed the nominal value of his salary. However, other employees who have held Bond's role have gone on to receive partnerships in TLP, significant income from related-party transactions, and expanded " other" compensation. The value of these benefits to Bond-and the value to him of continued good favor from the Tyson family-puts in doubt his independence from the Tyson family.

FN42. Once the interest of Tyson family directors is called into question, a doubt is raised as to the independence of other directors. For instance, with regard to Tollett's breeder hen research facility, Tollett may be considered directly interested, the Tyson family directors are interested due to the alleged *quid pro quo* relationships, and Bond's independence may be called into question as a result. Demand is thus excused.

## V. STATUTE OF LIMITATIONS

Equity follows the law and in appropriate circumstances will apply a statute of limitations by analogy.[FN43] A three-year statute of limitations

applies to breaches of fiduciary duty,[FN44] and the matter is properly raised on a motion to dismiss. [FN45] The statute of limitations begins to run at the time that the cause of action accrues, which is generally when there has been a harmful act by a defendant. This is true even if the plaintiff is unaware of the cause of action or the harm.[FN46]

FN43. *In re Dean Witter P'ship Litig.,* 1998 WL 442456, at *3 (Del. Ch. July 17, 1998).

FN44. 10 *Del. C.* § 8106.

FN45. *In re Dean Witter P'ship Litig.,* 1998 WL 442456, at *4.

FN46. *See Isaacson, Stolper & Co. v. Artisan's Sav. Bank,* 330 A.2d 120, 132 (Del.1974); *In re Dean Witter P'ship Litig.,* 1998 WL 442456, at *5.

Plaintiffs point to three justifications for tolling the statute of limitations that would allow me to consider an otherwise stale claim. Under the doctrine of inherently unknowable injuries, the statute will not run where it would be practically impossible for a plaintiff to discover the existence of a cause of action. No objective or observable factors may exist that might have put the plaintiffs on notice of an injury, and the plaintiffs bear the burden to show that they were "blamelessly ignorant " of both the wrongful act and the resulting harm. [FN47] Similarly, the statute of limitations may be disregarded when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth. Under this doctrine, a plaintiff must allege an affirmative act of "actual artifice" by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth.[FN48] Finally, the doctrine of equitable tolling stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary. No evidence of actual concealment is necessary in such a case, but the statute is only tolled until the investor "knew or had reason to know of the facts constituting the wrong." [FN49]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

> FN47. *See In re Dean Witter P'ship Litig.,*
> 1998 WL 442456, at *5; *Ruger v. Funk,*
> 1996 WL 110072, at *2 (Del.Super.Jan.22,
> 1996).

> FN48. *See Ewing v. Beck,* 520 A.2d 653,
> 667 (Del.1987); *In re Dean Witter P'ship
> Litig.,* 1998 WL 442456, at *5; *Litman v.
> Prudential-Bache Props., Inc.,* 1994 WL
> 30529, at *4 (Del. Ch. Jan. 14, 1994);
> *Halpern v. Barran,* 313 A.2d 139, 143
> (Del. Ch.1973).

> FN49. *See In re Dean Witter P'ship Litig.,*
> 1998 WL 442456, at *6.

Under any of these theories, a plaintiff bears the burden of showing that the statute was tolled, and relief from the statute extends only until the plaintiff is put on inquiry notice. That is to say, no theory will toll the statute beyond the point where the plaintiff was objectively aware, or should have been aware, of facts giving rise to the wrong.[FN50] Even where a defendant uses every fraudulent device at its disposal to mislead a victim or obfuscate the truth, no sanctuary from the statute will be offered to the dilatory plaintiff who was not or should not have been fooled.

> FN50. *Id.*

**\*13** One more complication emerges on a motion to dismiss an action as untimely: the evidence the Court is allowed to evaluate. If matters outside the complaint are to be considered by the Court, then this motion to dismiss is more properly treated as a motion for summary judgment, and the plaintiffs are entitled to conduct discovery.[FN51] Nevertheless, I may review two types of evidence, even if they are outside the four corners of the consolidated complaint, without converting the motion to one of summary judgment: (a) documents expressly referred to and relied upon in the complaint itself, and (b) documents that are required by law to be filed, and are actually filed, with federal or state officials.[FN52]

> FN51. Ch. Ct. R. 12(b).

> FN52. *Wal-Mart Stores, Inc. v. AIG Life
> Ins. Co.,* 860 A.2d 312, 320 n. 28
> (Del.2004) (holding that Court may take
> notice of documents filed with government
> officials according to requirements of
> federal and state law); *In re Dean Witter
> P'ship Litig.,* 1998 WL 442456, at *6 n. 46
> (explaining that matters referred to and
> relied upon in a complaint may be
> considered on a motion to dismiss).

## VI. ANALYSIS

With these rules in mind, I turn to each of plaintiffs' claims. Where defendants have raised an objection on the grounds of the statute of limitations, I consider that argument first, and then move to consideration of the substantive merits of each claim.

### A. Count I: Consulting Contracts for Peterson and Don Tyson in 2001

#### 1. Statute of Limitations

Defendants are entitled to the protection of the statute of limitations with regard to the Tyson and Peterson contracts signed in 2001.[FN53] The company disclosed both contracts as part of SEC filings in December 2001. By waiting to file this action until February 16, 2005, plaintiffs have given up their right to all claims in Count I except those regarding the 2004 contract with Don Tyson.

> FN53. Count I involves three consulting
> contracts: two signed in 2001 employing
> Don Tyson and Peterson as consultants
> and a revised contract for Don Tyson
> signed in 2004. Defendants do not argue
> that the statute of limitations applies to the
> contract signed in 2004.

Plaintiffs' arguments for tolling fall far short of the required standard. They admit that the contracts

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----                                                                          Page 16

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

were disclosed to the public in late 2001, but insist that (a) the contracts required no actual work on the part of the consultants and (b) the fact that no services were required of Tyson or Peterson could not have been known until either no services were rendered (for instance, when Peterson died) or when the SEC discovered that the company's disclosures of Don Tyson's perquisites were inadequate.

I can quickly dispense with the allegation that neither Don Tyson nor Peterson was "required" to do any work under their contracts. Plaintiffs ceaselessly complain of Tyson's perfidy in describing the contracts as anything other than optional on the part of the consultants. They base this upon a single clause: "Executive may be required to devote up to twenty (20) hours per month to Employer." [FN54] More fully, however, both contracts provide:

> FN54. Consol. Compl. at ¶ 107; Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. E at 2. Although the quoted language is from Peterson's contract, Don Tyson's 2001 contract is substantially similar.

Services During the Term. During the Term, Executive *will,* upon reasonable request, provide advisory services to [the Employer] as follows: ... (b) Executive may *be required* to devote up to twenty (20) hours per month to Employer .... (d) Executive shall not be obligated to render services.. during any period when he is disabled due to illness or injury, however Executive will continue to receive the benefits under Sections 3 and 4 of this Agreement.... [FN55]

> FN55. Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. E at 2 (emphasis added).

This contract is clear on its face. In exchange for the salary specified in the contract, Tyson could *require* twenty hours of work per month from either consultant at its discretion. The fact that the contracts purchase, in essence, an option on the employees' time does not make them illusory, nor is the nature of the agreement obscure. If plaintiffs

believed that these contracts were unfair, they could reasonably have been aware of their injuries in December 2001.

**\*14** I am even less convinced as to plaintiffs' contention that they were unaware of the nature of Peterson's contract until he died. The consulting contracts clearly contemplate the payment of benefits to the spouses of either employee after their deaths. In essence, the company chose to internalize the provision of life insurance to employees. Even were plaintiffs to maintain that this payment constituted a pure waste of corporate assets, the relevant value for consideration would not be the *ex post* cost of benefits paid to Ms. Peterson after her husband's death, but the cost of the *risk* placed on the company at the time of the contract.[FN56] Plaintiffs were on inquiry notice of this risk when Peterson signed his contract; his death gave the plaintiffs no new and relevant information.

> FN56. An employment contract does not constitute waste simply because it continues to pay benefits to the spouse of an employee after death. A corporation entering into such a contract merely takes upon itself the cost of providing the employee with an insurance policy payable to the employee's spouse. As a matter of economics, there may be little significant difference between providing an employee with (a) an option for post-death payment of salary, (b) an equivalent life-insurance or annuity policy, or (c) a salary increase sufficient for the employee to buy such insurance on his or her own.
> That plaintiffs gloss over this fact is understandable, as the complaint misstates the actual provisions of Peterson's contract when it alleges that "if Peterson died one day after he was awarded the consulting contract, Peterson's spouse would still be entitled to 10 years worth of payments and perquisites." Consol. Compl. at ¶ 111. That would be true if Tyson had purchased an assignable annuity for Peterson. In fact, Peterson's spouse would be entitled to *up to* 10 years of benefits under the contract, as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

the necessity for Tyson to pay terminates upon her death. As any actuary would recognize, the value of Peterson's contract would depend greatly upon such factors as the age of Peterson's wife, her health, etc. Plaintiffs provide no such information, instead baldly asserting that the contract must be unfair because it pays out after death. That the contract internalizes risks-even extreme ones-does not come close to creating the suggestion of waste.

Nor would it be clear that Peterson's contract constituted waste if plaintiffs claimed that Peterson in fact did no work. (Plaintiffs imply, but do not make, such an accusation, and the silence is telling.) Peterson's consulting contract came only after a bitter disagreement over the sale of IBP, Peterson's former company. Defendants may very well have considered the non-compete provision of his consulting contract worth the bulk of its costs and valued the labor component very lightly. Such a decision would not be outside the bounds of business judgment.

Plaintiffs provide no valid reason why they could not have brought suit concerning the 2001 contracts in a timely fashion. Therefore, Count I of the complaint is time-barred as to the 2001 agreements.

### 2. Substantive Claims

Plaintiffs and defendants disagree as to whether the whole board approved the 2004 Don Tyson consulting contract or whether it was relegated to the Compensation Committee. On a motion to dismiss, I am bound by the well-plead accusations in the consolidated complaint, and these are unequivocal in suggesting that the whole board approved the contract. The fact that the complaint recognizes the existence of the Compensation Committee is not enough to contradict this assertion. Although the complaint and the associated proxies admit to the existence of a committee, defendants can point to no proxy that suggests that the committee actually considered the 2004 consulting agreement. In the absence of such

evidence, plaintiffs' allegation must stand and the whole board must be considered as proper defendants.

On this issue, the distinction is of little moment, however, as plaintiffs fail to state a claim either way. Plaintiffs' argument that the consulting contract constitutes little more than a gift fails for the reason discussed above: the fact that Don Tyson's hours were to be determined by Tyson itself does not mean the contract lacked consideration. No strained reading of clear contractual language can convert a purchased option into a gift. As the consulting agreement does not fall outside the bounds of business judgment, Count I can only withstand a motion to dismiss by sufficiently alleging that a majority of those who approved the transaction were dominated by or otherwise conflicted with respect to the recipient.[FN57] The only directors for which sufficient conflicts are alleged, however, are John Tyson, Bond, Tollett and Barbara Tyson. Defendants' only allegations against Hackley, Kever, Jones, Smith, Zapanta or Allen are that the board members are nominated at the behest of the Tyson family because of their voting control and that they have "demonstrated a consistent and unvaried pattern of deferring to anything the Tyson family wants, and of failing to exercise independent business judgment." [FN58] As to the first argument, it is well-settled that a director's appointment at the behest of a controlling shareholder does not suffice to establish a lack of independence.[FN59] Plaintiffs' remaining argument becomes wholly circular: in order to find that defendants lack independence, I must conclude that they failed to exercise independent business judgment by approving self-interested transactions; and yet in order to find those very transactions beyond the bounds of business judgment, I must conclude that the defendants lacked independence. Such a decision would be contrary to the presumption of business judgment that directors enjoy, however, and cannot be supported.

> FN57. *Aronson v. Lewis,* 473 A.2d 805, 812 (Del.1984).
>
> FN58. Consol. Compl. at ¶ 146.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
(Cite as: --- A.2d ----)

FN59. *Aronson v. Lewis,* 473 A.2d 805, 816 (Del.1984); *In re Walt Disney Co. Derivative Litig.,* 731 A.2d 342, 356 (Del. Ch.1998).

**\*15** The consolidated complaint thus fails to allege that a majority of the entire board lacked independence.[FN60] Given that "a board's decision on executive compensation is entitled to great deference" [FN61] and that plaintiffs have failed to rebut the presumption of business judgment, the remainder of Count I must be dismissed for failure to state a claim.

FN60. Nor does the complaint allege that the decision to award the contract was less than unanimous, or that a majority of the six non-conflicted directors failed to approve the contract.

FN61. *Brehm v. Eisner,* 746 A.2d 244, 263 (Del.2000).

*B. Count II: Breach of Fiduciary Duty for Award of "Other Annual Compensation" in 2001*

1. *Statute of Limitations*

Defendants' objections based upon the statute of limitations extend only to "other annual compensation" paid in 2001, as the amounts of such compensation were disclosed in the proxy statement of Jan. 2, 2002.[FN62] Here plaintiffs may rely upon the doctrines of fraudulent concealment and equitable tolling. True, the proxy statement did disclose payments of "other annual compensation" to shareholders in early 2002, but according to the consolidated complaint, it did so by describing as business or travel expenses payments that could not be properly characterized as such. Plaintiffs had the right to rely upon fiduciaries to correctly categorize these payments, and at least as alleged, the mischaracterization would rise to the level of actual artifice. Hence, the first plaintiffs would have reason to know of this wrong would be upon learning of the SEC's investigation and its results in 2004. Thus the statute of limitations is tolled.

FN62. Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. J. at 16.

2. *Substantive Claims*

Plaintiffs argue that defendant directors [FN63] breached their fiduciary duties in two separate ways. First, they argue that the approval of "other annual compensation" payments constituted a breach. Second, they maintain that defendant directors failed to disclose sufficient details regarding these payments, thus bringing an SEC investigation upon the company. The disclosure charge is analytically similar to that raised in Count V, and I will consider it there, leaving this section to concentrate on the approval of the disputed compensation.

FN63. Count II implicates defendant directors Don Tyson, John Tyson, Bond, Hackley, Kever, Jones, Tollett, Barbara Tyson, Starr, Massey, Wray, Johnston, and Allen.

Once again, plaintiffs and defendants disagree as to which body approved the other annual compensation payments, and in this Count the issue is a distinction with a difference. Plaintiffs' complaint as to the approval of the compensation amounts to a claim for excessive compensation. To maintain such a claim, plaintiffs must show either that the board or committee that approved the compensation lacked independence (in which case the burden shifts to the defendant director to show that the compensation was objectively reasonable), or to plead facts sufficient to show that the board or committee lacked good faith in making the award. [FN64] Assuming that this standard is met, plaintiffs need only allege some specific facts suggesting unfairness in the transaction in order to shift the burden of proof to defendants to show that the transaction was entirely fair.[FN65]

FN64. *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1051 (Del. Ch.1996).

