IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JEFFREY M. NORMAN,    :
                      :
        Plaintiff,    :
                      :
    v.                :    C.A. No. 06-005-JJF
                      :
DAVID W. ELKIN, RICHARD M. SHORIN    :
and THE ELKIN GROUP, INC.    :    Jury Trial Demanded
                      :
        Defendants,    :
                      :
    and    :
                      :
US MOBILCOMM, INC.,    :
                      :
        Nominal Defendant.    :

## PRETRIAL ORDER

On August 22, 2007, at 1:30 p.m. in Courtroom 4-B, Fourth Floor, Federal Building, 844 King Street, Wilmington, Delaware, counsel for Plaintiff Jeffrey Norman ("Plaintiff" or "Norman") and counsel for Defendants David W. Elkin ("Elkin"), Richard M. Shorin ("Shorin") and The Elkin Group, Inc. ("TEG") (collectively, "Defendants") participated in a pretrial conference before this Court pursuant to Rule 16 of the Federal Rules of Civil Procedure and D. Del. LR 16.4 (1995 ed.). The following matters as to the trial of this action before the Honorable Joseph J. Farnan, Jr. are hereby ORDERED by the Court:

## I.    NATURE OF THE ACTION

A.    Pleadings

1.    On December 2, 2005, at 6:35 p.m., Norman initiated this action against Defendants and Nominal Defendant, US Mobilcomm, Inc. ("USM" or the "Company") in the Delaware Court of Chancery. (D.I. 1). On January 3, 2006, Defendants filed their Notice of

Removal in this Court, based on diversity of citizenship jurisdiction. (*Id.*). On January 6, 2006, Norman filed his Amended Complaint, seeking a jury trial and punitive damages. (D.I. 2). Norman's initial and Amended Complaint contain nine (9) separate causes of action asserted against Defendants in both their individual and/or corporate capacities. (D.I. 2). On February 1, 2006, Defendants filed their Answer, Affirmative Defenses and Counterclaim. (D.I. 5).

2.    On February 28, 2007 Plaintiff filed its answer to Defendant's Counterclaim. (D.I. 9).

3.    On February 16, 2007, Defendants filed their Motion for Summary Judgment and Opening Brief in support thereof. (D.I. 42). On March 23, 2007, Plaintiff filed his Answering Brief in opposition to Defendants' Motion for Summary Judgment. (D.I. 51). On April 10, 2007, Defendants filed their Reply Brief in further support of their Motion for Summary Judgment. By letter dated April 24, 2007, Plaintiff filed a sur-reply addressing legal arguments Plaintiff believed were first raised in Defendants' Reply Brief. (D.I. 54). Defendants' Motion for Summary Judgment is fully briefed and awaits the Court's consideration.

B.    Claims at Issue

1.    Through his Amended Complaint, Norman asserts nine (9) separate claims against the Defendants in both their individual and/or corporate capacities (where applicable),[1] including: (i) breach of contract; (ii) declaratory relief; (iii) usurpation of corporate opportunity; (iv) breach of Elkin's fiduciary duties of loyalty, care and good faith dealing to the Company and its minority stockholders; (v) breach of Elkin's fiduciary duty of disclosure; (vi) conversion and

---

[1] Defendants request that Plaintiff be required to clearly designate in the Pretrial Order which of his claims are derivative in nature and which are direct.

misappropriation of Company assets and good will; (vii) fraudulent representations; (viii) Shorin's aiding and abetting breaches of fiduciary duties; and (ix) unjust enrichment.[2]

### a.   Breach of Contract

Norman alleges that he and Elkin agreed to fund the Company with capital investments of $250,000 and $750,000, respectively.  Norman alleges that Elkin breached this agreement in three (3) distinct ways.  First, Elkin breached the parties' agreement by never contributing his capital or failing to contribute his capital in a timely fashion.  Second, Elkin breached the parties' agreement by executing his Shareholder Loan Agreement.[3]  Finally, Elkin breached the parties' agreement by failing to distribute proceeds/revenue from the sale of Company assets on a *pro rata* basis.

### b.   Declaratory Judgment

Norman seeks declaratory relief on four (4) issues.  First, Norman seeks a declaration that the Company is entitled to all consideration derived from the sale or diversion of Company property, including Federal Communications Commission ("FCC") licenses and application rights.  Second, Norman seeks a declaration that he is entitled to at least 25% of the proceeds from all sales of Company assets.  Third, Norman seeks a declaration that he is entitled to at least 25% of all future proceeds from the sale of Company assets.  Finally, Norman seeks a declaration that some, if not all, of Elkin's interests in the Company is forfeited as a result of his fraudulent conduct and failure to make his required capital contributions.  The forfeiture of his

---

[2] Defendants do not adopt, accept or endorse Plaintiff's description of the pleadings, nor do Defendants concede that the claims referenced in this section are viable or litigable.  Defendants further respectfully request that any claim raised in a pleading for the very first time by virtue of this submission be stricken in its entirety as untimely and overly prejudicial.  Defendant will identify such claims the first time they appear in the Pretrial Order and will, if necessary, file a Motion in Limine at the appropriate time.

