# EXHIBIT K

# SHAREHOLDER LOAN AGREEMENT

This agreement entered by and between David W. Elkin ("Shareholder") and US MobilComm, Inc. ("USM") as of September 1, 1995.

Whereas, USM may from time to time be in need of capital; and

Whereas, Shareholder may from time to time agree to lend capital to USM upon the following terms and conditions.

Now, Therefore, in consideration for the mutual covenants and promises contained herein, the parties agree as follows.

Shareholder shall be under no obligation to provide loans to USM.

Any and all funds provided by Shareholder to or on behalf of USM in excess of $420,000 shall be provided as a loan by Shareholder to USM.

Any and all such loans shall be made on an open account basis without interest being charged to USM.

The Shareholder Loans shall be repaid by USM to Shareholder prior to any distributions being made on account of equity contributions made to the company.

US MOBILCOMM, INC.

David W. Elkin, President

SHAREHOLDER

DAVID W. ELKIN

EXHIBIT
ELKIN 5
MK 12/6/06

DEPOSITION
EXHIBIT
Abo 13

MA348

# EXHIBIT L

Jeff Norman,

In preparation for a transaction there are several items which need to be resolved. I will attempt to present the areas of consideration in this letter together with my current thoughts on resolving them.

*6/2*

1. <u>Your Capital Contribution Deficit.</u> Approximately 85% of the capital invested in the company has been mine. You initially wire transfered $196,000 on ___, 1994. Additionally you paid $4,000 individually to one of our licensees and we have accounted for additional direct expenses by you in the amount of $_____. Thus the total accountable investment which you made to date is

*$ — I14,au*   *14,6au*   *53,6au  -56au  ⟨54800u⟩*

You withdrew from the corporation the total amount of $_____. In addition the company paid excess rent in the amount of $_____ for the office at 805 Third Avenue pursuant to our agreement on that matter.

*700u '45600 = ⟨12600⟩*   *1995*

While you have stated that you have spent a lot of funds in addition to the above we have never received an accounting of such amounts. You were asked on numerous occasions during 1996 for a full and complete accounting of your investment so that our 1995 corporate tax return could be filed. When you did not produce the accounting you were credited with the amount of $14,000 so that we could complete our tax return.

*1994*

*May 22*

You thus have a shortfall of approximately $100,000 in your account. I informed you several weeks ago of the need for additional capital to pay certain outstanding amounts in preparation for the potential transaction with Centennial. On ___ you were sent wire instructions. No further payments by you have been made.

*quite*   *Rick Shorin + I*

Compensation For Running The Business. For some time I have been running the business alone. From the outset I stated that appropriate adjustments would be made if there came a time that you were no longer involved in actively running the business. To be conservative I will use November 1, 1996 as the date I began running the business alone.

*August*

<u>Outstanding Payment to Baker McKenzie.</u>

*16,279*

*Nov*

Last ___ we received a bill from Baker McKenzie in the amount of $16,000. This include rent plus telephone charges and other items.

Regarding telephone charges the company does not pay for personal calls. From the onset of the Company Rick Shorin has done an allocation of my personal versus business calls and I have paid

EXHIBIT

Norman 5

form personal calls separately. Rick Shorin asked you on several occasions for copies of the
Baker McKenzie phone bills so that an allocation of the calls for you and Tommy could be made.
Rick was told by you that such bills were not available from Baker. Notwithstanding you *r*
comment, last fall Rick personally asked Baker for a copy of the bills and had no problem
receiving it.

A general review of those bills raises a lot of questions as to a lot of the calls made. In addition, I
compared our long distance charges to those from New York. The charges are, to say the least,
suspect.

In addition, you were informed in May or June of 1996 that USM was going to cease having a
New York office. In deference to your relationship with Ben I told you to take care of it.
Notwithstanding, it is my understanding that nothing was done in this regarding until late summer
of 1996 and we have bills as late as October,

Jeff, at this time I am proposing that you handle settling whatever amounts are owed to Baker
McKenzie. In return I will agree to treat any contributions by me in excess of 3 times your
investment as a loan to the company to be repaid from the first funds available. Assuming that a
transaction is consummated in the next 60-90 days I will not ask you to invest additional amounts
for your stock, *nor will I charge you interest*

You agree that in the event of a stock sale an amount equal to 10% of all cash will be directed to
be transfered to a reserve account to handle any future negative adjustments requiring payments
to the Buyer, and any and all other reasonable expenses required in connection with our
ownership of the company or the transaction with Centennial.

With regard to Tom Fiorita, he will receive from me, as a bonus, an amount equal to 3% of the
"Net Sale Profits", as such sums are distributed, and from you an amount equal to 2% of net sale
profits.

I have been very busy trying to move the transaction along for our mutual benefit. If you are
agreeable to the above please sign where indicated below so that we can proceed.

Sincerely,

_____
David W. Elkin
President

2