# EXHIBIT A

Page 1

1

2 IN THE UNITED STATES DISTRICT COURT

3 FOR THE DISTRICT OF DELAWARE

4

----------------------------------x

5 JEFFREY M. NORMAN,

6            Plaintiff,

7       vs.

8 DAVID W. ELKIN, RICHARD M.

  SHORIN and THE ELKIN GROUP,

9 INC.,

10            Defendants.

11         and

12 US MOBILCOMM, INC.,

13            Nominal Defendant.

14

----------------------------------x

15

16

17      DEPOSITION OF JEFFREY M. NORMAN

18           New York, New York

19        Friday, December 8, 2006

20

21

22

23

24 Reported by:

   LESLIE FAGIN

25 JOB NO.9289

Page 2

1
2          December 8, 2006
3              7:59 a.m.
4
5      Videotaped Deposition of JEFFREY M.
6  NORMAN, held at the offices of Blank
7  Rome, 405 Lexington Avenue, New York, New
8  York, pursuant to Notice and Federal
9  Rules of Civil Procedure, before Leslie
10 Fagin, a Notary Public of the State of
11 New York.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2      IT IS HEREBY STIPULATED AND AGREED,
3  by and between the attorneys for the
4  respective parties herein, that filing
5  and sealing be and the same are hereby
6  waived.
7      IT IS FURTHER STIPULATED AND AGREED
8  that all objections, except as to the
9  form of the question, shall be reserved
10 to the time of the trial.
11     IT IS FURTHER STIPULATED AND AGREED
12 that the within deposition may be sworn
13 to and signed before any officer
14 authorized to administer an oath, with
15 the same force and effect as if signed
16 and sworn to before the Court.
17
18
19
20
21
22
23
24
25

Page 3

1
2  A P P E A R A N C E S:
3
4  COZEN 0'CONNOR
5  Attorneys for Plaintiff
6      Suite 1400
7      Chase Manhattan Centre
8      1201 North Market Street
9      Wilmington, Delaware 19801-1147
10 BY:  DAVID A. FELICE, ESQ.
11
12 MARK A. EVETTS, ESQ.
13 Attorneys for Defendants
14      8502 Jackson Creek Bend Lane
15      Houston, Texas 77396
16
17 ALSO PRESENT:
18   PETER LEDWITH, Videographer
19
20
21
22
23
24
25

Page 5

1
2      THE VIDEOGRAPHER:  Here begins
3  videotape No. 1 in the deposition of
4  Jeffrey Norman in the matter of Norman
5  versus Elkin in the U.S. District Court,
6  District of Delaware.
7      Today's date is December 8, 2006.
8  The time is 7:59 a.m.
9      This deposition is being taken at
10 Blank Rome, 405 Lexington Avenue, New
11 York, New York, made at the request of
12 Mark Evetts of the law offices of Mark
13 Evetts.
14      The videographer is Peter Ledwith
15 on behalf of Esquire Deposition Services
16 located 216 East 45th Street, New York,
17 New York.
18      Would counsel and all present
19 please identify themselves.
20      MR. EVETTS:  Mark Evetts.  I
21 represent Mr. David Elkin, Richard
22 Shorin, The Elkin Group, the defendants.
23      MR. FELICE:  David Felice of Cozen
24 O'Connor representing the plaintiff,
25 Jeffrey Norman.

2 (Pages 2 to 5)

Page 6

1        J. Norman
2 J E F F R E Y  M.  N O R M A N, called as a
3    witness, having been duly sworn by a
4    Notary Public, was   examined and
5    testified as follows:
6 EXAMINATION BY
7 MR. EVETTS:
8    Q.   Would you please state your full
9 name for the record?
10   A.   Jeffrey Moore Norman.
11   Q.   Mr. Norman, when do you contend Mr.
12 Elkin breached his agreement with you to
13 invest $750,000 in USM?
14   A.   When I discovered that he had not
15 funded the company according to our original
16 agreement.
17       MR. EVETTS: Objection. Not
18    responsive.
19   Q.   The question wasn't when did you
20 discover, the question was when did he breach
21 it.  That is, when, in your opinion, based on
22 the agreement you contend existed in this
23 case, when was he obligated to invest
24 $750,000 and when did he fail to fulfill that
25 obligation?

Page 7

1        J. Norman
2       MR. FELICE: Objection. Compound.
3    Q.   Let's start with the first one.
4       When was he obligated, under the
5 oral agreement you're suing under in this
6 lawsuit, to invest $750,000?
7    A.   At the time that I contributed my
8 portion.
9    Q.   And I've got a document here that
10 will reflect this, but would you agree with
11 me that that was then around June 2, 1994?
12   A.   I contributed my $250,000 at that
13 particular time, yes.
14   Q.   And so it is your contention that
15 Mr. Elkin's obligation to contribute $750,000
16 was due and ripe at that moment?
17   A.   It was my understanding at that --
18 based on our conversation that when I put in
19 my contribution, he was going to put in his
20 contribution, if not that day, then within a
21 reasonable amount of time.
22   Q.   A reasonable amount of time being
23 within a month, two, three months?
24   A.   That was my understanding, yes.
25   Q.   And so Mr. Elkin, by your

Page 8

1        J. Norman
2 testimony, breached his agreement to invest
3 his equity into USM by the fall of 1994, is
4 that fair?
5       MR. FELICE: Objection as to form.
6    A.   Well, I would call it that he
7 breached his commitment to contribute his
8 money that I understood would be happening at
9 the time that I contributed the money.
10   Q.   And that breach occurred by the
11 fall of 1994?
12   A.   By the fall of --
13   Q.   I'm doing that.  I know you put in
14 your money June 2, 1994.  I think your
15 testimony was you expected him to put up his
16 money contemporaneous or within a reasonable
17 period of time after that, so I'm tacking on
18 three or four months.
19   A.   That's true.
20   Q.   So by the fall of 1994, Mr. Elkin
21 breached his commitment to put in his
22 investment in USM, is that right?
23       MR. FELICE: Objection as to form.
24   A.   In my mind, I don't know the legal
25 terminology, but in my mind, as a

Page 9

1        J. Norman
2 businessman, yes.
3    Q.   Okay.  And you knew by the fall of
4 1994 that Mr. Elkin hadn't put up his
5 750,000, didn't you?
6    A.   I don't remember the exact date,
7 but I discovered a few months after that,
8 when he didn't volunteer it to me, but I
9 asked him if he contributed his money and he
10 told me no, but he was going to be doing it
11 shortly.
12   Q.   And when was the next time you
13 became aware that he didn't live up to that
14 representation or that promise?
15   A.   Well, after that point in time,
16 I -- it was a long time ago, but, so I can't
17 give you an exact date, but I remember during
18 that time period that I might have seen a
19 selective document that had a capital
20 contribution chart that, you know, that
21 didn't show him putting in the money.  I
22 don't know -- I never actually got any kind
23 of documentation ever to this day, no cash
24 check statements or anything that -- of what
25 money was put in by Mr. Elkin.

