IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JEFFREY M. NORMAN, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| DAVID W. ELKIN, RICHARD M. | : |
| SHORIN and | :   CIVIL ACTION NO. 06-005-JJF |
| THE ELKIN GROUP, INC., | : |
| | : |
| Defendants, | : |
| | : |
| and | : |
| | : |
| US MOBILCOMM, INC., | : |
| | : |
| Nominal Defendant. | : |

Sean J. Bellew, Esquire and David A. Felice, Esquire of BALLARD
SPAHR ANDREWS & INGERSOLL, LLP, Wilmington, Delaware.

Attorneys for Plaintiff.

Steven L. Caponi, Esquire and Christine S. Azar, Esquire of BLANK
ROME LLP, Wilmington, Delaware.

Attorneys for Defendants.

**MEMORANDUM OPINION**

April $\underline{28}$, 2009
Wilmington, Delaware

Joseph J. Farnan Jr.
Farnan, District Judge

Pending before the Court are Defendants' Motion For Summary Judgment (D.I. 82) and Plaintiff's Cross-Motion For Partial Summary Judgment (D.I. 86). For the reasons discussed, the Motions will be denied.

## I.   PROCEDURAL BACKGROUND

Plaintiff Jeffrey M. Norman filed this action in the Delaware Court of Chancery on December 2, 2005, asserting causes of action against Defendants in both their individual and corporate capacities for breach of contract, declaratory relief, usurpation of corporate opportunities, breaches of fiduciary duty, breach of the duty of disclosure, conversion and misappropriation, fraudulent representation, aiding and abetting breaches of fiduciary duties, and unjust enrichment. (D.I. 1, Exh. A.) On January 3, 2006, Defendants removed the action to this Court on the basis of diversity jurisdiction. (D.I. 1.)

On February 16, 2007, Defendants moved for summary judgment, contending that Plaintiff's claims were barred by the pertinent statutes of limitations. (See D.I. 43.) The Court denied the Motion. (See D.I. 70.) However, on November 6, 2008, the Court held a pre-trial conference and granted Defendants leave to file an additional motion for summary judgment. Defendants filed their Motion on November 14, 2008, and Plaintiff filed a Cross-Motion for summary judgment with their Answering Brief on December 13, 2008. This Memorandum Opinion sets forth the Court's decision on the parties' Motions for summary judgment.

1

## II.  **FACTUAL BACKGROUND**

The pertinent facts in this case have not changed since Defendant filed its initial Motion For Summary Judgment.  For the sake of completeness, the Court repeats here, with only slight modification, the statement of facts it provided in its Memorandum Opinion (D.I. 70) denying Defendants' first Motion For Summary Judgment.

Plaintiff is a 25 percent stockholder of nominal Defendant US Mobilcomm, Inc. ("USM").  Plaintiff is a resident of Connecticut.  USM is incorporated in Delaware with its principal place of business in Pennsylvania.  Defendant David W. Elkin is a 75 percent stockholder, President, and sole director of USM. Elkin is a resident of Pennsylvania.  Defendant Richard M. Shorin was an officer, controller, and Assistant Secretary of USM. Shorin is also a resident of Pennsylvania.  Defendant The Elkin Group, Inc. ("The Elkin Group") is a corporation wholly-owned and controlled by Defendant Elkin with its incorporation and principal place of business in Pennsylvania.

Plaintiff and Defendant Elkin are the only two shareholders of USM, a closely-held corporation formed to participate in the wireless communications industry by acquiring 220 MHz licenses, constructing wireless communications systems, and marketing the service.  The parties dispute the precise nature of an agreement between Plaintiff and Defendant Elkin to fund USM.  However, there does not appear to be a dispute that at some point, Plaintiff and Defendant Elkin agreed that USM would require at

2

least $1 million in capital, 25 percent to be contributed by Plaintiff and 75 percent by Defendant Elkin. The extent to which this funding arrangement affected each parties' ownership interest in USM appears to be disputed to some degree. In addition to providing capital, each shareholder agreed to contribute his time to the company. According to each party, the other shareholder failed to meet his initial capital contribution amount.

According to Plaintiff, he worked on behalf of the company until 1996 to negotiate and enter into management agreements with other 220 MHz license holders. Defendant Elkin was responsible for raising additional capital and seeking potential partners or acquirers. According to Defendant Elkin, responsibility for the company has largely remained with him since 1996. Defendant Elkin attempted for several years, without success, to obtain outside financing for the company, or alternatively, a sale or merger.

