## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

JEFFREY M. NORMAN,        :

           Plaintiff,      :

v.             :      C.A. No. 06-005-JJF

DAVID W. ELKIN, RICHARD M. SHORIN :
and THE ELKIN GROUP, INC.      :      Jury Trial Demanded

           Defendants,      :

and      :

US MOBILCOMM, INC.,      :

           Nominal Defendant.      :

## POST-TRIAL BRIEF ON MATTERS RESERVED BY THE COURT BY DEFENDANTS DAVID W. ELKIN, RICHARD M. SHORIN AND THE ELKIN GROUP, INC. <u>AND NOMINAL DEFENDANT US MOBILCOMM, INC.</u>

**BLANK ROME LLP**

Steven L. Caponi (DE I.D. 3484)
Christine S. Azar (DE I.D. 4170)
1201 N. Market Street, Suite 800
Wilmington, DE 19801
Telephone: (302) 425-6400
Facsimile: (302)425-6464

*Attorneys for Defendants*

Dated: August 14, 2009

TABLE OF CONTENTS

Pages

Table of Authorities ............................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................1

I.    PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS ..........2

    A.    Plaintiff's Breach of Contract Claim is Time Barred .............................4

        1.    Failure to Contribute Capital .......................................................5

        2.    Failure to Make Pro Rata Distributions ......................................8

    B.    Plaintiff's Fraud Claim is Time Barred ...................................................8

        1.    Plaintiff Failed to Prove an Independent Act of Fraudulent Concealment 11

        2.    Plaintiff Was on Inquiry Notice by at least December 2002, Over Three Years Before Filing Suit ...........................................................13

            a.    The December 3, 2002 Letter ........................................14

            b.    The October 2003 Letter ...............................................19

    C.    Plaintiff's Conversion and Usurpation of Corporate Opportunity Claims Are Time Barred ..............................................................................................21

        1.    Facts Supporting the Conversion and Usurpation Claims were not Fraudulently Concealed ...........................................................22

        2.    The Discovery Rule Cannot Save The Conversion or Usurpation Claims 23

    D.    Aspects of the Plaintiff's Breach of the Fiduciary Duty of Loyalty Claim Are Barred ...........................................................................................28

        1.    Plaintiff's fiduciary claim for participation in Auction 18 is barred .........29

        2.    Plaintiff's fiduciary claims for execution of the Shareholder Loan Agreement are barred .................................................................31

    E.    Plaintiff's Duty Of Disclosure Claims are Barred by the Statute of Limitations ...32

        1.    Plaintiff's claim for failure to give notice of or the right to vote on the sale of assets is barred .....................................................................32

i

2.      Plaintiff's claim for failure to seek approval for the Shareholder Loan
        Agreement is barred ...............................................................................33

F.      Plaintiff's Remaining Claims are Likewise Barred by the Statute of Limitations 34

II.   Plaintiff's Claims Other than the Breach of Contract and Fraud are Derivative Claims and
      any Damages Belong to USM.......................................................................................35

A.      Conversion/Misappropriation is Derivative..........................................................36

B.      Plaintiff's Breach of Fiduciary Duty Claims are Derivative .................................37

C.      The Unjust Enrichment and Declaratory Judgment Claims are Derivative...........38

III.  ELKIN SHOULD BE AWARDED REASONABLE COMPENSATION AS AN OFFSET
      AGAINST ANY DAMAGES AWARDED .......................................................................38

CONCLUSION...................................................................................................................42

# TABLE OF AUTHORITIES

## FEDERAL CASES

Pages

*Benak v. Alliance Capital Management L.P.*,
    349 F. Supp. 2d 882 (D.N.J. 2004) ..................................................................................24

*Berry Petroleum Co. v. Adams & Peck*,
    518 F.2d 402 (2d Cir. 1975)............................................................................................20

*In re Big Wheel Holding Co., Inc.*,
    214 B.R. 945 (D. Del. 1997)...........................................................................................37

*Carr v. Gillis Associated Industrial, Inc.*,
    2007 U.S. App. LEXIS 8855 (3d Cir. Apr. 16, 2007) .........................................................9

*Eckstein v. Balcor Film Investors*,
    58 F.3d 1162 (7th Cir. 1995) ..........................................................................................24

*In re NAHC, Inc. Sec. Litigation*,
    306 F.3d 1314 (3d Cir. 2002)..........................................................................................24

*Robertson v. Seidman & Seidman*,
    609 F.2d 583 (2d Cir. 1979)............................................................................................20

*Seidel v. Lee*,
    954 F. Supp. 810 (D. Del. 1996)......................................................................................24

*Trucking Employees of N. J. Welfare Fund v. Colville*,
    16 F.3d 52 (3d Cir. 1994)................................................................................................39

## STATE CASES

*Bovay v. Byllesby*,
    38 A.2d 808 (Del. 1944) ....................................................................................2, 22, 29

*Cochran v. GAF Corp.*,
    666 A.2d 245 (Pa. 1995) .................................................................................................14

*Daugherty v. Teires*,
    1961 Pa. Dist. & Cnty. Dec. LEXIS 40 (Clinton C.P. Nov. 20, 1961)..............................12

*DeMartino v. Albert Einstein Medical Center*,
    460 A.2d 295 (Pa. Super. 1983)......................................................................................10

iii

*In re Dean Witter Partnership Litigation,*
  1998 Del. Ch. LEXIS 133 (Del. Ch. July 17, 1998) ........................................................14

*Deemer v. Weaver,*
  187 A. 215 (Pa. 1936) ........................................................................................................10

*Di Loreto v. Tiber Holding Corp.,*
  2001 Del. Ch. LEXIS 26 (Del. Ch. Feb. 20, 2001) ..........................................................39

*Drelles v. Manufacturers Life Insur. Co.,*
  881 A.2d 822 (Pa. Super. 2005) ....................................................................................13, 23

*Edwards v. Wyeth Pharms., Inc.,*
  2009 Phila. Ct. Com. Pl. LEXIS 133 (Phila. C.P. July 8, 2009 ........................................11

*Fine v. Checcio,*
  870 A.2d 850 (Pa. 2005) ............................................................................................ passim

*Gagliardi v. TriFoods International, Inc.,*
  683 A.2d 1049 (Del. Ch. 1996) .........................................................................................37

*Hall v. John S. Isaacs & Sons Farms,*
  146 A.2d 612 (Del. Ch. 1958) ...........................................................................................40

*Kingston Coal Co. v. Felton Mining Co.,*
  690 A.2d 284 (Pa. Super. 1997) ........................................................................................10

*Krevitz v. City of Philadelphia,*
  1992 Phila. Cty. Rptr. LEXIS 99 (Phila. C.P. July 8, 1992) .............................................10

*Lazarski v. Archdiocese,*
  926 A.2d 459 (Pa. Super. 2007) ...........................................................................10, 22, 23

*MCA v. Viacom,*
  1997 Del. Ch. LEXIS 160 (Del. Ch. Nov. 5, 1997) ...........................................................2

*In re ML/EQ Real Estate Partnership Litigation,*
  1999 Del. Ch. LEXIS 238 (Del. Ch. Dec. 20, 1999) ........................................................28

*Manzo v. Rite Aid Corp.,*
  2002 Del. Ch. LEXIS 147 (Del. Ch. Dec. 19, 2002) ........................................................38

*Molineux v. Reed,*
  532 A.2d 792 (Pa. 1987) ......................................................................10, 22, 32, 33

iv

*Montanya v. McGonegal*,
    757 A.2d 947 (Pa. Super. 2000)...............................................................................12, 23

*NL Industrial v. MAXXAM, Inc. (In re MAXXAM, Inc./Federated Development S'holders*
    *Litigation)*,
    698 A.2d 949 (Del. Ch. 1996).........................................................................................36

*Nestle USA, Inc. v. Wachovia Bank, N.A.*,
    2007 Phila. Ct. Com. Pl. LEXIS 293 (Phila. C.P. Oct. 5, 2007) .......................................12

*Pettinaro Construction Co. v. Lindh*,
    428 A.2d 1161 (Del. 1981) ............................................................................................39

*Pocono International Raceway, Inc. v. Pocono Produce, Inc.*,
    468 A.2d 468 (Pa. 1983) ...............................................................................................13

*Scranton Gas & Water Co. v. Lackawanna Iron & Coal Co.*,
    31 A. 484 (Pa. 1895).....................................................................................................24

*Technicorp International II, Inc. v. Johnston*,
    1997 Del. Ch. LEXIS 126 (Del. Ch. Aug. 22, 1997).......................................................40

*Technicorp International II, Inc. v. Johnston*,
    2000 Del. Ch. LEXIS 81 (Del. Ch. May 31, 2000) ....................................................40, 41

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ...........................................................................................36

*VGS, Inc. v. Castiel*,
    2003 Del. Ch. LEXIS 16 (Del. Ch. Feb. 28, 2003)..........................................................38

*Wilderman v. Wilderman*,
    315 A.2d 610 (Del. Ch. 1974)........................................................................................40

## OTHER AUTHORITIES

42 Pa. C.S.A. § 5524(7) ..........................................................................................................9

## PRELIMINARY STATEMENT

Plaintiff asserted nine claims at trial: fraud, breach of contract, conversion/misappropriation, breach of fiduciary duty (loyalty and disclosure), aiding and abetting breach of fiduciary duty, usurpation of corporate opportunity, unjust enrichment and declaratory judgment. Prior to the commencement of trial, the Court ruled that only the breach of contract, fraud and conversion claims were to be presented to the jury. The Court reserved for itself judgment on the remaining six claims. The Court also reserved judgment on whether Plaintiff's claims, both those decided by the Court and those by the jury, are barred by the applicable statute of limitations, and whether any given claim is direct or derivative in nature, and whether Elkin is entitled to a set off as compensation for services to US Mobilcomm, Inc. ("USM").

With regard to the three claims decided by the jury - breach of contract, fraud and misappropriation/conversion - the jury rendered a verdict on May 13, 2009. Prior to the verdict, Defendants timely moved for judgment as a matter of law as to each claim on the grounds that Plaintiff failed to present sufficient evidence to carry his burden of proof. With regard to the claims and issues removed from the jury's purview, these matters are being decided for the first time by this Court. Accordingly, Plaintiff bears the burden of proof.

Pursuant to the Court's pre-trial rulings and the stipulated briefing schedule, the parties are to file their opening briefs on those issues for which they bear the initial burden of proof by August 14, 2009. The Defendants' arguments in support of the matters reserved for decision by the Court on which they bear the burden are addressed in this post-trial brief. These include statute of limitations, whether claims are direct or derivative and Elkin's claim for set-off. Defendants' arguments in support of their motions for a judgment as a matter of law are presented in a separate submission filed contemporaneously with this post-trial brief.

