IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JEFFREY M. NORMAN,                    :
                                      :
          Plaintiff,                  :
                                      :
     v.                               :     C.A. No. 06-005-JJF
                                      :
DAVID W. ELKIN, RICHARD M. SHORIN     :
and THE ELKIN GROUP, INC.             :
                                      :
          Defendants,                 :
                                      :
     and                              :
                                      :
US MOBILCOMM, INC.,                   :
                                      :
          Nominal Defendant.          :

**PLAINTIFF'S ANSWERING POST-TRIAL BRIEF IN OPPOSITION TO
DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW**

Dated: September 11, 2009

Sean J. Bellew (#4072)
David A. Felice (#4090)
Ballard Spahr LLP
919 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 225-4466
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

I.    PRELIMINARY STATEMENT ..................................................................................... 1

II.   STANDARD OF REVIEW ............................................................................................. 2

III.  THE JURY'S VERDICT FINDING FRAUD SHOULD STAND. .................................. 3

      A.    The Jury Found There Were a Number of Fraudulent Misrepresentations. ........... 3

            1.    The December 2002 Letter Contained Fraudulent
                  Misrepresentations ......................................................................................... 4

            2.    The October 2003 Shareholder Loan Agreement Contained
                  Fraudulent Misrepresentations. ..................................................................... 5

      B.    Plaintiff Justifiably Relied Upon the False Representations Contained in
            the December 2002 Letter and October 2003 Shareholder Loan
            Agreement. ....................................................................................................... 7

            1.    Defendants Waived Their Reliance Argument. ........................................... 7

            2.    Notwithstanding Waiver, Reliance Was Established. ................................. 8

      C.    The Jury's Damages Award of $153,756 for the Fraud Claim Represents
            25% of the Money Mr. Elkin Distributed to Himself – and Fraudulently
            Concealed From Plaintiff. ................................................................................ 10

      D.    The Jury's Damages Award Should Not be Set Aside. ....................................... 11

IV.   THE JURY'S VERDICT FINDING CONVERSION SHOULD STAND,
      BECAUSE DEFENDANTS EXERCISED UNAUTHORIZED CONTROL
      OVER USM's STATUS AS A QUALIFIED BIDDER AND INCUMBENT
      LICENSE HOLDER BEFORE THE FCC, AND A MEASURE FOR DAMAGES
      WAS ESTABLISHED. ................................................................................................... 14

V.    THE JURY'S VERDICT FINDING BREACH OF CONTRACT SHOULD
      STAND, BECAUSE THE EXECUTION OF THE SHAREHOLDER LOAN
      AGREEMENT DROPPED ELKIN'S CAPITAL INVESTMENTS BELOW
      $750,000. ...................................................................................................................... 16

VI.   CONCLUSION .............................................................................................................. 19

i

## TABLE OF AUTHORITIES

### FEDERAL CASES

Atkinson v. Way, 2004 U.S. Dist. LEXIS 13702 (D. Del. July 19, 2004) ...............................12, 13

Bonjorno v. Kaiser Aluminum & Chem. Corp., 752 F.2d 802 (3d Cir. 1984) ................................7

Bowman v. Home Life Ins. Co. of Am., 260 F.2d 521 (3d Cir. 1958)............................................8

Carr v. Gillis Associated Indus., 2007 U.S. App. LEXIS 8855 (3d Cir. Mar. 26, 2007) ...............3

Great N. Ins. Co. v. ADT Sec. Servs., Inc., 517 F. Supp. 2d 723 (W.D. Pa. 2007) .....................17

Indian Coffee Corp. v. Procter & Gamble Co., 752 F.2d 891 (3d Cir. 1985) .................................2

nCube Corp. v. SeaChange, 313 F. Supp. 2d 361 (D. Del. 2004) ..........................................2, 3, 4

Orlando v. Billcon Int'l, Inc., 822 F.2d 1294 (3d Cir. 1987).........................................................7

Tann v. Serv. Distribs., Inc., 56 F.R.D. 593 (E.D. Pa. 1972) ..............................................3, 11, 12

United States v. Givan, 320 F.3d 452 (3d Cir. 2003) ............................................................12, 13

Universal Computer Sys., Inc. v. Allegheny Airlines, Inc., 479 F. Supp. 639 (M.D. Pa. 1979) .......................................................................................................................................14

Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481 (3d Cir. 1985)................................12

Weinstein v. Stryker, 267 F. Supp. 34 (E.D. Pa. 1967) .................................................................3

### STATE CASES

AM/PM Franchise Assoc. v. Atl. Richfield Co., 584 A.2d 915 (Pa. 1990)....................................15

Carroll v. Phila. Hous. Auth., 650 A.2d 1097 (Pa. Commw. Ct. 1994) ..................................10, 15

Delahanty v. First Pennsylvania Bank, 464 A.2d 1243 (Pa. Super. Ct. 1983) .............................12

Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800 (Pa. 1989)..................................................12

Lake v. Thompson, 77 A.2d 364 (Pa. 1951).................................................................................8

Northcraft v. Edward C. Michener Assocs., Inc., 466 A.2d 620 (Pa. Super. Ct. 1983) ...............15

Scaife Co. v. Rockwell-Standard Corp., 285 A.2d 451 (Pa. 1971) ..........................................8, 10

Scullion v. Emeco Indus., Inc., 580 A.2d 1356 (Pa. Super. Ct. 1990) .........................................10

