## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JEFFREY M. NORMAN, | : |
| Plaintiff, | : |
| v. | :     C.A. No. 06-005-LPS |
| DAVID W. ELKIN, *et al.*, | : |
| Defendants, | : |
| US MOBILECOMM, INC., | : |
| Nominal Defendant. | : |

David A. Felice, BAILEY & GLASSER LLP, Wilmington, DE

    Attorneys for Plaintiff.

David A. Dorey, Adam V. Orlacchio, and Craig Haring, BLANK ROME LLP, Wilmington, DE

Gerald Chalphin, Gerald Chalphin Law Office, Philadelphia, PA

    Attorneys for Defendants.

## MEMORANDUM OPINION

September 4, 2018
Wilmington, Delaware



**STARK, U.S. District Judge:**

This case comes before the Court on remand from the Third Circuit. Defendants David

W. Elkin ("Elkin"), Richard M. Shorin ("Shorin"), The Elkin Group, Inc. ("TEG"), and U.S.

Mobilcomm, Inc. ("USM") (collectively, "Defendants") seek judgment as a matter of law

pursuant to Federal Rule of Civil Procedure 50(b) regarding Plaintiff Jeffrey M. Norman's

("Norman" or "Plaintiff") remanded claims. (D.I. 301) The issues before the Court on remand

have been fully briefed. (D.I. 313, 315, 316, 318, 319, 321) For the reasons discussed below, the

Court will grant Defendants' motion to the extent that it will enter judgment in Elkin's favor on

Norman's claims for (i) breach of contract based on Elkin's failure to make pro rata distributions

of the proceeds of the sale of USM's assets in 2001, (ii) conversion, (iii) usurpation of corporate

opportunities, (iv) breach of the fiduciary duty of loyalty, (v) breach of the duty of disclosure, (vi)

unjust enrichment, and (vii) declaratory judgment. However, the Court will also enter judgment

in Norman's favor on Norman's (i) breach of contract claim based on Elkin's execution of the

Shareholder Loan Agreement ("SLA") and (ii) for Elkin's failure to distribute the proceeds from

the sale of USM's assets on a pro rata basis in 2002, as well as (iii) attendant damages for those

claims.

## I.    BACKGROUND[1]

### A.    Procedural History

On May 13, 2009, a jury returned a verdict in Norman's favor on Norman's breach of

---

[1] Given the extensive history of this litigation, the Court provides only the background
necessary to explain resolution of the issues on remand. Additional background information can
be found in numerous prior opinions and orders. (*See, e.g.*, D.I. 70, 71, 72, 98, 99, 156, 157, 165,
166, 187, 219, 220, 282, 290, D.I. 298 Attach. 1, 310)

contract,[2] fraud, and conversion claims.[3] (*See* D.I. 118) Norman was awarded $1 in nominal damages on his breach of contract claim, $105,756 in compensatory damages and $48,000 in punitive damages on his fraud claim, and $38,062 in compensatory damages on his conversion claim. (*See* D.I. 118) Following trial, Elkin moved for judgment as a matter of law, arguing that Norman's claims were barred by the applicable statute of limitations. *See Norman v. Elkin*, 726 F. Supp. 2d 464, 469 (D. Del. 2010) ("*Norman II*"). Former Judge Joseph J. Farnan, Jr. largely agreed with Elkin and held that all of Norman's claims were time-barred except for Norman's second and third theories of breach of contract (alleging execution of the SLA and failure to make *pro rata* distributions, respectively). (*See id.* at 470-76) Judge Farnan entered an Amended Judgment consistent with that decision. (*See* D.I. 158)

Following resolution of additional motions filed by both Norman[4] and Elkin, the Court held a second jury trial on Norman's two remaining breach of contract theories. The jury again found in Norman's favor and awarded him $1 in nominal damages based on Elkin's execution of

---

[2]Norman pressed three breach of contract theories at trial: (1) Elkin breached an agreement between the parties by failing to contribute his agreed-upon share of capital to USM; (2) Elkin improperly caused USM to enter into the SLA; and (3) Elkin failed to distribute the proceeds from sales of USM's assets to Norman on the required *pro rata* basis. (*See* D.I. 118) The jury returned a verdict in Norman's favor on all three theories. (*See id.*)

[3]Only three of Norman's nine claims went to the jury. *See Norman v. Elkin*, 726 F. Supp. 2d 464, 468 (D. Del. 2010). The Court reserved judgment on Norman's remaining claims and on the issue of whether Norman's claims were time-barred. *See id.*

[4]Norman moved to alter or amend the judgment or for a new trial. (*See* D.I. 159) The Court agreed with Norman that the jury's award of $1 for breach of contract was "against the clear weight of the evidence" and granted a new trial "limited exclusively to the issue of the appropriate damages for the breach of contract claim." *Norman v. Elkin*, 849 F. Supp. 2d 418, 424-25 (D. Del. 2012) ("*Norman III*"). Elkin moved for reconsideration of the limited scope of the new trial. (*See* D.I. 172) The Court granted Elkin's motion, holding that the new trial would address the merits of Norman's breach of contract claim, as well as damages. (*See* D.I. 187)