FN65. *Solomon v. Pathe Commc'ns Corp.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----

Page 19

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

1995 WL 250374, at \*4 (Del. Ch. Apr. 21, 1995), *aff'd,* 672 A.2d 35 (Del.1996).

Which body approved the compensation is thus critical to plaintiffs' claim. Plaintiffs' allegations with regard to Compensation Committee members Allen, Hackley, Jones, Smith, and Massey fail for the reasons already outlined in Count I.[FN66] On the other hand, plaintiffs point to obvious conflicts with regard to Don Tyson, John Tyson, Barbara Tyson, Tollett and Bond, sufficient to challenge at least half of the entire board. Hence, Count II should survive a motion to dismiss only if I must credit the complaint's assertion that the entire board approved the decision. If the Compensation Committee made the decision, on the other hand, Tyson is entitled to dismissal of this Count.

> FN66. *Aronson,* 473 A.2d at 815. Plaintiffs do include Massey as a director involved in related-party transactions dating from 2002 and 2003. Massey resigned from the Compensation Committee on August 2, 2002. Even given the extreme deference given to plaintiffs on a motion to dismiss, it would be unreasonable to challenge Massey's independence before his involvement in the sale of his farms. The complaint does not specify precisely when the other annual compensation was awarded in 2002 and, thus, I am forced to infer, at most, that Massey may have been interested over a period of eight months in 2002 before his resignation.

\*16 So long as plaintiffs' position is not contradicted within the consolidated complaint or documents upon which it relies, at this stage I must accept plaintiffs' assertion that the compensation was approved by the entire board. I may not hold otherwise merely because plaintiffs concede the existence of a compensation committee and rely upon proxy statements that mention the Committee, as defendants wish me to do. Studying all relevant proxy statements relied upon by plaintiffs, it is impossible to find a reference that directly states that the compensation in question was approved by the committee. To take one example, the January 2,

2003 proxy statement includes a "Summary Compensation Table" that includes six types of compensation: salary, bonus, other annual compensation, options, restricted stock and all other compensation.[FN67] The report of the Compensation Committee in the same proxy, however, discusses salaries, bonuses, options and stock, but remains conspicuously silent about other annual compensation.[FN68]

> FN67. Defs.' Opening Br. in Supp. of Mot. to Dismiss Ex. K at 2.

> FN68. *Id.* at 16-19.

It is thus reasonable to infer at this stage that the Compensation Committee did not approve or review the other annual compensation. Plaintiffs easily meet their further burden to allege some fact suggesting that the transactions were unfair to shareholders: the transactions and their related lack of disclosure undeniably exposed the company to SEC sanctions. Defendants misread *Solomon* to state that plaintiffs must show that the compensation itself was unreasonable in relation to similar companies in the industry. That the nature of the compensation was unfairly concealed from them is plainly sufficient.

Defendants' motion to dismiss Count II is therefore denied. I reiterate that at this stage in the litigation, I am required to give weight to plaintiffs' assertions regarding the body that approved the compensation, relying almost completely upon the statements of plaintiffs. The proxy statements are the only tangible evidence before me and they could be fairly read in favor of either party.

### C. Count III: Grant of Options Between 1999 and 2001

#### 1. Statute of Limitations

Plaintiffs urge this Court to conclude that no good faith challenge could be made to a spring-loaded option before 2003 because no diligent investor

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF    Document 53-3    Filed 04/10/2007    Page 55 of 87

Page 98 of 133

--- A.2d ----

Page 20

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

could have recognized the fortunate coincidence between stock-option grants and favorable news releases. The spring-loading of these option grants could only be discovered, according to plaintiffs, after investors were able to observe a pattern of opportune distributions. Defendants, on the other hand, assert that plaintiffs possessed every bit of information necessary to discover any alleged injury when the options were announced. All three options grants between 1999 and 2001 were listed in Tyson's proxy statements, and all three grants accurately included the number of shares granted, the exercise price, and the date of the grant. To defendants, any shareholder could have compared the stock option award with the year's news clippings and realized that, for instance, the 1999 options had been granted the day before Tyson announced the sale of the Pork Group for \$80 million. Two questions thus present themselves. First, have plaintiff alleged facts sufficient to suggest that the statute of limitations is be tolled? Second, did Tyson's disclosure of the mere date and price of the grants, without more, suffice to put plaintiffs on inquiry notice?

**\*17** Assuming every fact in the consolidated complaint to be true, plaintiffs amply demonstrate that the doctrines of equitable tolling and fraudulent concealment toll the statute of limitations. Plaintiffs allege that defendants knowingly spring-loaded options to key executives and directors while maintaining in public disclosures that such options were issued at market rates. Such partial, selective disclosure-if not itself a lie, certainly exceptional parsimony with the truth-constitutes an act of " actual artifice" that satisfies the requirements of the doctrine of fraudulent concealment. Even were this not the case, defendants' roles as fiduciaries would justify tolling the statute of limitations through the doctrine of equitable tolling. Plaintiffs were entitled to rely upon the competence and *good faith* of those protecting their interests.[FN69] It is difficult to conceive of an instance, consistent with the concept of loyalty and good faith, in which a fiduciary may declare that an option is granted at "market rate" and simultaneously withhold that both the fiduciary and the recipient *knew* at the time that those options would quickly be worth much more. Certainly at this stage of the litigation, plaintiffs are entitled to

the reasonable inference of conduct inconsistent with a fiduciary duty.

> FN69. *See In re Dean Witter P'ship Litig.,* 1998 WL 442456, at \*6.

Similarly, it would be inappropriate to infer that plaintiffs were on inquiry notice of injury simply because some relevant information was in the public domain. Certainly, investors are under an obligation to exercise reasonable diligence in their affairs, and no succor from the statute of limitations should be offered a dilatory plaintiff in the absence of such care.[FN70] Yet it would be manifest injustice for this Court to conclude, as a matter of law, that " reasonable diligence" includes an obligation to sift through a proxy statement, on the one hand, and a year's worth of press clippings and other filings, on the other, in order to establish a pattern concealed by those whose duty is to guard the interests of the investor.

> FN70. *Id.*

The consolidated complaint contains allegations sufficient to justify tolling the statute of limitations, at least for purposes of a motion to dismiss. At trial, defendants will have the opportunity to present evidence to show that plaintiffs were, in fact, on inquiry notice. For instance, defendants might establish that financial analysts, institutional investors, or academic researchers had published research suggesting that Tyson's directors favorably timed option grants long before the consolidated complaint was filed. I may not infer such knowledge at this point in the proceedings, however.

### 2. *Substantive Claims*

Plaintiffs concede that the sole authority to grant these options rested in the Compensation Committee, but argue that the entire board may be challenged because the Committee was required to consider the recommendations of the Chairman and Chief Executive Officer, each of whom were recipients of options themselves. This argument is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

inconsistent with Delaware law.

**\*18** A committee of independent directors enjoys the presumption that its actions are *prima facie* protected by the business judgment rule.[FN71] That the Committee was required to consult with other corporate officers is irrelevant: the committee admittedly retained independent authority and discretion to approve or modify whatever it received as a recommendation. Plaintiffs' complaint should properly target only the members of the compensation committee at the time the options were approved: Vorsanger, Massey, Cassady, Allen, Hackley, Jones and Smith.[FN72]

> FN71. *Nomad Acquisition Corp. v. Damon Corp.,* 1988 WL 383667, at \*6 (Del. Ch. Sept. 20, 1988).

> FN72. Although Count III is dismissed except with regard to these seven defendants, none of whom are alleged to have received any financial benefit through the grant of spring-loaded options, the other defendant directors may yet be affected indirectly. Not all acts of disloyalty or bad faith will directly benefit the malefactor, and a director may be held personally liable for a breach of the duty of loyalty in the absence of a personal financial gain. Where the beneficiary of disloyalty is not directly liable for losses, that beneficiary might still be found to retain "money or property of another against the fundamental principles of justice or equity and good conscience," and thus to be unjustly enriched. *Schock v. Nash,* 732 A.2d 217, 232-233 (Del.1999).

As plaintiffs' allegations against these directors are insufficient to suggest a lack of independence, plaintiffs must demonstrate that the grant of the 2003 options could not be within the bounds of the Compensation Committee's business judgment. A severe test faces those seeking to overcome this presumption: "[W]here a director is independent and disinterested, there can be no liability for corporate loss, unless the facts are such that no

person could possibly authorize such a transaction if he or she were attempting in *good faith* to meet their duty." [FN73]

> FN73. *Gagliardi v. TriFoods Int'l, Inc.,* 683 A.2d 1049, 1052-1053 (Del. Ch.1996) (emphasis added).

Whether a board of directors may in good faith grant spring-loaded options is a somewhat more difficult question than that posed by options backdating, a practice that has attracted much journalistic, prosecutorial, and judicial thinking of late.[FN74] At their heart, all backdated options involve a fundamental, incontrovertible lie: directors who approve an option dissemble as to the date on which the grant was actually made. Allegations of springloading implicate a much more subtle deception.[FN75]

> FN74. In a paradigmatic backdating scenario, a company issues stock options to an executive on one date while providing false documentation to show that the options were actually issued earlier, thus granting the executive an "in the money" option. Of the many reasons proposed for director's willingness to backdate options, favorable tax treatment, fairness among successively-hired employees, or shareholder-approved rules requiring at-market options are often mentioned. *See* David I. Walker, *Some Observations on the Stock Options Backdating Scandal of 2006* 1-6 (Boston Univ. Sch. of Law Working Paper Series, Law And Economics, Paper No. 06-31, 2006), *available at* http://ssrn.com/ abstract=929702. Although similar to spring-loading, the backdating of options always involves a factual misrepresentation to shareholders. Issuance of options in conjunction with such deception, and against the background of a shareholder-approved stock-incentive program, amounts to a disloyal act taken in bad faith. *See Ryan v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----                                                                                Page 22

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

*Giford,* --- A.2d---, --- (Del.2007).

FN75. The touchstone of disloyalty or bad faith in a spring-loaded option remains deception, not simply the fact that they are (in every real sense) "in the money" at the time of issue. A board of directors might, in an exercise of good faith business judgment, determine that in the money options are an appropriate form of executive compensation. Recipients of options are generally unable to benefit financially from them until a vesting period has elapsed, and thus an option's value to an executive or employee is of less immediate value than an equivalent grant of cash. A company with a volatile share price, or one that expects that its most explosive growth is behind it, might wish to issue options with an exercise price below current market value in order to encourage a manager to work hard in the future while at the same time providing compensation with a greater present market value. One can imagine circumstances in which such a decision, were it made honestly and disclosed in good faith, would be within the rational exercise of business judgment. But the facts alleged in this case are different.

Granting spring-loaded options, without explicit authorization from shareholders, clearly involves an indirect deception. A director's duty of loyalty includes the duty to deal fairly and honestly with the shareholders for whom he is a fiduciary.[FN76] It is inconsistent with such a duty for a board of directors to ask for shareholder approval of an incentive stock option plan and then later to distribute shares to managers in such a way as to undermine the very objectives approved by shareholders. This remains true even if the board complies with the strict letter of a shareholder-approved plan as it relates to strike prices or issue dates.

FN76. *In re Walt Disney S'holder Derivative Litig.,* 907 A.2d 693, 755 (Del.

Ch.2005) ("To act in good faith, a director must act at all times with an *honesty of purpose* and in the best interests and welfare of the corporation." (emphasis added)).

The question before the Court is not, as plaintiffs suggest, whether spring-loading constitutes a form of insider trading as it would be understood under federal securities law.[FN77] The relevant issue is whether a director acts in bad faith by authorizing options with a market-value strike price, as he is required to do by a shareholder-approved incentive option plan, at a time when he *knows* those shares are actually worth more than the exercise price. A director who intentionally uses inside knowledge not available to shareholders in order to enrich employees while avoiding shareholder-imposed requirements cannot, in my opinion, be said to be acting loyally and in good faith as a fiduciary.

FN77. Pls.' Answering Br. in Opp'n to Mot. To Dismiss at 13. Academic commentary on the relationship between spring-loading and insider trading is decidedly mixed. *See, e.g.,* Victor Fleischer, *Options Backdating, Tax Shelters, and Corporate Culture* 9 n. 27 (Univ. of Colo. Legal Studies Working Paper Series, Working Paper No. 06-38, 2006), *available at* http:// ssrn .com/abstract=939914; Stephen Bainbridge, Spring-loaded Options and Insider Trading, on ProfessorBainbridge.com, http:// www.professorbainbridge.com/2006/ 07/springloaded-op-1.html (July 10, 2006) (presenting argument of Iman Anabtawi that spring-loaded options constitute a form of insider trading or breach of fiduciary duty); Larry E. Ribstein, Options and Insider Trading, on Ideoblog, http:// busmovie.typepad.com/ ideoblog/2006/07/options-and-ins.html (July 11, 2006) (refuting Anabtawi's insider trading argument).

**\*19** This conclusion, however, rests upon at least

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF    Document 53-3    Filed 04/10/2007    Page 58 of 87

Page 101 of 133

--- A.2d ----

Page 23

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
(Cite as: --- A.2d ----)

two premises, each of which should be (and, in this case, has been) alleged by a plaintiff in order to show that a spring-loaded option issued by a disinterested and independent board is nevertheless beyond the bounds of business judgment. First, a plaintiff must allege that options were issued according to a shareholder-approved employee compensation plan.[FN78] Second, a plaintiff must allege that the directors that approved spring-loaded (or bullet-dodging) options (a) possessed material non-public information soon to be released that would impact the company's share price, and (b) issued those options with the intent to circumvent otherwise valid shareholder-approved restrictions upon the exercise price of the options. Such allegations would satisfy a plaintiff's requirement to show adequately at the pleading stage that a director acted disloyally and in bad faith and is therefore unable to claim the protection of the business judgment rule. Of course, it is conceivable that a director might show that shareholders have expressly empowered the board of directors (or relevant committee) to use backdating, spring-loading, or bullet-dodging as part of employee compensation, and that such actions would not otherwise violate applicable law. But defendants make no such assertion here.

> FN78. Shareholder approved employee compensation plans are common partially as a result of I.R.C. § 162(m), the section of the tax code that allows a business to deduct employee compensation above $1 million only if it qualifies as performance-based compensation. Performance-based compensation plans must be approved by a majority vote of shareholders. *See* I.R.C. § 162(m)(4)(C)(ii).

Plaintiffs' have alleged adequately that the Compensation Committee violated a fiduciary duty by acting disloyally and in bad faith with regard to the grant of options. I therefore deny defendants' motion to dismiss Count III as to the seven members of the committee who are implicated in such conduct.

## D. Count IV: Related Party Transactions

Plaintiffs include in their complaint related-party transactions taken from proxy statements covering the period between 1998 to 2004. Plaintiffs insist that these transactions were entered into for the purposes of enriching the Tyson family and other insiders. Before looking at the merits of the complaint, however, it is first necessary to address the statute of limitations.