[3] Defendants respectfully suggest that this claim was raised for the very first time in this submission and request that it be stricken in its entirety as untimely and prejudicial.

ownership interest in the Company should account for Elkin's failure to make his capital contributions in a timely fashion and the venture risk inherent to Norman's timely contributions.[4]

c.   Usurpation of Corporate Opportunities

Elkin usurped the Company's opportunities when he substituted TEG for USM in FCC 220 MHz Auction Number 18 as well as permitting TEG to participate in FCC 220 MHz Auction Number 24.[5]

d.   Breach of Fiduciary Duty of Loyalty

Elkin breached his fiduciary duty of loyalty to both Norman and the Company in at least four (4) ways. First, Elkin engaged in self-dealing when he used USM's incumbency position, applications and purported up-front payment during Auction Number 18 for the benefit of TEG and, ultimately, himself. Second, Elkin engaged in a self-interested transaction with the Company when he executed his own Shareholder Loan Agreement. Third, Elkin breached his fiduciary duty of loyalty when he conducted the Company's business for the benefit of himself as a purported creditor rather than for the benefit of the Company's equity owners at a time when he decided to sell the Company's FCC licenses. The Company was not insolvent or in the zone of insolvency during those times. Finally, and in the alternative, Elkin's forcing the Company into insolvency or the zone of insolvency following the execution of his Shareholder Loan Agreement breached his fiduciary duty of loyalty to Norman and the Company.[6]

---

[4] Defendants respectfully suggest that this claim was raised for the very first time in this submission and request that it be stricken in its entirety as untimely and prejudicial.

[5] Defendants respectfully suggest that this claim was raised for the very first time in this submission and request that it be stricken in its entirety as untimely and prejudicial.

[6] Defendants respectfully suggest that this claim was raised for the very first time in this submission and request that it be stricken in its entirety as untimely and prejudicial.

4

### e.    Breach of the Fiduciary Duty of Disclosure

Elkin breached his fiduciary duty of disclosure when he:  (i) failed to provide Norman with notice and/or the right to vote on the sale of substantially all of the Company's assets; (ii) failed to disclose or seek approval for the execution of his Shareholder Loan Agreement; and (iii) failed to disclose the sale of licenses and/or distribution of proceeds.[7]

### f.    Conversion and Misappropriation

Elkin misappropriated USM's good will and status as a qualified bidder and its incumbent status with the FCC during the 220 MHz Auction Number 18 when he allegedly filed an amendment to USM's application to name TEG as the applicant.

### g.    Fraud

Elkin attempted to and did, in fact, defraud Norman through the false and misleading statements contained in his December 3, 2002 letter to Norman's counsel and his subsequent delivery, in October of 2003, of his Shareholder Loan Agreement with a false and/or misleading schedule of contributions and distributions.[8]

### h.    Aiding and Abetting

Shorin aided and abetted Norman's above-referenced breaches of fiduciary duties through: (i) his compilation and filing of federal and State tax returns; (ii) processing and payment of disproportionate and unilateral distributions to Elkin; (iii) participation in Elkin's purported recapitalization theory used to support Elkin's Shareholder Loan Agreement; and (iv) his assistance during the bidding process for FCC 220 MHz Auction Numbers 18 and 24.

---

[7] Defendants respectfully suggest that (i) and (ii) were raised for the very first time in this submission and request that it be stricken in its entirety as untimely and prejudicial.

[8] Defendants object to this characterization of his fraud claim because Plaintiff has raised the Shareholder Loan Agreement at a potential basis for a fraud claim for the first time in this draft Pre-Trial Order.

i.     Unjust Enrichment

Elkin has been unjustly enriched to the detriment of Norman through his receipt of at least $601,000 from the proceeds of: (i) the Company's sales of its assets; (ii) TEG's sale of FCC Phase II 220 MHz licenses; and (iii) his apportionment of only 75% of the Company's capital gains realized as a result of its asset sales but receipt of 100% of the distributions made from those sales.

2.     Through their Answer to the Amended Complaint, Defendants assert eleven (11) affirmative defenses and one counterclaim against Norman seeking declaratory relief.

a.     Counterclaim for Declaratory Relief

Defendants seek a declaration that: (i) Norman's shares in USM be cancelled or forfeited due to his failure to provide the required $250,000 capital contribution for his ownership interest in USM; (ii) alternatively, that Norman's ownership interest in USM be reduced to reflect his actual capital contributions; or (iii) that he be required to contribute sufficient capital to raise his total capital contribution to $250,000.  Additionally, Defendants seek a declaration that: (i) Elkin should not be required to contribute more than three (3) times Norman's ultimate capital contribution if the parties are to remain 75% and 25% co-owners, respectively; (ii) that all advancements or provision of money or expenses by Elkin and/or TEG for the benefit of USM beyond Elkin's required capital contribution be deemed stockholder loans; and (iii) alternatively, if Elkin's and/or TEG advancements of money and expenses are not deemed stockholder loans, that they be deemed additional paid in capital to USM for the benefit of Elkin and, thus, the parties' respective ownership interests in USM must be adjusted accordingly.

b.    Affirmative Defenses

Defendants have asserted that Norman's claims must fail, in whole or in part, because they are: (i) barred by Section 102(b)(7) of the Delaware General Corporation Law and USM's certificate of incorporation; (ii) barred by the applicable statute of limitations and the doctrine of laches; (iii) precluded by the doctrines of waiver and estoppel; and (iv) barred by the failure and/or want of consideration. Finally, Defendants seek a set-off against any direct and/or derivative damages that may be awarded to Norman and/or USM, which set-off should be measured by the amount of money necessary to reasonably compensate Defendant Elkin for services he rendered over the past fourteen years or more to, and for the benefit of, USM and its shareholders, including Norman, and for which Elkin has never received any compensation of any kind.

## II.    CONSTITUTIONAL OR STATUTORY BASIS OF FEDERAL JURISDICTION

This action was originally filed in state court and Defendants removed the case pursuant to 28 U.S.C. § 1441. Jurisdiction is proper in this Court under 28 U.S.C. § 1332 which states that a district court has original jurisdiction of all civil actions "where the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between … citizens of different states." The diversity of citizenship requirement of 28 U.S.C. § 1332(a) is satisfied in this case because no Defendant is a citizen of the same state as Plaintiff. Plaintiff is a citizen of Connecticut. Defendant Elkin is a citizen of Pennsylvania. Defendant Shorin is a citizen of Pennsylvania. Defendant The Elkin Group is a citizen of Pennsylvania. Although Nominal Defendant US MobilComm is a citizen of both Delaware and Pennsylvania, because it is a disinterested stakeholder in this case, its citizenship should be ignored for diversity purposes.