3 (Pages 6 to 9)

Page 14

1        J. Norman
2 with, so on an overriding basis, I didn't
3 feel as though he had, in my mind, breached
4 our entire agreement. It was maybe the
5 capital contribution part.
6    Q.  I want to get back to that
7 response, in particular, your
8 characterization of an entire agreement.
9        I want to understand what that
10 means, but before I get there, was there ever
11 a moment in time when your relationship had
12 developed to the point that you subjectively
13 believed he had not lived up, Mr. Elkin had
14 not lived up to his promise?
15        MR. FELICE: Objection. Asked and
16    answered.
17    A.  In our business relationship you're
18 talking about?
19    Q.  Let's make this simple. I'm going
20 to be talking today about each of your causes
21 of action.
22        As far as I can recall, your first
23 cause of action is breach of contract, so
24 right now, all we're talking about is
25 whatever, let's get this straight, there is

Page 15

1        J. Norman
2 no writing for your oral contract, nobody
3 signed a contract?
4    A.  That's correct.
5    Q.  So it's breach of an oral contract,
6 right?
7    A.  Right.
8    Q.  And so an oral contract is proved
9 up by whatever you two gentlemen say that
10 agreement is, right?
11    A.  Correct.
12    Q.  Right now, you're the guy saying
13 what it is?
14    A.  Uh-huh.
15    Q.  So I'm asking you, based on the
16 oral agreement you contend was breached, was
17 there a moment in time when you realized Mr.
18 Elkin had failed to live up to his end of the
19 bargain under that oral agreement?
20        MR. FELICE: Objection to form.
21    A.  Are you talking about the capital
22 contribution part of the agreement?
23    Q.  I'm talking about the oral
24 agreement you allege Mr. Elkin is in breach
25 of.

Page 16

1        J. Norman
2    A.  At that particular point in time,
3 at that moment in time, I felt, in my mind,
4 that from a business point of view, he didn't
5 live up to our agreement, our oral agreement
6 of putting in money.
7        As far as our overall business
8 contract or arrangement, whatever you want to
9 call it, I felt that predominantly, that the
10 business arrangement was positive enough to
11 continue.
12    Q.  So I think I understand from your
13 answer you're standing on your testimony that
14 you understood by the fall of '94 or very,
15 very early part of '95, he had at least
16 breached the part of your oral agreement to
17 invest his money?
18    A.  That's correct.
19    Q.  Now, let's talk about the agreement
20 in its entirety.
21        What are the components of this
22 oral agreement, what were the mutual
23 promises?
24    A.  Mr. Elkin, I had an ongoing
25 business in New York with a gentleman Mr. Tom

Page 17

1        J. Norman
2 Fiorita, offices on 1330 Avenue of the
3 Americas. The company was doing maybe 650 to
4 a million dollars a year in revenue.
5        Mr. Elkin approached me and wanted
6 to get together. He had just sold his cable
7 operation and had a concept about securing
8 some licenses in the last lottery spectrum.
9 He said, let's get together and I believe he
10 came to the Plaza Hotel in New York, let's
11 get together and he said, here is my idea,
12 that there is last lottery part of the
13 auction, 220 spectrum, let's put together a
14 company and aggregate licenses together. The
15 split will be -- this is basically the first
16 time we met, 25 percent, 75 percent.
17        At that particular time, I don't
18 recall a capital figure and this is probably
19 early 1993, maybe even late 1992, we had this
20 conversation in New York. No capital was
21 really discussed except for the fact you are
22 going to contribute 25 percent and I will be
23 responsible for 75 percent and the discussion
24 was primarily my job was going to be go out
25 and put together marketing plans, to secure

5 (Pages 14 to 17)

Page 18

1       J. Norman
2 the licenses, figure out how to maybe
3 strategize in terms of aggregate for a
4 marketing pattern to create value.
5       Mr. Elkin's responsibilities, as he
6 relayed to me, as an attorney, he was going
7 to be able to handle the legal stuff.
8       Also with his financing background,
9 that he was going to raise capital for the
10 project and as his, you know, as an ex-chief
11 operating officer, he was also going to
12 handle that responsibility for the company
13 and that was our basic understanding.
14       The second piece of that is time --
15 so it was decided at that point in time,
16 basically within a month or two, do you want
17 to work on that project? I said, yes, he
18 understood I had another business, so I was
19 allocating time to this project and as time
20 went on throughout 1993, things evolved in
21 formulating the industry, I can't recall
22 whether the options took place then, but, you
23 know, the plan to aggregate the license with
24 cities to go after and then by the end of the
25 year, we started rough discussions about --

Page 19

1       J. Norman
2 primarily he did, what type of capital was
3 going to be needed and as I recall, the first
4 figure was less than a million dollars when I
5 signed on board, so it was also understood
6 that at that particular time, money that we
7 had put out for the business was going to be
8 counted towards our capital contribution and
9 that, I think, is a basis for our -- what was
10 the basis for our agreement.
11    Q.  I'm going to try to kind of parse
12 through that. These are sort of the terms or
13 elements that I heard.
14       Initially, no agreement about how
15 much money -- the initial agreement was about
16 just respective ownership percentages, 75/25?
17    A.  I don't know I would call it an
18 agreement at that point in time. I would
19 call it Mr. Elkin's proposal.
20    Q.  I heard from your answer that you
21 reached an agreement on the 25/75 before you
22 ever even knew how much money would be
23 associated with that?
24    A.  Yeah, he might have thrown a figure
25 out, we will put in half a million dollars.