In 1998, the Federal Communications Commission ("FCC") announced it would auction "Phase II" 220 MHz licenses. USM was a holder of "Phase I" licenses. The auctioning of Phase II licenses affected the interests of Phase I license holders by potentially undermining the value of Phase I licenses. In order to protect the interests of Phase I license holders, the FCC developed procedures by which Phase I licence holders were given

3

an opportunity, upon meeting certain criteria, to participate in
the Phase II auctions as qualified bidders.

Defendant Elkin sought to have USM participate in the Phase
II auctions. However, Elkin alleges that USM lacked the capital
to pay the fee to participate as a bidder. The parties'
submissions characterize quite differently how USM participated
in the auctions and to whom the acquired Phase II licenses
belonged. According to Defendant Elkin, he determined that the
best way to protect USM's interests in the auctions was to have a
friendly entity acquire any Phase II licenses that encroached on
USM's Phase I licenses. Elkin accomplished this by using
$200,000 of his own money, funnelled through his company, The
Elkin Group, to pay USM's fee to participate in the auction. The
FCC recognized USM, rather than The Elkin Group, as a qualified
bidder for its Auction No. 18 on its public documents. USM was
named on FCC public documents as a winning bidder for certain
Phase II licenses. (D.I. 51-4, Exh. N). Later, however,
Defendant Elkin amended the FCC registration to substitute The
Elkin Group for USM as the named bidder. (D.I. 51-4, Exh. M).
In his opening brief in support of his Motion for Summary
Judgment, Elkin characterized the Phase II licenses as "his newly
acquired Phase II licenses." (D.I. 43 at 13)(emphasis added).
After acquiring the Phase II licenses, Elkin sold them in
combination with USM's Phase I licenses. Elkin contends that USM

4

realized a windfall from the bundled sales as a result of the benefit that he, through The Elkin Group, conferred by acquiring Phase II licenses.

Plaintiff, however, characterizes the Phase II licenses as assets belonging to USM because the FCC named USM as the winning bidder of Auction No. 18. Plaintiff contends that, at the time the winning bids were announced, he was unaware that Defendant Elkin had substituted The Elkin Group for USM as the applicant for bidding. According to Plaintiff, when Elkin sold USM's licenses, he did not notify Plaintiff in his capacity as a shareholder, hold an annual meeting, or make any disclosure communicating the sale. Plaintiff contends that the bundled sale of Phase I and II licenses was a sale of USM's assets. According to Plaintiff, USM received no compensation for the sale of Phase II licenses, and Elkin, through The Elkin Group, personally benefitted from the proceeds of the sale.

According to Defendant Elkin, the proceeds of the sale of USM's licenses were used to repay loans he had made to USM or as a partial reduction in his capital contribution to USM. Defendant Elkin bases his characterization of the proceeds as repayment of loans on a Shareholder Loan Agreement which he executed on behalf of himself as shareholder and on behalf of the company as President. (D.I. 51-2, Exh. F). The agreement was made effective as of September 1, 1995, although it was executed sometime later. The agreement provided that any and all funds

5

provided by Elkin to or on behalf of USM in excess of $420,000 would be provided as a loan and repaid by USM prior to any distributions. From the sales of USM's licenses, Elkin received approximately $601,500. According to deposition testimony of Defendant taken in this proceeding, USM is now insolvent. (D.I. 51-6, Exh. CC).

## II. LEGAL STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a party is entitled to summary judgment if a court determines from its examination of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In determining whether there are triable issues of material fact, a court must review all of the evidence and construe all inferences in the light most favorable to the non-moving party. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976). However, a court should not make credibility determinations or weigh the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).

A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a genuine issue of material fact.

Celotex Corp. v. Catreet, 477 U.S. 317, 323 (1986). If the
nonmoving party fails to make a sufficient showing on an
essential element of his case for which he bears the burden of
proof, the moving party is entitled to judgment as a matter of
law. Id. at 322. Moreover, the mere existence of some evidence
in support of the nonmovant will not be sufficient to support a
denial of a motion for summary judgment; there must be enough
evidence to enable a jury to reasonably find for the nonmovant on
that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249
(1986).

## IV. DISCUSSION

### A. Defendants' Motion For Summary Judgment (D.I. 82)

Rather than address each of Plaintiff's claims individually,
Defendant has instead identified seven "discrete" issues that are
allegedly dispositive of Plaintiff's claims. The Court will
first consider each of Defendants' seven issues and determine
whether any of them can, in fact, be decided in Defendants' favor
on summary judgment. To the extent the Court determines that any
of these issues can be decided in Defendants' favor, the Court
will then consider if this will dispose of any of Plaintiff's
claims.