## I. PLAINTIFF'S CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

On February 16, 2007, the Defendants filed a motion for summary judgment that argued Plaintiff's claims were barred by the statutory limitations. In response, on September 26, 2007, the Court issued a Memorandum Opinion finding that Pennsylvania's two year statute of limitations applies to all of Plaintiff's claims except the breach of contract claim, which claim is covered by Delaware's three-year limitations period. (Mem. Op. at p. 9) (D.I. 70). Importantly, the Court ruled that <u>all</u> of Plaintiff's claims "accrued more than two years prior to the filing of this action, or three years for the breach of contract claim."[1] (*Id.*). Despite the filing of the Complaint beyond the limitations period, the Court further held that Plaintiff could nonetheless pursue his claims if there existed sufficient grounds for tolling the limitations period. (*Id.*).

Plaintiff has asserted two grounds to support tolling: with regard to the breach of contract and fraud claims, Plaintiff argues fraudulent concealment by the Defendants. With regard to the equitable claims, relying on *Bovay v. Byllesby*, 38 A.2d 808 (Del. 1944) and its progeny, Plaintiff argues wrongful self-dealing by David Elkin. The Court held that under either tolling principle the statute of limitations would begin to run at the time Plaintiff "knew or had reason to know of the facts constituting an alleged wrong." (Mem. Op. at p. 11). The Court proceeded to deny Defendants' motion for summary judgment because the question of when "Plaintiff knew or should have known" was a materially disputed fact that could not be resolved prior to the taking of testimony at trial. (*Id.* at p. 12).

---

[1] This and other findings contained in the Court's September 26, 2007 Memorandum Opinion constitute the law of the case and remain binding even at the post-trial phase of these proceedings. *MCA v. Viacom*, 1997 Del. Ch. LEXIS 160, at * 3 (Del. Ch. Nov. 5, 1997) (explaining that once issued, Memorandum Opinions are binding precedent).

2

With the trial complete and the record closed, the Court is now in a position to definitively determine whether Plaintiff has carried his burden to justify tolling the limitations period and when the limitations period expired with regard to the claims of:

- Fraud;
- Conversion;
- Breach of contract for failure to contribute capital or failure to contribute capital in a timely manner;
- Breach of contract for failure to distribute proceeds on a *pro rata* basis;
- Usurpation of corporate opportunity;
- Breach of fiduciary duty of loyalty and disclosure; and
- Unjust enrichment and declaratory judgment.

While this submission contains an exceeding amount of detail and voluminous citations to the trial record, Defendants wish to point out for the Court the "big picture" as it relates to statute of limitations. Other than breach of contract, <u>all</u> of Plaintiff's claims relate to the sale of wireless licenses owned by USM and the distribution of sale proceeds to Elkin. The record at trial proved that Plaintiff closely followed the auctions of licenses on the FCC website and, in early 2002, Elkin told Plaintiff in a telephone conversation that the licenses had been sold and that he, Elkin, had taken the proceeds as repayment of his shareholder loans. Shortly thereafter, his suspicions having been aroused, Plaintiff *hired a lawyer* to begin the process of demanding documents from Elkin regarding the sales and distributions. These inquiries resulted in the issuance by Elkin of the December 3, 2002 and October 2003 letters, discussed below, to Mr. Sama - Plaintiff's counsel.

Viewed objectively, Plaintiff's decision to hire a lawyer following his conversation with Elkin - more than anything - proves that before December 2002 Plaintiff was placed on inquiry notice of a possible injury and in fact began to discharge his obligation to engage in due diligence to see if his suspicions were accurate. Yet plaintiff waited three years until December

3

2005 to file this action, well beyond the two year limitations period. The evidence presented at trial leads to the inescapable conclusion that Plaintiff has failed to justify his untimely filing and that he is unable to rely upon tolling principles to extend the limitations period. Therefore, in accordance with the Court's Memorandum Opinion, his claims filed over two years before the filing of his complaint for the non-contract claims, and more than three years for the contract claim, must be dismissed.

A.    **Plaintiff's Breach of Contract Claim is Time Barred**

As explained in the introduction to Section I, this Court found that Delaware's three-year statute of limitations governs Plaintiff's breach of contract claim. Plaintiff asserts three bases for his breach of contract claim:

- That Elkin breached the parties' agreement by never contributing his capital or failing to contribute his capital in a timely fashion (Pre-Trial Order at p. 3) (D.I. 4);

- That Elkin breached the parties' agreement by executing his Shareholder Loan Agreement. (*Id.* at p. 3);

- That Elkin breached the parties' agreement by failing to distribute proceeds/revenue from the sale of Company assets on a *pro rata* basis. (*Id.* at p. 3).

At trial, the jury found that Elkin had breached the parties' contract on each of these bases but awarded nominal damages of $1.00. The trial record conclusively proves that the first and third bases for Plaintiff's breach of contract claim, the failure to contribute capital, and the failure to distribute proceeds/revenue, are barred by the statute of limitations because Norman <u>knew</u> well before December 2002 that Elkin had failed to honor the terms of the parties' contract as those terms were understood by Plaintiff.

4

### 1.   Failure to Contribute Capital

As noted above, Plaintiff's breach of contract claim is governed by Delaware's three year statute of limitations and, absent tolling, this period expired prior to the filing of Plaintiff's Complaint in December 2005. (Mem. Op. at p. 9).

Plaintiff brought this breach of contract claim, in part, because of his belief that Elkin was required to contribute $750,000 in capital at approximately the same time Plaintiff contributed his capital.

> **Q.** Okay, Now if I understand you correctly when you testified earlier, it was your understanding at the time, and still is today, that this agreement that you believe you reached required my client to put his capital into the company at approximately the same time that you put your capital into the company, correct?
>
> **A.** It was my understanding that he was going to do it at the exact same time I put my money in. In fact, he kept pressing me to put the money in.

(Norman Trans. p. 157, lines 6 - 14). Although Plaintiff argued at trial that Elkin failed to make his total contributions in a timely manner, he acknowledged his awareness of this failure as early as 1994, and that he considered the failure a breach by Elkin.

At trial, Plaintiff testified that from August 1994 through at least June 1995 he received the "Jeff/Dave" Spreadsheets showing the respective capital contributions and deductions of both parties (Norman Trans. p. 161, line 22 – p. 162, line 20) (Defs. Ex. 116 (all produced from Plaintiff's files)). Specifically, Plaintiff testified:

> Q:    And you knew that in - - this is November '94. And if we go and jump forward to May, we can see that, again, Mr. Elkin clearly is not even at half of $750,000; is that correct?
>
> A:    That's right.
>
> Q:    This is all information that came out of your file that you were aware of in 1994 and 1995; correct?
>
> A:    Correct.

5

(Norman Trans. p. 162, lines 14 - 20). Based on the Jeff/Dave spreadsheets, Plaintiff repeatedly testified at trial that he had actual knowledge in 1994 and 1995 that (at least in his view) Elkin had breached the alleged contract, yet he waited over ten years to file this action. An example of Plaintiff's lengthy admissions in this regard is:

> Q: You knew back in 1994, the fall of 1994, six, seven months after you contributed your money that my client, in fact, had not contributed the amount of money you believed he was obligated to contribute; is that correct?
>
> A: That's correct.
>
> Q: In your mind he had breached your agreement, correct?
>
> A: I don't think back then I looked at it in terms of the breach of the agreement. I looked at it more - - I guess it was more of a broken promise.
>
> Q: But you knew, in your mind, whether you want to call it a promise, or a contract, or an agreement, that what you told my client to do, he had not done.
>
> A: That's true.

(Norman Trans. p. 157, line 21 – p. 158, line 8).

Norman also testified that the above quote was consistent with his deposition testimony where he stated that he understood in the fall of 1994 or early 1995 that Elkin had breached the parties' oral agreement. (*Id.* at p. 158, lines 9–23). Norman testified that this was an area of dispute between the parties as early as November 1994: "we were having some serious issues that Mr. Elkin hadn't contributed capital (*Id.* at p. 141, lines 5-6). Norman testified that the dispute continued through the early years of USM. In 1995 and 1996, "I began to have disagreements ... with Mr. Elkin, because he hadn't contributed capital" (*Id.* at p. 143, lines 7-9);

6

and "I was going to put $250,000 at a moment in time, and he was going to put in $750,000 at a moment in time. That didn't happen. I wasn't happy with that." (*Id.* at p. 160, lines 23 – 25).

By early 1995, Norman's disagreement with Elkin over the alleged failure to contribute capital reached a point where Norman even hired an attorney to demand that Elkin contribute the remainder of his capital. Norman testified regarding a January 20, 1995 letter (Defs. Ex. 30) drafted by counsel for his signature and sent to Elkin:

> Q.   Okay. So by January 20th you knew it from - - you testified earlier in your deposition at the end of 1994, you believed you were in the position that Mr. Elkin had not lived up to your agreement, and so by January 20th the following -- excuse me --the beginning of the next year, January of 1995, you had a lawyer draft you a letter to try to encourage David Elkin to put in the remainder of his capital?
>
> A.   Yes .... .
>
> Q.   And we can see, if we go to the June '95 schedule that you had received, that it was clear that Mr. Elkin had not looked at your letter, because his capital was still $360,000; is that correct?
>
> A.   Right. He totally ignored it.

(Norman Trans. p. 163, line 6 – p. 164, line 24). The hiring of an attorney to draft a letter to Elkin clearly establishes that Norman had actual knowledge of the facts giving rise to his breach of contract claim. (*Id.* at p. 163, lines 15 – 25).

The record before this Court could not be more clear. Beginning in 1994, on a regular basis, Elkin kept Plaintiff informed about the parties' respective capital contributions by sending Plaintiff what were known to the parties as the "Jeff/Dave" spreadsheets. (Shorin Trans. p. 120, line 20 – p. 121, line 4). Plaintiff's extensive testimony establishes, based in part on this information, that—subjectively and objectively—over ten years before filing suit he was actually "aware of the facts giving rise to the wrong" that led to his breach of contract claim. Armed with

7

actual knowledge, Plaintiff cannot invoke tolling principles to save a claim filed nearly a decade too late.