Toy v. Metro. Life Ins. Co., 928 A.2d 186 (Pa. 2007).....................................................................8

Williams v. Bernard Hopkins, Jr., Inc., 2007 Phila. Ct. Com. Pl. LEXIS 103 (Phila. C.P. Apr. 5, 2007)...........................................................................................................................17

Young v. Frase, 702 A.2d 1234 (Del. 1997)..............................................................................12

## SECONDARY SOURCES

Restatement (Second) of Torts § 242...........................................................................................14

Restatement (Second) of Torts § 540............................................................................................8

## I.      PRELIMINARY STATEMENT

On May 13, 2009, the jury rendered a verdict in favor of Jeffrey M. Norman ("Plaintiff") on all claims – fraud, conversion/misappropriation, and breach of contract. Specifically, the jury found that David W. Elkin was liable for fraud by reason of the statements contained in his December 3, 2002 letter and by reason of the schedule of contributions and distributions included with his October 2003 Shareholder Loan Agreement.  (D.I. 119 (Verdict Form at 2-3).)  On the conversion/misappropriation claim, the jury found that Mr. Elkin and The Elkin Group ("TEG") misappropriated US Mobilcomm, Inc.'s ("USM") goodwill or status as a qualified bidder and an incumbent license holder with the Federal Communications Commission ("FCC") during the 220 MHz Auction Number 18.  (Id. at 3-4.)  With respect to the breach of contract claim, the jury found that Mr. Elkin breached an agreement in a number of ways: i) by failing to contribute his agreed-upon capital or failing to contribute his agreed-upon capital in a timely fashion; ii) by executing his October 2003 Shareholder Loan Agreement; and iii) by failing to distribute proceeds from the sales of USM's assets on a *pro rata* basis.  (Id. at 1-2.) The jury found Plaintiff did not waive his rights under the parties' agreement.  (Id. at 2.)

The jury also awarded damages to Plaintiff on all claims.  On the fraud claim, the jury awarded Plaintiff $105,756 in compensatory damages and $48,000 in punitive damages. (Id. at 3.)  For the conversion/misappropriation claim, the jury awarded Plaintiff $38,062.  (Id. at 4.)  The jury awarded Plaintiff $1.00 in nominal damages for the breach of contract claim.  (Id. at 2.)

On August 14, 2009, Mr. Elkin, Richard M. Shorin, TEG, and USM, Inc. ("Defendants") filed an opening post-trial brief for judgment as a matter of law ("JMOL"). Plaintiff submits this answering post-trial brief in response.  Pursuant to the stipulated briefing

schedule, the parties are to file any answering briefs by September 11, 2009.  (D.I. 133

(Stipulation and Order Regarding Briefing Schedule at ¶ b).)

## II.      STANDARD OF REVIEW

To say that Defendants carry a heavy burden would be an understatement.  In

nCube Corp. v. SeaChange, 313 F. Supp. 2d 361, 366 (D. Del. 2004) (Farnan, J.), the Court

explained that "[t]o prevail on a motion for judgment as a matter of law following a jury trial, the

moving party 'must show that the jury's findings, presumed or express are not supported by

substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict

cannot in law be supported by those findings.'"  (Citations omitted).  What Defendants fail to

recognize is that "[i]n assessing the sufficiency of the evidence, the Court must give the non-

moving party, 'as [the] verdict winner, the benefit of all logical inferences that could be drawn

from the evidence presented, resolve all conflicts in the evidence in his favor, and, in general,

view the record in the light most favorable to him.'"  Id. (citations omitted).  Moreover, despite

Defendants' brazen efforts to have this Court substitute Defendants' assessment of the evidence

for the jury's, "[t]he Court may not evaluate the credibility of the witnesses, may not weigh the

evidence, and may not substitute its view of the evidence for the jury's view.  Rather, the Court

must determine whether the evidence reasonably supports the jury's verdict."  Id. (citations

omitted).  Defendants seem to overlook the fact that a JMOL "may be granted only if, as a matter

of law, viewing all the evidence which has been tendered and should have been admitted in the

light most favorable to the party opposing the motion, no jury could decide in that party's favor."

Indian Coffee Corp. v. Procter & Gamble Co., 752 F.2d 891, 894 (3d Cir. 1985) (emphasis

added).  Here, Defendants have not met this burden.

III.     **THE JURY'S VERDICT FINDING FRAUD SHOULD STAND**

     A.     **The Jury Found There Were a Number of Fraudulent Misrepresentations**

        Defendants claim there can be no finding of fraud because the documents at issue did not contain fraudulent statements.  (D.I. 135 (Defs'. Op. Mem. Law Supp. JMOL at 1-8).)  However, such a claim ignores the fact that Mr. Elkin's December 2002 letter contained false or materially misleading statements of fact concerning the net proceeds generated from the sale of certain USM assets, as well as the amount of sales proceeds he distributed to himself.  (See Pl.'s Exs. 50, 51.)  In addition, the December 2002 letter failed to indicate that any purported shareholder loans were paid in capital.  (See Pl.'s Ex. 51.)  Regarding Mr. Elkin's October 2003 Shareholder Loan Agreement, it contained a false – and misleading – schedule of contributions.[1] (See Pl.'s Ex. 21.)