2

the SLA and $73,180.17 in compensatory damages for Elkin's failure to make *pro rata* distributions. (*See* D.I. 246)  Elkin again moved for judgment as a matter of law.  The Court again agreed with Elkin and entered judgment in his favor on both theories.  *See Norman v. Elkin*, 2015 WL 4886049, at *2-3 (D. Del. Aug. 14, 2015) ("*Norman IV*").  As to Norman's SLA-based claim, the Court concluded that Norman had failed to present evidence he was damaged by Elkin's actions independent of his other theory of breach (i.e., independent of Elkin's failure to make *pro rata* distributions).  *See id.* at *2.  The Court also agreed with Elkin that Norman's breach of contract claim for failure to make *pro rata* distributions of the proceeds from the sale of USM assets was barred by the applicable statute of limitations.  *See id.* at *2-3. The Court concluded Norman had been on inquiry notice of his claims since "before December 2, 2002," and that the statute of limitations was not tolled during the pendency of Norman's § 220 action in the Delaware Court of Chancery and, thus, his claim was time-barred.  *See id.* Consistent with that decision, the Court vacated the jury's verdict and entered final judgement in Elkin's favor.  (*See* D.I. 285)

Norman appealed.  So did Elkin, based on the sufficiency of the evidence supporting Norman's fraud and conversion claims.  *See Norman v. Elkin*, 860 F.3d 111, 121 (3d Cir. 2017) ("*Norman V*").  The Third Circuit affirmed on alternative grounds the Court's decision to enter judgement in Elkin's favor on his fraud claim, but vacated entry of judgment in Elkin's favor on all other claims.  *See id.* at 131.  The case was remanded for two purposes: (1) for the Court to reinstate the jury verdict and award of nominal damages for Norman's SLA-based breach of contract claim and (2) for the Court to determine whether § 220 tolling should apply to Norman's

3

claims, and, if so, whether Norman's remaining claims[5] are timely. *See id.*

### B. Facts Relating to Norman's Remaining Claims

#### 1. Elkin and Norman Found USM and Acquire Phase I Licenses

In 1991 and 1992, the FCC granted first-wave ("Phase I") 220 MHZ licenses by lottery. Norman and Elkin founded USM for the purpose of aggregating and selling these licenses. (*See* D.I. 315 Ex. 3 ¶ A) Norman and Elkin were USM's sole shareholders.

It was primarily Norman's responsibility to acquire Phase I licenses. After the acquisition phase ended, Norman's day-to-day involvement in USM ended. Elkin continued to manage USM's affairs.

#### 2. Acquisition of Phase II Licenses

In 1998, the FCC announced a competitive auction of "Phase II" licenses. Elkin registered USM with the FCC as a qualified bidder for Auction 18. (*See* D.I. 315 Ex. 3 ¶ Y; *id.* Ex. 4 at 97; D.I. 318 at 4) Elkin also registered TEG, his own company, as a qualified bidder for Auction 24. (*See* D.I. 315 Ex. 3 ¶¶ AA-BB) Elkin testified that it was necessary to register TEG as a qualified bidder because USM did not have adequate funding to participate in the auctions, yet USM needed to ensure the Phase II licenses – which overlapped with the Phase I licenses owned by USM – ended up in "friendly hands." (D.I. 315 Ex. 2 at 106-07)

USM won the rights to several Phase II licenses in Auction 18, and TEG won the rights to a single Phase II license in Auction 24. (*See* D.I. 315 Ex. 3 ¶ AA; D.I. 315 Ex. 4 at 101) Elkin subsequently transferred USM's rights in Phase II licenses to TEG. (*See* D.I. 315 Ex. 4 at 107)

---

[5]The remaining remanded claims are (1) breach of contract; (2) conversion; (3) usurpation of corporate opportunities; (4) breach of the fiduciary duty of loyalty; (5) breach of fiduciary duty of disclosure; (6) unjust enrichment; and (7) a declaratory judgement. (D.I. 301)

4

Some FCC notices listed USM as the winning bidder of the Phase II licenses, while others referred to TEG as the owner of the licenses. *See Norman V*, 860 F.3d at 116.

Norman "closely monitored" the FCC auction. *Id.* After the auction closed, Norman emailed Elkin asking for information about Auction 18. (*See* D.I. 315 Ex. 4 at 102-03) Elkin did not respond. (*See id.*)

### 3. Elkin Executes the SLA

When Norman and Elkin founded USM, they entered into an oral agreement regarding capitalization of the company. To meet USM's $1M capital requirement, Norman was to contribute $250,000 and Elkin was to contribute $750,000. (*See* D.I. 315 Ex. 3 ¶ D)

Sometime between 1995 and 2002, Elkin – without seeking Norman's approval – caused USM to enter into the SLA, pursuant to which USM agreed to treat any amount Elkin contributed above his capital requirement as a loan.[6] Elkin continued to make contributions to USM. USM's "Shareholder Loan Schedule" lists Elkin's contributions as totaling over $600,000, with certain contributions listed as loans. (*See* D.I. 315 Ex. 7 at 2)

### 4. Sale of Licenses and Distributions to Elkin

From 1999 to 2001, Elkin sold off USM's and TEG's licenses. (*See* D.I. 315 Ex. 4 ¶¶ CC-EE, GG, JJ, KK, MM) USM used the proceeds from these sales to repay Elkin's loans, so that its creditors would be paid before distributions were made to holders of equity. *See Norman IV*, 2015 WL 4886049, at *1. Over the course of two years, Elkin caused USM to pay out distributions to Elkin totaling $615,026. (*See* D.I. 315 Ex. 4 ¶¶ SS-YY) Norman was paid

---

[6]The SLA is dated September 1, 1995. (*See* D.I. 315 Ex. 7 at 1) Elkin testified that he could not remember when he entered into it, but also testified that the SLA was agreed to in 1997 and executed in 2000. (*See* D.I. 315 Ex 8 at 459-60) Other documents provide conflicting dates.