### 1. *Statute of Limitations*

Plaintiffs admit that many of the related-party transactions were revealed in Tyson's proxy statements. Amalgamated brought substantially the same complaint with regard to these transactions in 2004 without the benefit of Meyer's books and records request. Given these facts, there cannot be much doubt that plaintiffs were on inquiry notice. [FN79] Plaintiffs are caught on the horns of a dilemma. Either Amalgamated raised a claim on February 16, 2005 without sufficient knowledge (thus violating, among other things, Rule 11), or the fact that Amalgamated filed its complaint serves to show that any plaintiff would have been on inquiry notice at that point.

> FN79. Plaintiffs incorrectly suggest that the doctrine of fraudulent concealment tolls the statute of limitations until plaintiffs actually discover the facts giving rise to claims, citing a Superior Court case, *Wright v. Dumizo,* 2002 WL 31357891, at *3 (Del.Super .Oct. 17, 2002). The Superior Court in *Wright,* faced with a case in which the plaintiff had actually discovered wrongdoing, applied the law relevant to the case at hand and only paraphrased the more complete rule of *Giordano v. Czerwinski,* 216 A.2d 874, 876 (Del.1966). In *Giordano,* the Supreme Court was quite clear: "[W]hile the Statute of Limitations may not apply when the acts complained of are fraudulently concealed from the plaintiff, such application is suspended only until his rights are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

discovered or *could have been discovered by the exercise of reasonable diligence* ." *Id.* at 229 (emphasis added).

To the extent that the company disclosed that it was involved in related-party transactions, it can hardly be said that Tyson shareholders were not on notice. Shareholders in the course of ordinary diligence, particularly through demands for records under § 220, should have been able to discover their harm from the moment the related-party transactions were revealed. Thus, Count IV must be dismissed with regard to all transactions revealed in proxies before February 16, 2002.

### 2. *Substantive Claims*

**\*20** Two distinct parts of Count IV remain vital, however, and must be considered. First, the statute of limitations does not cover related-party transactions not revealed to the public.[FN80] For instance, the relationship between Tyson and its logo vendor, allegedly ongoing since 2001, seems *not* to have been disclosed in proxy statements. Second, the statute of limitations would not apply to transactions entered into after February 16, 2002. In considering the substantive question, the remaining transactions can be usefully separated into those that both parties agree were reviewed by some form of governance committee, and those that plaintiffs insist were never reviewed at all.[FN81]

> FN80. The complaint mentions only that transactions were disclosed through proxy statements. Defendants will of course have the opportunity to show at trial that information had been released to the public through other means (*e.g.,* press releases, website disclosures).

> FN81. Over the period in question, related-party transactions were either reviewed by the Special Committee or the Governance Committee. For simplicity, I refer to these both as the "independent committees."

### a. Transactions Admittedly Reviewed by an Independent Committee

I apply the standard *Aronson* analysis to those transactions admittedly reviewed by a special committee. Plaintiffs have already failed to challenge the disinterestedness and independence of the special committee.[FN82] The next question is whether the transactions are outside the bounds of business judgment: does the complaint allege sufficient facts from which I may infer that the board knew that material decisions were being made without adequate deliberation in a manner that suggests that they did not care shareholders would suffer a loss? [FN83] This is a scienter-based test, and the complaint must allege not only that the directors were incorrect in their assessment at the time but that they either intended to harm shareholders, or at least were absolutely careless in the matter.

> FN82. The consolidated complaint makes only one serious attempt to convince this Court that a member of the independent committees, defendant Massey, was interested, and this because of a single related-party transaction. Plaintiffs urge me to find that the other directors must have been interested simply because no disinterested director might have approved the long list of transactions in the complaint. This circular reasoning once again fails to convince.

> FN83. *Official Comm. of Unsecured Creditors of Integrated Health Servs.,* 2004 WL 1949290, at \* 10 (Del. Ch. Aug. 24, 2002) (quoting *In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 289 (Del. Ch.2003)).

This is a high hurdle, and plaintiffs do not come near to reaching it. The complaint must allege that the directors "consciously and intentionally disregarded their responsibilities." [FN84] Here plaintiffs rely upon my decision in *iXCore, S.A.S. v. Triton Imaging, Inc.,* where I stated that a complaint may remove the presumption of business judgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----                                                              Page 25

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

where it "may indicate a violation of the fiduciary duty of care in considering all material information reasonably available before making a business decision...." [FN85] Plaintiffs suggest that the meager materials they received in response to their § 220 request justifies the conclusion that "the [independent committees'] work was cursory at best and, at worst, a mere whitewash designed to deceive shareholders into believing that the company had exercised some level of control...." [FN86]

> FN84. *In re Walt Disney Co. Derivative Litig.,* 825 A.2d at 289.
>
> FN85. 2005 WL 1653942, at *1 (Del. Ch. July 8, 2005).
>
> FN86. Pls. Answering Br. in Opp'n to Mot. to Dismiss at 40.

The consolidated complaint offers up few facts in support of those conclusions, however. There is an important distinction between an allegation of non-deliberation and one of inadequate deliberation. [FN87] It is easy to conclude that a director who fails to consider an issue at all has violated at the very least a duty of due care. In alleging inadequate deliberation, however, a successful complaint will need to make detailed allegations with regard to the process by which a committee conducted its deliberations: the amount of time a committee took in considering a specific motion, for instance, or the experts relied upon in making a decision.[FN88] The consolidated complaint mentions none of these things, instead urging that defendants' bad faith is obvious due to the sheer volume of transactions challenged.[FN89] Not only would such a conclusion be contrary to Delaware law, it is also contrary to judicial policy, as it encourages complaints covering lengthy historical periods with scant evidentiary weight. Count IV, therefore, must be dismissed for failure to state a claim with regard to any transaction admittedly reviewed by an independent committee.[FN90]

> FN87. *See Oficial Comm. of Unsecured Creditors of Integrated Health Servs.,*

2004 WL 1949290, at *12 n. 58.

> FN88. The complaint does allege that an independent committee met only once a year, despite requirements in *their* charter that they meet more often. This is not enough for a court to infer, however, that the transactions were given only cursory review. A decision to change the scheduling of meetings does not require the conclusion that those meetings were ineffective or that the directors in attendance were insincere.
>
> FN89. The complaint attempts to conjure a suggestion of bad faith from a total of approximately \$163 million worth of related-party transactions, on the one hand, and specific allegations regarding the Arnett Sow Complex, the Tyson Children's Partnership Leases, and the grow-out transactions. Despite plaintiffs' best attempt to characterize the three specific transactions as beyond the possible bounds of business judgment, each is amenable to reasonable explanation. For instance, plaintiffs point to a reduction in the lease rates paid to the Arnett Sow Complex by 42.5%, rather than the 85% requested by the Pork Group, as somehow *per se* unfair. I have no reason to infer, however, that the Pork Group's recommendation lacked self-interest or was even reasonable, and in any event the law places the duty to make such a decision in the hands of Tyson's directors, not the Pork Group's. Nor are the lease rates paid by Tyson to the Tyson Children's Partnership so inherently high that this Court may conclude that no director could in good faith approve the transaction.
>
> Particularly confusing is plaintiffs' insistence that "[t]here is no valid business reason for selling ... insiders [Tyson's] raw materials and everything needed to develop it, and then turning around and buying the finished product from them at a higher price...." Consol. Compl. at ¶ 76. First, the *Herbets* settlement not only

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
(Cite as: --- A.2d ----)

specifically countenances the continuation of grow-out transactions, but also provides for rates at which profits may be split between Tyson and corporate insiders. Second, the obvious purpose of grow-out transactions is to shift the risk of production failure outside Tyson itself. The many tragedies that may adhere between egg and broiler hen-incidence of avian flu, alteration to regulations regarding the raising of poultry, etc.-become the concern of the contractor, who is presumably paid a premium to accept those risks.

FN90. The consolidated complaint concedes that an independent committee did review the following transactions: farm leases with Johnston & Starr and waste-water treatment plant leases with Don Tyson (1998); a farm lease with the John and Helen Tyson Estate; payments to Tollett's breeder hen research facility, and an office space lease from a company partially owned by Starr and John Tyson (1999); farm leases with John Tyson and the Randal Tyson Trust, the Tyson Children's Partnership, Tollett, Johnston, Don Tyson, the Randal Tyson Trust, and entities related to Starr, as well as the Arnett Sow Complex lease (2000); an aircraft lease with Tyson Family Aviation (2001); farm leases with the John Tyson and Randal Tyson Trust, Joe Starr and the children of Don Tyson, the Tyson Children's Partnership, JHT LLC, and Tollett, as well as payments to Tollett's breeder hen research facility, contracts with Don Tyson's waste water plants, and the office space lease with Starr and John Tyson (2004).

b. Transactions Allegedly not Reviewed by an Independent Committee

*21 Count IV actually hits its mark with respect to transactions after 2002 (or not revealed in proxy statements before that date) that are alleged by plaintiffs not to have been reviewed at all. As the

majority of the Tyson board can be considered interested at all relevant times, transactions not sterilized by independent review receive no protection from the business judgment rule, and plaintiffs must only allege that the transactions were in some way unfair to shift the burden upon the defendants to prove their entire fairness. FN91 By the terms of the *Herbets* settlement, all related-party transactions were required to be reviewed. The fact that they allegedly were not is sufficient for me to infer that, at least in the context of this case, the transaction may have escaped oversight for a reason.

FN91. *See Solomon v. Pathe Commc'ns Corp.,* 1995 WL 250374, at *5 (Del. Ch. Apr. 21, 1995), *aff'd,* 672 A.2d 35 (Del.1996).

Count IV, however, is dismissed except with respect to this relatively narrow class of claims.

*E. Count V: Breach of Fiduciary Duty for Inadequate Disclosure of Perquisites Leading to SEC Sanctions and Fines*

Before I may properly consider Count V, it is necessary to decipher from the complaint its actual scope. According to the consolidated complaint, " Defendants breached their fiduciary duties to Tyson by engaging in a consistent pattern and practice of neglect, which resulted in disclosure violations that exposed the company to SEC sanctions and fines, including, but not limited to failures to disclose amounts of 'other compensation,' amounts of ' travel and entertainment' expenses paid to executives by the company and amounts paid in related-party transactions." FN92 Count V is further targeted at "inadequate, incomplete, or no disclosures regarding large amounts of executive compensation, which any reasonable Board member would have adequately investigated and would have adequately disclosed." FN93 Yet, puzzlingly, neither the SEC investigation nor the allegations describing it in the complaint say anything about related-party transactions or executive compensation in general. Rather, they focus entirely on Don Tyson's perquisites.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN92. Consol. Compl. at ¶ 190.

FN93. *Id.*

Plaintiffs seem to believe that any or all alleged
malfeasance by the defendants may somehow be
shoehorned into a disclosure claim because *anything*
that defendants failed to disclose "exposed" Tyson
to SEC scrutiny. Disclosure claims do not allow so
broad a target. For a disclosure claim to be viable, it
must demonstrate damages that flow from the
failure to adequately *disclose* information, not that
the information disclosed concerned matters for
which damages are appropriate.[FN94] Plaintiffs
must at the very least allege some connection
between the lack of disclosure and an actual harm.
[FN95] Exposure to risk of investigation does not
suffice. Attempting to expand the concept of harm
to include the "risk" of investigation represents a
triumph of imagination, but little else.

> FN94. *Brown v. Perrette,* 1999 WL
> 342340, at *6 (Del. Ch. May 14, 1999).

> FN95. *Loudon v. Archer-Daniels-Midland
> Co.,* 700 A.2d 135, 147 (Del.1997).

Other than Don Tyson's perquisites, which resulted
in SEC penalties, plaintiffs make no showing of
damage from failure to disclose any form of
excessive compensation. Therefore, Count V fails
to state a claim regarding all matters not relating to
the SEC settlement.

**\*22** Allegations regarding the disclosure violations
stemming from Don Tyson's perquisites, on the
other hand, will not be dismissed. Defendants rely
upon Tyson's exculpatory provision under §
102(b)(7), which releases directors from liability for
breaches of the duty of care. It is not clear,
however, that the duty of care is at issue here.
Disclosure violations may, but do not always,
involve violations of the duty of loyalty.[FN96] A
decision violates only the duty of care when the
misstatement or omission was made as a result of a
director's erroneous judgment with regard to the
proper scope and content of disclosure, but was
nevertheless made in good faith.[FN97] Conversely,

where there is reason to believe that the board
lacked good faith in approving a disclosure, the
violation implicates the duty of loyalty.

> FN96. *Orman v. Cullman,* 794 A.2d 4, 50
> (Del. Ch.2002).

> FN97. *Id.* at 41.

It is too early for me to conclude that the alleged
failures to disclose do not implicate the duty of
loyalty. As stated in my discussion of Count II, I
must accept as true that the "other annual
compensation" was approved by the entire board, as
there is nothing in the proxy statements to
affirmatively suggest that it was considered by the
compensation committee. Furthermore, the entire
board approved the proxy statements later
condemned by the SEC. Since 2001, the board of
directors included Don Tyson, Barbara Tyson, John
Tyson, Tollett and Bond.[FN98] Where the
independence of a majority of the board can be
questioned, I cannot determine as a matter of law
that a disclosure violation was solely a violation of
the duty of care.[FN99]

> FN98. Bond was appointed to the Tyson
> board in 2001. For periods before 2001,
> Starr's membership on the board suffices to
> suggest a conflict of interest between Starr
> and Tyson. According to the complaint,
> Starr was involved in approximately $18
> million of related-party transactions with
> Tyson between 1998 and 2004.

> FN99. *Orman,* 794 A.2d at 41 ("
> Unfortunately for the defendants, however,
> because Orman has pled facts which make
> it reasonable to question the independence
> and disinterest of a majority of the Board
> that decided what information to include in
> the Proxy Statement, I cannot say, as a
> matter of law, that the complaint
> unambiguously states only a duty of care
> claim.").

As a consequence of this narrowing of plaintiffs'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF   Document 53-3   Filed 04/10/2007   Page 63 of 87
Page 106 of 133

--- A.2d ----

Page 28

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
(Cite as: --- A.2d ----)

scattershot allegations, Count V applies only to disclosure violations that culminated in the 2005 settlement with the SEC. Additionally, as this settlement covered the years 1997 to 2003, this count should be dismissed in its entirety with regard to defendant Zapanta (appointed to the board in 2004).

### F. Counts VI and VII: Breaches of Contract and Contempt Prior to 2002

Counts VI and VII address the responsibilities of the Tyson directors who entered into the *Herbets* settlement. Plaintiffs seek to enforce the settlement under one of two theories. Count VI maintains that the directors have breached a contractual duty. In the alternative, Count VII asks that I impose sanctions against the defendants for violating an Order of this Court. Both counts present procedural challenges that highlight a paradox of the derivative complaint. Shareholders bring suit on behalf of a corporation, but the corporation is also a party to most settlements. When a director later breaches such a settlement, who has the ability to bring an action on behalf of the shareholders to enforce the agreement, and how may it be done? The underlying allegations in both counts are the same: the directors failed to ensure that all related-party transactions were reviewed by a special committee and failed to review Don Tyson's perquisites.