### III. STATEMENT OF FACTS WHICH ARE ADMITTED AND REQUIRE NO PROOF

A.     This case is a dispute between the only two shareholders of a closely-held corporation, USM.  (Defendants' Response No. 1 to Plaintiff's First Set of Interrogatories).

B.     USM was and is headquartered in Pennsylvania.  (Amended Complaint ¶ 6).

C.     Elkin is the majority stockholder, president and sole director of USM.  (Ans. ¶¶ 1, 3).

D.     The required capital of the corporation was determined to be $1 million, making Elkin's capital requirement $750,000 and Norman's $250,000.

E.     Based upon Elkin's promise to contribute ultimately $750,000 in capital, which the parties agreed could take the form of either payment of monies to USM or the payment and/or provision of expenses incurred for the benefit of – or provided to – USM, Elkin received an additional 250 shares, bringing the amount of shares he owned in USM to 375, representing 75% of the outstanding stock of USM.  (Ans. ¶ 9).

F.     Based upon Norman's promise to contribute ultimately $250,000 in capital, which the parties agreed could take the form of either payment of monies to USM or the payment and/or provision of expenses incurred for the benefit of – or provided to – USM, Norman received 125 shares of USM, representing 25% of the outstanding stock of USM.  (Ans. ¶ 9).

G.     Norman is a minority stockholder of USM.  (Ans. ¶ 9).

H.     Shorin has served part time as an independent contractor controller for USM.  (Ans. ¶ 4).

I.     Both Elkin and Shorin are citizens of Pennsylvania.  (Amended Complaint ¶¶ 3-4).

J.     Corporate documents reflect that on or about February 3, 1998 Shorin was elected Secretary of USM. (MC001690).

K.     TEG maintains its headquarters at the same address and location as USM's principal place of business. (Ans. ¶¶ 5, 6).

L.     TEG maintains its headquarters at the same address and location as USM's principal place of business. (Ans. ¶¶ 5, 6).

M.     TEG was incorporated and is headquartered in Pennsylvania. (Amended Complaint ¶ 5).

N.     TEG is wholly-owned and controlled by Elkin. (Ans. ¶5).

O.     Norman worked for USM from approximately 1993 through sometime in 1996. (Ans. ¶ 10).

P.     USM was created and positioned to take advantage of a new wireless arena, one which Norman and Elkin hoped would rival the successes of the early cellular phone companies and other wireless communications ventures.

Q.     USM wanted to capitalize on the FCC's decision to award Phase I 220 MHz wireless licenses in a lottery-like giveaway. (Amended Complaint ¶ 23; Elkin Depo. at 36, line 12 – pg. 37, line 9).

R.     As of 1996, USM had entered into agreements with holders of approximately forty (40) to fifty (50) licenses in States that included: New York, Pennsylvania, Maryland, Florida, Massachusetts, Illinois, California, Texas, Connecticut, Wisconsin and the District of Columbia. (Ans. ¶ 11).

S.      In or around May of 1997, USM signed a letter of intent with Centennial Communications for the sale of all or substantially all of its assets for approximately $6 million. (Ans. ¶ 15).

T.      The transaction with Centennial Communications did not close. (Ans. ¶ 16).

U.      By 1998, the FCC announced that it was going to auction Phase II 220 MHz licenses. (Elkin Depo. at 234, lines 7 – 24).

V.      Elkin engaged in merger discussions with Incom Communications Corporation ("ICC"). (Ans. ¶ 17).

W.      Elkin proposed the concept of merging with ICC through which USM would have received a minority interest in the anticipated surviving entity. (Ans. ¶ 21).

X.      The proposed merger with ICC was never consummated. (Ans. ¶ 22).

Y.      USM was registered with the FCC as a potential bidder for Phase II Auction Number 18. (Ans. ¶ 26).

Z.      Shorin knew that $200,000 was paid to the FCC as an upfront payment for FCC Auction Number 18. (Ans. ¶ 25)..

AA.     TEG registered as a potential bidder for FCC Phase II Auction Number 24 and was a successful bidder for one (1) Phase II license in that auction. (Ans. ¶ 39).

BB.     Defendants did not register USM as a potential bidder for FCC Phase II Auction Number 24. (Ans. ¶ 39).

CC.     On March 4, 1999, USM entered into an agreement with Repeater Network Spectrum Aq., Inc. for a sale of licenses. (Ans. ¶ 40).

DD.     On January 30, 2001, USM entered into an agreement of sale with Roamer One, Inc. for the sale of licenses. (Ans. ¶ 32).

EE.     TEG entered into an agreement with Network Spectrum Aq., Inc. for the sale of a Phase II license.  (Ans. ¶ 49).

FF.     Schedule D to the 2000 federal tax return for TEG states that TEG paid $19,500 to acquire the Phase II BEA 31C 220 MHZ license covering the Miami area.  (USMD000409).

GG.     Schedule D to the 2000 federal tax return for TEG states that TEG sold the Phase II BEA 31C 220 MHZ license covering the Miami area for $65,000.  (USMD000409).

HH.     Schedule D to the 2000 federal tax return for TEG states that TEG realized a gain of $45,000 on the sale of the Phase II BEA 31C 220 MHZ license covering the Miami. (USMD000409).