Page 20

1       J. Norman
2    Q.  So you had this agreement that you
3 would co-own USM in the ratio of 75/25,
4 right?
5    A.  Right.
6    Q.  You had an agreement that the two
7 of you, I'm not going to try to summarize all
8 the different skill sets Mr. Elkin has versus
9 your skill sets, but, essentially, you guys
10 have an agreement that you would co-operate
11 USM?
12       MR. FELICE:  Objection as to form.
13    Q.  Based on each of your respective
14 skill sets?
15    A.  I did operations, but I wasn't --
16 my job was to secure the licenses.
17    Q.  I'm not trying to use a term of art
18 here. I'm just talking about you were going
19 to both run the business?
20    A.  In a loose sense, you could say
21 that.
22    Q.  And, eventually, there was an
23 addendum to that agreement or a
24 supplementation to that agreement where the
25 amount of necessary capital was settled upon

Page 21

1       J. Norman
2 at a million, was that about right?
3    A.  That's right.
4    Q.  Was there any discussions in this
5 agreement about sort of how long you would
6 both be obligated to run the business, i.e.,
7 a year, two, 10?
8    A.  No.
9    Q.  Was there any understanding as to
10 what would happen if one of you quit running
11 the business, but the other guy continued
12 running the business?
13    A.  No.
14    Q.  Was there any discussions about how
15 long either or both of you could work without
16 receiving any compensation from the company?
17    A.  Was there any discussions about
18 that? Potentially, possibly, it seems like
19 something that might have -- we might have
20 talked about, but I don't recall any details
21 of that.
22    Q.  Just so the jury is clear, as far
23 as the agreement we've just described, there
24 was no discussion about who was going to get
25 paid what, nobody was getting paid?

6 (Pages 18 to 21)

Page 62

1        J. Norman
2    A.  It doesn't cure the fact that he
3 breached it when he was supposed to put it
4 in.
5    Q.  But that's a breach that took place
6 now 11 years ago, right?
7        MR. FELICE:  Objection as to form.
8    A.  At that particular time, yeah.
9    Q.  You do know, whether you know it or
10 not, you're charged with knowing it, do you
11 know the statute of limitations has run years
12 and years and years ago on that --
13       MR. FELICE:  Objection as to form.
14    If you have a question, he can answer.
15    If it doesn't call for legal conclusion,
16    you can ask it.
17       MR. EVETTS:  He has constructive
18    knowledge of the law, every word
19    written.
20    Q.  Do you know the statute of
21 limitations has run on breach of contract?
22       MR. FELICE:  Objection as to form.
23    Calls for legal conclusion.
24    Q.  He is not instructing you not to
25 answer, so you have to answer.

Page 63

1        J. Norman
2    A.  Do I know that?  You just told me
3 that.  I know you're a good attorney.
4    Q.  You've been involved in some
5 lawsuits, you know what a statute of
6 limitations is?
7        MR. FELICE:  Let's move on.  If you
8    want to tell him what it is, that's
9    fine, but you're asking for a legal
10   conclusion.
11    Q.  Look, a client who brings a lawsuit
12 not only is on constructive knowledge of the
13 statute of limitations, they have a duty to
14 know when the statute of limitations runs.
15       MR. FELICE:  Objection as to form.
16    Q.  Otherwise it's a malicious
17 prosecution, if you bring a lawsuit with no
18 basis under the law, you can be sued for
19 that.
20       MR. FELICE:  Objection as to form.
21       Don't answer.  He is calling for
22    disclosure of attorney/client privilege.
23    Q.  From your understanding of statute
24 of limitations and causes of action, you
25 don't have any idea that your 11 year old

Page 64

1        J. Norman
2 breach of contract --
3        Mr. FELICE:  Objection as to form.
4    Calls for attorney/client privilege.
5        Don't answer that.
6    Q.  Are you going to follow your
7 counsel's instruction?
8        MR. FELICE:  I just instructed him
9    not to answer.  Move on.
10       MR. EVETTS:  Don't tell me what to
11    do, Mr. Felice.  I've been taking
12    depositions when you were a senior in
13    high school.
14    Q.  Are you going to follow your
15 counsel's instructions?
16    A.  Yes, sir.
17       MR. FELICE:  Don't badger my
18    client.
19    Q.  Isn't it true, Mr. Norman, you also
20 knew, you say it happened by happenstance,
21 but you learned that USM had sold licenses
22 from Mr. Elkin, isn't that right?
23    A.  Yes.
24    Q.  You learned it because you called
25 him on the phone and you asked him, right?

Page 65

1        J. Norman
2    A.  No, I didn't ask -- well, I guess
3 over time I did.  I called him because I
4 hadn't heard anything and it was probably
5 over a year.  Any information, despite some
6 requests, and I was driving in Pennsylvania
7 for business one day and I said I'm going to
8 call him up and see what's going on, haven't
9 heard anything, haven't gotten any
10 information, I get him on the telephone,
11 after the pleasantries, I said, what is going
12 on with the company?  He said, nothing, and
13 it was like an interrogation.  I said, do we
14 still have all our licenses?  He said, well,
15 no, and then I said, did we sell any
16 licenses, and he said, yes, and I said,
17 where?  Oh, I think we sold a couple in Miami
18 and in Boston.  I said, well, how much did we
19 get?  I don't recall exactly, a few hundred
20 thousand dollars.  Then I said, did you take
21 a distribution, and he said, yes, I did.  I
22 said, how come you didn't tell me about it?
23 He said, it wasn't your turn, and I said, why
24 don't you send me the information you got?
25 He said, okay.  Hung up the phone, didn't

17 (Pages 62 to 65)