#### 1. Whether A Proper Accounting Has Been Made Of All USM Funds

Defendants contend that the "cornerstone of Plaintiff's
complaint rests on the false assertion that Defendants stole or

7

misappropriated USM assets." (D.I. 83 at 6.) To rebut this allegedly "false assertion," Defendants have provided a compendium of documents (D.I. 74) (hereinafter "the Submission") that allegedly "details the entire financial history of USM and proves that every dollar has been properly accounted for." (D.I. 83 at 6.) In their Reply Brief in support of their Motion For Summary Judgment, Defendants contend that Plaintiff has "conceded" the accuracy of the Submission and otherwise declined to challenge the authenticity or accuracy of a single document in the Submission. (D.I. 88 at 6.)

Plaintiff has made no such concession. On the contrary, Plaintiff states "there are serious questions regarding the truthfulness of Defendants' Submission." (D.I. 87 at 13.) As one example, Plaintiff points to a June 1997 Schedule of Stockholder Equity, which lists a total of $2,000 in "capital withdrawals by shareholder" in 1995. (D.I. 87, Exh. 2.) Defendants' Submission, by contrast, purports to show that Plaintiff alone made capital withdrawals far in excess of $2,000. (See D.I.74, Exh. B.) Similarly, though Defendants now allege that Plaintiff's total capital withdrawals through July 1996 exceed $60,000, (see D.I. 83 at 20; D.I. 74, Exh. B), the Schedule of Stockholder Equity lists only $15,500 in total capital withdrawals by shareholders through June 1997.

Plaintiff responds that the Schedule of Stockholder Equity is "wholly irrelevant" and contends that it was "not created as a

8

contemporaneous document meant to accurately reflect the status of the stockholders' contributions and reductions to capital." (D.I. 88 at 3.) But this begs the question, if the Schedule of Stockholder Equity was not meant to "accurately" reflect the stockholders' capital contributions and withdrawals, what was it meant to reflect? Likewise, Plaintiff notes discrepancies between the Shareholder Loan Agreement and the Submission, pointing specifically to loans that appear on the Loan Agreement but not in the Submission. (D.I. 87 at 13-14.) In the Court's view, Defendants have not addressed these discrepancies, and thus, there remains an issue of fact as to the accuracy of the Submission. Accordingly, the Court will not grant summary judgment on any of Plaintiff's claims on the basis of the accuracy of the Submission.

### 2. Issues Pertaining To The Calculation Of Plaintiff's Capital Account

The basis for many of Plaintiff's claims is that although Defendant Elkin allegedly failed to fulfill his obligation to fund USM with $750,000, Plaintiff did meet his obligation to fund USM with $250,000. Afterwards, when Elkin sold USM, Plaintiff alleges that Elkin then failed to distribute proceeds from the sale on a pro rata basis. (See D.I. 87 at 9-10, 12.) However, according to Defendants, Plaintiff never contributed $250,000 to USM, and his capital account now stands at only $139,400. (See D.I. 74, Exh. B.) The discrepancy between the parties' competing figures is attributable to

9

disputes over whether (1) Plaintiff is entitled to a $50,000 credit for his capital account, and (2) whether Defendants properly reduced Plaintiff's capital account by roughly $60,000. According to Defendants, a number of claims can be disposed of on summary judgment if these issues are decided in their favor.

However, the Court concludes that genuine issues of material fact remain as to both of these issues. With respect to whether Plaintiff's capital account should be credited for $50,000, Plaintiff points out that in May 1994 he wired $196,000 to USM's account, noting on accompanying documentation that he estimated that he had paid at least an additional $50,000 in "out of pocket to date" on USM's behalf. (D.I. 87, Exh. 20.) Shortly thereafter, Defendant Elkin, acting as the sole board of director for USM, issued Plaintiff an amount of stock equivalent to a 25% ownership interest in USM, (see id., Exh. 6), an event that Plaintiff points to as evidence of agreement among the parties that he had met his funding obligations. Plaintiff further submits an affidavit from his accountant, William Dylewski, stating that from 1993 through July 1996, Plaintiff had paid expenses on behalf of USM in the amount of $104,260. (See id., Exh. 21.) In response, Defendants rely largely on deposition testimony that allegedly shows that Plaintiff was aware of an ongoing dispute over whether he should receive a $50,000 credit and that Defendants had, in fact, declined to award the credit. (See D.I.88 at 4-5.) However, the Court has reviewed the