### 2.   Failure to Make Pro Rata Distributions

Plaintiff asserts that Elkin breached the parties' agreement by failing to distribute proceeds from the sale of Company assets on a *pro rata* basis. (Pre-Trial Order at p. 3). Norman, however, knew about the sales of USM licenses prior to the receipt of the December 3, 2002 letter from conversations he had with David Elkin. (Norman Trans. p. 113, lines 3-9). It was after this conversation that he sought legal help in getting more detailed information about the sales. (*Id.*). In fact, the December 2002 letter itself states "Per your request of October 2, 2002, over [the] past three years US MobilComm, Inc. has sold the Mhz licenses it owned ..." (Defs. Ex. 120). Clearly, prior to October 2, 2002 Norman knew sales of the USM licenses had been made and had his attorney request more information. Elkin confirmed during cross examination at trial, that Norman's attorney had written to him in October 2002 requesting more information regarding "the sale of assets of USM." (Elkin Trans. p. 249, line 24 – p. 250, line 4).

Thus, the December 3, 2002 letter does not *start* the running of the limitations period, it is actually evidence that confirms Norman had been on inquiry notice at least two months earlier. Thus, the breach of contract claim for failure to make *pro rata* distributions is barred by the three-year statute of limitations, and Plaintiff cannot meet his burden of showing fraudulent concealment.

### B.   Plaintiff's Fraud Claim is Time Barred

Plaintiff's claim for fraud is very limited and directed solely at two letters sent by David Elkin to Plaintiff's counsel. (Pre-Trial Order at p. 5). The first letter, dated December 3, 2002, concerned the sale of USM wireless licenses, the proceeds of the licenses, and the manner in which the proceeds were allocated. (Defs. Ex. 120). Plaintiff's only basis for alleging fraud is

8

his argument that the sale price and corresponding distribution amounts reflected in the letter were allegedly incorrect. The second letter, sent in October 2003, enclosed a copy of Elkin's shareholder loan agreement and attached schedule itemizing Elkin's contributions/distributions. (Defs. Ex. 121).[2]  Once again, Plaintiff's only basis for alleging fraud with respect to this letter is his allegation that the attached schedule of contributions/distributions was "false and/or misleading." (Pre-Trial Order at p. 5).

The statute of limitations in Pennsylvania for claims of common law fraud is two years. 42 Pa. C.S.A. § 5524(7). The limitations period on fraud claims is computed from the time the cause of action accrues. *Fine v. Checcio,* 870 A.2d 850, 857 (Pa. 2005). Thus, the relevant statute of limitations begins to run as soon as the right to institute and maintain a suit arises, which generally is when the injury was inflicted. *Id.*  This Court previously held in its Memorandum Opinion that absent application of tolling principles, Plaintiff's claims were "time barred by the statute of limitations because the causes of action accrued more than two years prior to the filing of this action, or three years for the breach of contract claim." (Mem. Op. at p. 9).

"Mistake, misunderstanding, or lack of knowledge in themselves do not toll the running of the statute." *Fine,* 870 A.2d at 857. "Once a cause of action has accrued and the prescribed statutory period has run, an injured party is barred from bringing his cause of action." *Id.* There are, however, exceptions that act to toll the running of a statute of limitations. *Id.* With regard to

---

[2]  In the Pre-Trial Order (at p. 5, fn 8) and again at trial, Defendants argued that Plaintiff's allegations of fraud with regard to the October 2003 letter were improper because it was raised for the first time in the Pre-trial Order itself. Defendants renew their objection and believe this argument should be stricken as untimely. "District Courts have broad discretion to disallow the addition of new theories of liability at the eleventh hour." *Carr v. Gillis Associated Indus., Inc.,* 2007 U.S. App. LEXIS 8855, at *9-10 (3d Cir. Apr. 16, 2007) (new theories of liability made at summary judgment stage or after close of discovery were found to be untimely and they were therefore rejected).

9

the fraud claim, while the law recognizes alternative tolling doctrines, Plaintiff argued and pled only one—fraudulent concealment. (Mem. Op. at p. 11).

The doctrine of fraudulent concealment is a rare exception to the requirement that a complaining party must file suit within the statutory period. *Lazarski v. Archdiocese,* 926 A.2d 459, 465 (Pa. Super. 2007) citing *Kingston Coal Co. v. Felton Mining Co.,* 690 A.2d 284, 291 (Pa. Super. 1997). "The doctrine is based on a theory of estoppel, and provides that the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." *Fine,* 870 A.2d at 860 citing *Deemer v. Weaver,* 187 A. 215 (Pa. 1936). "[I]n order for fraudulent concealment to toll the statute of limitations, the defendant must have committed some affirmative independent act of concealment upon which the plaintiffs justifiably relied." *Lazarski,* 926 A.2d at 465.

Stated differently, the doctrine of fraudulent concealment is akin to an affirmative defense asserted by plaintiffs to stave off dismissal of their claims as untimely. Therefore, "[t]he plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence." *Fine,* 870 A.2d at 860, citing *Molineux v. Reed,* 532 A.2d 792, 794 (Pa. 1987). This standard requires the presentation of evidence, not argument. *See Krevitz v. City of Philadelphia,* 1992 Phila. Cty. Rptr. LEXIS 99 at *10 (Phila. C.P. July 8, 1992) quoting *DeMartino v. Albert Einstein Medical Center,* 460 A.2d 295, 301 (Pa. Super. 1983).

Throughout the course of this action, Plaintiff has altered his fraud arguments in an effort to save these claims from the two year statute of limitations. This effort, however, has fallen short. For the now closed record proves that Plaintiff's fraud claim accrued and that he knew, or at a minimum was on inquiry notice, of the facts underlying the alleged wrong more than two

10

years before he filed this action.  Under well settled Pennsylvania law, Plaintiff has failed to carry his heavy burden of establishing by clear, precise and convincing evidence that the two-year limitations period applicable to the fraud claim should be tolled due to an independent act of fraudulent concealment by Elkin.

### 1.   Plaintiff Failed to Prove an Independent Act of Fraudulent Concealment

As noted previously, Plaintiff's fraud claim is posited on two separate alleged acts of fraud, with each alleged act represented by a letter.  (Pre-Trial Order at p. 5).  Because two separate acts are at issue, as opposed to a continuation of a singular fraud, Plaintiff must prove an independent act of fraudulent concealment with respect to both the December 2002 letter and the October 2003 letter.   Establishing a fraudulent act as to only one letter cannot prevent the application of the statute of limitations to bar claims based on the other letter.

As a threshold matter, the evidence presented at trial precludes Plaintiff from meeting his burden with respect to the December 2002 or October 2003 letter, because he failed to present any evidence of an independent fraudulent act or fraudulent concealment by Elkin.  Under settled Pennsylvania law, the "[a]ffirmative independent act of fraudulent concealment" must be, as the term suggests, an act that is separate and apart from the underlying act of fraud.  *Edwards v. Wyeth Pharms., Inc.*, 2009 Phila. Ct. Com. Pl. LEXIS 133, at * 20 (Phila. C.P. July 8, 2009). The independence requirement has been articulated as follows:

> In order to find fraudulent concealment, the plaintiff must show that, **in addition to committing the acts that constitute the wrong for which plaintiff is suing**, defendant did or said something that amounts to concealment of the wrongdoing. For instance, if a doctor commits surgical malpractice and subsequently tells the patient that the resulting pain is normal and not of concern, the doctor may be found to have fraudulently concealed his/her wrongful act so as to toll the limitations period.

*Nestle USA, Inc. v. Wachovia Bank, N.A.*, 2007 Phila. Ct. Com. Pl. LEXIS 293, at * 5-6 (Phila.

C.P. Oct. 5, 2007) (emphasis added); *Daugherty v. Teires*, 1961 Pa. Dist. & Cnty. Dec. LEXIS

40, at * 2 (Clinton C.P. Nov. 20, 1961) (finding that the concealment must be an affirmative

independent act); *Montanya v. McGonegal*, 757 A.2d 947, 951-52 (Pa. Super. 2000) (requiring

an affirmative independent act of concealment upon which the plaintiff justifiably relied).

In the Pre-Trial Order, Plaintiff's counsel defined very explicitly and narrowly his claim

for fraud as follows:

> Elkin attempted to and did, in fact, defraud Norman through the
> false and misleading statements contained in his December 3, 2002
> letter to Norman's counsel and his subsequent delivery, in October
> 2003, of his shareholder loan agreement with a false and/or
> misleading schedule of contributions and distributions.

(Pre-Trial Order at p. 5). Later, in the section of the Pre-Trial Order titled "Plaintiff's Statements

of Issues of Law," Plaintiff noted that the only issues regarding the fraud claim were:

> Whether Elkin's letter dated December 3, 2002 to Norman's
> attorney contained false or materially misleading statements of
> fact; and
>
> Whether the disclosure of Elkin's Shareholder Loan Agreement
> and Schedule of Payments attached thereto, as delivered in October
> 2003, contained false or materially misleading statements of fact.

(Pre-Trial Order at p. 20). It is clear from the Pre-Trial Order that the December 2002 and

October 2003 letters by Elkin are themselves the allegedly fraudulent acts giving rise to

Plaintiff's fraud claim.[3] There is no other allegation in the Complaint or act identified in the Pre-

Trial Order or at trial that Plaintiff claims was fraudulent.

---

[3]  To the extent Plaintiff may wish to argue Elkin attempted to conceal his alleged fraud through omissions, such argument is of no avail. For in addition to the requirement of being independent, the alleged act of fraudulent concealment must also be an affirmative act, "mere silence or nondisclosure is insufficient," and to be sufficient to toll the limitations period, the act must have been one "upon which the plaintiff justifiably relied." *Montana*, 757 A.2d at 951-52.

12

Plaintiff has not presented evidence or identified an "affirmative" "fraudulent" act of concealment that was "independent" of the two letters, and that caused Plaintiff to relax his vigilance or deviate from his right of inquiry in "justifiable reliance," let alone proven at trial an independent fraudulent act of concealment as to each of the two letters, through clear precise and convincing evidence.

### 2.   Plaintiff Was on Inquiry Notice by at least December 2002, Over Three Years Before Filing Suit

Even if the doctrine of fraudulent concealment was applicable, which it is not, the two year limitations period is tolled <u>only</u> until such time as Plaintiff knows of his injury or is placed on inquiry notice. *Drelles v. Mfrs. Life Insur. Co.*, 881 A.2d 822, 832 (Pa. Super. 2005) (holding the standard of reasonable diligence applies to the doctrine of fraudulent concealment); *Fine*, 870 A.2d at 861 (holding that the statute of limitations tolled by fraudulent concealment begins to run when plaintiff is placed on inquiry notice).