        Defendants pay no attention to the fact that the jury found in favor of Plaintiff with respect to the existence of fraudulent misrepresentations.  As a result, Plaintiff no longer bears the burden to prove fraud.  See nCube Corp., 313 F. Supp. 2d at 366.  The "jury may accept or reject such testimony as it deems proper.  This rule applies even [where] the testimony is uncontradicted and unrefuted."  Tann v. Serv. Distribs., Inc., 56 F.R.D. 593, 598 (E.D. Pa. 1972) (citations omitted); see also Weinstein v. Stryker, 267 F. Supp. 34 (E.D. Pa. 1967).

        By arguing that Plaintiff's position "rests on an 'assumption' built atop an 'observation,'" Defendants are simply picking a fight with the jury – the factfinder.  (D.I. 135 at 4.)  The same holds true with Defendants' argument that "Plaintiff presented no evidence

---

[1]     Defendants contend that Plaintiff's allegations of fraud with respect to the October 2003 Shareholder Loan Agreement should be stricken as untimely.  (D.I. 135 at 2, n.1.)  However, in Carr v. Gillis Associated Indus., 2007 U.S. App. LEXIS 8855, at *9-10 (3d Cir. Mar. 26, 2007), the plaintiff put forward a new theory of liability after his first theory was dismissed.  Here, Plaintiff did not change his theory of liability.

showing the schedule contained a false or misleading statement." (<u>Id.</u> at 7.)  The jury determined

Defendants' story just did not add up – and with good reason.

       1.     The December 2002 Letter Contained Fraudulent Misrepresentations

      There were a number of fraudulent misrepresentations made in Defendants'

December 2002 letter.  First, as of November 11, 2002, Defendants knew the net proceeds from

USM's sale of Phase I licenses were $602,120.  (Pl.'s Ex. 50.)  Through their December 2002

letter to Plaintiff, Defendants misrepresented that the "Total Net Proceeds" of USM's sale of

Phase I licenses were $479,708.  (Pl.'s Ex. 51; <u>see also</u> Norman Tr. 113:10-19, 197:8-18.)

Similarly, as of November 11, 2002, Defendants knew that Mr. Elkin distributed at least

$601,500 to himself as repayment of shareholder loans.  (<u>See</u> Pl.'s Ex. 50.)  However, in the

December 2002 letter to Plaintiff, Defendants misrepresented that Mr. Elkin had distributed to

himself just $380,588 as repayment of shareholder loans.  (Pl.'s Ex. 51; <u>see also</u> Norman Tr.

197:8-18; Elkin Tr. 250:19-21.)  Finally, the December 2002 letter to Plaintiff did not indicate

that Mr. Elkin's purported shareholder loans were once paid in capital.  (<u>Compare</u> Pl.'s Ex. 51

<u>with</u> Elkin Tr. 222:20-23.)  Those are the facts.  Defendants tried to explain away the

misrepresentations and intentional concealment, but the jury simply did not find their story

credible.

      Defendants put a lot of stock in Mr. Shorin's testimony, but the jury did not

believe him.  Defendants now ask the Court to reevaluate Mr. Shorin's credibility, which is

outside the scope of the Court's powers.  <u>See</u> <u>nCube Corp.</u>, 313 F. Supp. 2d at 366.  Defendants

are quick to note that Mr. Shorin explained that comparing Plaintiff's Exhibits 50 and 51 was

like comparing "apples to oranges."  (D.I. 135 at 5.)  However, Mr. Shorin did not claim to be

the author of the November 11, 2002 letter.  (Shorin's Tr. 175:12-176:13.)  As a result, Mr.

Shorin was no more qualified to compare the documents than anyone else.  Moreover, the net

proceeds reported in USM's tax returns were more than the proceeds indicated in the December 2002 letter.  (Compare Pl.'s Exs. 8 at MC000539, 9 at MC000561, 10 at MC000578 <u>with</u> Pl.'s Ex. 51.)  The documents are contradictory on their face.  It is within the province of the jury to weigh credibility, and the jury had more than sufficient evidence to discount the testimony of Mr. Shorin with respect to the December 2002 letter.

2.     The October 2003 Shareholder Loan Agreement Contained Fraudulent Misrepresentations.

The October 2003 Shareholder Loan Agreement contained a fraudulent schedule of contributions.  Mr. Elkin admitted that the Shareholder Loan Agreement – to and from himself – was not executed on September 1, 1995 as it reads on its face.  (Elkin Tr. 233:14-234:9; Pl.'s Ex. 21.)  Instead, it was created at least five – and perhaps as many as eight – years later.  (<u>See</u> Elkin Tr. 233:14-234:9, 246:20-247:16.)  The document, which purports to memorialize Mr. Elkin's loans to USM, directly contradicts the fact that Mr. Elkin did not make loans to USM. IRS tax returns are clear that USM never reported any shareholder loans for the years during which Mr. Elkin claims to have made them.  Mr. Norman testified as follows:

> Q.  US MobilComm did not enter any shareholder loan in its tax return in 1997?
>
> A.  No, it did not.
>
> Q.  You had a chance to look at tax returns for 1998, '99, going forward?
>
> A.  That's correct.  There was no notation on any of the corporate tax returns for a shareholder loan.
>
> . . .
>
> Q.  You've taken a look at those tax return[s] [referring to 2002 and 2003], Mr. Norman, correct?
>
> A.  Yes.

> Q.  In any of those years, did US MobilComm ever report to the
> I.R.S. that it had shareholder loans?
>
> A.  No, it did not.