5

nothing.  (*See* D.I. 315 Ex. 4 ¶ DDD)

### 5.    Norman Learns of License Sales and Distributions

Norman received federal income tax K-1 forms from USM for the tax years 2000 and 2001

that declared USM had realized a capital gain.  (*See* D.I. 315 Ex. 4 ¶ RR; *id.* Ex. 9 at 19; *id.* Ex.

10 at 21)  The forms did not specify what had been sold, nor did they list any shareholder loans or

distributions.  (*See* D.I. 315 Ex. 9 at 19-20; *id.* Ex. 10 at 21-22; *see also* D.I. 315 Ex. 9 at 4:19; *id.*

Ex. 10 at 4:19) (reporting no "Loans from shareholders" on USM tax return Form 1120S for 2000

and 2001)  "However, in a deposition, Norman admitted that, 'a capital gain, by definition . . . has

to be sale of a license." *Norman V*, 860 F.3d at 117 (quoting App. at 512).

In the summer of 2002, Norman called Elkin ("Summer 2002 Call").  During the Summer

2002 Call, Elkin told Norman that some of USM's licenses had been sold and that Elkin had taken

a distribution.  (*See* D.I. 315 Ex. 6 at 251-52)  When Norman pressed Elkin about why Norman

had not also received a distribution, Elkin told him, "Oh, it wasn't your turn."  (*Id.* at 252)

Norman asked Elkin to send him more information about the sales but never received it.  (*See id.*)

On October 2, 2002, Norman's attorney sent Elkin a letter requesting information pursuant

to 8 Del. C. § 220 "about the sale or other disposition of any assets or stock of [USM] over the

past three (3) years, and the distribution or use of any proceeds of any such sales or dispositions."

(D.I. 315 Ex. 12) ("October 2002 Letter")  Two months later, on December 3, 2002, Elkin sent

Norman a letter acknowledging that USM had sold the licenses "it owned," that the net proceeds

from those sales totaled $479,708, and that $380,588 of the proceeds had been used for the

"Repayment of Shareholder Loans."  (D.I. 315 Ex. 13 at 1) ("December 2002 Letter")  The

December 2002 Letter also included purchase and sale agreements revealing that TEG had sold

Phase II licenses. *See Norman V*, 860 F.3d at 117. Nearly a year later, in October 2003, USM sent Norman's attorney a letter that included a copy of the SLA and Shareholder Loan Schedule. (*See* D.I. 315 Ex. 7) ("October 2003 Letter")

### 6.     Norman Files His § 220 Action and Subsequent Suit

On November 16, 2004, Norman filed a § 220 action in the Delaware Court of Chancery, to compel USM to allow him to inspect the company's books and records. At a hearing in August 2005, former Vice Chancellor Parsons found "there [was] a credible basis here for inferring possible mismanagement and wrongdoing on the part of Mr. Elkin," including by executing self-dealing transactions with no notice to Norman, the minority shareholder. (*See* D.I. 315 Ex. 16 at 219) The Chancery Court granted Norman's § 220 request on October 2, 2005. Based on his successful § 220 action, Norman was able to obtain a number of documents related to his subsequent claims against Elkin. Norman filed suit against Elkin in the Court of Chancery on December 5, 2005. (D.I. 1) Elkin then removed the action to this Court. (*Id.*)

## II.    LEGAL STANDARDS

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "Entry of judgment as a matter of law is a sparingly invoked remedy," one "granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir.2007) (internal quotation marks omitted).

To prevail on a renewed motion for judgment as a matter of law following a jury trial, the

moving party "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (internal quotation marks omitted). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review." *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the Court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991); *Perkin–Elmer*, 732 F.2d at 893. The Court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." *Id.* Rather, the Court must determine whether the evidence reasonably supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict"); 9B Wright & Miller, Federal Practice & Procedure § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury properly could find a verdict for that party.").

## III. DISCUSSION

On remand, the Court must decide (1) whether § 220 tolling applies to Norman's claims

8

and (2) if so, whether Norman's claims are timely. As explained below, the Court concludes that § 220 tolling applies to Norman's claims. The Court also concludes that Norman's claims for breach of contract based on Elkin's failure to make *pro rata* distributions of the proceeds of the sale of USM's assets in 2001, conversion, usurpation of corporate opportunities, breach of the fiduciary duty of loyalty, breach of duty of disclosure, unjust enrichment, and declaratory judgment are all, nonetheless, time-barred.

## A. Section 220 Tolling Applies to Norman's Claims

"State law determines what circumstances permit the limitations period to be tolled." *Norman v. Elkin*, 2007 WL 2822798, at \*4 (D. Del. Sept. 26, 2007) ("*Norman I*"). "[T]here is no hard and fast rule" under Delaware law for determining whether to toll the statute of limitations during the pendency of a § 220 action. *Norman V*, 860 F.3d at 125 (internal quotation marks omitted); *see also id.* ("The filing of a § 220 action does not, however, automatically toll the applicable limitations period."). To decide whether to toll the limitations period based on the pendency of a § 220 action, the Court must consider various factors, including "the relationship between [the § 220 action] and the claims eventually filed," "the existence of deceitful, bad faith conduct," and "evidence that, without the information gathered during the § 220 action, suit could not have been brought." *Id.* (internal quotation marks, citations, and alterations omitted). The Third Circuit has further advised that "[c]ourts in our Circuit should proceed with due regard for the positive role that § 220 actions are meant to play under Delaware law." *Id.* at 125-26. The burden is on Norman to prove tolling should apply. *See Norman IV*, 2015 WL 4886049, at \*2.