#### 1. Procedural Issues for Contempt Under Rule 70(B)

**\*23** Plaintiffs' motion for contempt is procedurally improper and may be easily dismissed. Defendants urge that there is no cause of action for civil contempt, citing an opinion of the 7th Circuit,[FN100] but there is no need to go so far afield for guidance. The contempt powers of Delaware courts are indeed broad, and "the protean force of equity has not been spent" in this jurisdiction: this Court retains the power to fashion remedies "where justice requires and the law is silent." [FN101] Nevertheless, I need only exercise this power where the law is actually *silent* and no just remedy available. The rules of the Court of Chancery speak directly to the matter of

contempt:

> FN100. *D. Patrick, Inc. v. Ford Motor Co.,* 8 F.3d 455, 459 (7th Cir.1993).

> FN101. *Parsons v. Mumford,* 1989 WL 63899, at \*1-2 (Del. Ch. June 14, 1989).

"For failure to ... obey or perform any order, an attachment may be ordered by the Court *upon a filing in the case* of an affidavit ... setting forth the facts constituting the disobedience." [FN102]

> FN102. Ch. Ct. R. 70(b) (emphasis added).

Plaintiffs' proper recourse with regard to contempt would be to file a motion to show cause in the earlier case. Given the peculiar nature of derivative complaints, in which a corporation is both a nominal defendant and the entity on whose behalf damages are sought, plaintiffs are arguably already parties to the earlier case. Even were this not true, Rule 71 provides that an order made in favor of a person not a party to an action may be enforced "by the same process as if that person were a party." [FN103] Plaintiffs face no impediment in pursuing contempt and, thus, there is no particular reason for this Court to craft for them a peculiar equitable remedy. Count VII must be dismissed.

> FN103. Ch. Ct. R. 71.

#### 2. Breach of Contract Claim for a Settlement in a Derivative Action

If plaintiffs' contempt claim is procedurally improper, it is equally true that there is no Delaware authority barring the enforcement of a settlement agreement through an action for breach of contract. Defendants may be correct in describing as "bizarre" [FN104] a process by which a plaintiff may assert rights under a contract on behalf of the company when the company itself did not fulfill its responsibility. But such an action is no more unusual than the derivative lawsuit itself. The *Herbets* settlement, although embodied in a court

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF    Document 53-3    Filed 04/10/2007    Page 64 of 87

--- A.2d ----

Page 29

Page 107 of 133

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
(Cite as: --- A.2d ----)

order, represented an agreement between the company and its shareholders, on the one hand, and the company as embodied in its board, on the other. That settlement, entered into by a minority shareholder on behalf of the company, should be enforceable by another minority shareholder. To object that plaintiffs in the two actions have differing names would reduce the institution of derivative litigation to a rigid formalism.

> FN104. Defs.' Opening Br. in Supp. of Mot. to Dismiss at 45.

Similarly, the fact that the settlement was adopted as a court order makes it no less enforceable as a contract. While there is authority for the proposition a Delaware court cannot enforce a settlement through contempt unless it is adopted as part of an order,[FN105] defendants point to no authority to suggest that once adopted contempt becomes the *only* remedy for violation. Nor is there any need to create such a rule.

> FN105. *Read v. Wilmington Senior Ctr., Inc.,* 1992 WL 296870, at *1 (Del. Ch. Sept. 16, 1992) (recounting that Read had failed in the Court of Common Pleas to enforce an action for contempt because the settlement had not been incorporated into an order).

### 3. *Violations of the Herbets Settlement*

**\*24** I must still determine whether the complaint alleges a claim for breach of contract. Count VI asserts that defendants violated the *Herbets* settlement in three ways: through a failure to review annually the related-party transactions; through a failure to review the annual expenses submitted by Don Tyson; and finally, through a failure to keep track of the use of the Tyson boat.[FN106] Two issues remain: first, are plaintiffs barred by the statute of limitations, and second, do they present a claim for which relief may be granted?

> FN106. Plaintiffs include the grow-out

operations as related-party transactions under Count IV, and maintain that "neither the Board nor its Committees reviewed whether Tyson was receiving a fair price from the Tyson insiders at the front end of these arrangements, or whether it was paying a fair price when buying the livestock back at the end." Consol. Compl. at ¶ 77. Plaintiffs' allegations, if true, would seem to implicate an additional condition of the *Herbets* settlement not included in the complaint: "In any further livestock and feed sale and repurchase transactions between the Company any directors [sic], officers or their affiliates, the profits, if any, in excess of the Company's short-term borrowing rate will be shared between the Company (75%) and the individual (25%)." As the issue has not been brought before the Court, I do not consider it here.

With regard to the statute of limitations, there is no reason to suspect that plaintiffs were on inquiry notice before the SEC investigation. Where plaintiffs have relied upon a fiduciary's statements (such as proxy statements) attesting that all related-party transactions were reviewed, they are not on inquiry notice of the harm done to them unless they had some reason to suspect that the information upon which they relied was inaccurate. Defendants assured shareholders in their proxy statements that related-party transactions and Don Tyson's perquisites were disclosed and reviewed. The SEC now insists that this was incorrect, but there is no indication in the record that investors should have known of the dissembling before the SEC uncovered it.

As to the substantive issue, plaintiffs have certainly put forward facts sufficient to suggest that defendants breached their contract made with shareholders in 1997. The complaint suggests strongly that not all of Don Tyson's perquisites, nor many related-party transactions, were actually reviewed. If nothing else, the SEC investigation provides a very strong inference.[FN107] Defendants protest that no such review was required, and that no breach can be found in "the alleged fact that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

https://web2.westlaw.com/print/printstream.aspx?rs=WLW7.02&destination=atp&vr=2.0&s...    4/10/2007

Case 1:06-cv-00005-JJF    Document 53-3    Filed 04/10/2007    Page 65 of 87

Page 108 of 133

--- A.2d ----

Page 30

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
(Cite as: --- A.2d ----)

Compensation Committee did not review every detail of every expense item submitted by Don Tyson, but instead created procedures for others to do so." [FN108] This directly contradicts the settlement language. Nothing in *Herbets* suggests that directors are *entitled* to establish such procedures. The *Herbets* case, like this one, alleged that interested Tyson directors and management are working primarily for the benefit of the Tyson family. Shareholders agreed to a settlement that provided them with protection from future abuse through the oversight of independent directors. If Tyson's directors instead chose to delegate their contractual duties to others, they did so against the terms of the agreement and at their own peril. Reading the settlement to allow the independent board to devolve its review responsibilities to management led by John Tyson would give new meaning to allowing the fox to guard the henhouse.

> FN107. Defendants make some attempt at distinguishing the expense payments to Don Tyson before his retirement and the payments to Don Tyson as a result of his consulting contract after his retirement, an exercise that brings to light an interesting fact. The 2001 Don Tyson and Peterson contracts are almost entirely identical. However, Peterson's contract (which has no bearing on the *Herbets* settlement) entitles him to "reimbursement for reasonable out of pocket expenses." Don Tyson's contract is conspicuously silent on the issue of "expenses," instead entitling him to "travel and entertainment costs."

> The *Herbets* settlement, on the other hand, makes no reference to the position Don Tyson occupies, inside or outside of Tyson's organizational structure. It instead requires that a committee review all " expense reimbursements" to him as an individual. Defendants nevertheless wish me to infer that any payments to Don Tyson after his retirement are outside the scope of the settlement: Tyson was being reimbursed, after all, not for "expenses" but for "costs."

> I decline to take such a narrow view of the

agreement, at least at this stage. I cannot imagine that the strictest of formalists would comb through words as defendants suggest, allowing directors to escape the terms of a settlement agreement by making payments consistent with past practices but distinguished by the granting of a new name.

> FN108. Defs.' Opening Br. in Supp. of Mot. to Dismiss at 47.

Finally, defendants attempt to recharacterize Count VI as a fiduciary duty claim in order to draw themselves within the protection of the Tyson exculpatory clause. Count VI and Count IV do draw upon substantially the same facts, but they are two separate causes of action. A director might well breach a contract without violating any fiduciary duty.[FN109] Similarly, a director can behave utterly disloyally while attending to the terms of a contract. Tyson's 102(b)(7) provision only exculpates a director from liability for breaches of fiduciary duty, and therefore is of no relevance to Count VI.

> FN109. Indeed, to the extent that a contract may be rationally and efficiently breached, a director might believe that he is *obligated* by his fiduciary duties to do so.

**\*25** Assuming (as I must) the truth of all factual allegations, Count VI thus states a claim for which relief may be granted.

### G. Count VIII: Material Misrepresentations in the 2004 Proxy Statement

Count VIII converts plaintiffs' grievances over related-party transactions and misrepresentations regarding other annual compensation into a class action claim for misrepresentation in Tyson's 2004 proxy statement. Plaintiffs theorize that had Tyson's management faithfully disclosed information regarding these transactions, shareholders might not have voted to elect the directors and, therefore, seek nominal damages to recompense them for their right to cast a fully-informed vote as well as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

disgorgement of "all ill-gotten gains" received by the directors elected in 2004. Defendants protest, *inter alia,* that the claim presented is not direct but derivative, that the issue of the 2004 elections have been mooted by subsequent events, and that damages are inappropriate in the context of an election for directors. I will deal with these arguments in order.

The Supreme Court recently has determined that the proper analysis of direct and derivative claims centers on two questions: who has suffered the alleged harm, and who would receive the benefit of any remedy that a court would impose? [FN110] For a shareholder (or, as here, a class of shareholders) to maintain a direct claim, he or she must identify an injury that is not dependent upon injury to the corporation. To put it another way, plaintiffs must demonstrate that "considering the nature of the wrong alleged and the relief requested ... he or she can prevail without showing an injury to the corporation...." [FN111] In a very limited sense, plaintiffs have succeeded.

> FN110. *Tooley v. Donaldson, Lufkin & Jenrette, Inc.,* 845 A.2d 1031, 1036 (Del.2004) (quoting *Agostino v. Hicks,* 2004 WL 443987, at *7 (Del. Ch. Mar. 11, 2004)).

FN111. *Id.*

Where a shareholder has been denied one of the most critical rights he or she possesses-the right to a fully informed vote-the harm suffered is almost always an individual, not corporate, harm. Withholding information from shareholders violates their rights even if it leads to them making the " right," and even highly profitable, result. To hold otherwise would be to state that a corporation may request consent from its shareholders, withhold relevant information, and only be liable for damages in those situations in which it appears *ex post* that the company has suffered financial damages. This cannot be, and is not, the law of Delaware.

Nevertheless, plaintiffs have failed to suggest any form of relief that can be granted to them in a direct

claim and, thus, Count VIII must be dismissed. In a direct suit based upon a disclosure claim, the Supreme Court has been very clear: damages to plaintiff shareholders are limited only to those that arise logically and directly from the lack of disclosure, and nominal damages are appropriate only where the shareholder's economic or voting rights have been injured.[FN112] Plaintiffs' allegations demonstrate harm to the corporation that accrued from the lack of disclosure in the 2004 proxy, but even assuming that defendants obtained " ill gotten gains" through their election, the shareholders would have no direct right to share in any disgorgement of these benefits. On the other hand, there is no allegation that as a result of the 2004 election plaintiffs' rights to a share of economic profits or access to the shareholder franchise have been impeded. Lacking any form of relief that might be granted, plaintiffs have failed to state a claim, and thus Count VIII must be dismissed.[FN113]

> FN112. *In re J.P. Morgan Chase & Co. S'holder Litig.,* 906 A.2d 766, 773-74 (Del.2006).

FN113. Curiously, both parties suggest that plaintiffs have requested that I void the 2004 elections. Defs.' Opening Br. in Supp. of Mot. to Dismiss at 48 ("Plaintiffs seek to void this election in 2004...."); Pls.' Answering Br. in Opp'n to Mot. to Dismiss at 59 ("Under the factual circumstances present here, the equitable remedy of voiding past elections is available ..."). The consolidated complaint, however, contains only a request for damages. Consol. Compl. at ¶¶ 209-210. In any event, equitable relief would be inappropriate for at least two reasons. First, given that the consolidated complaint admits that Don Tyson directly or indirectly controls over 80% of the voting power of the company, it seems highly unlikely that any order insisting upon new elections would foster some different result. Second, the board has survived two subsequent elections regarding which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- A.2d ----, 2007 WL 1018209 (Del.Ch.)
**(Cite as: --- A.2d ----)**

plaintiffs make no allegations of impropriety. Overturning the result of the 2004 elections would thus have no real effect, as it is beyond this Court's power to insist that new directors travel backwards in time a number of years to take up their posts.

### H. Count IX: Unjust Enrichment

**\*26** As a parting shot, plaintiffs level a claim for unjust enrichment against various of the individual defendants and TLP, alleging that they have benefited at the expense of the company through self-dealing transactions and breaches of fiduciary duties. Defendants rightly point out that no part of this Count presents new factual issues, but that does not render it irrelevant. Count IX presents an opportunity to assign liability to an individual director without requiring plaintiffs to demonstrate fault with respect to that director.

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." [FN114] A defendant may be liable " even when the defendant retaining the benefit is not a wrongdoer" and "even though he may have received [it] honestly in the first instance." [FN115] Although neither party develops the concept in their brief, the structure of the complaint suggests that were certain directors to be found liable for breaches of fiduciary duty under other theories, Count IX would allow the Court to force other directors to disgorge, for example, improperly spring-loaded options or profits from related-party transactions without having to show a breach of fiduciary duty on the part of a particular director.

> FN114. *Schock v. Nash,* 732 A.2d 217, 232-233 (Del.1999).

FN115. *Id.*

Given the considerable complexity of the other eight counts of the complaint, it would be difficult for me to conclude there is no "reasonably

conceivable set of circumstances" [FN116] under which it might later be determined that one of the fourteen named defendants was unjustly enriched. I will provide only one example that could reasonably be imagined. TLP is included in this Count, and yet TLP is not itself a Tyson director. Some of the Tyson family stock options-property that might be subject to disgorgement-may have been transferred from any one of the family members to TLP, and the resolution of this matter may result in the need to enjoin TLP to return those shares. For this reason, I will not dismiss Count IX.

> FN116. *In re Gen. Motors (Hughes) S'holder Litig.,* 897 A.2d 162, 168 (Del.2006) (quoting *Savor, Inc. v. FMR Corp.,* 812 A.2d 894, 896-97 (Del.2002)).