II.     Schedule K-1 of the 2000 federal tax return for TEG states that the $45,500 gain reflected on Schedule D to the 2000 federal tax return for TEG was dispersed to Elkin in 2000 as a long-term capital gain.  (USMD000410).

JJ.     TEG entered into an agreement with Roamer One, Inc. for the sale of FCC licenses.  (Ans. ¶ 51).

KK.     On March 13, 2001, USM entered into an agreement of sale with Roamer One, Inc. for the sale of Phase I licenses in which USM had an interest.  (Ans. ¶ 43).

LL.     Schedule D to the 2001 federal tax return for TEG states that TEG paid $24,252 to acquire the Phase II 220 MHZ license covering the Boston area.  (USMD000422).

MM.     Schedule D to the 2000 federal tax return for TEG states that, on or about August 9, 2001, TEG sold the Phase II 220 MHZ license covering the Boston area for $131,000. (USMD000422).

NN.    Schedule D to the 2000 federal tax return for TEG states that TEG realized a gain from the sale of the Phase II 220 MHZ license covering the Boston area in the amount of $106,748. (USMD000422).

OO.    Schedule K-1 of the 2001 federal tax return for TEG states that the $106,748 gain reflected on Schedule D to the 2001 federal tax return for TEG was dispersed to Elkin in 2001 as a long-term capital gain. (USMD000423).

PP.    The 2001 Federal Tax Return for USM reflects that additional paid-in capital decreased by $457,600, reflecting a decrease in capital from $973,038 to $515,438. (MC000548).

QQ.    Norman received reports from USM reflected that his capital contributions were reduced by the amount of distributions made to him and expenses paid on his behalf.

RR.    Norman's 2000 and 2001 K-1s show long term capital gains of $16,711 and $104,000 respectively. (Amended Complaint at Ex. B; Norman Depo. At 77, line 14-78, line 8).

SS.    On or about April 30, 2000, Elkin received $90,000 from USM. (Elkin Depo. Ex. 2).

TT.    On or about August 31, 2000, Elkin received $35,000 from USM. (Elkin Depo. Ex. 2).

UU.    On or about May 31, 2001, Elkin received $220,000 from USM. (Elkin Depo. Ex. 2).

VV.    On or about July 31, 2001, Elkin received $30,600 from USM. (Elkin Depo. Ex. 2).

WW.    On or about August 31, 2001, Elkin received $200,000 from USM. (Elkin Depo. Ex. 2).

12

XX.    On or about February 28, 2002, Elkin received $10,000 from USM.  (Elkin Depo. Ex. 2).

YY.    On or about May 31, 2002, Elkin received $29,426 from USM.  (Elkin Depo. Ex. 2).

ZZ.    Elkin has received approximately $600,000 from USM.  (Ans. ¶ 56).

AAA.    Shorin prepared and filed USM's tax returns from 2002 to the present.  (Ans. ¶ 71).

BBB.    USM did not receive any money directly for the sale of TEG's Phase II licenses, whether auctioned during FCC Auctions No. 18 or 24.  (Request for Admission No. 9).

CCC.    Norman did not receive any cash distributions in 2001.  (Ans. ¶ 75).

DDD.    Norman received no cash distributions from USM from 2001 to present.  (Request for Admission No. 13).

EEE.    USM did not have a annual stockholder meeting in 1998.  (MC001690).

FFF.    On or about February 3, 1998, Elkin was elected President and Treasurer of USM. (MC001690).

GGG.    As of January 31, 1998, USM had a contractual right to accrued management fees in the amount of approximately $1,153,350, subject to revenues or profits being available to pay such management fees. (Request for Admission No. 14).

## IV.    STATEMENT OF ISSUES OF FACT WHICH REMAIN TO BE LITIGATED

A.    Plaintiff's Statement of Issues of Fact

1.    When Elkin executed his Shareholder Loan Agreement.

2.    Whether Elkin ever contributed capital totaling $750,000.

3.    Whether Elkin maintained his capital contributions.

4.    The nature and extent of Shorin's participation in Elkin's allegedly unlawful conduct.

5.    Whether Elkin advanced funds to the Company.

6.    Whether Elkin personally paid for expenses on behalf of the Company.

7.    Whether Norman personally paid for expenses on behalf of the Company.

8.    Whether the Company properly accounted for the expenses Norman paid on behalf of the Company.

9.    Whether the Company properly accounted for the expenses Elkin paid on behalf of the Company.

10.   Whether the Company required the continued employment of Norman following the aggregation of licenses which was complete in 1996.

11.   The amount of time Elkin spent on behalf of the Company from 1996 though the present.

12.   Whether Norman knew or had reason to know of Elkin's sale of Company assets.

13.   Whether Norman knew or had reason to know of Elkin's unilateral distribution of sale proceeds to himself.

14.   Whether the Company collected any revenue on its accrued management fees.

15.   What efforts Elkin undertook to cause the Company to attempt to collect on its accrued management fees.

16.   Whether Elkin presented the FCC Phase II Auction opportunity to the Company for consideration.

17.    Whether the Company was in a position to bid during the FCC Phase II Auctions.

B.    Defendants' Statement of Issues of Fact

1.    When Elkin reached the agreement with USM and Norman that any contribution he made to USM over three times Norman's capital contribution would be treated as a shareholder loan.

2.    When Elkin and Norman agreed to the amount of their combined capital contribution.

3.    Whether Norman ever contributed capital in an amount totaling $250,000.

4.    Whether Norman and Elkin agreed they would co-own and co-operate USM as 25% and 75% co-owners, respectively.

5.    Whether Norman maintained his level of capital contributions.

6.    Whether expenses allegedly paid by Norman for the benefit of USM and its shareholders were approved by Elkin and/or USM.