Page 66

1          J. Norman
2 hear anything from him.
3     Q.   And didn't that occur in like early
4 2000?
5     A.   It occurred right before Mr. Sama
6 sent him a letter.
7     Q.   Right before?
8     A.   Shortly before. I can't recall the
9 exact timing of it. I called Mr. Sama up to
10 tell him about it.
11     Q.   You know that Mr. Sama's letter
12 went to Mr. Elkin in October 2002?
13     A.   I would like to see it to refresh
14 my memory. I haven't looked at that stuff in
15 a year.
16     Q.   You don't know that?
17     A.   I want to say yes, but I don't want
18 to say something that -- can I ask Mr. Felice
19 if that's true?
20          THE WITNESS:  Is that true?
21          MR. FELICE:  What was the question?
22     Q.   You know Mr. Sama's letter went to
23 Mr. Elkin in October 2002?
24     A.   I want to say yes.
25          MR. FELICE:  I believe it's that

Page 67

1          J. Norman
2     time.
3     A.   I will say that.
4     Q.   Now that you know that, it's your
5 testimony this conversation with Mr. Elkin
6 took place shortly before that, is that
7 right?
8     A.   Yeah, I don't know how far in
9 advance, but it was before that, yes.
10     Q.   Shortly before that?
11     A.   I don't know. To be honest with
12 you, I'm just guessing.
13          Actually, it might have been. I
14 don't think I would -- I would give Mr.
15 Elkin, knowing me, I probably gave him more
16 than enough time to produce it and it
17 actually might have been a while before that
18 now that I think back on it, where I got up
19 my -- I got pissed off enough where I said,
20 he is still not sending me anything and I
21 just had it with all the requests and no
22 response and that's when I went to Mr. Sama.
23     Q.   And in that same conversation, you
24 learned about the Repeater transaction,
25 right?

Page 68

1          J. Norman
2     A.   I don't even think he told me who
3 he sold them to.
4     Q.   But you know today?
5     A.   Yes.
6     Q.   And in the same conversation he
7 told you about the Romer transaction?
8          MR. FELICE:  Objection.
9     A.   He told me we got rid of some
10 licenses in Miami and Boston and it was a
11 couple hundred thousand dollars, I believe
12 were his words.
13     Q.   And so we're clear about when that
14 conversation took place, do you recall a
15 trial in a related case in the 220 action?
16     A.   The one you talked about earlier
17 today, the Warren trial.
18     Q.   I'm talking about the trial before
19 I was involved in this case, the 220 action
20 in the Vice Chancellor --
21     A.   Sure.
22     Q.   You remember that trial?
23     A.   Sure I do.
24     Q.   You remember you testified at the
25 trial?

Page 69

1          J. Norman
2     A.   I remember I testified at the
3 trial.
4     Q.   I will try to refresh your
5 recollection of how long before the Sama
6 letter went out that you talked to Mr. Elkin.
7          Here is the question. This is page
8 167, line 11:
9          What were your reasons for having
10 this letter delivered to the company?
11          Your answer: I have been
12 unsuccessful in getting any kind of
13 information that was satisfactory to me,
14 dated October, probably for the previous 24
15 months and actually prior to that, I had
16 discovered there was a sale of assets that,
17 you know, I kind of discovered by
18 happenstance and apprised Mr. Elkin on that.
19          Do you recall that you learned
20 about the sale of the assets more than 24
21 months before the Sama letter went out?
22     A.   I don't know. That doesn't
23 sound -- that paragraph there, to be honest
24 with you, as I sit here today, I can't tell
25 you the exact time that I called him.

18 (Pages 66 to 69)

Page 70
```
1        J. Norman
2    Q.  Where could we look --
3    A.  Twenty-four months.
4    Q.  Do you have notes at home of the
5 conversation where Mr. Elkin told you he sold
6 the licenses --
7    A.  Actually, I probably could track it
8 back because I was doing some work for a
9 technology company that was out of the other
10 part of Pennsylvania, so I would have to go
11 to my diaries and maybe I can track it back
12 looking at e-mails about meetings out in that
13 part of the state because I didn't go out
14 there a lot.
15    Q.  Based on when you knew you worked
16 for the technology company, can you give us a
17 better estimate of when you had that
18 conversation with Mr. Elkin?
19    A.  I would have to check my diaries to
20 pin it down, but I know the sequence was I
21 talked to him on the telephone, I didn't get
22 the document, I went to Mr. Sama.
23    Q.  Here is what you say at the 220
24 trial.  The question was --
25       MR. FELICE:  What page are you on?
```

Page 71
```
1        J. Norman
2       MR. EVETTS:  I'm on page 192.
3    Q.  Just to put it in context, this is
4 when the cross-examination first began after
5 Mr. Felice passed the witness.
6       Good afternoon, Mr. Norman.  My
7 name is Elizabeth Wilburn.
8       You responded, hi.
9       She asked you the very same
10 question I asked you, Mr. Norman, the demand
11 letter in this case is dated -- this is your
12 later demand letter, October 2004?
13    A.  This says 2004.  I think we sent
14 two, I think we sent two demand letters.
15    Q.  You sent a demand letter --
16    A.  There was some legal thing, I had
17 to send one and then he also sent one, so I
18 think there were two.  As I recall there were
19 two letters because we didn't get -- in the
20 first demand letter, we didn't get -- in our
21 minds, enough information and that's what
22 kind of triggered the whole thing and as I
23 recall, there were -- Mr. Sama sent him a
24 couple of letters and then there was a formal
25 demand letter that went out.
```

Page 72
```
1        J. Norman
2    Q.  If you talked to Mr. Elkin any time
3 before the then Sama letter went out, which I
4 think is uncontroverted you did?
5    A.  That's true.
6    Q.  And he revealed he had sold
7 licenses and he revealed to you what you now
8 know are the Repeater and Romer transactions,
9 right?
10    A.  I don't recall the names of the
11 companies he sold them to, but I remember he
12 said he got rid of some licenses, sold some
13 license.
14    Q.  He told you in that same
15 conversation that he had made a distribution
16 to himself, right, and you certainly knew --
17    A.  I don't know if he used the word
18 distribution, but I asked him if money was
19 distributed and I didn't get any and there
20 are own two shareholders.
21    Q.  You knew you didn't get any?
22    A.  Exactly.
23    Q.  Mr. Sama's letter went out more
24 than three years before you filed this
25 lawsuit.  It is uncontroverted you knew,
```