deposition testimony supplied by Defendants and, importantly, the testimony does not show that Plaintiff ever agreed that he should not receive a $50,000 credit. Though Plaintiff acknowledged that the parties may have disagreed over whether he should receive the credit, (see D.I. 88, Exh. 1 at 138:13-25), he further testified that he "never understood" statements by Defendants Elkin and Shorin to the effect that he should not receive the credit (see id. at 163:8-17). In the Court's view, Plaintiff's deposition testimony does not warrant summary judgment on the issue of whether his capital account should be credited by $50,000. In sum, although Plaintiff provides only minimal evidence to support his entitlement to a $50,000 credit, the Court concludes that the evidence is sufficient to defeat summary judgment.

The Court further finds that there is a genuine issue of material fact with respect to whether Plaintiff's capital account was properly reduced by roughly $60,000. As set forth above, there are discrepancies between the Schedule of Stockholder Equity and Defendants' Submission that bear on whether Plaintiff's capital withdrawals were properly accounted for. (See supra Part IV.A.1 of this Memorandum Opinion.) On the basis of this evidence alone, the Court concludes that summary judgment is not appropriate.

In addition, the Court notes that there continues to be a number of additional disputes regarding whether Plaintiff's capital account was properly reduced to pay for New York City

11

office space used by Plaintiff during the 1994 to 1996 time frame. These reductions constitute a large portion of the $60,000 in allegedly improper reductions. First, the parties dispute whether Plaintiff even agreed that his capital account could be reduced to pay for the office space. According, to Defendants, Plaintiff agreed to the terms of an October 1994 letter from Elkin to Plaintiff, which provided that "[a]ll payments made by USM towards your New York Office . . . shall be treated as a reduction of your capital contribution to USM." (D.I. 87, Exh. 1.) The letter further states that Plaintiff would agree to its terms of by depositing a set of checks that were enclosed with the letter. (Id.) However, according to Plaintiff, he never deposited the enclosed checks and hence never agreed to the terms of the letter. (See D.I. 87 at 19.)

In their Reply Brief, Defendants respond that although Plaintiff may not have overtly agreed to the terms of the October 1994 letter, he nevertheless accepted the terms by his conduct, and/or he is equitably estopped from challenging the letter. For a number of reasons, the Court will not grant summary judgment on this basis. First, because Defendants raised these issues for the first time in their Reply Brief, Plaintiff has not had an adequate chance to respond to them. Second, in the Court's view, whether Plaintiff accepted the terms of the letter by his conduct or is equitably estopped from challenging the letter is a fact intensive inquiry that, on the current record, cannot be resolved

12

on summary judgment. For instance, the parties dispute whether the New York city office should be considered a reasonable and necessary business expense. Plaintiff notes that USM listed the New York office both in the management agreement it offered to Phase I license holders and on its letterhead. (See D.I. 87, Exh 22; D.I. 74, Exh. G.) Similarly, Plaintiff contends that USM listed $39,000 in "rents" expense on its 1996 federal tax return and that there is an issue as to whether this referred to the New York office space. (D.I. 87 at 20.) This dispute over whether the New York office was a legitimate business expense infects the issue of whether Plaintiff could, for instance, be reasonably viewed as having agreed by his conduct to have his capital account reduced to pay rent on office space. Accordingly, the Court will not grant summary judgment on the issue of whether Plaintiff's capital account was properly reduced.

### 3. Whether Elkin's Contributions To USM Beyond His Initial Capital Contribution Should Be Characterized As Shareholder Loans

According to Defendant Elkin, although his capital account now stands at $457,000, he actually provided capital totaling roughly $1.07 million to USM. The approximate $615,000 difference between these two figures, Elkin contends, corresponds to a series of loans that Elkin made to USM and that USM has since repaid. (See D.I. 83 at 11-12.) Defendant Elkin contends that if the Court agrees that the $615,000 in contributions should be characterized as loans, then Plaintiff's claims for

13

breach of contract, declaratory judgment, breach of fiduciary duty, fraud, aiding and abetting, and unjust enrichment must be dismissed.[1]  In support of the position that the contributions should be characterized as loans, Elkin points out that he executed a Shareholders Loan Agreement memorializing his intent that the contributions be characterized as loans.  (See D.I. 74, Exh. K.)  In addition, Elkin contends that the additional $615,000 in contributions were used to cover day-to-day operations of USM and, under standard accounting principles, would thus be characterized as loans rather than equity.  (See D.I. 83 at 12-13.)