The point at which the limitations period begins to run again is the moment when a plaintiff is presented with information that would cause a person to engage in reasonable diligence to investigate whether he has been wronged. The Pennsylvania Supreme Court has explained that "reasonable diligence" is not an absolute standard. *Pocono Int'l Raceway, Inc. v. Pocono Produce, Inc.*, 468 A.2d 468, 471 (Pa. 1983). Rather, it is "what is expected from a party who has been given reason to inform himself of the facts upon which his right to recovery is premised." *Fine*, 870 A.2d at 858. As the Pennsylvania Supreme Court also stated:

> There are very few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful. This is what is meant by reasonable diligence. Put another way, **the question in any given case is not, what did the plaintiff know of the injury done him? But, what might he have known, by the use of the means of information within his reach, with the vigilance the law requires of him?**

13

*Id.* (citations and quotations omitted) (emphasis added).   "Reasonable diligence is just that, a reasonable effort to discover the cause of an injury under the facts and circumstance present in the case." *Cochran v. GAF Corp.,* 666 A.2d 245, 249 (Pa. 1995).

Where a plaintiff is able, through the exercise of reasonable diligence, to ascertain he has suffered a wrong from reviewing documents, including public documents, he has been put on inquiry notice, whether he in fact knew about the wrongful conduct or not. *See, e.g., In re Dean Witter P'ship Litig.,* 1998 Del. Ch. LEXIS 133, at *31 (Del. Ch. July 17, 1998).   Moreover, it is not required that the information that constitutes inquiry notice necessarily reveal the ***details*** of the Plaintiff's claims.   In other words, "having all of the facts necessary to articulate the wrong is ***not*** required." *Id.* at *31, fn. 49 (emphasis in original).   "Rather, once a plaintiff is in possession of facts sufficient to make him suspicious, or that ***ought to make him suspicious***, he is deemed to be on inquiry notice." *Id.* (emphasis added).

An examination of the December 2002 and October 2003 letters, combined with the testimony elicited at trial, proves that Plaintiff knew of the facts giving rise to his fraud claim, or at a minimum was on inquiry notice of such facts, over two years before he filed this action. Thus, even if there was an affirmative act of concealment, which there was not, Plaintiff's claim for fraud is still untimely.

### a.   The December 3, 2002 Letter

Plaintiff testified that there were <u>two</u> fraudulent statements/facts contained in the December 3, 2002 letter. (Defs. Ex. 120).   The first alleged error was "that the total net proceeds stated in the letter was incorrect[.]" (Norman Trans. p. 113, lines 10-11).   The second pertains to the portion of the letter stating that Elkin had paid himself $380,588 from the proceeds of the license sales.   Therefore, the question to be answered for statute of limitation purposes is when

14

was Plaintiff in possession of information that would have placed a reasonable person on inquiry notice regarding the veracity of the December 2002 letter. (Mem. Op. at p. 11). This question was answered at trial through Plaintiff's testimony when he acknowledged being in actual possession of documents, in the form of asset purchase agreements attached to the December 2002 letter and a schedule of shareholder loans enclosed with the October 2003 letter, that permitted him to determine the accuracy of the December 2002 letter or, at a minimum, to place him on inquiry notice of possible wrongdoing.

The December 2002 letter states:

> Per your request of October 2, 2002, over the past three years US MobilComm, Inc. has sold the 220 Mhz licenses *it* owned in Florida, Boston and Chicago, together with related equipment.

(Defs. Ex. 120) (emphasis added). The letter then goes on to note that the total net proceeds for the sales was $479,708 and that Elkin repaid shareholder loans in the amount of $380,588. The sole basis for Plaintiff's allegation of fraud is his belief that the figures in the December 2002 letter are inconsistent with Plaintiff's Exhibit 50, a schedule that identifies the proceeds for the sale of licenses in Florida and Boston as $665,240 and reflects a shareholder loan repayment of $601,500. Plaintiff argues that he is entitled to toll the limitations period because he did not know that the figures in the December 2002 letter were allegedly false until he obtained Exhibit 50 in the Section 220 action in the Delaware Court of Chancery.

With regard to the total net proceeds from the sales figure listed in the December 2002 letter, Plaintiff's claim is posited on a misreading of the letter and not a fraudulent statement.[4] Plaintiff contends that the December 2002 letter was misleading because he believed that the

---

[4] *See* Defendants' Memorandum of Law in Support of Motions for Judgment as a Matter of Law by Defendants David W. Elkin, Richard M. Shorin and The Elkin Group, Inc. and Nominal Defendant US Mobilcomm, Inc. for the Defendants' discussion of the factual accuracy of the December 2002 letter.

15

total net proceeds figure in the December 2002 letter covered the sale of all licenses owned and managed by USM and not just a subset of USM's licenses. However, the asset purchase agreements attached to the letter and Plaintiff's sworn testimony doom such argument to failure. On cross-examination, Plaintiff was directed to Section 5.7 of the Purchase and Sale Agreement with Repeater Network, titled "Other Licenses," which stated:

> It shall be a condition of closing that the six (6) Phase I licenses located in the Miami, Florida, area and the Phase II EA License covering the West Palm Beach-Miami, Florida Area, also being purchased by the Purchaser from US MobilComm, Inc., The Elkin Group, Inc. and licenses managed by US MobilComm, Inc. have been transferred to the Purchaser... .

(Defs. Ex. 120 at PLTF1672). When examined about the clear terms of this provision, Plaintiff testified as follows:

> Q. So we have the Phase I licenses owned by the individuals with whom US MobilComm had a management agreement, are clearly not included in the sale, correct?
>
> A. Right. That was only Phase I licenses.

(Norman Trans. p. 130, lines 12-15). As recognized by Plaintiff at trial, not only did the asset purchase agreement clearly state that the licenses owned by third-parties and managed by USM were the subjects of separate transactions, it also explicitly excluded any Phase II licenses owned by USM. Plaintiff testified at length that, from 1999 to 2002, he actively followed the Phase II auctions on the FCC website and that he knew that USM had won several Phase II licenses. (*Id.* at p. 99, lines 5 - 25; p. 103, lines 1 - 7; p. 125, lines 6 - 13; p. 131, lines 16 - 19). At a minimum, the contradiction between the written words in the asset purchase agreements and Plaintiff's (mis)understanding of the December 2002 letter would have placed a reasonable person on inquiry notice.

Plaintiff's testimony, which corroborates the testimony of David Elkin, irrefutably states that the December 2002 letter addresses only the sale of USM licenses. (Norman Trans. p. 123,

lines 2-13). To the extent Plaintiff misunderstood the letter itself, he admits that the attached purchase and sale agreements provided him with <u>actual notice</u> that the licenses owned by The Elkin Group and parties with whom USM had management agreements were not part of the sales, but were part of separate transactions. (*Id.*). Even if the clear written terms of the asset purchase agreements did not constitute actual knowledge, the contradiction between the relevant clauses and Plaintiff's alleged "misreading" of the December letter would have placed a reasonable person on inquiry notice.

Plaintiff testified several times that he regularly kept tabs on USM business operations and the acquisition of licenses by avidly following the auction of licenses on the FCC web site. (Norman Trans. p. 80, lines 13 - 21, 103, lines 1 - 4). He also testified that USM's business strategy was to aggregate licenses to obtain wide area coverage and then sell the licenses for a profit. (*Id.* at p. 61, line 14 – p. 62, line 22; p. 67, line 9-16). As Plaintiff noted many times at trial, he believed that he owned 25% of USM and, therefore, was entitled to 25% of any distributions from the Company. (*Id.* at p. 60, lines 10-17; p. 64, lines 1-7; p. 82, lines 18-23; p. 210, lines 2-10). Any reasonable person standing in Plaintiff's shoes in 2002 would have, faced with allegedly contradictory documents regarding the distribution of sale proceeds, immediately engaged in due diligence to determine if they, as the only other stockholder, were entitled to a portion of the proceeds from the sale of licenses. Combined, the asset purchase agreements and publicly available information on the FCC web site provided all the information necessary to engage in reasonable diligence to determine if Plaintiff had been wronged.

With regard to the second allegedly fraudulent statement in the December 2002 letter addressing the amount of proceeds paid to Elkin, the question of when Plaintiff was on inquiry notice can likewise be answered objectively. In October 2003, years before receiving Exhibit 50,

17

Elkin, responding to a request by Plaintiff's counsel, sent a copy of the Shareholder Loan Agreement and a Shareholder Loan Schedule (the "Schedule"). (Norman Trans. p. 135, line 15 - p. 136, line 11).    The Schedule documented the date and amount of every contribution/distribution involving Elkin. When one compares the December 2002 letter to the Schedule Plaintiff received in October 2003, it is clear that amounts repaid to Elkin for the same time period do not match.

Accepting Plaintiff's argument, if a difference between Exhibit 50 and the December 2002 letter is all that was necessary to know he had been defrauded, then the limitations period would begin to run as soon as Plaintiff received any document showing a larger shareholder repayment to Elkin. Falling beneath the weight of his own argument, in October 2003—more than two years before filing suit—Plaintiff and his counsel received the Schedule, which covered the same time period as the December 2002 letter and that differed from the December 2002 letter by over $235,000. Plaintiff must concede that by no later than early October 2003 he knew of the facts giving rise to his claim of fraud as it relates to the repayment figure in the December 2002 letter. If not endowed with actual knowledge, Plaintiff was at a minimum placed on inquiry notice by October 2003, which itself starts the running of the limitation period.

By October 2003, it is clear that Plaintiff possessed ample documentation, in the form of the asset purchase agreements and the Schedule, to know, based on his reading of the December 2002 letter, that he may have been wronged. Therefore, he knew enough to be placed on inquiry notice, had an obligation to engage in meaningful due diligence to determine if his suspicions of wrongdoing were justified, and was required to file suit within two years. He did not discharge his responsibilities and, as a result, the Complaint is time barred.

18

**b.     The October 2003 Letter**

Plaintiff's claim of fraud with respect to the October 2003 letter, as noted in the Pre-Trial Order, was Elkin's "delivery, in October 2003, of his shareholder loan agreement with a false and/or misleading schedule of contributions and distributions." (Pre-Trial Order at p. 5). At trial, however, Plaintiff presented no evidence showing the Shareholder Loan Schedule contained a false or misleading statement. Likewise, there was no testimony showing that, even if there was a false or misleading statement, Elkin engaged in any independent affirmative fraudulent act intended to prevent Plaintiff from investigating or discovering the misstatement.

The entirety of Plaintiff's testimony with regard to the October 2003 letter consists of approximately a single page of transcript testimony that encompasses eight questions and answers. (Norman Trans. p. 109, line 15 - p. 110, line 14). None of the questions or answers touched upon the schedule of contributions/distributions. (*Id.*). Once again, Defendants find themselves in a circular argument of trying to show that Plaintiff was on inquiry notice of an alleged false statement, when the record is devoid of any testimony showing a false statement exists. Even if, however, a false or misleading statement was contained in the October 2003 letter, Plaintiff was on notice of the inaccuracy on the very date he received the letter.