(Norman Tr. 111:12-18, 112:17-22; <u>see also</u> 110:20-111:11, 111:19-112:15; Abo Tr. 34:3-35:19, 37:10-37:12.)  In addition, the amount of proceeds Mr. Elkin says he paid himself contradicts the amount reflected in the October 2003 Shareholder Loan Agreement.  (<u>Compare</u> Pl.'s Ex. 21 <u>with</u> Pl.'s Ex. 50.)

Mr. Elkin's testimony regarding the October 2003 Shareholder Loan Agreement was called into question when counsel exposed the fact that Mr. Elkin had offered several different answers as to when the document was created.  (Elkin Tr. 246:13-247:16.)  At one point, the October 2003 Shareholder Loan Agreement was supposedly created within one year of September 1995.  (<u>Id.</u> at 247:8-11.)  At another point, it was created in 2001 or 2002.  (<u>Id.</u> at 246:24-247:7.)  Finally, at trial, Mr. Elkin testified that the October 2003 Shareholder Loan Agreement was executed in 2000.  (<u>Id.</u> at 247:3-7.)

Defendants' credibility regarding the October 2003 Shareholder Loan Agreement also suffered during Mr. Shorin's testimony.  While Mr. Shorin took the time to correct mistakes made in USM's internal documents, he did not find it important to correct tax returns submitted to the IRS to reflect Mr. Elkin's purported shareholder loans.  (Shorin Tr. 157:4-158:11, 167:4-168:21, 178:1-25; Elkin Tr. 245:20-246:12.)  The fact that Mr. Shorin, a CPA, did not correct mistakes reflected on IRS tax forms, despite having knowledge of such mistakes, is something the jury was free to consider during deliberations.

Given the abundance of evidence supporting the conclusion that the December 2002 letter and October 2003 Shareholder Loan Agreement contained fraudulent misrepresentations, the jury was more than justified in finding in favor of Plaintiff.

**B.     Plaintiff Justifiably Relied Upon the False Representations Contained in the December 2002 Letter and October 2003 Shareholder Loan Agreement**

Defendants claim "the record at trial is devoid of any evidence showing, suggesting or even inferring that Plaintiff detrimentally and reasonably relied upon a false statement." (D.I. 135 at 8-12.)  However, Defendants waived their right to challenge the jury's finding on reliance because they did not argue this issue in their initial motion for judgment as a matter of law.  Even if the Court considers the merits of this issue, Defendants' argument fails to consider the parties, their relationship, and the circumstances surrounding the December 2002 letter and October 2003 Shareholder Loan Agreement, all of which played a role in Plaintiff's refraining from filing suit to recover money owed to him.

1.     Defendants Waived Their Reliance Argument

As a threshold matter, Defendants waived their right to challenge the jury's finding on reliance.  A "Rule 50(b) motion may consider only specific grounds asserted in the motion for a directed verdict."  <u>Orlando v. Billcon Int'l, Inc.</u>, 822 F.2d 1294, 1298 (3d Cir. 1987) (citation omitted) (district court erred in granting motion for judgment notwithstanding verdict on damages claim, where plaintiff was not on notice that sufficiency of evidence was being challenged); <u>see also</u> <u>Bonjorno v. Kaiser Aluminum & Chem. Corp.</u>, 752 F.2d 802, 814 (3d Cir. 1984) (defendant not entitled to judgment notwithstanding verdict where neither raised damages issues specifically in motion for directed verdict nor objected to jury instructions on matter).

Here, Defendants were sufficiently vague, in their motion for judgment as a matter of law, that the reliance issue is waived.  Defendants made a fleeting reference to reliance in the context of damages, but nothing more.  (Day 3 Tr. 270:1-271:9.)  Defendants cannot assert their reliance argument now for the first time.

2.      Notwithstanding Waiver, Reliance Was Established

Even if the Court considers the merits of Defendants' reliance argument, the

jury's finding should be upheld.  According to the jury instructions, "4.  the fact that Mr. Norman

acted, or declined to act, in justifiable reliance on the false representation[s]" supports a finding

of fraud.  (D.I. 116 (Jury Instructions at 24).)  The Supreme Court of Pennsylvania has stated

"that justifiable reliance is typically a question of fact for the fact-finder to decide, and requires a

consideration of the parties, their relationship, and the circumstances surrounding their

transaction."  Toy v. Metro. Life Ins. Co., 928 A.2d 186, 208 (Pa. 2007) (citing Scaife Co. v.

Rockwell-Standard Corp., 285 A.2d 451, 455 (Pa. 1971)).  The recipient of a fraudulent

misrepresentation has no duty to investigate its falsity in order to justifiably rely upon it, though

he is not justified in relying upon the truth of the misrepresentation where he knows it to be false

or falsity is obvious.  See Toy, 928 A.2d at 207-08 (plaintiff not prohibited from establishing

justifiable reliance on agent's alleged misrepresentations by fact that she failed to review life

insurance policy or cover sheet); see also Bowman v. Home Life Ins. Co. of Am., 260 F.2d 521,

522-23 (3d Cir. 1958); Restatement (Second) of Torts § 540.  "The law leans toward protecting

even the foolishly credulous against the machinations of those who would defraud."  Lake v.

Thompson, 77 A.2d 364, 367 (Pa. 1951) (citations omitted).