Norman has met his burden to show § 220 tolling should apply to his claims. As an initial matter, there is a clear connection between Norman's § 220 action and the claims he eventually

9

brought in this Court. In his § 220 action, Norman sought to investigate possible mismanagement by Elkin related to the sale of USM assets and how the proceeds from those sales were distributed. The claims Norman later brought against Elkin and USM were related to that information. *See Norman V*, 860 F.3d at 126 (noting Norman gained "valuable information" related to his claims through his § 220 action). This factor weighs in favor of tolling the statute of limitations.

Norman's § 220 action was also successful, which favors tolling. *See id.* at 125-26. The Chancery Court granted Norman's request to inspect USM's books and records in "pretty broad form," finding a "credible basis" for inferring mismanagement and wrongdoing by Elkin. (D.I. 315 Ex. 16 at 219, 221) As the Third Circuit explained, "In such circumstances, tolling is likely appropriate absent a countermanding consideration, such as evidence that a shareholder pursued the § 220 action in bad faith or in order to stall." *Norman V*, 860 F.3d at 126.

The record reveals no such countermanding consideration. There is no evidence of bad faith on Norman's part in seeking inspection of USM's books and records. *See id.* Norman's request appears to have been undertaken entirely in good faith and only after Elkin repeatedly refused to provide Norman with information about the sale of licenses and how the proceeds from those sales were used. Nor is there evidence that Norman initiated the § 220 action to stall in bringing his claims.[7]

Elkin's arguments to the contrary are unavailing. Elkin contends that the statute of limitations should not be tolled because there is no evidence of fraudulent concealment. Yet the

---

[7]The Court hereby denies Elkin's request for discovery or further opportunity to submit evidence of bad faith. After a decade of litigation, including two jury trials and an appeal, the record is fully developed. If Elkin had wanted to submit evidence of Norman's bad faith, he could have done so.

10

existence of fraudulent concealment is only one factor the Court is to consider in determining whether to toll the statute of limitations. *See id.* at 125 (rejecting notion that bad faith conduct is "prerequisites to tolling"). Therefore, a lack of fraudulent concealment does not, on its own, dictate that tolling is inappropriate. Thus, even assuming Elkin did not fraudulently conceal his alleged wrongdoing, this does not outweigh the other factors in this case that indicate tolling is appropriate.

The Court also disagrees with Elkin that whether a plaintiff had sufficient evidence to bring suit prior to initiating a § 220 action is determinative of whether to toll the statute of limitations. The Third Circuit rejected that proposition as well. *See id.* While it is a consideration, a plaintiff's ability or inability to bring suit without the information gleaned during his § 220 action is not dispositive of whether to toll the limitations period. In any event, here, Norman did gain "valuable information" related to his eventual suit through his § 220 action, which weighs in favor of tolling. *See id.* at 126.

Accordingly, when balancing the relevant factors, the Court concludes that Norman has met his burden to show that the statute of limitations should be tolled during the pendency of his § 220 action. Thus, the statute of limitations for Norman's claims is tolled from November 16, 2004, when Norman initiated his § 220 action, until October 2, 2005, when Norman successfully completed it.

## B.    Timeliness of Norman's Disputed Remanded Claims[8]

Norman's contract claims are subject to a three-year statute of limitations, while his non-contract claims are subject to a two-year limitations period. *See Norman I*, 2007 WL 2822798, at *4; *see also Norman V*, 860 F.3d at 122-24. Elkin contends that, even if § 220 tolling applies, he is entitled to judgment as a matter of law on all of Norman's claims. (D.I. 313 at 2) According to Elkin, each of Norman's claims is time-barred because Norman was on inquiry notice of his claims well before he filed his § 220 action in November 2004. (D.I. 313 at 2) Norman responds that he was unaware of sufficient facts to put him on notice of his claims before November 2001 (for his breach of contract claims) – that is, three years before he filed his § 220 action – or November 2002 (for his non-contract claims) – that is, two years before he filed his § 220 action.

"As a general matter, it is well-settled that a cause of action accrues for purposes of a statute of limitations . . . . at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." *Pomeranz v. Museum Partners, L.P.*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005) (internal quotation marks and alterations omitted). However, "various theories exist under which a plaintiff may seek tolling of the statute of limitations." *Id.* at *3. Yet, "the statute of limitations is only tolled, until the plaintiff receives inquiry notice of his or her cause of action

---

[8]As discussed above, *see supra* note 2, Norman advanced three breach of contract theories. Norman did not appeal the judgment entered against him on his first theory of breach, for Elkin's failure to meet his capital contribution requirements. *See Norman V*, 860 F.3d at 122 n.14. Accordingly, Norman waived the issue, *see id.*, and the Court will not disturb the judgment against Norman on that theory. With respect to Norman's second theory of breach, the Third Circuit held that Elkin's execution of the SLA was an independent breach that entitles Norman to nominal damages and ordered the Court to reinstate the jury verdict in Norman's favor and the award of nominal damages. *See id.* at 128-29. The Court will do so. Finally, the Third Circuit affirmed on alternative grounds the entry of judgment in Elkin's favor on Norman's fraud claim. *See id.* at 131. Accordingly, the judgment in Elkin's favor on that claim likewise stands.

(i.e., when the plaintiff knew or should have known of the facts in the claim asserted based on discovery of the wrong or the fraudulent concealment)." *Norman II*, 726 F. Supp. 2d at 470. "Inquiry notice does not require the plaintiff to have actual knowledge of the wrong, but merely an objective awareness of the facts giving rise to the wrong." *Id.* (internal quotation marks omitted).