### VII. CONCLUSION

Based on the foregoing analysis of the complaint, the following list of hits and misses describes the issues that remain before the Court as the case goes forward. Counts I and VIII are dismissed in their entirety, and Count VII must be dismissed as procedurally improper. Count IV remains only with regard to related-party transactions that were either not disclosed before or undertaken after February 16, 2002 and were allegedly not reviewed by an independent committee. Count V goes forward only as to disclosure failures in regard to Don Tyson's perquisites that led to the SEC settlement. Counts II, VI and IX survive completely intact, while Count III survives as to the seven members of the compensation committee.

Plaintiffs and defendants shall confer and submit an implementing form of Order.

Del.Ch.,2007.
In re Tyson Foods, Inc.
--- A.2d ----, 2007 WL 1018209 (Del.Ch.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9

# Westlaw.

Not Reported in A.2d

Page 1

Not Reported in A.2d, 1993 WL 18769 (Del.Ch.), 18 Del. J. Corp. L. 1204
**(Cite as: Not Reported in A.2d)**

**H**
In re USACAFES, L.P. Litigation
Del.Ch.,1993.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County.
In re USACAFES, L.P. LITIGATION.
**Civ. A. No. 11146.**

Submitted: Oct. 13, 1992.
Decided: Jan. 21, 1993.

**\*\*1205** Joseph A. Rosenthal, Rosenthal, Monhait,
Gross & Goddess, P.A., Wilmington, Scott W.
Fisher, and Jerald M. Stein, Garwin, Bronzaft,
Gerstein & Fisher, New York City, and Robert M.
Roseman, Spector & Roseman, P.C. Philadelphia,
for plaintifffs.
John H. Small, and Bruce E. Jameson, Prickett,
Jones, Elliott, Kristol & Schnee, Wilmington,
Michael L. Knapek, and Michael C. French,
Jackson & Walker, Dallas, TX, for defendants
Cafes One, L.P., Cafes General Partner, Inc., Sam
Wyly, Charles J. Wyly, C. Jeffrey Rogers, B.B.
Tuley, J.D. Francis, and F. Jay Taylor.
Daniel A. Dreisbach, Richards, Layton & Finger,
Wilmington, David L. Kornblau, Paul, Weiss,
Rifkind, Wharton & Garrison, New York City, for
defendant Metsa, Inc.

## MEMORANDUM OPINION
ALLEN, Chancellor.
**\*1** Pending is plaintiffs' motion pursuant to
Chancery Court Rule 15, for leave to file a Second
Amended Consolidated and Supplemental
Complaint.

**\*\*1206** Since 1989, plaintiffs have been pursuing
class action claims related to the sale that year of
substantially all of the assets of USACafes, L.P. to
Metsa Acquisition Corp., ("Metsa"). *See In Re
USACafes, L.P. Litigation,* Del.Ch., 600 A.2d 43

(1991). The class action is on behalf of all of the
public holders of limited partnership interests in
USACafes, L.P. (now Cafes One, L.P.). The
principal defendants are the general partner,
USACafes General Partner, Inc., its directors
(including its controlling shareholders Sam and
Charles Wyly), and Metsa.

Plaintiffs now seek to amend their complaint to seek
damages in a derivative capacity, on behalf of Cafes
One, L.P., against the directors of the general
partner, for allegedly improper payments made to
the defendants in the years prior to the sale of assets
to Metsa. (¶¶ 41-49) Central defendants in the
proposed amended pleading, as in the original
pleading, are Sam and Charles Wyly, brothers who
own all of the voting stock of the general partner, as
well as approximately 40% of the limited
partnership units, and who serve as chairman and
president (Sam) and director and officer (Charles)
of the general partner.

The new allegations are that in the years 1986 to
1989 the directors of the general partner awarded
themselves "excessive directors' fees, salaries,
travel expenses, automobile expenses, business
allowances, and options grants" that "were
unrelated to any services rendered to USACafes." (
¶ 94) These fees were paid by the partnership
under the Partnership Agreement.

Specifically, plaintiffs allege that in 1988, Sam
Wyly attended only one directors' meeting
personally and three by telephone and provided no
other substantial services to USACafes, while
receiving \$124,278 in wages and salaries, and
\$483,000 in "non-employee compensation" from
USACafes. (¶ 43) Plaintiffs allege that as
compensation for attending these four directors'
meetings in 1988, Charles Wyly received \$114,305
in wages and salary and \$183,000 in "
non-employee compensation." For the year 1989,
Sam Wyly received payments totaling \$684,711 [FN1]
and Charles Wyly received \$353,865 **\*\*1207**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1993 WL 18769 (Del.Ch.), 18 Del. J. Corp. L. 1204
**(Cite as: Not Reported in A.2d)**

for services of substantially the same character.[FN2] (¶ 44) This is alleged to be waste or, at least, unfair self-dealing, since the Wylys are alleged to dominate and control the board of directors of the general partner.

> FN1. Sam Wyly allegedly received the following payments in 1989:

> FN2. Charles Wyly is alleged to have received the following payments in 1989:

In addition, the proposed complaint seeks to add claims that the partnership paid one Don Thomson, who is alleged to be a friend of the Wylys, over $300,000 in fees and expenses in 1988, and loaned him several hundred thousand dollars from 1987 to 1989. These payments are said to constitute waste.

It is also alleged that defendants awarded themselves options to purchase limited partnership units, including 100,000 options to Sam Wyly and Charles Wyly each in 1986 and 200,000 to Sam and 100,000 to Charles in 1988, without compensation to the firm. (¶ 47)

*2 It is further asserted that in an effort to conceal these activities, defendants converted USACafes from a corporation to a limited partnership in 1986, thus avoiding certain disclosure obligations created by the federal securities laws and regulations. (¶ 48) Compliance with these avoided disclosure obligations, in plaintiffs' view, would have resulted in the exposure of defendants' activities to the scrutiny of plaintiffs and the general public, and alerted plaintiffs to bring suit to protect the asserted rights of the limited partnership before the expiration of the statute of limitations.

Finally, plaintiffs seek to add to their complaint, additional detail regarding the Metsa transactions. These new factual allegations are that the business prospects for the Company were quite good at the time of the sale and that, in connection with the sale, the Wyly's diverted $438,000 in fees to Glass and Wyly, a financial advisory firm owned by Evan Wyly, Sam Wyly's son. (¶ 69)

Plaintiffs also claim that the newly alleged acts of corporate waste injured the class of unit holders in the Metsa sale because they had the effect of depressing the market value of USACafes, L.P. and thus decreasing the amount realizable by the unit holders in its sale. The claim that the entity was over-reached by the general partners is, however, plainly a derivative and not a class claim. It is one thing to claim that the unit holders might have individually **1208 received more on a liquidation sale if the company would have been better shopped or if some part of the consideration the buyer was willing to pay had not been improperly diverted. It is rather different to say that more could have been realized if the business had years earlier been run in some other way. The latter claim is plainly derivative and relates to earlier acts and earlier (potential) liabilities. This is a material fact in a motion raising limitations issues.

I.

Defendants oppose plaintiffs' motion to amend, arguing that the proposed additional claims would be stricken on a motion to dismiss and therefore should not be added to the complaint. *See Itek Corp. v. Chicago Aerial Indus., Inc.,* Del.Supr., 257 A.2d 232, 233 (1969). Defendants maintain that the proposed derivative claims, contained in Count III of the proposed complaint, cannot survive a motion to dismiss because: (1) the applicable statute of limitations has run; (2) in any event, plaintiff has failed to meet the demand requirement by making demand upon the general partner to pursue these claims or adequately alleging that demand is excused; (3) plaintiffs' and their law firm will have fatal conflicting interests if they attempt to represent both the class and derivative claimants simultaneously; and (4) the proposed complaint fails to allege fraud with particularity.

II.

I turn to the limitation issue which I regard as dispositive. Defendants claim that, to the extent that plaintiffs' proposed amended complaint seeks to recover damages for alleged wrongdoing which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF   Document 53-3   Filed 04/10/2007   Page 71 of 87

Page 59 of 133

Not Reported in A.2d

Page 3

Not Reported in A.2d, 1993 WL 18769 (Del.Ch.), 18 Del. J. Corp. L. 1204
**(Cite as: Not Reported in A.2d)**

occurred prior to July 1, 1989, the claims are barred
by application of the three year statute of limitations
contained in 10 *Del.C.* § 8106 (1991).[FN3]

> FN3. Plaintiff filed the proposed Second
> Amended Complaint on July 1, 1992.

**\*3** The application of the statute of limitations by
the Court of Chancery, in an action charging a
corporate director with actionable self-dealing has
been the subject of a recent opinion. *See Kahn v.
Seaboard Corp.,* Del.Ch., No. 11485, Allen, C.
(Jan. 14, 1993). In that case, in harmonizing *Bokat
v. Getty Oil Co.,* Del.Supr., 262 A.2d 246 (1970)
and *Bovay v. H.M. Byllesby & Co.,* Del.Supr., 38
A.2d 808 (1944), I expressed the opinion that where
actionable self-dealing is alleged in a derivative suit
against a corporate fiduciary, **\*\*1209** the statute of
limitations applies, but may be tolled until such time
as a reasonably diligent and attentive stockholder
knew or had reason to know the facts alleged to
constitute the wrong. Furthermore, it was there
held that where, as here, plaintiff's pleading shows
on its face that if the applicable statute were
applied, the claim asserted would be time-barred,
then it is plaintiff's burden to plead facts which
could support a conclusion that, in the
circumstances, the running of the statute was tolled.
*See Kahn v. Seaboard Corp., supra* at 16. Finally,
if this is done as a pleading matter, but defendant is
able to show by undisputed facts outside of the
pleadings that the statute was not tolled during the
three year period prior to filing of the complaint,
then defendant may be awarded a summary
judgment. *See Bokat v. Getty Oil Co., supra.*

Here the principal question with respect to the
impact, if any, of the statute of limitations upon the
present assertion of this claim is the question when
did class members have reasonable notice of the
facts now alleged to constitute the claims that
plaintiff wishes to assert derivatively. The parties
have submitted certain public filings which I treat as
establishing, not the truth of any statements therein,
but the fact that the statements therein were made
on and after the filing of such documents.

### A. Disclosures Concerning Salaries Received by Directors

A review of the 10-K forms and other public
documents filed by USACafes with the S.E.C.
shows that prior to fiscal year 1988, the company
disclosed the individual salaries paid by the
partnership to each of the general partner's directors
or principal officers each year. For example, the
1986 prospectus issued by USACafes discloses that
in fiscal year 1986 the defendants were paid the
following cash compensation: Sam
Wyly-$456,000; Charles Wyly-$228,000; C.
Jeffrey Rogers-$337,865; Charles B.
Brewer-$170,500; Ronald W. Parker-$165,500;
Mr. J.D. Francis and Mr. F. Jay Taylor-$30,000
director's fee to each. (DX A at 75)

USACafes 10-K for the fiscal year ending
December 31, 1987 shows the following cash
compensation: Sam Wyly-$580,144; Charles
Wyly-$288,143; C. Jeffrey Rogers-$287,938
salary, $682,948 bonus; Charles B.
Brewer-$131,292 salary, $261,906 bonus; Ronald
W. Parker-$142,308 salary, $270,085 bonus; Mr.
J.D. Francis and Mr. F. Jay Taylor-$30,000
director's fee to each. (DX B at 45) [FN4]

> FN4. All references to defense exhibits
> refer to documents attached to defendants'
> submission of October 21, 1992.

**\*4 \*\*1210** In fiscal year 1988, under the heading "
Executive Compensation", the company reported
only the aggregate amount of direct and indirect
expenses, incurred by the General Partner on behalf
of the partnership, and reimbursed by the
partnership. In 1988, these expenses totalled
$5,830,000. (DX C at 48) Plaintiffs now assert
Sam Wyly received some $610,000 (*see* p. 2 above)
that year. While his share of the $5.8 million
expense was not reported, note how comparable
that amount was to what had been reported for the
previous year ($580,000) as payments to him. For
fiscal year 1989, the Company reported the direct
and indirect expenses incurred by the general
partner and paid by the partnership in the same
fashion, stating that they totalled approximately

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1993 WL 18769 (Del.Ch.), 18 Del. J. Corp. L. 1204
**(Cite as: Not Reported in A.2d)**

$7,200,000. (DX D at 59) Now plaintiffs wish to allege that Sam Wyly received $684,711 (*see* n. 1 above) which was not separately disclosed.

### B. Disclosures Concerning Loans To C. Jeffrey Rogers

Plaintiffs allege that improper loans were extended to Mr. C. Jeffrey Rogers from 1986 until 1989. (¶ 46) A review of the S.E.C. filings shows that the existence and amount, but not the exact purpose, of these loans was disclosed by the Company. The prospectus issued in 1986 stated that "since October 1983, Mr. Rogers has obtained a series of loans from the Company ... with the largest principal amount ... outstanding ... being $977,455." (DX A at 79) The Company's 10-K for the fiscal year ending December 31, 1987 discloses that Mr. Rogers at that point had two loans of $1,062,176 and $864,911 respectively. (DX B at 48) The 10-K for the fiscal year ending December 31, 1988 disclosed that Mr. Rogers owed the Company $1,131,000 on that date. (DX C at 43) Finally, the 1989 10-K shows that as of October 1989, Mr. Rogers owed $813,000 to the Company and that this debt was forgiven "in conjunction with the sale" to Metsa. (DX D at 25)

The 1986 prospectus and December 31, 1987 10-K form do not describe how Rogers applied the funds he obtained through the loans from the Company, except to note that they included amounts owed under his stock purchase agreement with the Company. (DX A at 79) The 1988 and 1989 10-K forms state that the loans included amounts under stock and unit purchase agreements "and for personal use." (DX C at 40; DX D at 49)

### C. Disclosure of Payments to Don Thomson

Don Thomson, a former director of USACafes and later a consultant to the company, is alleged in the proposed amended **\*\*1211** complaint to have received improper cash payments from the Company and to have improperly arranged for the Company to pay hundreds of thousands of dollars in life insurance premiums on his behalf. (¶ 45) The

1986 prospectus stated that in February 1984 Mr. Thomson entered into a seven year contract to provide financial advisory services to the Company in exchange for the Company paying him a fee of $90,000 annually. The document states that the Company was also paying the premiums on an insurance policy on his life.[FN5] The prospectus discloses that the annual premium on this policy was $124,236 for fiscal year 1986. (DX A at 78) The same document also reveals that Mr. Thomson was indebted to the company in the amount of $106,390. (DX A at 79) Mr. Thomson's indebtedness to the Company is disclosed on the 1987, 1988, and 1989 10-K forms. (DX B at 39; DX C at 43; DX D at 54) In 1989 Mr. Thomson's indebtedness totalled $317,000 and was forgiven as part of the Metsa sale. That forgiveness is challenged in the existing class action. (DX D at 54)

> FN5. The document also states that USACafes was the beneficiary under the policy to the extent of premiums previously paid, with the remainder being paid to Mr. Thomson's immediate family.