7.    What is the ultimate value of the contributions of capital, payment of expenses by Elkin for the benefit of USM and its shareholders, and the provision of an office and other overhead items.

8.    Whether Elkin was able to sell some of USM's Phase I licenses by bundling them with Phase II licenses purchased by TEG.

9.    Whether the expenses paid by Elkin for the benefit of USM and/or his provision of an office and other overhead items were approved by USM.

10.    Whether the contributions of additional monies and the payment of expenses by Elkin for the benefit of USM, and the provision of an office and other overhead items, should be characterized as loans from shareholders.

11.    Whether Elkin was entitled to have the shareholder loans repaid out of USM's revenues or capital gains.

12.    If Elkin's contributions of additional monies and the payment of expenses by Elkin for the benefit of USM, and the provision of an office and other overhead items are characterized as additional paid in capital, how the additional capital contributions impact the parties' respective ownership interests in USM.

13.    Whether Norman agreed with Elkin that his capital contribution would be reduced in exchange for Elkin and/or USM making certain payments to him and/or paying some expenses for his benefit.

14.    Whether and to what extent Norman withdrew funds from USM.

15.    Whether Norman's ownership interest in USM should be reduced if his capital contribution was reduced below $250,000.

16.    Whether any such payments to Norman and/or made for his benefit should be characterized as loans to a shareholder or a reduction in capital.

17.    When Norman discontinued his employment with USM and the reason for the discontinuance of his employment.

18.    Whether the 220MHz industry faced obstacles that impeded USM's ability to succeed in the market.

19.    The ownership and transfer of FCC licenses were a matter of public records at all relevant times.

20.    Whether Norman took any steps to assist, manage or contribute to the operations of USM, whether financially or otherwise, following the discontinuance of his employment.

21.    Whether Norman attempted to sell USM, without Elkin's knowledge, for the benefit of Norman and at the expense of USM.

22.    Whether Elkin received any compensation for services he rendered on behalf of USM and its shareholders and the value of those services.

23.    Whether Norman knew, actually or constructively, that USM was selling assets.

24.    Whether Norman knew, actually or constructively, that USM had made any payments to Elkin, however those payments are characterized.

25.    If summary judgment is not granted on any claim, when Norman knew or should have known he possessed such a claim.

26.    If summary judgment is not granted on any claim, whether the statute of limitations and/or laches should bar that claim.

27.    Whether USM had the ability to participate in any FCC Phase II Auctions.

28.    Whether USM was qualified to participate in any FCC Phase II Auctions.

29.    Whether USM had the financial resources to pay for a license if it were the successful bidder in any FCC Phase II Auction.

30.    Whether Centennial was able to raise the necessary funds to complete the sale.

31.    Whether Norman attempted to negotiate for the sale of some or all of USM on terms that personally benefited Norman at the expense of both USM and Elkin.

17

32.    Whether Shorin ever served as an employee, officer or director of USM.

33.    Whether Shorin rendered services to USM on a contract basis.

## V.    STATEMENT OF ISSUES OF LAW WHICH REMAIN TO BE LITIGATED

A.    Plaintiff's Statement of Issues of Law

1.    Whether Elkin breached the parties' agreement to fund the Company when he executed the Shareholder Loan Agreement.

2.    Whether Elkin breached the parties' agreement to fund the Company when he failed to contribute his capital in a timely fashion.

3.    Whether Elkin breached the parties' agreement to fund the Company when he distributed proceeds from the sale of Company assets on anything other than a *pro rata* basis.

4.    Whether Norman is entitled to a declaration that the Company is entitled to all consideration derived from the sale of Company assets.

5.    Whether Norman is entitled to a declaration that he is entitled to at least 25% of the proceeds from those sales.

6.    Whether Norman is entitled to a declaration that he is entitled to at least 25% of all future proceeds of future sales or revenue.

7.    Whether Norman is entitled to a declaration that some, if not all, of Elkin's ownership interest in the Company is forfeited as a result of his fraudulent conduct and failure to make his agreed-upon capital contributions.

8.    Whether Elkin's substitution of TEG for USM in FCC Auction Number 18 constituted a usurpation of a corporate opportunity.

9.    Whether TEG's participation in FCC Auction Number 24 was a usurpation of a corporate opportunity.[9]

10.    Whether Elkin's use of USM's incumbency position, application and reported upfront payment for FCC Auction Number 18 constituted a breach of fiduciary duties to both the Company and Norman.[10]

11.    Whether Elkin's execution of the Shareholder Loan Agreement constituted a breach of his fiduciary duties to both the Company and Norman.

12.    Whether Elkin's pattern of conducting business for the benefit of himself as a purported creditor of the Company rather than for the benefit of the Company's equity holders at the time of and immediately following its sales of the Company's assets constituted a breach of his fiduciary duties to Norman.

13.    Whether Elkin's forcing the Company into insolvency or the zone of insolvency following the execution of the Shareholder Loan Agreement constituted a breach of his fiduciary duties to Norman.

14.    Whether Elkin's failure to provide Norman with notice and/or the right to vote on the sale of substantially all the Company's assets violated his fiduciary duty of disclosure to Norman.

15.    Whether Elkin's failure to disclose or seek approval for the execution of the Shareholder Loan Agreement constituted a breach of his fiduciary duty of disclosure to Norman.

---

[9] Defendants object to this characterization of his fraud claim because Plaintiff has raised the Shareholder Loan Agreement at a potential basis for a fraud claim for the first time in this draft Pre-Trial Order.

[10] Defendants object to this characterization of his fraud claim because Plaintiff has raised the Shareholder Loan Agreement at a potential basis for a fraud claim for the first time in this draft Pre-Trial Order.