Page 73
```
1        J. Norman
2 prior to that, sometime prior to that, that
3 Mr. Elkin sold licenses and made a
4 distribution, if I represent to you the
5 longest statute of limitations available to
6 you, and I don't think that it will even
7 apply is three years, how aren't all those
8 claims barred by the statute of limitations?
9       MR. FELICE:  Objection.  Calls for
10    legal conclusion.
11    A.  That's a legal conclusion that I
12 guess will be answered.  All I know is from
13 my point of view is he told me I couldn't get
14 the information from him and that was, I
15 think, evident in a lot of these things we've
16 been talking about for Mr. Elkin.
17       Stretch, stretch, stretch.  Give as
18 little as possible, hedge the bet and not
19 provide.  Instead, most business situations
20 I'm in, you ask the question, yeah, sure, I
21 sold Miami 10 licenses, it was -- I know he
22 remembered exactly what he did.  He has got a
23 mind for that.  I sold it for 350, whatever
24 the sale price was, I sold the other one 10
25 licenses for X and it was closed on this day,
```

19 (Pages 70 to 73)

Page 78

1         J. Norman
2 assets it owned were licenses, right?
3         MR. FELICE: Objection as to form.
4    A.   Right.
5    Q.   So if there is a capital gain, by
6 definition, it has to be sale of a license?
7         MR. FELICE: Objection as to form.
8    A.   Yeah.
9    Q.   Let's take a look. I'm going to
10 hand you what was previously marked PX-7.
11 This is a copy of the US Mobilcomm, Inc.'s
12 2000 tax return.
13         If you'll look at the K-1 for you,
14 which is Bates stamped MC 543, the second to
15 last page.
16         Do you see that?
17    A.   MC 543, I'm looking at it.
18    Q.   That's your K-1?
19    A.   Yeah.
20    Q.   You received it?
21    A.   Yeah.
22    Q.   You probably received that around
23 March 2001?
24    A.   That's when it's supposed to be
25 sent out, yeah.

Page 79

1         J. Norman
2    Q.   Did you normally get them when they
3 were supposed to be sent out?
4    A.   Sometimes I didn't, actually.
5    Q.   This is a bad year because this is
6 one of the few years that you had to actually
7 pay income taxes on ordinary income.
8         Do you see?
9    A.   Yes.
10    Q.   But this is a doubly bad year
11 because you also have a net long term capital
12 gain, don't you?
13    A.   Where does it say that?
14    Q.   Next to the biggest number on the
15 page.
16    A.   Are we looking -- 16,000 total for
17 the year?
18    Q.   Yeah.
19    A.   Okay, yeah.
20    Q.   So the minute you received this,
21 given that it imposed whatever your personal
22 tax rate is on that ordinary income, plus
23 whatever the capital gains tax rate is, this
24 is a bad year for you, you have to pay --
25 I've seen plenty of years where you had a

Page 80

1         J. Norman
2 major benefit from owning your stock in US
3 Mobilcomm, you had an ordinary loss, right?
4    A.   Yeah, a lot of years.
5    Q.   But this a bad year because you
6 have to pay, double, you have to pay taxes on
7 two different line items, so you knew the
8 minute you received this, that US Mobilcomm
9 had sold licenses, didn't you?
10         MR. FELICE: Objection as to form.
11    A.   No, I guess so if I look at it now,
12 but I think you're overdramatizing the effect
13 on my reaction to it when I got it. I think
14 I just put it in the stack with my accounting
15 stuff for the tax guy. I didn't jump on the
16 phone right away and say, oh, my God, we sold
17 all the licenses of the company, let me find
18 out what's going on.
19    Q.   You may call it overdramatization,
20 but I've got news for you, statute of
21 limitations, accruals, causes of action,
22 sometimes it doesn't even matter if you know,
23 but if there a chance for you to know, i.e.,
24 tax returns showing taxable income from the
25 sale of licenses, whether you actually dawned

Page 81

1         J. Norman
2 on you or not, you knew?
3         MR. FELICE: Objection to form. If
4    you have a question, you can ask him a
5    question. Stop badgering my witness.
6    Q.   Did you have a response to that?
7         MR. FELICE: Is there a question?
8    A.   I didn't know when I read this tax
9 return. Maybe I was supposed to, but I did
10 not know.
11         THE WITNESS: Can we take a break
12    at some point in time.
13         MR. EVETTS: Right now.
14         THE VIDEOGRAPHER: The time is 9:23
15    a.m. We're off the record.
16         (Recess.)
17         THE VIDEOGRAPHER: 9:33. On the
18    record.
19    Q.   Back to your claims, Mr. Norman, of
20 the breach of contract. I want to go back to
21 the first one, failing and refusing to
22 provide Norman with complete access to USM's
23 corporate business financial accounting books
24 and records.
25         By what date did Mr. Elkin breach

21 (Pages 78 to 81)

Page 94

1        J. Norman
2    facts.
3        MR. EVETTS: That is appropriate to
4    assume certain facts. Do you not know
5    that?
6        MR. FELICE: You are saying, assume
7    that US Mobilecomm didn't have that. If
8    you want to take the oath and testify,
9    go ahead. If you want to put a document
10   in front of him, go ahead.
11   Q.  If USM -- how was USM ready to
12 participate in auction 18 if it lacked the
13 finances to make the required upfront payment
14 to the FCC? Just tell the jury that, simple
15 question.
16   A.  There were a lot of variables
17 involved with the auction and give me the
18 date for that again.
19   Q.  The auction?
20   A.  Yes.
21   Q.  September 18, 1998.
22   A.  I wasn't involved with the company
23 at that point in time and I hadn't gotten any
24 documents after I left, so it was my
25 assumption, because I had no communication

Page 95

1        J. Norman
2 when I left, the company was ready for the
3 auction.
4    Q.  What do you mean you hadn't gotten
5 any documents after you left? You know now,
6 from reviewing documents, that there were
7 contracts, financial statements, lists of
8 licenses, lists of equipment being
9 transferred from USM to Centenial with blind
10 copies going to Vincent Sama. We had Vincent
11 Sama editing purchase agreements. You know
12 there were tons of documents regarding USM
13 financial condition that you were privy to.
14   A.  The documents, we only got the
15 purchase and sale agreement from Mr. Elkin,
16 we didn't get any -- the financial documents
17 you're describing.
18   Q.  When you were acting as liaison
19 between USM and Mark Hatten in the fall of
20 1998, you weren't getting financial documents
21 then?
22   A.  I think I might have gotten one
23 that I just sent to Mr. Hatten. You would
24 have to show it to me.
25   Q.  You're saying you got a financial