Plaintiff responds, first, that the Shareholder Loan Agreement was a "post-hoc" improper attempt by Elkin to – unbeknownst to Plaintiff – retroactively characterize the contributions as loans.  Defendants note that the Shareholder Loan Agreement was not executed until well after its effective date; indeed, in interrogatory responses, Defendant Elkin states that he did not execute the agreement until 2001 or 2002, roughly six years after the effective date of the Agreement.  (See D.I. 83, Exh. 3 at 5.)  In addition, Plaintiff submits the declaration of Martin H. Abo, an accountant he retained to provide testimony in this litigation.  Mr. Abo reviewed USM's tax returns from 1997-2004 and concluded that USM never listed any loans from

_____

[1] Defendants offer no explanation whatsoever as to why these claims should be dismissed if the Court characterizes the $615,000 in contributions as loans.  (See D.I. 83 at 10-11.)

14

shareholders on those returns.  Similarly, in discovery,
Defendants have admitted that USM never filed a tax return that
claimed any amount as "Loans from Shareholders" on Form 1120S.
(D.I. 87, Exh. 4 at 3.)

In view of the lengthy delay in the execution of the
Shareholder Loan Agreement and the evidence that USM never listed
the shareholder loans on their tax returns, the Court concludes
that there remains a genuine issue of material fact as to whether
Elkin's $615,000 in contributions to USM should be characterized
as loans, and therefore the Court will not grant summary judgment
on this issue.

### 4.    Whether Elkin's Financial Contribution To USM Has Been Definitively Quantified

Defendant Elkin contends that there is no dispute that he
contributed approximately $450,000 in equity and $615,000 in
operating capital to USM and that this disposes of Plaintiff's
claims for breach of contract, declaratory judgment, breach of
fiduciary duty, fraud, aiding and abetting, and unjust
enrichment.[2]  (See D.I. 83 at 11.)  In light of the Court's
conclusion that summary judgment is not appropriate as to the
accuracy of the Submission (see supra Part IV.A.1 of this
Memorandum Opinion) and whether the $615,000 in contributions
should be characterized as loans (see supra Part IV.C), the Court

---

[2] Again, Defendants fail to explain how a decision in their
favor on this issue would dispose of Plaintiff's claims.

15

concludes that summary judgment is not appropriate on the issue of whether Elkin's financial contribution to USM has been definitively quantified.

Furthermore, even if the Court were to conclude that Elkin is correct that his capital account should be valued at $457,000, the Court is unable to conclude that this disposes of Plaintiff's claims. For instance, Plaintiff's breach of contract claim alleges, inter alia, that Elkin breached an agreement for Plaintiff to fund USM with $250,000 of capital and Elkin to provide $750,000. (See D.I. 87 at 9.) In support of this position, Plaintiff points to, for instance, a discovery response by Defendants in which they admit that Elkin agreed to pay $750,000 for a 75% ownership in USM subject to Plaintiff's payment of $250,000 for a 25% ownership in USM. (See D.I. 87, Exh. 4 at 4.) Likewise, in their Counterclaim, Defendants allege that "Elkin and Norman originally agreed that Elkin would invest $750,000 in USM and that Norman would invest $250,000 and that these initial investments would result in Elkin owning 75% and Norman owning 25% of USM's then outstanding shares." (D.I. 5 ¶ 127.) Although Defendants now contend that Elkin and Plaintiff agreed only to maintain their capital contributions in a 3 to 1 ratio, these admissions are sufficient to defeat summary judgment on this issue. Accordingly, even if the Court were to find that Elkin's account is properly valued at $457,000, the breach of contract claim would remain. The Court has further reviewed the

16

other claims that Defendants contend are appropriate for summary
judgment on the basis of Elkin's capital account having been
properly quantified and fails to see an adequate basis for
summary judgment on those claims also.

### 5. Whether Elkin's Capital Account Is In Excess Of Three Times Plaintiff's Capital Account

For the reasons stated above, the Court concludes that
genuine issues of material fact remain as to whether Elkin's
capital account is in excess of three times Plaintiff's capital
account. (See supra Parts IV.A.1 - IV.A.4 of this Memorandum
Opinion.) In addition, for reasons stated above, the Court
further concludes this issue is not, on its own, dispositive of
any of Plaintiff's claims. (See supra Part IV.A.4 of this
Memorandum Opinion.)