Yet again, the sole basis for alleging fraud is the fact that Plaintiff received a copy of Exhibit 50, showing a figure paid to Elkin as repayment of shareholder loans that differed from the Schedule attached to the Shareholder Loan Agreement. As noted in the preceding section, comparing the Schedule to the December 2002 letter, both in the possession of Plaintiff and his counsel by early October 2003, shows a difference of over $235,000 in the amounts repaid to Elkin. Plaintiff has relied upon the December 2002 letter and Exhibit 50 as the sole basis for his fraud claim. If the mere existence of two documents reflecting differing figures is all that was necessary for Plaintiff to sue for fraud, then he was, at a minimum, placed on inquiry notice of a

19

potential wrong when he had those documents in his position and he compared the figures on the Schedule to those in the December 2002 letter.

That all Norman needed to know to put him on at least inquiry notice of his fraud claims was, in fact, known to him by October 2003, at the latest, is bolstered by the fact that nothing turned up in the Section 220 action or this lawsuit other than Exhibit 50 that supports his claims. Even if Exhibit 50 helped Plaintiff to somewhat refine the size of the distributions to Elkin, this is a revelation of degrees, not of kind. The classic statement of the rule of accrual in this Circuit is as follows:

> [T]he time from which the statute of limitations begins to run is not the time at which a plaintiff *becomes aware of all of the various aspects of the alleged fraud*, but rather the statute runs from the time at which plaintiff should have discovered *the general fraudulent scheme*. [T]he statutory period . . . [does] not await [plaintiff's] *leisurely discovery of the full details* of the alleged scheme.

*Robertson v. Seidman & Seidman*, 609 F.2d 583, 587 (2d Cir. 1979) (citing *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir. 1975) (emphasis added).

That Plaintiff was on inquiry notice prior to and after receipt of the December 2002 and October 2003 letters cannot be refuted and is, in fact, confirmed by his actually conducting an inquiry - assisted by counsel - during this entire time period. Plaintiff testified at trial that in early 2002 Elkin informed him in a call that USM had sold licenses. (Norman Trans. p. 113, lines 3 - 9). This call prompted Plaintiff to hire a lawyer, Mr. Sama, who demanded documents related to the sales from Elkin. (*Id.* at p. 112, line 23 – p. 113, line 9). This demand/inquiry is what caused Elkin to send the December 2002 letter with the purchase agreements to Mr. Sama on Plaintiff's behalf. (*Id.*; p. 109, lines 5 - 20). Still unsatisfied with the answers he received, Mr. Sama contacted Elkin in 2003 and demanded a copy of the Shareholder Loan Agreement and

20

attached Schedule that would justify the loans mentioned in the December 2002 letter. (*Id.*). This demand resulted in the October 2003 letter being sent to Mr. Sama. (*Id.*). Conducting a further reaching inquiry, Plaintiff hired another set of lawyers to file the Section 220 action in 2004 to inspect USM's books and records.

Plaintiff's conduct, the clear documents and the testimony at trial all prove Plaintiff knew or was on inquiry notice of his fraud claims by late 2002. One cannot engage in a three year investigation - that was led by counsel - into the very facts supporting your claims and then, after the statute of limitations period expires, argue that you were oblivious to the potential wrongdoing. Despite actual knowledge and suspicions of wrongdoing, Plaintiff filed this action after the limitations period expired. Unable to prove tolling by clear precise and convincing evidence, Plaintiff's the fraud claim must be dismissed as untimely.

### C.   Plaintiff's Conversion and Usurpation of Corporate Opportunity Claims Are Time Barred.

The scope of Norman's claim for conversion is stated in the Pre-Trial Order and rests on the assertion that:

> Elkin misappropriated USM's good will and status as a qualified bidder and its incumbent status with the FCC during the 220MHz Auction Number 18 **when** he allegedly filed an amendment to USM's application to name TEG as the applicant.

(Pre-Trial Order at p. 5) (emphasis added). Likewise, Plaintiff's claim for usurpation of corporate opportunity is set forth in the Pre-trial Order as:

> Elkin usurped the Company's opportunities **when** he substituted TEG for USM in FCC 220 MHz Auction Number 18 as well as permitting TEG to participate in FCC 220 MHz Auction Number 24.

(Pre-Trial Order at p. 4) (emphasis added). A plain reading of the Pre-Trial Order limits the claim for conversion and the claim for usurpation to the act of filing an amendment to "USM's

application" (the "Amendment") to participate in Auction No. 18. Auction No. 18 occurred on October 22, 1998. The claim does not pertain to TEG's subsequent acquisition and sale of the licenses awarded in the auction, which acts are addressed by the breach of fiduciary duty claim.

Because these claims are covered by Pennsylvania's two-year statute of limitations, the statute began to run in October of 1998 and expired two years later in October of 2000, years before this action was commenced. The only basis under Pennsylvania law for tolling the limitations period is fraudulent concealment and the discovery rule.[5] With regard to these claims, however, Plaintiff cannot argue fraudulent concealment because he never alleged or provided evidence at trial showing an independent affirmative act of fraud by Elkin intended to lull Plaintiff into ignoring his obligation to engage in reasonable diligence. *Lazarski*, 926 A.2d at 465. Plaintiff fares no better under the discovery rule, because all of the information necessary to discover his alleged injury was in his possession by December 2002 and, independently, was also publicly available on the FCC web site since March 1999. With regard to either doctrine, Plaintiff bears the burden of proof by clear and convincing evidence. *Molineaux v. Reed*, 532 A.2d 792, 794 (Pa. 1987). Plaintiff cannot meet his burden.

### 1. Facts Supporting the Conversion and Usurpation Claims were not Fraudulently Concealed

Plaintiff cannot argue fraudulent concealment because he presented no evidence proving Elkin sought to conceal the Amendment substituting TEG or established an act satisfying the

---

[5] This Court, in its September 26, 2007 Memorandum Opinion on Defendant's Motion for Summary Judgment states that the equitable tolling principle first set forth in *Bovay v. Byllesby*, 38 A. 2d 808 (Del. 1944), allowing the statute of limitations to be tolled in derivative actions alleging wrongful self-dealing by a corporate fiduciary, could apply. It is clear after trial that this doctrine does not apply. First, Delaware law does not apply to the statute of limitations argument on any claim except breach of contract. Second, as the Court noted, even if the *Bovay* rule applied, the courts applying *Bovay* have tolled the statute of limitations only until the shareholder knew or had reason to know of the facts constituting the wrong – in other words, until the Plaintiff is on inquiry notice. (Mem. Op. at 10).

"independence" requirements of the doctrine. *Lazarski*, 926 A.2d at 465.  In fact, at trial Plaintiff testified at length on direct examination that Elkin failed to provide him with any information related to Auction No. 18 and failed to mention the fact that TEG had acquired the licenses for which USM had been a qualified bidder.  For example:

> Q. So you understood that US MobilComm was a successful bidder for those licenses?
>
> A. Yes, I did.
>
> Q.  Did Mr. Elkin ever respond to this e-mail by informing you that he intended to transfer the licenses from US MobilComm to The Elkin Group?
> A. No, he didn't.

(Norman Trans. p. 103, lines 5 - 11) (emphasis added).   Having never discussed USM's application or the intent to file the Amendment with Plaintiff, Elkin clearly did not engage in any act of concealment, let alone an  "independent" act that would justify tolling due to fraudulent concealment.[6]

## 2.      The Discovery Rule Cannot Save The Conversion or Usurpation Claims

The discovery rule is akin to the doctrine of fraudulent concealment, but places a more stringent burden on a plaintiff seeking its benefits.  "When a plaintiff seeks to benefit from the discovery rule, he/she has the burden of establishing his/her inability to know of the injury despite the exercise of due diligence." *Drelles*, 881 A.2d at 834.  Put another way, "the question in any given case is not, what did the plaintiff know of the injury done to him? But, what might he have known, by the use of the means of information within his reach, with the vigilance the

---

[6]    Should Plaintiff seek to argue the absence of any acts by Elkin was itself fraudulent concealment through omission,  his argument runs counter to the law of Pennsylvania, which requires an affirmative independent act. *Montanya,* 757 A.2d at 951-52.

23

law requires of him?" *Fine*, 870 A.2d at 858 citing *Scranton Gas & Water Co. v. Lackawanna Iron & Coal Co.*, 31 A. 484, 435 (Pa. 1895).

In this case, the evidence presented conclusively proves that Plaintiff had in his physical possession all of the information necessary to learn of his conversion and usurpation claims. Independently, the FCC web site, which Plaintiff regularly followed, placed within his reach detailed publicly available information that would have likewise alerted Plaintiff to the information upon which he bases his claim for conversion or usurpation. The existence of these public filings, which Norman testified he followed, is fatal to Plaintiff's claims. *See e.g. In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1326 (3d Cir. 2002) (dismissing securities fraud claims as untimely because SEC filings and press releases were sufficient to put plaintiff on inquiry notice); *Seidel v. Lee*, 954 F. Supp 810, 817 (D. Del. 1996) (concluding that public documents, specifically SEC filings, annual and quarterly reports, provided plaintiff with adequate inquiry notice and dismissed plaintiff's claims as time barred); *Benak v. Alliance Capital Mgmt. L.P.*, 349 F. Supp. 2d 882, 888 (D.N.J. 2004) citing *Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1169 (7th Cir. 1995) (upholding district court's finding that storm warnings, which included a registration statement and reports "in the press," had triggered limitations period).

On direct examination, Norman tried to avoid the statute of limitations by testifying, wrongly, that he did not have the purchase agreements until he received them as part of the Section 220 action in the Delaware Court of Chancery (Norman Trans. p. 105, line 12 - p. 106, line 3).  Norman testified that, upon receiving the purchase agreements, he was immediately alerted to the transfer from USM to TEG and of the alleged wrongdoing by Elkin. (*Id.* at p. 105, line 12 – p. 106, line 23). Therefore, Plaintiff argues the statute of limitations should toll until that point. On cross examination, however, Norman acknowledged that he actually <u>received and</u>

24

reviewed the purchase agreements in 2002, when they were attached to the December 3, 2002 letter from Elkin to Sama. (*Id.* at p. 117, line 20 – p. 18, line 15).

While he may have initially been "mistaken" when he read the purchase agreements, Plaintiff was correct when he testified that the documents each clearly note that the Phase II Auction No. 18 licenses had been transferred from USM to TEG. (Defs. Ex. 120). In the Purchase and Sale Agreement between USM and Repeater Network Spectrum Aq., Inc., Section 5.5 and 5.7 state:

> The Phase II EA license won by The Elkin Group, Inc. at the FCC auction shall have been issued to the seller pursuant to a Final Order of the FCC.
>
> It shall be a condition of Closing that the six (6) Phase I licenses ... and the Phase II EA license covering the West Palm Beach – Miami, Florida area, also being purchased by the Purchaser from US MobilComm, Inc., The Elkin Group, Inc. and licenses managed by Us MobilComm, Inc. have been transferred to the Purchaser ...