Again, despite Defendants' attempts to put on the blinders, the jury found in favor

of Plaintiff on the fraud claim.  Thus, Defendants now carry the burden.  Not only is there direct

testimony that Plaintiff relied on Defendants' fraudulent misrepresentations (Norman Tr. 114:10-

12), but there is also significant circumstantial evidence indicating Plaintiff refrained from

pursuing his rights sooner due to his reliance on same.  There was no reason for Plaintiff to know

– or have reason to know – of Defendants' fraudulent misrepresentations and intentional

concealment.  Plaintiff and Mr. Elkin had a long-standing relationship with one another that went

back to college – where they met through mutual friends.  (Norman Tr. 63:3-5, 63:9-25.)

Plaintiff and Mr. Shorin also knew each other for a long time – as far back as 1994, when Mr.

Shorin began working for USM.  (See id. 63:6-8; see also Shorin Tr. 96:6-9, 100:18-20.)  Mr.

Elkin has an undergraduate degree in Business Administration, a law degree from the University

of Miami, a master's degree in tax law from the University of Miami, and experience as a

general counsel of a company.  (Norman Tr. 86:8-87:19.)  Mr. Shorin has an undergraduate

degree in Economics from the University of Rochester, an MBA from the University of

Rochester, a master's degree in taxation from Villanova University, and he is a CPA.  (Id. 87:22-

88:8; Shorin Tr. 98:18-99:1.)  Moreover, Plaintiff and Mr. Elkin were the only two shareholders

in USM.  (Pretrial Order at 8, ¶ ¶ A, C, D, E, F.)  Mr. Shorin maintained their books and records.

(Shorin Tr. 94:1-8.)  Plaintiff should have been able to trust Defendants, but – as it turns out –

they were not as honorable as Plaintiff was led to believe.

       In terms of the circumstances surrounding the December 2002 letter and October

2003 Shareholder Loan Agreement, both were provided to Plaintiff's counsel.  (Pl.'s Ex. 51;

Norman Tr. 135:18-136:7.)  Any argument that Plaintiff should have known the documents

provided to his lawyer were fraudulent is simply incredulous.  It is unfathomable that Defendants

would suggest Plaintiff should have known the December 2002 letter and October 2003

Shareholder Loan Agreement were fraudulent absent the documents produced during litigation.

Plaintiff's testimony clearly demonstrates that he did not know or have reason to know of the

facts constituting Defendants' wrongdoing until he secured the production of certain USM

internal documents through the books and records petition under 8 Del. C. § 220 ("§ 220

action").  (Norman Tr. 61:8-13, 106:1-17, 113:10-114:5, 192:7-9, 197:1-198:7, 199:17-201:18,

203:9-11.)  Once Plaintiff was put on notice of Defendants' fraudulent statements, he took action

to recover money owed to him.  It was appropriate for the jury to conclude that Plaintiff would have taken action sooner had Defendants provided him with the information necessary to connect the dots.  Instead, Defendants engaged in a game of "keep away."

The fact that Plaintiff detrimentally relied upon Defendants' fraudulent misrepresentations, and did not immediately sue to recover money owed to him, was justified given the parties, their relationship, and the circumstances surrounding the fraudulent misrepresentations.  In making its decision as to the existence of justifiable reliance, the jury had sufficient evidence before it to find this element of Plaintiff's fraud claim satisfied.

C.    **The Jury's Damages Award of $153,756 for the Fraud Claim Represents 25% of the Money Mr. Elkin Distributed to Himself – and Fraudulently Concealed From Plaintiff**

Defendants claim that "no evidence was elicited at trial showing: (i) plaintiff was damaged; (ii) the value of the damages; (iii) or how the damages were proximately related to his reasonable reliance on a fraudulent statement." (D.I. 135 at 14.)  Defendants' argument fails to recognize that Defendants hid the true activities of USM from Plaintiff, and Defendants prevented Plaintiff from receiving money that belonged to him.  Mr. Elkin distributed $615,026 to himself in 2004, at least 25% ($153,756) of which belonged to Plaintiff.

According to the jury instructions, the last element necessary to establish a claim for fraud is "5.  damage to Mr. Norman as a result of [his] reliance." (D.I. 116 at 24.)  "Damages need not be proved with mathematical certainty."  Scullion v. Emeco Indus., Inc., 580 A.2d 1356, 1360 (Pa. Super. Ct. 1990) (citations omitted).  Although a jury may not award damages on the basis of speculation or conjecture, damages are only speculative if the uncertainty concerns the fact of damages – not the amount.  See Carroll v. Phila. Hous. Auth., 650 A.2d 1097, 1100 (Pa. Commw. Ct. 1994).  Whether damages are proximately caused by fraud is a question for the jury.  Scaife, 285 A.2d at 457 (reinstating jury verdict).

Here, Plaintiff was damaged, because Defendants fraudulently concealed the fact that Mr. Elkin was distributing money to himself (from USM), at least 25% of which belonged to Plaintiff.  (Norman Tr. 210:1-10; Abo Tr. 50:25-51:17, 52:7-12, 52:18-19.)  The amount of money Mr. Elkin distributed to himself was in excess of $600,000.  (Abo Tr. 50:25-51:17, 52:7-12, 52:18-19.)  Specifically, it totaled $615,026.  (Dfs.' Ex. 118 at 1.)  The jury awarded $105,756 to Plaintiff in compensatory damages for his fraud claim, and $48,000 in punitive damages.  (D.I. 119 (Verdict Form at 3).)  Combined, the total amount of damages on Plaintiff's fraud claim equals $153,756, which is 25% of the $615,026 Mr. Elkin distributed to himself.  Because Defendants fraudulently concealed Mr. Elkin's distributions to himself, Plaintiff – for a period of time – refrained from filing suit to recover the money owed to him.