### 1. Norman's *Pro Rata* Breach of Contract Claim

Elkin contends that Norman's breach of contract claim for Elkin's failure to distribute proceeds from the sale of USM assets on a *pro rata* basis is time-barred because Norman was on inquiry of the claim long before Norman filed his § 220 action. (*See* D.I. 315 at 13) Norman counters that Elkin's breach was continuous, such that Norman's claim did not accrue until May 2002 when the final challenged distribution was made. (*See* D.I. 315 at 13-14) Norman further argues that, even if Elkin's breaches are severable, Norman was not aware of the facts underlying Elkin's breaches until after November 2001. For the reasons discussed below, the Court concludes Elkin's breaches are severable, such that the limitations period began to run on the date each distribution was made. The Court further concludes that Norman's claim based on the 2002 distributions is timely, as Norman's causes of action related to those distributions accrued after November 2001, less than three years before the filing of Norman's § 220 action in November 2004. However, Norman's claim for breach, to the extent it is based on the 2001 distributions, is time-barred.

### a. Elkin's *pro rata* distribution breaches are severable

Under Delaware law, a cause of action for breach of contract accrues at the time of breach. *See SPX Corp. v. Garda USA, Inc.*, 2012 WL 6841398, at *3 (Del. Super. Ct. Dec. 6, 2012) (internal quotation marks omitted). "Whether a contract is continuous or severable impacts the

13

accrual date." *Id.* (internal quotation marks omitted; alterations in original). If a contract is

continuous, the statute of limitations does not begin to run "until the termination of the entire

contract." *Id.* (internal quotation marks omitted). However, if a contract is severable, the statute

of limitations "begins to run on each severable portion when a party breaches that portion of the

contract." *Id.* (internal quotation marks omitted). To determine whether a contract is continuous

or severable, the Court looks to "the terms and subject matter of the contract, taken together with

pertinent facts and circumstances surrounding the contract" in order to determine the intent of the

parties. *Kaplan v. Jackson*, 1994 WL 45429, at *3 (Del. Super. Ct. Jan. 20, 1994).

Here, Elkin's breaches are severable. Each distribution by USM is a clearly divisible

breach of the parties' oral agreement regarding Norman's rights to *pro rata* distributions. Nothing

in the record suggests Elkin's actions constituted a single breach of the parties' open-ended

obligations to one another. *See SPX Corp.*, 2012 WL 6841398, at *3 (explaining company's

obligation to pay worker compensation claims created "continuing obligation until the[ claims]

are reimbursed"). Nor is there support for Norman's suggestion that his cause of action did not

accrue until the SLA was invalidated or its loan provisions were satisfied via the final distribution

in May 2002 (even if Norman was not aware of the facts that would have allowed him to bring

suit). *See AM Gen. Holdings LLC v. Renco Grp., Inc.*, 2016 WL 4440476, at *2 (Del. Ch. Aug.

22, 2016). Rather, while Norman had an ongoing entitlement to *pro rata* distributions, it was that

very entitlement which meant Norman could have alleged a breach of contract after the first

distribution (that was given solely to Elkin) in May 2001. Accordingly, the Court concludes

Elkin's breaches are severable, such that the statute of limitations began to run on each challenged

distribution on the dates when Elkin caused the distributions to be made. *See SPX Corp.*, 2012

WL 6841398, at *3.

### b. Timeliness of Norman's *Pro Rata* Distributions Claims

Elkin caused USM to pay distributions to Elkin on May 31, 2001, July 31, 2001, August 31, 2001, February 28, 2002, and May 31, 2002. (D.I. 61 ¶¶ UU-YY) Elkin contends that Norman was on inquiry notice of his *pro rata* distribution-based claims no later than September 1, 1999, when TEG filed a public application with the FCC to assign a Phase II license to a third-party. (D.I. 313 at 8) Elkin points to additional FCC notices – specifically, TEG's and USM's applications to transfer licenses to third-parties between January 2000 and February 2001– that, Elkin contends, gave Norman additional notice of his claims. (D.I. 313 at 9) Elkin further argues that Norman's 2000 K-1, which Elkin contends Norman received sometime "in the spring of 2001," put Norman on notice of his claims because Norman testified that he knew the long-term capital gain allocated to him on the K-1 meant, by definition, that USM had sold licenses. (D.I. 313 at 9) (citing D.I. 313 Ex. C at C-8-9)

Norman sees things very differently. First, Norman contends that his claims related to the 2002 distributions are timely because the distributions occurred after November 2001, meaning these claims arose less than three years before the filing of his § 220 action. (D.I. 315 at 14) As for the 2001 distributions, Norman contends that because his claim is based on the improper distributions themselves – and not the license sales that led to the distributions – "[i]t is remarkable for Elkin to argue that Norman should have known about improper distributions years *before* the challenged distributions even took place." (D.I. 318 at 1; *see also* D.I. 321 at 6)

The Court agrees with Norman with respect to the 2002 distributions. His claim as directed to those distributions is not time-barred because that portion of his cause of action

15

accrued after November 2001 – less than three years before the filing of his § 220 action.