### D. Disclosures of Grants of Stock and Unit Options

**\*5** The plaintiffs allege in ¶ 47 of the Complaint that "Sam Wyly dispensed huge quantities of options to acquire USACafes securities to himself, his brother, and certain favored executives whenever he deemed it appropriate." Putting to one side the defects of such a pleading from the point of view of vagueness, it must be noted that the following was disclosed in 1986: "[o]n September 22, 1986 the Company granted 200,000 and 100,000 non-qualified stock options to Sam Wyly and Charles J. Wyly, Jr. respectively, at an exercise price of $6.25 per share, the last reported sales price of the common stock on such date." (DX A at 75) The 1986 prospectus also states that C. Jeffrey Rogers received options to buy 257,000 shares while Charles Brewer and Ronald Parker received options to buy 70,000 and all directors and officers received options to buy 452,000 shares. The 1987 form 10-K states that

[d]uring 1987, Mr. Rogers was granted 100,000 options to purchase units ... at a price ... which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF    Document 53-3    Filed 04/10/2007    Page 73 of 87    Page 61 of 133

Not Reported in A.2d                                                                                    Page 5

Not Reported in A.2d, 1993 WL 18769 (Del.Ch.), 18 Del. J. Corp. L. 1204
**(Cite as: Not Reported in A.2d)**

represented fair market value ... No other executive officers of the General Partner were granted unit options during 1987.

(DX B at 47) The 1988 form 10-K states that "[o]n January 18, 1988, **\*\*1212** 200,000 and 100,000 options were granted to Mr. Sam Wyly and Mr. Charles Wyly, respectively, at $8.00 per unit which approximated fair market value." (DX C at 49) The 1988 10-K also states that on January 17, 1988 Mr. Rogers received options to purchase 120,000 units while Mr. Parker and Mr. Brewer received options on 35,000 and 20,000 units respectively. Mr. Parker also received, according to the 1988 form 10-K, additional options to purchase 17,500 units on November 18, 1988. (DX C at 49) The 1989 form 10-K states that on May 10, 1989 an option to purchase 25,000 units at $9.125 was issued to "an executive officer of the general partner " and later redeemed for the difference between the exercise price and $10.25, totalling $28,125. (DX D at 61)

3

Generally Delaware courts have, in the absence of actual steps to conceal a wrong by a corporate director, applied the statute of limitations to stockholders in derivative actions against corporate directors seeking the award of money. *See Bokat v. Getty Oil Co.,* Del.Supr., 262 A.2d 246 (1970); *Halpern v. Barran,* Del.Ch., 313 A.2d 139 (1973); *Boeing Co. v. Shrontz,* Del.Ch., No. 11273, Berger, V.C. (Apr. 20, 1992). In *Bovay v. H.M. Byllesby & Co., supra* the Court declined to do so where the essence of the claim was fraudulent self-dealing that personally enriched a corporate fiduciary. My understanding of this law when read together is set forth in *Kahn v. Seaboard Corp., supra.*

Here I conclude that the statute of limitations does apply to bar litigation now of these claims that, if they are assumed to be valid, arose prior to July 1, 1989.[FN6]

> FN6. I note that these new matters do not arise out of the subject matter of the complaint-the asset sale to Metsa or the

disclosure of voting rights in the 1986 Prospectus and thus would not "relate back " under Ch.C. Rule 15.

I find no basis in the pleaded or undisputed facts concerning public disclosures to rebut the application of the statute. The notion that the 1986 conversion to the partnership form had the purpose or effect of "covering up" the alleged wrongs now brought forward-the grant of options and the payment of salaries chiefly-seems palpably to be a lawyers' invention for litigation use. But I here do not now pass on matters of plausibility; plaintiffs' counsel are permitted to advance factual contentions that others take to be implausible**\*\*1213** if they have good ground to believe them to be true. *See* Ch.C. Rule 11 (1991). But plaintiffs have pleaded no fact that would support the idea that this reorganization was done for the purpose of concealing future wrongs. More pertinently they have not shown that the conversion resulted in a situation in which a reasonably alert interest holder would not have been placed on notice of conduct of the kind here complained of, during the period when the statute was running but had not run out.

**\*6** The facts set forth above, derived from publicly filed documents, disclose to reasonably alert interest holders the existence of a practice of paying compensation to the Wylys and the level of those payments and the Wylys involvement in the Company; disclosed the loans to Mr. Rogers; disclosed payments to Mr. Thomson and the insurance arrangements; and disclosed the grants of options at market price.

Shareholders or interest holders need not delve aggressively into the internal affairs of a corporation or a limited partnership in order to assure that a non-public, self-dealing transaction is not foreclosed from attack by limitations, but when facts are disclosed that give rise to inquiry, an applicable statute of limitations will require timely action to preserve rights. *See Bokat, supra; Kahn v. Seaboard Corp., supra.* That in my judgment is the case here.

The motion to file the proposed amended complaint will be denied. The parties are directed to confer

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 6

Not Reported in A.2d, 1993 WL 18769 (Del.Ch.), 18 Del. J. Corp. L. 1204
**(Cite as: Not Reported in A.2d)**

and attempt to agree on those parts of the proposed
amendment that may be permitted by agreement.

| | |
|---|---|
| Salary: | $141,421 |
| Director's Fee: | $339,000 |
| Business Allowance: | $144,000 |
| Auto, Travel & Ins. | $60,490 |
| Total | $684,711 |

| | |
|---|---|
| Salary: | $141,421 |
| Director's fee | $111,000 |
| Business Allowance | $72,000 |
| Auto, Travel & Ins. | $29,324 |
| Total | $353,865 |

Del.Ch.,1993.
In re USACAFES, L.P. Litigation
Not Reported in A.2d, 1993 WL 18769 (Del.Ch.),
18 Del. J. Corp. L. 1204

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

Westlaw.

Not Reported in A.2d                                                          Page 1

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

## C
Yaw v. Talley
Del.Ch.,1994.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Court of Chancery of Delaware, New Castle County
Robert E. YAW, II, Plaintiff,
v.
William W. TALLEY, II, Larry E. LEE, Mrs. Pieter
A. Fisher, Individually and as Administratrix or
Executrix of the Estate of Pieter A. Fisher, and Alex
Massad, Defendants,
andRamco Holding Corp., a Delaware corporation,
Nominal Defendant.
**Civ.A. No. 12882.**

Submitted: Nov. 1, 1993.
Decided: March 2, 1994.

Robert K. Payson, Arthur L. Dent, and Stephen C.
Norman, Potter, Anderson & Corroon, Wilmington,
of counsel: David J. Branson and Daniel J.
Culhane, Kaye, Scholer, Fierman, Hays & Handler,
Washington, DC, James M. Sturdivant and Richard
B. Noulles, Gable & Gotwals, Tulsa, OK, for
plaintiff.
Henry N. Herndon, Jr., Morris, James, Hitchens &
Williams, Wilmington, of counsel: V. Burns Hargis
and Roger D. Graham, Hartzog, Conger, Cason &
Hargis, Oklahoma City, OK, for defendants
William W. Talley, II and Larry E. Lee.
Lawrence A. Hamermesh, Morris, Nichols, Arsht &
Tunnell, Wilmington, of counsel: Robert A. Sacks,
Michael H. Steinberg, and Steven S. Lucas,
Sullivan & Cromwell, Los Angeles, CA, for
defendant Mrs. Pieter A. Fisher Individually and as
Executrix of the Estate of Pieter A. Fisher.
R. Franklin Balotti, Richards, Layton & Finger,
Wilmington, of counsel: William Stutts, Baker &
Botts, Austin, TX, for defendant Alex Massad.
David C. McBride, Young, Conaway, Stargatt &
Taylor, Wilmington, of counsel: C. David Stinson,

McAfee & Taft, Oklahoma City, OK, for defendant
RAMCO Holding Corp.

### MEMORANDUM OPINION
JACOBS, Vice Chancellor.
**\*1** Pending are motions to dismiss and for summary
judgment in this derivative action brought by the
plaintiff, Robert E. Yaw, II ("Yaw" or "the plaintiff"
). Yaw is a shareholder of the nominal defendant,
RAMCO Holding Corp. ("RAMCO"),[FN1] a
Delaware corporation. The individual defendants
are RAMCO's current directors, Dr. William W.
Talley, II ("Talley"); Mr. Larry E. Lee ("Lee");
and Mrs. Pieter A. Fisher, individually and as
executrix of the estate of her late husband, Pieter A.
Fisher, who was a RAMCO director (the "Estate").
Also named as a defendant is Alex Massad ("
Massad"), who was a RAMCO director from 1991
to mid-1992.

> FN1. The corporation is referred to as "
> RAMCO Oil and Gas, Inc." in certain
> correspondence referenced in the
> complaint and contained in the first
> McBride Affidavit. Because there is no
> indication to the contrary, the Court will
> assume, solely for purposes of this motion,
> that RAMCO and RAMCO Oil and Gas,
> Inc. are one and the same entity.

Yaw filed his complaint on March 2, 1993, alleging
that the defendants had engaged and/or acquiesced
in self-dealing transactions, corporate
mismanagement, waste of corporate assets, and the
usurpation of a corporate opportunity, for which the
defendants were jointly and severally liable. On
May 10, 1993, the defendants moved to dismiss the
complaint. In support, they filed an opening brief,
together with an affidavit to which was attached
certain correspondence referenced in the complaint.
In response, the plaintiff amended his complaint
on June 18, 1993.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

The defendants renewed their motion to dismiss the amended complaint, and submitted a reply brief, together with a second affidavit containing evidentiary material outside the scope of the pleadings. The defendants rested their motion to dismiss on three grounds: (i) Yaw failed to comply with Chancery Court Rule 23.1; (ii) Yaw is bringing the litigation for an improper purpose, and therefore he is an unsuitable derivative plaintiff; [FN2] and (iii) two of Yaw's claims are barred by the statute of limitations.

> FN2. The parties agree that the motion to dismiss on this second ground may be treated as if converted into a motion for summary judgment. *See* Oral Arg.Tr. at 75-76, 93-95.

This is the Opinion of the Court, after briefing and oral argument, on the defendants' motions to dismiss and for summary judgment.

### I. *THE FACTS*

Except where otherwise noted, the facts are derived from both the amended complaint and from documents referenced in that complaint, which are attached to the first McBride affidavit. RAMCO, a Delaware corporation with its principal place of business in Tulsa, Oklahoma, was formed in 1987 to acquire and develop a diversified portfolio of oil and gas producing properties. RAMCO has four shareholders, Yaw, Talley, Lee and the Estate, each of whom owns 25% of RAMCO's outstanding common stock.[FN3] Messrs. Fisher, Massad, Lee, and Dr. Talley were directors of RAMCO until mid-1992. In June 1992, Mr. Fisher died and was replaced on the board by his wife. At that time Massad, who had been a director since 1991, also left the board. Mr. Lee and Dr. Talley remain on RAMCO's board of directors along with Mrs. Fisher. Mr. Lee served as RAMCO's Chief Executive Officer until his removal sometime prior to September 1992. McBride Aff.Ex.C. Dr. Talley is also an officer of RAMCO. Amended Complt. ¶ 3.

> FN3. Each shareholder owns 562,000 shares of Class A Common Stock. Plaintiff additionally owns 15,000 shares of RAMCO Preferred Stock. Amended Cmplt. ¶ 1.

#### A. *The Allegations of the Complaint*

Yaw complains of six transactions and events that, he claims, amounted to self-dealing, waste of corporate assets, corporate mismanagement and usurpation of a corporate opportunity by the defendant directors.

*2 Yaw first claims that Messrs. Talley, Lee, Fisher and Mrs. Fisher received excessive compensation amounting to corporate waste to the extent of $2 million. *Id.* at ¶ 12. In particular, plaintiff alleges that during 1991 and 1992, Lee received $800,000 while working part-time for RAMCO; the Fishers received $300,000; and Talley received $600,000. Plaintiff alleges that these payments were excessive, jeopardized RAMCO's financial health, and rendered it incapable of funding approximately $4 million in short term commitments. *Id.* at ¶ 13.

Second, the plaintiff alleges that in 1988 the defendant directors wasted RAMCO's corporate assets in a self-dealing transaction whereby Talley, through one of his business interests, sold various used computer equipment and furniture to RAMCO for $1.7 million. *Id.* at ¶ 14. To induce the board's approval of the sale, the computers were misidentified and overvalued. Much of the equipment quickly proved obsolete. *Id.* at ¶ 15. Moreover, some of the furniture was never delivered, yet no corresponding deduction was ever made from the purchase price. *Id.* at ¶ 16.

Third, Yaw claims that RAMCO was caused to pay in excess of $1.5 million to "Design Too," an interior decoration firm, for the redecoration of RAMCO's offices in Tulsa, and that a substantial portion of those funds was converted to the personal use of Mr. Lee and/or his wife. *Id.* at ¶ 18.

The plaintiff's fourth claim is that defendants Talley and Lee converted RAMCO funds through improper expense account reimbursements. Yaw

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF    Document 53-3    Filed 04/10/2007    Page 78 of 87

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

alleges three specific instances in which Lee allegedly charged his personal expenses to the corporation: a $5,000 private birthday party for Mrs. Lee, a $4,000 personal dinner in Hong Kong, and $5,000 to pay a country club assessment and for wines now stored in Lee's home. Yaw also alleges that RAMCO reimbursed $40,000 of Talley's expenses, including $5,000 for a hunting trip to Russia. All told, plaintiff alleges, RAMCO was caused improperly to reimburse over $150,000 in personal expenses. *Id.* at ¶ 20.

Fifth, the plaintiff alleges that defendants Talley, Lee, Fisher and Mrs. Fisher managed RAMCO in a grossly negligent manner. Yaw claims that the defendants caused RAMCO to pay its creditors up to ninety days after the company's debts fell due. That practice, Yaw alleges, created a working capital deficit and gave rise to a potential claim against RAMCO for breach of its fiduciary duties to one of its limited partners in a partnership.[FN4] Yaw further claims that the defendants' failure to file timely audited financial statements with Chase Manhattan Bank caused RAMCO to fall out of full compliance with its credit agreement with that bank. *Id.* at ¶ 21.

> FN4. Plaintiff claims that this late payment pattern constituted a breach of fiduciary duty owed by these defendants to RAMCO's limited partner, New York Life Insurance Company, under an agreement requiring New York Life to pay RAMCO thirty days in advance for operating expenses related to the development of certain oil and gas properties. *Id.* at ¶ 21.

Finally, the plaintiff claims that in 1990, the defendants usurped a corporate opportunity of RAMCO. *Id.* at ¶ 23. RAMCO's board investigated an invitation from the Trust Company of the West to purchase an interest in a pipeline. Messrs. Lee and Fisher and Dr. Talley rejected the offer on RAMCO's behalf, but immediately thereafter acquired that interest for their personal accounts. *Id.* at ¶ 22-24. They then allegedly sold their interests 15 months later for a net profit of $2.75 million. *Id.* at ¶ 25.