16.     Whether Elkin's failure to disclose the sales of licenses and/or distribution of proceeds from those sales constituted a breach of his fiduciary duty of disclosure to Norman.

17.     Whether Elkin and TEG misappropriated USM's status as a qualified bidder and incumbent FCC license bid during FCC Auction Number 18.

18.     Whether Elkin and/or TEG misappropriated certain Phase II licenses for which USM was identified as the winning bidder following FCC Auction Number 18.

19.     Whether Elkin and/or TEG misappropriated USM's good will.

20.     Whether Elkin's letter dated December 3, 2002 to Norman's attorney contained false or materially misleading statements of fact.

21.     Whether the disclosure of Elkin's Shareholder Loan Agreement and schedule of payments attached thereto, as delivered in October 2003, contained false or materially misleading statements of fact.

22.     Whether Shorin's preparation, completion and filing of the Company's State and federal tax returns tended to aid or abet Elkin's breach of his fiduciary duties.

23.     Whether Shorin's processing and payment of disproportionate distributions to Elkin tended to aid or abet Elkin's breach of his fiduciary duties.

24.     Whether Shorin's role in the "recapitalization theory" used to support Elkin's Shareholder Loan Agreement tended to aid or abet Elkin's breach of his fiduciary duties.

25.     Whether Shorin's assistance during the bidding process for FCC Auction Numbers 18 and 24 tended to aid or abet Elkin's breach of his fiduciary duties.

26.     Whether Elkin was unjustly enriched by his receipt of more than $601,000 from USM.

27.    Whether Elkin was unjustly enriched by his receipt of the proceeds from TEG's sale of various Phase II licenses.

28.    Whether Elkin was unjustly enriched when the Company apportioned only 75% of the capital gains realized as the result of its asset sales but distributed 100% of the proceeds to him.

B.    Defendants' Statement of Issues of Law[11]

1.    Whether Elkin is entitled to be repaid for the contributions of monies, advancement of expenses he incurred on behalf of USM and the provisions of an office and other overhead items that, taken together, exceed the value of his required capital contribution.

2.    Whether any of Norman's shares in USM must be cancelled or forfeited due to his failure to provide the required $250,000 capital contribution.

3.    Whether Norman's ownership interest in USM should be reduced to reflect Norman's withdrawal of monies from USM.

4.    Whether Norman should be required to contribute sufficient capital to raise his total capital contributions to $250,000.

5.    Whether Elkin's capital contributions should be exactly three (3) times Norman's contributions.

6.    Whether all advancements of money and/or payment of expenses by Elkin for the benefit of USM beyond his required capital contribution should be deemed stockholder loans.

---

[11] Defendants' reserve the right to adopt one or all of Plaintiff's Statement of Issues of Law as their own and to admit facts in support or in opposition to the same.

7.      Whether Elkin's advancements of money and/or payment of expenses should be deemed additional capital contributions to USM and, if so, whether the parties' respective ownership interests in USM should be adjusted accordingly.

8.      Whether Norman's claims for breaches of the duty of care are barred by Section 102(b)(7) of the Delaware General Corporation Law and USM's certificate of incorporation.

9.      Whether Norman had actual or constructive knowledge of facts sufficient to place him on at least inquiry notice of the allegedly improper conduct of the Defendants.

10.     Whether Norman's claims are barred in whole or in part by the applicable statute of limitations or the doctrine of laches.

11.     Whether the alleged agreement to fund the company that forms the basis of Norman's contract claims was supported by adequate consideration and/or whether any such consideration failed in whole or in part.

12.     Whether Defendants are entitled to set-off or offset any damages or monies owed to Norman and/or USM by the amount necessary to reasonably compensate Elkin for services rendered for the benefit of USM and its shareholders and for which Elkin received no compensation.

13.     Whether any funds to be repaid by Defendants must be repaid in their entirety to USM and not Norman.

14.     Whether Norman's claims are direct or derivative in nature.

15.     Whether USM can be required to make a distribution to its stockholders.

16.     Whether USM was qualified to participate in the FCC Phase II Auction.

17.    Whether USM had the ability and financial resources to participate in the FCC Phase II Auctions.

18.    Whether Elkin usurped USM's corporate opportunity in connection with the FCC Phase II Auctions, including auctions Number 18 and 24.

19.    Whether Elkin had a duty to provide Norman with notice and/or the right to vote on the sale of USM's assets.

20.    Whether Elkin and Norman orally agreed to the treatment of excess capital as shareholder loans in 1997, which agreement was later reflected in the Shareholder Loan Agreement.

21.    Whether Elkin had a duty to disclose or seek Norman's approval prior to the execution of the Shareholder Loan Agreement.

22.    Whether Elkin had a duty to disclose to Norman USM's sale of licenses and/or distribution of proceeds from those sales.

23.    Whether Shorin served as an employee, officer or director of USM.

## VI.    **EXHIBITS AND DESIGNATIONS**

A.    Plaintiff's list of exhibits that he intends to offer at trial is attached hereto as Exhibit A.

B.    Defendants' list of exhibits that they intend to offer at trial is attached hereto as Exhibit B.

C.    The parties reserve the right to seek to offer an exhibit designated by the other party, even if not introduced by the designating party. All objections to such documents are preserved.

D.      The parties agree that they shall exchange demonstrative exhibits they intend to use at trial in their respective case-in-chief and in their respective opening statements by no later than 7:00 p.m. on the calendar day immediately prior to their anticipated use.  The notice provisions of this paragraph shall not apply to demonstrative exhibits created in the courtroom during trial testimony or the enlargement, highlighting, ballooning, etc. of trial exhibits or of testimony.  The parties shall meet and confer to resolve any objections to demonstrative exhibits. Any objections that cannot be resolved shall be raised with the Court before the demonstrative exhibit is used for the witness or presentation.