Page 96

1        J. Norman
2 document from USM?
3    A.  I'm saying I don't know if I did.
4    Q.  You didn't look at it, you just
5 sent it onto Mark Hatten?
6    A.  I probably would have looked at it.
7    Q.  You're sitting there telling me
8 your big complaint is you can't get enough
9 financial information. Now, you get a
10 full-blown balance sheet and P&L and you're
11 not going to study it a little bit?
12   A.  I don't know if it was or not. I
13 would have to look at it. I remember seeing
14 something the other day from the exhibits,
15 something for Mark Hatten, a fax. There was
16 some financial information. It's still
17 regarding my answer to the auction. I don't
18 agree with your supposition.
19   Q.  My supposition is very simple. If
20 USM didn't have any money, was it ready to
21 participate in the auction?
22       MR. FELICE: Objection as to form.
23   A.  I didn't believe that to be the
24 case.
25   Q.  I didn't ask you whether you

Page 97

1        J. Norman
2 believed that to be the case.
3        I asked you, if USM did not have
4 any money, could it have participated in the
5 auction?
6        MR. FELICE: Objection. Form.
7    Foundation.
8    A.  Probably.
9    Q.  What?
10   A.  Probably, it could have.
11   Q.  Let's talk about that. Let me ask
12 you something else, too.
13       Are you taking a position in this
14 lawsuit that -- let me start back, scratch on
15 that.
16       You followed USM and some of its
17 progress through the FCC, right?
18   A.  Through the FCC auction, the
19 auction 18, I did.
20   Q.  You had some testimony, and I've
21 got some documents here that say I've been
22 following the document through the FCC
23 website.
24   A.  I followed auction 18 through the
25 FCC, yes, I did.

25 (Pages 94 to 97)

Page 98

```
1           J. Norman
2     Q.  So you knew that USM was a
3 qualified bidder?
4     A.  Yes.
5     Q.  To know that, you saw -- the same
6 document that lists USM as a qualified bidder
7 lists the 200,000 upfront deposit?
8     A.  Yes.
9     Q.  You also, by following that
10 auction, you also knew they were the high
11 bidder on five different licenses, right?
12    A.  Yes.
13    Q.  And let me show you what I'm
14 marking Norman Exhibit 4.
15        (Document marked Norman Exhibit 4
16    for identification.)
17    Q.  Isn't this a facsimile transmittal
18 sheet from you to Mark Hatten and David
19 Kleeman dated December 15, 1998?
20    A.  Well, I can't say definitely
21 because there is no fax number on here, plus
22 it says total of pages 3, including the
23 cover, and there are four, so I can't say
24 definitely yes, but what's the question?
25    Q.  This is your document, right, you
```

Page 100

```
1           J. Norman
2     Q.  At this point in time, you were the
3 one that told Mr. Elkin that Mark Hatten and
4 his company had an interest in buying,
5 acquiring, investing in US Mobilcomm, right?
6     A.  Yes.
7     Q.  You acted as liaison between US
8 Mobilcomm and Mark Hatten and his company?
9     A.  For the introduction, I did.
10    Q.  They must have asked you for some
11 financial information, didn't they?
12    A.  I just put him in touch with Mr.
13 Elkin.
14        MR. EVETTS:  Objection.  Not
15    responsive.
16    Q.  Did Mr. Hatten ask you for
17 financial information on the company?
18    A.  I don't recall.
19    Q.  Did you provide this financial
20 information to Mr. Hatten on the company?
21    A.  I don't recall.
22    Q.  Look at the next page, it's the
23 balance sheet for US Mobilcomm dated November
24 16, 1998, is that right?
25    A.  The one that says draft on it?
```

Page 99

```
1           J. Norman
2 produced this document, right?
3     A.  I did.
4        MR. FELICE:  I can represent PFT is
5    the plaintiff's production.
6     Q.  This is your own document from your
7 own files representing your copy of something
8 you sent to Mark Hatten, right?
9     A.  That's what I said.  I can't tell
10 you for sure that I did send it to him.  If
11 we produced it, I had it in my files.  If you
12 look on the top, I say, click here, type, I
13 didn't finish it and there is no fax
14 confirmation and no fax number on it and the
15 page is wrong, so I can't say 100 percent
16 yes, but let's assume --
17    Q.  Mr. Norman, you worked, after you
18 left USM in late '96 or early 97, the person
19 you went to work for is Mark Hatten?
20    A.  I did some consulting.  I didn't go
21 to work for him.  Brief consulting for him.
22    Q.  At this point in time, you've lost,
23 you know this, you lost the Centenial deal,
24 right?
25    A.  Yes.
```

Page 101

```
1           J. Norman
2     Q.  Yes.
3     A.  Yes.
4     Q.  This came from your files?
5     A.  I assume so.
6     Q.  So this had to be provided to you
7 at sometime around the date on that document,
8 right?
9     A.  Yes.
10    Q.  Will you tell the jury how much
11 cash US Mobilcomm has in both the checking
12 and money market account at this point?
13    A.  According to this document, it has
14 got 10,300.
15    Q.  Where in this document, by the way,
16 does it make note that USM either owns some
17 phase 2 licenses or has a $200,000 deposit at
18 the FCC?
19    A.  Nowhere on this page.
20    Q.  If you had been following USM on
21 the FCC website and you know or you think it
22 has $200,000 at the FCC or by this time, has
23 five licenses, why wouldn't that raise a red
24 flag with you, where is that 200,000, where
25 are those licenses?
```

26 (Pages 98 to 101)

Page 106

1          J. Norman
2    speculation.
3    A.  I can't speculate on that.
4    Q.  Look --
5    A.  I certainly would have liked that
6 telephone call. I would like that
7 opportunity.
8    Q.  I happen to have a very detailed
9 report on you, Mr. Norman, which includes
10 your small claims judgments from clothing
11 stores and God knows what else, gas
12 companies, tax liens on your home.
13       You're telling me you don't know
14 for sure whether in the latter part of 1998,
15 you had an extra $50,000 laying around?
16    A.  I don't think that's the point.
17 The point is whether I wanted to take the
18 opportunity.
19       When I first went into the venture,
20 I didn't have the whole $250,000 at that time
21 either, but I took advantage of it and got
22 that for the business opportunity.
23       MR. EVETTS:  Objection.
24    Nonresponsive.
25    Q.  Do you know that Mr. Elkin, in the