### 6. Whether Plaintiff's Usurpation Of Corporate Opportunity And Misappropriation Claims Fail As A Matter Of Law

Briefly, Plaintiff's usurpation of corporate opportunity and
misappropriation claims allege that Elkin improperly permitted
The Elkin Group to take USM's rightful place in the auction for
Phase II Licenses. (See D.I. 87 at 10-11.) Defendants respond
that the claims fail as a matter of law because USM did not have
the financial capability to participate in the Phase II auction.
Specifically, pointing to documents in their Submission,
Defendants contend that USM had at most about $28,000 of funds in
its money market account during the relevant time frame, and a

17

minimum of $200,000 was needed to even register as a participant in the Phase II auction.[3]  (D.I. 83 at 25-26.)

In response, Plaintiff points to two proposed transactions involving USM shortly before the Phase II auctions in which USM was allegedly valued at approximately $6 million.  First, in May 1997, USM considered a sale of its assets to Centennial Communications Corporation for a total of $6 million.  (See D.I. 87, Exh. 7.)  Second, in February 1998, USM considered merging with Incom Communicatins Corporation.  Plaintiff points to evidence suggesting that, in advance of this potential merger, USM should have been valued at roughly $7.6 million.  (See id., Exhs. 8-9.)  Pointing to these valuations, Plaintiff argues that "[b]ased on these figures a jury could reasonably conclude that [USM] had the financial wherewithal to bid on or purchase Phase II licenses."  (D.I. 87 at 22.)

No party attempts to set forth the legal standard for determining whether a corporation is financially unable to exploit a corporate opportunity.  Nor does any party cite any

---

[3] Defendants further contend that the Court, in its Memorandum Opinion denying Defendants' first Motion For Summary Judgment (D.I. 70), already found that USM was not adequately capitalized to participate in the Phase II auction.  (See D.I. 83 at 25.)  Specifically, Defendants note that in the "Background" section of the Memorandum Opinion the Court stated that "[h]owever, USM lacked the capital to pay the fee to participate as a bidder."  (D.I. 70 at 3.)  This is clearly not a factual finding by the Court.  Rather, this is merely a background statement made by the Court to help the reader of the Memorandum Opinion understand the statute of limitations issues raised by the first Motion For Summary Judgment.

cases supporting its position on this issue.  However, the
Court's review of the available authority suggests that the
Defendant faces a significant burden in establishing that a
corporation was financially unable to take advantage of a
corporate opportunity.  For instance, the Court of Chancery of
Delaware recently applied the standard that "such financial
inability must amount to insolvency to the point where the
corporation is practically defunct."  Gen. Video Corp. v.
Kertesz, 2008 Del. Ch. LEXIS 181, at *56-*57 (Del. Ch. Dec. 17,
2008); but see Yiannatsis v. Stephanis by Sterianou, 653 A.2d
275, 279 (Del. 1995) (stating "we do not adopt the 'insolvency-
in-fact test'" and that courts should consider "a number of
options and standards for determining financial inability,
including but not limited to, a balancing standard, temporary
insolvency standard, or practical insolvency standard").
Similarly, in Borden v. Sinskey, 530 F.2d 478, 490-91 (3d Cir.
1976), the defendant, an officer and director of a corporation,
argued that the corporation was unable to take full advantage of
an opportunity to acquire the stock of a bank because the
corporation lacked sufficient funds to do so, an argument similar
to the one now raised by Defendants in this case.  Though
concluding that the corporation in Borden did, in fact, have
adequate funds to make the stock purchase, the Third Circuit
further explained that even if the corporation lacked adequate
funds, there was no reason why the corporation could not have

19

raised the funds through a loan secured by the stock. <u>Borden</u>,
530 F.2d at 491.

In light of this authority, the Court cannot conclude that
there is no genuine issue of material fact as to whether USM had
a corporate opportunity simply because it had only about $28,000
in its money market account during the relevant time frame.
Indeed, given the evidence that USM may have in fact had a value
of roughly $6 million dollars, the Court agrees with Plaintiff
that a reasonable jury could find that USM could have raised the
funds necessary to participate in the auction for Phase II
licenses.[4]  Accordingly, the Court will not grant summary
judgment on this issue.

## 7. Whether The Pertinent Statute Of Limitations Bars Plaintiff's Claims

Defendants' earlier Motion For Summary Judgment raised the
defense that Plaintiff's claims are time barred because the
pertinent limitations period has passed for all of his claims.
(<u>See</u> D.I. 42.)  As set forth in the Court's Memorandum Opinion on
Defendants' earlier Motion For Summary Judgment, Pennsylvania's

---

[4] Defendants also contend that Plaintiff admitted at
deposition that he had tried and failed to raise money for USM to
participate in the Phase II auction.  The Court has reviewed the
relevant testimony, and notes that Plaintiff, in response to a
question over whether he knew that Defendant Elkin had been
trying to raise money for USM to participate in the auction,
simply stated "I know we were both [i.e., Plaintiff and Defendant
Elkin] trying to raise the money".  (D.I. 88, Exh. 1 at 106:25-
107:8.)  In the Court's view, this testimony is too inconclusive
to entitle Defendants to summary judgment.