(*Id.* at PLTF1672-73). In the Purchase and Sale Agreement between USM and Roamer One, Inc., also attached to the December 2002 letter, Section 5.5 states

> Prior to or upon Closing on three of the Licenses identified by call signs WPCM901, WPCP576 and WPBQ436 ("Incumbent Licenses"), the Purchaser must have acquired from The Elkin Group, the Phase II 220 MHz licenses for BEA003 (Boston-Worcester-Lawrence Lowell-Brockton, MA-NH-RI-VT), Channel Blocks B and C, under call signs WPOI695 and WPOI696.

(*Id.* at PLT1693). Upon being read the language from the Republic Network Agreement at trial, Plaintiff admitted that this provision, standing alone, indicated that the Phase II licenses in West Palm and Miami to be sold by TEG were the same licenses USM had won in the auction. (Norman Trans p. 129, lines 12-22). These provisions provided Plaintiff with actual knowledge of the transfer or, at a minimum, would have put any reasonable person on inquiry notice.

25

In addition to physically possessing documents that answered all of his questions, Norman had even more information at his disposal. Norman testified at trial that he followed Auction No. 18 on the internet at the FCC website. (Norman Trans. p. 121, lines 2-17). This included reviewing the list of the winning bidders for Auction No. 18 immediately after the auction in 1998. (*Id*. at p. 125, lines 5-9; Pltfs. Ex. 39). Norman acknowledged that this list included the precise licenses - by location and reference number - won by USM in Auction 18. (*Id*. at p. 125, line 14 – p. 126, line 13). For example, the list showed that USM had won the licenses "BEA031 Miami, Florida" and "BEA003 Boston-Worcester-Lawrence, MA" (Pltfs. Exhibit 39 at p. PTF0394 and 401).

While Plaintiff claims he was unaware that the BEA031, BEA003 and other licenses won by USM had been transferred to TEG, publicly available documents from the very same FCC web site frequented by Plaintiff prove otherwise. For example, at trial Plaintiff was forced to acknowledge that the FCC web site included the documents located at Defendant's Exhibit 106. (Norman Trans. p. 177, line 22 – p. 180, line 14). These documents constituted "public notice" by the FCC and clearly state that the BEA031 and BEA003 licenses had been transferred to TEG. This document was on the FCC's web site beginning March 25, 1999—over three years before Plaintiff and his counsel received the December 2002 letter attaching the Purchase Agreements and six years before the action was filed. To place an even finer point on this issue, the Court can note that the language of the Purchase Agreement quoted above, which Plaintiff acknowledged receiving and reviewing in 2002, states that the same licenses identified in Defs. Exhibits 39 and 106 (BEA031 and BEA003) were owned and being sold by TEG.[7]

---

[7] Because these documents, when read together, so clearly dispose of Plaintiff's claims, and for the Court's ease of reference, attached hereto as Exhibit 1 are excerpts from the Purchase and

When confronted with the multiple sources of information and asked if after receiving the December 3, 2002 letter he "had all of the information in front of you to determine that the Elkin Group had acquired the licenses won by USM in the Phase II Auction," Norman replied "Well, technically, but not really." (Norman Trans. p. 131, lines 20-25). His explanation for the "not really" was not that he was unable to figure it out from the documents but that:

> when I did get these documents, and I was reading, I saw the reference to The Elkin Group, **and it was odd because I had just seen that US MobilComm had won the licenses.** I remember actually going back and checking the FCC website and seeing -- you can go there - - we can pull it up right now like we did it last week - - that US MobilComm is the winner of the 220 auctions.
>
> So I remember going back to Mr. Sama and we discussed that. But I went to sort of check it out and looked on the FCC website and it still had US MobilComm as the winner.

(*Id.* at p. 132, lines 1–10) (emphasis added). The magnitude of this testimony cannot be overstated. Norman testified at trial that in 2002 he read the purchase agreements and found it "odd" that they listed TEG as owning the exact same licenses Norman believed were owned by USM. Furthermore, not only does Norman admit he had actual knowledge, he states that he <u>was</u> sufficiently alerted to the transfer of licenses from USM to TEG that he undertook additional investigation and consulted his attorney about the issue. Norman acknowledges that, upon receiving the Roamer One Agreement and the Repeater Network Agreement that referenced The Elkin Group owning licenses, "there probably was a way that [he] could have tracked this information down." (*Id.* at p. 178, lines 17-25).

It is conclusive that Plaintiff knew of the transfer of licenses to TEG or, at a minimum, was on inquiry notice, at the latest, by December 3, 2002. It is more likely Plaintiff knew by

---

Sale Agreements and FCC Public Notices discussed and cross-referenced herein with the relevant notations highlighted.

March 1999, based on the public notices but, under the most charitable reading of the evidence, the two year statute of limitations on this claim began to run on December 3, 2002 and expired one year prior to this action being filed on December 2, 2005. *In re ML/EQ Real Estate P'ship Litig.*, 1999 Del. Ch. LEXIS 238, at * 7 (Del. Ch. Dec. 20, 1999) ("[w]here inquiry notice is the critical issue, the plaintiff's access to and the sufficiency of the information pointed to by the defendants will usually be the only relevant issues."). The jury verdict in favor of Plaintiff on his conversion claims must be set aside.

With regard to the aspect of the usurpation claim related to Auction Number 24, there was no testimony at trial about Auction Number 24 and Plaintiff has thus waived that claim. In any event, the testimony that was presented at trial is that the list of qualified bidders and, in turn, the list of winning bidders for each auction is available publicly through the FCC website. (Norman Trans. p. 121, lines 6 – 25). TEG was both the applicant and the winning bidder in Auction No. 24, as discussed above. Norman testified that he followed the auctions on the internet. (*Id.*). Thus, he had all of the information at his disposal related to any claim for usurpation of corporate opportunity for TEG's purchase of licenses in Auction Number 24.

### D.  Aspects of the Plaintiff's Breach of the Fiduciary Duty of Loyalty Claim Are Barred

In the Pre-Trial Order, Norman claims that Elkin breached his fiduciary duty of loyalty to Norman and the Company in four ways:

1.  Elkin engaged in self-dealing when he used USM's incumbency position, applications and purported up-front payment during Auction Number 18 for the benefit of TEG and, ultimately, himself.

2.  Elkin engaged in a self-interested transaction with the Company when he executed his own Shareholder Loan Agreement.

3.  Elkin conducted the Company's business for the benefit of himself as a purported creditor rather than for the benefit of the Company's equity owners at a time when he

28

decided to sell the Company's FCC licenses. The Company was not insolvent or in the zone of insolvency during those times.

4.  In the alternative, Elkin's forcing the Company into insolvency or the zone of insolvency following the execution of his Shareholder Loan Agreement breached his fiduciary duty of loyalty to Norman and the Company.

(Pre-Trial Order at p. 4). The first two aspects of Norman's breach of duty of loyalty claim rests on the same alleged misconduct that supports the claims discussed in preceding sections and, for the same reasons, are barred by Pennsylvania's two-year statute of limitations.[8] The second two bases for asserting a breach of fiduciary duty are deficient because they fail to articulate a cognizable claim and no evidence was presented at trial that could support such claims. Therefore, Defendants will address in this section only the statute of limitations arguments pertaining to points 1 and 2 that have not already been addressed, while arguing the merits of points 3 and 4 in the companion brief filed contemporaneously with this submission.

### 1.    Plaintiff's fiduciary claim for participation in Auction 18 is barred

The first aspect of Norman's claim for breach of fiduciary duty rests on the proposition that Elkin improperly participated in Auction No. 18 for the benefit of himself and TEG. This allegation is identical to the allegation supporting Plaintiff's fraud and conversion claims. Therefore, these claims were likewise filed after the applicable two-year statute of limitations had expired and can only be resurrected if the limitations period is tolled. To establish tolling, Plaintiff must satisfy his burden of proving the discovery rule or doctrine of fraudulent concealment are applicable. The evidence adduced at trial precludes him from doing either.

---

[8]  The Court found in its September 26, 2007 Memorandum Opinion that Pennsylvania's two year statute of limitations applies to the breach of fiduciary duty claims. (Mem. Op. at 9). Thus, the *Bovay* rule requiring tolling of the statute in derivative actions alleging wrongful self-dealing by a fiduciary is inapplicable. Moreover, even under *Bovay,* tolling would end when the plaintiff is on inquiry notice. (*Id.* at p. 10).

As discussed above, Norman admits that by December 3, 2002, he was physically provided or had access to all of the information necessary to conclusively establish that TEG had participated in Auction 18 and that Elkin had transferred to TEG all of the licenses Plaintiff believed were owned by USM.

It was on December 3, 2002, that Norman received the letter from Elkin detailing sales that had been made of USM Phase I licenses and attaching the Purchase Agreements. (Defs. Ex. 120). As detailed above, both sales agreements attached to the December 3, 2002 letter stated that the sale of the Phase I licenses was contingent upon the receipt of the Phase II licenses owned by TEG. *Id.* The fact that TEG owned any Phase II licenses was enough to put Norman on inquiry notice since he testified that he did not believe TEG owned any Phase II licenses. (Norman Trans. p. 101, lines 5 - 18). The agreements also contain sufficient detail to put Norman on notice that the Phase II licenses "owned by TEG" were the exact Phase II licenses he believed were owned by USM. (*Id.* at p. 131, lines 20 - 25). The public notices Norman testified he reviewed in 2002 also noted, using the same location and reference number as the sales agreements, that TEG owned the licenses originally bid on by USM. (*Id.* at p. 105, line 12 – p. 106, line 23).

In light of the overwhelming evidence at trial, it is clear that Norman was actually aware of all the material facts necessary to allege his breach of fiduciary duty claim with respect to Auction No. 18 as early as December 2002. At a minimum, the numerous FCC publicly-available notices, the Purchase Agreements and the December 2002 letter, placed Norman on inquiry notice more than three years before suit was filed. This conclusion is evidenced by the fact that Norman, upon reviewing these documents, retained a lawyer to vindicate his rights and

30

demand additional documents from Elkin.  (Norman Trans. p. 112, line 23 – p. 113, line 9; p. 131, line 20 – p. 132, line 10).