The jury's damages determination for fraud should stand, because Defendants' actions caused significant financial harm to Plaintiff, the reasonable value of which was awarded to him.

### D.     The Jury's Damages Award Should Not be Set Aside

Defendants argue that the damages awarded to Plaintiff should be set aside, because any damages suffered by Plaintiff were not proximately related to an alleged fraud, and even if Defendants' conduct technically constituted fraud, it was not sufficiently outrageous to warrant punitive damages.  (D.I. 135 at 15-16.)  Defendants' proximate cause argument has already been addressed in section III(C), supra, and their contention with respect to punitive damages gives no deference to the jury, which determined Defendants' acts of fraudulent misrepresentation and intentional concealment were sufficiently outrageous to justify such punishment.

Defendants do not cite to Tann, 56 F.R.D. at 598, where the court opined: "Damages assessed by a jury are not to be set aside unless shocking to the judicial conscience or

so grossly inadequate as to constitute a miscarriage of justice, . . ., or unless the jury's award indicates caprice or mistake or a clear abuse of its fact-finding discretion or the clear influence of partiality, corruption, passion, prejudice, or a misconception of the law." (Citations omitted); see also Van Buskirk v. Carey Canadian Mines, Ltd., 760 F.2d 481, 488 (3d Cir. 1985) (deciding not to set aside damages); Young v. Frase, 702 A.2d 1234, 1236 (Del. 1997) ("It follows that, in the absence of exceptional circumstances, the validity of damages determined by the jury should likewise be presumed."). "The trial judge should be extremely reluctant to interfere with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff." Tann, 56 F.R.D. at 598; see also Delahanty v. First Pennsylvania Bank, 464 A.2d 1243, 1263 (Pa. Super. Ct. 1983) ("It is well settled law in Pennsylvania that the decision of whether to award punitive damages and the amount to be awarded are within the discretion of the fact finder.") (citations omitted); Kirkbride v. Lisbon Contractors, Inc., 555 A.2d 800 (Pa. 1989) ("It is for the jury to weigh [certain] factors in arriving at an appropriate punitive damage award."). It is presumed that the jury followed the Court's instructions. See United States v. Givan, 320 F.3d 452, 462 (3d Cir. 2003); Atkinson v. Way, 2004 U.S. Dist. LEXIS 13702, at *8-9 (D. Del. July 19, 2004).

> Here, the jury instructions read in pertinent part:
>
> Punitive damages are different from compensatory damages. Compensatory damages are awarded to compensate the plaintiff for the injury suffered. Punitive damages, on the other hand, are awarded in addition to compensatory damages.
>
> You may award punitive damages to punish a party for outrageous conduct and to deter a party, and others like him, from engaging in similar conduct in the future. To award punitive damages, you must find by a preponderance of the evidence that Mr. Elkin acted intentionally or recklessly. Punitive damages cannot be awarded for mere inadvertence, mistake, errors of judgment and the like, which constitute ordinary negligence.

. . .

> In determining any award of punitive damages, you may consider
> the nature of Mr. Elkin's conduct and the degree to which the
> conduct was reprehensible.  Finally, you may assess an amount of
> damages that will deter Mr. Elkin and others like him from similar
> conduct in the future.  You may consider Mr. Elkin's financial
> condition when evaluating deterrence.  Any award of punitive
> damages must bear a reasonable relationship to Mr. Norman's
> compensatory damages. . . .

(D.I. 116 at 28-29.)  It is presumed the jury followed these instructions.  See Givan, 320 F.3d at

462; Atkinson, 2004 U.S. Dist. LEXIS 13702, at *8-9.  The evidence supports the fact that the

jury did follow the Court's instructions.  On his fraud claim, Plaintiff was awarded $105,756 in

compensatory damages and $48,000 in punitive damages.  (D.I. 119 at 3.)  The punitive damages

awarded do not even outpace the compensatory damages awarded here.  Combining the

compensatory damages and punitive damages, the jury awarded Plaintiff $153,756 on his fraud

claim.  This represents 25% of the $615,026 Mr. Elkin – with Mr. Shorin's assistance –

distributed to himself and fraudulently concealed from Plaintiff.  (Dfs.' Ex. 118 at 1.)  As

previously established, Plaintiff was a 25% shareholder in USM.  In light of Defendants'

despicable conduct, fraudulently concealing from Plaintiff the fact that the only other

shareholder in the company he owned was wrongfully distributing money to himself, as well as

attempting to justify their fraudulent activities through a contrived recapitalization scheme, the

jury was well within its boundaries in making its damages determinations.

Because Plaintiff's damages were proximately related to Defendants' fraudulent

misrepresentations, and because Defendants' conduct was outrageous, the jury's damages award

should not be set aside.

**IV.  THE JURY'S VERDICT FINDING CONVERSION SHOULD STAND, BECAUSE DEFENDANTS EXERCISED UNAUTHORIZED CONTROL OVER USM's STATUS AS A QUALIFIED BIDDER AND INCUMBENT LICENSE HOLDER BEFORE THE FCC, AND A MEASURE FOR DAMAGES WAS ESTABLISHED**

Defendants claim "(1) Plaintiff has not established an asset of the Company that can be the subject of a conversion claim and (2) Plaintiff did not establish any measure of damages for the alleged conversion."  (D.I. 135 at 16.)  Defendants ignore the fact that USM's status as a qualified bidder and an incumbent license holder before the FCC was merged into documents, and the measure of damages was determined by taking 25% of the gains on the sale of Phase II Auction Number 18 licenses – an amount that was reflected in TEG's tax returns.