However, as concerns the three 2001 distributions (on May 31, 2001, July 31, 2001, and August 31, 2001), the evidence in the record shows that a reasonable person in Norman's position would have had inquiry notice of his claims prior to November 2001. This evidence includes, most prominently, public filings from 1999 to 2001 indicating that TEG and USM had reassigned their Phase II licenses to third-parties. (D.I. 314 Ex. A) These notices made clear that licenses had been sold by USM and TEG. This alone was likely sufficient to put Norman, one of USM's two shareholders, on high alert. *See U.S. Cellular Inv. Co. of Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 504 (Del. 1996) (holding plaintiff had notice of claims based on public filings with FCC); *see also In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999) ("[E]ven where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available."). In addition, by November 2001, Norman had received his 2000 USM K-1 statement, which made clear to Norman that license sales had occurred. (*See* D.I. 313 Ex. C at C-8-9; *see also Norman IV*, 2015 WL 4886049, at *3 (observing "USM had never previously generated any profit"))

To be clear, Court is not holding that Norman was on inquiry notice of his claim based on FCC filings for events that occurred years before the distributions. Rather, the Court is holding that, as of November 2001, a reasonably prudent investor in Norman's position would have known enough to put him on notice of the need to undertake further inquiry to determine if Elkin had wronged him. *See Norman IV*, 2015 WL 4886049, at *3. "That is inquiry notice." *Id.* If Norman had done so, he would have discovered Elkin's allegedly improper distributions. *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *7 (explaining statute of limitations tolled only

16

until "persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, if pursued, would lead to the discovery of the injury").

Accordingly, the Court will enter judgment in Elkin's favor on Norman's claim regarding the 2001 distributions. The Court will also reinstate the jury verdict and award of damages in Norman's favor on the breach of contract claim for Elkin's failure to make *pro rata* distributions from the sale of USM assets for the amount attributable of the 2002 distributions, with pre- and post-judgment interest ($5,000 + $14,598.05 = 19,598.05). (*See* D.I. 315 Ex. 17)

## 2. Norman's Non-Contract Claims

### a. Norman's conversion claim is time-barred

Elkin seeks judgment as a matter of law on Norman's conversion claim based on Elkin's substitution of TEG for USM in Auction 18. (D.I. 61 ¶ B.1.f) Elkin contends Norman's conversion claim is time-barred because Norman was on inquiry notice of his claim by November 1998, when TEG filed a publicly available FCC Form 601 to have the Auction 18 licenses issued to TEG (and not to USM).[9] (D.I. 313 at 6) Elkin contends that a number of other publicly available FCC notices from 1999 to 2001 "clearly named TEG as the applicant, owner and/or assignor of the Phase II licenses" and, thus, put Norman on additional notice of his conversion claim. (*See* D.I 313 at 6-7) (pointing to FCC notices regarding issuance of Auction 18 licenses to TEG (rather than USM), application by TEG to participate in Auction 24, and assignment of

---

[9]Norman contends that the Form 601 was not admitted into evidence at either trial, and, therefore, the Court cannot consider it, despite the fact that Norman testified that he was tracking the results of Auction 18 on the FCC website and, thus, presumably would have seen the Form 601. (*See* D.I. 318 at 7) Elkin does not dispute that the Form 601 was never admitted into evidence. Regardless, it is not necessary to the Court's conclusion as to the timeliness of Norman's claims, as the other FCC notices and Summer 2002 Call would, on their own, be sufficient to put Norman on notice of his various claims.

Phase II licenses from TEG to third-parties) In addition, Elkin contends Norman had "further notice that USM was not the party acquiring the Phase II licenses" because Norman was not asked to contribute any money toward the FCC deposit for the Auction 18 licenses and the USM balance sheet did not show the FCC deposit or any Phase II licenses as assets. (D.I. 313 at 8)

Norman disagrees. (D.I. 315 at 2-3, 15) As an initial matter, Norman argues that his conversion claim did not accrue until 2000 and 2001 when Elkin exercised "unauthorized" use or control over the Phase II licenses by "s[elling] the licenses and retain[ing] all the proceeds for himself." (D.I. 315 at 15-16) Norman also insists that all the FCC notices about Auction 18 listed USM – not TEG – as the qualified bidder and winner of the Phase II licenses, such that they could not have put him on notice of his conversion claim. (D.I. 318 at 8-9) As Norman sees it, he was first on inquiry notice of his conversion claim in December 2002, when he received Elkin's letter "disclos[ing] the potential existence of TEG sales." (D.I. 315 at 16)

On the issue of when Norman's claim accrued, the Court agrees with Elkin. Having filed suit based on the premise that "the Defendants' actions were adverse to [Norman's] claimed interest in the Phase II licenses," Norman cannot now claim TEG and USM were "equivalent" to one another, thereby undermining his entire theory of conversion, in an effort to ensure that his claim is timely. (D.I. 316 at 3) Accordingly, the Court concludes Norman's claim accrued when Elkin registered TEG as the applicant and/or owner of the Phase II licenses.

The Court further concludes that a reasonable person in Norman's position would have had inquiry notice of his conversion claim before November 2002. As of 1998, publicly available FCC notices indicated that TEG was applying to have the Auction 18 Phase II licenses issued to itself, rather than USM. To the extent Norman challenges Elkin's actions beyond registering TEG

18

in Auction 18, FCC filings from 1999 to 2000 made clear TEG was bidding on Phase II licenses and reassigning them to third parties. (*See* D.I. 314 Ex. A) In addition, during the Summer 2002 Call, Elkin informed Norman that he had sold licenses and taken a distribution. This was sufficient to put Norman on inquiry notice of his claim. *See U.S. Cellular*, 677 A.2d at 504 (holding plaintiff had notice of claims based on public filings with FCC).

While Norman contends he had no reason to see or search for this information, Norman testified that he had tracked the results of Auction 18 on the FCC website and, after the auction closed, emailed Elkin asking for more information about the results of the Phase II auction. *See Norman II*, 726 F. Supp. 2d at 472. Yet Elkin never responded. This should have prompted further inquiry, not blind reliance on Elkin's silence. *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8 ("[E]ven where defendant is a fiduciary, a plaintiff is on inquiry notice when the information underlying plaintiff's claim is readily available."); *Seidel v. Lee*, 954 F. Supp. 810, 817 (D. Del. 1996) (explaining shareholders are entitled to rely on good faith of fiduciaries but "should not put on blinders to such obvious signals [of wrongdoing] as publicly filed documents").