## B. *The Plaintiff's Purported Demand Upon the Board*

*3 Beginning on September 24, 1992, Yaw, assisted by his Washington, D.C. counsel, David J. Branson, Esquire, wrote four letters to Talley, Mrs. Fisher, and V. Burns Hargis, Esquire, an Oklahoma attorney who represented Messrs. Talley and Lee. *Id.* at ¶¶ 25-29. The defendants contend that these letters, which included two draft complaints, constituted a demand upon RAMCO's board of directors. The plaintiff insists that they did not. Because the legal character of these letters is disputed, some elaboration of their contents is required.

On September 24, 1992, Yaw wrote a letter to Talley, accusing Talley, Lee and Fisher of the alleged wrongful acts described above. Amended Cmplt. ¶ 25; McBride Aff.Ex.A. Yaw proposed that he and Talley meet and conclude an agreement regarding: (1) the "purchase [of] 100 percent of the outstanding shares of RAMCO" by any one of three identified third-party offerors; and (2) the " allocation of the proceeds of the sale of shares" in a manner that would compensate Yaw for the allegedly improper diversions of funds to the directors. McBride Aff.Ex. A at 1, 3. Yaw warned that if Talley refused to comply with these terms, he would file a federal court action against the directors in Tulsa, Oklahoma, charging them with "fraud, theft of corporate opportunity and misallocation of corporate resources." *Id.* at 1.

On September 29, 1992, Yaw wrote a letter to Mrs. Fisher, threatening to sue "all of the directors [including the late Mr. Fisher] who approved of or permitted the alleged acts of fraud, theft of corporate opportunity, and misallocation of corporate resources" detailed in his previous letter to Talley (a copy of which was enclosed). McBride Aff. Ex. B. Yaw advised Mrs. Fisher that a meeting with Talley was scheduled for October 5, 1992 in Tulsa.

On September 30, 1992, Yaw again wrote to Talley, notifying him of the scheduled meeting on October 5, 1992. Yaw expected that Talley and Lee would at that time "discuss [with Yaw] the sale of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

RAMCO Holding Corp. and respond to the issues raised in Yaw's September 24 letter." McBride Aff.Ex.C. Yaw also demanded RAMCO's audited financial statements for 1990 and 1991, as well as the materials furnished to the board in connection with the removal of Lee as RAMCO's Chief Executive Officer.

On October 6, 1992, Yaw again wrote to Mrs. Fisher, chronicling the events of the October 5 meeting that she had not attended. He also reported to Mrs. Fisher that a potential purchaser had made an offer to buy RAMCO for $16 million, less the company's debt. Yaw stated that although Talley and Lee had refused to consider a sale of the company, they nevertheless wanted time to prepare an offer to purchase Yaw's shares. Yaw sent a copy of that October 6 letter to Massad. McBride Aff.Ex. D.

Three months later, on January 13, 1993, Mrs. Fisher's California attorney, Michael H. Steinberg, Esquire, received from Yaw's attorney, Mr. Branson, a draft complaint in a proposed derivative action to be brought in the United States District Court for the District of Delaware. McBride Ex. E.

\*4 On February 4, 1993, Yaw's attorney wrote to Mr. Hargis (the Oklahoma attorney who represented Talley and Lee) a letter sharply criticizing Lee's response to the offer of a new third party bidder, Lyco Energy Corporation ("Lyco"), to purchase 100% of RAMCO's shares. Lee had told Lyco that the RAMCO board would not determine which offers, if any, to entertain until the board met at the end of that month. McBride Aff.Ex. F at 2.[FN5] Criticizing Lee's position, Yaw's counsel stated that Lee should have consulted the other shareholders:

> FN5. Lyco apparently had submitted to Mr. Lee an offer to purchase 100% of RAMCO's shares for $16 million, less the company's debt. Lyco requested certain information in order to perform due diligence. It appears that Lee did not provide any information, but instead requested evidence of Lyco's financing. Although Lee received a letter from

Donaldson, Lufkin, Jenrette's Energy Group, confirming that firm's involvement in procuring financing, Lee still refused to meet with Lyco until after the board meeting. McBride Aff.Ex.G. at 1-2.

RAMCO does not need to hold a Board meeting to determine if the company is for sale. Mr. Lee can take a telephone poll of the other three shareholders and learn if there is a consensus, immediately. *Id.* Referencing the draft complaint he had previously sent to Mrs. Fisher's counsel, Yaw's counsel warned that if no binding contract to sell RAMCO were executed by February 28, 1993, he had been instructed to file suit in the United States District Court for the District of Delaware.[FN6]

> FN6. Mr. Yaw's counsel stated that:
> The action will seek damages from the defendant directors for a continuous and continuing breach of their fiduciary duties and will seek the immediate appointment of a conservator for the corporation to stop Messrs. Talley and Lee from taking any more funds from the corporation.
> McBride Aff.Ex. F at 2.

Mr. Hargis responded to Yaw's attorney in a letter dated February 8, 1993, as follows:
Presumably, you are writing to me because I am the attorney for Talley and Mr. Lee. However, the issues raised and demands made in your letter are matters with which the corporation must deal.

McBride Aff.Ex. G.

Yaw's counsel then replied to Mr. Hargis in a letter dated February 9, 1993:
I did write to you because you are the attorney for Dr. Talley and Mr. Lee. My letter seems to have caused some confusion, however, as evidenced by your recommendation that I contact Mr. Stinson, counsel for the company.
Mr. Yaw has no intention of suing the company. His complaint is with the directors as detailed in the complaint....
The directors continue to take excessive compensation. A sale of the company is one way

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

to stop that practice. Ergo, Mr. Yaw's decision to file the complaint on March 1, 1993 if there is no contract to sell the company then in place.

McBride Aff.Ex.H. Enclosed with this letter was a copy of a draft complaint substantially similar to the one ultimately filed in this Court.

## II. *THE CONTENTIONS*

The defendants seek the dismissal of this action on three grounds. First, they argue that the letters written by Yaw and his attorney to the defendants and their counsel constituted a pre-suit demand that the board properly refused. Second, the defendants contend that Yaw is not a proper plaintiff because he brings this action for ulterior motives that are adverse to the company's interests. Third, they argue that two of Yaw's claims (the 1988 computer and furniture purchase claims) are barred by the statute of limitations.

In response, the plaintiff argues that his letters did not constitute a pre-suit demand because they were written to the defendants as stockholders, not as directors, of RAMCO. Moreover, the letters did not demand that the board take corporate action to redress the claims made here, but only requested that the defendants, as individuals, sell their shares. In any event, Yaw contends, the particularized facts alleged in the complaint establish that demand was excused.

*5 Alternatively, Yaw contends that even if his letters were found to constitute a Rule 23.1 demand, the defendants improperly refused it. Although Yaw recognizes that the making of a demand " tacitly concedes the independence of a majority of the board to respond," he argues that the Court must still inquire into the Board's good faith and the alleged reasonableness of its investigation of the alleged wrongdoing. *Levine v. Smith,* Del.Supr., 591 A.2d 194, 214 (1991); *Spiegel v. Buntrock,* Del.Supr., 571 A.2d 767, 777 (1990). In that regard, he contends that the particularized facts alleged in the complaint create a reasonable doubt that the directors acted in good faith and reasonably investigated his claims. The defendants

vehemently disagree.

Second, the defendants argue that the complaint must be dismissed because Yaw is not a proper plaintiff. They contend that Yaw brought this suit impelled by improper ulterior motives, namely, to accomplish his personal objective of selling the company and garnering for himself the lion's share of the proceeds. [FN7] They say that Yaw is using this action simply as a device to inject himself into the negotiations for the sale of RAMCO. The decision to sell RAMCO, defendants say, properly rests with the board, which is empowered to manage the corporation by 8 *Del.C.* § 141(a). Finally, defendants argue that because Yaw is prosecuting this action for his own personal gain, he will not act for the benefit of all shareholders, as *Youngman v. Tahmoush,* Del.Ch., 457 A.2d 376, 381 (1983) requires. The plaintiff vigorously disputes these charges.

> FN7. Defendants suggest that Yaw may be aligned with some of the potential purchasers, such as Lyco, which would make him an inappropriate derivative plaintiff because his interests would conflict with those of the corporation and the remaining shareholders.

Lastly, the defendants contend that 10 *Del.C.* § 8106 , the three-year statute of limitations, bars the 1988 furniture and computer purchase claims.

## III. *THE SUFFICIENCY OF THE PLAINTIFF'S CLAIMS*

### A. *The Statute of Limitations Defense*

I first address whether the statute of limitations defense bars the computer and furniture purchase claims. In deciding that issue on a motion to dismiss:
all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true, but neither inferences nor conclusions of fact unsupported by allegations of specific facts upon

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 6

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

which the inferences or conclusions rest are
accepted as true.

*Grobow v. Perot,* Del.Supr., 539 A.2d 180, 187 n. 6
(1988).

The challenged claims arise out of alleged computer
equipment and furniture purchases by RAMCO
from one of Talley's business interests in 1988.
Defendants argue that those claims are time-barred
by 10 *Del.C.* § 8106. [FN8] As this Court has
previously noted:

> FN8. Section 8106 provides in pertinent
> part:
> No action ... to recover damages caused by
> an injury unaccompanied with force or
> resulting indirectly from the act of the
> defendant shall be brought after the
> expiration of *3 years* from the accruing of
> the cause of such action....
> *Id.* (emphasis added).

It is by now firmly established that the three-year
statute of limitations applies to shareholder
derivative actions which seek recovery of damages
or other essentially legal relief.
*Halpern v. Barran,* Del.Ch., 313 A.2d 139, 141
(1973) (citing *Bokat v. Getty Oil Co.,* Del.Supr.,
262 A.2d 246 (1970)).

However, in actions seeking damages or essentially
legal relief the statute of limitations is not inflexibly
applied. As a substantive matter, fiduciaries who
benefit personally from their wrongdoing,
especially as a result of fraudulent self-dealing, will
not be afforded the protection of the statute.
*Halpern,* 313 A.2d at 142 (interpreting *Bovay v.
H.M. Byllesby & Co.,* Del.Supr., 38 A.2d 808 (1944)
). Moreover, even in the absence of fraudulent
concealment,
**\*6** ... *Bokat,* in harmonizing *Bovay,* recognized ...
that where wrongful self-dealing is alleged in a
derivative action, the statute does not run against
the plaintiff until he or she knew or had reason to
know the facts alleged to give rise to the wrong.

*Kahn v. Seaboard Corp.,* Del.Ch., C.A. No. 11485,

Allen, C., slip op. at 15 (Jan. 14, 1993). To invoke
these tolling exceptions to the statute, the party
asserting the claim must observe certain pleading
requirements. Specifically, where the complaint
asserts a claim that on its face would otherwise be
time-barred, the plaintiff bears the burden of
pleading facts that would operate to toll the statute.
*In re USACafes, L.P. Litig.,* Del.Ch., Cons. C.A.
No. 11146, Allen, C. (Jan. 21, 1993); *see also In re
MAXXAM Inc./ Federated Dev. Shareholders Litig.,*
Del.Ch., C.A. Nos. 12111 and 12353, Jacobs, V.C.
(Apr. 13, 1993).

The complaint in this case pleads facts that, without
more, would bar the computer and furniture
purchase claims. The alleged wrongdoing occurred
in 1988, more than three years before this action
was commenced on March 2, 1993. Yaw has pled
no facts sufficient to invoke the tolling exceptions
for concealment of self-dealing by a fiduciary. He
has not alleged that these transactions were either
fraudulently concealed from him, or that he, as a
reasonably attentive and diligent shareholder
relying on the company's directors, was nonetheless
kept ignorant of these abuses until sometime within
the three-year limitations period. For those
reasons, the 1988 computer and furniture purchase
claims are time barred and will be dismissed.

### B. Whether the Plaintiff's Pre-Suit *Communications Operate as a Demand*

The second issue is whether the letters and
proposed complaints that Yaw and his counsel sent
to the defendants and their counsel constituted a
demand within the meaning of Chancery Court Rule
23.1. For the reasons next discussed, I conclude
that they did not.

On a motion to dismiss under Rule 23.1,[FN9] the
plaintiff must demonstrate either that no pre-suit
demand was made because it would have been
futile, or that a demand was made but was
wrongfully refused. To demonstrate that demand
would have been futile, the plaintiff must allege
particularized facts creating a reasonable doubt that
"(1) the directors are disinterested and independent
[or] (2) the challenged transaction was otherwise

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

the product of a valid exercise of business judgment.
" *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 814
(1984). However, by the very making of a
demand, the shareholder plaintiff tacitly concedes
the independence of a majority of the board to
respond. When a board refuses a demand thus
made, the only permissible challenge is to the
board's good faith and to the reasonableness of its
investigation. *Levine v. Smith,* Del.Supr., 591 A.2d
194, 212 (1991); *Spiegel v. Buntrock,* Del.Supr.,
571 A.2d 767, 777 (1990). Thus, a judicial
determination that a plaintiff has made a demand
carries with it significant legal consequences.

> FN9. Rule 23.1 pertinently requires that:
> The complaint shall also allege with
> particularity the efforts, if any, made by the
> plaintiff to obtain the action he desires
> from the directors or comparable authority
> and the reasons for his failure to obtain the
> action or for not making the effort.
> Ch.Ct.R. 23.1.

\*7 Before reaching the demand excused-demand
refused analysis, this Court must first consider
whether the plaintiff did, in fact, make a pre-suit
demand. There is no all-inclusive legal formula
defining what types of communications will
constitute a demand. That determination is
essentially fact-driven. *See Bergstein v. Texas Int'l
Co.,* Del.Ch., 453 A.2d 467, 469 (1982).
Precedents do, however, provide guidance here.
The United States District Court for the District of
Delaware, applying Delaware law, has held that:
At a minimum, a demand must identify the
wrongdoers, describe the factual basis of the
wrongful acts and the harm caused to the
corporation, and request remedial relief.

*Allison on Behalf of G.M.C. v. General Motors
Corp.,* D.Del., 604 F.Supp. 1106, 1117 (1985).
The mere sending of a proposed complaint, without
more, will not necessarily constitute a demand
because it might not identify the specific remedial
corporate action that the shareholder wants the
board to take.[FN10] As the Chancellor has held:

> FN10. Letters to the board requesting a
> meeting or threatening suit in an effort to
> extract information or other concessions
> specific to the individual plaintiff, have
> also been held not to constitute a demand.
> *Seibert v. Harper & Row, Publishers, Inc.,*
> C.A. No. 6639, Berger, V.C., letter op. at
> 8-9 (Dec. 5, 1984).

I do not accept that the mere sending of a copy of a
complaint constitutes a demand that the board take
the legal action therein embodied. For an action to
constitute a valid demand, it must embody a *specific
request* for the board to take *legal action* on behalf
of the corporation.
*Leslie v. Telephonics Office Technologies,* Del.Ch.,
C.A. No. 13045, Allen, C., slip op. at 24-25 (Dec.
30, 1993) (emphasis added).