E.      Any document offered into evidence at trial that was produced during discovery and which, on its face, appears to have been authored by a party, or an employee, officer, representative or affiliate of the party shall be deemed *prima facie* authentic, subject to the right of the party against whom such document is offered to offer evidence to the contrary.

## VII.   TRIAL WITNESSES

A.      Plaintiff intends to call the following witnesses in his case-in-chief:

1.      Jeffrey Norman;

2.      David Elkin;

3.      Richard Shorin;

4.      Martin Abo;

5.      Tom Fiorita; and

6.      William A. Dylewsky

B.      Defendants' list of trial witnesses it may call at trial include the following:

1.      Jeffrey Norman;

2.      David Elkin;

24

     3.     Richard Shorin;

     4.     Martin Abo; and

     5.     Tom Fiorita

C.     The parties agree that they shall provide the other side with the name of each witness they expect to call and the order in which they expect to call the witnesses by 7:00 p.m. the calendar day immediately prior to the anticipated trial date. For rebuttal witnesses, the parties agree that they shall provide the other side with notice of witnesses by 7:00 p.m. the calendar day immediately before any such witness is called live at trial.

## VIII. BRIEF STATEMENT OF INTENDED PROOFS

A.     Plaintiff's Statement of Intended Proofs

In support of his claims, in addition to the facts not in dispute, Plaintiff expects to offer the proofs set forth below:

1.     Elkin breached the parties' agreement to fund the Company's operations when he: (i) executed his Shareholder Loan Agreement; (ii) failed to contribute or contribute in a timely fashion his required capital contributions; and (iii) failed to distribute proceeds from sales on a *pro rata* basis.

2.     Norman will prove that, based on his status as a 25% shareholder in the Company and Elkin's unlawful diversion of corporate opportunities, he should be awarded declaratory relief as follows: (i) the Company is entitled to all consideration derived from Elkin's and TEG's sale of licenses; (ii) Norman is entitled to at least 25% of proceeds from the Company's, Elkin's and TEG's sale of licenses; (iii) Norman is entitled to at least 25% of all future proceeds from the sale of Company assets; and (iv) that some, if not all, of Elkin's interest

in the Company is forfeited as a result of his fraudulent conduct and failure to make capital contributions.

3.    The Company was ready, willing and able to participate in FCC Auction Number 18, and Elkin failed to first present the opportunity to the Company prior to taking steps on behalf of TEG to participate in the FCC Phase II Auctions.

4.    Elkin purposely used USM's incumbency status, applications and purported upfront payments for FCC Auction Number 18 to benefit both himself and TEG.

5.    Elkin's execution of his Shareholder Loan Agreement was a self-interested transaction to memorialize improper distributions already made by the Company.

6.    Plaintiff will prove that Elkin had a fiduciary duty of disclosure to provide Norman with notice and/or a right to vote on the sale of substantially all of the Company's assets, to disclose or seek approval of the Shareholder Loan Agreement, and to disclose the sale of the Company's FCC licenses and/or the distributions made from the proceeds from those sales.

7.    Plaintiff will prove that the Company maintained an interest in its status as a qualified bidder and incumbent with the FCC and that Elkin and TEG's actions of allegedly amending the USM application to change applicant names constituted a misappropriation of both USM's status and good will with the FCC and the licenses ultimately issued as a result of the Phase II Auctions.

8.    Plaintiff will prove that Elkin's letter dated December 3, 2002 to Norman's attorney, Vincent A. Sama, Esquire, contained false or materially misleading statements of fact concerning the proceeds from various sales, that it lacked a disclosure of certain sales and misrepresented the use of proceeds from those sales. Moreover, Plaintiff will

prove that Elkin's disclosure of his Shareholder Loan Agreement and the accompanying scheduled payments was undertaken in an effort to mislead and defraud Norman as to his rights and remedies as a stockholder.

9.     Plaintiff will prove that Shorin knowingly assisted Elkin in breaching his fiduciary duties to USM and Norman and is therefore liable for aiding and abetting.

10.     Plaintiff will show that Elkin was unjustly enriched through the receipt of more than $601,000 from USM's sale of licenses, his receipt of proceeds from TEG's sale of various Phase II licenses and Elkin's apportionment of only 75% of the capital gains realized as the result of the license sales but receipt of 100% of the proceeds.

B.     Defendants' Statement of Intended Proofs

In support of their defense to the claims asserted by Norman, Defendants, in addition to the facts not in dispute, expect to offer the proofs set forth below:

1.     Elkin will prove that he agreed to allow Norman to acquire a 25% ownership interest in USM in return for agreeing to provide 25% of the combined capital provided to USM by Elkin and Norman.  Elkin will further prove that the amount of the combined capital was not determined at the time of this agreement, nor was there an agreement regarding the timing of when capital contributions were required to be made.

2.     Following discussions with a potential equity investor, Elkin and Norman agreed to provide $1 million of capital to USM ($250,000 by Norman and $750,000 by Elkin). Elkin and Norman also agreed to contribute their time, effort and expertise to help grow the company.

3.     Elkin will prove that Norman failed to make his agreed upon investment of $250,000 and that he instead never contributed more than $200,000.  Elkin will also prove that

Norman subsequently withdrew a significant portion of his paid in capital and that his capital contribution was reduced accordingly.

        4.     Elkin will prove that Norman breached the parties' agreement when he quit working for the benefit of USM and ceased contributing his time, effort and expertise to help grow USM.

        5.     Elkin will prove that, following the departure of Norman and continuing through the present, the responsibility for managing USM's operations fell exclusively on Elkin. Elkin will also show that he has not received any compensation for his years of service that benefited USM and Norman.