Page 107

1          J. Norman
2 months, really in the years leading up to
3 this auction, had been trying to raise the
4 money for US Mobilcomm to participate
5 meaningfully in the phase 2 auctions, did you
6 know that?
7    A.  I know we were both trying to raise
8 the money.
9    Q.  At some point, Mr. Elkin had to
10 decide, as the deadline is approaching, to
11 put your money up or shut up. At some point,
12 he has to say, nobody is going to come
13 through, at some point if nobody comes up to
14 the table, you have to take the matter in
15 your own hands, right?
16       MR. FELICE:  Objection as to form.
17    A.  I can't answer for Mr. Elkin.
18    Q.  My point to you, it's a simple
19 question, not whether you would have wanted
20 the call, whether you would have wanted the
21 opportunity, had a call come to you in August
22 1998, if we're going to do this, I need your
23 50,000 and I need it now, were you in the
24 financial position to send that $50,000 to
25 the company?

Page 108

1          J. Norman
2       MR. FELICE:  Objection as to form.
3    A.  Probably yes.
4    Q.  Probably yes?
5    A.  Yes.
6    Q.  August 1998?
7    A.  Yeah, I could have raised the cash.
8    Q.  I didn't ask you that.
9       I want to know, did you have the
10 cash?
11       MR. FELICE:  Objection as to form.
12    A.  I don't know. I would have to look
13 back. This is a long time ago.
14    Q.  The two of you had been trying to,
15 quote, raise the cash, as you just said, for
16 years, so if you could have raised the cash,
17 why didn't you?
18       MR. FELICE:  Objection. Asked and
19    answered.
20    A.  Why didn't we raise the cash?
21    Q.  Why didn't you raise it? You said
22 you could have raised it.
23    A.  We did have a couple of potential
24 companies that wanted to raise cash for us.
25    Q.  I can show you 50 attempts to raise

Page 109

1          J. Norman
2 cash that Mr. Elkin engaged in, but my
3 question is, you just said to me, I think I
4 could have given the 50,000 because I believe
5 I could have raised it. If you could have
6 raised the money, why didn't you?
7       MR. FELICE:  Objection. Asked and
8    answered.
9    A.  We weren't raising $50,000 for the
10 company, we were raising a couple of million
11 dollars for the company and we had problems
12 doing that and it turned out some of those
13 problems with some of the people in New York
14 that I talked to after the fact -- I got some
15 feedback from numerous people that they
16 didn't want to put money in because Mr. Elkin
17 had a reputation of being a difficult person
18 to deal with.
19       MR. EVETTS:  Objection.
20    Nonresponsive.
21    Q.  You know, raising money for a
22 privately held company always requires a
23 certain connection with the founders, doesn't
24 it?
25    A.  Yes.

28 (Pages 106 to 109)

Page 114

1         J. Norman
2 that?
3    A.  That's his business, that's his own
4 personal business and he has a right to do
5 that and I -- you know, his personal money, I
6 have nothing to say about it.
7    Q.  That's an interesting point.  Let
8 me ask you this...
9        MR. EVETTS:  Let's take a break.
10       THE VIDEOGRAPHER:  10:07.  Off the
11   record.  End of tape 1.
12       (Recess.)
13       THE VIDEOGRAPHER:  10:14.  On the
14   record.  Beginning of tape 2.
15   Q.  You talk a lot in your complaint
16 about what it means to be, quote, a qualified
17 bidder for auction 18.
18       Do you recall that?
19   A.  Yes.
20   Q.  And the fact that USM was a
21 qualified bidder, right?
22   A.  Yes.
23   Q.  Do you understand whether the
24 primary qualification, in accordance with the
25 FCC guidelines for filling out an

Page 115

1         J. Norman
2 application, is putting up a deposit
3 sufficient to cover the licenses you
4 anticipate bidding on?
5    A.  Yes.
6    Q.  So the primary, quote, factor for
7 US Mobilcomm was the ability to put up the
8 upfront deposit, right?
9    A.  Right.
10   Q.  And so if, as you already said, if
11 it turns out in this case, under the facts,
12 that USM didn't put up the 200,000, it didn't
13 have the 200,000, Mr. Elkin put up the
14 200,000, regardless of what FCC things, USM
15 wasn't qualified to bid at the auction,
16 right?
17       MR. FELICE:  Objection.
18   A.  Say that again.
19   Q.  It's really simple.  You said that
20 if USM didn't have the money, Mr. Elkin
21 didn't have any obligation to put it up,
22 right, if he did put it up, just to hold
23 their spot, he could change his mind and take
24 it back, as you put it, it's his money, he
25 could do what he wants to with it, right?

Page 116

1         J. Norman
2    So my point is, if, in fact, USM
3 qualified only by the grace of David Elkin
4 because he put up his personal money, when he
5 took away his personal money, USM would no
6 longer qualify to bid at that auction, would
7 they?
8        MR. FELICE:  Objection.
9    Foundation.
10   A.  If there was no money there as a
11 deposit, they wouldn't, no.
12   Q.  Let me get back to the point where
13 you said it was his money, he could do what
14 he wants to with it.
15       Have you ever started a business
16 from scratch yourself?
17   A.  Uh-huh.
18   Q.  Where you were the sole
19 shareholder?
20   A.  Yes.
21   Q.  And have you experienced, like many
22 startup businesses, during that first year,
23 it's hard to pay all the bills or as you
24 start adding employees, it's hard to make
25 payroll and all that good stuff?