20

two-year limitations period applies to all of Plaintiff's claims except his breach of contract claim, for which the Delaware three-year limitations period applies.  (D.I. 70 at 9.)  Though the court denied Defendants' earlier Motion, Defendants nevertheless raise the statutes of limitations again in the instant Motion.[5]

First, Defendants contend that there was an active dispute regarding Plaintiff's request for a $50,000 credit to his capital account as early as 1994.  In particular, Defendants contend that Plaintiff was put on notice of this dispute as early as 1994 by notations in Shareholder Contribution Sheets stating "JEFF ESTIMATE, NEED DETAIL."  (See D.I. 74, Exh. H.)  According to Defendants, these notations alerted Plaintiff that he would not receive the disputed credit unless he provided additional detail regarding the expenses that formed the basis for the credit.  Defendants further point to an October 1994 letter which, although noting that Plaintiff has borne personal expenses that will be treated as an addition to his capital account, states that there has not yet been a final determination as to the amount of the credit.  (Id., Exh. G ¶ 4.)  Having not filed this action until 2005, however, Defendants contend that "this aspect of Plaintiff's claim" should be dismissed because limitations period has long since passed.  (D.I. 83 at 18.)

---

[5] Though Defendants raise the statute of limitations in their Opening Brief in support of their Motion, they decline to discuss it in their Reply Brief.

Plaintiff responds that because he is not, in fact, seeking a declaration that his capital account be adjusted by $50,000, Defendants are trying to apply the statute of limitations in a way that does not even address the claims at issue in this case. (See D.I. 87 at 22.) Whether this is true or not, the Court nevertheless concludes that summary judgment is not appropriate on the issue of whether Plaintiff's claim to a $50,000 credit is time barred. On reviewing the Shareholder Contribution Sheets, the Court concludes that the notations "JEFF ESTIMATE, NEED DETAIL" are too vague and inconclusive in substance to warrant summary judgment that Plaintiff was on notice of his claims as early as 1994 such that they are now time barred. Indeed, Plaintiff testified at deposition that he "never understood" suggestions that he would not receive the $50,000 credit. (See D.I. 88, Exh. 1 at 163:8-17). Furthermore, the October 1994 letter that Defendants point to as evidence of Plaintiff being "clearly placed on notice that his request for credit had not been granted," (D.I. 83 at 19), actually states that "you and I [i.e., Plaintiff and Defendant Elkin] have personally borne certain expenses on behalf of USM which will be treated as additions to our contributed capital." (D.I. 74, Exh. G ¶ 4.) Thus, in the Court's view, there remains a genuine issue of fact as to the precise time Plaintiff was on notice of a dispute over the $50,000 credit.

Second, Defendants contend that as of 1994 Plaintiff was not only aware but consented to have his capital account reduced by roughly $60,000. In support of this position, Defendants again point to both the October 1994 letter and the Shareholder Contribution spreadsheets. (See D.I. 83 at 22-23.) However, as explained above, the Court concludes that the parties continue to have a genuine dispute as to whether Plaintiff actually agreed to the terms of the October 1994 letter. (See Part IV.A.2 of this Memorandum Opinion.) Furthermore, given that a large portion of the alleged capital reductions were for New York office space, the Court is unable to conclude, even after reviewing the Shareholder Contribution Sheets, that summary judgment is appropriate on the issue of whether Plaintiff knew in 1994-1995 that these expenses would legitimately be deducted from his capital account and not treated as business expenses.

Finally, with regard to Plaintiff's usurpation of corporate opportunity claim, Defendants contend that Plaintiff was aware in 2001, at the latest, of the facts surrounding the bidding for and purchase of Phase II licenses. (D.I. 83 at 26.) However, the Court has reviewed the evidence and argument Defendants present on this issue and concludes that it is essentially the same material they presented in support of their first Motion For Summary Judgment on this issue, which the Court denied. (See D.I. 70; D.I. 76 (denying Defendants' Motion For Reconsideration of the Court's initial summary judgment ruling).) Accordingly,

23

the Court will also deny Defendants' second Motion For Summary Judgment on this issue.