### 2. Plaintiff's fiduciary claims for execution of the Shareholder Loan Agreement are barred

The second aspect of Norman's claim for breach of fiduciary relates to Elkin's <u>execution</u> of the Shareholder Loan Agreement.  This claim rests on the premise that the mere existence and execution of the Shareholder Loan Agreement constituted a breach of fiduciary duty.  Therefore, the statute of limitations period necessarily began to run as soon as Plaintiff learned of the Shareholder Loan Agreement and its execution.  Through his own testimony, Plaintiff stated that he knew about the Shareholder Loan Agreement when he received a copy of it from Elkin in October 2003, which was more than two years before the filing of the Complaint.  (Norman Trans. p. 135, line 15 – p. 136, line 14).  Moreover, Norman was aware that the repayment of shareholder loans had occurred when he received the December 2002 letter Elkin had sent to Norman's counsel.  That letter clearly states "Repayment of Shareholder Loans - $380,588." (Defs. Ex. 120).  Since Norman and Elkin are the only two shareholders of USM, it was clear to Norman in 2002 that Elkin had shareholder loans and repaid a portion of those loans.  Thus, by no later than October 2003, when he received the actual Shareholder Loan Agreement, Norman was well aware that Elkin had executed the Shareholder Loan Agreement and repaid the loans.

The evidence is unrefuted that Norman was aware of (1) TEG's acquisition of the Phase II licenses as part of FCC Auction 18 no later than December 3, 2002 and (2) the execution of the shareholder loan agreement and repayment of loans no later than early October 2003.  Since the Complaint was not filed until December 2, 2005, both claims are untimely, as Plaintiff has not and cannot meet his heavy burden to justify tolling.

E.      **Plaintiff's Duty Of Disclosure Claims are Barred by the Statute of Limitations**

Norman contends that Elkin breached his fiduciary duty of disclosure in three ways:

- Elkin failed to provide Norman with notice and/or the right to vote on the sale of substantially all of the Company's assets;
- Elkin failed to disclose the sale of licenses and/or distribution of proceeds; and
- Elkin failed to disclose or seek approval for the execution of his Shareholder Loan Agreement.

(Pre-Trial Order at p. 5).

As with his other fiduciary duty claims, these claims: (i) are subject to Pennsylvania's two year statute of limitations; (ii) expired prior to the filing of this action; and (iii) may only be revived if the limitations period is tolled for an extended period of time. *Fine v. Checcio*, 870 A.2d 850, 858 (Pa. 2005). Plaintiff bears the burden of showing tolling is appropriate by clear, precise and convincing evidence. *Molineaux*, 532 A.2d at 794. The evidence at trial demonstrates that Norman was on notice of each of these claims more than two years before filing suit and, thus, the claims are barred.

1.      **Plaintiff's claim for failure to give notice of or the right to vote on the sale of assets is barred**

With regard to Norman's alleged right to vote on the sale of USM assets, the record is clear that he knew by December 2002 that nearly all of USM's assets had been sold and that he had not been given an opportunity to vote on the sale. (Defs. Ex. 120). This fact establishes actual knowledge of an alleged harm, precludes tolling and bars this aspect of his claim as untimely. This conclusion is supported by Norman's testimony when he stated:

- In the fall of 2002 Elkin told Norman in a telephone call that USM had sold its licenses (Norman Trans. p. 113, lines 7 - 9).

- This call led him to retain a lawyer who requested additional information from Elkin regarding the sales. (*Id.*).

32

- On December 3, 2002, Norman and his counsel received a letter from Elkin detailing the sale of the USM Phase I licenses, attaching the Purchase Agreements and stating that Elkin had repaid himself over $300,000 in loans. (*Id.* at p. 115, line 22 – p. 118, line 12). (Defs. Ex. 120).

- That he was responsible for aggregating the Phase I license so he knew how many USM owned and where they were located. (*Id.* at p. 61, lines 1 - 4). He also knew that the principal assets of USM were its licenses. (*Id.* at p. 90, line 16 – p. 91, line 11).

Clearly, when he received the December 3, 2002 letter, Norman possessed all of the facts necessary to <u>know</u> of his alleged injury pertaining to Elkin's purported failure to provide Norman with notice or a vote on the sale of USM assets, as well as the failure to disclose the sale of licenses and distribution of proceeds. Plaintiff was also on notice from FCC public notices that the transfer of the subject licenses had taken place and, of course, that he had not been asked to approve such transfers.

### 2. Plaintiff's claim for failure to seek approval for the Shareholder Loan Agreement is barred

To the extent the claim rests on Elkin's alleged failure to seek Plaintiff's approval for the Shareholder Loan Agreement, the statute of limitations is a complete bar. As with the first two aspects of this claim, upon receipt of the Shareholder Loan Agreement in October 2003, Norman was in possession of all necessary facts to know whether he had been wronged, or, at the very least, if further diligence was required. For at that moment, Norman knew the Shareholder Loan Agreement existed, that it had not been previously provided to him and that he had not been asked to approve the loans. Norman's testimony on this point is clear and fatal to his claim:

> Q:   So you knew in October 2003 that my client had cut a shareholder loan agreement, and at least you had what Mr. Elkin represented to be the amount of those loans, correct?

> A:   That's correct.

33

> Q:    But you knew when you received this that you had
> not been asked to approve or authorize this document, correct?

> A:    That's correct.

(Norman Trans. p. 136, lines 8-14).   In addition to the agreement itself, Norman was also on

notice as early as December 2002 that Elkin made loans to USM and had repaid himself over

$300,000 for those loans when Norman received the December 3, 2002 letter. (Defs. Ex. 120).

There is simply no conclusion this Court can draw other than to find that Plaintiff has

utterly failed to justify the tolling of the limitations period and that his disclosure claims are

barred by Pennsylvania's two year statute of limitations.

### F.    Plaintiff's Remaining Claims are Likewise Barred by the Statute of Limitations

The remaining claims asserted by Plaintiff are for (1) declaratory judgment on the

following grounds:

- The Company is entitled to all consideration derived from the sale or diversion of Company property, including Federal Communications Commission ("FCC") licenses and application rights.

- Norman is entitled to at least 25% of the proceeds from all sales of Company assets.

- Norman is entitled to at least 25% of all future proceeds from the sale of Company assets.

- Some, if not all, of Elkin's interests in the Company are forfeited as a result of his fraudulent conduct and failure to make his required capital contributions. The forfeiture of his ownership interest in the Company should account for Elkin's failure to make his capital contributions in a timely fashion and the venture risk inherent to Norman's timely contributions.

(Pre-Trial Order at pp. 3-4), and (2) unjust enrichment, asserting:

> Elkin has been unjustly enriched to the detriment of Norman
> through his receipt of at least $601,000 from the proceeds of: (i)
> the Company's sales of its assets; (ii) TEG's sale of FCC Phase II

34

> 220 MHz licenses; and (iii) his apportionment of only 75% of the
> Company's capital gains realized as a result of its asset sales but
> receipt of 100% of the distributions made from this sales.

(Pre-Trial Order at p. 6). Both the declaratory judgment and unjust enrichment claims are less

independent causes of action than they are requests for a specific remedy should the Court find

liability under one of Plaintiff's other claims.   Moreover, these claims are based on the same

facts as the claims discussed above related to the sale of USM assets and the distribution of the

sale proceeds to Elkin as the repayment of loans.   Therefore, Defendants will rely upon and

incorporate in this section, their arguments that Plaintiff has failed to carry the burden of proof

necessary to justify tolling the limitations period and that Plaintiff's claims are time barred.


## II.   Plaintiff's Claims Other than the Breach of Contract and Fraud are Derivative Claims and any Damages Belong to USM

In the Amended Complaint, Plaintiff states that he is bringing the lawsuit both

derivatively and directly.

> This Amended Complaint seeks to remedy the following wrongs
> done to the Company and to Norman, directly:(i) breach of
> contract; (ii) declaratory relief; (iii) usurpation of corporate
> opportunity; (iv) breaches of Elkin's fiduciary duties of loyalty,
> care and good faith dealing to the Company and its minority
> stockholder; (v) breach of Elkin's fiduciary duty of disclosure; (vi)
> conversion and misappropriation of Company assets and goodwill;
> (vii) fraudulent representation; (viii) aiding and abetting breaches
> of fiduciary duties; and (ix) unjust enrichment.

(Amended Complaint at pp. 1-2) (D.I. 2). Plaintiff did not specify in the Complaint which

claims he was asserting derivatively and which were direct claims. In fact, to date he has not

done so. While Plaintiff's claims for breach of contract and fraud are direct claims, the

remaining claims are wholly derivative in nature. Because Plaintiff is asserting the derivative

claims on behalf of USM, the damages associated with the derivative claims, if any, will be owed to USM and not to Plaintiff individually.

A lawsuit can be either direct or derivative. Whether a lawsuit is direct or derivative depends on the following two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004). If a plaintiff can prevail in his lawsuit without showing an injury or breach of duty to the corporation, the lawsuit should be treated as a direct action. *Id.* at 1036. A derivative claim, on the other hand, "belongs to the corporation, not to the shareholder plaintiff who brings the action. The shareholder plaintiff's interest is limited to compelling the corporation (by 'standing in its shoes') to assert the corporation's right to seek redress for the alleged wrongdoing." *NL Indus. v. MAXXAM, Inc. (In re MAXXAM, Inc./Federated Dev. S'holders Litig.)*, 698 A.2d 949, 956 (Del. Ch. 1996) (internal citations omitted). "Because a derivative suit is being brought on behalf of the corporation, the recovery, if any, must go to the corporation." *Tooley*, 845 A.2d at 1036. Plaintiff's claims other than breach of contract and fraud are derivative and, thus, any damages would go, not to Plaintiff, but to USM.

### A.    Conversion/Misappropriation is Derivative

Plaintiff has conceded that his claims for misappropriation of the Company's goodwill are derivative. *See* Opposition to Defendants' Motion in Limine to Preclude Plaintiff from Asserting that any Damages Awarded in this Lawsuit are Owed Directly to Plaintiff (D.I. 14) ("Plaintiff's claim for misappropriation of the Company's goodwill is derivative."); Final Jury Instructions p. 27 (D.I. 116) ("Mr. Norman's conversion claim is brought derivatively on behalf

of US Mobilcomm."). The claim itself as set forth in the Pre-Trial Order is clear: "Elkin misappropriated USM's good will and status as a qualified bidder and its incumbent status with the FCC during the 220 MHz Auction Number 18 when he allegedly filed and amendment to USM's application to name TEG as the applicant." (Pre-Trial Order at p. 5) (emphasis added).[9] Thus, Plaintiff is claiming that Elkin wrongfully took for himself something that belonged to the Company, not Norman, and, if true, the value of what was taken would go back to the Company.