In order to establish a claim for conversion, Plaintiff had to prove the following by a preponderance of the evidence:

>1.  US Mobilcomm possessed the status as a qualified bidder and incumbent license holder before the Federal Communications Commission;

>2.  Mr. Elkin or The Elkin Group exercised control over the status;

>3.  The exercise of the control was unauthorized;

>4.  US Mobilcomm was harmed as a result of the conduct.

(D.I. 116 at 27.)  It is well accepted that: "(1) Where there is conversion of a document in which intangible rights are merged, the damages include the value of such rights [and] (2) One who effectively prevents the exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion, even though the document is not itself converted."  Restatement (Second) of Torts § 242; see also Universal Computer Sys., Inc. v. Allegheny Airlines, Inc., 479 F. Supp. 639, 646 (M.D. Pa. 1979) (bid proposal capable of being converted; motion for judgment notwithstanding verdict granted on other grounds).  "The measure of damages in an action for conversion is the market value of the converted property at

the time and place of conversion." Northcraft v. Edward C. Michener Assocs., Inc., 466 A.2d

620, 628 (Pa. Super. Ct. 1983).  "There are a number of ways that damages may be removed

from the realm of speculation and be submitted to the jury with a rational basis from which the

amount can be inferred.  As long as the method of proof provides the jury with a 'reasonable

basis' for calculating damages, the issue should be submitted to the trier of fact." AM/PM

Franchise Assoc. v. Atl. Richfield Co., 584 A.2d 915, 926 (Pa. 1990); see also Carroll, 650 A.2d

at 1100.

Here, USM's status as a qualified bidder and an incumbent license holder with the

FCC was merged into USM's Phase II application and FCC public notices.  (See Pl.'s Exs. 38-

39; Pretrial Order at 10, ¶ Y.)  The documents indicate USM was a qualified bidder for Phase II

Auction Number 18 licenses (Pl.'s Ex. 38; Pretrial Order at 10, ¶ Y; Norman Tr. 96:5-9, 100:8-

10) and it was a winning bidder for same (Pl.'s Ex. 39).  Nowhere in the documents is Mr. Elkin

or TEG listed as a qualified bidder – or a winning bidder – for Phase II Auction Number 18

licenses.  (Pl.'s Exs. 38-39; Norman Tr. 99:19-100:2, 100:11-12.)  All of a sudden, without

informing Plaintiff, Defendants surreptitiously bootstrapped USM's incumbency position for

TEG's benefit by amending USM's registration to name TEG as the applicant.  (See Norman Tr.

99:6-103:11, 106:24-107:4.)  Defendants went to great lengths to keep their untoward plan a

secret.  When Plaintiff sent an e-mail to Mr. Elkin on November 10, 1998, which was premised

on the notion that USM was a successful bidder for the Phase II Auction Number 18 licenses,

Mr. Elkin never responded.  (See Pl.'s Ex. 40; Norman Tr. 102:24-103:11.)  Nor did Mr. Elkin

inform Plaintiff of his bait-and-switch at USM's annual stockholder meeting in 1998, because no

such meeting was scheduled or held.  (See Pretrial Order at 13, ¶ EEE.)  Further, Plaintiff –

besides having no reason to suspect wrongdoing at the time – did not have all the information he

needed to access certain FCC documents online, which may have tipped him off to Defendants'

devious scheme sooner.  (See Norman Tr. 103:21-104:3, 201:13-202:13.)  Phase II licenses were

virtually worthless if there was another license holder with an incumbency position in the same

territory.  (See id. at 65:3-67:8, 97:13-98:13.)  Lacking incumbency status, Defendants turned to

magic tricks, and unfortunately for them, the crowd caught on.

      Plaintiff provided the jury with a reasonable basis for calculating damages

associated with the conversion claim through his own testimony and that of Mr. Abo.  Both

Plaintiff and Mr. Abo explained that Defendants' sales of the Phase II Auction Number 18

licenses amounted to approximately $200,000, and after factoring in the expense of the licenses,

gains amounted to about $152,000.  (Norman Tr. 102:6-13; Abo Tr. 50:25-51:5, 51:18-52:3,

52:13-19.)  The precise number was $152,248.  (Pl.'s Exs. 13-14.)  Taking into account

Plaintiff's 25% ownership interest in USM, 25% of $152,248 equals $38,062, which is the exact

amount of damages the jury awarded Plaintiff for his conversion claim.  (D.I. 119 at 4.)

      Because USM's status as a qualified bidder and an incumbent license holder

before the FCC was merged into documents, as well as the fact that Plaintiff's damages were

established with reasonably certainty, the jury's verdict regarding conversion should stand.

## V.   THE JURY'S VERDICT FINDING BREACH OF CONTRACT SHOULD STAND, BECAUSE THE EXECUTION OF THE SHAREHOLDER LOAN AGREEMENT DROPPED ELKIN'S CAPITAL INVESTMENTS BELOW $750,000

      Defendants claim there can be no breach of contract, because there was no

testimony at trial that the parties agreed not to treat capital contributions over the required

amounts as loans – or that the parties agreed not to loan money to USM.  (D.I. 135 at 18-19.)