Again, the Court is not holding that a reasonable person in Norman's position would know he had a claim for conversion based on the facts known to him as of November 2002, "only that such a person would know enough to put him on notice that he should undertake further inquiry, in order to determine if a wrong had been committed against him. That is inquiry notice." *Norman IV*, 2015 WL 4886049, at *3; *see also In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *7 (explaining statute of limitations was tolled only until "persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, if pursued, would lead to the

19

discovery of the injury").

Accordingly, the Court will grant judgment in Elkin's favor on Norman's conversion claim.

### b. Norman's usurpation of corporate opportunities claim is time-barred

Norman alleges Elkin usurped corporate opportunities properly belonging to USM by substituting TEG for USM in Auction 18 and registering TEG to participate in Auction 24. Elkin seeks judgment in his favor on Norman's usurpation claim, contending Norman was on inquiry notice of his usurpation claim "no later [than] November 4, 1998." (D.I. 313 at 6) Elkin advances the same arguments – and evidence – with respect to Norman's usurpation claim as he did for Norman's conversion claim. (D.I. 313 at 6-8) (arguing that FCC notices of TEG's application for and assignment of Phase II licenses, as well as fact Elkin never asked Norman for capital contributions and USM balance sheet did not show assets related to Phase II licenses, put Norman on inquiry notice of usurpation claim)

Norman counters that he was not on notice of his usurpation claim because there was no "'smoking gun'" that should have prompted Norman, a minority shareholder, to inquire into Elkin's behavior until he received the December 2002 Letter disclosing sales of Phase II licenses by TEG. (*See* D.I. 315 at 19-20) (quoting *In re Mushroom Transp. Co.*, 382 F.3d 325, 343 (3d Cir. 2004))

For many of the reasons already discussed above, the Court concludes a reasonable person in Norman's position would have had inquiry notice of his usurpation claim before November 2002. Public filings from 1998 and 1999 listed TEG as the applicant for issuance of Auction 18

20

Phase II licenses and listed TEG as a qualified bidder for Auction 24. (*See* D.I. 314 Ex. A) A number of other FCC notices from 1999 and 2000 made clear TEG had been granted Phase II licenses and, later, reassigned them, all of which would have been sufficient to give Norman notice of his usurpation claim. *See U.S. Cellular*, 677 A.2d at 504; *see also In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *7.

Norman's allegation that his fiduciary relationship with Elkin insulates him from having to investigate wrongdoing absent a "smoking gun" is unavailing. While the existence of a fiduciary relationship is relevant to the determination of when a reasonable person would have been on notice of his claims, *In re Mushroom Transp. Co.*, 382 F.3d at 343, "the trusting plaintiff still must be reasonably attentive to his interests." *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *8. Norman was not entitled to ignore public filings that clearly indicated that TEG had been registered in Auction 18 and Auction 24 in place of USM, the USM K-1s that indicated there had been license sales, and Norman's Summer 2002 phone call with Elkin, in which Elkin told Norman that USM had sold licenses. These notices should have prompted investigation by Norman into potential wrongdoing.

Accordingly, the Court will grant judgment in Elkin's favor on Norman's usurpation of corporate opportunities claim.

### c.   Norman's breach of the fiduciary duty of loyalty claim is time-barred

Norman alleges Elkin breached his fiduciary duty of loyalty by (1) engaging in self-dealing during the Phase II auctions by using USM's position to benefit TEG, (2) executing the SLA, (3) conducting USM's business for himself as a purported creditor, and (4) forcing USM into

21

insolvency after execution of the SLA. (D.I. 315 at 17)

Elkin seeks judgment in his favor on all bases of Norman's fiduciary duty claim. Elkin contends that the same FCC notices discussed above were sufficient to put Norman on notice of his claim before November 2002. (D.I. 313 at 6) Norman counters that, as to the first, third, and fourth bases for his claim, he was not on inquiry notice until he received Elkin's December 2002 Letter, which disclosed purchase and sale agreements showing TEG had sold Phase II licenses. (D.I. 315 at 17) As to the SLA-basis of his claim, Norman contends he was not aware of the facts underlying his claim until Elkin sent him a copy of the SLA in October 2003. (D.I. 315 at 17)

For the reasons discussed above with respect to Norman's conversion claim, the Court agrees with Elkin that Norman's claim based on Elkin engaging in self-dealing during the Phase II auctions is time-barred because a reasonable person would have been on notice of this portion of his claim before November 2002. Accordingly, the Court will enter judgment in Elkin's favor on that portion of Norman's claim.

Norman's claim with respect to Elkin's execution of the SLA is also time-barred. Elkin contends Norman was on notice of the facts underlying this claim by November 1998, when Norman received a USM balance sheet and other financial documents indicating USM was losing money, yet its capital was increasing. (D.I. 313 at 10) Elkin contends the financial figures were so striking that a reasonable investor should have realized Elkin was continuing to contribute money to USM and "could [not] have expected Elkin to [do so] . . . without an appropriate mechanism in place," such that Norman had sufficient facts to put him on notice that Elkin had executed the SLA (or taken some similar measure). (D.I. 313 at 10-11) The Court agrees. Norman, as the only other shareholder of USM, was aware of how much capital Elkin had

22

contributed (and that Norman himself had not contributed any additional capital). *See Norman II,* 726 F. Supp. 2d at 474. The information Norman received regarding USM's financials – particularly given Norman's knowledge that USM had yet to make a sale and was struggling to survive as a company – should have been startling enough to prompt further inquiry by Norman. *See Pomeranz,* 2005 WL 217039, at \*10 ("[P]laintiffs cannot avoid the conclusion that the March Schedules still should have raised their eyebrows regarding what was happening to the financial strength of the Partnership."). Quite simply, Norman "should have begun asking questions." *Id.* This is inquiry notice, and, accordingly, the Court will enter judgment in Elkin's favor on this portion of Norman's breach of fiduciary duty claim.