From these precedents it is possible to distill three
elements essential to a determination that a demand
has been made. To constitute a demand, a
communication must specifically state: (i) the
identity of the alleged wrongdoers, (ii) the
wrongdoing they allegedly perpetrated and the
resultant injury to the corporation, and (iii) the legal
action the shareholder wants the board to take on
the corporation's behalf. Those elements are
consistent with and derive from the policies
underlying the demand requirement. One of those
policies is to put the board on notice of possible
wrongdoing and enable it to take corrective
intracorporate action. *See, e.g., Pogostin v. Rice,*
Del.Supr., 480 A.2d 619, 624 (1984). It is
essential that the communication contain these three
elements to enable the board to perform its duty to
make a good faith investigation of claims of alleged
wrongdoing, and, where appropriate, to rectify the
misconduct.

In many cases, the fact that a Rule 23.1 pre-suit
demand is being made will be facially clear from
the communication itself. But cases such as this
will also arise, where the character of the
shareholder communication is ambiguous or
unclear. In such cases the party asserting that a
demand was made (here, the defendants) should
bear the burden of proof, by showing that at least
the three essential elements enumerated above are

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 8

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

embodied in the communication. Only then will the communication acquire the dignity of a legally significant act that would entitle the board to argue that a demand was made and properly refused.

**\*8** Policy considerations require that the burden lie with the party asserting that a demand was made, and that ambiguous communications be construed against a finding of a demand. This Court has recognized the severe procedural consequences to a plaintiff found to have made a pre-suit demand, namely, being precluded from challenging the board's independence and disinterestedness. In that connection this Court has observed:

The peculiarities of the law of demand in Delaware can make it quite significant whether a demand is deemed to be made because a demand on the board to take action is said to concede (and waive any challenge to) the board's ability to exercise a binding business judgment. In light of the weighty consequence of a demand under Delaware law, I doubt that it is necessary to extend this waiver by construing *ambiguous communications* to be demands that have that effect.

*Leslie v. Telephonics Office Technologies,* Del.Ch., C.A. No. 13045, Allen, C., slip op. at 24 (Dec. 30, 1993) (emphasis added, citations omitted).

To interpret an ambiguous communication as a demand would discourage a shareholder from bringing potential wrongdoing to the corporation's attention in a forum other than the courtroom, for fear that his position, should he later decide to sue derivatively, would procedurally be more difficult to support. Furthermore, to require a board to investigate claims asserted ambiguously in an equivocal communication would not be an efficient use of corporate resources, because the board would lack the information necessary to make a good faith inquiry. Therefore, an ambiguous communication (i.e., one which does not clearly and specifically embody the three essential elements discussed above) ought not to be considered a demand within the meaning of Rule 23.1.

Applying this analysis to the plaintiff's letters, I conclude that they do not constitute a demand. Although the letters do allege wrongdoing by

identified persons and do describe the alleged harm to the corporation, they do not specifically request the board to embark upon a particular course of remedial corporate action.[FN11] The plaintiff's letters consistently ask the other shareholders to agree to sell their shares to a third party bidder, but they do not request that the board formally resolve to sell RAMCO. Yaw's correspondence merely reveals his ultimate objective: an immediate disposition of all of RAMCO's shares that would enable him to cash out his 25% interest at a price reflecting a control premium. Such a price would be presumably higher than Yaw could otherwise obtain. Yaw wants out of a relationship with business partners that, for whatever reasons, has soured. Such a sale of RAMCO shares, and a distribution to Yaw of more than his *pro rata* share of the proceeds, would benefit Yaw individually, but not the corporation or its shareholders as a group. I conclude, for these reasons, that the plaintiff's letters do not constitute a Rule 23.1 demand upon the RAMCO board.

> FN11. Plaintiff's argument that the letters were sent to the addressees as shareholders, not *qua* directors, is disingenuous, because he sent a copy of the letter discussing the October 5, 1992 meeting to Massad, who was never a shareholder of RAMCO. *See* McBride Aff.Ex.D.
> Yaw's letters do, however, come excruciatingly close to constituting a demand whether they suggest that "a sale of the company is one way to stop" the overcompensation of directors, one of the practices of which Yaw complains. McBride Aff.Ex.H. In that letter Yaw stops just short of expressly demanding that the board, in a specific remedial action, resolve to sell the company to stem those alleged abuses.

### C. *Demand Futility Analysis*

**\*9** That conclusion only begins the inquiry, because to survive the pending motion to dismiss, the plaintiff must still demonstrate that a demand would

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

have been futile as to each remaining claim. *See Needham v. Cruver,* Del.Ch., C.A. Nos. 12428 and 12430, Hartnett, V.C., slip op. at 8 (May 12, 1993) (noting that the "pre-suit demand futility analysis must be conducted for each claim in a stockholder derivative action").

Regarding the claims of overcompensation, expense account abuse, and usurpation of corporate opportunity,[FN12] the plaintiff has pleaded with particularity that each of these alleged breaches personally benefitted defendants Talley, Lee and Fisher, who constituted a majority of the directors who approved the challenged board actions. The complaint therefore alleges, as to each of these claims, self-dealing that creates a reasonable doubt that a majority of the directors were disinterested. Under the first branch of *Aronson,* futility is established when the particularized facts alleged in the complaint create a reasonable doubt that a majority of the board profited personally from an " ' interested director' transaction." *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 815 (1984).

> FN12. Since the computer and furniture sales claims have been dismissed on other grounds, I need not consider them. *(See supra* Part III.A.)

The defendants respond that the pleaded facts do not create a reasonable doubt that the directors were not disinterested or independent, because the defendants did not receive the same dollar amounts in the challenged transactions. However, the defendants present no authority or reasoned argument why it is required that the directors benefit in the same manner or in the exact same amount from a transaction, in order to be deemed interested for demand futility purposes. I therefore conclude that as to the four claims enumerated above, a demand would have been futile and is excused.

The mismanagement claim requires a different analysis, because it does not involve a transaction in which it is claimed that the directors who approved it were interested. The plaintiff must therefore establish a reasonable doubt that the board's

decisions to pay the company's debts in an untimely manner and to submit financial statements were not the product of a valid exercise of business judgment. *Aronson,* 473 A.2d at 814. Plaintiff alleges that (i) the defendants' failure to pay the company's debts in a timely manner gave rise to a potential claim (and lawsuit) against RAMCO for breach of its fiduciary duty to its limited partner, New York Life; and (ii) that the defendants' failure to file audited statements with Chase Manhattan Bank caused RAMCO to fall out of compliance with its credit agreement with that bank. Those facts, as pleaded in this complaint, create a reasonable doubt that those board decisions were the products of a valid exercise of business judgment. Demand with regard to the mismanagement claim would have been futile and is therefore excused.

### D. *Sufficiency of Pleadings on the Redecoration Claim*

The pleaded facts underlying the plaintiff's redecoration claim are far more problematic. For the reasons set forth below, those facts fail to establish demand futility, because they do not state a derivative claim against the board, but only a conversion claim against defendant Lee.

**\*10** The amended complaint alleges in pertinent part:

18. In 1990, over \$1.5 million of RAMCO's corporate funds were allegedly spent for decorating RAMCO's offices in Tulsa, Oklahoma. On information and belief, defendant Lee and/or his wife converted a substantial part of that amount for their personal use.

19. The corporate funds converted by Lee and/or his wife must be returned to RAMCO.

32. .... All of the directors are alleged to have participated in the acts of self-dealing and are therefore not capable of exercising independent business judgment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

38. By entering into the redecoration scheme to benefit himself, Lee profited in this self-dealing transaction at the expense of RAMCO, thereby breaching his fiduciary duty of loyalty to RAMCO and RAMCO's shareholders.

Amended Cmplt. ¶¶ 18, 19, 32, 38. These allegations clearly state a claim for conversion against Lee. While the complaint alleges in general and nonspecific terms that the directors each engaged in various self-dealing transactions, it cannot be fairly read to claim that a majority of the board participated in the redecoration/conversion scheme. Although plaintiff states in his brief that Lee converted the funds "with the complicity of the board of directors" (PAB at 4), that statement is without factual support in the complaint. The complaint also falls short of alleging that the directors approved the disbursement of funds for redecoration with knowledge that a substantial portion of those funds would be converted to Lee's personal use.

Because the pleaded facts do not allege that a majority of the directors were either interested in the transaction with Lee or approved that transaction knowing that it was wrongful, the redecoration claim cannot survive scrutiny under Rule 23.1 unless the pleaded facts create a reasonable doubt that the board's decision was the product of a valid exercise of business judgment. In that connection, only Lee is alleged to have stood on both sides of that transaction, and no pleaded facts indicate that the other directors acquiesced in a disproportionate distribution to Lee of $1.5 million. For these reasons, and because it is alleged that the board approved the expenditure of corporate funds for redecoration (as distinguished from the conversion), the plaintiff has shown no basis to doubt that the board's action was anything but the product of a valid exercise of business judgment. Therefore, a demand, had one been made, would not have been futile and is not excused.

I am reluctant, however, to dismiss this claim without affording the plaintiff an opportunity to amend his complaint to state a claim against the directors. The statement in plaintiff's brief that Lee

converted some portion of the $1.5 million *with the complicity of the other directors,* suggests that he may have a basis to assert such a claim. The uncertainty over the board's awareness of, or acquiescence in, the alleged conversion, and the dollar magnitude of that claim, make it just to allow the plaintiff to plead that claim specifically, provided that he has a basis for doing so. Chancery Court Rule 15(a) empowers this Court, in the exercise of its discretion, to allow the plaintiff to amend his pleading freely when justice so requires. Ch.Ct.R. 15(a). The plaintiff will therefore be granted thirty days to amend his complaint solely in connection with the redecoration claim.

IV.

*11 The final issue presented is whether Yaw is a proper derivative plaintiff. Both parties agreed at oral argument that this question should be treated as a summary judgment matter, since the defendants submitted and relied upon materials not referenced in the complaint. *See Lineberger v. Welsh,* Del.Ch., 290 A.2d 847, 848 (1972); *see also* Tr. at 45-49, 91-95. Summary judgment is appropriate where the moving party can "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ch.Ct.R. 56(c) (Replacement Vol.1987). [FN13] The moving party bears the burden of meeting that standard. *Brown v. Ocean Drilling & Exploration Co.,* Del.Supr., 403 A.2d 1114 (1979).

> FN13. Rule 56(e) further provides that: "an adverse party may not rest upon the mere allegations or denials of his pleading, but his response ... must set forth specific facts showing that there is a genuine issue for trial." Ch.Ct.R. 56(e); *see also Feinberg v. Makhson,* Del.Supr., 407 A.2d 201, 203 (1979).

This Court has held that the plaintiff in a derivative action, in addition to being a shareholder, must be a suitable derivative plaintiff. In *Katz v. Plant Industries, Inc.,* Del.Ch., C.A.No. 6407, Marvel, C., letter op. at 3-4 (1981), this Court enumerated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:06-cv-00005-JJF    Document 53-3    Filed 04/10/2007    Page 86 of 87    Page 12 of 133

Not Reported in A.2d                                                           Page 11

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

several factors for consideration in determining whether a derivative plaintiff is suitable:

Among the elements ... are: economic antagonisms between representatives and class; the remedy sought by plaintiff in the derivative action; indications that the named plaintiff was not the driving force behind the litigation; plaintiff's unfamiliarity with the litigation; other litigation pending between the plaintiff and defendants; the relative magnitude of plaintiff's personal interests as compared to his interest in the derivative action itself; plaintiff's vindictiveness toward the defendants' [sic] and, finally, the degree of support plaintiff was receiving from the shareholders he purported to represent.

*Id.* at 3 (quoting *Davis v. Comed., Inc.,* 619 F.2d 588, 593-95 (6th Cir.), *reh'g denied,* 623 F.2d 28 (1980)). In *Youngman v. Tahmoush,* Del.Ch., 457 A.2d 376, 381 (1983), Vice Chancellor Hartnett held that the critical question is whether there exists a substantial conflict of interest between the plaintiff and the other shareholders. The Court placed upon the defendants the burden of showing such a material conflict.

Here, the defendants argue that a recent $3 million judgment entered against Yaw in favor of U.S. Trust *(see* Second McBride Aff.Exs. A-F) has imposed financial pressures upon Yaw that impel him to seek an immediate sale of RAMCO and ignore its long-term growth prospects. Those pressures are said to make Yaw an inappropriate plaintiff. *Tr.* at 32. The defendants concede that Yaw does not seek a sale of the company as an item of relief in this action, but contend that he is using this action as leverage to insinuate himself into the negotiations for that sale. *Id.* at 33, 36. Arguing that *Youngman* calls for a "motivational test," *id.* at 38-39, the defendants argue that to validate Yaw's status as a derivative plaintiff would harm RAMCO by interfering with the directors' discretion to decide whether and on what terms a sale of the company should take place. *Id.* at 40.

**\*12** The plaintiff counters that if he is not allowed to prosecute these claims, then no one can, because he is the only shareholder not accused of wrongdoing, and no other shareholder is able to

bring these claims to light. Plaintiff argues that although his interest in seeing RAMCO sold may be a relevant factor, it is not conclusive. That is, Yaw's interest in having the company sold does not compel a conclusion that he will not faithfully and vigorously prosecute the corporation's claims.

I agree. Yaw's goal of restoring all funds wrongfully extracted from the corporation is consistent with the financial interest of all RAMCO shareholders generally, including the defendants *qua* shareholders. In that capacity, the defendants stand to benefit if assets wrongfully extracted are restored to the corporation, even though in their capacity as directors those same defendants would be the ones required to repay the funds. The defendants have not persuaded me that Yaw's personal motivation creates a substantial likelihood that this derivative action would not be vigorously prosecuted. *Emerald Partners v. Berlin,* Del.Ch., 564 A.2d 670, 674 (1989) (noting that a derivative plaintiff "will not be disqualified simply because he may have interests which go beyond the interests of the class"). The plaintiff's economic interest in seeking the return of funds allegedly misappropriated from the company is sufficiently aligned with the interests of the corporation, and the shareholders as a group, to permit Yaw to prosecute this action. The defendants' motion for summary judgment will therefore be denied.

3

To summarize: the defendants' motion to dismiss the 1988 computer and furniture purchase claims on the basis of the statute of limitations, is granted. The defendants' motion for summary judgment on the ground that Yaw is an unsuitable derivative plaintiff, is denied. The defendants' motion to dismiss the remaining claims pursuant to Rule 23.1 is denied, except as to the office redecoration/conversion claim. That claim will be dismissed, subject to the plaintiff's right to amend the complaint within thirty days for the sole purpose of pleading the office redecoration/conversion claim against the defendant directors.

IT IS SO ORDERED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 1994 WL 89019 (Del.Ch.), 20 Del. J. Corp. L. 454
**(Cite as: Not Reported in A.2d)**

Del.Ch.,1994.
Yaw v. Talley
Not Reported in A.2d, 1994 WL 89019 (Del.Ch.),
20 Del. J. Corp. L. 454

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.