        6.     Elkin will prove that since the inception of USM, he has been the company's only financial patron, repeatedly paying USM's expenses. Elkin will further prove that he personally incurred expenses for the benefit of USM, and loaned property and money to USM to enable the Company to meet its ongoing obligations.

        7.     Elkin will prove that he reached an agreement with USM and Norman in 1997 that all of his contributions in excess of three times Norman's capital contributions would be treated as a shareholder loan.

        8.     Elkin will prove that he executed the shareholder loan agreement in an effort to document a portion of his personal financing of USM over many years.

        9.     Elkin will prove that from the outset of the venture he was involved in a continuing effort to help USM grow, to develop the 220 MHz industry, raise equity or debt financing for USM, and maximize the prospects and value of USM through potential mergers, acquisitions, and sales.

10.    Elkin will show that the 220MHz industry faced numerous obstacles to success and that the 200 MHz licenses held by USM ultimately became technically obsolete.

11.    Elkin will prove that USM was not qualified to participate in the Phase II Auctions and did not have the financial resources to participate in the Phase II Auctions.

12.    Elkin will prove that, in his business judgment, the acquisition of Phase II licenses by anyone other than USM, would have severely undermined whatever value USM's Phase I licenses still possessed.

13.    Elkin will show that he personally advanced money to USM to participate in the Phase II Auctions to ensure that an entity friendly to USM acquired any Phase II licenses that encroached on USM's Phase I licenses.

14.    Elkin will show that the decision to expend his own money to acquire Phase II licenses, using his company TEG, was in the best interest of USM and its shareholders and was done for the sole and exclusive purpose of maintaining for USM the possibility of some future financial return.

15.    Elkin will prove that his decision to sell USM's Phase I licenses bundled with the Phase II licenses owned by TEG was in the best interest of USM and its shareholders.

16.    Elkin will prove that he rightfully applied approximately $600,000 of the proceeds from the sale of licenses to repay money he had advanced or paid on behalf of USM, or as a partial reduction in his capital.

17.    Elkin will prove that he properly accounted for, applied/distributed the proceeds from the sale of USM assets.

18.    Elkin will prove that he properly reduced Norman's capital to reflect monies Norman had either failed to contribute or had taken out of USM for his personal benefit and use.

19.    Elkin will prove that any return of capital to him did not cause his aggregate capital contribution to fall below three times that of Norman's capital contribution.

20.    Elkin will prove that Pennsylvania's two (2) year statute of limitations applies to the claims asserted by Norman and that all of Norman's claims are timed barred.

21.    Elkin will prove that nearly all of plaintiff's claims were readily ascertainable from public filings, conversations with Elkin and from documents provided to him more than three years prior to the filing of this action.

22.    Elkin will prove that he was under no duty to disclose or provide Norman with notice and/or a right to vote on the sale of USM's assets, to disclose or seek approval of the Shareholder Loan Agreement, or to disclose the sale of the Company's FCC licenses and/or the distributions made from the proceeds from those sales.

23.    Elkin will prove that his letter dated December 3, 2002 to Norman's attorney, Vincent A. Sama, Esquire, did not contain false or materially misleading statements of fact concerning the proceeds from various sales, or that it improperly lacked a disclosure of certain sales or misrepresented the use of proceeds from those sales.

24.    Elkin will prove that the disclosure of his Shareholder Loan Agreement and the accompanying scheduled payments was not undertaken in an effort to mislead and defraud Norman as to his rights and remedies as a stockholder.

25.    Elkin will prove that Shorin did not assisted Elkin in breaching any fiduciary duties owed to USM or Norman.

## IX.    DEFENDANTS' STATEMENT AS TO THEIR COUNTERCLAIM

A.    Through their counterclaim, Defendants will prove that they are entitled to a declaration that:

1.    Norman's shares in USM be cancelled or forfeited due to his failure to provide the required $250,000 capital contribution for his ownership interest in USM.

2.    Alternatively that Norman's ownership interest in USM be reduced to reflect his actual capital contributions or that he be required to contribute sufficient capital to raise his total capital contributions to $250,000.

3.    Elkin's capital contributions should be exactly three (3) times Norman's contributions.

4.    That all advancements of money or expenses by Elkin for the benefit of USM beyond his required capital contribution be deem stockholder loans.

5.    Alternatively, if Elkin's advancements of money and expenses are not deemed stockholder loans, that they be deemed additional capital contributions to USM and the parties' respective ownership interests in USM should be adjusted accordingly.

## X.    AMENDMENT OF PLEADINGS

The parties do not anticipate nor intend to seek amendment of the pleadings.

## XI.    CERTIFICATION OF ATTEMPTED RESOLUTION OF CONTROVERSY

The parties certify that two-way communication has occurred between persons having authority in a good faith effort to explore the resolution of the controversy by settlement. No agreement has been reached.

This Order shall control the subsequent course of the action unless modified by the Court to prevent manifest injustice.

_____          /s/ Christine S. Azar
Sean J. Bellew (#4072)                    Steven L. Caponi (#3484)
David A. Felice (#4090)                   Christine S. Azar (#4170)
Cozen O'Connor                            Blank Rome LLP
1201 North Market Street, Suite 1400      1201 N. Market Street, Suite 800
Wilmington, DE 19801                      Wilmington, DE 19801
Telephone: (302) 295-2000                 Telephone: (302) 425-6408
Facsimile: (302) 295-2013                 Facsimile: (302)425-6464
 *Attorneys for Plaintiff*                 *Attorneys for Defendants*

IT IS SO ORDERED this ____ day of August, 2007.


_____
UNITED STATES DISTRICT JUDGE