Page 117

1         J. Norman
2    A.  Yes.
3    Q.  From time to time, have you just
4 had to forego your own salary or compensation
5 or, for that matter, put in money to make
6 other people's payrolls?
7    A.  Yes.
8    Q.  And in that situation, what is it
9 your expectation, let's just say, January 1st
10 rolls around, not enough money in the bank to
11 make payroll, I've heard about that a bunch
12 of times in my past experience, not enough
13 money to make payroll, you have to go write a
14 check and put it in your company's bank
15 account, $10,000 to make that payroll.
16       You've done that in the past?
17   A.  Yes.
18   Q.  What is your expectation when the
19 company becomes better off, becomes more
20 flush, a big sale or big receivable comes in,
21 would you expect to be able to get back that
22 $10,000 you put in to cover the payroll?
23   A.  Hopefully, yes.
24   Q.  And would you expect that, even if
25 you didn't enter into any kind of formal loan

30 (Pages 114 to 117)

Page 174

1        J. Norman
2 opposed to, you're just saying you never
3 talked about it?
4      A.   A concept and generalities, I'm not
5 opposed to, no.
6      Q.   So as we sit here today, now that
7 it's been 10 years since you've left, do you
8 think David should be entitled to some sort
9 of an adjustment for putting in an extra 10
10 years into the company than you did?
11        MR. FELICE:  Objection.
12     Foundation.
13     A.   No, I don't.
14     Q.   You don't?
15     A.   No, I don't.
16     Q.   I thought you just said yes.
17     A.   You asked me a hypothetical
18 question in life, okay.  You're asking me
19 specific.
20     Q.   Telling me why, in this situation,
21 putting in an additional 10 years isn't worth
22 the same?
23     A.   Because, first of all, he never
24 communicated so -- we were holding licenses.
25 Okay.  There is not a lot of work involved

Page 175

1        J. Norman
2 with that.
3      Q.   Mr. Norman, and --
4      A.   And Rick Shorin was getting paid
5 out of the company costs to do a lot of the
6 day to day stuff besides being a CFO.
7      Q.   You do know before you went out
8 because this was your forte, you were the
9 person responsible for aggregating the
10 licenses?
11     A.   Uh-huh.
12     Q.   So you do know that as you
13 aggregated these licenses, you made
14 commitments to pay site rental fees, right?
15     A.   Right.
16     Q.   And you also know, under the SEC
17 rules, there were deadlines to get the
18 licenses constructed so they wouldn't be
19 forfeited, you knew that, right?
20     A.   Yes.
21     Q.   You also knew there were FCC rules
22 that required having subscribers on the
23 system by certain periods or you would
24 forfeit or lose the licenses?
25     A.   Yes.

Page 176

1        J. Norman
2      Q.   Do you have any idea what the
3 aggregate site rental fees were when you
4 maxed out the number of licenses the company
5 either owned or managed?
6      A.   I've got an idea.
7      Q.   What is it?
8      A.   Anywhere from a couple hundred to
9 $1,000 a month, maybe.
10     Q.   So how much was it a month to just
11 keep up with your contractual obligations?
12     A.   It's hard to -- I can't sit here
13 this second because some of the licensees
14 were paying that amount themselves.
15     Q.   Let's throw out a number.  If it
16 was 30,000 a month to cover site rental fees
17 for 50 licenses, plus your construction
18 requirements, plus your subscriber
19 requirements, do you have any idea what the
20 high watermark was for USM subscriber
21 revenues or revenues of any kind from
22 operations?
23     A.   Anywhere from 60 to a hundred
24 thousand annually.
25     Q.   Annually, so 5,000 to 8,000 a

Page 177

1        J. Norman
2 month?
3      A.   Yes.
4      Q.   If your site rental fees are 30,000
5 a month, plus you've got to install a half
6 million dollars worth of equipment, plus you
7 have to continually work to bring subscribers
8 and keep subscribers on the system so you
9 don't forfeit everything you sunk all that
10 money into, that's an ongoing separate
11 operating business with ongoing financial
12 obligations, isn't it?
13     A.   Yes, but I think you're mixing the
14 time up on the build out and constructing on
15 that.
16        I believe when I left the company,
17 most of that stuff was already done because
18 we were involved with that, too, Tom and I.
19     Q.   But when the company --
20     A.   So --
21     Q.   When the company never manages to
22 generate sufficient cash flow to pay even a
23 fraction of its ongoing bills, who do you
24 think has to deal with the creditors, the
25 people that aren't being paid, the equipment

45 (Pages 174 to 177)

Page 198

1    J. Norman
2  to give you the courtesy.
3    MR. FELICE: If you're not
4  finished, it may not make sense for me
5  to question him and if you are given the
6  right to recall this witness, we will
7  address it then. If not, we'll address
8  it through other evidence. Thank you.
9    THE VIDEOGRAPHER: This is the end
10  of deposition of Jeff Norman and the
11  time is 12:04 p.m. This is the end of
12  tape No. 2.
13    (Time noted: 12:04 p.m.)
14
15    _____
16    JEFFREY M. NORMAN
17
18 Subscribed and sworn to before me
19 this ___ day of _____, 2006.
20
21 _____
22
23
24
25

Page 199

1
2    C E R T I F I C A T E
3 STATE OF NEW YORK    )
4         : ss.
5 COUNTY OF NEW YORK    )
6
7    I, LESLIE FAGIN, a Notary Public
8  within and for the State of New York, do
9  hereby certify:
10    That JEFFREY M. NORMAN, the witness
11  whose deposition is hereinbefore set
12  forth, was duly sworn by me and that such
13  deposition is a true record of the
14  testimony given by the witness.
15    I further certify that I am not
16  related to any of the parties to this
17  action by blood or marriage, and that I
18  am in no way interested in the outcome of
19  this matter.
20    IN WITNESS WHEREOF, I have hereunto
21  set my hand this 14th day of December,
22  2006.
23    _____
24    LESLIE FAGIN, RPR
25

Page 200

1
2 ----------------I N D E X----------------
3 WITNESS          EXAMINATION BY    PAGE
4 JEFFREY M. NORMAN  MR. EVETTS      6
5
6 ------------------EXHIBITS------------------
7    NORMAN        FOR ID.
8    1        45
9    2        43
10    3        54
11    4        98
12    5        130
13    6        134
14    7        134
15    8        134
16    9        143
17    10        156
18
19
20
21
22
23
24
25

51 (Pages 198 to 200)

ESQUIRE DEPOSITION SERVICES
302-426-9857