**B.   Plaintiff's Cross-Motion For Summary Judgment (D.I. 87)**

The parties dispute whether the Court permitted Plaintiff to file a Cross-Motion For Summary Judgment at the November 6, 2008 pre-trial conference. (See D.I. 86, Exh. 3; D.I. 89.) In these circumstances, Defendant has declined to respond to Plaintiff's Cross-Motion For Summary Judgment. Putting aside the issue of whether the Court granted Plaintiff leave to file a cross-motion for summary judgment, the Court concludes that Plaintiff is not entitled to summary judgment on any of the issues raised in his cross-motion.

First, Plaintiff contends that he is entitled to summary judgment that Plaintiff and Elkin agreed that Plaintiff was to contribute exactly $250,000 to USM and Defendant was to contribute exactly $750,000 to USM, for a total of $1 million. (D.I. 87 at 24.) Defendants, however, contend that Plaintiff and Elkin agreed only to a 25/75 ownership split and would "fund USM's needs in proportion to their equity position." Defendants note that Plaintiff testified at deposition that he first agreed with Elkin that the ownership split would be 25/75, and only later agreed with Elkin that $1 million of capital would be necessary to fund USM. (See D.I. 83, Exh. 1 at 20:2-21:3.) In light of this testimony, the Court concludes that genuine issues of fact remain as to the precise nature of the parties' agreement

24

to fund USM, and the Court will thus not grant summary judgment on this issue.

Second, Plaintiff seeks summary judgment that he met his $250,000 funding obligation. (D.I. 87 at 25.) In light of the Court's conclusion that genuine issues of material fact remain as to whether Plaintiff is entitled to have his capital account credited by $50,000 and whether his capital account was properly drawn down by roughly $60,000, the Court concludes that summary judgment is not appropriate on this issue.

Third, Plaintiff asks the Court to grant summary judgment that Defendant Elkin's execution of the Shareholder Loan Agreement constitutes a breach of fiduciary duty and a breach of contract. Defendants note that Plaintiff testified at deposition that if Elkin made a contribution to USM in excess of three times Plaintiff's contribution, there should be an adjustment for that excess contribution to reflect that they possibly constituted loans. (See D.I. 83, Exh. 1 at 182:2-183:14.) In light of this testimony, the Court concludes that summary judgment is not appropriate on the issue of whether Shareholder Loan Agreement was a breach of contract or a breach of fiduciary duty.

Finally, Plaintiff seeks summary judgment that a December 2002 letter written by Elkin was fraudulent. Briefly, this letter states that USM received a total of $479,708 from the sale of its Florida, Boston and Chicago licenses and that $380,588 of these proceeds were used to repay shareholder loans. (See D.I.

25

74, Exh. 17.) Plaintiff notes, however, that Defendants'
Interrogatory Responses and internal USM documents state that
Defendant Elkin had made greater than $600,000 from the sale of
licenses and had also repaid himself more than $600,000 of
shareholder loans. (See D.I. 74, Exh. 4 at 6; id., Exh. 14.)
Plaintiff further contends that Defendant Elkin failed to
disclose in the letter that the shareholder loans were paid in
capital, the existence of the Shareholder Loan Agreement, and
that USM had no remaining interest in the Phase II licenses.
(D.I. 87 at 23.) Based on these allegations, Plaintiff contends
that summary judgment on his fraud claim is appropriate.
However, to establish fraud, Plaintiff must establish, among
other elements, that Defendant Elkin made false representations
with an intent to induce Plaintiff to act or refrain from
acting.[6] Plaintiff includes no allegations in his Cross-Motion
For Summary Judgment tending to establish this intent element,
which, in the Court's view, is particularly fact intensive in
nature. Accordingly, the Court will deny Plaintiff's Motion For
Summary Judgment on his fraud claim.

---

[6] The elements of a common law fraud (or deceit) cause of
action consist of (1) a false representation, usually one of
fact, made by the defendant; (2) the defendant's knowledge or
belief that the representation was false, or was made with
reckless indifference to the truth; (3) an intent to induce the
plaintiff to act or to refrain from acting; (4) the plaintiff's
action or inaction taken in justifiable reliance upon the
representation; and (5) damage to the plaintiff as a result of
such reliance. Gaffin v. Teledyne, Inc., 611 A.2d 467, 472 (Del.
1992).

26

## V. CONCLUSION

For the reasons discussed, Defendants' Motion For Summary
Judgment (D.I. 82) will be denied and Plaintiff's Cross-Motion
For Summary Judgment (D.I. 86) will also be denied.  An
appropriate Order will be entered.