Disingenuously, Plaintiff asserts that the verdict form would inform the jury of this fact and enable it to apportion any recovery it wished onto Plaintiff. The jury verdict form submitted did not clearly make this distinction as evidenced by the fact that the jury found that, of the amount in damages they deemed sufficient to compensate USM, all should be recovered by Plaintiff. Because this claim is derivative and not direct, and the jury misapportioned damages, the jury's award of damages to Plaintiff must be set aside.

### B.     Plaintiff's Breach of Fiduciary Duty Claims are Derivative

Claims for breach of fiduciary duty are quintessential derivative claims.    Norman's loyalty claims have four bases:  (1) self dealing is using the USM incumbency position to benefit TEG and himself;  (2) engaging in a self interested transaction with the Company when he executed the Shareholder Loan Agreement;  (3) conducting the business for the benefit of himself

---

[9]  The usurpation of corporate opportunity claim similarly seeks damages for Elkin's usurpation of "the Company's opportunities when he substituted TEG for USM in FCC 220 MHz Auction Number 18 as well as permitting TEG to participate in FCC 220 MHz Auction Number 24. *See* Pre-Trial Order. (Pre-Trial Order at p. 4) (emphasis added). Thus, on its face this is a derivative claim. Moreover, usurpation claims are, by definition, derivative. *In re Big Wheel Holding Co., Inc.*, 214 B.R. 945, 951-52 (D. Del. 1997) ("The vehicle for remedying a violation of the corporate opportunity doctrine is a derivative suit.") citing *Gagliardi v. TriFoods Int'l, Inc.*, 683 A. 2d 1049, 1055 (Del. Ch. 1996) (interpreting an allegation of usurpation of corporate opportunity as being a derivative claim, since there is no duty in such as case to the minority shareholders as individuals).   Defendants duty is not to share an opportunity with the other shareholders but to not take an opportunity from the company. *In re Big Wheel*, 214 B.R. at 952. Therefore, the usurpation claim is derivative and any damages would go to USM, not to Plaintiff.

rather than the equity owners; and (4) forcing the Company into insolvency following the execution of the Shareholder Loan Agreement. (Pre-Trial Order at p. 4). On their face, these claims set out only claims for a harm to the Company and are derivative claims. Moreover, the courts of Delaware have found these types of claims to be derivative. *VGS, Inc. v. Castiel*, 2003 Del. Ch. LEXIS 16, * 39-40 (Del. Ch. Feb. 28, 2003) (claims for self dealing are derivative, not direct). Thus, any damages flowing from these claims would go to USM, not Plaintiff.

Likewise, Plaintiff's disclosure claims relate to Elkin's alleged failure to disclose or seek shareholder approval for the actions he took to salvage value from the licenses owned by USM. (Pre-Trial Order at p. 5); *Manzo v. Rite Aid Corp.*, 2002 Del. Ch. LEXIS 147, * 18 (Del. Ch. Dec. 19, 2002) (allegations that plaintiff was deprived of accurate information is an injury suffered by all shareholders and is derivative in nature).[10] This is true even where a shareholder may also have certain contractual rights. *Id.* at *19-20.

### C.    The Unjust Enrichment and Declaratory Judgment Claims are Derivative

As discussed above, the unjust enrichment and declaratory judgment claims relate only to the allegations that Elkin sold <u>Company</u> assets and improperly made distributions himself. To the same extent the underlying claims on which these remedies are based are derivative, so too are the unjust enrichment and declaratory judgment. Any damages that are awarded on these claims belong not to Norman but to USM.

## III.   ELKIN SHOULD BE AWARDED REASONABLE COMPENSATION AS AN OFFSET AGAINST ANY DAMAGES AWARDED

Elkin is entitled to offset in a reasonable amount any damages awarded for services rendered by him for the benefit of USM. In their Answer, Defendants asserted an affirmative

---

[10]  Obviously, to the extent the breaches of fiduciary duty claims are derivative, the aiding and abetting breaches of fiduciary duty claims are derivative as well.

defense based on their right to offset any damages that the Plaintiff may be awarded with the amount of compensation owed to Elkin.[11]

> In the event Plaintiff proves himself entitled to any return of capital or distribution of money from USM – or damages of any kind from any Defendant herein – Elkin is entitled to a set-off against any such award measured by the amount of money necessary to reasonably compensate him for services he rendered over the past twelve years or more to, and for the benefit of, USM and its shareholders, including Norman, and for which Elkin never received any compensation of any kind.

(Answer, ¶ 123) (D.I. 5).

It is within the discretion of the court to decide whether set-off should be allowed. *Pettinaro Constr. Co. v. Lindh*, 428 A.2d 1161, 1164 (Del. 1981). As a doctrine of equity, "set-off should be allowed when, in view of all the circumstances, equity and good conscience require it to be made, substantial justice will be promoted thereby, and the rights and interests of third persons will not be infringed. *Id.* Accusations of inequitable conduct by the defendant do not preclude the defendant from asserting set-off. *Di Loreto v. Tiber Holding Corp.*, 2001 Del. Ch. LEXIS 26, at *13-14 (Del. Ch. Feb. 20, 2001) (holding that defendant was entitled to setoff damages awarded to plaintiff even though defendant was found to have made false representations to plaintiff).

Directors and officers are entitled to be compensated for the services they provide to their corporations even when such compensation has not been authorized by the shareholders, the corporate charter or by-laws, or any other contract that allows for such compensation because

---

[11] Elkin's claim encompasses any and all rights of set-off and recoupment that he may be able to assert to reduce the amount of any damages awarded to the Plaintiff. Although separate remedies, the terms "set-off" and "recoupment" are often used interchangeably as they refer to equitable principles that allow defendants to offset their liability and are not necessarily viewed as mutually-exclusive principles. *See, e.g., Trucking Employees of N. J. Welfare Fund v. Colville*, 16 F.3d 52, 56 (3d Cir. 1994)(Court referred to "recoupment by means of equitable setoff").

39

"where an officer-director has fixed his or her own compensation, our courts have recognized a right to recover under a theory of quantum meruit." *Technicorp Int'l II, Inc. v. Johnston*, 1997 Del. Ch. LEXIS 126, at \*43 (Del. Ch. Aug. 22, 1997); *see also Hall v. John S. Isaacs & Sons Farms*, 146 A.2d 612 (Del. Ch. 1958) (finding that "the salary recipients may yet establish that such payments to them, although unauthorized by a proper board and not validly ratified by independent stockholders are recoverable upon a theory of quantum meruit"); *Wilderman v. Wilderman*, 315 A.2d 610, 615 (Del. Ch. 1974) (finding "that additional compensation received by [the officer] for the years in question [could] find its authorization in the theory of quantum meruit").

In *Technicorp Int'l II v. Johnston*, the Court explained that, under Delaware caselaw

> the defendants may be entitled to recover the reasonable value of their services on the basis of quantum meruit if they can demonstrate that (i) they provided services as officers with the understanding that they would be compensated, (ii) they did not grant themselves excessive compensation to unjustly enrich themselves, and (iii) [the corporations] benefited from those services and would be unjustly enriched if the defendants were not compensated.

*Technicorp*, 1997 Del. Ch. LEXIS 126, at \*45-46.  In a subsequent *Technicorp v. Johnston* decision, the Court explained that

> [t]o avoid such unjust enrichment, courts of equity, applying Delaware law, have implicitly recognized that even where a corporate fiduciary's breach of the duty of loyalty results in his being stripped of all profit flowing from the breach, it is appropriate to offset against the corporation's recovery an amount that represents reasonable compensation to the fiduciary for services legitimately performed.

*Technicorp Int'l II, Inc. v. Johnston*, 2000 Del. Ch. LEXIS 81, at \*196 (Del. Ch. May 31, 2000).

After an equitable analysis of the facts surrounding the defendants counterclaim for

compensation, that Court held that the defendants, although liable for breaches of fiduciary duties, were entitled to offset their compensation. *Id.* at *197-200.

Elkin established at trial that he was entitled to compensation for providing services to, and for the benefit of, USM for over twelve years. Elkin testified that similarly situated executives in the same situation as USM made approximately $250,000 to $500,000 per year in the same time frame. (Elkin Trans. p. 194, lines 2-7). The reasonableness of that amount was not refuted by the Plaintiff. Equitable principles demand that Elkin be permitted to offset against any damages awarded because it would be grossly inequitable to allow the Plaintiff to recover money from Elkin when he is owed compensation for years of service.

It is undisputed that Plaintiff turned his back on USM during a critical period, which left Elkin alone to run USM. (Elkin Trans. p. 202, lines 5 - 15; Norman Trans. p. 68, lines 2 – 11). While Plaintiff was able to pursue different avenues to make money, Elkin was left with the heavy burden of trying to make a fledgling company a success with limited support and capital. Elkin alone had to deal with all of the issues that confronted participants in the 220 MHz industry – an industry that ultimately failed. Elkin alone pursued possible sale opportunities and sources of financing for the company. As Plaintiff testified, Elkin was in charge of "strategic relationships, financing and selling the company." (Norman Trans. p. 7, lines 11 – 16).

For years, Elkin ran USM by himself, for the benefit of various stakeholders of USM, without receiving a penny of compensation. (Elkin Trans. p. 193, line 25 – p. 194, line 1). Once Plaintiff eventually decided to re-engage himself in the business affairs of USM, he belatedly questioned some of the actions that Elkin took as the sole manager of USM. Plaintiff failed to recognize that, set against the backdrop of the failing 220 MHz industry that caused several

41

companies to go bankrupt, Elkin, using his best efforts, was able to salvage what little value USM had. (Elkin Trans. p. 193, lines 7-18). This is a model for awarding compensation.

Despite Plaintiff's accusations of misdoings, Elkin is still entitled to compensation for his years of service. Elkin will not be unjustly enriched by the offset because, unlike Plaintiff, Elkin was forced to forgo opportunities that could have been more profitable. In the end, nothing can compensate Elkin for the years of stress and anxiety over trying to make USM a success. Considering the equities, Defendant should be permitted to offset a reasonable amount of compensation against any damages entered against him.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, this Court should find that Plaintiff's claims are barred by the statute of limitations, that the claims other than fraud and breach of contract are derivative and that Elkin is entitled to reasonable set off against any damages awarded.

Dated:   August 14, 2009

**BLANK ROME LLP**

Steven L. Caponi (DE Bar No. 3484)
Christine S. Azar (DE Bar. No. 4170)
1201 Market Street, Suite 800
Wilmington DE 19801
Telephone: (302) 425-6400
Facsimile: (302) 425-6464

*Attorneys for Defendants David W. Elkin, Richard M. Shorin, The Elkin Group, Inc., and Nominal Defendant US MobilComm, Inc.*

42

122138.00601/40182945v.1