Defendants' argument ignores the fact that an agreement existed between the parties, which

required Mr. Elkin to maintain $750,000 in his USM capital account, and due to the Shareholder

Loan Agreement, his capital account dropped below that amount – to $420,000.

Defendants take issue with the fact that there was a "meeting of the minds" on the terms of the parties' shareholder agreement.  According to the jury instructions, a "meeting of the minds" is described as follows: "A legally binding contract requires that the parties manifest or show mutual assent to the contract's terms.  Mutual assent is not a subjective or personal understanding of the terms by either party.  Rather, mutual assent must be shown by words or acts of the parties in a way that represents a mutually understood intent." (D.I. 116 at 18.)  "An agreement is sufficiently definite if the parties intended to contract with each other and if a reasonably certain basis exists upon which a court could grant an appropriate remedy." Great N. Ins. Co. v. ADT Sec. Servs., Inc., 517 F. Supp. 2d 723, 736 (W.D. Pa. 2007).  Defendants cite Williams v. Bernard Hopkins, Jr., Inc., 2007 Phila. Ct. Com. Pl. LEXIS 103, at *4 (Phila. C.P. Apr. 5, 2007), in support of their position, but Williams is inapposite, because in that case, the parties never discussed the specific amount of compensation at issue.  Here, specific contributions were discussed and agreed upon.  (Pretrial Order at 8, ¶ ¶ D, E.)

Defendants' argument presumes they were allowed to convert capital to debt whenever desired.  However, no such presumption exists.  By Defendants' own admission, "[t]he required capital of [USM] was determined to be $1 million, making Elkin's capital requirement $750,000 and Norman's $250,000." (Id. at ¶ D.)  Moreover, Defendants admitted that Mr. Elkin's total number of shares in USM rose to 375, in exchange for his promise to contribute $750,000 in capital.  (Id. at ¶ E.)  During cross-examination of Mr. Elkin at trial, it was further established that Mr. Elkin's understanding of the agreement was that he was supposed to pay $750,000 for a 75% ownership interest in USM.  (See Elkin Tr. 228:21-233:13.)  However, Mr. Elkin only maintained $420,000 in his USM capital account, which is just 56% of the total capital he agreed to contribute to USM.  (See Pl.'s Ex. 21; Norman Tr. 69:13-16.)  In contrast,

Plaintiff's capital contributions of $250,000 satisfy his obligations to USM.  (See Norman Tr. 69:13-16; Abo Tr. 30:25-31:14.)

Recognizing his capital contributions were deficient, and in breach of the parties' agreement, Mr. Elkin attempted to justify his actions by conjuring up the notion of a recapitalization scheme.  The jury did not buy into Mr. Elkin's self-serving scheme with good reason – Mr. Elkin did not make loans to the company as he suggested, and the parties never agreed to such a modification of their agreement.  Mr. Abo, a CPA, clearly supported the fact that Mr. Elkin made no loans to USM:

> Q.  So the books of the company, themselves, did [they] have any indications of loans from shareholders?
>
> A.  No, no.
>
> Q.  And these documents [referring to IRS tax returns] that were filed from the – with the federal government, did they have any indication that they were loans from shareholders?
>
> A.  Not at all.

(Abo Tr. 37:10-12; see also id. 34:3-35:19; Norman Tr. 110:20-112:22.)  According to Mr. Elkin's own testimony, the Shareholder Loan Agreement – to himself and from himself – was dated September 1, 1995, but it was not actually created until a number of years later – 2000 at the earliest.  (Elkin Tr. 233:14-236:15; Pl.'s Ex. 21.)  Thus, even if one were to assume for the moment that Mr. Elkin actually began making loans to USM in 1995 – which Plaintiff vehemently contests and the evidence does not support – the contrived Shareholder Loan Agreement itself would not cover those supposed loans.  Notwithstanding the fact that Mr. Elkin did not make any loans to USM justifying his recapitalization scheme, the parties never agreed to such an arrangement whereby Mr. Elkin would put money in at his discretion and reduce his capital contributions as he has here.  (Norman Tr. 74:15-76:6.)

Because Mr. Elkin breached the parties' funding agreement by executing his Shareholder Loan Agreement, the jury's verdict on breach of contract should stand.

## VI.     CONCLUSION

WHEREFORE, for all of the foregoing reasons, Defendants' Motions for Judgment as a Matter of Law should be DENIED.

Dated: September 11, 2009

*/s/ Sean J. Bellew*
Sean J. Bellew (#4072)
David A. Felice (#4090)
Ballard Spahr LLP
919 North Market Street, Suite 1201
Wilmington, DE 19801
Telephone: (302) 252-4465
Facsimile: (302) 225-4466
 *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Sean J. Bellew, do hereby certify that on September 11, 2009, I electronically filed the

foregoing with the Clerk of Court using CM/ECF which will send notification of such filing to

the following counsel of record:

> Steven L. Caponi, Esquire
> Blank Rome LLP
> 1201 N. Market Street, Suite 800
> Wilmington, DE 19801


Dated: September 11, 2009                     */s/ Sean J. Bellew*
                                              Sean J. Bellew (#4072)
                                              Ballard Spahr LLP
                                              919 North Market Street, 12th Floor
                                              Wilmington, Delaware  19801
                                              Telephone: (302) 252-4465
                                              Facsimile: (302) 252-4466
                                              *Attorneys for Plaintiff*