As for Plaintiff's claim based on Elkin conducting USM's business for himself as a purported creditor by selling USM's licenses (D.I. 61 ¶ B.1.d), Norman's claim is time-barred. As discussed above, numerous public filings would have put Norman on inquiry notice of his claim well before November 2002. In addition, Norman received 2000 and 2001 K-1s from USM (sometime in 2001 and 2002) that allocated to Norman a tax liability on more than $100,000 of income, which Norman testified made clear to him that USM had sold licenses. (D.I. 313 Ex. C at C-8-9) Elkin also informed Norman that USM had sold licenses during their Summer 2002 Call. This was sufficient to put a reasonable person in Norman's position on inquiry, if not actual, notice of his claim before November 2002. Accordingly, the Court will enter judgment in Elkin's favor on this portion of Norman's claim.

Finally, the record shows that Norman was on inquiry notice of his claim based on Elkin forcing USM into the zone of insolvency following execution of the SLA before November 2002. (D.I. 61 ¶ B.1.d) That evidence includes: the FCC notices that TEG and USM had sold Phase II

23

licenses, the USM balance sheets indicating that the company was losing money, and the Summer 2002 Call in which Elkin told Norman he had sold licenses and that Elkin had taken a distribution, but it was not Norman's turn to take a distribution. All of this, together, is sufficient for a reasonable person to be put on notice that he should undertake further inquiry to determine if a wrong had been committed against him. Accordingly, the Court will enter judgment in Elkin's favor on this portion of Norman's claim.

### d. Elkin's breach of the fiduciary duty of disclosure is time-barred

Norman claims Elkin breached his duty of disclosure by (1) executing the SLA, (2) selling the Phase II licenses and distributing the proceeds to himself, and (3) selling substantially all of USM's assets, without disclosing those events to – or seeking the approval of – Norman. (D.I. 315 at 18)

Elkin seeks judgment in his favor on Norman's claim due to it being time-barred. (D.I. 316 at 8-9) Norman responds by urging the Court to "maintain" Judge Farnan's finding that Norman had inquiry notice of his claim related to the SLA in October 2003, when Elkin provided Norman a copy of the SLA. (D.I. 315 at 18) As to his other two disclosure claims, Norman contends that Judge Farnan's finding that Norman was on inquiry notice of these claims based on Elkin's December 2002 should also be maintained.[10] (D.I. 315 at 18)

---

[10]Norman's reliance on Judge Farnan's previous conclusions is unavailing. Judge Farnan did not hold that October 2003 and December 2002 were the earliest points at which Norman had notice of his claims. *See Norman II*, 726 F. Supp. 2d at 474; *see also Norman V*, 860 F.3d at 126-27 ("[W]with regard to the breach of fiduciary duty claims, the Court decided that Norman had inquiry notice 'by December 2002' but did not decide whether Norman had notice at an earlier point.") (quoting *Norman II*, 726 F. Supp. 2d at 474-75). Nor did Judge Farnan have the benefit of all of the evidence currently before the Court.

24

For the reasons discussed above regarding Norman's breach of fiduciary duty claim, and on the record now before the Court, the Court concludes that Norman's claim regarding execution of the SLA is time-barred. In addition, for the reasons discussed above in the context of Norman's breach of contract and conversion claims, the Court concludes Norman's claim based on Elkin selling the Phase II licenses and distributing the proceeds himself and selling substantially all of USM's assets are time-barred.

### e.    Norman's unjust enrichment claim is time-barred

Elkin seeks judgment in his favor on Norman's unjust enrichment claim based on Elkin's receipt of the five challenged distributions from USM. (D.I. 61 ¶ B.1.i.) Elkin contends this claim is time-barred based on the "inquiry notice effects of the FCC notices and the K-1s." (D.I. 316 at 9)

For many of the reasons discussed above in the context of Norman's *pro rata* theory of breach of contract (for which the statute of limitations is year longer than it is for Norman's unjust enrichment claim), the Court agrees with Elkin. The FCC notices and K-1s were sufficient to put Norman on notice that of the need to investigate potential wrongdoing. This is inquiry notice, and Norman was put on such notice of his claim regarding all of the challenged distributions based on these facts prior to November 2002.

Accordingly, the Court will enter judgment for Elkin on Norman's unjust enrichment claim.

### f.    Norman's declaratory judgment claim is time-barred

Norman seeks a declaratory judgment that (1) USM is entitled to all proceeds from the sale of USM property; (2) Norman is entitled to 25% of the proceeds from the sale of USM assets;

(3) Norman is entitled to 25% of all future proceeds of USM; and (4) "some, if not all, of Elkin's interests in [USM] is forfeited as a result of his fraudulent conduct and failure to make his required capital contributions." (D.I. 61 ¶ B.1.b.) Elkin seeks judgment in his favor on Norman's declaratory judgment claim based on the statute of limitations. (D.I. 313 at 6)

For the reasons discussed above, the Court concludes that all bases of this claim are time-barred. Accordingly, the Court will enter judgment in Elkin's favor on the declaratory judgment claim.

## IV.    CONCLUSION

An appropriate Order follows.